1

2

3

4

5

6

Dockets.Justia.com

1

2    AMERICAN BLIND &
     WALLPAPER FACTORY, INC., a
3    Delaware corporation d/b/a
     decoratetoday.com, Inc.,

4                    Counter-Plaintiff,

5        v.

6    GOOGLE, INC., AMERICA
     ONLINE, INC., NETSCAPE
7    COMMUNICATIONS
     CORPORATION, COMPUSERVE
8    INTERACTIVE SERVICES, INC.,
     ASK JEEVES, INC., and
9    EARTHLINK, INC.

10                   Counter-Defendants/
                     Third-Party Defendants.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

Page

3      I.      INTRODUCTION ....................................................................................................... 1

4      II.     FACTUAL BACKGROUND ..................................................................................... 4

5              A.      American Blind's Trademarks.......................................................................... 4

6              B.      Google's AdWords Program ........................................................................... 6

7              C.      The Business Of The Third-Party Defendants................................................ 8

8      III.    ARGUMENT .............................................................................................................. 8

9              A.      The Governing Legal Standard For A Rule 12(b)(6) Motion Precludes Dismissal ........ 8

10             B.      The Auctioning Of Trademarks Hurts Competition ...................................... 10

11             C.      American Blind's Allegations Regarding Google's "Use" Of The American
                       Blind Marks Are Sufficient To Give Rise To A Claim Of Trademark
12                     Infringement .................................................................................................. 12

13                     1.      The Ninth Circuit's Decision in Playboy Enterprises, Inc. v. Netscape
                               Communications Corp. ...................................................................... 12
14

15                     2.      Analogous Decisions Hold That The Hidden Use Of Trademarked
                               Terms To Divert An Internet User To A Website Violates The Lanham
                               Act ...................................................................................................... 15
16

17                     3.      The Pop-Up Cases On Which Defendants Rely Are Distinguishable And
                               Have Been Rejected By Other Courts ............................................... 16

18             D.      American Blind Has Sufficiently Alleged Contributory Trademark Infringement ....... 18

19             E.      American Blind Sufficiently Alleges A Claim For Tortious Interference With
                       Prospective Economic Advantage ................................................................. 20
20

21                     1.      American Blind Alleges An Independent, Wrongful Act ................... 20

22                     2.      American Blind Alleges A Probability Of Future Economic Benefit .............. 22

23                     3.      Section 230 of the Communications Decency Act Does Not Immunize
                               Defendants From American Blind's Tortious Interference Claim .................. 23

24     IV.     CONCLUSION ......................................................................................................... 24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**CASE LAW**

3

*1-800 Contacts, Inc. v. WhenU.com, Inc.*, 309 F. Supp. 2d 467 (S.D.N.Y. 2003) ........... 18

4

*Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873 (9th Cir. 1999) ........................ 1, 12

5

*Bihari v. Gross*, 119 F. Supp. 2d 309 (S.D.N.Y. 2000) ................................................. 16

6

7

*Brookfield Communications v. West Coast Entertainment Corp.*,
174 F.3d 1036,1045 (9th Cir. 1999) ......................................................................... 15, 19

8

9

*Carafano v. Metrosplash.com, Inc.*, 207 F.Supp.2d 1055, 1066 (C.D. Cal. 2002) ......... 23

*Crab Boat Owners Ass'n. v. Hartford Insurance Co. Of The Midwest*,
2004 WL 1622044 at *2 (N.D. Cal. July 20, 2004) ......................................................... 9

10

11

*Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 248-49 (9th Cir. 1997),
*citing* Fed. R. Civ. Pro. 8(a) .................................................................................. 9-10

12

*Government Employees Insurance Co. v. Google, Inc. and Overture Services,
Inc.*, Case No. 1:04cv 507 (pending) ............................................................................ 14

13

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) ....... 20-21, 22

14

15

*Optinrealbig.com, LLC v. Ironport Systems, Inc.*,  2004 WL 1459337 at * 7
(N.D. Cal. June 25, 2004) ............................................................................................ 23

16

*Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) ....... 9, 21

17

*Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020
(9th Cir. 2004) ..........................................................................................2, 12-15, 17, 19

18

*Promatek Indus. Ltd. v. Equitrac Corp.*, 300 F.3d 808 (7th Cir. 2002) ........................... 16

19

*Summit Machine Tool Manufacturing Corp. v. Victor CNC Systems, Inc.*, 7 F.3d
1434, 1439 (9th Cir. 1993) ............................................................................................ 12

20

21

*Toho Co., Ltd. v. Sears, Robuck & Co.*, 645 F.2d 788 (9th Cir. 1981) ............................. 9

22

*U-Haul Int'l., Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723 (E.D. Va. 2003) .......... 16-18

23

*Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734 (E.D. Mich. 2003) ..... 16-18

24

**STATUTES**

25

15 U.S.C. § 1114(1)(a) ................................................................................................ 21

26

15 U.S.C. § 1125(a) .................................................................................................... 21

27

28

1

2

# I.
# INTRODUCTION

3    While Google is correct that competition is good, *unfair* competition is not.  Readily

4    conceding that it sells, for its own healthy profit, the famous brand names and trademarks owned

5    by others without their knowledge or consent, Google nonetheless advances the remarkable

6    proposition that it cannot be liable for this conduct under any conceivable set of facts.  Relying on

7    strained analogies to pizza parlors and car dealerships, Google insists that its trademark

8    trafficking is somehow immune from the trademark laws.  Google[1] is wrong for at least five

9    reasons.

10    First, Google's arguments ignore the very purpose of, and important policies behind, the

11    federal trademark protection statues.  In *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873 (9th

12    Cir. 1999), the Ninth Circuit reiterated that "[t]wo goals of trademark law are reflected in the

13    federal scheme.  On the one hand, the law seeks to protect consumers who have formed particular

14    associations with a mark.  On the other hand, trademark law seeks to protect the investment in a

15    mark made by the owner."  These goals are thwarted entirely if Google is permitted to hijack the

16    trademarks owned by one company and auction and sell them to that company's competitors (or,

17    of course, the company itself, but only if it is willing to buy its own marks back from Google).

18    Although Google is loathe to admit it, the Internet – and, more particularly, commerce

19    over the Internet – is like nothing seen before.  Unlike billboards on highways, signs in malls or

20    advertising flyers left on a door, people use the Internet to find things, often particular goods and

21    services.  Google has positioned (and promotes) itself as something of an unbiased portal through

22    which people will avoid the unwanted noise and clutter of the web as they hunt for whatever

23    relevant thing – as alleged here, goods and services – they seek.

24    In sharp contrast to billboards and other passive advertising, Internet use requires

25    deliberate activity: a computer must be obtained and Internet access must be available, and then

26

---

[1]    Unless otherwise noted, as used herein, "Google" and/or "Defendants" collectively refers to Counter-

27    defendant Google, Inc., as well as to the Third-party Defendants upon whose behalf Google, Inc. has filed the instant

       motion (*e.g.,* Ask Jeeves, Inc. and Earthlink, Inc.) or who have joined in the motion (*e.g.,* America Online, Inc.,

28    Netscape Communications Corporation, Compuserve Interactive Services, Inc.).

1  the consumer must consciously turn on the computer, select and enable their web browser, and

2  then manually enter or type their destination. It is a search. Indeed, the universal phrase, "search

3  term," is not mere happenstance; rather, it evolved because the Internet is about *searching*.

