1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

GOVERNMENT EMPLOYEES      .        Civil Action No. 1:04cv507
INSURANCE COMPANY,        .
                          .
           Plaintiff,     .
                          .
      vs.                 .        Alexandria, Virginia
                          .        November 19, 2004
GOOGLE, INC., and OVERTURE .       10:00 a.m.
SERVICES, INC.,           .
                          .
           Defendants.    .
                          .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:          CHARLES D. OSSOLA, ESQ.
                            CHRISTOPHER WINTERS, ESQ.
                            Arnold & Porter LLP
                            555 Twelfth Street, N.W.
                            Washington, D.C. 20004
                              and
                            JOHN F. ANDERSON, ESQ.
                            Troutman Sanders LLP
                            1660 International Drive, Suite 600
                            McLean, VA 22102


FOR DEFENDANT GOOGLE:       MICHAEL H. PAGE, ESQ.
                            Keker & Van Nest, LLP
                            710 Sansome Street
                            San Francisco, CA 94111-1704
                              and
                            MELANIE D. COATES, ESQ.
                            Wilmer Cutler Pickering Hale and
                            Dorr LLP
                            1600 Tysons Boulevard, Suite 1000
                            McLean, VA 22102

(Pages 1 - 27)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1  APPEARANCES:  (Cont'd.)

 2  FOR DEFENDANT OVERTURE:      DAVID S. FLEMING, ESQ.
                                 Brinks Hofer Gilson & Lione
 3                               455 North Cityfront Plaza Drive
                                 Suite 3600
 4                               Chicago, IL 60611
                                   and
 5                               RICHARD C. SULLIVAN, JR., ESQ.
                                 Reed Smith LLP
 6                               3110 Fairview Park Drive, Suite 1400
                                 Falls Church, VA 22042
 7

 8  ALSO PRESENT:                MICHAEL KWON, ESQ.

 9
    OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
10                               U.S. District Court, Fifth Floor
                                 401 Courthouse Square
11                               Alexandria, VA 22314
                                 (703)299-8595
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                      P R O C E E D I N G S

2          THE CLERK:  Civil Action 2004-507, Government Employees

3    Insurance Company, et al. v. Google, Inc.  Will counsel please

4    note their appearance for the record.

5          MS. COATES:  Melanie Coates, local counsel for Google,

6    along with Michael Page from Keker & Van Nest.

7          MR. PAGE:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. PAGE:  With me is Michael Kwon, in-house counsel at

10   Google.

11         MR. ANDERSON:  Good morning, Your Honor.  John Anderson,

12   Chuck Ossola, and Chris Winters here on behalf of the plaintiff,

13   GEICO.

14         THE COURT:  Good morning.  Now, just so I'm clear,

15   Overture has not filed any dispositive motion, correct?

16         MR. OSSOLA:  That's correct.

17         THE COURT:  So I'm not looking at an Overture motion a

18   week or two down the road?

19         MR. OSSOLA:  No, Your Honor.  That's my understanding.

20         MR. SULLIVAN:  Good morning, Your Honor.  This is

21   Richard Sullivan, with Reed Smith.  You've met David Fleming

22   before from the Brinks Hofer firm.  We're here for Overture.

23         THE COURT:  All right.  Well, good, you can answer

24   yourselves.  You've not filed anything?

25         MR. FLEMING:  That's correct, Your Honor.  We have not

4

1   filed and do not plan to file a summary judgment --

2          THE COURT:  All right.  But you did appear at the

3   pretrial conference, and you've filed your list of witnesses and

4   exhibits, etc.?

5          MR. FLEMING:  Yes, we have, Your Honor.

6          THE COURT:  All right, very good.  I just want to make

7   sure.

8          All right.  Well, what we have here are the -- let me

9   address the administrative issue first.  I have GEICO's motion for

10  leave to file under seal the complete memorandum in opposition to

11  the motion for summary judgment and certain exhibits.

12         I'm just sort of letting the word get out, this sealing

13  business is becoming a real problem, and the developing case law

14  in the Fourth Circuit convinces me that the standard for sealing

15  documents, especially when you get to the summary judgment stage,

16  is extremely high threshold.

