** E-filed on 3/30/05 **

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| GOOGLE INC., | Case Number C 03-05340 JF |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY DEFENDANTS' MOTIONS TO DISMISS |
| v. | |
| AMERICAN BLIND & WALLPAPER FACTORY, INC., et al., | [Docket Nos. 36 and 37] |
| Defendants. | |
| AMERICAN BLIND & WALLPAPER FACTORY, INC., | |
| Counterclaimant, | |
| v. | |
| GOOGLE INC., et al., | |
| Counter-Defendant/ Third-Party Defendants. | |

Counter-Defendant Google Inc. ("Google") and Third-Party Defendants Ask Jeeves, Inc.

("Ask Jeeves"), Earthlink, Inc. ("Earthlink"), America Online, Inc. ("AOL"), Netscape

Communications Corporation ("Netscape"), and Compuserve Interactive Services, Inc.

Dockets.Justia.com

("Compuserve") (collectively "Defendants") move to dismiss the counterclaims and third-party claims of Counterclaimant American Blind & Wallpaper Factory, Inc. ("American Blind") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.[1] American Blind opposes the motions. The Court has read the moving and responding papers and has considered the oral arguments of counsel presented on September 17, 2004. For the reasons set forth below, the motions to dismiss will be granted in part and denied in part.

## I. BACKGROUND

Google filed the instant action for declaratory relief on November 26, 2003, seeking a judicial determination that its "AdWords" advertising program does not infringe American Blind's trademarks. On April 12, 2004, the Court denied American Blind's motion to dismiss the complaint or, in the alternative, to stay proceedings in the case. On May 4, 2004, American Blind answered Google's complaint and asserted counterclaims against Google and third-party claims against Ask Jeeves, Earthlink, AOL, Netscape, and Compuserve for trademark infringement and dilution, false representation, injury to business reputation, unfair competition, tortious interference with prospective business advantage, and, in the alternative, contributory trademark infringement and dilution. Now before the Court are Defendants' motions to dismiss American Blind's counterclaims and third-party claims. American Blind's allegations are as follows:

American Blind is a direct-to-consumer retailer of custom window treatments and wall coverings. It sells and promotes its home decorating products and related services across the United States through a Web site[2] and toll-free telephone numbers. A significant amount of

---

[1] Two separate motions to dismiss are before the Court: (1) a motion by Google, Ask Jeeves, and Earthlink to dismiss American Blind's counterclaims and third-party claims and (2) a motion by AOL, Netscape, and Compuserve to dismiss American Blind's third-party claims. AOL, Netscape, and Compuserve adopt and incorporate by reference the arguments set forth in the motion by Google, Ask Jeeves, and Earthlink.

[2] American Blind owns over a dozen Internet domain names, including <www.americanblind.com>, <www.americanblindandwallpaper.com>, and <www.americanblindandwallpaperfactory.com>.

Case No. C 03-05340 JF
ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY DEFENDANTS' MOTIONS TO DISMISS
(JFLC1)

1   American Blind's business is conducted through its Web site, which it has operated since 1997.[3]

2   It estimates that its Web site receives more than 30,000 visits per day and processes more than

3   400,000 transactions per year. Since at least 1986, American Blind has used the names and marks

4   "AMERICAN BLIND" and "AMERICAN BLINDS" in connection with its products and

5   services. In addition, American Blind is the owner of and has exclusive rights to use the

6   following trademarks, which are registered with the United States Patent and Trademark Office:

7   "AMERICAN BLIND & WALLPAPER FACTORY," "AMERICAN BLIND FACTORY," and

8   "DECORATETODAY."[4] As a result of extensive advertising and promotion and annual

9   revenues in excess of $100 million, American Blind alleges that its products and services sold

10  under the American Blind Marks[5] have acquired a fine reputation and are famous among

11  prospective purchasers of home decorating products and related services in the United States.

12      Google operates an Internet search engine, which allows Internet users to locate Web sites

13  that match the "keywords," or search terms, they enter. A search engine uses algorithms to

14  process the keywords and produce a search-results page that displays links to the Web sites in the

15  search engine's database that match the keywords. Links to the Web sites usually are displayed in

16  order of decreasing relevance, with the most relevant Web sites listed first. Google's free search

17  engine processes hundreds of millions of searches daily and covers billions of Web pages.

18      In addition, Google offers a keyword-triggered advertising program called "AdWords."

19  AdWords enables advertisers to purchase or bid on certain keywords. Then, when an Internet

20  user enters those keywords in Google's search engine, the program generates links, known as

---

22  [3] American Blind has spent over $10 million developing its Web site, spends over $1
23  million per year maintaining, enhancing, and updating its Web site, and employs over fifty full-
24  time employees in connection with its Internet operations.

25  [4] The registration dates for these trademarks are December 17, 1996, November 3, 1987,
    and July 17, 2001, respectively.

27  [5] Hereinafter, the term "American Blind Marks" refers collectively to the names and
    marks "AMERICAN BLIND" and "AMERICAN BLINDS" and to American Blind's three
    registered trademarks.

1   "Sponsored Links," to the advertisers' Web sites. Sponsored Links appear at the top and on the

2   margins of Google's search-results pages. American Blind alleges that, in many instances, the

3   search-results pages "are designed so that the 'Sponsored Link' display is inconspicuous or

4   otherwise not apparent," and "it is not apparent who exactly 'sponsors' these links."

5   Counterclaims ¶ 39. Whenever an Internet user clicks on a Sponsored Link, the corresponding

6   advertiser must pay Google. According to American Blind, Google has reported that ninety-six

7   percent of its net revenues in the first quarter of 2004 were derived from advertising. Google also

8   offers a feature called "AdWords Keyword Suggestions," which recommends additional keyword

9   purchases to its advertising customers to "help you improve your ad relevance." *Id*. ¶ 45 & Ex. B.

10  The suggestions are organized into categories by Google and sometimes are referred to as

11  "optimization campaigns."

