# Exhibit A

```
                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA

GOOGLE, INC., a Delaware corporation,

           Plaintiff,
     vs.                           Case No. C 03-5340-JF

AMERICAN BLIND & WALLPAPER
FACTORY, INC., a Delaware corporation
d/b/a decoratetoday.com, Inc., and
DOES 1 - 100, inclusive,

           Defendants.
_____/

AMERICAN BLIND & WALLPAPER
FACTORY, INC., a Delaware corporation
d/b/a decoratetoday.com, Inc.,

           Counter-Plaintiff,
     vs.

GOOGLE, INC.,

           Counter-Defendant.
_____/
```

**CERTIFIED COPY**

The video deposition of JEFFREY A. ALDERMAN, taken pursuant to the Rules of the State of California, before Lana Kia Haws, CRR, CM, RPR, CSR-0995, a Notary Public in the County of Oakland, Acting in the County of Wayne, State of Michigan, at the Inn at St. John's, 44045 Five Mile Road, Plymouth, Michigan, on August 4, 2006, commencing at or about the hour of 8:00 a.m.

APPEARANCES:
    Keker & Van Nest, LLP
    BY:  MR. MICHAEL H. PAGE
    710 Sansome Street
    San Francisco, CA  94111-1704
    (415) 391-5400
        Appearing on behalf of the Plaintiff.

    Kelley Drye & Warren, LLP
    BY:  MR. PAUL W. GARRITY
    101 Park Avenue
    New York, New York  10178
    (212) 808-7613
        Appearing on behalf of the Defendants.

U.S. LEGAL Support
Certified Shorthand Reporters
180 Montgomery Street, Suite 2180
San Francisco, CA 94104
888-575-3376 • Fax 888-963-3376
www.uslegalsupport.com

Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento ... and across the nation

1  last group of pages that have, you know, a kind of a
2  business card size ad where the front of the book
3  would be more of a full page or half page ad.
4      Q.  So the back of book is sort of like the
5  classified stuff at the back of the magazine?
6      A.  Classified or advertisers' section, index.
7          MR. PAGE:  Time flies.  We need to change
8  tape again.
9          THE VIDEOGRAPHER:  Off the record,
10 11:23:47 a.m.
11         (Recess taken.)
12         THE VIDEOGRAPHER:  Back on the record,
13 11:32:38 a.m.
14         MR. PAGE:  I will mark as Exhibit 3.
15         (Mark'd for identification
16         was Deposition Exhibit No. 3.)
17     Q.  (BY MR. PAGE)  Exhibit 3 is a four-page
18 document consisting of a string of e-mails, the last
19 one being from yourself to Joel Levine and Ron Myers
20 on July 6th, 2006.  Subject, analysis of C.J. brand
21 keyword policy change.
22         Do you recognize this document?
23     A.  Yes.
24     Q.  Did you, in fact, write this?
25     A.  Yes.

105

1  Q. Is this the analysis you referred to earlier
2  that Commission Junction had done on the impact of
3  changing your bidding rules on branded keywords?
4  A. Yes.
5  Q. And what was the conclusion from that
6  analysis?
7  A. The conclusion was, based on my notes here,
8  that we saw 55 percent drop in sales from our affiliate
9  program during that time period.
10 Q. And it was your conclusion that most of that
11 drop was likely a result of the policy change?
12 A. Yes.
13 Q. In the second paragraph of your conclusions,
14 you say, "Since 4/7/06, we have not experienced an
15 increase in sales from our branded keyword category on
16 Google, Yahoo or M.S.N.  Does this mean our competition
17 is picking up these sales from infringing our these
18 marks?  My assumption is yes, but this will be hard to
19 prove."
20 Why -- first of all, it was 4-7-06, the
21 date on which you stopped letting affiliates bid on your
22 branded keywords?
23 A. Yes.
24 Q. Did you do any analysis of whether there was
25 an increase or decrease in visits to your website via

106

1   natural results on branded searches?

2   A.  We did.

3   Q.  And what was your result?

4   A.  We did not see any increase.

5   Q.  How much income -- how much -- strike that.

6       The comparison you did on sales was
7   quarter to quarter, correct, in terms of C.J. sales?

8   A.  Yes. That was the time period in the analysis,
9   was quarter to quarter.

10  Q.  And was Q -- are you running calendar quarters
11  here? Is Q1 January 1 through the end of March?

12  A.  Yes.

13  Q.  And Q2 is first of April through the end of
14  June?

15  A.  Correct.

16  Q.  And for that period, the policy you were
17  testing in Q2 was only in effect for six weeks, correct?

18  A.  It was about six weeks.

19  Q.  Did you compare those six weeks to other weeks
20  in Q2?

21  A.  We did. In Coremetrics, we looked back
22  previously really on -- it was a daily level, a daily
23  trend level.

24  Q.  And what was the comparison of daily trends for
25  the six-week period in which C.J. affiliates were not

107

1  allowed to bid on branded --

2  A. We saw a, again, significant drop off in sales

3  was the biggest key factor that we discovered; and we

4  were looking to see that difference in sales, was that

5  picked up by any other of our programs.

6  Q. Okay. Did you compare that to the level of

7  spend by the Commission Junction affiliates?

8  A. With Commission Junction, really, sales is, you

9  know, a direct result of spend, meaning our affiliates

10  get paid a percentage of sale, of sales that they

11  generate for us. So we did look at that as well.

