# Exhibit D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GOOGLE, INC., a Delaware corporation,

        Plaintiff,

vs.               Case No. C 03-5340-JF

AMERICAN BLIND & WALLPAPER
FACTORY, INC., a Delaware corporation
d/b/a decoratetoday.com, Inc., and
DOES 1 - 100, inclusive,

        Defendants.
_____/

AMERICAN BLIND & WALLPAPER
FACTORY, INC., a Delaware corporation
d/b/a decoratetoday.com, Inc.,

        Counter-Plaintiff,
vs.

GOOGLE, INC.,

        Counter-Defendant.
_____/

**CERTIFIED COPY**

    The video deposition of JEFFREY A. ALDERMAN, taken pursuant to the Rules of the State of California, before Lana Kia Haws, CRR, CM, RPR, CSR-0995, a Notary Public in the County of Oakland, Acting in the County of Wayne, State of Michigan, at the Inn at St. John's, 44045 Five Mile Road, Plymouth, Michigan, on August 4, 2006, commencing at or about the hour of 8:00 a.m.

APPEARANCES:
    Keker & Van Nest, LLP
    BY:  MR. MICHAEL H. PAGE
    710 Sansome Street
    San Francisco, CA  94111-1704
    (415) 391-5400
        Appearing on behalf of the Plaintiff.

    Kelley Drye & Warren, LLP
    BY:  MR. PAUL W. GARRITY
    101 Park Avenue
    New York, New York  10178
    (212) 808-7613
        Appearing on behalf of the Defendants.

**U.S. LEGAL**
*Support*

Certified Shorthand Reporters
180 Montgomery Street, Suite 2180
San Francisco, CA  94104

888-575-3376 • Fax 888-963-3376
www.uslegalsupport.com

Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation

1   American Blind aware of any other evidence of actual
2   customer confusion as a result of advertising on
3   Google?
4       A.  We have, since Mr. Katzman left, we have,
5   with the new individuals processes in place to alert
6   me directly if they are aware or receive any customer
7   confusion issues as a result of paid advertising from
8   Google.
9       Q.  Okay, and have you, in fact, been alerted to
10  any customer confusion issues as a result of paid
11  advertising from Google?
12      A.  Not since he left, no.
13      Q.  Okay.  Were you made aware of any before you
14  left?
15      A.  No.  Again, just, as I mentioned earlier, just
16  anecdotally from him.
17              (Mark'd for identification
18              was Deposition Exhibit No. 1.)
19      Q.  (BY MR. PAGE)  This is a big ugly exhibit with
20  hopefully very short questions.  I want you to review
21  every page of this document.
22              I have marked as Alderman Exhibit 1 a
23  large and ugly document, Bates ABWF48864 through 48987,
24  which appears to be a text dump from a data base of some
25  sort.

36

1           Can you tell me what this document is?

2      A.   It looks like a bunch of gobbley goop.  Just

3  looking at the top of the page, it does say Product

4  Surveys.

5      Q.   I will represent to you this was produced to us

6  sometime in the last few days, and that is about all I

7  know about it.

8      A.   Yeah.  This is really -- you know, the product

9  surveys on the website is really handled by Michael

10 Layne.

11     Q.   Unfortunately, I received this after his

12 deposition.  So I am just trying to find out where it

13 comes from.

14          MR. GARRITY:  Absolutely.  Do you mind if

15 we just go off the record for just a minute?

16          MR. PAGE:  Yeah, sure.  You may very well

17 know.

18          THE VIDEOGRAPHER:  Off the record,

19 8:54:28 a.m.

20          (Recess taken.)

21          THE VIDEOGRAPHER:  Back on the record,

22 9:05:44 a.m.

23     Q.   (BY MR. PAGE)  Before we broke, we were looking

24 at Alderman Exhibit 1.

25          I think the question is, what is this?

37

**U.S. Legal Support**

1   A.   Yeah.  Basically, people that came to the website and bought.

2   Q.   I see.  Okay.  If you could move forward to the next document, which is 043044, E-Commerce Review, July and August.

3   A.   Okay.

4   Q.   Can you tell me where that document ends?

5   A.   It appears 093 is the last page.

6   Q.   Okay.  All right.  And is this a document you prepared?

7   A.   This is a document that I had input into.  I believe Scot Powers put this together.

8   Q.   Okay.  Do you have any reason to think that any of the data in this report is inaccurate?

9   A.   No, no reason to believe that it's inaccurate.

10   Q.   And is it your understanding that the July and August referred to on the caption page is 2004?

11   A.   Yes.

12   Q.   If you could flip forward to the next document, which starts at 043094 --

13   A.   Okay.

14   Q.   -- if you could tell me where that document ends.  My guess is 107.

15   A.   Yes.

16   Q.   Is this a document you prepared?

84

1   A.   Are you referring -- you are referring to this
2   one here?
3   Q.   Yes, S.E.O. Impact Analysis starting at 043094.
4   A.   I believe Scot Powers put this together.
5   Q.   Was there a time in which American Blind
6   reduced the bids on all of its search programs -- all
7   or some of its search programs to a maximum of ten cents
8   per click?
9   A.   Not all keywords in the program. I believe
10  the majority of keywords were dropped to a minimum --
11  I should say a maximum bid of ten cents.
12  Q.   Okay, and why did you do that?
13  A.   I believe we did that because that was
14  direction from Steve Katzman and our C.F.O. as well.
15  I believe it was a cost reduction exercise.
16  Q.   Was it originally designed to be an experiment,
17  or was it just a new policy?
18  A.   I believe it was just an experiment, actually.
19  We also tried to determine if we cranked all of our
20  bids down what the true impact of that would be to the
21  company.
22  Q.   Okay, and what did you find? What was the
23  impact on the company?
24  A.   The impact to the company was paid search
25  programs are very important to the business.

