1    KEKER & VAN NEST, LLP
     MICHAEL H. PAGE - #154913
2    MARK A. LEMLEY - #155830
     KLAUS H. HAMM - #224905
3    AJAY S. KRISHNAN - #222476
     710 Sansome Street
4    San Francisco, CA  94111-1704
     Telephone:  (415) 391-5400
5    Facsimile:  (415) 397-7188

6    Attorneys for Plaintiff and Counter Defendant
     GOOGLE INC.
7

8                           UNITED STATES DISTRICT COURT

9                          NORTHERN DISTRICT OF CALIFORNIA

10

11   GOOGLE INC., a Delaware corporation,          Case No. C 03-5340-JF (RS)

12                            Plaintiff,           **MEMORANDUM OF POINTS AND**
                                                   **AUTHORITIES IN SUPPORT OF**
13          v.                                     **GOOGLE'S MOTION FOR SUMMARY**
                                                   **JUDGMENT**
14   AMERICAN BLIND & WALLPAPER
     FACTORY, INC., a Delaware corporation         Date:        January 30, 2006
15   d/b/a decoratetoday.com, Inc., and DOES 1-    Time:        9 a.m.
     100, inclusive,                               Courtroom: 3, 5th Floor
16                                                 Judge:       Hon. Jeremy Fogel
                             Defendants.
17

18   AMERICAN BLIND & WALLPAPER
     FACTORY, INC., a Delaware corporation
19   d/b/a decoratetoday.com, Inc.,

20                            Counter-Plaintiff,

21          v.

22   GOOGLE INC.,

23                            Counter-Defendant.

24

25

26

27

28

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
                                 CASE NO. C 03-5340-JF (RS)

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................1

II. FACTS ......................................................................................................2

    A. Google's search engine. .....................................................................2

    B. Google's AdWords program. ...............................................................3

    C. Google's trademark policy. ..................................................................5

III. ARGUMENT .............................................................................................6

    A. ABWF's claims fail because using a trademark as a selection criterion for displaying an ad does not constitute a "use in commerce" under the Lanham Act. ..................................................................................6

        1. Google's motion to dismiss. .......................................................6

        2. The trademark "use in commerce" requirement is met only if the defendant uses a trademark *as a trademark*. ............................7

        3. Using a trademark as a triggering criterion for the display of advertisements is not trademark use. .........................................9

    B. All of ABWF's claims fail because the only alleged mark for which it attempts to prove confusion—"American Blinds"—is not enforceable. ...............14

    C. ABWF's infringement and common-law claims fail, because ABWF's survey was so flawed that ABWF cannot prove either actual confusion or a likelihood of confusion. ...................................................................18

    D. ABWF's claims also fail because ABWF cannot prove initial interest confusion, given that ABWF's study never examined the allegedly confusing websites of its competitors. ..............................................24

    E. ABWF's dilution claims fail because ABWF's failure to perform a fame survey means that there is *no* evidence that the ABWF marks are famous. .........................................................................................26

    F. All of ABWF's claims are barred by the doctrine of unclean hands, because ABWF engages in *precisely* the same conduct that it challenges. ...........................................................................................31

IV. CONCLUSION ..........................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*1-800 Contacts, Inc. v. WhenU.com, Inc.*,
   414 F.3d 400 (2d Cir. 2005) ............................................................. 8, 9, 10, 11

*A.B.C. Carpet Co., Inc. v. Naeini*, No. 00-CV-4884-FB,
   2002 WL 100604 (E.D.N.Y. Jan. 22, 2002) ...................................... 27

*Acad. of Motion Picture Arts and Scis. v. Network Solutions, Inc.*,
   989 F. Supp. 1276 (C.D. Cal. 1997) .................................................. 7

*Anheuser-Busch Inc. v. Andy's Sportswear Inc.*, No. C-96-2783 TEH,
   1996 WL 657219 (N.D. Cal. Aug. 28, 1996) .................................... 28

*Avery Dennison Corp. v. Sumpton*,
   189 F.3d 868 (9th Cir. 1999) ............................................................ 27, 28

*BigStar Entertainment, Inc. v. Next Big Star, Inc.*,
   105 F. Supp. 2d 185 (S.D.N.Y. 2000) .............................................. 28, 29

*Bosley Med. Inst., Inc. v. Kremer*,
   403 F.3d 672 (9th Cir. 2005) ............................................................ 7

*Breuer Elec. Mfg. Co. v. Hoover Co.*, No. 97 C 7443,
   1998 WL 427595 (N.D. Ill. Jul 23, 1998).......................................... 28

*Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*,
   214 F.3d 432 (3rd Cir. 2000) ............................................................ 15

*DaimlerChrysler AG v. Bloom*,
   315 F.3d 932 (8th Cir. 2003) ............................................................ 8

*Discovery Commons, Inc. v. Animal Planet, Inc.*,
   172 F.Supp.2d 1282 (C.D. Cal. 2001) .............................................. 26

*Edina Realty, Inc. v. TheMLSonline.com*, No. Civ. 04-4371 (JRT/FLN),
   2006 WL 737064 (D. Minn. Mar. 20, 2006) ..................................... 12

*Grotrian v. Steinway & Sons*,
   523 F.2d 1331 (2d Cir. 1975) ............................................................ 24

*Hotmail Corp. v. Vans$ Money Pie Inc.*, No. C-98-20064 JW,
   1998 WL 388389 (N.D. Cal. Apr. 16, 1998)...................................... 28

*I.P. Lund Trading ApS v. Kohler Co.*,
   163 F.3d 27 (1st Cir. 1998)................................................................ 28

*Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*,
   326 F.3d 687 (6th Cir. 2003) ............................................................ 8, 9

*Karl Storz Endoscopy-America, Inc. v. Surgical Techs., Inc.*,
   285 F.3d 848 (9th Cir. 2002) ............................................................ 8, 9, 14

*Lamparello v. Falwell*,
   420 F.3d 309 (4th Cir, 2005), *cert. denied*, 126 S. Ct. 1772 (2006)........................ 25

*Levi Strauss & Co. v. Blue Bell, Inc.*,
   778 F.2d 1352 (9th Cir. 1985) (en banc) .......................................... 15

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
   985 F.Supp. 949 (C.D. Cal. 1997) .................................................... 8, 9

ii

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
No. 1:06cv321(JCC), 2006 WL 3182468, at *7 (E.D. Va. Nov. 3, 2006) .............................. 27

*M2 Software, Inc., v. Madacy Entm't*,
421 F.3d 1073 (9th Cir. 2005) ................................................................................ 18, 28

*Mattel, Inc. v. MCA Records, Inc.*,
296 F.3d 894 (9th Cir. 2002) ............................................................................................ 28

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*,
425 F.Supp.2d 402 (S.D.N.Y. 2006) .......................................................................... 11, 12

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*,
431 F.Supp.2d 425 (S.D.N.Y. 2006) .................................................................. 1, 11, 12

*Moseley v. V Secret Catalogue, Inc.*,
537 U.S. 418 (2003)........................................................................................................... 31

*Nissan Motor Co. v. Nissan Computer Corp.*,
378 F.3d 1002 (9th Cir. 2004) .......................................................................................... 26

*Panavision Intn'l, L.P. v. Toeppen*,
141 F.3d 1316 (9th Cir. 1998) .......................................................................................... 26

*PepsiCo, Inc. v. Reyes*,
70 F.Supp.2d 1057 (C.D. Cal. 1999) ................................................................................ 28

*Playboy Enterprises, Inc. v. Netscape Communications Corp.*,
354 F.3d 1020 (9th Cir. 2004) ........................................................................ 10, 11, 24, 25

*PostX Corp. v. docSpace Co., Inc.*,
80 F.Supp.2d 1056 (N.D. Cal. 1999) ............................................................................... 28

*Republic Molding Corp. v. B. W. Photo Utilities*,
319 F.2d 347 (9th Cir. 1963) ............................................................................................ 32

*Rescuecom Corp. v. Google Inc.*, -- F.Supp.2d --, No. 5:04-CV-1055 (NAM/GHL),
2006 WL 2811711 (N.D.N.Y. Sept. 28, 2006)........................................................... 13, 14

*Star Markets, Ltd. v. Texaco Refining & Marketing, Inc.*,
950 F. Supp. 1030 (D. Haw. 1996)............................................................................. 27, 28

*Sunset House Distrib. Corp. v. Coffee Dan's Inc.*,
240 Cal. App. 2d 748 (1966) .............................................................................................. 7

*TCPIP Holding Co. v. Haar Commc'ns, Inc.*,
244 F.3d 88 (2d Cir. 2001) ......................................................................................... 28, 29

*Thane Int'l v. Trek Bicycle Corp.*,
305 F.3d 894 (9th Cir. 2002) ..................................................................................... 27, 28

*Thompson Med. Co. v. Pfizer, Inc.*,
753 F.2d 208 (2d Cir. 1985) .............................................................................................. 16

*Toho Co. v. Sears, Roebuck & Co.*,
645 F.2d 788 (9th Cir. 1981) .............................................................................................. 7

*Toys "R" Us, Inc. v. Akkaoui*, No. C 96-3381 CW,
1996 WL 772709 (N.D. Cal. Oct. 29, 1996) .................................................................... 28

iii

# TABLE OF AUTHORITIES
## (cont'd)

<u>**Page(s)**</u>

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992)...................................................................................... 15

*Vision Sports, Inc. v. Melville Corp.*,
   888 F.2d 609 (9th Cir. 1989) ......................................................................... 16

## Statutes

15 U.S.C. § 1065 ................................................................................................... 15

15 U.S.C. § 1111 ................................................................................................... 15

15 U.S.C. § 1114 ................................................................................................... 18

15 U.S.C. § 1125 ............................................................................................. passim

15 U.S.C. § 1127 ..................................................................................................... 8

## Other Authorities

Eric Goldman, *Deregulating Relevancy in Internet Trademark Law*,
   54 Emory L.J. 507 (2005)............................................................................... 14

Restatement (Third) of Unfair Competition § 32 (1995)..................................... 31, 32

Zachary Zweihorn, *Searching for Confusion:  The Initial Interest Confusion Doctrine and
   Its Misapplication to Search Engine Sponsored Links*, 91 Cornell L. Rev. 1343 (2006)......... 24

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

## I.    INTRODUCTION

The primary issue in this case is whether product placement—a practice that is entirely legal under trademark law in the physical world—suddenly becomes illegal when it takes place on the Internet.  A common form of product placement is for the manufacturer of a lesser-known brand to pay a store to display its products next to a well-known competitor, with the hope that when customers seek the well-known brand they will notice the competing product and purchase it instead.  That is why other colas are found next to Coke, and generic ibuprofen next to Advil, on grocery store shelves.  This practice does not violate trademark laws because the manufacturer paying for product placement is not using the well-known brand to identify the source of its products.  Instead the manufacturer is using the trademarks to identify potential customers and inform them that *different* products and services exist.