4       In this case, as alleged in detail by American Blind, consumers use Google – a *search*

5  engine – to find the specific goods and services that have been offered by American Blind for

6  over fifty years. To accomplish this end, American Blind alleges, consumers will type into

7  Google's *search* window any one of a number of American Blind's trademarks, expecting that

8  they will be presented with American Blind's web site and its distinctive goods and services.

9  Instead, because Google auctions and sells American Blind's trademarks to any fly-by-night

10 operation or competitor willing to bid on the brand name, consumers are diverted unwittingly to

11 these poachers' sites.

12      This sort of deception and consumer confusion is precisely what the trademark laws are

13 intended to prohibit. As alleged by American Blind's Mark, it has spent over 50 years and

14 millions of dollars establishing its name, goodwill and reputation. Yet, if Google has its way,

15 American Blind, like every other retailer in this age of Internet commerce, will be forced to sit

16 helplessly as its competitors – or anyone else hoping to exploit a brand name or intercept

17 customers – profit from the years of time, energy, and money invested by American Blind to

18 develop its name and reputation. This cannot be, and indeed is not, the result envisioned by the

19 federal trademark laws.

20      Second, Google's proposition that its vigorous promotion, auction and sale of others'

21 trademarks does not constitute a "use" of a trademark is without support in the law or logic.

22 Ignoring (or dismissing) recent Ninth Circuit law, Google argues that, because it does not use

23 American Blind's trademarks as a "source identifier" for Google's *own* brand, its use of these

24 marks is not the kind of "use" that gives rise to claims for trademark infringement, dilution or

25 unfair competition. The law is otherwise. In a case directly on point, *Playboy Enterprises, Inc. v.*

26 *Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004), the Ninth Circuit held earlier this

27 year that selling trademarks as keywords for advertising does indeed constitute "use" under the

28 Lanham Act. *Id.* at 1024. More telling, Google can cite to no case – because none exists – in

1    which it has been held that branding one's own goods or services is the *only* "use" of a trademark

2    prohibited under the Lanham Act.

3        Third, the law has rejected Google's claim that its advertisers do not "use" American

4    Blind's marks simply because the American Blind marks are not contained in the text of the

5    advertiser's display.  The fact that Google and its advertiser hide the trademarks is of little

6    consequence, since courts universally have condemned such schemes in similar contexts (such as

7    the use of trademarks in unseen, embedded code, called "metatags," to lure Internet users to web

8    sites that are not affiliated with the trademark holder).  As alleged by American Blind here, the

9    practice of not identifying American Blind in Google's search displays is all the more insidious

10   because consumers are deceived into believing that the displayed search results are authentic.

11       Fourth, Google's arguments are wholly improper at this stage of the litigation.  Ignoring

12   the strict pleading standards required for dismissal under Rule 12(b)(6), Google repeatedly urges

13   this Court to weigh the facts or, worse, accept Google's version of the facts.  For example,

14   Google argues that, when a consumer types in an American Blind trademark that a Google

15   advertiser has purchased as a "trigger," the resulting display "offer[s] the searcher options in

16   addition to the search results."  (Google Mot. at p. 3.)  With all due respect, this is the very heart

17   of this case – American Blind alleges that the consumer is not merely presented with "options,"

18   but rather is deceived into thinking that they have found American Blind.  Whether the consumer

19   appreciates the difference will be the subject of proof to be developed to support (or refute) the

20   element of likelihood of consumer confusion (a required element under the Lanham Act), which

21   is a classic issue of *fact* that cannot be decided now.

22       Many of Google's arguments are predicated, directly or indirectly, on issues of fact that

23   have not been the subject of discovery and ought not be decided without the benefit of unbiased

24   inquiry.  On a motion to dismiss, the parties must accept all of American Blind's allegations as

25   true and the alleged facts must be viewed in the light most favorable to American Blind.  If

26   American Blind's claims provide Google with notice of the nature of and grounds for American

27   Blind's claims – which is all that is required now – then American Blind's claims should not be

28   dismissed.

Finally, Google moves to dismiss American Blind's claim for tortious interference with prospective economic advantage based on perceived pleading deficiencies.  American Blind, however, has alleged all of the required elements of a claim for tortious interference with prospective economic advantage.  That Google again disputes the facts underlying American Blind's allegations does not warrant the dismissal of American Blind's tortious interference with prospective economic advantage claim.  Similarly, Google's suggestion in a footnote that it and its cohorts are immune from tort liability based on the Communications Decency Act is also factually inaccurate.  As the facts will show, Google is more than a mere conduit of information provided by others; rather, Google determines when its customers' advertisements will appear and the format in which the "Sponsored Links" will appear.  Accordingly, neither Google nor the other Third-party Defendants are entitled to immunity under the Communications Decency Act.

## II.
## FACTUAL BACKGROUND

### A.    American Blind's Trademarks

American Blind is one of the largest direct-to-consumer retailers of custom order window treatments and wall coverings in the United States and on the Internet.  American Blind, in conjunction with its predecessor companies, has been in the home decorating business for over a half century.  American Blind sells and promotes its home decorating products and related services across the United States through a website and toll-free telephone numbers. (Counterclaim ¶ 16).

Since at least as early as 1986, and long prior to the acts of the Defendants complained of herein, American Blind adopted and used, and has continued to use, the names and marks AMERICAN BLIND and AMERICAN BLINDS (hereinafter collectively identified as "AMERICAN BLIND") in connection with home decorating products and related services which have been offered for sale and sold in interstate commerce.  (Counterclaim ¶ 17).

In addition to the AMERICAN BLIND name and mark, American Blind is the owner of and has the exclusive rights to use the following trademarks registered with the United States Patent and Trademark Office:

| Mark | Reg. Number | Reg. Date |
|------|-------------|-----------|
| AMERICAN BLIND & WALLPAPER FACTORY | 2,022,925 | 12/17/96 |
| AMERICAN BLIND FACTORY | 1,463,548 | 11/03/87 |
| DECORATETODAY | 2,470,542 | 07/17/01 |

(True and accurate copies of proof of these registrations are attached to American Blind's Counterclaim as Exhibit A.)  The foregoing registered marks, together with the AMERICAN BLIND name and mark are hereinafter collectively referred to as the "American Blind Marks." (Counterclaim ¶ 18).

Long prior to the acts of the Defendants complained of herein, American Blind's home decorating products and related services sold under the American Blind Marks have been extensively advertised, promoted and sold by American Blind in interstate commerce throughout the United States.  American Blind expends millions of dollars each year in connection with the advertisement and promotion of its products and services sold under the American Blind Marks. (Counterclaim ¶ 20).

American Blind's home decorating products and related services sold under the American Blind Marks have acquired a fine reputation, and are famous among current and prospective purchasers of home decorating products and related services.  (Counterclaim ¶ 23).  The public has used and now uses the American Blind Marks to identify American Blind and its home decorating products and related services and to distinguish American Blind and its products and services from the home decorating products and related services offered by others, and the American Blind Marks have acquired an outstanding celebrity as a source of quality home decorating products and related services, and symbolizes and embodies the goodwill rightfully belonging exclusively to American Blind.  (Counterclaim ¶ 23).