17         I think it's going to be an ongoing problem, but I must

18  tell you-all that my practice is going to be I'm not spending a

19  lot of my time worrying about sealing things.  If lawyers present

20  me with a really narrow sealing request that is based on

21  compelling justification, then obviously, I will grant that

22  motion, but if it's a broad request and I'm finding that I'm

23  spending a lot of time looking at documents for which there's no

24  reasonable basis to be sealing, then I'm not going to spend my

25  time looking for the one or two meritorious issues that might be

1  amongst that.

2        That's how I take attorney-client privilege documents

3  the same way.  If you give me a hundred and I do a random sampling

4  and the first five I pick out are not subject to the privilege,

5  I'm not going to waste my time looking at the other 95.  I think

6  it's been waived.

7        Now, in this case, a couple of the things about

8  percentage of income based upon this kind of business, etc., some

9  of those things I can understand of a proprietary nature, although

10 now that Google is public or going public, I don't know where you

11 are at this point, probably a lot of that stuff is actually not so

12 much in the private domain anymore, but some of the specific

13 attachments, I didn't see any way in which they would really truly

14 be subject to a seal, and as I said, the Fourth Circuit's just,

15 what, in the last two weeks in that Washington case sent very

16 clear signals that it doesn't expect litigation to be done in

17 privacy.  So I'm torn.

18        I think you did better than most of the lawyers I've had

19 recently in terms of trying to be somewhat selective, but I still

20 think it was broader than was necessary, and if this case were

21 being heavily watched by the media, we would most likely have a

22 motion from them to unseal.

23        So I'm going to go ahead and be generous at this time

24 rather than -- and I'm going to grant the motion, and so you can

25 file under seal the original unredacted, and we'll leave the case

1    as it is, but, I mean, this is sort of a message for the future

2    that it's got to be much more narrowly tailored or I won't be

3    granting any sealing.  All right?

4              MR. OSSOLA:  Yes.

5              THE COURT:  However, I am not going to struggle if I

6    have to write an opinion in this case with -- because again, I'm

7    working off of a national security background, where you have to

8    run it by the CIA to get anything even published as a judge.  I'm

9    not going to live like that in this case.

10             So assuming we have a trial and I have to do findings of

11   fact and conclusions of law, I'm not going to worry nor am I going

12   to ask my law clerk to struggle with making sure that we don't

13   include proprietary information in that opinion.  If it's come out

14   during the trial or if it's in the papers I've had to consider,

15   it's coming out.

16             So I just want you to know I cannot spend the time doing

17   that.  It's very labor intensive, as you know, because you went

18   through the process of redacting stuff yourselves.  Okay?

19             MR. OSSOLA:  Understood, Your Honor.

20             THE COURT:  All right.

21             MR. OSSOLA:  And the CIA is not involved in this case.

22             THE COURT:  Thank goodness.  But in any case, that is a

23   problem.  All right.  So I've granted GEICO's motion for leave to

24   file, and that leaves then just the defendant Google's motion for

25   summary judgment.

1    All right.  Again, as you know from our previous round

2   on the motion to dismiss, it was my view that I could not grant

3   that motion in part because this issue about likelihood of

4   confusion is such a fact-specific issue that it would need to be

5   played out, you know, in a trial forum.

6    I must tell you honestly I still think, although it has

7   become a more solid basis right now, I still think that most

8   likely that's where this case has to ultimately be resolved, but

9   I'll hear some argument if you want to --

10    MR. PAGE:  Okay.  Hopefully, I can change your mind on

11   that.  In assessing the likelihood of confusion evidence and the

12   likelihood of confusion in this case, it's important to separate

13   out the two very different theories of liability put forward by

14   GEICO.

15    The first theory is that the use of their trademark in

16   the text of an advertisement gives rise to a likelihood of

17   confusion.  That theory at least on an injunctive level applies to

18   both Overture and to Google on a liability basis but not on an

19   injunctive basis, because unlike Overture, Google does not permit

20   advertisers to use the, use the GEICO trademark in the text of

21   their ads now, so there's no point in an injunction that would

22   require us to stop doing something we don't do.