12         Through AdWords, Google has sold to American Blind's competitors keywords

13  comprised, in whole or part, of the American Blind Marks, including "American Blind,"

14  "American Blinds," and "Americanblinds.com," and these sales have continued over American

15  Blind's objections. Thus, when an Internet user enters these keywords in Google's search engine,

16  Sponsored Links to the competitors' Web sites appear on the search-results page. Moreover,

17  through its AdWords Keyword Suggestions feature, Google actively and deliberately encourages

18  American Blind's competitors to purchase as keywords both the American Blind Marks and

19  "virtually every conceivable, though indistinguishable, iteration of those marks." *Id*. ¶ 45. For

20  example, an advertiser who is considering purchasing the keyword "American Blind" is

21  encouraged also to purchase the keywords "american blinds," "american blinds and wallpaper,"

22  and "american blinds and wallpaper factory," among others. Google has labeled the optimization

23  campaign containing these suggestions as the "American Blind optimization campaign."

24         American Blind alleges that the intended result of AdWords is to divert consumers who

25  wish to find American Blind's products and services to search-results pages that list the Web

26  sites of American Blind's competitors. That is, Google sells and its advertisers purchase the

27  possibility of intercepting American Blind's potential customers, who may click on the links to

28

4

the Web sites of American Blind's competitors without realizing that they are being directed to a

competitor's Web site or who may eventually recognize the diversion but either fail to search for

or be forced to spend time and energy searching for American Blind's Web site. Google has the

technological capacity to block the purchase of keywords and in fact, for over four years,

operated under a policy pursuant to which it would exercise its discretion to block the purchase

of certain keywords once it was advised that a company had purchased as a keyword another

company's trademark.[6] Google changed its policy sometime after January 27, 2004, when

American Blind filed a lawsuit against Google in the United States District Court for the

Southern District of New York. According to American Blind, Google's new policy is not to

disable Sponsored Links when advertisers have purchased keyword triggers that are trademarked

terms.

Ask Jeeves, Earthlink, AOL, Netscape, and Compuserve (collectively "the non-Google

Defendants") operate Web sites that include an Internet search engine. They pay Google to access

its Web-searching platform and thus display "similar, if not virtually the same, results of search

queries as those displayed by Google." *Id.* ¶ 68. They also profit each time an Internet user clicks

on "any of the links provided by these search results."[7] *Id.*

Although American Blind has not given Defendants permission or a license to use the

American Blind Marks for the promotion or sale of the products and services of its competitors,

it alleges that Defendants are capitalizing illegally on the American Blind Marks by permitting

and encouraging American Blind's competitors to purchase keywords[8] that cause links to the

---

[6] American Blind alleges that Google falsely represented at one point that it was blocking competitors from purchasing American Blind's registered trademarks as keywords.

[7] Although the meaning of this statement is not entirely clear, it reasonably may be inferred from the broader context of the counterclaims, including the specific allegations against Google, that American Blind alleges that the non-Google Defendants profit when Internet users click on the Sponsored Links or their equivalent and not when they click on literally "any of the links" displayed on a given search-results page.

[8] Although American Blind levels this particular allegation against all Defendants, its *specific* factual allegations regarding the sale of and profit from the American Blind Marks as

5

competitors' Web sites to be listed "in a position above or next to" the link to American Blind's

Web site when Internet users enter search terms "identical or substantially similar to the

American Blind Marks." *Id*. ¶ 71. American Blind further alleges that "confusion" regarding

sponsorship, authorization, and/or source of the links[9] and "diversion" of Internet users to the

Web sites of American Blind's competitors are the "intended result[s]" of Defendants' manner of

listing search results. *Id*. ¶ 73. Internet users' ability to distinguish between Sponsored Links and

links to American Blind's Web site allegedly is compromised not only by Defendants' use of the

label "Sponsored Links,"[10] without explanation that the Sponsored Links actually are paid

advertisements unaffiliated with American Blind, but also by Defendants' failure to display

Sponsored Links in a different color, typeface, or font size from that used to display other links.

Defendants and their advertisers—rather than American Blind—are said to be profiting from

their use of the American Blind Marks, while American Blind suffers harm to its sales,

reputation, customer relationships, and marks.

## II. LEGAL STANDARD

A complaint may be dismissed for failure to state a claim upon which relief can be

granted for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under

a cognizable legal theory. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Robertson v. Dean*

*Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984). For purposes of a motion to dismiss,

---

keywords are much more detailed with respect to Google than they are with respect to the non-Google Defendants.

[9] American Blind elaborates that "Defendants' search engines are deceptive and mislead consumers into believing falsely that the website links to which they are directed via manipulated search 'results' links are sponsored or authorized by and/or originating from American Blind" and that the "manipulated search 'results' engineered by the Defendants fail to inform the consumers that the companies listed therein may have no relationship with—and, indeed, may directly compete with American Blind—the trademark owner for which the user was searching." *Id*. ¶¶ 75-76.

[10] Although Defendants explain that some of them use a different term to label their keyword-triggered advertisements, the Court will use the term "Sponsored Links" to refer to all such links displayed by all Defendants.

6

1  all allegations of material fact in the complaint are taken as true and construed in the light most

2  favorable to the nonmoving party. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir.

3  1994). Although the Court generally may not consider any material beyond the pleadings when

4  ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), *Cooper v.*

5  *Pickett*, 137 F.3d 616, 622 (9th Cir. 1997), it may consider documents that are attached to and

6  part of the complaint, *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987). A

7  complaint should not be dismissed "unless it appears beyond doubt the plaintiff can prove no set

8  of facts in support of his claim that would entitle him to relief." *Clegg*, 18 F.3d at 754. However,

9  the Court "is not required to accept legal conclusions cast in the form of factual allegations if

10 those conclusions cannot reasonably be drawn from the facts alleged." *Id.* at 754-55. Motions to

11 dismiss generally are viewed with disfavor under this liberal standard and are granted rarely. *See*

12 *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).

### III. DISCUSSION

**A.    Trademark Infringement, Dilution, False Representation, Unfair Competition, and Injury to Business Reputation**

Defendants move to dismiss American Blind's claims of trademark infringement,[11] false

representation,[12] and dilution[13] under the Lanham Act, dilution and injury to business reputation[14]

---

[11] Section 32(1) of the Lanham Act creates civil liability for "[a]ny person who shall, without the consent of the registrant . . . , use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). American Blind alleges that "the unauthorized and willful use of copies, variations, reproductions, simulations or colorable imitations of [its] registered marks in connection with the sale of keyword advertising" constitutes such trademark infringement. Counterclaims ¶ 91.