12  Q. Maybe I asked that badly.

13      What I am trying to get at is whether

14  when you put this policy in effect, did your Commission

15  Junction affiliates immediately start spending more on

16  other keywords; or did you simply have less Commission

17  Junction paid search activity for some period of time?

18  A. When we kicked the affiliates off of the brand

19  keywords, some of -- I would tell you that most of our

20  affiliates, paid search affiliates, at that time, saw

21  a significant reduction in sales and traffic that they

22  were driving to us.

23      Some of our affiliates have other

24  keywords in their programs as well that they target

25  for us.

1   Q. Right.

2   A. More niche keywords they target for us, paid

3   and natural.

4   Q. So my question is -- well, different question.

5       Do you know whether in response to being

6   kicked off your branded keywords, your C.J. affiliates

7   increased their spend on non-branded keywords?

8   A. That, I don't know. I would tell you that our

9   affiliates are really an outstretched sales arm for us,

10  for the organization; and affiliates are in business,

11  also, to make money; and so affiliates can spend on

12  paid search how much they can to make a profit still.

13      So they are not gonna go in the red and

14  bid three, four dollars a click on a word like blinds.

15  It just doesn't make sense.

16  Q. How are your commission rates set to C.J.

17  affiliates? Is it strictly a flat percentage of

18  sales?

19  A. Yes.

20  Q. Is it the same for each affiliate?

21  A. We have got a standard affiliate rate, which is

22  five and a half percent. We do have a couple affiliates

23  that we -- that are a little bit higher than that that

24  we use an incentive to get in our program and then

25  monitor them over a given period of time; and if they do

109

1  well, obviously, or give us increased placement,
2  permanent placement on their website, like with a
3  company like My Points, as an example, you know, then
4  we will increase their commission during a little time
5  period.
6      Q.  If the drop in sales from quarter 1 to quarter
7  2 was 55 percent and the period in quarter 2 in which
8  the policy changed was six weeks, wouldn't you have had
9  to had negative sales for that six-week period in order
10 to get the 55 percent drop for the entire quarter?
11     A.  I am not sure I understand your question
12 there.
13     Q.  Let me put it another way.
14         How can an effect that was only in place
15 for six weeks out of a quarter be responsible for a
16 55 percent drop in sales for the entire quarter?  It's
17 physically impossible.
18     A.  Again, when we determined the before and after
19 impact, we were looking at trending activity.  These are
20 the quarter over quarter numbers.
21         Just based on looking at this e-mail,
22 there was a 55 percent drop in sales a quarter after
23 quarter.  It may have not been a --
24     Q.  But if you took the sales from quarter 1 and
25 you removed -- if you set six weeks of that quarter to

110

1  zero, it would be less than a 55 percent reduction for
2  the quarter, wouldn't it?
3      A.  Yeah, I suppose so.
4      Q.  So there has to be some cause other than the
5  change in policy for this 55 percent drop, correct?
6      A.  Well, no.  We looked at all of our paid search
7  affiliates individually as well and looked at their
8  trends year to date, and we did see a drop-off in all
9  of those paid search affiliates the moment we changed
10 the policy and said you can no longer bid on our brand
11 keywords.
12     Q.  Do you have that data?
13     A.  I don't know if it's here in front of us; but,
14 obviously, we could pull that together.  I am sure that
15 was -- I'm surprised it was not sent.
16          MR. GARRITY:  Certainly, yeah, if it
17 wasn't previously sent, of course, we would be happy
18 to send it.
19     Q.  (BY MR. PAGE)  Okay.  All right.  In -- I am
20 sure we have the data somewhere, but, roughly, what was
21 the sales -- strike that.
22          The figures here for Q1 and Q2, the
23 868,000 and the 562,000, those are gross sales, right?
24     A.  Correct.
25     Q.  So your commission would have been -- you would

111

1  have paid a commission of five-and-a-half percent,
2  roughly, on that number?
3      A.  Right.  Plus, obviously, the Commission
4  Junction management fee on top of that.
5      Q.  For the same quarter, either one of them, do
6  you know, roughly, what your own sales were through
7  paid search?
8      A.  I am sure we have that information.  If not
9  here, it's easily accessible.
10     Q.  Roughly, for the year, what are your quarterly
11 sales through paid search total?
12     A.  I don't want to guess.
13     Q.  Okay.  I'm sure I can find it.
14     A.  Yeah.
15     Q.  After reporting your conclusion, you have a
16 section called Solution and you have various
17 recommendations here?
18     A.  Yes.
19     Q.  Are all of the -- strike that.
20         Were all of the things you recommended in
21 the Solutions section, in fact, implemented?
22     A.  To the best of my knowledge, these were all
23 implemented.
24     Q.  Okay, and are they all -- are all of these
25 things that you suggest current policy?

112

CERTIFICATE OF NOTARY

STATE OF MICHIGAN   )
                    ) ss.
COUNTY OF OAKLAND   )

        I, Lana Kia Haws, Certified Shorthand Reporter and Notary Public in and for the above county and state, do hereby certify that the deposition of JEFFREY A. ALDERMAN was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and foregoing answers made by the witness which were duly recorded by me stenographically and later reduced to computer transcription; and I certify that this is a true and correct transcript of my stenographic notes so taken.

199

**U.S. Legal Support**

1
2
3
4    I further certify that I am not Of
5 Counsel to either party nor interested in the event of
6 this cause.
7
8         *[signature]*
9   Lana Kia Haws, CM, RPR, CSR-0995
10    Notary Public
11    State of Michigan
12    County of Oakland
13    Acting in the County of Wayne
14
15
16 My Commission Expires:
17 September 29, 2011
18
19
20
21
22
23
24
25