85

1    MR. GARRITY: Yep.

2    Q. (BY MR. PAGE) And if you can tell me what

3 Exhibit 6 is, if you know?

4    Exhibit 6, this is the order they came

5 in. I have no idea whether this is 1, 2, 5 or

6 20 different -- well, fewer than 20.

7    I make no representation as to whether

8 these are actually a single document. I don't know.

9 They appear to be bits and pieces of different things,

10 but the questions I have are on the second and third

11 page.

12    A. Okay.

13    Q. I just want to walk through some of these

14 formulas and make sure I understand them.

15    On the third page -- oh, I'm sorry.

16    Do you recognize this document or any

17 pieces of it?

18    A. Pieces of it, I do.

19    Q. Which pieces?

20    A. Page two, page three, page four, near the back

21 where it says Search Term Expansions, so 590, and the

22 following page as well.

23    Q. Okay. Going back to the handwritten page of

24 formulas, is this your handwriting?

25    A. No.

98

1   question, the recommended max cost per click is simply
2   straight break even, right?
3       A.  Yeah.  What's in the system, what it's gonna
4   net out to is break even level.
5       Q.  So the earning plus the cost -- earning plus
6   cost -- yeah, okay.
7               MR. GARRITY:  Yeah.
8               MR. PAGE:  We don't really need him, do
9   we?
10              MR. GARRITY:  No.  Jeff, you have a soda.
11  Mike and I will --
12              MR. PAGE:  Yeah.  So often, almost
13  literally true of a 30(b)(6) deposition.
14      Q.  (BY MR. PAGE)  Let me -- if you could flip to
15  the next document, Curran 7; and if you could tell me
16  what this document is?
17      A.  Well, it appears to be an analysis showing each
18  search engine program, Google, Yahoo, MSN, C.J., data
19  feeds as well and just showing it looks like just year
20  over year how much we have spent in '03, '02, '03, '04
21  and an estimate for '05.
22      Q.  I see, and breaking out total spend versus
23  branded keyword spend kind of?
24      A.  Yes.
25      Q.  All right.  And, if you go on to Exhibit 8 --

102

1  sorry -- Curran 8, which is a multi-page document that
2  has a caption on the first page that reads Incremental
3  Advertise -- looking like it's gonna end in ing.
4     A.  Okay.
5     Q.  Can you tell me what this document is?
6          MR. GARRITY:  I am just looking through
7  this as well, Mike.
8          It looks like the way that it breaks,
9  it's done year over -- it's a little bit -- you know,
10 unfortunately, the way that it had to get broken in
11 half, it looks like 3018 through 3023 would be the total
12 2005 Incremental Advertising but just gets broken in
13 half.
14         MR. PAGE:  Yeah, and then it goes back in
15 time.
16         MR. GARRITY:  And then it goes back and
17 it starts the next one.  So, for example, 3021 seems to
18 be the right half of the document that starts on 3018.
19         MR. PAGE:  Yeah.
20         MR. GARRITY:  Just for clarity, Jeff, I
21 think it does that, you know, over and over again by
22 year.
23         THE WITNESS:  Oh, I see.  Okay.
24    Q.  (BY MR. PAGE)  It's the usual pain of printing
25 a spreadsheet.

```
 1              So, is what he just said right?
 2      A.   That appears to be correct, yes.
 3      Q.   First, did you have any involvement in
 4  preparing this document?
 5      A.   No, I did not.
 6      Q.   Do you know who did prepare this document?
 7      A.   This type of a document is prepared from our
 8  finance group, and I believe the individual would be
 9  Jeff Rouleau.
10      Q.   Is this a true and accurate summary of American
11  Blind's advertising spending from 2001 through 2005?
12      A.   It appears to be.  It's difficult to read how
13  it's printed, but it appears to be.  If I am just
14  looking at the totals, it appears to be accurate.
15      Q.   Do you have any reason to think that there
16  is anything missing from this that was spent on
17  advertising in any of these years?
18      A.   It's in the ball park.  We typically spend
19  around ten million dollars a year on advertising.
20      Q.   An irrelevant question, but I have got to ask.
21           What's the difference between back of
22  book and front of book in magazines?
23      A.   In magazine ads --
24      Q.   Yes.
25      A.   -- sure.  Back of book ads are typically the
```

104

**U.S. Legal Support**

CERTIFICATE OF NOTARY

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF OAKLAND    )

        I, Lana Kia Haws, Certified Shorthand Reporter and Notary Public in and for the above county and state, do hereby certify that the deposition of JEFFREY A. ALDERMAN was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and foregoing answers made by the witness which were duly recorded by me stenographically and later reduced to computer transcription; and I certify that this is a true and correct transcript of my stenographic notes so taken.

199

```
 1
 2
 3
 4            I further certify that I am not Of
 5   Counsel to either party nor interested in the event of
 6   this cause.
 7
 8                    _____
 9                    Lana Kia Haws, CM, RPR, CSR-0995
10                    Notary Public
11                    State of Michigan
12                    County of Oakland
13                    Acting in the County of Wayne
14
15
16   My Commission Expires:
17   September 29, 2011
18
19
20
21
22
23
24
25
```