As one federal court recently ruled, search engines such as the one operated by Google Inc. engage in "the electronic equivalent of product placement."  *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 431 F.Supp.2d 425, 427 (S.D.N.Y. 2006).  And American Blind & Wallpaper Factory, Inc. ("ABWF") wants to stop it.  ABWF wants to prevent Google from allowing ABWF's competitors to display advertisements next to a list of the hundreds of thousands of search results that appear when a Google user conducts a search using ABWF's alleged trademarks.  It is undisputed that these ads do not contain ABWF's alleged trademarks.  And in any event, like the hundreds of thousands of other search results, these competing ads are relevant to ABWF's potential customers since they offer services that compete with the services marketed under the alleged ABWF marks.  While this sort of comparative advertising has always been legal, ABWF is hoping to use the relative novelty of targeted Internet advertising to convince the Court to rule that trademark law should be applied differently in cyberspace.  It should not.  Both on and off the Internet, there can be no trademark infringement if there is no trademark use.  Thus, since as a matter of law Google does not use ABWF's trademarks, it does not infringe them and the Court should grant this summary judgment motion.

Aside from the fact that Google does not use ABWF's trademarks, there are several additional and independent reasons why ABWF's claims cannot survive summary judgment:

- First, ABWF's claims that Google infringes its two purported common law marks—"American Blind" and "American Blinds"—must fail because ABWF cannot prove that it has any rights in those marks. These are descriptive marks. For a common law descriptive mark to be valid, it must have secondary meaning. ABWF has presented no evidence that these marks have secondary meaning.

- Second, ABWF's claims that Google has violated its rights to its three registered trademarks must fail because ABWF has presented no evidence that Google's alleged used of these marks is likely to cause confusion. ABWF's only likelihood of confusion evidence is a survey, but this survey focuses on only one of ABWF's common law marks and *does not mention its registered marks*.

- Third, ABWF's survey shows no likelihood of confusion because it has no probative value. The survey lacks a control and is entirely based on the false premise that "American Blinds" is a brand of window blinds when no such brand exists. These fundamental problems make the survey unreliable and leave ABWF without any evidence of likelihood of confusion.

- Fourth, even if ABWF's confusion survey were reliable, it would be insufficient to establish confusion *as a matter of law* because it did not analyze the websites of ABWF's competitors. ABWF's sole theory of confusion is the oft-criticized doctrine of "initial interest confusion" ("IIC"). But to establish IIC in the internet context, the trademark holder must analyze the website to which traffic was allegedly diverted. ABWF did not do this, and therefore cannot establish IIC.

- Fifth, ABWF's dilution claims must fail because there is no evidence that any of ABWF's marks are "famous," which is a necessary element of a dilution claim. Indeed, the only relevant evidence suggests that ABWF's *own customers* have difficulty recognizing ABWF's asserted marks. Further, ABWF has not even attempted to prove actual dilution, as the statute requires, for its damages claim.

- Finally, all of ABWF's claims should fail under the unclean hands doctrine. ABWF actively engages in the *exact* same type of advertising that it wants Google to stop its rivals from conducting. While ABWF claims that Google violates a host of state and federal laws because Google allows advertisers to display their ads when users search for ABWF's trademarks, ABWF displays ads on Google when users search for its competitors' trademarks. The unclean hands doctrine prohibits such hypocrisy and bars ABWF from pursuing its claims.

## II.    FACTS

**A.    Google's search engine.**

Familiar to millions of Internet users, Google offers a free Internet search engine. To conduct a search, a user types one or more search terms (the words or phrases that describe the information sought), and hits the "Enter" key or clicks on the "Google Search" button. In response, Google produces a results page that lists the web pages related to the search terms, with the most relevant page appearing first, then the next, and so on. *See* Google, Google Help Center, http://www.google.com/help/basics.html (last visited Dec. 18, 2006). For example, when

1    a computer user searches for "american blinds and wallpaper factory," the results page lists the

2    first ten results and indicates that approximately 600,000 additional results are listed on

3    subsequent pages.  *See* Declaration of Klaus H. Hamm in Support of Google Inc.'s Motion for

4    Summary Judgment ("Hamm Decl.") Ex. A**.**

5    **B.    Google's AdWords program.**

6        Google's AdWords programs allows advertisers to place targeted advertising on the

7    results page of a Google search.[1]  Specifically, when a user types a query into Google's search

8    engine, that query can trigger advertisements—or Sponsored Links—that will be displayed in

9    two special sections of the search results page: (1) the right hand column of the page, under a

10   heading titled "Sponsored Links," and (2) above the natural search results, with a colored

11   background, next to an insignia that says "Sponsored Links."  The ads contain text and a link to

12   the advertiser's website.  *Id.*, Ex. A.

13       In order to have their ads appear on Google's search results page, hundreds of thousands

14   of Google advertisers bid on keywords or keyword phrases.  If a user's search terms "match" the

15   keyword or keyword phrase, the advertiser's ad *might* be displayed on the search results page.

16   Whether the ad actually appears on the search results page depends on numerous factors,

17   including how much the advertiser bid vis-à-vis other advertisers, how frequently users have

18   clicked on the ad in the past, and the comparative relevance of the advertiser's website to the

19   user's query.

20       There are several ways in which an advertiser's choice of keywords or keyword phrases

21   can be "matched" to the search terms entered by the user.[2]  For instance, an advertiser can

22   designate desired keywords or keyword phrases as "broad match" terms, which is the default

23   choice.  As its name suggests, broad match is an expansive matching algorithm.  Broad match

24   keyword phrases—such as "tennis shoes"—will match with user queries as long as each word in

25   _____

26   [1] The following explanation of how the AdWords program functions derives from the AdWords Help Center, Google's published instructional materials for potential advertisers.  *See* Hamm Decl. Ex. B.  The look, feel, and operation of the AdWords program can also be gleaned by

27   visiting www.google.com, and performing actual searches.

28   [2] The following discussion of "matching" options also derives from the AdWords Help Center. Hamm Decl. Ex. C.

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

the keyword phrase (or variant or select synonym thereof) is included in the query, regardless of order. So, an advertiser who designates "tennis shoes" as a broad match keyword phrase will match with any of the following search queries: "tennis shoe," "shoes tennis," "red tennis shoes," "tennis red shoes," "buy tennis shoes," "tennis sneaker," and "buy tennis sneakers."

By contrast, "exact match" is a selective matching algorithm. A keyword phrase designated as an exact match will match with a user query only when the keyword phrase and the query are identical. So, an advertiser who designates "tennis shoes" as an exact match keyword phrase will match with only one user query—"tennis shoes"—but will fail to match with queries such as "tennis shoe stores."

In addition to choosing a matching algorithm, an advertiser can also designate "negative" keywords. A keyword phrase containing a negative keyword will not match with a search query that includes the negative keyword. So, an advertiser who designates "tennis shoes" as a broad match keyword phrase, but designates "red" as a negative keyword, will match with the queries "blue tennis shoes" and "good tennis sneakers," but not with the term "red tennis shoes."

Let's apply these concepts to this case. ABWF sells, among other things, window blinds and wallpaper online. This case arises out of ABWF's claim that when a Google user searches for ABWF's alleged trademarks—such as "American Blinds" or "American Blind Factory"[3]—no ads for ABWF's competitors should appear on the search results page. Google permits advertisers to bid on keywords that are identical to a registered trademark. *See infra* § II.C ("Google's trademark policy"). Thus, when ABWF's competitors bid on the keyword phrase "American Blind Factory," and the competitors' ads appear on a search results page listing results relevant to the query "American Blind Factory," ABWF claims its trademark has been infringed.

But given the nature of the broad match algorithm, ABWF's competitors' ads also appear in response to a user query for "American Blind Factory" *even though the competitor never bid*

---

[3] ABWF has asserted the following purported trademarks against Google: "American Blind," "American Blinds," "American Blind & Wallpaper Factory," "American Blind Factory," and "Decoratetoday." ABWF's Answer, Affirmative Defenses, and Counterclaims (Docket Item No. 24) ("ABWF's Counterclaims"), ¶¶17 & 18.

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

*on the keyword phrase "American Blind Factory" or anything like it.* For instance, if ABWF's competitors designated "blinds" as a broad match keyword, their ads would be triggered by a search for "American Blind Factory." The only way to be sure that none of ABWF's competitors ads appear in response to a query for "American Blind Factory," is to identify all of ABWF's competitors, and require them to designate "American Blind Factory" as a negative keyword phrase. Indeed, this is precisely what ABWF has asked Google to do. Hamm Decl. Ex. D. As noted below, however, ABWF itself refuses to designate its competitors' trademarks as negative keywords in its own Google advertising.

**C.    Google's trademark policy.**

As mentioned above, Google permits advertisers to trigger Sponsored Links with trademarks. But Google does not permit advertisers to use trademarks in the text of ads unless the trademark holder authorizes them to do so. *Id.*, Ex. E at GGLE 00018826. As Google's website states: "When we receive a complaint from a trademark owner, we only investigate the use of the trademark in ad text. If the advertiser is using the trademark in ad text, we will require the advertiser to remove the trademark and prevent them from using it in ad text in the future. **Please note that we will not disable keywords in response to a trademark complaint.**" Google, Trademark Complaint Procedures, http://www.google.com/tm_complaint_adwords.html#1 (last visited Dec. 18, 2006) (emphasis in original); *see also* Hamm Decl. Ex. E at GGLE 00018826. When Google receives a trademark complaint, it investigates it. *Id.*, Ex. F at 91:2-93:22. If the trademark is valid, Google blocks the offending ads, and adds the trademark to its trademark monitor list. *Id.* Ads containing in their text trademarks from the list will be automatically blocked on Google. *Id.*

ABWF has notified Google that it has three registered trademarks: American Blind & Wallpaper Factory, American Blind Factory, and Decoratetoday. ABWF's Counterclaims, ¶18. Each of these trademarks, as well as several variations, are on Google's trademark monitor list, which means that only companies who have permission from ABWF may use them in the title or text of a Google Sponsored Link. Hamm Decl. Ex. F at 110:2-110:25.