A significant and critical amount of American Blind's business is conducted via the Internet.  The company estimates that, each day, it receives in excess of thirty thousand (30,000)

1    visits by customers or potential customers to its Internet website and processes over 400,000

2    Internet transactions every year.  (Counterclaim ¶ 33).

3        American Blind has spent over $10 million in developing its website, and spends in excess

4    of $1 million per year in maintaining, enhancing and updating its website.  In addition, American

5    Blind employs over 50 full-time employees in connection with its Internet operations, all of

6    whom are rigorously trained and supervised.  (Counterclaim ¶ 34).

7    **B.    Google's AdWords Program**

8        Upon information and belief, Google's Internet search engine, which is free to consumers,

9    is the most widely-used Internet search engine in the world.  (Counterclaim ¶ 36).  One of the

10   programs Google offers to its business customers is a keyword-triggered advertising program

11   entitled "AdWords."  Google's "AdWords" program enables advertisers to purchase or bid on

12   keywords that generate an advertising link (known as a "Sponsored Link") to the purchaser's

13   website.  For example, a company might bid on the keyword "wallpaper" through Google's

14   "AdWords" program so that the company's website will be the first, or among the first, listed

15   "Sponsored Links" when a customer enters the word "wallpaper" in Google's search engine

16   window.  Google posts these so-called "Sponsored Links" on the top of and in the margins of its

17   search engine results page based on whichever keywords appear in user queries posted to

18   Google's Internet search engine.  Google's advertising customers then pay Google based on the

19   number of Internet users who "click" on these advertising links.  (Counterclaim ¶¶ 37-38).

20       The designation "Sponsored Link" is itself confusing and misleading.  In many instances,

21   the Defendants' search engine "results" pages are designed so that the "Sponsored Link" display

22   is inconspicuous or otherwise not apparent.  Moreover, it is not apparent who exactly "sponsors"

23   these links or what a "Sponsored Link" even is.  (Counterclaim ¶ 39).

24       Google profits every time an Internet user clicks on a "Sponsored Link" for one of the

25   advertisers to whom Google has sold keywords in its "AdWords" program.  (Counterclaim ¶ 40).

26   According to Google, 96% of its net revenues in the first quarter of 2004, which totaled $389

27   million, were derived from advertising revenues.  (Counterclaim ¶ 41).

28

1    Google continues to sell to American Blind's competitors the keywords "American

2    Blind," "American Blinds" and "Americanblinds.com," among others.  Accordingly, if a

3    consumer using Google's search engine types American Blind's trademarked phrase "American

4    Blind and Wallpaper Factory" in the search window, Google causes the links to websites of

5    competitors who have purchased the "American Blind" keyword from Google to appear at the top

6    or in the margins of the results page.  Similarly, it is possible for a consumer who types

7    "American Blinds" or "Americanblinds.com" in the Google search window to be directed to a

8    "results" web page that displays the products and services of American Blind's competitors

9    through the keyword sold to them by Google.  (Counterclaim ¶ 44).

10    Google does not just sell American Blind's marks, it actively promotes and encourages

11    competitors to embark on a sweeping competitive raid on the American Blind Marks and virtually

12    every conceivable, though indistinguishable, iteration of those marks.  This is accomplished by

13    what Google calls its "AdWords Keywords Suggestions" feature, which lures Google's paying

14    customers by the promise of "ideas for new keywords that can help you improve your ad

15    relevance" (this feature is not available to, or even viewable by, the public).  (Counterclaim ¶ 45).

16    Google's AdWords Keywords Suggestions feature generates additional recommended

17    keyword purchases to Google's advertising customers.  Google likes to refer to this as "keyword

18    targeting."  It cannot, therefore, be suggested that Google is merely selling terms that, by

19    happenstance, coincidentally comprise part (or all) of the American Blind Marks.  Rather, Google

20    intentionally has designed its financially lucrative "AdWords" program to maximize the

21    infringement and dilution of American Blind's marks.  (Counterclaim ¶ 46).

22    By the operation and design of its keyword sales program, Google causes consumers who

23    specifically intend and desire to find American Blind's products and services to be diverted

24    instead to search "results" web pages that list American Blind's competitor's products and

25    services.  This result is intended, both by Google and its advertising customers who purchase

26    keywords consisting of the American Blind Marks.  Google sells, and its advertising customers

27    hope to purchase, the possibility that they will intercept consumers who, due to American Blind's

28    extensive and pervasive advertising resulting in invaluable goodwill, are trying to find one of the

1  nation's largest and most respected and trusted direct-to-consumer retailers of window treatments

2  and wall coverings.  (Counterclaim ¶ 50).

3      Through this practice, Google traffics in the infringement and dilution of the American

4  Blind Marks.  Google has knowingly sold the American Blind Marks in commerce and included

5  them in Google's search engine for Google's own profit and to increase the competitive

6  advantage of American Blind's competitors.  (Counterclaim ¶ 52).

7  **C.    The Business Of The Third-Party Defendants**

8      America Online, Ask Jeeves, CompuServe, Earthlink, and Netscape each operate websites

9  that include a search engine for locating information on the Internet.  (Counterclaim ¶ 67).  On

10  information and belief, these Third-party Defendants pay Google in exchange for Google

11  providing access to its web searching platform.  By utilizing the Google web searching platform,

12  the Third-party Defendants display similar, if not virtually the same, results of search queries as

13  those displayed by Google.  (Counterclaim ¶ 68).  In some instances, however, the Third-party

14  Defendants' search results pages are even more confusing than Google's search results page.

15  (Counterclaim ¶ 73).  For example, a consumer who conducts a search for "American Blinds"

16  from Netscape's website is confronted misleadingly with a host of competitors' advertisements.

17  (Counterclaim ¶ 73).  Some competitors' advertisements are called "Sponsored Links," while

18  others are given priority treatment with graphics at the very top of the search "results" page.  (*See,*

19  *e.g.*, Exhibit F to American Blind's Counterclaim.)  Again, this diversion and confusion is the

20  intended result – allowing American Blind's competitors to intercept consumers looking for

21  American Blind.  (Counterclaim ¶ 73).  On information and belief, each of the Third-party

22  Defendants also profit every time an Internet user clicks on any of the links provided by these

23  search results.  (Counterclaim ¶ 68).

24
                            **III.**
25                        **ARGUMENT**

26  **A.    The Governing Legal Standard For A Rule 12(b)(6) Motion Precludes Dismissal**

27      As the Chief Judge of this Court recently noted "[a] motion to dismiss for failure to state a

28  claim is viewed with disfavor," "is rarely granted," and is proper only in "extraordinary cases."

1  *Crab Boat Owners Ass'n. v. Hartford Insurance Co. Of The Midwest*, 2004 WL 1622044 at *2

2  (N.D. Cal. July 20, 2004).  Not bothering even to reference Rule 12(b)(6) in its memorandum,

3  Google completely disregards that "[a] complaint should not be dismissed unless a plaintiff could

4  prove no set of facts in support of his claim that would entitle him to relief."  *Parks School of*

5  *Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

6        Google also ignores that, on a motion to dismiss this Court must "take all allegations of

7  material fact as true and construe them in the light most favorable to the nonmoving party."