23    The second theory, it's a very different theory, is that

24   the use of "GEICO" as the keyword that triggers an advertisement

25   itself gives rise to a likelihood of confusion.  That is what

1    Google allows advertisers to do because we believe first that it

2    is not a trademark use at all, but we've already addressed that

3    issue with Your Honor, and second, that it does not give rise to a

4    likelihood of confusion, and on that issue, there are no triable

5    issues of fact anymore because GEICO's own survey, although it

6    didn't set out to do it, tested that theory conclusively.

7         As you'll recall, GEICO's expert, Dr. Ford, used in his

8    survey a stimulus, which was a Google search page -- and it's

9    Exhibit B to his report, which is Exhibit B to the Coates

10   declaration -- he used a stimulus that consisted of a Google

11   search page where the search term that was entered was "GEICO."

12        The sponsored links consisted of five sponsored links.

13   Four of those sponsored links contained the word "GEICO," and all

14   five of those sponsored links offered comparison rates for

15   insurance, get insurance rates here, free insurance quotes, that

16   sort of thing.  And he tested confusion on that stimulus.

17        And all of the experts agree that there are three

18   possible sources of that confusion:  One, what term did you search

19   for; two, does the trademark appear in the ad and does that give

20   rise to the confusion, which was true of four of the five ads; or

21   three, is it background confusion that's simply the result of the

22   context that's nonactionable.

23        As an example, if you put up a shoe store with a sign

24   that says "Hundreds of Name Brands Here," you don't use anybody's

25   trademark at all, and you survey 100 people in front of that store

1  and say, "Do you think this store sells Nike shoes?," many of them

2  are going to say, "Yes."  It's a perfectly logical supposition

3  that they have hundreds of name brands, "Sure, yeah, I think they

4  sell Nike."

5        Similarly, if you show someone an ad that says "Compare

6  Insurance Rates Here" and ask them, "Do you think that you can get

7  GEICO rates here?," their supposition is going to be, "Yeah, they

8  compare insurance rates."  That may be confusion, but it's not

9  confusion that stems from the trademark use.

10       So in order to figure out what the source is of that

11 confusion, a proper survey needs to do controls.  It needs to do

12 tests that isolate one source from the other to show where the

13 confusion comes from.

14       And Dr. Ford tried to do a control, but he got it very

15 wrong.  What he did was he eliminated one source of actionable

16 confusion, the word "GEICO" in the ads, and he eliminated the

17 context.  He got rid of the ads that say "Compare Insurance Rates

18 Here," and he kept the second arguably actionable source of

19 confusion, "GEICO" as the search term, and his results were that

20 when people entered "GEICO" as a search term but the word is not

21 in the ad and the ad does not offer insurance comparisons, the

22 confusion rate is zero.

23       So as to the use of "GEICO" as a keyword, their only

24 evidence on confusion is that it is zero.  There are only two

25 conclusions you can draw from that:  Either A, that there's a

1   valid control and he tested it correctly, in which case it proves

2   our case; or it's an invalid control, in which case they have no

3   evidence to present at trial on confusion at all, because that is

4   their only evidence of confusion.

5         We, we did our own survey, and we set up a control that

6   did it correctly.  What we did was we showed people a search page

7   with "GEICO" as the search term and ads that offered comparison

8   insurance rates, "Compare Insurance Here," at the actual ads that

9   they complained of in their complaint, and we tested confusion on

10  that.

11        We then did a control sell, exactly the same stimulus.

12  They searched for "GEICO," they saw the same insurance ads, and we

13  asked them, "Do you think you can get Allstate insurance here?"

14        And even though there was no search for Allstate, there

15  was no mention of "Allstate" anywhere on the search page, the

16  level of confusion was higher for Allstate than it was for GEICO,

17  which establishes that the -- to the extent people think they can

18  get GEICO quotes from a site that says "Compare Insurance Here,"

19  it's not because of what they searched for; it's because they

20  think they can get insurance quotes there because they can, and

21  that's what it says, and they assume -- in GEICO's case

22  incorrectly -- that those quotes include GEICO.

23        But that's a belief the user brings to the situation

24  from their own experience and has nothing to do with any alleged

25  trademark use even if you believe that triggering an ad that

1   doesn't use the trademark is, in fact, a trademark use.