[12] Section 43(a) of the Lanham Act creates civil liability for "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1).

Case No. C 03-05340 JF
ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY
DEFENDANTS' MOTIONS TO DISMISS
(JFLC1)

1   and unfair competition[15] under the California Business and Professions Code, and trademark

2   infringement and unfair competition under California common law on the ground that American

3   Blind has not alleged actionable trademark "use." *See* 15 U.S.C. § 1114(1)(a) (proscribing

4   particular "use in commerce" of registered mark); 15 U.S.C. § 1125(a)(1) (proscribing particular

5   _____

6   American Blind alleges that "the use of copies, variations, reproductions, simulations or
    colorable imitations of the American Blind Marks on and in connection with keyword

7   advertising" constitutes a false designation of origin and false description and representation.
    Counterclaims ¶ 96. Specifically, Defendants' use is alleged to "convey[] the misleading

8   commercial impression to the public that the advertisers other than American Blind listed in the
    Defendants' manipulated search 'results' pages, or their products, are approved by, sponsored by

9   or are [sic] somehow affiliated or connected with American Blind." *Id*. ¶ 95.

10

11      [13] Section 43(c) of the Lanham Act provides civil remedies for a "person's commercial
    use in commerce of a mark or trade name, if such use begins after the mark has become famous

12   and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c). American Blind
    alleges that Defendants' use of "copies, variations, reproductions, simulations or colorable

13   imitations of the American Blind Marks in connection with the advertising, offering for sale and
    sale of Defendants' keyword advertising services" constitutes dilution. Counterclaims ¶ 100.

14   Specifically, Defendants' use is alleged to have lessened the capacity of the American Blind
    Marks to distinguish American Blind's products and services from those of others and to have

15   diluted the distinctive quality of the American Blind Marks.

16

17      [14] Section 14330 of the California Business and Professions Code provides a civil remedy
    for "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark

18   registered under this chapter, or a mark valid at common law, . . . notwithstanding the absence of
    competition between the parties or the absence of confusion as to the source of goods or

19   services." Cal. Bus. & Prof. Code § 14330. American Blind alleges that Defendants'
    "unauthorized use . . . of copies, variations, reproductions, simulations or colorable imitations of

20   . . . the American Blind Marks in connection with the advertising, offering for sale and sale of
    Defendants' keyword advertising services" constitutes dilution and injury to American Blind's

21   business reputation. Counterclaims ¶ 105.

22      [15] Section 17200 of the California Business and Professions Code prohibits "any
    unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading

23   advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of

24   Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code § 17200. American
    Blind alleges that Defendants' "unauthorized use . . . of copies, variations, reproductions,

25   simulations or colorable imitations of . . . the American Blind Marks in connection with the
    advertising, offering for sale and sale of Defendants' keyword advertising services" constitutes

26   unfair competition. Counterclaims ¶ 110. Specifically, Defendants' use is alleged to be

27   "misleading in a material respect" and to "dilute or tarnish American Blind's business reputation
    and/or the effectiveness of the . . . American Blind Marks." *Id*. ¶¶ 110-11.

28

8

1    "use[] in commerce" of false designation of origin, false or misleading description of fact, or

2    false or misleading representation of fact); 15 U.S.C. § 1125(c) (proscribing particular

3    "commercial use in commerce" of famous mark); *Playboy Enters., Inc. v. Netscape*

4    *Communications Corp.*, 354 F.3d 1020, 1024 n.10 (9th Cir. 2004) (declining to examine

5    California trademark claims separately because they are "'substantially congruent'" to trademark

6    claims under the Lanham Act); *Brookfield Communications, Inc. v. West Coast Entm't Corp.*,

7    174 F.3d 1036, 1047 n.8 (9th Cir. 1999) (observing that analysis under sections 32 and 43(a) of

8    the Lanham Act oftentimes is identical, even though the latter provision protects against a wider

9    range of practices than the former); *Sunset House Distrib. Corp. v. Coffee Dan's, Inc.*, 50 Cal.

10   Rptr. 49, 52 (Ct. App. 1966) (requiring, among other things, allegation of defendant's "use of a

11   confusingly similar tradename" to state claim for trade name unfair competition under California

12   law).

13       In support of their argument that American Blind has not alleged—and cannot

14   allege—that they have used the American Blind Marks in a manner that is cognizable under the

15   trademark laws, Defendants cite a number of authorities from other circuits that either state or

16   can be read to suggest that a defendant is not engaged in the requisite "use" of a trademark or

17   other mark unless the defendant uses the mark to identify the source of *its own* goods or services.

18   Among them are (1) *Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.*, in which the

19   United States Court of Appeals for the Sixth Circuit identified as a "preliminary question" in a

20   trademark case "whether defendants are using the challenged mark in a way that identifies the

21   source of *their* goods" and held that if the defendants are using the trademark only "in a

22   'non-trademark' way—that is, in a way that does not identify the source of a product—then

23   trademark infringement and false designation of origin laws do not apply,"[16] *Interactive Prods.*

24

25       [16] Although *Interactive Products* involved a question as to whether the defendant's use of
     the plaintiff's trademark in the post-domain path of one of the defendant's Web pages signified
26   the source of either the Web page or the product offered for sale therein, the court ultimately
     decided the case on the basis of lack of evidence of likelihood of confusion rather than on the
27   basis of trademark "use." *See Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326
     F.3d 687, 698 (6th Cir. 2003).
28

1  *Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003) (emphasis added);

2  (2) *U-Haul International, Inc. v. WhenU.com, Inc.*, in which the United States District Court for

3  the Eastern District of Virginia found that there was no trademark "use" under the Lanham Act,

4  because, among other things, there was no evidence that the defendant "use[d] [the plaintiff's]

5  trademarks to identify the source of *its* goods or services," *U-Haul Int'l, Inc. v. WhenU.com, Inc.*,

6  279 F. Supp. 2d 723, 728 (E.D. Va. 2003) (emphasis added); and (3) *Wells Fargo & Co. v.*

7  *WhenU.com, Inc.*, in which the United States District Court for the Eastern District of Michigan

8  held that "[t]here can be no liability under the Lanham Act absent the use of a trademark in a way

9  that identifies the products and services being advertised *by the defendant*," *Wells Fargo & Co. v.*