### III.    ARGUMENT

**A.    ABWF's claims fail because using a trademark as a selection criterion for displaying an ad does not constitute a "use in commerce" under the Lanham Act.**

Google moves for summary judgment on each of ABWF's causes of action because Google does not use ABWF's registered trademarks *as trademarks*.  Instead of using ABWF's trademarks to identify the source of Google's search engine or any of its advertisers' (other than ABWF's) products or services, the undisputed fact is that Google uses these trademarks only as a triggering criterion for determining when and where to display ads.  In concrete terms, Google does not brand its search engine with ABWF's trademarks and Google does not permit advertisers to use ABWF's trademarks in the text or title of their Sponsored Links without ABWF's permission.  Given these undisputed facts, Google does not *use* ABWF's registered trademarks *in commerce*, as required by the Lanham Act.  As a result, ABWF's claims cannot succeed as a matter of law.

#### 1.    Google's motion to dismiss.

As the Court recalls, this is the not the first time Google has made this argument.  Earlier in this litigation, Google moved to dismiss ABWF's trademark infringement and related causes of action on the ground that Google's use of ABWF's alleged trademarks to trigger third-party advertisements does not constitute "use in commerce" of ABWF's marks under the Lanham Act. The Court denied this part of Google's motion, but not because it disagreed with Google. Indeed, the Court signaled its willingness to consider this argument in the future.  The Court wrote that it "concludes that resolution of the novel legal questions presented by this case should await the development of a full factual record."  Order Granting in Part and Denying in Part Counter-Defendant's and Third-Party Defendant's Motion to Dismiss ("March 30, 2005 Order") (Docket Item No. 48) at 16.  In so ruling, the Court emphasized "that it expresses no opinion as to whether Defendants ultimately will prevail in trying to prove that they are not liable to American Blind on these claims.  This Order should be understood only as allowing American Blind's counterclaims and third-party claims to proceed beyond the motion-to-dismiss stage,

1  which will enable the Court to consider both the relevant facts and the applicable law in the

2  context of a fuller record."  *Id.*

3       More than two years have passed since Google moved to dismiss and, in that time, the

4  parties have engaged in all manner of discovery.  Before closing, discovery included the

5  production of more than 100,000 pages of documents and numerous depositions.  At the same

6  time, the legal questions involved are no longer so novel.  In 2005, the Second Circuit became

7  the first—and so far only—federal appellate court to rule on whether Internet advertising

8  triggered by trademarks is a trademark use (it is not), and three district court opinions have

9  applied that ruling to hold that when Google triggers Sponsored Links with keywords that

10  resemble trademarks there is no trademark use.  The time has come for the Court to consider, on

11  the basis of what evidence ABWF could adduce, whether the use of a trademark as a selection

12  criterion for the appearance of an ad constitutes "use in commerce."

     **2.**     **The trademark "use in commerce" requirement is met only if the defendant uses a trademark *as a trademark*.**

13
14       Somewhat confusingly, two use-in-commerce requirements exist under the Lanham Act.

15  The first of these requirements is "simply a jurisdictional predicate to any law passed by

16  Congress under the Commerce Clause" of the United States Constitution, requires a showing

17  only that the conduct at issue are the type that Congress may regulate under the Commerce

18  Clause, and is not at issue in this case.  *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th

19  Cir. 2005).  Rather, the Lanham Act's second use-in-commerce requirement is the obstacle that

20  ABWF cannot overcome and that should serve as the basis for granting summary judgment for

21  Google on ABWF's remaining claims.[4]

22
23
24
25
26
27
28

---

[4] All of ABWF's remaining claims against Google share this "use in commerce" requirement. *See Acad. of Motion Picture Arts and Scis. v. Network Solutions, Inc.*, 989 F. Supp. 1276, 1279-81 (C.D. Cal. 1997) (federal trademark infringement and dilution claims and state law unfair competition claims require that defendant "used" another's mark without permission in connection with its own goods and services); *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793 (9th Cir. 1981) (dilution doctrine codified in Business and Professions Code protects trademark holder from harm due to defendant's "use" of its mark); *Sunset House Distrib. Corp. v. Coffee Dan's Inc.*, 240 Cal. App. 2d 748, 753 (1966) (state law trademark infringement and unfair competition claims require defendant's "use of a confusingly similar tradename" to tradename used by plaintiff); 15 U.S.C. § 1125(a)(1) (false representation actionable under Lanham Act if party "uses in commerce" a "false or misleading representation of fact").  For

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1    The "use in commerce" requirement at issue in this case comes straight from the Lanham

2    Act's definition of the phrase.  *See Karl Storz Endoscopy-America, Inc. v. Surgical Techs., Inc.*,

3    285 F.3d 848, 855 (9th Cir. 2002):[5]

4        The term "use in commerce" means the bona fide use of a mark in the ordinary
         course of trade, and not made merely to reserve a right in a mark. For purposes of
5        this Act, a mark shall be deemed to be in use in commerce—

6        (1) on goods when—

7        (A) it is placed in any manner on the goods or their containers or the displays
         associated therewith or on the tags or labels affixed thereto, or if the nature of the
8        goods makes such placement impracticable, then on documents associated with
         the goods or their sale, and
9
         (B) the goods are sold or transported in commerce, and
10
11       (2) on services when it is used or displayed in the sale or advertising of services
         and the services are rendered in commerce, or the services are rendered in more
12       than one State or in the United States and a foreign country and the person
         rendering the services is engaged in commerce in connection with the services.

13    15 U.S.C. § 1127.

14    The test for whether a party uses a trademark under the Lanham Act's definition of "use

15    in commerce" has been succinctly summarized as whether a party is using the mark to identify

16    the source of goods or services:  the question is "whether defendants are using the challenged

17    mark in a way that identifies the source of their goods.  If defendants are only using [the]

18    trademark in a 'non-trademark' way—that is, in a way that does not identify the source of a

19    product—then trademark infringement and false designation of origin laws do not apply."

20    *Interactive Prods.*, 326 F.3d at 695.  Or, put even more succinctly, the issue is whether the

21    defendant uses the trademark so that it "function[s] as a trademark."  *Lockheed Martin Corp. v.*

22    *Network Solutions, Inc.*, 985 F.Supp. 949, 956 (C.D. Cal. 1997)  If the alleged infringer is not

23    using the trademark as a trademark, then it is not using the trademark "in connection with the

24

25    simplicity's sake, this argument often refers to ABWF's trademark infringement claim and the
      federal Lanham Act.  But, as noted, the argument applies equally to each of ABWF's state and
26    federal claims.

27    [5] In addition to the Ninth Circuit, other circuits, including the Second, Sixth and Eighth Circuits,
      have articulated this same requirement.  *See 1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d
28    400, 412 (2d Cir. 2005); *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d
      687, 695, 698 (6th Cir. 2003); *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 (8th Cir. 2003).

8

1    sale, distribution or advertising of goods and services," and the use "is not prohibited by

2    trademark law." *Id.* at 957.

3    　　　This use requirement is a predicate to a finding of trademark infringement. While several

4    circuits have made it clear that courts should consider use before considering likelihood of

5    confusion, the Ninth Circuit does not impose a rigid order for considering the requirements of an

6    infringement claim. *Compare 1-800 Contacts*, 414 F.3d at 412 (holding that considering

7    likelihood of confusion before use "puts the cart before the horse. Not only are 'use,' 'in

8    commerce,' and 'likelihood of confusion' three distinct elements of a trademark infringement

9    claim, but 'use' must be decided as a threshold matter because, while any number of activities

10   may be 'in commerce' or create a likelihood of confusion, no such activity is actionable under

11   the Lanham Act absent the 'use' of a trademark.") *and Interactive Prods.*, 326 F.3d at 698

12   (trademark use is a "preliminary question" and when there is no trademark use it is "unnecessary

13   for the district court to examine the eight factors traditionally used to determine likelihood of

14   confusion") *with Karl Storz*, 285 F.3d at 853-57 (considering likelihood of confusion before

15   considering use). But, just as in other circuits, in the Ninth Circuit use is an independent and

16   necessary requirement for a finding of trademark infringement. For example, in *Karl Storz*, the

17   district court granted summary judgment for the alleged infringer Surgi-Tech on the separate

18   grounds that it did not use Storz's trademarks and that there was no likelihood of confusion. On

19   appeal, the Ninth Circuit reversed. First, it found there was a triable issue of fact that a

20   likelihood of confusion existed. *Id.* at 855. Having made that determination, before reversing,

21   the court held that it "must address whether Surgi-Tech used Storz's trademark in commerce."

22   *Id.* If Surgi-Tech had demonstrated either that there was no likelihood of confusion or there was

23   no use, it would have been entitled to summary judgment. Thus, if Google can show that it does

24   not use ABWF's marks, it cannot infringe them, and Google is entitled to summary judgment.

25   　　　**3.    Using a trademark as a triggering criterion for the display of advertisements
              is not trademark use.**

26

27   　　　Since the Court ruled on Google's motion to dismiss, the Second Circuit became the first

28   federal appeals court to consider the trademark-use requirement in the context of internet

9

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1    advertising.[6] *1-800 Contacts*, 414 F.3d at 400.  In a detailed opinion, the Second Circuit held

2    that the use of a term similar to a trademark to trigger a pop-up ad is not trademark use.  The

3    trademark holder, 1-800 Contacts, sued WhenU, a company that delivers Internet advertising on

4    behalf of third parties, because WhenU displayed pop-up ads when computer users searched for

5    the term "www.1800contacts.com" in a search engine or entered it as an address in an internet

6    browser.  *Id.* at 404.

7        WhenU, however, did not place that term on or in the pop-up ads.  Because of this fact,

8    the Court held that WhenU "does not 'use' 1-800's trademark in the manner ordinarily at issue in

9    an infringement claim: it does not 'place' 1-800 trademarks on any goods or services in order to

10   pass them off as emanating from or authorized by 1-800."  *Id.* at 408.  It then relied on this

11   principle—that an ad does not use a trademark if the ad does not contain the trademark—when it

12   ruled that the "fatal flaw" of the district court's holding was its failure to recognize that the "pop-

13   up ads do *not* display the 1-800 trademark."  *Id.* at 410 (emphasis added).  Instead of using the

14   trademark to identify source, the court held that WhenU used the trademark only as an internal

15   triggering criterion for delivering relevant advertising to computer users—an act that does not

16   violate trademark laws:

17           A company's internal utilization of a trademark in a way that does not
             communicate it to the public is analogous to a [sic] individual's private thoughts
18           about a trademark.  Such conduct simply does not violate the Lanham Act, which
             is concerned with the use of trademarks in connection with the sale of goods or
19           services in a manner likely to lead to consumer confusion as to the source of such
             goods or services.
20
21   *Id.* at 409.