8  *Parks School of Business, Inc.*, 51 F.3d at 1484.  Moreover, "[t]he federal rules require only a

9  'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Gilligan v.*

10  *Jamco Development Corp.*, 108 F.3d 246, 248-49 (9th Cir. 1997), *citing* Fed. R. Civ. Pro. 8(a).

11  Applying Federal Rule of Civil Procedure 8(a) in the context of a motion to dismiss, the Ninth

12  Circuit has held that "[t]he Rule 8 standard contains 'a powerful presumption against rejecting

13  pleadings for failure to state a claim."  *Id.* at 249.

14        Not surprisingly, most of the cases cited by Google were decided at the summary

15  judgment stage – after discovery had been conducted.  More specifically, only a single case cited

16  by Google was decided in favor of granting a Rule 12(b)(6) motion.[2]  In light of the standard set

17  forth by Federal Rule of Civil Procedure 8(a) and the Ninth Circuit's interpretation of this Rule,

18  American Blind's counterclaims should not be dismissed unless it appears beyond doubt that

19  American Blind can prove no set of facts that would entitle it to relief.  *Gilligan*, 108 F.3d at 248.

20  American Blind's Counterclaims more than meet this minimal threshold and Defendants' motions

21  to dismiss should, therefore, be denied for this reason alone.

22

23

24  [2]      That case, *Toho Co., Ltd. v. Sears, Robuck & Co.*, 645 F.2d 788 (9th Cir. 1981), is readily distinguishable
from the case before this Court.  In *Toho Co., Ltd.*, the Ninth Circuit affirmed the dismissal of the plaintiff's
complaint because it was literally inconceivable that the Plaintiff would be able to establish a likelihood of consumer
25  confusion regarding whether "Bagzilla" garbage bags manufactured by defendant Sears were somehow made,
sponsored by, or affiliated with the creators of the Godzilla cartoon character. *Id.* at 791.  Given that the Plaintiff
26  "produces or sponsors only literary works and toys" and that Sears displayed its name prominently on the packaging
of the "Bagzilla" garbage bags, the Court found that there was no likelihood that consumers would be confused by
27  Sears' use of the name "Bagzilla." *Id.*  In contrast, the evidence will show that the American Blind competitors who
purchase American Blind's trademarks from Google are in the same business and sell the same products as American
28  Blind, thus causing substantial consumer confusion.

B.    **The Auctioning Of Trademarks Hurts Competition**

Google attempts to justify its blatant infringement of American Blind's federally-protected trademarks by arguing that its conduct furthers competition. (Google Mot. at p. 1). Although American Blind agrees with the general principle that competition is good, unfair competition – especially trading on the trademarks and goodwill of another – both hurts competition and is counter to the purpose of the federal trademark protection scheme.

Among Internet users in the United States, it is estimated that thirty-nine percent (39%) currently use the Internet to make online purchases. (Counterclaim ¶ 25). As a result, it is estimated that, today, annual sales of goods and services over the Internet exceed $92 billion. (Counterclaim ¶ 26). In light of these staggering figures, online retailers go to great lengths to design and implement effective websites that favorably display their products and are easy for Internet users to navigate to make purchases.

Although in business for over 50 years, American Blind has been a pioneer in the use of the Internet for commerce. American Blind owns hundreds of Internet domain names, has spent over $10 million in developing its website, and spends in excess of $1 million per year in maintaining, enhancing and updating its website. (Counterclaim ¶ 34). As a result of American Blind's expenditure on its website, American Blind's pervasive national advertising, American Blind's superior products, and American Blind's exceptional customer service, American Blind has developed an extraordinary reputation in the home decorating business, thus making its name and its trademarks exceptionally valuable assets.

Google is now trying to profit off this hard work by selling the reputation and goodwill associated with the American Blind name. American Blind's direct competitors are invited by Google to buy American Blind trademarks, and thus to appear as "Sponsored Links" on the search results display page whenever a consumer types in or searches for American Blind. The intentional result is the interception and diversion of American Blind's customers and/or potential customers. Indeed, it cannot seriously be disputed that both Google and its advertisers – American Blind's competitors – deliberately intend to piggyback on American Blind's name and reputation. It is precisely because Google and its advertisers realize the value of being able to

OPPOSITION TO MOTION TO DISMISS
COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1   intercept and divert a *targeted* consumer that Google's AdWords advertising scheme has

2   flourished.

3        The need for brand name protection on the Internet has never been greater.  Internet

4   shoppers have more choices than ever before of where to shop and from whom to purchase nearly

5   any product, never once having the opportunity to step into a brick-and-mortar shop to assess the

6   merchant or the quality of wares.  To ensure that they are buying high-quality products from

7   reputable retailers, consumers naturally rely on brands that they know and retailers with which

8   they have had positive experiences in the past.  Still, reports of Internet fraud are rampant, and

9   Google does nothing to police the legitimacy of the companies and individuals lining up to buy

10  other companies' trademarks.

11       Tacitly acknowledging that interception and diversion are, if not intended, then at least

12  possible, Google attempts to argue that consumers are not confused by the competitors'

13  advertisements because they are listed separately and are posted as "Sponsored Links."  This is,

14  of course, a factual question that is not ripe for adjudication.  As alleged by American Blind in its

15  Counterclaims, the designation "Sponsored Link" is in fact confusing and misleading.

16  (Counterclaim ¶ 39).

17       In many instances, Google's search engine "results" pages are designed so that the

18  "Sponsored Link" display is inconspicuous or otherwise not apparent.  (Counterclaim ¶ 39).

19  Moreover, it is not apparent who exactly "sponsors" these links.  (Counterclaim ¶ 39).  Since

20  trademark owners often bid on their own trademarked terms through Google's AdWords

21  program, often the trademark owners themselves appear in the "Sponsored Links" section of the

22  search results page, thereby adding to consumer confusion regarding who exactly "sponsors" the

23  links.  It is entirely possible, if not likely, that consumers erroneously believe that the retailer for

24  which they were searching "sponsors" the additional links, and that the "Sponsored Links" are for

25  partners or affiliates of the trademark owner.  If a consumer proceeds under this belief, he is

26  likely to be disappointed when he learns that the "Sponsored Link" is actually a paid

27  advertisement disguised as a "Sponsored Link."

28       Google does nothing to abate the confusion.  Google does not define "Sponsored Link"

1   for the consumer, which serves to increase the consumer's likely confusion.  In fact, the term

2   "Sponsored Link" is even more confusing or misleading to the consumer than a banner

3   advertisement or a pop-up advertisement. The term "sponsored" itself implies an affiliation with

4   the typed-in keyword.  In addition, there is no real distinction between the characteristics and/or

5   placement of the "Sponsored Links" from the natural search results, and there is similarly no

6   distinction between the "Sponsored Links" for the trademark owner and other competitors.