2        As -- because Google only allows people to trigger ads

3   off trademarks and does not today allow them to put "GEICO" in the

4   text of the ads, that's the only issue before this Court as to

5   injunctive relief.

6        THE COURT:  All right.  You-all want to respond to that?

7   Who's going to be -- let me have that issue responded to.

8        MR. PAGE:  Okay.

9        THE COURT:  Mr. Ossola?

10       MR. OSSOLA:  Your Honor, the -- Mr. Page has our theory

11  wrong.  This is not a case where we're singling out any one factor

12  and looking at it in isolation.  This is a case -- and the survey

13  reflects it -- where what is being looked at is the presentation

14  of the search results of the sponsored listings on the page in

15  conjunction with the organic listings; the context in which that

16  occurs, which, of course, is the subject of the survey in terms of

17  what was presented to users; the fact that -- which will be

18  presented at trial, auto insurance quotes from GEICO are not

19  available through any of these sites, GEICO insurance quotes are

20  only available through GEICO; the fact that Google's own policy in

21  the history of the evolution of their trademark policy shows that

22  they started out being concerned about not about misleading

23  consumers and did not allow what they're now allowing in terms of

24  allowing advertisers to bid on competitors' trademarks and admits

25  in the spring and during the course of this litigation, they've

1  modified their policy again, and now they don't allow the use of

2  trademarks in the text, but the evidence will show that

3  notwithstanding that change, it has continued.

4          During the depositions of Google witnesses in this case,

5  it still continued.  We did live feeds at the time, and we still

6  saw "Google" appearing in the text of ads.

7          So the effectiveness of the change in terms of

8  injunctive relief, well, that's a matter for the Court to address

9  after hearing the evidence.  The appropriateness of injunctive

10  relief with respect to use of the mark in the text is part of this

11  case.  It's essentially been admitted by Google, and its own

12  internal user study, which is alluded to in our opposition which

13  will be presented at trial, showed overwhelming levels of

14  confusion associated with this, and there are hundreds of

15  instances of past infringement that will be essentially admitted

16  at trial as a result of Google's own admissions through its user

17  survey and its change in policy.

18          All of that will be considered by the Court in, first, a

19  determination of liability, and second, whether or not injunctive

20  relief is appropriate.

21          Google says, "We've changed the policy.  It's taken some

22  time to clean all of it up.  No injunction is needed."

23          What you'll hear from us is there have continued to be

24  problems throughout the litigation of this case.  It's changed its

25  policies back and forth a number of times, and injunctive relief

1  is indeed important.

2       But let me step back to, to the theories of liability.

3  What the Court will consider at trial is likelihood of confusion

4  based on the entire setting, not just the use of trademarks in the

5  text, but also, of course, the use of trademarks of competitors as

6  keywords, which Google originally prohibited and then allowed and

7  we will submit and show for financial reasons only.

8       And what was surveyed and studied by Dr. Ford showed

9  that whether the trademark is in the -- whether the GEICO mark is

10  in the text or whether the GEICO mark is just the trigger for the

11  auto quote sponsored listings, he found very high levels of

12  confusion, 60 to 65 percent levels of confusion, which he said and

13  which the defendant's survey expert acknowledged are high levels

14  of confusion if that is sustained by the Court.

15       Google is simply asking you to interpret the meaning of

16  our survey, which is bolstered not only by Dr. Ford but also by

17  another experienced expert, Ivan Ross, they're asking you to

18  interpret our survey the way they think it should be interpreted,

19  and not only is that inappropriate at the summary judgment level;

20  you have a classic disagreement among experts about the meaning

21  and significance of the survey results.

22       Those survey results, as counsel alluded to, involve

23  different controls.  The Court is going to have to decide which

24  are appropriate and which were not, but I will say this:  that

25  defendant's findings of confusion before they started cutting back

1  with the controls were also strong, over 40 percent affiliation

2  confusion, and then they use an elaborate series of controls to

3  get that number down to below 5 percent.  We think that's

4  inappropriate.  We will attempt to demonstrate that at trial.