10  *WhenU.com, Inc.*, 293 F. Supp. 2d 734, 757 (E.D. Mich. 2003) (emphasis added).[17] Relying on

11

12  [17] Both *U-Haul* and *Wells Fargo*, as well as a third case, *1-800 Contacts, Inc. v.*

13  *WhenU.com*, 309 F. Supp. 2d 467 (S.D.N.Y. 2003), involved trademark disputes arising from the pop-up advertisements generated by WhenU.com's computer software program, "SaveNow." SaveNow contained a "directory of commonly used search phrases, commonly visited web

14  addresses, and various keyword algorithms," and it functioned by scanning an Internet user's

15  activity to "determine whether any of the terms, web addresses, or content match[ed] the information in the directory." *U-Haul*, 279 F. Supp. 2d at 725-26. When it found a match,

16  SaveNow "identifie[d] an associated product or service category" and then, if appropriate, displayed a pop-up advertisement on the user's computer screen. *Id.* at 726. The particular

17  advertisement that was displayed was selected at random from the advertisements that matched

18  the "category of the user's activity." *Id.* WhenU.com ("WhenU") sold "advertising space and opportunities" to merchants but did not sell "individual web addresses" or "guarantee to any

19  advertiser that its ad [would] be shown when a consumer visit[ed] a particular website." *Id.* The plaintiffs in *U-Haul*, *Wells Fargo*, and *1-800 Contacts* brought claims for trademark violations

20  under the Lanham Act, among other things, based on SaveNow's display of competitors' pop-up

21  advertisements when Internet users searched for the plaintiffs' Web sites.

22  The *U-Haul* court granted summary judgment in favor of WhenU as to the trademark claims, finding that WhenU's pop-up advertisements did not constitute "use in commerce" of the

23  plaintiff's trademarks. *See id.* at 727. It reasoned that WhenU's incorporation of the plaintiff's

24  trademarks into the SaveNow directory did not constitute trademark "use" under the Lanham Act, because, among other things, there was no evidence that WhenU "use[d] [the plaintiff's]

25  trademarks to identify the source of its goods or services," and WhenU "merely use[d] the marks for the 'pure machine-linking function' and in no way advertise[d] or promote[d]" the plaintiff's

26  trademarks. *Id.* at 728. Similarly, the *Wells Fargo* court denied the plaintiffs' motion for a preliminary injunction, in part based on its conclusion that WhenU did not "use" the plaintiffs'

27  marks in commerce. *See Wells Fargo*, 293 F. Supp. 2d at 757. It found that the inclusion of the

28  plaintiffs' marks in the SaveNow directory did not constitute trademark "use," because WhenU

10

these authorities,[18] Defendants argue that American Blind's claims that are premised on

trademark "use" must be dismissed, because American Blind does not—and cannot—allege that

Defendants use the American Blind Marks to identify the source of *their own* search engines or

advertising products.

     The Court has given careful consideration to the arguments and authorities presented by

Defendants, as well as to their attempts to analogize this case to non-Internet situations in which

---

did not "use any of the plaintiffs' trademarks to indicate anything about the source of the
products and services it advertise[d]." *Id.* at 762. In contrast, the *1-800 Contacts* court, in ruling
on the plaintiff's motion for a preliminary injunction, concluded that WhenU had used the
plaintiff's mark. *See 1-800 Contacts*, 309 F. Supp. 2d at 489. Among other things, it found that
inclusion of a version of the plaintiff's mark in the SaveNow directory was a "use" of the mark
"to advertise and publicize companies that are in direct competition with Plaintiff." *Id.* The *1-800
Contacts* court disposed of the contrary findings on "use" in *U-Haul* and *Wells Fargo* in a brief
footnote, stating simply that it disagreed with and was not bound by those decisions. *See id.* at
490 n.43.

     [18] In addition to urging the Court to adopt the reasoning of the aforementioned cases,
Defendants also make more general arguments for dismissal drawn from the source-identifying
function of trademarks, *see* 15 U.S.C. § 1127 (defining the term "trademark" to include "any
word, name, symbol, or device, or any combination thereof" that is used by a person "to identify
and distinguish his or her goods . . . from those manufactured or sold by others and to indicate
the source of the goods"); *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308
(9th Cir. 1992) (stating that the "purpose of trademark" is a "source-identification function"), and
the policies behind the trademark laws, *see Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924)
(holding that a trademark "only gives the right to prohibit the use of it so far as to protect the
owner's good will against the sale of another's product as his"). More recent decisions from the
United States Supreme Court and the United States Court of Appeals for the Ninth Circuit
provide a fuller explanation of the policies and objectives of the trademark laws. *See, e.g.,
Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-64 (1995) (stating that the "basic
objectives" of trademark law are, "by preventing others from copying a source-identifying mark,
[to] 'reduce[] the customer's costs of shopping and making purchasing decisions,' for it quickly
and easily assures a potential customer that *this* item—the item with this mark—is made by the
same producer as other similarly marked items that he or she liked (or disliked) in the past. . . .
[and to] help[] assure a producer that it (and not an imitating competitor) will reap the financial,
reputation-related rewards associated with a desirable product") (internal citation omitted); *Intel
Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 618 (9th Cir. 1993) (stating that "[t]rademark policies
are designed (1) to protect consumers from being misled as to the enterprise, or enterprises, from
which the goods or services emanate or with which they are associated; (2) to prevent an
impairment of the value of the enterprise which owns the trademark; and (3) to achieve these
ends in a manner consistent with the objectives of free competition") (internal quotation marks
omitted).

Case No. C 03-05340 JF
ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY
DEFENDANTS' MOTIONS TO DISMISS
(JFLC1)

they assert that there would be no question as to the absence of any viable trademark claims.[19]
However, in light of the uncertain state of the law, the Court does not find Defendants'
arguments sufficient to warrant dismissal of American Blind's counterclaims and third-party
claims at the pleading stage. In particular, given the most relevant Ninth Circuit
decision—*Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir.
2004)—it does not appear "beyond doubt" that American Blind "can prove no set of facts in
support of [its] claim[s] that would entitle [it] to relief," *Clegg*, 18 F.3d at 754.