22

23   _____

[6] Although the Ninth Circuit has applied trademark law to internet advertising, it has never
24   applied the trademark-use doctrine in these circumstances.  Indeed, Google is not aware of any
     district court opinion within the Ninth Circuit that has considered this issue, aside from this
25   Court's consideration of Google's motion to dismiss.  As this Court's order on Google's motion
     to dismiss acknowledges, the Ninth Circuit opinion *Playboy Enterprises, Inc. v. Netscape*
26   *Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004), "did not undertake a separate discussion
     of the element of trademark 'use'" and that the opinion's discussion of trademark use "concerned
27   only the jurisdictional requirement of use '*in commerce*' and not the separate requirement of
     trademark 'use.'"  March 30, 2005 Order at 14 (emphasis in original).
28

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1      In making this critical distinction between using a trademark in ad text and using it as an

2   ad-display selection criterion, the Second Circuit analogized the sort of internal processing of ads

3   Google does here to "product placement."  Using a trademark to determine when to display an ad

4   for competing products on the Internet is, for purposes of trademark law, equivalent to placing a

5   less-popular competing brand next to a more-popular one with the intent that consumers will

6   consider the less-popular brand when they initially seek the popular one:

7          Indeed, it is routine for vendors to seek specific 'product placement' in retail
           stores precisely to capitalize on the competitors' name recognition.  For example,
8          a drug store typically places its own store-branded generic products next to the
           trademarked products they emulate in order to induce a customer who has
9          specifically sought out the trademarked product to consider the store's less-
           expensive alternative.  WhenU employs this same marketing strategy by
10         informing [users] who have sought out a specific trademarked product about
           available coupons, discounts, or alternative products that may be of interest to
11         them.

12   *Id.* at 411; *see also Playboy Enters.*, 354 F.3d at 1035 (using product-placement analogy and

13   stating "There is a big difference between hijacking a customer to another website by making the

14   customer think he or she is visiting the trademark holder's website … and just distracting a

15   potential customer with another *choice*, when it is clear that it is a choice.") (Berzon, J.,

16   concurring) (emphasis in original).

17      The *1-800 Contacts* court did not expressly decide how its rules for trademark use should

18   be applied to keyword advertising.  414 F.3d at 409, n.11.  Since *1-800 Contacts* issued, three

19   district court opinions relied on it in a single six-month period to hold that when a search engine

20   triggers Sponsored Links with a trademarked term, there is no trademark use and no violation of

21   trademark law.  The first two decisions are from a case in which the plaintiff claimed that a

22   trademark violation takes place when ads for a pharmacy appear as Sponsored Links on Google

23   when a user enters the trademark "ZOCOR" into the search engine.  *Merck & Co., Inc. v.*

24   *Mediplan Health Consulting, Inc.*, 425 F.Supp.2d 402 (S.D.N.Y. 2006); *Merck & Co., Inc. v.*

25   *Mediplan Health Consulting, Inc.*, 431 F.Supp.2d 425 (S.D.N.Y. 2006).  In the first opinion, the

26   court ruled that this triggering was not trademark use because "defendants do not 'place' the

27   ZOCOR marks on any goods or containers or displays or associated documents, nor do they use

28   them in any way to indicate source or sponsorship.  Rather the ZOCOR mark is 'used' only in

11

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

the sense that a computer user's search of the keyword 'Zocor' will trigger the display of sponsored links to defendants' websites. This internal use of the mark 'Zocor' as a key word to trigger the display of sponsored links is not use of the mark in a trademark sense." *Merck & Co., Inc.*, 425 F. Supp. 2d at 415.

The *Merck* court issued a second ruling on this same issue two months later when it denied Merck's motion for reconsideration. Using the product-placement analogy, the court explained once again that the use of the trademark ZOCOR as a keyword trigger is not trademark use:

> Rather, the marks are used only in the sense that a computer user's search of the keyword "Zocor" will trigger the display of sponsored links to defendants' websites. This internal use of the keyword "Zocor" is not use of the mark in the trademark sense; rather, this use is more akin to the product placement marketing strategy employed in retail stores, where, for example, a drug store places its generic products alongside similar national brand products to capitalize on the latter's name recognition. The sponsored link marketing strategy is the electronic equivalent of product placement in a retail store.

*Merck & Co., Inc.*, 431 F. Supp. 2d at 427 (internal citations omitted).

The court also tackled the argument that WhenU.com's pop-up ads are distinguishable from Google's Sponsored Links. The court held that "[t]here is a difference, but not … a meaningful one for these purposes." *Id.* It held that for purposes of trademark use analysis, Google's AdWords program is indistinguishable:

> The search engine companies included the keyword "Zocor" in their internal directories of keywords. When a computer user typed in the keyword Zocor, she would be offered, by virtue of the internal search engine processes, sponsored links to defendants' websites, in addition to the actual websites generated by the search engine program using neutral and objective criteria. This internal use of the keyword 'Zocor' is not use of the ZOCOR mark to indicate source or sponsorship. It may be commercial use, in a general sense, but it is not trademark use. Indeed, if anything, keywording is less intrusive than pop-up ads as it involves no aggressive overlaying of an advertisement on top of a trademark owner's webpage.

*Id.* at 428.[7]

---

[7] The *Merck* court correctly disagreed with a district court that found *advertisers* liable for selecting keywords in ways that might have confused consumers. 425 F. Supp. 2d 402, 431 F. Supp. 2d at 426-27 (disagreeing with *Edina Realty, Inc. v. TheMLSonline.com*, No. Civ. 04-4371 (JRT/FLN), 2006 WL 737064 at *3 (D. Minn. Mar. 20, 2006)). It is worth noting that the decision *Merck* declined to follow held only that advertisers who actually choose keywords might be engaging in trademark use, not that a search engine that accepts those ads is doing so.

386387.02

1    The *Merck* court is correct that for purposes of trademark-use analysis no meaningful

2    difference exists between Sponsored Links and WhenU.com's pop-up advertising, and that

3    neither qualifies as trademark use.  In both situations, a user types in a trademark or a term

4    similar to one.  And in both situations, the user is then presented with an advertisement that does

5    not use the trademark in the text of the ad.  It's also true that Google's Sponsored Links present a

6    more clear-cut case of non-trademark use than WhenU.com's pop-up ads.  Not only are

7    Sponsored Links less intrusive than pop-up ads, but in addition Google users who type in a

8    search term that is a trademark do not expect Google automatically to link the user to the

9    trademark owner's webpage.  Google simply does not work that way.  When a user types a query

10   into Google, Google's proprietary algorithms generate a listing of web pages (in some cases,

11   hundreds of thousands of them) that are contextually relevant to that query.  It pushes far beyond

12   the bounds of reason to argue that a person would expect that all of these listings are sponsored

13   by the trademark owner.  Instead, the user is presented with a selection of relevant links and,

14   then, if the user desires, he may click on a link that interests him.

15       The third, and most recent, opinion to rely on *1-800 Contacts* to hold that using

16   trademarks to trigger Sponsored Links does not violate trademark laws, like the current case,

17   considered claims brought directly against Google.  *Rescuecom Corp. v. Google Inc.*, --

18   F.Supp.2d --, No. 5:04-CV-1055 (NAM/GHL), 2006 WL 2811711 (N.D.N.Y. Sept. 28, 2006).

19   In holding that this practice is not trademark use, the court focused on the fact that none of the

20   Sponsored Links "display plaintiff's trademark" and that if Google does not place "plaintiff's

21   trademark on any goods, containers, displays, or advertisements, or use[] plaintiff's trademark in

22   any way that indicates source or origin" there is no trademark use.  *Id.* at *6-7.  In short, if the

23   trademark is not being used to indicate source, it makes no difference under trademark law if

24   Google is otherwise "capitalizing on the good will of plaintiff's trademark by marketing it to

25   plaintiff's competitors as a keyword in order to generate defendant's own advertising

26   revenues[.]"  *Id.* at *5.

27       Google's current summary judgment motion raises the exact issues considered in the two

28   *Merck* opinions and the *Rescuecom* opinion.  It is undisputed that Google allows ABWF's

13

competitors to bid on ABWF's registered trademarks for the opportunity to display their ads when Google users enter ABWF's trademarks as search terms.  But it is also undisputed that Google's policy allows trademark holders to prevent unauthorized advertisers from using the trademarks in the text or title of their ads.  Moreover, it is undisputed that Google monitors ABWF's trademarks and prohibits unauthorized users from displaying those trademarks in the title or text of their Sponsored Links.  Thus, neither Google nor its advertisers place ABWF's trademarks "on any goods, containers, displays, or advertisements, or use[]" ABWF's trademarks "in any way that indicates source or origin." *Rescuecom*, at *7.  These are the material facts, and they are not disputed.  Under these facts, Google does not use ABWF's trademarks as a matter of law. *Id.*  Since Google does not use these marks, Google does not infringe them, and Google is thus entitled to summary judgment. *Karl Storz*, 285 F.3d at 855.

A contrary decision would throw the search engine business into chaos.  Any trademark owner could make it to trial simply by complaining that some ads were showing up in proximity to "its" search results.  But the purpose of trademark law is to protect consumers, not to insulate trademark owners from legitimate competition.  And since consumers rely on the robust marketplace of search technology to help them find the information they are looking for, *see* Eric Goldman, *Deregulating Relevancy in Internet Trademark Law*, 54 Emory L.J. 507, 509 (2005), it would be perverse in the extreme for trademark law to deny those consumers the very information they need to make informed choices under the guise of protecting them from harm.

**B.    All of ABWF's claims fail because the only alleged mark for which it attempts to prove confusion—"American Blinds"—is not enforceable.**

ABWF's claims also face a basic procedural roadblock it cannot avoid:  the only purported trademark for which it even attempts to present evidence of confusion (unsuccessfully, as set forth below) is not enforceable at all in this action, either as a federally registered mark or as a common-law trademark.

At the time this action was filed, ABWF owned three federally-registered trademarks: "American Blind & Wallpaper Factory," "American Blind Factory," and "DecorateToday."[8]

---

[8] *See* ABWF's Counterclaim at ¶¶ 17 & 18.

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1    ABWF, however, has chosen not to present evidence of any actual or likely confusion regarding

2    any of those three marks, instead limiting its survey evidence to the "American Blinds" mark.

3    That mark, however, was not even registered at the time this action was commenced, and was

4    not placed in the principal register until September 26, 2006.[9]

5            As a result, ABWF does not get the benefit of 15 U.S.C. § 1115's statutory presumption

6    of validity and exclusive rights.  Under § 1115, registration on the principal register confers such

7    a presumption, and that presumption becomes incontestable after five years.  15 U.S.C. § 1065.

8    That presumption, however, applies only if the registration *predates* the first alleged infringing

9    use.  *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985) (en banc).