7       If Google is permitted to encourage brand competitors to buy the trademarks of others to

8   lure consumers unwittingly to the competitors' websites, it is ultimately the consumer who will

9   suffer.  Consumers will become less trusting.  The incentive for companies to spend money on

10  their brand name, employee training, quality control measures, credit card security, authentic

11  goods, etc. will be sharply reduced.  This does not enhance competition, nor does it help the

12  consumer.  Quite the opposite.  Google's practice of selling trademarks to competitors as

13  keywords dissuades trademark owners from investing in their trademarks and confuses

14  consumers, thus impeding competition.  This is not what the federal trademark scheme was meant

15  to accomplish.  *See Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873 (9th Cir. 1999); s*ee also*

16  *Summit Machine Tool Manufacturing Corp. v. Victor CNC Systems, Inc.*, 7 F.3d 1434, 1439 (9th

17  Cir. 1993).

18  **C.    American Blind's Allegations Regarding Google's "Use" Of The American Blind
         Marks Are Sufficient To Give Rise To A Claim Of Trademark Infringement**

19

20      Google admits that it sells American Blind's federally-protected trademarks to advertisers,

21  and it further admits that it profits from the sale of these trademarks.  Yet Google argues that it is

22  not "using" American Blind's trademarks.  This position is contrary to both common sense and

23  established Ninth Circuit law.

24      **1.    The Ninth Circuit's Decision in *Playboy Enterprises, Inc. v. Netscape
             Communications Corp.***

25      Google would have this Court believe that, although Google suggests that bidders

26  purchase American Blind's trademarks and then sells those marks to the highest bidders for

27  Google's own profit, Google is not using American Blind's trademarks because it does not

28  "brand" its products or services with American Blind's marks.  (Google Mot. at p. 5-7).

1    However, "branding" is not a required part of any trademark infringement claim.  Moreover, in

2    the Internet age, the traditional definition of "use" of a trademark must be flexible enough to

3    address rapidly expanding and improving technology and new techniques for trademark

4    infringement.  In *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020

5    (9th Cir. 2004), the Ninth Circuit recently acknowledged the applicability of trademark protection

6    laws to the Internet.

7        In *Playboy,* the Ninth Circuit recognized that selling trademarks as keywords for

8    advertising does constitute "use" under the Lanham Act.  *Id.*  Playboy argued that two search

9    engines, Netscape and Excite, committed trademark infringement by selling Playboy's

10   trademarks as keywords to advertising customers that wanted their advertisements to appear when

11   an Internet user searched for Playboy's trademarks.  The Ninth Circuit reversed summary

12   judgment in favor of the defendants and held that Playboy established a genuine issue of material

13   fact regarding the defendants' infringement of the Playboy marks.  In the *Playboy* decision, the

14   Ninth Circuit expressly stated that "defendants clearly used the marks in commerce," and that use

15   under the Lanham Act "sweeps as broadly as possible."  *Id.* at 1024.

16       Google sweeps this decision under the rug, attempting to distinguish the case in a mere

17   footnote.  (Google Mot. at p. 6 n. 8).  In Google's view, the whole issue simply escaped the Ninth

18   Circuit's attention.  Google argues that the Ninth Circuit did not consider whether the defendants

19   in *Playboy* were "using" Playboy's trademarks as required by the Lanham Act, and instead

20   focused only on the issue of likelihood of confusion.  (Google Mot. at p. 6 n. 8).  That Google

21   would suggest that the Ninth Circuit (as well as all of the parties in the case) overlooked an issue

22   as fundamental as whether the defendants' "use" of a trademark implicated the Lanham Act at all

23   is, to say the least, surprising.

24       Google's interpretation of the *Playboy* decision – that the Ninth Circuit actually believed

25   that the defendants in Playboy were not "using" Playboy's trademarks but opted not to mention it

26   – shows little faith in the judiciary or the parties.  Did Netscape – a party both in the *Playboy* case

27   and in this case – just now suddenly come to the realization that the Lanham Act was never

28   involved in either case?  Even if one assumes that all of the parties and their lawyers missed the

1    issue, the Ninth Circuit no doubt would have raised it *sua sponte* if it felt it was appropriate.

2    Moreover, when the Ninth Circuit held that summary judgment should be reversed and remanded

3    the case because "[g]enuine issues of material fact exist as to [Playboy's] trademark infringement

4    and dilution claims," it is highly unlikely that the court did so knowing that, ultimately, Playboy's

5    claims would be barred on purely legal grounds anyway.  The only reasonable interpretation is

6    that the Ninth Circuit agreed with the parties' conclusion – including notably the defendants'

7    conclusion – that defendants were "using" Playboy's trademarks as required for a Lanham Act

8    claim.  In light of the Ninth Circuit's analogous decision in *Playboy*, Defendants cannot argue

9    that they are not "using" American Blind's trademarks.

10          Google is also a defendant in a trademark infringement lawsuit brought by Government

11   Employees Insurance Company ("GEICO") in the Eastern District of Virginia and pending as

12   *Government Employees Insurance Co. v. Google, Inc. and Overture Services, Inc.*, Case No.

13   1:04cv507.  In that case, GEICO asserts analogous claims to those brought by American Blind in

14   this case.  In support of its motion to dismiss the GEICO complaint and in an attempt to

15   distinguish the Ninth Circuit's *Playboy* decision, Google stated in the GEICO case that:

16                  The potential broader implications of the [*Playboy*] decision were
                    persuasively criticized in Judge Berzon's concurrence, which took
17                  issue with the Ninth Circuit's idiosyncratic view of initial interest
                    confusion.  Furthermore, the parties settled the case before a
18                  petition for rehearing en banc could be filed.  *Playboy* is of dubious
                    precedential value even in the Ninth Circuit, and certainly should
19                  not be extended to other circuits not already burdened with the
                    Ninth Circuit's bizarre 'initial interest confusion' rule.
20

21   (Reply Brief of Google Inc. In Support Of Motion To Dismiss [the GEICO complaint], a copy of

22   which is attached hereto as <u>Exhibit 1</u>, p. 10 n. 6) (internal citations omitted).  American Blind

23   anticipates that Google may raise in its reply brief in this case the failure of the Ninth Circuit to

24   conduct an *en banc* hearing in the *Playboy* case.  American Blind, however, is aware of no rule or

25   case that states that a ruling by the Ninth Circuit is of "dubious precedential value" simply

26   because the Ninth Circuit did not consider the ruling *en banc*.  Since there is no majority opinion

27   contemporaneous with or subsequent to the *Playboy* decision that overrules or even questions the

28

*Playboy* decision, this Court and the parties must accept the current state of the law in the Ninth Circuit, as set forth in the majority's *Playboy* decision.

### 2. Analogous Decisions Hold That The Hidden Use Of Trademarked Terms To Divert An Internet User To A Website Violates The Lanham Act

The Ninth Circuit's decision in *Playboy* is in accord with other decisions of the Ninth Circuit and other jurisdictions, which hold that the hidden use of trademarked terms in a website's metatags violates the Lanham Act. Metatags are hidden computer code included in a website that are "intended to describe the contents of a website." *Brookfield Communications v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999). Search engines often rely on these metatags to direct Internet searchers to websites that contain information about their search terms. "The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be 'hit' in a search for that keyword and the higher on the list of 'hits' the web page will appear." *Brookfield Communications,* 174 F.3d at 1045. Courts have recently been confronted with the question of whether the use of a competitor's trademarks in one's website's metatags constitutes trademark infringement under the Lanham Act.