5        But the point is you're being asked to interpret the

6  meaning of these controls at summary judgment stage, and I think

7  the law in the Fourth Circuit on questions such as likelihood of

8  confusion is pretty clear that that is generally not done and can

9  only be done with great care.

10        And I think here there's another reason why the Court

11  should avoid getting into an interpretation of the meaning of our

12  survey and, of course, crediting Google's survey on summary

13  judgment without hearing from the experts, and that is, their

14  attack is predicated on what our control proves, and that is --

15  fundamentally misapprehends the purpose of a control.

16        Our control and their control doesn't prove anything in

17  and of itself.  It doesn't test for confusion.  It is simply there

18  to filter out the background noise that should be filtered out in

19  assessing what are the reasons why we got these results 60-65

20  percent, close to 70 percent in some findings of confusion as to

21  the source of the sponsored listings and whether they were

22  affiliated with GEICO.

23        And so the, the Nike control which was used by Dr. Ford

24  was simply used to screen out background noise.  You cannot take

25  that control and say it proves lack of likelihood of confusion.

1  That is not an appropriate use of a control, and I think all the

2  survey experts will, will confirm that at trial.

3        So I would submit that this is a situation where you

4  will hear from two experts, a primary survey expert and a rebuttal

5  survey expert, from GEICO at trial; the findings of the GEICO

6  survey will be presented; the findings of the Google survey will

7  be presented; we will offer a rebuttal witness which will -- who

8  will attempt to demonstrate to Your Honor that the Google survey

9  was an elaborate attempt after finding high levels of confusion to

10 cut them back based on controls that were not proper; but at the

11 end of the day, the Court will have to assess who's right and what

12 methodology was correct against the backdrop of the other evidence

13 in the case, including Google's conduct, including the changes in

14 its trademark policy and what they mean, and including its own

15 internal studies which suggested that they knew that there was a

16 problem with, with selling competitors' trademarks to other

17 companies, which is why originally they didn't do it, and then

18 there were reasons why they began doing it, and then because of

19 the overwhelming levels of confusion that they found in their own

20 internal study, they changed their policy to prohibit the use of

21 trademarks in text, and that has not been effective.

22        THE COURT:  All right.

23        MR. PAGE:  Your Honor, counsel just said a couple of

24 things that are very telling, the first of which is that their

25 theory isn't that confusion comes from one source or another but

1    that it's the whole package, the whole gestalt, and that's what

2    their expert said:  "I said I wanted to test it all together and

3    then none of it together."

4           You can't do that because you're counting the noise as

5    well as the actionable confusion.  It's why every survey has to

6    have a control.

7           They would love to be able to count every human being

8    who thinks that when they look at a site that says "Compare

9    Insurance Rates Here," that they can probably get GEICO insurance

10   there, but that's not actionable, just like you can't sue the

11   store that says "Millions of -- Hundreds of Name Brands Available"

12   because consumers think they have a certain brand.  You need to

13   take the noise out.

14          The other telling thing he said was that the point of a

15   control is to filter out the noise.  The way you do that is you

16   measure the overall confusion from both the actionable --

17   allegedly actionable conduct and the noise, and you get a number,

18   and then you do a control where you remove the actionable parts

19   and you leave in what you're calling the noise and you measure

20   that, and you subtract the noise from the overall confusion.

21          They did that, but what they called the noise was

22   "GEICO" as a search term.  They left that in, and they measured

23   it, and they took out the context of the ads and the use, and when

24   they measured what they were calling noise, the result was zero.

25          THE COURT:  All right.

1          MR. PAGE:  If I could move on to a couple of other

2    issues?

3          THE COURT:  Actually, actually, as much as I enjoy --

4    this is a great case.  I've said that probably too many times

5    before.

6          MR. PAGE:  Don't --

7          THE COURT:  Wait.  I think there's a lot of merit to

8    your argument.  I think the issue about surveys is always

9    problematic and whether the proper technique has been used and

10   whether the proper controls has been used, very interesting

11   issues.

12         I'm concerned, frankly, about the procedural posture of

13   the case at this point, and I'm cognizant of the fact that we're

14   set as a bench trial, not as a jury trial, so the use of resources

15   is somewhat different.