In *Playboy*, the Ninth Circuit reversed a summary judgment in favor of two companies
that operate Internet search engines, Netscape and Excite, Inc., finding that genuine issues of
material fact precluded summary judgment on the plaintiff's claims of trademark infringement
and dilution. *See Playboy*, 354 F.3d at 1022. The case involved a practice called "keying,"
whereby advertisers could target Internet users with particular interests by linking their
advertisements to certain search terms that were grouped into lists by the defendants. *See id.* at
1022-23. When a user entered one or more of those terms into the search engines, advertisements
that were "keyed" to the terms would appear as "banner ads" running along the top or side of the
search-results page. *Id.* at 1023. The defendants were paid a fee by the advertisers for the
"keying" service. *Id.* The list containing terms related to sex and adult-oriented entertainment, to
which the defendants required adult-oriented companies to link their advertisements, contained
two of the plaintiff's trademarks: "playboy" and "playmate." *Id.* The adult-oriented banner ads
often were graphic in nature, were confusingly labeled or not labeled at all, and contained buttons
reading "click here" that, when clicked, made the search-results page disappear and opened the
advertiser's Web site. *Id.*

//

---

[19] Defendants analogize the instant case to Ford's payment to have *Car and Driver*
magazine run Ford advertisements facing every Toyota advertisement in order to target Toyota's
customers or a pizzeria owner's handing flyers to customers on their way to Domino's. While it
is of no consequence to the outcome of the instant motions, the Court notes that, as alleged by
American Blind, Defendants themselves would not be the analogs to Ford and the pizzeria
owner, because they are not alleged to be the advertisers.

Case No. C 03-05340 JF
ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY
DEFENDANTS' MOTIONS TO DISMISS
(JFLC1)

In concluding that a genuine issue of material fact precluded summary judgment as to the claim of trademark infringement, the *Playboy* court focused on the element of likelihood of confusion.[20] *See id.* at 1024-29. It found adequate evidence of initial interest confusion[21] in the appearance of unlabeled banner ads—many of which took users to the advertisers' Web sites when they accepted the invitation to "click here"—immediately after users entered the plaintiff's trademarks as search terms in the defendants' search engines. *See id.* at 1025-26. The court further concluded that the defendants' alleged "use" of the plaintiff's trademarks—a "misappropriat[ion]" of the goodwill of the plaintiff's marks by defendants "in conjunction with advertisers," whereby Internet users were led to the Web sites of the plaintiff's competitors—was "actionable." *Id.* Accordingly, the court allowed the case to proceed under theories of direct and contributory liability, because the defendants were "potentially liable" under one theory or the other.[22] *Id.* at 1024 (observing that the question of "[w]hether the defendants are directly or

---

[20] Likelihood of confusion is the "'core element of trademark infringement.'" *Id.* at 1024 (quoting *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999)).

[21] The term "initial interest confusion" describes a situation in which, although the consumer does not experience confusion as to the source of goods or services, the defendant, by diverting or capturing the consumer's initial attention, improperly benefits from the goodwill that the plaintiff developed in its mark. *Brookfield Communications*, 174 F.3d at 1062-63; *see also Playboy*, 354 F.3d at 1025 (discussing *Brookfield Communications* and reaffirming that initial interest confusion—"customer confusion that creates initial interest in a competitor's product . . . [a]lthough dispelled before an actual sale occurs"—is actionable trademark infringement). The existence of initial interest confusion does not depend on whether a sale is completed as a result of the confusion. *Brookfield Communications*, 174 F.3d at 1062. In *Brookfield Communications*, the Ninth Circuit, reviewing the district court's denial of the plaintiff's motion for a preliminary injunction, concluded that the defendant's use of its competitor's trademark in the metatags of its Web site was likely to cause initial interest confusion. *See id.* at 1066. Metatags are "HTML code not visible to Web users but used by search engines in determining which sites correspond to the keywords entered by a Web user." *Id.* at 1061 n.23.

[22] The *Playboy* court also concluded that genuine issues of material fact precluded summary judgment as to the claim of dilution. *See id.* at 1031. As relevant to the instant case, the court rejected the defendants' argument that dilution could not be found because they did not "label their own goods with [the plaintiff's] marks," observing that, "[a]ccording to [the plaintiff's] evidence, in the minds of consumers, defendants implicitly label the goods of [the plaintiff's] competitors with its marks." *Id.* at 1033.

13

1    merely contributorily liable proves to be a tricky question").

2         Defendants attempt to distinguish *Playboy* on two grounds, neither of which is persuasive

3    for present purposes. First, they argue that, because the "issue raised by the instant

4    motion—whether the use of a trademark as a keyword to trigger advertising can be actionable

5    under trademark law—was not before the *Playboy* court," Mot. by Google, Ask Jeeves, &

6    Earthlink to Dismiss Countercls. & Third-Party Claims at 6 n.8, the case is inapposite.

7    Defendants are correct that the *Playboy* court did not undertake a separate discussion of the

8    element of trademark "use" and that the court observed that there was "[n]o dispute" as to

9    whether the defendants had "used the marks in commerce." *Playboy*, 354 F.3d at 1024. However,

10   it is not at all clear that the court's ultimate conclusion that the defendants' alleged "use" of the

11   plaintiff's trademarks was "actionable," *id*. at 1026, was not based on an implicit, preliminary

12   determination of actionable trademark "use" in the sense discussed by Defendants. If the use

13   were not actionable in the latter sense, it is unclear why the court would have undertaken a

14   lengthy and, by Defendants' apparent reading of the case, wholly unnecessary likelihood-of-

15   confusion analysis.[23] Moreover, the possibility of such an implicit determination does not appear

16   to have been precluded by the court's observation that there was "[n]o dispute" as to whether the

17   defendants had "used the marks in commerce," as the accompanying footnote suggests that the

18   observation concerned only the jurisdictional requirement of use "*in commerce*" and not the

19   separate requirement of trademark "use." *Id*. at 1024 (emphasis added); *see id*. at 1024 n.11

20   ("Federal jurisdiction over trademark cases rests on the Commerce Clause, sweeps as broadly as

21   possible, and clearly encompasses the circumstances of this case.").