10   Where the registration comes *after* the first allegedly infringing use commences, as here, the

11   presumption does not apply, and the plaintiff must meet the burden of establishing that it holds

12   an enforceable common-law trademark.  *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins.*

13   *Agency, Inc.*, 214 F.3d 432 (3rd Cir. 2000).

14          ABWF cannot meet this burden.  Where, as here, a claimed mark is merely descriptive

15   (*i.e.*, "American Blinds" for blinds made and sold in America), the plaintiff must establish that

16   the phrase, through widespread and continuous use, has acquired "secondary meaning."  *Two*

17   *Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992).  A mark acquires secondary

18   meaning if the public comes to associate the mark with a particular source of goods or services:

19   for example, associating "Holiday Inn" with a particular hotel chain, rather than simply a

20   description of inns in which one spends one's holiday.

21

22

---

23   [9] In fact, ABWF has never given Google notice of this registration, either via actual notice or via
     displaying the mark with notice pursuant to 15 U.S.C. § 1111.  *See* DecorateToday, Blinds,
     http://www.decoratetoday.com/products/blinds/ (last visited Dec. 13, 2006) (using "American

24   Blinds" mark without an "R" symbol).  As a result, ABWF is barred from recovering any
     damages for alleged infringement of the "American Blinds" mark.  15 U.S.C. §1111 ("no profits

25   and no damages shall be recovered under the provisions of this Act unless the defendant had
     actual notice of the registration").

26   Additionally, ABWF asserts the non-plural "American Blind" mark, possibly as a separate mark.

27   That mark is neither registered, nor included in ABWF's confusion survey.  Thus, at best, it
     suffers the same defects as the "American Blinds" mark.

28

---

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1    Secondary meaning may be proved by either direct or circumstantial evidence.  Direct

2 evidence consists of testimony by consumers, typically in the form of survey evidence.  "An

3 expert survey of purchasers can provide the most persuasive evidence of secondary meaning."

4 *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989).  ABWF, however, did

5 not conduct a secondary meaning survey, and has adduced no direct evidence of secondary

6 meaning:

7    Q.    Okay.  Did you do anything to determine whether the term American Blinds
       has achieved secondary meaning with consumers?

8
     A.    No.
9
     Q.    You're familiar with secondary meaning surveys, correct?
10
     A.    Yes.
11
     Q.    And you've done them in the past, correct?
12
     A.    Yes.
13
     Q.    But you did not do one in this case, correct?
14
     A.    That's right.
15
     . . .
16
     Q.    Okay.  So you're not -- let me put it this way:  As an expert you're not
17       offering an opinion on whether there is secondary meaning, correct?

18    A.    Right.

19 Hamm Decl. Ex. G at 60:11-23 & 62:11-15.

20    Neither can ABWF meet its burden on the basis of circumstantial evidence.

21 Circumstantial evidence of secondary meaning typically includes evidence of long, continual,

22 and exclusive use of the mark, large advertising expenditures promoting the mark, unsolicited

23 media coverage, and the like.  *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208 (2d Cir. 1985).

24 ABWF, however, has made virtually no use of "American Blinds" as a trademark.  Although its

25 interrogatory responses claim a brief use of "American Blind" in 1986, that use ceased in 1988,

26 whereupon ABWF proceeded to cycle through a series of other company names.  Hamm Decl.

27 Ex. H at 2-3.  Moreover, ABWF has produced no evidence of that alleged use, and its

28 Counterclaim makes clear that this alleged early use was actually as "a distinctive *part* of

1    American Blind's corporate title and trade name," not as an independent mark. ABWF's

2    Counterclaim ¶19 (emphasis added).

3          ABWF's more recent "use" of "American Blinds" as a mark is nothing but a litigation

4    ploy. ABWF never even sought to register "American Blinds" as a trademark until April 9, 2004

5    (Hamm Decl. Ex. I), after this lawsuit had commenced and in anticipation of ABWF's filing of

6    its counterclaims. Moreover, that application stated only ABWF's *intent* to use the mark in the

7    future. *Id.*

8          The first and only evidence of even arguable *actual* use of "American Blinds" as a

9    trademark[10] is a single screen shot of an internal page of ABWF's website, showing the phrase

10   "American Blinds" in the middle of a page that displays the "American Blinds, Wallpaper &

11   More" and "decoratetoday" trademarks at the top. This page was submitted to the Patent &

12   Trademark Office on May 9 of this year, as ABWF's sole proof of actual use of the purported

13   mark. Hamm Decl. Ex. J. It appears, however, that the words "American Blinds" were first

14   added to that page only days earlier, on May 3, 2006, solely in order to manufacture the evidence

15   of use required by the PTO. Hamm Decl. Ex. N.[11]

16         Other than this litigation-driven token use, ABWF cannot establish even that it has used

17   the "American Blinds" mark, let alone establish the sort of continuous, widespread use necessary

18   to establish secondary meaning. Because ABWF cannot meet that burden, summary judgment is

19   mandated on all of ABWF's trademark claims relating to this purported mark.

20

21   [10] Indeed, the only use ABWF appears to make of "American Blinds" is as a domain name
     (www.americanblinds.com). Mere use as a domain name, however, does not constitute
22   trademark use, particularly where the website is not itself a separate service, but rather simply a
     sales outlet for the owner's goods. *See* Hamm Decl. Ex. K (Trademark Manual of Examination
23   Procedures § 1215.02 and cases cited therein); *see also* United States Patent and Trademark
     Office, TMEP Chapter 1200, http://tess2.uspto.gov/tmdb/tmep/1200.htm#_T121502. This is
24   particularly true in this case, where ABWF uses several different URL's for its website, and
     chooses between them based entirely on which one is most descriptive of the goods each user is
25   ordering. Hamm Decl. Ex. L at 122:5-125:6; *Id.*, Ex. M.

26   [11] In fact, it appears that the PTO never sought or obtained any evidence of secondary meaning,
     despite the clearly descriptive nature of the mark. Accordingly, now that the PTO has placed the
27   mark on the principal register, Google will (in the event this case survives the instant motion) ask
     for leave to amend its complaint to seek cancellation of the "American Blinds" mark.

28

17

**C.    ABWF's infringement and common-law claims fail, because ABWF's survey was so flawed that ABWF cannot prove either actual confusion or a likelihood of confusion.**

ABWF's infringement claims fail for the additional, fundamental reason that ABWF cannot present *any* evidence of either actual confusion or a likelihood of confusion.  15 U.S.C. § 1114(1) (requiring likelihood of confusion); 15 U.S.C. § 1125(a) (same); *M2 Software, Inc., v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) (requiring likelihood of confusion, and including proof of actual confusion as a factor in the likelihood-of-confusion analysis).  ABWF has produced no evidence of actual confusion, instead relying on a survey conducted by Alvin Ossip in an attempt to establish a likelihood of confusion.  That survey, however, is of zero probative value, for myriad reasons.

Before examining those failings, however, it is important to emphasize that this is not a typical trademark survey.  As the Court is no doubt aware, virtually every trademark defendant comes before judge or jury decrying the "fatal flaws" in its opponent's survey.  All too often, the defendant then trots out a series of nits about the wording of a particular question or the shape of the universe—objections that go at best to the weight to be accorded the survey.

This is not such a case.  The mistakes made by Mr. Ossip are far more fundamental.  When we say his survey is of *zero* probative value, we mean precisely that.

A crucial error that Mr. Ossip made[12] was to omit from his study all three of ABWF's established trademarks, instead limiting his study to the term "American Blinds."  At a minimum, therefore, ABWF can produce *no* evidence of confusion as to any of its other alleged marks, and summary judgment is therefore appropriate as to those marks.  And, as set forth above, the one "mark" for which ABWF did try to submit evidence is not enforceable in this action, as its registration long postdates the alleged infringement and the filing of this action.  So at best, ABWF can offer a theory of confusion only as to a "mark" it does not in fact own or use.

But even if "American Blinds" were an enforceable mark, Mr. Ossip presents no evidence of confusion.  His first problem is that he managed to get all the way through

---

[12] We do not seek to impugn Mr. Ossip's abilities unfairly:  in many instances, we assume that the mistakes he made were the result of relying on counsel's instructions and decisions.

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1    designing, fielding, and analyzing his survey, writing his expert report, and preparing for

2    deposition under the mistaken impression that there exists a product with the brand name

3    "American Blinds":

4        Q.    Mr. Ossip, what are American Blinds?

5        A.    American Blinds are a brand of window blinds that are sold by a company
              called American Blinds, Wallpaper and More.

6
         Q.    Okay.  And when you say they are a brand of window blinds, do you mean
7              that there are window blinds out there that say American Blinds on them?

8        A.    That are called -- yeah, that are sold by this company.

9        Q.    Okay.  And the brand name on them is American Blinds?

10       A.    I don't know about the brand name on them if I looked at the blinds, but
              that is -- if I went in and asked for that brand, that's the brand that I would
11             be shown.

12   Hamm Decl. Ex. G at 8:17-9:8.

13           In fact, no such product exists.  His client, ABWF, contends (albeit without any evidence)

14   that "American Blinds" is a short-form name *of the company* American Blind & Wallpaper

15   Factory, a.k.a. American Blind Factory, a.k.a. American Blinds, Wallpaper & More, a.k.a.

16   Decoratetoday.com.  But whatever one calls the company, it does not sell any *products* named

17   "American Blinds."  Rather, it sells various well-known brands such as Levolor, Hunter-

18   Douglas, and the like.  *See* American Blinds, Wallpaper & More, Browse Our Blinds,

19   http://www.decoratetoday.com/products/blinds/default.asp?si=5 (last visited Dec. 17, 2006).  It

20   also sells a "house brand," but the brand name used for those blinds is "American Brand," not

21   "American Blinds."  *Id.*  American Blinds window blinds do not exist, and never have.

22           Mr. Ossip's ignorance of his client's own business renders his survey incomprehensible.

23   First, he affirmatively chose as respondents people who claimed to have heard of this nonexistent

24   product, while rejecting those who *correctly* said they had not:  In his screening, he asked

25   potential respondents if they had ever heard of "American Blinds window blinds," and used only

26   those who said yes.[13]  Hamm Decl. Ex. O at Appx. A, "Screener," p.3.  Then, in the substantive

27

28   [13] This also illustrates the danger of asking leading, rather than open-ended, questions:  If Mr.
     Ossip had asked "What window blind brands do you know of?" rather than "Have you heard of

19

questioning, he repeatedly asks those already confused respondents where they think they could buy these nonexistent blinds:

> 4. [P]lease move the mouse to put the cursor on the listing on this page that you would try FIRST if you wanted to order American Blinds on-line.
>
> 4b. Do you think that clicking on that listing <u>would or would not</u> take you directly, or link you, to a website where you could order American Blinds, or don't you know?
>
> 5. [I]f you were to click on the particular listing I have moved the cursor on, do you think it <u>would or would not</u> take you directly, or link you, to a website where you could order American Blinds, or don't you know?