In addressing a situation such as this, the Ninth Circuit held that the use of trademarked terms in metatags on defendant's website violated the Lanham Act. *Brookfield Communications*, 174 F.3d at 1036. Specifically, the Court held that the defendant could not use the trademarked term "moviebuff" as one of its metatags. *Id.* The Ninth Circuit found that "by using 'moviebuff.com' or 'moviebuff' to divert people looking for 'MovieBuff' to its website, [the defendant] improperly benefits from the goodwill that [the plaintiff] developed in its mark." *Id.* at 1062. In coming to this decision, the Ninth Circuit obviously found that the defendant was "using" plaintiff's trademark for purposes of the Lanham Act even though it was not branding its products with plaintiff's trademarks.[3] As a result, this case similarly contradicts Google's position that it is not "using" American Blind's marks for purposes of the Lanham Act.

The Seventh Circuit came to the same decision regarding the use of trademarked terms in

---

[3] The *Playboy* decision includes a concurring opinion by Judge Berzon that questions the correctness of the Ninth Circuit's holding in *Brookfield Communications, Inc.* However, the majority opinion in *Playboy* relies upon and makes repeated references to the *Brookfield Communications, Inc.* decision and includes no suggestion that *Brookfield Communications, Inc.* is likely to be overruled in the near future.

1   metatags in *Promatek Indus. Ltd. v. Equitrac Corp.*, 300 F.3d 808 (7th Cir. 2002).  In *Promatek*,

2   the Seventh Circuit held that the inclusion of a name identical to or virtually identical to

3   plaintiff's trademark in defendant's metatags created a likelihood of confusion and therefore

4   violated the Lanham Act.  In *Promatek*, the defendant's only use of plaintiff's trademarked term

5   "COPITRAK" was in defendant's metatags – computer code that is invisible to Internet users.  *Id.*

6   at 812.  Obviously, the defendant in *Promatek* was not using the plaintiff's trademark to brand its

7   own product or services.  Nonetheless, the Seventh Circuit held that defendant's conduct violated

8   the Lanham Act.  *See also Bihari v. Gross*, 119 F. Supp. 2d 309 (S.D.N.Y. 2000) (holding that the

9   inclusion of trademarks in metatags constitutes "use" under the Lanham Act).

### 3.    The Pop-Up Cases On Which Defendants Rely Are Distinguishable And Have Been Rejected By Other Courts

Ignoring the precedents set forth above, Google instead relies upon a pair of

distinguishable district court cases from other jurisdictions involving "pop-up" advertisements

generated randomly by computer programs offered by WhenU.com, Inc. ("WhenU") that claim to

match an Internet user's viewing activities.  *See Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F.

Supp. 2d 734 (E.D. Mich. 2003); *U-Haul Int'l., Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723

(E.D. Va. 2003).  In both *Wells Fargo & Co.* and *U-Haul Int'l., Inc.,* the district courts denied

plaintiffs' claims for trademark infringement because the courts found that the defendants were

not "using" plaintiffs' trademarks as required by the Lanham Act.[4]  Both of these cases, however,

are distinguishable, are not binding on this Court, and have been rejected by other cases

considering analogous issues.

In *U-Haul Int'l., Inc.,* U-Haul claimed that "WhenU's pop-up advertisements, which

crowd[ed] the computer user's screen and block[ed] out U-Haul's website display, in effect,

infringe[d] on U-Haul's registered trademark and alter[ed] U-Haul's copyrighted

advertisements."  279 F. Supp. 2d at 724.  The *U-Haul Int'l., Inc.* court granted summary

judgment – not a motion to dismiss – for the defendants on U-Haul's trademark claims because

the Court found that "[p]laintiff fails to show how a pop-up advertisement appearing in a separate

---

[4]     Neither *U-Haul Int'l., Inc.* nor *Wells Fargo & Co.* were decided on Rule 12(b)(6) motions to dismiss.

1   window on an individual's computer obstructing U-Haul's advertisement is a 'use' of U-Haul's

2   trademarks in commerce." *Id.* at 727.

3       In granting the defendants' summary judgment motion in *U-Haul Int'l., Inc.*, the Eastern

4   District of Virginia relied upon several facts that are distinguishable from the present case.

5   Specifically, the court relied heavily on the fact that "the computer user consented to th[e] detour

6   [presented by WhenU's pop-up ad] when the user downloaded WhenU's computer software from

7   the Internet." *Id.* at 725.  In addition, the *U-Haul Int'l., Inc.* court relied upon the fact that the

8   WhenU pop-up advertisements appeared in a separate and distinct window from U-Haul's

9   trademark.  *Id.* at 727-28.  Finally, and most important, the court found that WhenU did not sell

10  the U-Haul trademark.  *Id.* at 728.

11      In contrast, in this case, the users of Google's search engines have in no way consented to

12  being presented with "Sponsored Links" for a trademark owners' competitors when searching for

13  the trademark owner.  In addition, the "Sponsored Links" appear on the same page and in the

14  same window as the links to the trademark owner.  Finally, the Defendants here are actually

15  selling and profiting from the sale of American Blind's Marks.  There are multiple factual

16  distinctions between the *U-Haul Int'l., Inc.* case and this case, and the *U-Haul Int'l., Inc.* case is

17  neither persuasive nor binding on this Court.

18      Similarly, in *Wells Fargo & Co.*, the Eastern District of Michigan denied plaintiff's

19  request for a preliminary injunction and held that plaintiff did not establish a likelihood of

20  prevailing on the merits of the case because defendant did not "use" plaintiff's trademark in

21  commerce.  293 F. Supp. 2d at 757-65.  In coming to this decision, the court found that "when

22  WhenU's advertisements pop-up and partially overlap plaintiffs' sites on the computer screen, it

23  seems apparent to the user that what is appearing on his or her screen are two distinct sources of

24  material." *Id.* at 761.  In contrast, it is not apparent to users of Google's search engine here who

25  sponsors the "Sponsored Links" or whether the companies listed in the "Sponsored Links" are

26  related to the trademark owner for which the user was searching.  In addition, the *Wells Fargo &*

27  *Co.* decision relies, at least in part, on the decision of the Central District of California in *Playboy*

28  *Enterprises, Inc. v. Netscape Communications Corp.*, 55 F. Supp. 2d 1070 (C.D. Cal. 1999),

1  which was overruled, as described earlier.  For these reasons, this Court should not follow the

2  holding in *Wells Fargo & Co.*

3      A more recent decision by the Southern District of New York, *1-800 Contacts, Inc. v.*

4  *WhenU.com, Inc.*, 309 F. Supp. 2d 467 (S.D.N.Y. 2003), completely rejects the definition of

5  "use" required for a Lanham Act violation that was adopted in both *Wells Fargo & Co.* and *U-*

6  *Haul Int'l., Inc.*  In *1-800 Contacts, Inc.*, plaintiff sought a preliminary injunction to enjoin

7  defendant from delivering to Internet users defendant's competitive "pop-up" advertisements

8  when such users were attempting to find or access plaintiff's website.  *Id.*  The Southern District

9  of New York granted plaintiff a preliminary injunction on plaintiff's trademark claims, and held

10  that defendant was "using" plaintiff's trademarks for purposes of the Lanham Act.  *Id.* at 488-89.