16         Resolving this case in the context of a trial, where, as

17   you know, the burdens are different, the presumptions are

18   different, etc., is a better forum in which to address these

19   issues, so I am going to deny the motion for summary judgment not

20   because I necessarily find it is without merit but because I think

21   it is far better to resolve these issues in the context of a

22   complete record so that that particular issue is out of any

23   appellate proceedings that go down the road.

24         If I'm reversed, so be it on the merits but not on a

25   procedural error of resolving the case prematurely.  All right?

1          MR. PAGE:  Okay.  Your Honor, briefly, if I could

2   address a different issue, which I think -- on which you can very

3   easily resolve this case on summary judgment immediately?   I

4   realize I'm fighting uphill --

5          THE COURT:  I'm looking forward to hearing that.  All

6   right, let me hear.

7          MR. PAGE:  Which is very simply, there is no claim of

8   damages here at all.  The traffic that flows to GEICO and the

9   money they make off the traffic that flows to GEICO from Google is

10  nothing that they are entitled to in the first place.

11         Google built a search engine that daily sends millions

12  of -- or millions of dollars in the course of a year to GEICO for

13  nothing.  They are under no obligation to do so and --

14         THE COURT:  Wait.  Isn't the reality of this case not a

15  damage claim but the injunction?  That's the sense that I have of

16  it.

17         MR. PAGE:  That is correct, Your Honor, but if there is

18  no damage, no injunction will lie.  There's no harm to remedy.

19         What they are complaining about is that a small subset,

20  even if you grant all of their, their theories that an ad that

21  says "Compare Insurance Rates" is somehow fraudulent because they

22  didn't let anybody compare their rates and they claim no one's

23  allowed to and that's misleading, even though it doesn't say

24  "GEICO" to begin with, even if you grant all of that, they're not

25  harmed.  It is just a dimunition in a free flow of business to

19

1  them to begin with.

2         These aren't two different issues.  This isn't -- I

3  grant that if I run into your car, I can't claim that I'm off the

4  hook because I painted your house for free.  Clearly, that's not a

5  defense, but you can't sue me for failing to finish the trim if I

6  decide to paint your house for free, and that's what they're doing

7  here.

8         They are claiming that the, the free flow of business

9  that goes to them from Google is being diminished a little bit,

10  and that's not a damage claim.  That's just a dimunition in a free

11  good to begin with.  And on that basis, you can grant summary

12  judgment today.

13         THE COURT:  All right, let me hear a response to that.

14         MR. OSSOLA:  Your Honor, you're being asked to accept an

15  absolutely extraordinary proposition.  This case is about

16  sponsored listings.  Sponsored listings is the primary, almost the

17  entire source of revenue for Google.  It's an advertising program

18  where they're paid on each time a consumer clicks on an

19  advertisement.

20         That's what this case is about, and there is a

21  substantial damages component to it because every time, as we will

22  show, every time a consumer clicks on one of these sponsored

23  listings, believing as we will demonstrate that there's some

24  connection that they'll either get a GEICO quote or this is GEICO

25  or this is sponsored by GEICO, we have lost a click, and as we

20

1  will show you, a very substantial portion of GEICO's business now

2  comes through the Internet, and our damages expert will present to

3  you calculations that will show how many clicks have been lost.

4  Clicks through to the GEICO site is what I'm talking about.

5       We will then show you what the historic percentage of

6  conversion rates is of the number -- and it's low; it's low -- but

7  the number of clicks multiplied by that conversion rate and taking

8  into account the value of an insurance policy over time is very

9  high, and you will hear that this has, that this has cost GEICO a

10  substantial amount of lost profits.

11      What you are being asked to accept is that because

12  Google includes through its algorithm "GEICO" in the organic

13  listings, that free benefit outweighs any damages associated with

14  trademark infringement.  So if we violate the law, it's okay.  You

15  should disregard those damages because we're including you in a

16  benefit that we're offering to others through our organic

17  listings.

18      That's not the way the law works, and in fact, you know,

19  this is such an extraordinary proposition, we will ask you before

20  the trial to strike it because a damages theory that says that you

21  can, that you can commit infringement and cause damage should be

22  disregarded and, in fact, overwhelmed because there's some

23  charitable contribution being made in another context that is not

24  at issue in the case is simply not defensible.