22        Second, Defendants attempt to distinguish *Playboy* on the ground that its holding was

23   limited to facts not present in the instant case. The *Playboy* court noted that, "if a banner

24   advertisement clearly identified its source or, even better, overtly compared [the plaintiff's]

25

26        [23] Indeed, Defendants themselves, in the midst of presenting arguments to distinguish
     *Playboy*, appear inadvertently to acknowledge this point: "Instead of addressing trademark use,
27   the *Playboy* case involved a classic analysis of likelihood of confusion—an issue that need only
     be addressed if, in fact, there is a trademark use." Reply by Google, Ask Jeeves, & Earthlink at 7.
28

                                                    14

1    products to the sponsor's own, no confusion would occur under [the plaintiff's] theory." *Id*. at

2    1025 n.16. Elsewhere, the court reiterated that it was "not addressing a situation in which a

3    banner advertisement clearly identifies its source with its sponsor's name, or in which a search

4    engine clearly identifies a banner advertisement's source," noting that those clear identifications

5    "might eliminate the likelihood of initial interest confusion," and it emphasized that it was

6    "evaluating a situation in which defendants display competitors' unlabeled banner

7    advertisements, with no label or overt comparison to [the plaintiff], after Internet users type in

8    [the plaintiff's] trademarks." *Id*. at 1030 & n.43. Defendants assert that, unlike the banner ads in

9    *Playboy*, the Sponsored Links clearly identify the sources of the advertisements and thus cannot

10   result in confusion. However, the distinctions Defendants attempt to draw between *Playboy* and

11   the instant case in order to justify dismissal would require the Court to make factual findings and

12   draw legal conclusions, particularly with regard to likelihood of confusion, that are inappropriate

13   when it is ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule

14   12(b)(6)"). In light of the very liberal standard applicable to Rule 12(b)(6) motions, the Ninth

15   Circuit's expansive holding in *Playboy*,[24] and the obvious commercial importance of this case to

16   

17   ⎯⎯⎯⎯⎯⎯⎯⎯⎯

     [24] Defendants call the Court's attention to Judge Berzon's concurrence in *Playboy*, which

18   suggests that the majority opinion is "fully consistent with the applicable precedents" but

     "express[es] concern" that one of those precedents—*Brookfield Communications*—was "wrongly

19   decided" and may need to be reconsidered. *Id*. at 1034. Noting the analytical similarity between

     keyword advertisements and the metatags found to be infringing in *Brookfield Communications*,

20   Judge Berzon disagrees with any application of *Brookfield Communications* that might suggest

     that there could be a Lanham Act violation even if banner advertisements were "clearly labeled,

21   either by the advertiser or by the search engine." *Id*. She opines that it is not reasonable "to find

     initial interest confusion when a consumer is never confused as to source or affiliation, but

22   instead knows, or should know, from the outset that a product or web link is not related to that of

     the trademark holder because the list produced by the search engine so informs him." *Id*. at 1034-

23   35. Her reasoning is based non-Internet examples where "distracting a potential customer with

     another *choice*, when it is clear that it is a choice," clearly does not constitute trademark

24   infringement. *Id*. at 1035. The examples include a department store's displaying its own brand of

     clothing more prominently than a designer brand that customers may be seeking and a bookstore

25   owner's accepting money from one adult magazine to display that magazine in front of another

     such magazine. *See id*. Although Judge Berzon's concurrence raises interesting questions for

26   another day, it does not alter the result the Court must reach in ruling on the instant motions to

27   dismiss.

28   

15

1  the parties and others similarly situated, the Court concludes that resolution of the novel legal

2  questions presented by this case should await the development of a full factual record.

3      Accordingly, Defendants' motions to dismiss American Blind's claims of trademark

4  infringement, false representation, and dilution under the Lanham Act, dilution and injury to

5  business reputation and unfair competition under the California Business and Professions Code,

6  and trademark infringement and unfair competition under California common law are DENIED.[25]

7  In so ruling, the Court emphasizes that it expresses no opinion as to whether Defendants

8  ultimately will prevail in trying to prove that they are not liable to American Blind on these

9  claims. This Order should be understood only as allowing American Blind's counterclaims and

10  third-party claims to proceed beyond the motion-to-dismiss stage, which will enable the Court to

11  consider both the relevant facts and the applicable law in the context of a fuller record.[26]

12

13      [25] AOL, Netscape, and Compuserve appear to advance an independent ground for
dismissal of the third-party claims asserted against them. They argue that American Blind's
14  allegation that they are using Google's Web-searching platform but not that they are "engaging in
the other business practices alleged against Google . . . [or] any other independent wrongdoing"
15  does not "provide a sufficient basis to state a claim against [them]." Mot. by AOL, Netscape, &
Compuserve to Dismiss Third-Party Claims at 1. Their briefs, however, devote virtually no space
16  to this assertion. The Court declines to dismiss the third-party claims on a basis that has not been
briefed adequately.
17

18      [26] Although the Court does not rely upon it—and thus need not discuss Defendants'
19  attempt to distinguish it—the Court notes that its approach is consistent with the approach taken
by the United States District Court for the Eastern District of Virginia in *Government Employees*
20  *Insurance Co. v. Google, Inc.*, 330 F. Supp. 2d 700 (E.D. Va. 2004) (hereinafter "*GEICO*"), a
case very similar to this one in which the plaintiff sued Google and Overture Services, Inc., both
21  search engine operators, for trademark infringement, false representation, dilution, and unfair
competition, among other things, based on allegations that the defendants are selling its
22  trademarks as keywords that trigger Sponsored Links. *See GEICO*, 330 F. Supp. 2d at 701-02.
23  The defendants in *GEICO* appear to have made the same arguments regarding failure to allege
actionable trademark "use" as Defendants make in the instant case, and the *GEICO* court appears
24  to have considered many of the same authorities considered by this Court. *See id.* at 702-03. The
*GEICO* court found sufficient allegations of trademark "use" and denied the defendants' motion
25  to dismiss the corresponding claims. *See id.* at 703-04 (observing that a "fair reading of the
26  complaint reveals that plaintiff alleges that defendants have unlawfully used its trademarks by
allowing advertisers to bid on the trademarks and pay defendants to be linked to the
27  trademarks"). In so ruling, the court explained that the fact-specific issues of whether the
28  defendants are making fair use of the plaintiff's trademarks and whether there is a likelihood of