*Id.* at Appx. A, "Main Questionnaire," pp.1-2.

The respondents, as a result, are left to meaningless guesswork: looking at ads for stores that say they sell window blinds, and guessing whether the imaginary brand "American Blinds" can be found there. Not surprisingly, most guess that they can be found via an ad that reads: "Offering wallpaper, curtains, framed art, lighting, paint, **blinds** and shutters, area rugs and home accents." *Id.*, Ex. P (emphasis in original). A much smaller number guess that American Blinds can be found at "Budget Blinds" (10%) or "Just Blinds" (17%). *Id.*,. Ex. O at 9.

The second problem with Mr. Ossip's survey is even more fundamental: he fails entirely to include any sort of control, and thus has no basis to opine that even the small confusion levels he reports have anything to do with the trademark infringement alleged by his client. It is axiomatic that, in any scientific experiment, one must isolate the effect of the element one is testing from the effect of all other influences. For example, in testing the efficacy of a headache remedy, one can assume that, within any given hour, some percentage of headaches disappear on their own. An experiment that gives aspirin to 100 sufferers, and then finds that an hour later only 80 of them have headaches, cannot conclude that aspirin cures 20% of headaches in an hour. In order to have any validity, the experiment needs a control. If a placebo is given to another 100 subjects, and an hour later 90 still have headaches, the conclusion would be that aspirin is effective in 10% of cases, not 20%.

---

American Blinds window blinds?", he would have avoided false positives. For a more detailed explanation of this and other flaws in Mr. Ossip's methodology, see Hamm Decl. Ex. Q, ¶14.

386387.02

1   In our case, Mr. Ossip failed to use any control.  *Id.*, Ex. Q at 12-13.  The hypothesis he

2   should have tested is not whether some percentage of consumers are confused—of course they

3   are, in virtually any circumstance—but rather whether the use by competitors of "American

4   Blind" as a keyword is likely to *cause* additional confusion.[14]  Mr. Ossip could easily have tested

5   this, by presenting half of his subjects with search results for the term "American Blinds" and the

6   other half with the identical results, but as search results for a generic term such as "window

7   coverings" or "blinds."  In that manner he could have (putting aside the other flaws in his survey)

8   measured what confusion, if any, is attributable to the accused conduct.

9   Consider, by way of analogy, the following experiment:  Bring 100 respondents to the

10  front of a large store, named "Bob's Shoes," with a huge banner that reads "Hundreds of Name

11  Brands!  Largest Selection in Town!"  Ask each person whether they think they can get Nike

12  shoes at Bob's.  Suppose 40% say yes.  They might be right, or they might be wrong:  it seems a

13  reasonable guess.  But if Bob's *doesn't* sell Nike, the 40% are "confused" not by any trademark

14  infringement, but by "background" factors—specifically, by the assumption that "hundreds of

15  name brands" probably includes Nike.

16  Next, we place a small, barely perceptible Nike "swoosh" logo among the many logos on

17  the front door of Bob's, and ask another 100 people the same question.  Suppose 41% say yes.

18  Can we conclude that the use of the Nike logo has led to 41% confusion?  Of course not:  we

19  have to subtract the control amount of 40%, because these people would have been confused

---

[14] Mr. Ossip was quite candid in explaining that he did not, in fact, test the correct hypothesis:

> Q.   Okay.  Well, let me back up.  What hypothesis were you testing in this
>      experiment?
>
> A.   My hypothesis was that in a situation where American Blinds did not have to run
>      paid for ads to defend the selection of their products, I tried to isolate the effect of
>      one competitive ad at the head of the organic and another situation where there
>      were four competitive ads, two on the left, two on the right.
>
> Q.   I see.  So you were testing the different levels of confusion where there was one
>      ad versus four ads?
>
> A.   Yes, in essence.

Hamm Decl. Ex. G at 14:25-15:14.

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

386387.02

1    anyway by the huge banner that said "Hundreds of Name Brands!"  This yields a net 1%

2    confusion as a result of the use of Nike's trademark.

3          Mr. Ossip's problem is that he did only the second half of the experiment, and then

4    assumed that all of the confusion he found was the result of the swoosh (or in our case, the

5    "American Blind" search term).  Without a control, that result cannot be corrected, and it cannot

6    be relied on.  It is of precisely zero probative value.  At deposition, Mr. Ossip was forced to

7    agree:

8             Q.   Do you have any scientific basis for the opinion that the confusion would
                  have been less using the search term blinds?
9
              A.   I didn't do it, so I can't say I have evidence in that regard.
10
      *Id.*, Ex. G at 24:4-8.

11

12          As noted above, Mr. Ossip's primary question to each respondent (when asked where

13    "they would click first") yielded only minimal (10%-13%) confusion, even without a control.

      *Id.*, Ex. O at 7.  Clearly unsatisfied with that result, Mr. Ossip committed his third fatal error,
14
      going on to ask additional questions of respondents who had *already gotten the right answer*, and
15
      then counting some of them as confused anyway.  *Id.* (counting 19% of respondents, who would
16
      have clicked on the natural search result for ABWF, as confused).  In effect, having lost the first
17
      round, he says "how about two out of three?", and then asks them whether the links they did *not*
18
      choose would also get them to somewhere they could buy the imaginary American Blinds.  He
19
      then simply adds the "confused" respondents from the second question to those from the first.
20
            The problem here is obvious.  ABWF's theory in this case is that people who are
21
      affirmatively trying to find the ABWF website are misdirected to other sites, never to return.  But
22
      the overwhelming majority (19 out of 32) of Ossip's "confused" respondents are people who, if
23
      they were trying to get to ABWF, *succeeded on the first try*, and in the real world would have
24
      actually arrived at ABWF's website.  *Id.*  In this manner, Mr. Ossip inflates (uncontrolled)
25
      figures of 10.4%-12.8% to a conclusion of 28.7%-31.7% confusion.  *Id.* at 8.
26

27

28

1    And even those properly reduced numbers are concocted.  In fact, *not one of the 10-13%*

2    *of respondents Mr. Ossip counts as confused in the first question identified anything related to*

3    *the search term as the reason for their confusion.*[15]  *Id.*, Ex. O at 26.

4    These are the only the most obviously fatal problems with Mr. Ossip's survey, each of

5    which mandates discarding it.  Other major flaws include the fact that, in preparing the stimuli to

6    show respondents, Mr. Ossip chose to remove from real-world Google pages all of ABWF's own

7    ads.[16]  Mr. Ossip explained that he wanted to see what would happen if ABWF did not in fact

8    advertise its own website.  *Id.*, Ex. G at 26:4-28:4; *id.*, Ex. O at 5, lns. 1-2.  But in doing so

9    violated the cardinal rule that survey stimuli should, to the extent possible, replicate real life

10   experiences.[17]  For a more thorough discussion, we submit the accompanying report of Dr.

11   Itamar Simonson.  *Id.*, Ex. Q, ¶13.  For each of these reasons, the Court must reject Mr. Ossip's

12   report as without any scientific basis or value.  *Daubert*, 509 U.S. 579, 592-93 (1993).  And

13   because the Ossip survey is the *only* evidence of confusion ABWF can offer, the failure of that

14   evidence mandates summary judgment in Google's favor.

---

[15] Ossip breaks yet another cardinal rule of survey methodology, categorizing and analyzing the "verbatim" answers himself, rather than having it done by a "blind" panel (*i.e.*, one that does not know the desired result of the survey or who is paying them).  Hamm Decl. Ex. Q, ¶65.  The resulting bias is obvious:  Mr. Ossip himself sets out to decide which responses indicate that the confusion is a result of the use of the "American Blinds" phrase, and determines that answers about the third party ads such as "Because on the computer you can get anything quick and fast," "Says blinds," or "Most of the websites, you can order online. It says easy payment option and you can be billed later" all should be counted as indicating confusion caused by the search term. Hamm Decl. Ex. O at 26.

[16] *Compare* Hamm Decl. Ex. P (screen shot of an artificial Google search results page, for the query "american blinds," that Ossip used in his survey and that includes no ABWF Sponsored Links) *with* Hamm Decl. Ex. R (screen shot of an actual Google search results page, for the query "american blinds," showing ABWF's ads (1) as the primary Sponsored Link above the organic search results (using the URL "www.AmericanBlinds.com"), and (2) as the second Sponsored Link on the right-hand column of the page (using the URL "AmericanWallpaper.com/Blinds")).

[17] For example suppose one were measuring confusion between Advil and a competitor "Andvil."  If I ask people to find the Advil on a supermarket shelf, but first remove the Advil from the shelf, a much higher percentage will pick an "Andvil" bottle than if the Advil is left in place:  "Andvil" may not be exactly the brand they remember, but it's the closest available choice.

1  **D.    ABWF's claims also fail because ABWF cannot prove initial interest confusion, given that ABWF's study never examined the allegedly confusing websites of its competitors.**

2

3    ABWF's claims fail for yet another reason.  ABWF claims are based on the oft-criticized

4  doctrine of "initial interest confusion" ("IIC").[18]  IIC springs from cases such as *Grotrian v.*

5  *Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975).  In that case, Grotrian's use of the

6  trademark "Steinweg" was alleged to confuse customers into visiting the Grotrian store under the

7  initially mistaken impression that it sold Steinway pianos.  Although it was clear that customers

8  were disabused of that notion long before buying a piano, the claim was that, having gone to the

9  trouble of traveling to the Grotrian store, they might nonetheless decide that the Grotrian-

10  Steinweg piano was good enough, and buy it, rather than go through the additional trouble of

11  traveling to an authentic Steinway store.  At its heart, IIC is about switching costs:  having

12  invested the time to go to one outlet, the consumer may well buy there rather than incur the

13  additional search cost of going to a second store.  "Implicit in the offline decisions was an

14  understanding that potential purchasers, though they may eventually discover which company

15  they are actually dealing with, will have expended much time and effort and, in effect, may be

16  cutting their losses by settling for the impostor."  Zweihorn, 91 Cornell L. Rev. at 1355.