11      Specifically, the court held that "by causing pop-up advertisements to appear when

12  SaveNow users have specifically attempted to find or access Plaintiff's website, Defendants are

13  'using' Plaintiff's marks that appear on plaintiff's website."  *Id.* at 489.  Similarly, the Court held

14  that defendant WhenU.com "uses" plaintiff's mark by including a version of plaintiff's 1-800

15  Contacts mark in defendant's proprietary directory of terms that triggers pop-up advertisements

16  by companies that are in direct competition with plaintiff.  *Id.*  In this case, Google is "using"

17  American Blind's Marks by causing American Blind's competitors' "Sponsored Links" to appear

18  when users are attempting to find American Blind's website by searching for American Blind's

19  Marks.  Just as the court did in *1-800 Contacts, Inc.*, this Court should hold that Google is "using"

20  American Blind's Marks as required for a Lanham Act claim.

21  **D.      American Blind Has Sufficiently Alleged Contributory Trademark Infringement**

22      American Blind agrees with Google's assertion that to succeed on a claim for contributory

23  trademark infringement, American Blind must allege, among other things, that Google's

24  advertisers infringe American Blind's trademarks.  At this stage, however, American Blind need

25  only include in its Counterclaim a "short and plain statement of [its] claim showing that [it] is

26  entitled to relief."  Fed. R. Civ. Pro. 8(a).  American Blind has sufficiently alleged this element of

27  a contributory infringement claim.

28      In order to defeat American Blind's claim for contributory trademark infringement,

1    Google again asserts that in order to "use" a trademark in violation of the Lanham Act, Google's

2    advertisers would have to brand their own products with the American Blind trademarks.

3    (Google, Ask Jeeves, and Earthlink Motion To Dismiss p. 8).  However, as discussed above, the

4    Ninth Circuit has found in both *Playboy* and *Brookfield Communications* that a defendant "uses"

5    a trademark for purposes of the Lanham Act even if it does not brand its products with the

6    trademark.  In light of the applicable law, American Blind adequately alleges trademark

7    infringement by Google's advertisers when it alleges:

8
9              Similarly, it is possible for a consumer who types "American
              Blinds" or "Americanblinds.com" in the Google search window to
              be directed to a "results" web page that displays the products and
              services of American Blind's competitors through the keyword sold
10             to them by Google.

11   (Counterclaim ¶ 44).

12
13             Google does not just sell American Blind's marks, it actively
              promotes and encourages competitors to embark on a sweeping
              competitive raid on the American Blind Marks and virtually every
              conceivable, though indistinguishable, iteration of those marks.
14

15   (Counterclaim ¶ 45).

16
              In each of these examples, by the operation and design of its
              keyword sales program, Google causes consumers who specifically
17             intend and desire to find American Blind's products and services to
              be diverted instead to search "results" web pages that list American
18             Blind's competitor's products and services.  This result is intended,
              both by Google and its customers who purchase keywords
              consisting of the American Blind Marks.  Google sells, and its
19             customers hope to purchase, the possibility that they will intercept
              consumers who, due to American Blind's extensive and pervasive
20             advertising resulting in invaluable goodwill, are trying to find one
              of the nation's largest and most respected and trusted direct-to-
21             consumer retailer of window treatments and wall coverings.

22   (Counterclaim ¶ 50).

23
              Defendants and certain of American Blind's competitors seek to
              exploit the hard-earned popularity and success of American Blind
24             and the products and services sold by American Blind under the
              famous American Blind Marks.  In an attempt to illegally capitalize
25             on the American Blind Marks, Defendants have permitted and
              promoted certain of American Blind's competitors to bid on
26             advertising keywords so that their websites are listed in a position
              above or next to American Blind's link when a consumer types a
27             search query identical or substantially similar to the American
              Blind Marks.

28

1    (Counterclaim ¶ 71).

2              Defendants' acts, namely the inducement of American Blinds'
                competitors to purchase the American Blind Marks as keywords
3                and the refusal to block or otherwise disable American Blind's
                competitors' advertisements that result from searches for the
4                American Blind Marks (despite Defendants' knowledge that such
                advertisements infringe the American Blind Marks), constitute
5                contributory trademark infringement.

6    (Counterclaim ¶ 129).

7    These allegations by American Blind are sufficient to establish that Google's advertisers "used"

8    American Blind's trademarks as required for a Lanham Act claim.  As a result, American Blind's

9    claim for contributory trademark infringement should stand and Google's motions to dismiss this

10   claim should be denied.

11   **E.    American Blind Sufficiently Alleges A Claim For Tortious Interference With
           Prospective Economic Advantage**

12
13            Pursuant to California law, in order to allege a claim for tortious interference with

14   prospective economic advantage, American Blind must allege "(1) an economic relationship

15   between the plaintiff and some third party, with the probability of future economic benefit to the

16   plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional wrongful acts on the

17   part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship;

18   and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  *Korea*

19   *Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1153 (2003).  In its motions to dismiss,

20   Google erroneously claims that American Blind fails to allege an independent wrongful act by

21   Google and also a probability of future economic benefit.  As set forth below, American Blind

22   sufficiently alleges these elements of a claim for tortious interference with prospective economic

23   advantage.

24        **1.    American Blind Alleges An Independent, Wrongful Act**

25            Google claims that American Blind fails to allege an independent, wrongful act as

26   required to establish a claim for tortious interference with prospective economic advantage.

27   (Google Mot. at p. 9).  American Blind does not dispute that an act is independently wrongful

28   under California law only if it is unlawful pursuant to some "constitutional, statutory, regulatory,

common law, or other determinable legal standard." (Google Mot. at p. 9, citing *Korea Supply Co.*, 29 Cal.4th at 1159).  However, American Blind fulfills this pleading requirement when it alleges:

> Among other things, the deliberate acts of Google and its use of the American Blind Marks, as described herein, constitute trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a), dilution of American Blind's famous marks in violation Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), dilution and unfair competition under the laws of the State of California, trademark infringement and unfair competition under the common law, and tortious interference with prospective economic advantage in violation of the laws of the State of California.

(Counterclaim, ¶ 85).

> The aforesaid acts of Defendants, namely, the unauthorized and willful use of copies, variations, reproductions, simulations or colorable imitations of American Blind's registered marks in connection with the sale of keyword advertising, constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

(Counterclaim, ¶ 91).

> Use by Defendants of copies, variations, reproductions, simulations or colorable imitations of the American Blind Marks in connection with the advertising, offering for sale and sale of Defendants' keyword advertising services has and will continue to lessen the capacity of American Blind's famous and distinctive American Blind Marks to distinguish American Blind's products and services from those of others, and has diluted the distinctive quality of American Blind's famous and distinctive American Blind Marks.

> The aforesaid acts of Defendants constitute dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

(Counterclaim, ¶¶ 100-101).

While Google may disagree with the merit of these allegations, that is not the proper subject for consideration on a motion to dismiss.  For purposes of this motion, this Court must accept American Blind's allegations as admitted and must view the facts alleged in the light most favorable to American Blind.  *Parks School of Business, Inc.*, 51 F.3d at 1484.  Since American Blind has obviously alleged independent, wrongful acts by the Defendants, American Blind's claim for tortious interference with prospective economic advantage should not be dismissed.