25      THE COURT:  All right.  It's an interesting argument.

1          MR. PAGE:  Your Honor, I think --

2          THE COURT:  It got my attention.  I heard it.  I'll be

3    listening for it during the course of the trial.  I'll save

4    Mr. Ossola the time, don't try to strike it from the trial.  I

5    mean, we're going to have a trial so that all the issues can be

6    litigated and whatever decision I render is based on a complete

7    record.  All right?

8          Now, we're set for this trial to begin on Monday,

9    December 13.  Am I correct in assuming that you're going to go --

10   the case will go against Google first?  I mean, Overture has sort

11   of been the quiet player in all of this.

12         I would think the lawyers are working well together.

13   Talk among yourselves and make sure that you have a good, clear

14   order of proof.  I suspect -- because there are definitely from my

15   understanding of the records, definitely differences between

16   Overture -- factual differences between Overture and Google, the

17   way the pages look, the way the searches are done.  Some of the

18   legal issues may be the same as to both defendants, but I want to

19   make sure that, you know, the evidence is properly demarcated

20   there.  Obviously, I've been better educated about the Google

21   aspect of this case than I have the Overture aspect.

22         The last question, I think I mentioned this to you last

23   time or at the last pretrial, is there any work being done behind

24   the scenes to try to resolve this as a business resolution?

25         MR. OSSOLA:  Your Honor, there are settlement

1  discussions ongoing with Overture, and those are substantial.

2  Mr. Page and I continue to talk about, about settlement with

3  Google.  I don't know if he'll disagree, but I'm not sure our

4  conversations have risen to the level of settlement negotiations

5  yet, but we have had conversations, and we will, I think, continue

6  to have conversations.

7       So we're cognizant of the complexity of the case.  We're

8  cognizant of the importance of the case to both of these parties.

9  So those conversations are continuing.

10      MR. PAGE:  Yeah.  I would agree we, we have had

11  discussions.  We will continue to have discussions.  I would say

12  that there has been some movement.  I won't characterize the

13  direction, however.

14      THE COURT:  I would assume that technologically, it's

15  almost possible, if not definitely possible, what if Google

16  decided -- well, GEICO indicates in their papers that Google has

17  made a decision that it does not allow the Google name to be bid

18  upon.  Does the Google name appear, though, within your searches?

19      In other words, if somebody just wants to learn about

20  Google and they go on -- I haven't actually bothered to do this

21  exercise at home, but I assume I can pick up Google as an

22  informational purposes like any other keyword in a general search?

23      MR. PAGE:  Absolutely, Your Honor.  And it is, it is not

24  true that we prevent people from bidding on the Google keyword.

25  We did at one point; we do not do that and haven't for quite some

1  time.  It's a rare event.

2        I think most advertisers are -- find it unlikely that

3  people will go to the Google site to search for the Google site or

4  for information about Google when they're already there, so it's a

5  rare example.

6        We do have a policy where we discourage advertisers from

7  describing things as Google specials or, you know -- and try to

8  give an impression that they are somehow different from the rest

9  of the advertisers.  So we do not let them use "Google" in the

10 text, just like we don't let them use other trademarks in the

11 text.

12       I do want to clarify something Mr. Ossola said.  We have

13 not repeatedly changed our policy.  Our policy was until June of

14 this year that when a trademark holder requested it, we would

15 block their trademark both as a keyword and in the text.

16       In June, that policy changed, and we now continue to

17 block trademarks in the text, but we do not block the use of

18 trademarks as keywords.  That was the one change in policy.

19             THE COURT:  But you had or have the ability to do that?

20             MR. PAGE:  We have the ability to, to block just about

21 anything.  It's challenging to execute because we have hundreds of

22 thousands of advertisers doing millions of ads, each of which they

23 input themselves.  We have a whole lot of bells and whistles where

24 you can have automatic insertion of whatever the user searched

25 for.  You can have multiple different ads that rotate.  You can

1   have ads that get paused and reactivated.

2        So when we made the change in June, it took us some time

3   to go back and pick up -- when we were blocking ads as keywords as

4   well, you didn't have an issue with keyword insertion in the text

5   because it wasn't running to begin with.