16

1    **B.    Contributory Trademark Infringement and Contributory Dilution**

2         Defendants move to dismiss American Blind's alternative claims of contributory

3    trademark infringement[27] and contributory dilution[28] under the Lanham Act. As above,

4    Defendants' arguments are based on a claimed absence of allegations of the requisite "use" of the

5    American Blind Marks—in this context, by Defendants' advertisers.[29] Defendants reason that,

6    because their advertisers are alleged to use the American Blind Marks only as a trigger for the

7    _____

8    confusion are not properly resolved through a motion to dismiss. *See id.* at 704. Approximately
     four months later, on December 15, 2004, the *GEICO* court entered an oral ruling granting
9    Google's motion for judgment as a matter of law, finding that the plaintiff had not established
     that "the mere use of its trademark by Google as a search word or keyword or even using it in
10   their AdWord program standing alone violates the Lanham Act because . . . there's no evidence
     that that activity *standing alone* causes confusion." Statement of Recent Decision by Google,
11   Ask Jeeves, and Earthlink (Dec. 21, 2004), Ex. A at 16 (emphasis added). Portions of the case
12   still remain pending, and the court has yet to issue a written decision regarding its oral ruling.

13        [27] "Contributory infringement occurs when the defendant either intentionally induces a
14   third party to infringe the plaintiff's mark or supplies a product to a third party with actual or
     constructive knowledge that the product is being used to infringe the service mark." *Lockheed*
15   *Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 983 (9th Cir. 1999). American Blind
     alleges, in the alternative, that "Defendants' acts, namely the inducement of American Blind'
16   [sic] competitors to purchase the American Blind Marks as keywords and the refusal to block or
     otherwise disable American Blind's competitors' advertisements that result from searches for the
17   American Blind Marks (despite Defendants' knowledge that such advertisements infringe the
18   American Blind Marks)" constitute contributory trademark infringement. Counterclaims ¶ 129.

19        [28] American Blind alleges, in the alternative, that "Defendants' acts, namely the
     inducement of American Blinds' [sic] competitors to purchase the American Blind Marks as
20   keywords and the refusal to block or otherwise disable American Blind's competitors'
21   advertisements that result from searches for the American Blind Marks (despite Defendants'
     knowledge that such advertisements were being used to dilute the American Blind Marks)"
22   constitute contributory trademark dilution. Counterclaims ¶ 135. The Ninth Circuit has observed
     that, "[a]lthough courts have discussed contributory dilution, no appellate court or statute has yet
23   established the cause of action," and that, where it has been recognized, it has been defined as
24   "encouraging others to dilute." *Lockheed Martin*, 194 F.3d at 986. In light of its disposition of
     Defendants' motions and in the absence of any contrary authority, the Court declines to reach the
25   issue at this time.

26        [29] The Court does not address Defendants' argument that American Blind also has failed
27   to allege that Defendants have done anything "that would qualify as contributory liability," as the
     argument was raised for the first time in their reply brief. Reply by Google, Ask Jeeves, &
28   Earthlink at 13.

Case No. C 03-05340 JF
ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY
DEFENDANTS' MOTIONS TO DISMISS
(JFLC1)

1  display of their advertisements and not as an identification of the source of their products, they

2  do not engage in trademark "use" of the American Blind Marks, and therefore, with no direct

3  violation of the trademark laws, Defendants cannot be contributorily liable. However, in light of

4  the foregoing discussion, the Court concludes that American Blind's failure to allege that

5  Defendants' advertisers have used the American Blind Marks to identify the source of their own

6  products is not fatal to American Blind's claims at this stage of the case.

7      This result finds support in *Brookfield Communications*, where the Ninth Circuit

8  concluded that the defendant's use of its competitor's trademark in the metatags of its Web site

9  was likely to cause initial interest confusion. *See Brookfield Communications*, 174 F.3d at 1066.

10  As in *Playboy*, the court's analysis of likelihood of confusion seems to have presumed a

11  preliminary, if implicit, determination of actionable trademark "use" in the sense discussed by

12  Defendants. *See supra* note 23 and accompanying text. The purchase of trademarks as keywords

13  for a Web site and the insertion of trademarks as metatags in the code of a Web site, both of

14  which are employed as means of having links to that Web site appear on a search-results page,

15  are sufficiently analogous that it cannot be said that American Blind has failed to allege

16  actionable trademark "use" by Defendants' advertisers. In sum, given the current state of the

17  governing law, American Blind has made sufficient allegations of direct infringement and

18  dilution by Defendants' advertisers and contributory liability on the part of Defendants such that

19  it does not appear "beyond doubt" that American Blind "can prove no set of facts in support of

20  [its] claim[s] that would entitle [it] to relief." *Clegg*, 18 F.3d at 754. Accordingly, Defendants'

21  motions to dismiss American Blind's alternative claims of contributory trademark infringement

22  and contributory dilution are DENIED.[30]

23  //

24  //

25  //

26

27      [30] As above, the Court emphasizes that it expresses no opinion as to whether Defendants

28  ultimately will prevail on these alternative claims.

Case No. C 03-05340 JF
ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY
DEFENDANTS' MOTIONS TO DISMISS
(JFLC1)

1    **C.    Tortious Interference with Prospective Business Advantage**

2    Defendants move to dismiss American Blind's state law claim of tortious interference

3    with prospective business advantage.[31] The elements of tortious interference with prospective

4    business advantage are as follows: (1) an economic relationship between the plaintiff and some

5    third party, with the probability of future economic benefit to the plaintiff, (2) the defendant's

6    knowledge of the relationship, (3) intentional acts on the part of the defendant designed to disrupt

7    the relationship, which acts are wrongful by some legal measure other than the fact of

8    interference itself,[32] (4) actual disruption of the relationship, and (5) economic harm to the

9    plaintiff proximately caused by the defendant's acts. *Korea Supply Co. v. Lockheed Martin*

10   *Corp.*, 63 P.3d 937, 950-51 (Cal. 2003). Defendants argue that American Blind fails to allege an

11   independently wrongful act, as required by the third element, or probability of future economic

12   benefit from existing economic relationships, as required by the first element.