17    In the online context, however, switching costs are negligible at best:  If a consumer,

18  seeking ABWF's website, instead clicks on a competitor's ad, she need merely click the "back"

19  button to return to Google's search page.  No travel or search effort is invested or lost, and thus

20  there is no reason to settle for a known impostor rather than to continue the search.  If, on the

21  other hand, the *target* website is itself deceptive (*i.e.*, if the user, having clicked on the

22  Sponsored Link, arrives at that website and cannot tell she has been misdirected), that user may

23  in fact be diverted.  This was the case in *Playboy Enterprises*, in which users, having typed

24  "Playboy" into their search engine, were presented with an *unlabelled* banner ad on the search-

25  results page that led them to believe they had in fact arrived at Playboy's website.  354 F.3d at

26  _____

27  [18] For an excellent survey of IIC in the online context, *see* Zachary Zweihorn, *Searching for Confusion:  The Initial Interest Confusion Doctrine and Its Misapplication to Search Engine Sponsored Links*, 91 Cornell L. Rev. 1343 (2006).

28

1022-23.  It was that further deception, which prevented users from simply clicking away from the infringing ad, that the court found to be infringement.  Judge Berzon, in concurrence, emphasized the problem with existing IIC cases, criticized them as "expand[ing] the reach of initial interest confusion from situations in which a party is *initially* confused to situations in which a party is *never* confused."  *Id.* at 1034 (emphasis added).

Recognizing the at-best negligible switching costs involved in online searches, the court in *Lamparello v. Falwell*, 420 F.3d 309, 316 (4th Cir, 2005), *cert. denied*, 126 S. Ct. 1772 (2006), held that a finding of even initial confusion cannot be based on the content of a link to a website alone:  rather, one must examine the website to which the link connects.  If a user, having followed that link, can readily see that it is not what she sought, the momentary confusion before she clicks the back button cannot suffice to support a claim of damages.  *Id.* at 318.

ABWF fails entirely to satisfy this requirement:  Mr. Ossip's survey is based solely on the content of the Sponsored Links on a Google page, and he never asked his respondents to look at the pages to which those links connect.  As a result, he cannot opine as to whether *any* user would be confused long enough to buy from a competitor, rather than simply clicking the back button.[19]  In fact, when asked whether he had any difficulty determining whether those competitors' sites were affiliated with ABWF, he candidly admitted he did not, and had no reason to think consumers would either:

> Q.   Did you have difficulty making that determination?
>
> A.   I don't recall having difficulty.
>
> Q.   Did you do anything to study whether consumers, once they go to these competitive sites, have difficulty determining whether they're American Blind & Wallpaper sites?
>
> A.   No.

Hamm Decl. Ex. G at 58:17-24.

---

[19] Even if ABWF had adduced evidence of confusion based on the content of target websites, that would at best support a claim against the advertisers who own those sites, not against Google.

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1    Because ABWF can adduce no evidence that any consumers are confused long enough to

2    be lost as customers, its trademark claims fail on that basis as well.

3    **E.    ABWF's dilution claims fail because ABWF's failure to perform a fame survey
     means that there is _no_ evidence that the ABWF marks are famous.**

4

5    Although fame is a necessary element of any dilution claim, there is no evidence in the

6    record that would allow ABWF to carry its burden of proof on fame.  This is largely because

7    ABWF never conducted a fame survey.  But there is also affirmative evidence that ABWF's

8    marks are _not_ famous.  Summary judgment must therefore be granted on ABWF's dilution

9    counterclaims.[20]  Additionally, summary judgment must be granted as to the damages portion of

10   ABWF's dilution claim because ABWF adduced no evidence of actual dilution.

11   Dilution is the "blurring" or "tarnishment" of a _famous_ mark, whether or not there is

12   confusion.  _See_ 15 U.S.C. § 1125(c)(1).  Thus, fame—a measure of how widely recognized a

13   mark is—is a necessary element of a dilution claim.  Fame is measured at the time of the first

14   "arguably" diluting use.  _Nissan Motor Co. v. Nissan Computer Corp._, 378 F.3d 1002, 1013 (9th

15   Cir. 2004).  The Federal Trade Dilution Act ("FTDA"), which was passed in 1995, governs

16   dilution claims.  15 U.S.C. § 1125(c).

17   The FTDA was amended in October 2006.  Those amendments slightly complicate the

18   fame analysis, because fame will have to be analyzed under both the old and new versions of the

19   statute.  The amendments made it substantially harder for a trademark owner to prove fame, but

20   do not affect the main point: by failing to produce a survey, ABWF has no probative evidence of

21   fame under either the old or the new test.

22   In this case, both the pre- and post-October 2006 versions of the FTDA may apply,

23   because ABWF seeks both damages and injunctive relief on its dilution counterclaims.  ABWF's

24   injunction claim will be governed by the current version of the statute.  _See Louis Vuitton_

25   _____

26   [20] ABWF's dilution counterclaims are ABWF's third ("Lanham Act—Dilution"), fourth ("Injury
     to Business Reputation and Dilution—Cal. Bus. & Prof. Code § 14330), and ninth
     ("Contributory Dilution—Lanham Act") causes of action.  ABWF's Counterclaims at 23-26.
     The California state law dilution claim "is subject to the same analysis as [a] federal claim."
     _Panavision Intn'l, L.P. v. Toeppen_, 141 F.3d 1316, 1324 (9th Cir. 1998); _Discovery Commons,
     Inc. v. Animal Planet, Inc._, 172 F.Supp.2d 1282, 1290 n.1 (C.D. Cal. 2001).

27

28

1   *Malletier S.A. v. Haute Diggity Dog, LLC*, No. 1:06cv321(JCC), 2006 WL 3182468, at *7 (E.D.

2   Va. Nov. 3, 2006). This is because injunctive relief is prospective, and "the right to it must be

3   determined at the time of the hearing." *Id.* On the other hand, ABWF's damages claim is

4   explicitly barred under the current version of the statute, because it arose from an alleged first

5   diluting use that took place prior to October 6, 2006. 25 U.S.C. § 1125(c)(5)(A). Thus,

6   ABWF's claim for damages resulting from dilution, if permitted at all, must be governed by the

7   pre-October 2006 version of the FTDA.

8          Prior to October 2006, it was sufficient for a dilution plaintiff to show that its mark was

9   famous only within a limited geographic area or a specialized market segment. *See, e.g.*, *Thane*

10  *Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 908 (9th Cir. 2002) (citing *Avery Dennison Corp. v.*

11  *Sumpton*, 189 F.3d 868, 877 (9th Cir. 1999)). Now, the statute states, "a mark is famous if it is

12  widely recognized by *the general consuming public of the United States* as a designation of

13  source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis

14  added). So fame in a niche market is no longer sufficient to prove that a mark is famous.

15         Under both the new and old versions of the FTDA, fame is a measure of how well

16  recognized a mark is. Although the new and old versions of the FTDA list a set of factors a

17  court may consider when evaluating fame—such as the extent of geographic reach of a

18  company's advertising and sales—the touchstone of the fame inquiry, as indicated by the

19  statute's definition of fame, is how widely recognized the mark is. *Id.*

20         To be famous, "a mark must be truly prominent and renowned." *See Thane Int'l.*, 305

21  F.3d at 907-08 (quoting *Avery Dennison Corp. v. Sumpton*, 189 F.3d at 875); *id.* at 911 ("the

22  mark must be a household name") (citing *A.B.C. Carpet Co., Inc. v. Naeini*, No. 00-CV-4884-

23  FB, 2002 WL 100604, at *5 (E.D.N.Y. Jan. 22, 2002)). This is because a violation of the FTDA

24  "triggers extensive relief—preventing all others from using the mark, regardless of whether the

25  marks are in related fields or are those of competitors." *Star Markets, Ltd. v. Texaco Refining &*

26  *Marketing, Inc.*, 950 F. Supp. 1030, 1033 (D. Haw. 1996). Thus, the types of marks that obtain

27  dilution protection are ones that most people are familiar with, such as Dupont, Buick, Kodak,

28

Barbie, Pepsi, Pepsi-Cola, Hotmail, Toys "R" Us, and Budweiser.[21]  By contrast, marks lacking fame are not nearly as well known, such as "Trek" bicycles, "Avery" and "Dennison" office supplies, "M2" music and video software, "PostX" e-mail security services, "Star Markets" grocery stores, or "Tornado" vacuum cleaners.[22]

The main reason to grant summary judgment on ABWF's dilution claims is that ABWF has not performed a fame survey.  It therefore has no way to establish that its products are "widely recognized" in even a niche market, let alone by "the general consuming public of the United States."  *Id.*; 11 U.S.C. § 1125(c).  As a matter of common sense, the marks asserted in this case—"American Blind," "American Blinds," "American Blind & Wallpaper Factory," "American Blind Factory," and "DecorateToday"—simply do not have the recognition or renown of "Barbie," "Pepsi," "Hotmail," or "Budweiser."  As such, the failure to perform a survey—either in some relevant niche market or generally—leaves ABWF without any proof of *actual* market recognition.  *See TCPIP Holding Co. v. Haar Comm'ns, Inc.*, 244 F.3d 88, 99-100 (2d Cir. 2001) (dismissing a preliminary injunction motion based on dilution due to plaintiff's failure to "submit consumer surveys, press accounts, or other evidence of fame"); *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 47 (1st Cir. 1998) ("Consumer surveys could be used as evidence of such fame, but consumer surveys are absent from this case."); *BigStar Entertainment, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 218 (S.D.N.Y. 2000) (noting the "absence in this record of any consumer surveys documenting the extent of actual public identification of plaintiff's marks" when finding marks not famous).

---

[21] *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001) (noting that the House Report accompanying the 1995 FTDA identifies Dupont, Buick, and Kodak as famous marks) (citing 1995 U.S.C.C.A.N. 1029, 1030); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) (Barbie); *PepsiCo, Inc. v. Reyes*, 70 F.Supp.2d 1057 (C.D. Cal. 1999); *Hotmail Corp. v. Van$ Money Pie Inc.*, No. C-98-20064 JW, 1998 WL 388389 (N.D. Cal. Apr. 16, 1998); *Toys "R" Us, Inc. v. Akkaoui*, No. C 96-3381 CW, 1996 WL 772709 (N.D. Cal. Oct. 29, 1996); *Anheuser-Busch Inc. v. Andy's Sportswear Inc.*, No. C-96-2783 TEH, 1996 WL 657219 (N.D. Cal. Aug. 28, 1996) (Budweiser).

[22] *Thane Int'l*, 305 F.3d 894; *Avery Dennison Corp.*, 189 F.3d 868; *M2 Software, Inc. v. Viacom, Inc.*, 119 F.Supp.2d 1061 (C.D. Cal. 2000), *rev'd on other grounds*, 30 Fed. Appx. 710 (9th Cir. 2002) (unpublished); *PostX Corp. v. docSpace Co., Inc.*, 80 F.Supp.2d 1056 (N.D. Cal. 1999); *Star Markets*, 950 F. Supp. 1030; *Breuer Elec. Mfg. Co. v. Hoover Co.*, No. 97 C 7443, 1998 WL 427595 (N.D. Ill. Jul 23, 1998) (Tornado).