1

**2.    American Blind Alleges A Probability Of Future Economic Benefit**

2

In its motions to dismiss, Google claims that "American Blind fails to allege the existence

3

of an ongoing economic relationship with which Defendants' [sic] interfered."  (Google Mot. at p.

4

10).  Google further claims that American Blind "does not allege that Defendants interfered with

5

any existing contract, agreement or other relationship between it and its customers."  *Id.*

6

As an initial matter, Google is confusing the elements of a claim of tortious interference

7

with contract with a claim for tortious interference with prospective economic advantage.  The

8

California Supreme Court has cautioned that the torts of tortious interference with contract and

9

intentional interference with prospective economic advantage are separate and distinct.  *Korea*

10

*Supply Co.*, 29 Cal.4th at 1157.  "[T]he tort of interference with prospective economic advantage

11

'is considerably more inclusive than actions based on contract or interference with contract, and is

12

thus is [sic] not dependent on the existence of a valid contract."  *Id.*  Thus, contrary to Google's

13

assertions, American Blind's failure to allege the existence of any existing contract or agreement

14

is not relevant to whether it properly pleads an action for tortious interference with prospective

15

economic advantage.

16

Instead, American Blind must simply allege that it had an economic relationship with

17

some third party, with the probability of future economic benefit to American Blind.  *Korea*

18

*Supply Co.,* 29 Cal. 4th at 1153.  American Blind has clearly met this pleading requirement.

19

Specifically, in its Counterclaim, American Blind alleges:

20

21

> Today, American Blind has close to seven million households on
> file nationwide and generates annual revenues in excess of $100
> million.

22

(Counterclaim ¶ 29).

23

24

25

> A significant and critical amount of American Blind's business is
> conducted via the Internet.  The company estimates that, each day,
> it receives in excess of thirty thousand (30,000) visits by customers
> or potential customers to its Internet website and processes over
> 400,000 Internet transactions every year.

26

(Counterclaim ¶ 33).

27

28

> Many of American Blind's customers regularly purchase products
> from American Blind's website, and are repeat customers.  It is
> probable that such customers and others will continue to seek to

visit American Blind's website and purchase American Blind's goods and services in the future.

(Counterclaim ¶ 120).

Absent Defendants' intentional and improper interference through their deceptive and manipulated search engine "results," it is reasonably certain that American Blind would realize additional sales from existing customers and/or new customers.

(Counterclaim ¶ 122).

It is clear from these allegations from American Blind's Counterclaim that American Blind has alleged that it has an economic relationship with a great number of customers, that a high percentage of American Blind's customers are repeat customers, and that American Blind had a reasonable expectation of receiving future benefit from its past and current customers, thereby satisfying the pleading requirements for a claim of tortious interference with prospective economic advantage.

Since American Blind alleges both that Google committed an independent, wrongful act and the existence of a relationship with its customers with the probability of future economic benefit, American Blind's claim for tortious interference with prospective economic advantage should stand and Google's motions to dismiss this claim should be denied.

**3.    Section 230 of the Communications Decency Act Does Not Immunize Defendants From American Blind's Tortious Interference Claim**

Google also includes a closing footnote claiming that Section 230 of the Communications Decency Act ("CDA") provides it and its cohorts with immunity from American Blind's claim for tortious interference with prospective economic advantage.  (Google Mot. at p. 11 n. 13). However, Section 230 of the CDA does not immunize Defendants from American Blind's tortious interference claim because the CDA offers no immunity if the service provider contributes to the content of the disputed statement.  *See Optinrealbig.com, LLC v. Ironport Systems, Inc.,*  2004 WL 1459337 at * 7 (N.D. Cal. June 25, 2004); *Carafano v. Metrosplash.com, Inc.*, 207 F.Supp.2d 1055, 1066 (C.D. Cal. 2002), *affirmed on other grounds,* 339 F.3d 1119 (9th Cir. 2003).

The allegations in American Blind's Counterclaim make clear that Google is not simply providing content created by others. Instead, American Blind alleges that Defendant Google sells advertising keywords to advertisers and then displays the advertisements as "Sponsored Links" on its search engine results page. (Counterclaim ¶ 38). Moreover, the Defendants design their search engine results page "so that the 'Sponsored Link' display is inconspicuous or otherwise not apparent" and so that "it is not apparent who exactly 'sponsors' these links" or what a "Sponsored Link" even is. (Counterclaim ¶ 39).

In addition, Google profits every time an Internet user clicks on a "Sponsored Link" for one of the Defendants' advertisers. (Counterclaim ¶¶ 40, 68). Finally, as part of its AdWords Keywords Suggestions feature, Google recommends to American Blind's competitors that they purchase trademarks owned by American Blind as keywords for the competitors' advertising. (Counterclaim ¶¶ 46-47). By taking these actions, the Defendants are not merely acting as a conduit for information such that they would be protected by the immunity provisions of the CDA. Rather, the Defendants are taking an active role in determining when advertisers' sponsored links will be displayed and how the display of the sponsored links will appear to Internet users. These actions by the Defendants have resulted directly in the confusion of American Blind's current and prospective customers. (Counterclaim ¶¶ 50-51, 73-76). As a result, Defendants are not protected by the immunity provisions of the CDA.

## IV.
### CONCLUSION

Defendants' base their motions to dismiss on their belief that they are not "using" American Blind's Marks as required for a Lanham Act claim. Given that Defendants are selling American Blind's Marks to American Blind's competitors and that Defendants are profiting from these sales of American Blind's Marks, Defendants' position defies common sense, established Ninth Circuit law, and the rationale underlying the trademark protection statutes themselves. If Defendants are legally permitted to continue selling American Blind's Marks to American Blind's competitors, the entire rationale behind the federal trademark protection scheme has been abandoned, and both trademark owners and consumers will suffer. Finally, American Blind has

OPPOSITION TO MOTION TO DISMISS
COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1   sufficiently alleged a claim for tortious interference with prospective economic advantage and

2   Defendants' claims regarding immunity from such claims pursuant to the Communications

3   Decency Act are misplaced.  For all of these reasons, Defendants' motions to dismiss should be

4   denied, and American Blind's claims should stand.

5

6   Dated:        August 10, 2004              HOWREY SIMON ARNOLD &
                                               WHITE
7

8                                              By:/s/ Robert N. Phillips
9                                                  ROBERT N. PHILLIPS

10                                             David A. Rammelt
                                               Susan J. Greenspon
11                                             Dawn M. Beery
                                               KELLEY DRYE & WARREN LLP
12                                             333 West Wacker Drive
                                               Suite 2600
13                                             Chicago, Illinois 60606

14                                             Attorneys for Defendant/Counter-
                                               Plaintiff American Blind and Wallpaper
15                                             Factory, Inc.

16

17

18                     **ATTESTATION OF CONCURRENCE OF FILING**
19

20          I, Robert N. Phillips, under penalty of perjury of the laws of the United States of America,

21   attest that concurrence in the filing of this document has been obtained from each of the other

22   signatories to this document.

23

24                                             /s/ Robert N. Phillips
25                                             Robert N. Phillips

26

27

28