6        When we changed that, we started having ads that would

7   pop "GEICO," for example, in on automatic insertion.  It took some

8   time to go back manually and get rid of those.  We then had to

9   deal with ads that when we did that search, had been paused so

10  they weren't there, and reactivated.

11       So it admittedly has taken us some time to implement the

12  process of enforcing our procedures, but that doesn't give rise to

13  derivative liability, and we continue to improve the process, and

14  I'm sure Mr. Ossola will tell you that although they do

15  occasionally find instances, they are very rare at this point, and

16  they disappear very quickly.

17       THE COURT:  Okay.

18       MR. OSSOLA:  Your Honor, can I just say one other thing

19  about what Mr. Page said?  I think there are two aspects of this.

20  As a matter of policy, almost philosophy, Google has allowed

21  anybody to bid on the trademark -- on any keyword, including a

22  trademark of a competitor.  That's a business decision they made.

23  They didn't used to do that, that's what I meant by change, but

24  that's the decision they've, they've made.

25       THE COURT:  All right.

1          MR. OSSOLA:  So they've chosen to allow that, but on the

2   technological side, you know, this is their program.  AdWords is

3   their program.  It has elaborate controls and policies and

4   relevance criteria.

5          They can certainly, of course, as a matter of policy and

6   as a matter of technology take whatever steps might be necessary

7   to fix problems prospectively or retrospectively.  It is a

8   complicated exercise to do it retrospectively, which is one of the

9   reasons we're here, because we do not want to continue doing this,

10  which is finding repeated problems, policing the mark.

11         But there are two aspects of this, and they're both

12  complicated.

13         THE COURT:  Who is the magistrate judge assigned to this

14  case?

15         MR. OSSOLA:  Judge Buchanan, Your Honor.

16         THE COURT:  All right.  Well, again, if you think that

17  getting with a judge who can keep you sort of focused would help,

18  make sure you call her well in advance of the trial date.  If not,

19  we'll see you here.

20         Now, I'm going to have this trial upstairs in the 7th

21  floor courtroom, which will give you access to a much better

22  technology setup.  I would assume during the course of this trial

23  we will have live online presentation of some evidence, and you

24  have the ability to get into the -- work with Ms. Travers on that,

25  but I think we can probably fulfill any of the technology needs up

1    there.  Okay?

2              MR. OSSOLA:  We'll do that.

3              MR. PAGE:  That was one question I did want to address

4    to the Court.

5              THE COURT:  Yes.

6              MR. PAGE:  If the Court would, would like, we could

7    arrange so that we could have live Internet access so that

8    witnesses can say, well, for example, if you do this.

9              THE COURT:  That --

10             MR. PAGE:  I think that would be helpful.  We could

11   certainly do it with canned examples as well but --

12             THE COURT:  All right.  It's going to be an analog

13   connection because of firewall issues.  You can't cut into the DCN

14   itself.

15             MR. PAGE:  Okay.

16             THE COURT:  Ms. Travers and Mr. Bachman are our tech

17   people.  You can work that out with them.

18             But yes, I had anticipated this case will need that kind

19   of facility, and we have that.  So upstairs, right above this

20   courtroom, Courtroom 7, and I'm sure we'll be in contact with you

21   informally by telephone to set up other logistics that need to be

22   addressed.

23             I don't expect any more pretrial motions in this case,

24   right?

25             MR. PAGE:  Neither do I, Your Honor.

27

1          THE COURT:  All right, very good.

2          MR. OSSOLA:  Your Honor, your comment about damages, the

3    only reason I made it is to see what your reaction is, and given

4    your reaction, we'll present our arguments at trial.

5          THE COURT:  Very good, all right.  We're going to recess

6    court until 11:30.

7          MR. PAGE:  Thank you, Your Honor.

8          MR. OSSOLA:  Thank you, Your Honor.

9                        (Which were all the proceedings

10                         had at this time.)

11

12                  CERTIFICATE OF THE REPORTER

13      I certify that the foregoing is a correct transcript of the

14    record of proceedings in the above-entitled matter.

15

16

17    _____

                              Anneliese J. Thomson
18

19

20

21

22

23

24

25