13   Defendants' first asserted ground for dismissal of this claim fails, because it rests solely

14   on their argument that American Blind has not alleged actionable trademark "use," an argument

15   that the Court already has rejected. As American Blind's claims of trademark violations, unfair

16   competition, false representation, and injury to business reputation will proceed past the motion-

17   to-dismiss stage, so too can those claims serve, for present purposes, as allegations that satisfy

18   _____

19   [31] American Blind alleges that (1) "[m]any" of its customers are "repeat customers" and
20   "regularly" purchase products from its Web site, (2) it is probable that "such customers and
     others" will "continue to seek to visit" the Web site and purchase products and services "in the
21   future," (3) Defendants were aware of American Blind's "reasonable expectation of future
     transactions" with its "returning customers," as well as with customers who "may be attracted" to
22   its goods and services because of its goodwill, advertising, and promotion, (4) "[a]bsent
     Defendants' intentional and improper interference through their deceptive and manipulated
23   search engine 'results,' it is reasonably certain that American Blind would realize additional sales
24   from existing customers and/or new customers," (5) Defendants "intentionally and improperly
     interfered with American Blind's future and prospective sales," and (6) American Blind has
25   suffered and will continue to suffer irreparable injury as a result of Defendants' actions.
26   Counterclaims ¶¶ 120-24.

27   [32] An act is independently wrongful if it is "unlawful, that is, if it is proscribed by some
     constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea*
28   *Supply Co.*, 63 P.3d at 954.

Case No. C 03-05340 JF
ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY
DEFENDANTS' MOTIONS TO DISMISS
(JFLC1)

1  the pleading requirements for the third element of tortious interference with prospective business

2  advantage.

3       However, the Court agrees with Defendants that American Blind's allegations with

4  respect to the first element of the claim are insufficient. The tort of interference with prospective

5  business advantage applies to "interference with *existing* noncontractual relations which hold the

6  promise of future economic advantage. In other words, it protects the expectation that the

7  relationship eventually will yield the desired benefit, not necessarily the more speculative

8  expectation that a potentially beneficial relationship will eventually arise." *Westside Ctr. Assocs.*

9  *v. Safeway Stores 23, Inc.*, 49 Cal. Rptr. 2d 793, 804, 806 (Ct. App. 1996) (holding that,

10  "[w]ithout an existing relationship with an identifiable buyer, [the plaintiff's] expectation of a

11  future sale was 'at most a hope for an economic relationship and a desire for future benefit'");

12  *see also Roth v. Rhodes*, 30 Cal. Rptr. 2d 706, 715 (Ct. App. 1994) (holding that, in doctor's

13  lawsuit based on defendants' refusal to lease offices to him, doctor failed to allege requisite

14  "existing relationship," because future patients were merely "speculative"). Allegations that

15  amount to a mere "hope for an economic relationship and a desire for future benefit" are

16  inadequate to satisfy the pleading requirements of the first element of the tort. *Blank v. Kirwan*,

17  703 P.2d 58, 70 (Cal. 1985).

18       Even though American Blind has alleged relationships with "repeat customers" who

19  "probabl[y]" will "continue to seek to visit" its Web site and purchase its goods and services,

20  Counterclaims ¶ 120, American Blind's alleged expectation of "future and prospective sales" to

21  these customers, *id*. ¶ 123, with which Defendants are alleged to have interfered, is too

22  speculative to support this claim. It does not rise to the level of the requisite "*promise* of future

23  economic advantage," *Westside Ctr. Assocs.*, 49 Cal. Rptr. 2d at 804 (emphasis added), instead

24  expressing merely a "hope . . . and a desire" for unspecified future sales to unspecified returning

25  customers, *Blank*, 703 P.2d at 70, in the form of a legal conclusion. Moreover, it goes without

26  saying that American Blind's even more speculative allegations regarding "new" customers with

27  whom it cannot claim any past or present interactions, however insubstantial, also are inadequate

28  to support this claim. American Blind has failed to point to any case law suggesting that its

20

1  allegations regarding the probability of future economic benefit from its existing economic

2  relationships with third parties are sufficient. Accordingly, Defendants' motions to dismiss

3  American Blind's claim of tortious interference with prospective business advantage are

4  GRANTED.[33]

5                                    **IV. ORDER**

6          Good cause therefore appearing, IT IS HEREBY ORDERED that the motions to dismiss

7  by Counter-Defendant Google and Third-Party Defendants Ask Jeeves, Earthlink, AOL,

8  Netscape, and Compuserve are (1) GRANTED as to American Blind's claim of tortious

9  interference with prospective business advantage and (2) DENIED as to American Blind's other

10 claims.

11

12

13 DATED: March 30, 2005

14

15                                          /s/ (electronic signature authorized)
                                            JEREMY FOGEL
16                                          United States District Judge

17

18

19

20

21

22

23

24

25

26  ──────────────────

27      [33] Because the Court has granted Defendants' motions to dismiss on this ground, it need
    not address their argument that the claim is barred by section 230 of the Communications
28  Decency Act.

                                    21
Case No. C 03-05340 JF
ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY
DEFENDANTS' MOTIONS TO DISMISS
(JFLC1)

1    This Order has been served upon the following persons:

2

3    Ravind Singh Grewal          rsg@kvn.com

     Michael H. Page              mhp@kvn.com, sjr@kvn.com
4
     Robert Nathan Phillips       phillipsr@howrey.com, cranmerp@howrey.com
5
     Stephen E. Taylor            staylor@tcolaw.com, jschinske@tcolaw.com,
6                                 cdunbar@tcolaw.com, jklohonatz@tcolaw.com

7    Dawn Beery
     Kelley Drye & Warren LLP
8    333 West Wacker Drive
     Suite 2600
9    Chicago, IL 60606

10   Susan Greenspon
     Kelley Drye & Warren LLP
11   333 West Wacker Drive
     Suite 2600
12   Chicago, IL 60606

13   Mark A. Lemley
     Keker & Van Nest, LLP
14   710 Samsome Street
     San Francisco, CA 94111-1704
15
     David A. Rammelt
16   Kelley Drye & Warren LLP
     333 West Wacker Drive
17   Suite 2600
     Chicago, IL 60606
18

19

20

21

22

23

24

25

26

27

28

Case No. C 03-05340 JF
ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANT'S AND THIRD-PARTY
DEFENDANTS' MOTIONS TO DISMISS
(JFLC1)