1    Thus, while it may be true that ABWF has engaged in "extensive advertising and

2  promotion of American Blind's home decorating products and related services" (ABWF's

3  Counterclaims, ¶23), this tells us nothing about the *actual* recognition of ABWF's marks.  *See*

4  *TCPIP Holding Co.*, 244 F.3d at 99 ("Over the past decade, [plaintiff's] affidavit asserts, TCPIP

5  spent 'tens of millions of dollars' advertising its mark, but does not tell how many millions,

6  when expended, or how effectively.") (mark held not famous); *BigStar Entertainment, Inc.*, 105

7  F. Supp. 2d at 218 (noting "the absence of proof of relative success in achieving recognition and

8  secondary meaning from capital expended to promote the marks" when finding marks not

9  famous).

10    Moreover, there is affirmative record evidence—ABWF's own pre-litigation surveys—

11  that ABWF's marks are not famous.  ABWF performed three qualitative studies of the best

12  names for their retail business to be used on their catalog and as their main URL.  Hamm Decl.

13  Ex. S & Ex. T (two of the three reports).  These studies were conducted by the Kaden Company,

14  a marketing research firm.  Admittedly, these studies only claim to be "qualitative" and not

15  "quantitative."  Thus, the studies themselves caution that the "results are only indicative and

16  projectable to all ABWF buyers or prospects."  Nonetheless, these are the only consumer studies

17  regarding the ABWF marks that were produced in this case, and they were not conducted for the

18  purpose of litigation.  Also, these studies were performed in 2002 and 2003, which is close in

19  time to Google's first alleged diluting use.  Thus, they are the most probative studies of the

20  strength of ABWF's marks that exist in this case.  Notably, the studies consisted primarily of

21  individuals who had previously purchased products from ABWF or who had requested ABWF

22  catalogs.  *Id.*, Ex. T at 4 & Ex. S at 24.  The studies would therefore not be able to prove that

23  ABWF marks *are* famous.  But the studies do show that ABWF's marks are difficult to

24  remember, even to those already familiar with the company:

25    • ***Most study participants did not recognize the decoratetoday.com mark.***  Two of
        the Kaden studies confirmed this finding.  One study stated, "all but a few
26      [participants] were quizzical regarding the decoratetoday.com address.  Most said
        that they failed to understand why decoratetoday.com was the address…that in
27      their minds it had no connection with the name of the company and what it sold.
        In fact, several thought that in going to decoratetoday.com, they would be buying
28

from a company other than American Blind and Wallpaper." Hamm Decl. Ex. S at 16. Indeed, the other study pointed out that "A requestor remarked, 'The name of the web site should be the same as the name of the company. Why are they trying to confuse us?'" *Id*., Ex. T at 12.

- ***Most study participants did not remember that the company had the word "factory" in its name, and therefore would not have remembered the alleged marks "American Blind & Wallpaper Factory" or "American Blind Factory."*** In one of the studies, only two to three participants remembered that the word "factory" was in the company name. *Id*., Ex. T at 10.

- ***The only word that participants reliably associate with the company is "American"—not even "American Blind" or "American Blinds."*** One study stated, "The majority of past customers and requestor nonconverters [*i.e.,* people who requested the catalog but did not purchase ABWF's products] indicate that if they wish to find the American web site, they would be triggered to the site because of the name American, American Blinds, American Blinds and Wallpaper or even American Wallpaper…To them, the 'brand' name of the company, and the brand equity it enjoys, clearly begins with the 'American' name." *Id*., Ex. S at 16. The other study stated, "Respondents were asked to write down the name of the company. Most wrote American Blinds, American Blinds and Wallpaper, American Wallpaper and Blinds or simply American." *Id*., Ex. T at 10. It went on to say that, "**American** is what people remember first when thinking about the company. That **American** is the equity in the name of the company." *Id*., Ex. T at 12 (emphasis in original).

It is no surprise that the Kaden study participants were confused about ABWF's name. As ABWF itself admits—and as the multitude of trademarks asserted here illustrates—it kept changing the name of the company. According to ABWF's own interrogatory response, ABWF used the following company names during the following dates to refer to its retail business, when communicating with customers:

| Company Name | Dates |
|---|---|
| "American Blind Factory," "American Blind" | 1986 to 1988 |
| "American Blind and Wallpaper Factory," "American Blind and Wallpaper" | 1988 to 1992 |
| "American Blind, Wallpaper and Carpet Factory, Inc." | 1993 to "the second half of the 1990's" |
| "American Blind, Wallpaper & More" | "the second half of the 1990's" |
| "DecorateToday.com" | December 9, 1999 to February 28, 2001 |
| "American Blind & Wallpaper Factory, Inc." | February 28, 2001 to January 6, 2006 |
| "American Blind, Wallpaper & More" | January 6, 2006 to present |

*Id*., Ex. H.

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1    Thus, ABWF's own use of multiple company names confused its own customers to the

2    point that they are unable to recognize its trademarks.

3    ABWF's claim for dilution under the pre-October 2006 standard suffers another fatal

4    flaw.  The Supreme Court held in *Moseley v. V Secret Catalogue, Inc.* that a dilution plaintiff

5    could not prevail unless it could show evidence of actual dilution to the value of its mark.[23]  537

6    U.S. 418, 433 (2003).  ABWF has offered no evidence—survey or otherwise—purporting to

7    show any such thing.  At a minimum, therefore, even if ABWF's unregistered, unused marks

8    were "famous," Google is entitled to summary judgment against ABWF's dilution *damages*

9    claim.

10   **F.    All of ABWF's claims are barred by the doctrine of unclean hands, because ABWF
     engages in *precisely* the same conduct that it challenges.**

11   ABWF does *precisely* what it accuses its competitors of doing: it fails to take proactive

12   steps to prevent its own ads from appearing on the search results page when a user searches for

13   its competitors' trademarks.  The doctrine of unclean hands therefore bars every one of ABWF's

14   causes of action.

15   Claims for trademark infringement, dilution, and unfair competition are subject to

16   equitable principles such as unclean hands.  15 U.S.C. § 1115 (infringement); 15 U.S.C. §

17   1125(c)(1) (dilution); Restatement (Third) of Unfair Competition § 32 cmt. a (1995) (common

18   law claims).  The doctrine of unclean hands bars relief that would otherwise be available when

19   "the owner of a [trademark] has engaged in other substantial misconduct that is directly related

20   to the owner's assertion of rights in the trademark."  Restatement (Third) of Unfair Competition

21   § 32.  In describing how a trademark owner's misconduct must be "directly related" to his

22   misconduct, the Ninth Circuit has explained, "What is material is not that the plaintiff's hands

23   are dirty, but that he dirtied them in acquiring the right he now asserts, or that *the manner of the*

24   *dirtying renders inequitable the assertion of such rights against the defendant*."  *Republic*

25   ───────────────────

26   [23] The current version of the FTDA unambiguously provides that a dilution plaintiff need not
     provide evidence of actual dilution.  15 U.S.C. § 1125(c).  Thus, ABWF's failure to submit

27   evidence of actual dilution only affects its claim under the pre-October 2006 version of the
     statute (*i.e.*, ABWF's damages claim).

28

1    *Molding Corp. v. B. W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir. 1963) (emphasis added);

2    Restatement (Third) of Unfair Competition § 32 (Reporter's Note, cmt. a) (quoting *Republic*

3    *Molding Corp.*, 319 F.2d 347 at 349).

4         The doctrine of unclean hands fits ABWF's conduct perfectly. What ABWF asks for in

5    this lawsuit is that when a search engine user performs a search for one of ABWF's

6    trademarks—such as "American Blind & Wallpaper Factory"—that user should never see an

7    advertisement for one of ABWF's competitors. How would this be accomplished? ABWF

8    believes it is incumbent on Google and/or its competitors to designate ABWF's trademarks as

9    negative keywords in its competitors' AdWords campaigns. Hamm Decl. Ex. U & Ex. V. The

10   irony is that ABWF refuses to do the same for its competitors. Indeed, ABWF's 30(b)(6)

11   designee admitted that ABWF does not designate its competitors' trademarks as negative

12   keywords even though it "knows" this policy will result in ABWF ads appearing in response to

13   searches for its competitors' trademarks. *Id.*, Ex. L at 163:19-165:12.

14        To use a concrete example, in January of 2003, ABWF noticed that the ads for one of its

15   competitors, USAWallpaper.com, would appear on the results page of a search for "American

16   Blind and Wallpaper Factory." *Id.*, Ex. D. So, ABWF demanded that ABWF's trademarks be

17   designated as negative keywords in USAWallpaper.com's AdWords campaigns.[24] The result

18   would have been that no USAWallpaper.com ad would appear on the results page of any Google

19   search that included ABWF's trademarks as search terms. But *even today*—four years after the

20   dispute over USAWallpaper.com—a Google search for "usawallpaper.com" will return an ad for

21   ABWF. *Id.*, Ex. W; *see also id.*, Ex. X (screen shot of a Google search for the term "internet

22   wallpaper store"—the precise trade name of one of ABWF's competitors—triggering an ABWF

23   ad under the Sponsored Links column on the right-hand side of the page). Obviously, ABWF

24   never went through the trouble of designating "USA Wallpaper" as a negative keyword, even

25   _____

26   [24] As Google explained to ABWF at the time, it is not necessarily true that USAWallpaper.com
     was directly bidding on keywords that resembled ABWF's trademarks. Hamm Decl. Ex. D.

27   Rather, because of AdWords' "broad match" functionality, if USAWallpaper.com merely bid on
     the word "blinds," a query for "American Blind & Wallpaper Factory" could have triggered
     USAWallpaper.com's ad. *Id.*

28

386387.02

1  though it insists that USAWallpaper.com is legally required to designate "american blind and

2  wallpaper factory" as a negative keyword.  This is practically the definition of unclean hands.

3  More than being "directly related" to the infringement it seeks to remedy, ABWF's own

4  misconduct is *precisely the same* as the alleged infringement it seeks to remedy.

5     Thus, the doctrine of unclean hands should bar relief on all of ABWF's claims.

6                     **IV.    CONCLUSION**

7     For the foregoing reasons, this Court should enter summary judgment in favor of Google.

8

9  Dated:  December 26, 2006              KEKER & VAN NEST, LLP

10

11

12               By:   /s/  Michael H. Page
                      MICHAEL H. PAGE
13                    Attorneys for Plaintiff and Counter Defendant
                      GOOGLE INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)