# EXHIBIT Q

Dockets.Justia.com

1  KEKER & VAN NEST, LLP
   MICHAEL H. PAGE - #154913
2  MARK A. LEMLEY - #155830
   KLAUS H. HAMM - #224905
3  AJAY S. KRISHNAN - #222476
   710 Sansome Street
4  San Francisco, CA 94111-1704
   Telephone: (415) 391-5400
5  Facsimile: (415) 397-7188

6

7  Attorneys for Plaintiff and Counter Defendant
   GOOGLE INC.

8

9                UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11 GOOGLE INC., a Delaware corporation,        Case No. C 03-5340-JF (RS)

12                              Plaintiff,
                                              **EXPERT REPORT OF DR. ITAMAR**
13        v.                                  **SIMONSON**

14 AMERICAN BLIND & WALLPAPER
   FACTORY, INC., a Delaware corporation
15 d/b/a decoratetoday.com, Inc., and DOES 1-
   100, inclusive,
16
                              Defendants.
17

18 AMERICAN BLIND & WALLPAPER
   FACTORY, INC., a Delaware corporation
19 d/b/a decoratetoday.com, Inc.,

20                         Counter-Plaintiff,

21        v.

22 GOOGLE INC.,

23                        Counter-Defendant.

24

25

26

27

28

384604.01

# EXPERT REPORT OF DR. ITAMAR SIMONSON

## BACKGROUND AND QUALIFICATIONS

1.      I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University.  A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

2.      I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.

3.      My field of expertise is consumer behavior, marketing management, trademark infringement, survey methods, and human judgment and decision making. Most of my research has focused on buyers' purchase behavior, the effect of product characteristics (such as brand name, price, features), the competitive context, and marketing activities (such as promotions, advertising) on buying decisions, and trademark infringement.

4.      I have received several awards, including (a) the award for the Best Article published in the Journal of Consumer Research (the major journal on consumer behavior) between 1987 and 1989, (b) the "Ferber Award" from the Association for Consumer Research, which is the largest association of consumer researchers in the world, (c) the 1997 O'Dell Award, given to the Journal of Marketing Research (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years, (d) the 2001 O'Dell award, (e) the award for the Best Article published in the Journal of Public Policy & Marketing (the major journal on public policy and legal aspects of marketing) between 1993 and 1995, (f) the 2002 American Marketing Association award for the Best Article in the area of services marketing, and (g) I was a winner in a competition dealing with research on the effectiveness of direct

1

marketing programs, which was organized by the Direct Marketing Association and the Marketing Science Institute.

5.    I have published three articles relating to trademark surveys and trademark infringement from the customer's perspective, including two in the <u>Trademark Reporter</u> and one in the <u>Journal of Public Policy & Marketing</u>.  The two articles published in the <u>Trademark Reporter</u> were: "The Effect of Survey Method on Likelihood of Confusion Estimates:  Conceptual Analysis and Empirical Test,"[1] and "An Empirical Investigation of the Meaning and Measurement of Genericness".[2]  The <u>Journal of Public Policy & Marketing</u> article, titled "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications",[3] was selected (in 1997) as the Best Article published in that journal between 1993 and 1995.

6.    At Stanford University I have taught MBA and executive courses on Marketing Management, covering such topics as buyer behavior, developing marketing strategies, building brand equity, advertising, sales promotions, and retailing.  I also taught an MBA course on Marketing to Businesses and a course on High Technology Marketing.  In addition to teaching MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.

7.    I have taught several doctoral courses.  One doctoral course examines methods for conducting consumer research.  It focuses on the various stages involved in a research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and analysis, and deriving conclusions.

---

[1]  Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," <u>Trademark Reporter</u>, 83 (3), 364-393.
[2]  Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," <u>Trademark Reporter</u>, 84 (2), 199-223.
[3]  Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," <u>Journal of Public Policy and Marketing</u>, 13(2), 181-199.

A second doctoral course that I have taught deals with buyer behavior, covering such topics as buyer decision making processes, influences on purchase decisions, and persuasion. A third doctoral course that I have taught deals with buyer decision making. Prior to joining Stanford University, during the six years that I was on the faculty of the University of California at Berkeley, I taught an MBA Marketing Management course, a Ph.D. course on buyer behavior, and a Ph.D. course on buyer decision making. I also taught in various executive education programs, including a program for marketing managers in high technology companies.

8.     After completing my MBA studies and before starting the Ph.D. program, I worked for five years in a marketing capacity in a subsidiary of Motorola Inc., serving in the last two years as the product marketing manager for two-way communications products. My work included (a) defining new products and designing marketing plans for new product introductions, (b) customer and competitor analysis, and (c) sales forecasting.

9.     I have conducted, supervised, or evaluated well over 1,000 marketing research studies, including many related to trademark, branding, marketing strategies, and advertising-related issues. I serve on nine editorial boards, including leading journals such as the *Journal of Consumer Research, Journal of Marketing Research, Journal of Consumer Psychology,* and *Journal of Marketing.* I am also a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics. As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading journals. I have also worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics. A list of cases in which I provided sworn testimony during the past four years is included in Exhibit B. I am being compensated at my standard rate of $650 an hour.

10.     I was asked by counsel for Google, Inc. to evaluate the survey conducted by Mr. Ossip (Ossip Survey) on behalf of American Blind and Wallpaper Factory, Inc.

(ABWF). Documents that I reviewed in connection with the preparation of this report are listed in Exhibit C.

## SUMMARY OF CONCLUSIONS

11.    Although the stated objective of the Ossip Survey referred to whether those entering the search term 'american blinds' were misled by sponsored links on the results page, the survey completely failed to test the effect of entering that term in the Google search engine. Specifically, no attempt was made to find out if respondents would provide similar answers regarding sponsored links if a different search term to which ABWF does not object, such as "blinds," were entered instead. Thus, the survey lacked any control, making the results uninterpretable and unreliable.

12.    The Ossip Survey was based on the premise that a distinct brand of window blinds called "American Blinds" exists; otherwise, the survey procedure becomes meaningless. However, an examination of ABWF's own website indicates that a brand of window blinds called "American Blinds" does not actually exist. It is also noteworthy that ABWF's tendency to change frequently the company name, its brand names, and its websites was likely to diminish the recognition and equity of each of the various names it has used over time.

13.    The Ossip Survey violated the basic rule that a survey should approximate marketplace conditions as closely as possible. In particular, following the guidelines of ABWF's counsel, Mr. Ossip chose to omit all sponsored links related to ABWF, even though such links always appear on the resulting webpage when the search term 'american blinds" is entered in the Google search engine. The webpages produced for the purpose of the survey violated marketplace conditions in other important ways, such as showing many of the respondents just one sponsored link (which, if selected, was counted by Mr. Ossip as indicating confusion).

14.    The Ossip Survey relied on leading and ambiguous questions. Respondents were asked where they would go first if they wanted to order "american blinds;" the approximately 90% of the respondents who did not select a sponsored link that Mr. Ossip classified as indicating confusion were then asked if sponsored links they had not

selected would allow them to order "american blinds." The first question was highly ambiguous because consumers may very well take advantage of the ease of searching for information on the Internet and check other, possibly cheaper or better, websites, regardless of whether such sites sold a (presumed) brand called "American Blinds." The follow-up questions suffered from strong demand-effects, because respondents were likely to assume that they would not have been asked about particular sponsored links unless one or more of them offered the brand they were presumably looking for. These questions were also influenced by the well-known tendency to agree with suggested responses, known as the "acquiescence bias."

15.    Contrary to standard procedure, the open-ended explanations of respondents were coded by Mr. Ossip, who knew the purpose of the survey and the identity of its sponsor. As a reflection of the resulting biased coding, any respondent who explained a yes answer by saying, for example, "Says blinds; Will go to a website with blinds," was counted by Mr. Ossip as misled.

16.    The survey universe was seriously flawed. Among other problems, all of the respondents were women, as if men are never involved in information search about blinds, and most of the respondents had no prior experience searching on the Internet for information about window blinds.

17.    Despite the major flaws of the Ossip Survey, its results show that triggering search results on the phrase 'american blinds' in the Google search engine does not confuse consumers or cause them to be misled regarding brands that can be purchased through sponsored links.

18.    In summary, considering the combination of such fatal flaws of the Ossip Survey, the obvious conclusion is that this survey provided no evidence in support of the claim that triggering sponsored links based on alleged trademarks (or terms) such as 'american blinds' in the Google search engine misleads consumers regarding brands that can be purchased through sponsored links. To the extent that one relies on this survey,

6

the only conclusion that can be drawn is that the use of trademarks such as keywords does not confuse or cause consumers to be misled by sponsored links.

## INTRODUCTION

19.     The stated objective of the Ossip Survey (Ossip Report, page 2) was to determine if those who enter the term 'american blinds' in the Google search engine "are misled into thinking that the sponsored links shown on the search results page will lead them to a website where they can make the purchase." As I explain in detail below, the Ossip Survey (a) failed to test whether triggering results on the search term 'american blinds' (as opposed to another term such as 'blinds') misleads consumers or causes confusion regarding sponsored links, and failed to include any control, (b) was based on the false assumption that a brand called "American Blinds" exists (and on the untested assumption that "american blinds" has acquired secondary meaning), (c) deviated in significant ways from marketplace reality (e.g., failed to present the actual sponsored links seen by consumers who enter the term "american blinds"), (d) relied on leading questions, and (e) defined the wrong survey universe. Despite these major flaws, an examination of Ossip Survey results supports the conclusion that triggering ads (or sponsored links) on the search term 'american blinds' does not mislead and does not cause consumers to attempt to purchase ABWF blinds from sponsored links that do not offer such blinds.

20.     However, before I examine these flaws of the Ossip Survey more closely, two basic questions need to be addressed:

a.  Whether a situation whereby consumers go to a store or a website under the belief that that store might offer them a certain product and then find out it does not is uncommon or indicates that consumers were misled; and

b.  Whether consumers are accustomed to the fact that, when they search for information about one product/brand, makers of similar products/brands often target them using ads and other promotional means.

8

CONSUMERS' INFORMATION SEARCH AND EXPOSURE TO ADVERTISING

21.    The consumer decision making process can be represented using the following model:[4]

Problem Recognition → Information Search → Evaluation of Alternatives → Purchase

For example, the consumer may first identify a possible need for mini-blinds. That consumer may then search for information about different available alternatives. The consumer might go to a store that sells such blinds, use a yellow pages directory, buy a home decoration magazine, and/or use the Internet. The consumer may evaluate each alternative, which may lead to a decision to buy a particular mini-blind type and brand, a decision to delay such a purchase, or some other decision.

22.    During the information search phase, consumers are typically exposed to multiple brands. For example, whether or not the consumer goes to a store to seek information and potentially purchase a particular brand of camera, s/he is likely to be exposed to other camera brands that are sold in the same section of the store. Also, when searching for information about a particular brand in a magazine, the consumer is likely to be exposed to other brands as well.

23.    Furthermore, consistent with the basic marketing concept of consumer "targeting", marketers routinely provide consumers who search for information about (or buy) one brand/product with information and/or incentives to buy competing alternatives. For example, when buying one brand of orange juice, supermarket shoppers someimes automatically receive coupons for their next purchase of a competing brand. When searching for information about a Panasonic plasma TV on an Internet shopping website, that site often suggests similar or better options to the consumer. And when ordering

---

[4] See, for example, P. Kotler and K. Keller (2006), *Marketing Management*, 12th Edition, Chapter 6, p. 191, Pearson.

9

from a catalog or donating to a charity, the consumer is likely to receive competing catalogs or additional requests for donations. And so on.

24.    Of course, consumers are well aware that numerous advertisers target them every day. In particular, consistent with basic principles of consumer learning, consumers have undoubtedly learned from their experience that, once identified as prospective buyers of a particular product type, marketers of competing alternatives are likely to try to attract them to their products. Thus, when searching for information about a particular brand on the Internet, consumers recognize that some of the ads to which they are exposed will be for competing products/brands.

25.    When going to a store with the intention to gather information and potentially purchase a particular brand and then finding out that the store does not carry that brand, the consumer often wastes a significant amount of time (driving to the store, parking, etc.). Similarly, when visiting a store that is known to sell a particular brand and then finding out that the store no longer carries that brand, does not carry the particular model of that brand, or the particular model is temporarily out of stock, the consumer wastes a significant amount of time. By contrast, clicking on a web link to find out which brands and products that site offers typically takes virtually no time. In a few seconds, the consumer can determine whether s/he is interested in the brands/products on that site. Indeed, the efficiency of information search on the Internet is perhaps its main consumer advantage. Thus, when seeing a heading such as "Low cost blinds," it is virtually costless for the consumer to try his/her luck by clicking on the link – if that source offers the brand they are looking for at lower prices, they may buy it there; if it does not, they can simply hit the "Back" button and go back to the previous search results.

26.    In summary, information search whereby a consumer gathers information about various available options is a fundamental part of many everyday purchase decisions. Furthermore, advertising, in general, and advertising that targets consumers

10

who are in the market for specific products, in particular, are well-known facts of life. Consumers are well-aware that marketers use ads in promoting their products to prospective buyers, which identify themselves, for example, by where they buy, what they bought recently (e.g., if they bought a house, they may need financing), and the information they seek. And, as indicated, consumers have undoubtedly learned that, once their information search or purchase behavior suggests an interest in a particular product type or brand, marketers of similar products or brands will try to present them with information about other attractive alternatives.

27.    Accordingly, when using an Internet search engine such as Google, consumers are likely to know that ads and sponsored links that appear on the screen may very well represent products and brands that are different from those entered as the search word. That is, any sponsored link may or may not offer the products indicated as the search terms, just as ads targeted at consumers who search for a particular product or brand may or may not offer the particular product/brand a consumer might have initially considered. This common situation has nothing to do with deception or misleading consumers, unless a particular sponsored link or website indicates that it carries a product/brand that it does not.

11

<u>DID THE OSSIP SURVEY TEST WHETHER ENTERING THE SEARCH TERM</u>
<u>'AMERICAN BLINDS' MISLEADS CONSUMERS REGARDING BRANDS THAT</u>
<u>CAN BE PURCHASED FROM SPONSORED LINKS?</u>

28.    As indicated, the stated objective of the Ossip Survey focused on whether "those who enter the term 'american blinds' in the Google search engine" are misled.[5] Thus, putting other flaws aside, the Ossip Survey could achieve its stated objective only if it indeed tested the effect of sponsored links shown to consumers entering the term 'american blinds' on their beliefs as to whether they can buy that brand from sponsored links that do not offer it. However, as is clear when examining how the survey was implemented, the Ossip Survey completely failed to test the effect of triggering ads on the term 'american blinds' on consumer confusion.

29.    First, I assume that ABWF does not generally object to advertising on the Internet, considering that it does extensive advertising on the Internet, bids for sponsored links on Google and other search engines, and web advertising is the major source of ABWF's business (as discussed extensively during the deposition of Mr. Alderman). I also assume that ABWF does not question Google's right to sell keywords such as "blinds" to advertisers, including ABWF's competitors.

30.    Given these assumptions, the Ossip Survey could not have assessed whether triggering ads on the term 'american blinds' misled consumers, with respect the ability to buy ABWF blinds from advertised websites, without comparing the effect of that keyword with a suitable control keyword to which ABWF does not object. If the survey were to find that using the term 'american blinds' causes what it considers confusion whereas using the control term does not, ABWF could have argued that the search term mislead consumers. Conversely, if both 'american blinds' and the control

---

[5] I understand that ABWF also asserts rights to other trademarks in this litigation, such as "American Blind & Wallpaper Factory" and "decoratetoday.com." Mr. Ossip's survey, however, addresses only "American Blinds."

search word produced the same results, we would conclude that using 'american blinds' does not cause consumer deception. However, without such a control or a benchmark, it is simply impossible to conclude that the 'american blinds' keyword was the cause of any confusion.

31.    The failure to include a control search term was particularly perplexing because (a) finding a suitable control (e.g., 'blinds') was straightforward in the present case, (b) including a control has become an essential requirement from any survey, in litigation or any other context, that is designed to test a cause-effect relation, and (c) Mr. Ossip was provided with the Court's decision in the GEICO case in which the failure to use a proper control was a major reason for the Court's criticism of the survey conducted on behalf of GEICO.

32.    During his deposition (rough draft, pages 15, 18), Mr. Ossip admitted that he could not know whether the percentage of survey participants who were "misled" (as he defined it) would have been different with another search term such as "blinds":

"Q.    Do you have any scientific basis for the opinion that the confusion would have been less using the search term blinds?

A.    I didn't do it so I can't say I have evidence in that regard."

33.    Given this admission and the fact that his survey did not allow him to determine if the search term had anything to do with the survey results, it is simply incomprehensible how Mr. Ossip could have reached any conclusions or made any claims on the basis of his survey regarding consumer confusion that was due to the "american blinds" search term.

13

## HAS THE "AMERICAN BLINDS" NAME BEEN USED AS A BRAND NAME AND
## IS LIKELY TO HAVE SECONDARY MEANING?

34.    The Ossip Survey and Report assume that a brand of window blinds called "American Blinds" is actually being used in the marketplace and is known to consumers as such. In fact, to qualify for participation in the Ossip Survey, prospective respondents had to say that they had heard of "American Blinds window blinds." Furthermore, during his deposition, Mr. Ossip testified that (rough transcript, page 2): "American Blinds are a brand of window blinds that are sold by a company called American Blinds & Wallpaper and more." Mr. Ossip also testified that he had seen (through the Internet) an "American Blinds blind" and that he had been told that it was a brand name for window blinds (id., page 58). He conceded that his survey was based on the assumption that such a brand actually existed (id., page 61). The survey also appears to assume that the term "american blinds" identifies a single source, that is, it has secondary meaning. However, Mr. Ossip indicated (id., page 55) that his survey did not test for secondary meaning. I am informed that ABWF claims that consumers hace come to understand "American Blinds" ro refer to the company ABWF, not to its products.

35.    In fact, the company's current name is "American Blind and Wallpaper Factory Inc." As testified by Mr. Layne during his deposition, the company's name has changed several times. Furthermore, the company has used many URLs as part of its Internet marketing efforts, which have typically led consumers to the www.decoratetoday.com website. Mr. Layne and Mr. Alderman testified that the company is currently considering switching from the www.decoratetoday.com website to another destination.

36.    The www.decoratetoday.com website lists various product categories offered for sale, including: Blinds & Shutters, Wallpaper & Fabric, Curtains & Draperies, Beddings, Area Rugs, Custom Frame Art, and the Sofa Collection. If consumers click on "Blinds & Shutters," they reach the webpage:

14

http://www.decoratetoday.com/products/blinds/default.asp?si=3. Under the heading:
"We Carry All the Name Brands," that webpage lists the following brands (in
alphabetical order): American BRAND, Bali, Comfortex, GRABER, HT,
HunterDouglas, Kirsch, Levolor, LouverDrape, M&B, Nanik, Prestige, Oxford House,
and Value Window Fashions. Thus, according to ABWF's own website, the list of "all
the name brands" does not include "American Blinds".

      37.    It is also important to recognize that "American Blinds" is likely to be a
weak brand name that lacks secondary meaning. Consumers are bombarded on a daily
basis by information about thousands of brands (e.g., in stores, on the web, in newspapers
and magazines) and ads. As a result, getting consumers to pay attention to any particular
brand or ad is very challenging and requires extensive and expensive marketing efforts
over an extended period. This problem is particularly severe when trying to establish
brand equity and recognition for a brand of window blinds called "American Blinds" for
two reasons. First, although not impossible (e.g., American Airlines), building awareness
and acquiring secondary meaning for a rather generic sounding, nondistinctive name such
as "American Blinds" is particularly challenging. Second, ABWF's tendency to change
frequently the company name, the brand names it is using, the various websites it relies
on, and the vendors that produce its private label blinds (i.e., the American BRAND
brand) further diminishes the likelihood of building equity in any specific brand name or
acquiring secondary meaning in any of the various brand names it might have used.

      38.    Considering that a distinct brand of window blinds called "American
Blinds" does not exist, one certainly cannot presume that a consumer entering the search
term "american blinds" is looking for products that are sold on the ABWF website (i.e.,
www.decoratetoday.com) or are looking for its private label "American BRAND". For
example, as Mr. Ossip testified (rough transcript, page 63), a consumer entering the
search term "american blinds" may be looking for information about American (i.e., US-
made) blinds.

15

39.     A question that might arise is how to explain the fact that participants in the Ossip Survey said that they had heard of the American Blinds brand of window blinds if such a brand does not exist and is unlikely to have secondary meaning. However, the explanation is quite simple and it is known as "spurious awareness." Specifically, when survey respondents are asked whether they have heard about a particular brand with a name that seems plausible for the product category, many of them will say that they have heard of that brand even if they have not. As Professor Keller indicates,[6] "Any research must consider the issue of consumers making up responses or guessing. That problem is especially evident with certain types of aided awareness or recognition measures for the brand. *Spurious awareness* occurs when consumers erroneously claim that they recall something that they really don't and that maybe doesn't even exist." Indeed, the phenomenon of spurious awareness applies also to non-existing brands, which are referred to as "phantom brands." In some cases, the level of spurious awareness of phantom brands is higher than 50%. The spurious awareness problem has also been addressed in the literature on survey research. For example, "The Survey Research Handbook"[7] makes the following recommendation: "There are two ways to ask about awareness: *aided* and *unaided* recall. With aided recall, the respondents are asked, "Have you heard of ___?" The problem with this kind of question is that many people will say they've heard of it, even though they haven't. To avoid this problem, ask for more details concerning the characteristics of the object or use the unaided recall method." The Survey Research Handbook further recommends to "Use unaided recall to measure awareness, if possible, to avoid false reports of recognition."

40.     Spurious awareness can be caused by at least two factors. First, respondents may truly believe that they have heard about the brand, because it seems like

---

[6] K. Keller (2003), *Strategic Brand Management*, Chapter 9, Pearson Education.

[7] Pamela L. Alreck and Robert B. Settle, *The Survey Research Handbook: Guidelines and Strategies for Conducting a Survey,* Second Edition, McGraw-Hill, 1995, page 12.

a plausible and/or familiar name. Second, when a survey asks about particular brands, the respondent can reasonably assume that these brands exist, and he or she is expected to know that. Thus, consistent with the tendency for "yea-saying" (or "acquiescence bias") and with survey "demand effects,"[8] respondents tend to say "yes" when asked if they have heard about provided brand names. The tendency to claim prior familiarity with (unfamiliar) brand names might be exacerbated if prospective respondents know in advance that they would receive a monetary compensation for participating in the survey.

41.    The problem of aspiring respondents who claim to be familiar with a brand even when they are not can be addressed using fictitious ("phantom") but plausible names for the product category. If a respondent claims familiarity with such phantom names, s/he could be excluded from the survey, because that respondent's claimed brand familiarity is not credible. Alternatively, a researcher might rely on "unaided" awareness measures whereby prospective respondents are asked to list all the brands in the category at issue with which they are familiar (e.g., "What brands of window blinds have you heard about? Any other brands? …").

42    Finally, while there are some known brands of window blinds, the manner in which blinds are sold and advertised on the Internet and in Yellow Pages indicates that brand names typically play a relatively limited role in that product category. Instead, the emphasis appears to be on the name of the seller or store (e.g., blinds.com, Home Depot) and the types of window blinds they offer (e.g., vertical blinds, mini blinds, wood blinds).

---

[8] "Yea-saying," also known as acquiescence bias," refers to the tendency of survey respondents to say "yes" and agree with statements provided to them. "Demand effects" refer to the tendency of survey respondents to provide answers that they believe are expected of them.

## DID THE OSSIP SURVEY APPROXIMATE MARKETPLACE CONDITIONS?

43.    One of the most basic principles of surveys conducted in a litigation context is that, although a survey typically cannot replicate marketplace conditions, the survey should be designed so that it approximates the essential characteristics of the marketplace as closely as possible. As Professor McCarthy points out, "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[9]

44.    The Ossip Survey completely failed to approximate marketplace conditions. Following the guidance of ABWF's counsel (rough transcript, page 191), Mr. Ossip removed from the webpages shown to respondents all the ads for ABWF. That is, a consumer in the marketplace who enters the search term "american blinds" would never encounter webpages like the ones shown to the Ossip Survey respondents. In particular, the ABWF ads, which are normally likely the ads that are most directly linked to the search term at issue (e.g., referred to in the sponsored link as "American Blinds, Wallpaper & More Official Site") were omitted. Mr. Ossip testified that the ABWF attorney wanted to "test the effect of the competitive ads without the defensive ads for American Blinds" (id., page 191). However, presumably, the Ossip Survey was designed to test if consumers in the marketplace who enter the term "american blinds" in the Google search engine "are misled into thinking that the sponsored links shown on the search results page will lead them to a website where they can make the purchase." That is, the Ossip report never indicates that the survey was designed to test whether consumers are misled in an imaginary world that might have existed had ABWF behaved differently. As an aside, the fact that AWB bids on a wide range of keywords that do not represent any of its brand names (as testified by Mr. Alderman) indicates that it is

---

[9] McCarthy at §32:163.

18

unlikely that ABWF would not have placed ads on pages with search results for the keywords "american blinds" had its competitors not been allowed to do so.

45.     Thus, the decision to omit from the stimuli shown to the Ossip Survey respondents all AWB ads was yet another major flaw of the survey. Like the lack of any control, that flaw by itself could have produced evidence of confusion where none exists.

46.     Yet another important deviation from what consumers using Google and entering the search terms at issue would actually see refers to the links shown to them. Mr. Ossip artificially created carefully selected sponsored links, which did not reflect marketplace reality. Thus, for example, many of the Ossip Survey respondents were shown just one link, which did not reflect what consumers entering the terms "american blinds" actually see. Mr. Ossip's justification for that decision was (rough transcript, page 24), "Because I wanted to isolate the effect of a sponsored link appearing on top of the organic results." However, as is obvious, the effect of a sponsored link appearing on top of the organic results is likely to be influenced by the presence or absence of other sponsored links. Specifically, there is little doubt that respondents were more likely to select a sponsored link (i.e., the one that Mr. Ossip chose to present on the webpage) when it is the only one presented as opposed to one of several sponsored links.

47.     The Ossip Survey deviated from marketplace reality in other significant ways. In reality, consumers enter the search terms, as opposed to being asked to assume that they did. Of course, since a primary objective of the survey was (or should have been) to test the effect of entering the search term/brand at issue, it was essential to have the respondents actually enter those terms. However, Mr. Ossip apparently assumed that it did not matter (page 94) and was concerned about typos (page 89).

19

### DID THE OSSIP SURVEY RESPONDENTS REPRESENT THE RELEVANT CONSUMER UNIVERSE?

48.    As Professor McCarthy points out,[10] "The first step in designing a survey is to determine the 'universe' to be studied. The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case. Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."

49.    The Ossip Survey was designed to determine if "those who enter the term 'american blinds' in the Google search engines, seeking to buy on-line that specific window blind brand or from that specific company, are misled ..." Accordingly, the relevant respondents needed to be consumers who had a reasonable likelihood of entering a term such as "american blinds" using the Google search engine, presumably because they sought information and/or wished to buy window blinds.

50.    The need to include relevant respondents is not merely an "academic" requirement – if survey participants are unlikely to use a search engine for that purpose and lack relevant experience (or any concrete indication that they would seek such information within a reasonable time period), they cannot represent actual consumers in the marketplace. For example, consumers who have used a search engine to look for information about blinds are likely to be more knowledgeable and have a better understanding of sponsored links and organic search results that appear when entering search terms that include the word "blinds".

51.    Accordingly, all prospective respondents should have been asked in the screening phase whether they had prior experience searching for information about and/or buying blinds on the Internet or were planning to use a search engine for that purpose within a specified time period. Those without such experience or plans should

---

[10] McCarthy at §32:159.

20

not have been allowed to participate in the survey. Indeed, in Question E in the Screener, respondents were asked if they had ever used or would consider using the Internet to get information about window blinds (and three other products), and only those who indicated they did were allowed to participate in the survey.

52.    At the conclusion of the Ossip Survey, respondents were asked if they had had any related prior experience:

"9. Have you ever obtained information about or bought window blinds on-line?" The results showed that most of the respondents (over 60%), including two-thirds (67%) of those whom Mr. Ossip counted as confused, indicated they had never before obtained information or bought window blinds online. Evidently, to qualify for participation in the survey, most of the survey participants were willing to say that they would consider using the Internet to obtain information about window blinds, even though they had never done so. This finding raises doubts as to whether the Ossip Survey respondents represented consumers who do have some experience.

53.    Furthermore, in addition to lacking prior experience searching for information about blinds online, participants were not asked if they were planning to buy blinds or to search for information about blinds online in the future. Instead, respondents were qualified to participate (and receive $3) by stating that they "would consider using the Internet to get information about window blinds." Thus, while most of them never used the Internet for that purpose before and were not asked if they had any plans to buy or seek information about blinds, they were qualified to participate because they said that they would consider using the Internet to get information about blinds. Clearly, such respondents could not represent the relevant consumers who actually use the Internet, and the Google search engine in particular, to obtain information about blinds.

54.    Another problem with the Ossip Survey respondent universe was that all of the participants were female. During his deposition (page 61), Mr. Ossip explained that "it seemed logical and I was told that that's the group that would generally buy blinds." .

21

Considering that blinds are an important component of home decoration, there is little doubt that men are often involved and may very well be the primary decision makers in some cases regarding the type of blinds the household selects. In particular, men may help the purchase process by seeking information about window blinds on the Internet. Thus, a sample that includes only women is significantly under-inclusive and cannot be representative of the entire relevant population of prospective purchasers and prospective users of a search engine for the purpose of obtaining information about window blinds.

55.    A study of online search behavior that was conducted by the Pew Research Center (as part of their "Pew Internet & American Life Project"), which was included among the materials reviewed by Mr. Ossip, contrasted the experience of men and women. The study concluded that men have significantly greater experience using Internet search engines, with many women using search engines quite infrequently. Men also tend to be more confident about their search abilities. These findings further illustrate the implications of the failure to interview both men and women.

56.    Furthermore, Mr. Ossip testified (page 62) that he had no relevant demographic information and had "no idea" (page 76) what the ages of ABWF prospective customers were. It thus appears that Mr. Ossip failed to take into consideration a critical aspect of his and any such litigation-related survey, namely, selecting the relevant universe of respondents. As Professor McCarthy stated, "Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."

## WERE THE OSSIP SURVEY QUESTIONS UNBIASED AND NONLEADING?

57.     After they were shown the webpage assigned to them (which, as shown above, misrepresented reality), respondents were asked: "Suppose you wanted to order from American Blinds on-line. Without clicking on anything, please move the mouse to put the cursor on the listing on this page that you would try first if you wanted to order American Blinds on-line." First, this question is highly ambiguous, because it initially refers to "from American Blinds" but then asks about "order American Blinds," with the latter suggesting that "American blinds" is a product rather than a company. It is also noteworthy that all questions were read to respondents by the interviewers, so respondents did not see if a particular word was emphasized in the questionnaire or whether the word "Blinds" started with a capital "B."

58.     More importantly, this question can provide no reliable indication as to whether a respondent who selected a sponsored link was misled or confused. One of the main virtues of the Internet is that the time and effort involved in information search are very limited. Accordingly, a consumer who happens to see a sponsored link that promotes its low rates, free consultation, free installation, and so on, may very well give it a try without ever being misled, confused, or making any assumptions about the particular brands offered on that website. The consumer may simply click on that link, and if s/he likes what is presented on the site, the consumer may acquire information and possibly even place an order. If the consumer determines that the site does not offer what s/he is looking for, the prices are not low, or it is unattractive for some other reason, s/he can go back to the previous webpage in less than a second.

59.     Furthermore, in order to answer such a question, the respondents had to know how American Blinds sells its products, and in particular, its distribution strategy. For example, if respondents knew that American Blinds sold its products only directly to consumers and did not use any third-party distributors, then they could reasonably assume that other websites and retailers did not offer American Blinds products.

23

However, consumers are not usually privy to marketing or distribution strategies of brands, and therefore have no basis for knowing all the websites offering a particular brand.

60.    Thus, the first question could not be relied upon to identify the number of consumers who were misled. As explained below, relatively few of the respondents said that they would  go first to a sponsored link, and virtually none explained such a decision on the basis of the search term they had presumably entered. Thus, putting aside the fact that the stimuli shown to respondents omitted all ABWF sponsored links and there was no control, the evidence produced by this first question indicated lack of confusion. In reality, of course, that would be the end of the process;  if consumers were to continue searching for "american blinds," they would be much more likely to select one of the organic results than any sponsored link.

61.    However, the Ossip Survey gave respondents further opportunities to demonstrate that they were misled. Specifically, after indicating where they would go first, interviewers moved the cursor to specific sponsored links (e.g., "Low Cost Blinds") and asked: "Without actually doing so, if you were to click on the particular listing I have moved the cursor on, do you think it would or would not take you directly, or link you, to a website where you could order American Blinds on-line, or don't you know?"

62.    This question was highly leading and suffered from strong demand effects (i.e., respondents were likely to guess what the "right" or expected answer was). Specifically, considering that this question came after respondents had been asked where they would go to order American blinds, it was reasonable to assume that the interviewer was now giving them the correct answer. For those who were asked about four different sponsored links, it was likely obvious that, at the very least, one of the four links shown to them must have been a possible source for American blinds – why else would the interviewer select these links and ask about them? Of course, here again the Ossip Survey failed to include any control that could account for "noise" and demand effects.

24

63.    Furthermore, this question invited guesses, because consumers had no basis for knowing which brands each website offers.  Similarly, if respondents were asked if they could order the HunterDouglas or Kirsch blinds from the www.decoratetoday.com website, they might say Yes or No, but such answers would be mere guesses, possibly based on their interpretation of the purpose of the question.  As indicated, consumers and survey respondents are usually not privy to the marketing strategies of companies.  However, if asked a direct (suggestive) question, many of them might hypothesize or guess that the link does offer the product referred to in the question.  Why else would they be asked that question?

64.    Such guesses, of course, did not represent any real confusion that occurred in the real world, outside the artificial context of the Ossip Survey.  That is, based on the reasonable assumption that respondents had no basis for knowing how or where American blinds were distributed, the questions they were asked were not meaningful and merely invited guesses based on leading cues provided in the survey.

25

## WHAT CAN WE LEARN FROM THE OSSIP SURVEY RESULTS?

65.     The fatal flaws of the Ossip Survey make its results largely irrelevant and uninformative. However, as shown below, even with these biases the reported survey results are consistent with the conclusion that triggering sponsored links based on the search term "american blinds" using the Google search engine did not mislead consumers regarding brands offered by sponsored links. First, however, we have to consider the manner in which the Ossip Survey results were analyzed. In particular, to ensure unbiased, objective analysis of the respondents' open-ended answers, the coding of these responses must be done by people who are unaware of the purpose of the survey and the identity of its sponsor (often referred to in the literature as "blind judges"). Otherwise, intentionally or not, the often subjective coding of verbatim answers tends to be biased in favor of the party sponsoring the survey. The present survey provides an extreme illustration of the biases created by having a person, who knows what the party paying for the survey was looking for, make the subjective judgments involved in coding the respondents' answers.

66.     Contrary to standard procedure, Mr. Ossip coded the results himself. That is, even though the research firm that assisted him in conducting the survey could undoubtedly also arrange to have the analysis done by objective, unbiased ("blind") judges, Mr. Ossip apparently preferred to do it himself.

67.     The consequences of the self-coding are obvious when we examine the open-ended answers that Mr. Ossip classified as indicating that respondents were misled. In the first survey (referred to as Phase 1), Mr. Ossip determined that 10.4% of the respondents who selected a sponsored link first were misled. However, none of these respondents mentioned the search term as a reason for saying they would try that sponsored link first if they wanted to buy American blinds. Instead, they mentioned things such as (Ossip Report, page 9) certain selling points (e.g., low cost, payment option), being a sponsored link, or the fact that the site was selling various blinds. As is

26

obvious, the mere fact that these 10.4% of the respondents would first try a website that offered some attractive terms or service could not be relied upon for determining that they expected to buy "American Blinds" window blinds on that website (rather than just spending a couple of seconds to "check out" that site). Rather similar results were obtained (regarding the listings the respondents would try first) in the "Phase 2" survey, again providing no evidence that any respondent was confused due to the "american blinds" keyword.

68.    As indicated, respondents were given additional opportunities to demonstrate what Mr. Ossip coded as indicating that they were misled. However, the overwhelming majority of the respondents coded by Mr. Ossip as misled (all of whom "failed" to be misled when asked where they would go first) provided no indication that the search term "american blinds" had any effect on a belief that they could order "American blinds" from the highlighted site. Consider, for example, Respondent number 11643, who explained her response (regarding the justblinds.com sponsored link) as follows (Ossip Report, p. 26): "Says blinds. Will go to a website with blinds." Putting aside the lack of any reference to the search term, it is unclear on what conceivable basis Mr. Ossip counted that respondent as misled. The respondent explicitly indicated that she answered Yes because that site "Says blinds." Thus, that respondent either misunderstood the question or simply believed that it referred to whether she could order blinds (of any kind) from that site. That is, it is unclear on what basis Mr. Ossip, the single coder of these responses, concluded from this answer that the Respondent believed that a brand called "American Blinds" was necessarily sold through the JustBlinds.com website.

69.    Similarly, Respondent 10651 explained her "Yes" answer (regarding blinds.com) as follows: "Because it says blinds. That's all." Another "misled" respondent (#00345) explained her Yes answer as follows: "Because is says blind.com so you are going to see more blinds." And ("misled") respondent 10843 explained (Ossip

27

Report, p. 25): "Because it talks about window blinds. Nothing." If such responses represent misled consumers, as Mr. Ossip apparently believes, it means that no company (presumably, with the exception of ABWF) is allowed to advertise its blinds on the Internet. That is, when shown a sponsored link offering blinds and asked if they could order "American blinds" through that link, some survey respondents would say Yes (for the reasons outlined above) and would thus be considered (using Mr. Ossip's coding scheme) to be misled.

70.    In conclusion, despite all the biases and flaws of the Ossip Survey discussed above, his survey results indicate that a negligible percentage (less than 3%) made any reference to the search term when explaining why they said Yes when asked whether they could order American blinds from the links shown to them.

71.    Furthermore, the low percentage of "misled" respondents, who provided conceivably relevant reasons, is informative in light of the well-known acquiescence bias[11] whereby respondents tend to say Yes when asked a question such as, Could you order American blinds from this site? In particular, because the Ossip Survey failed to include any control, it is impossible to know whether the finding that some respondents answered Yes when asked if they could order American blinds from the suggested link was due solely to such an acquiescence bias. Thus, to the extent that one relies on the Ossip Survey, the only conclusion that can be drawn is that using 'american blinds' as a keyword in the Google search engine does not cause consumer confusion.

12/5/2006
Date

I. Simonson
Itamar Simonson, Ph.D.

---

[11] See, e.g., J. Krosnick (1999), "Survey Research," *Annual Review of Psychology*, 537-67.

28

**EXHIBIT A**

## Itamar Simonson

**ADDRESSES**                                    December  2006

Home:                                      Office:
  1044 Vernier Place                          Graduate School of Business
  Stanford, CA 94305                           Stanford University
     (650) 857-9038                           Stanford, CA 94305-5015
Cell: (650) 387-7677                             (650) 725-8981
Fax: (650) 857-9090                           itamars@stanford.edu

**EDUCATION**

Ph.D.                    Duke University, Fuqua School of Business
                        Major: Marketing;  May 1987

M.B.A.                   UCLA,  Graduate School of Management
                        Major: Marketing;  March 1978

B.A.                     Hebrew University, Jerusalem, Israel
                        Major: Economics, Political Science;  August 1976

**ACADEMIC POSITIONS**

July 1987 - June 1993        University of California, Berkeley
                                Haas School of Business
                                Assistant Professor

July 1993 – Aug. 1996        Stanford Graduate School of Business
                                Associate Professor of Marketing

Sept. 1996 – Aug. 1999       Stanford Graduate School of Business
                                Professor of Marketing

Sept. 1999 –                 Stanford Graduate School of Business
                                Sebastian S. Kresge Professor of Marketing

1994 – 2000                  Stanford Graduate School of Business
                                Marketing Group Head

Fall 2000                    MIT Sloan School of Management
                                Visiting Professor of Marketing

**AWARDS**

- Best Article in the *Journal of Consumer Research* during the period 1987-1989.
- The 1997 O'Dell Award (for the *Journal of Marketing Research* article that has had the greatest impact on the marketing field in the previous five years).
- The 2001 O'Dell Award.
- Best Article in the *Journal of Public Policy & Marketing* during the period 1993-1995.
- The 2002 American Marketing Association Award for the Best Article in the area of Services Marketing.
- The Association for Consumer Research 1990 "Ferber Award."
- Finalist for the O'Dell Award: 1995; 2002; 2004; 2005; 2007.
- Finalist for the 2003 Paul Green Award (for the *Journal of Marketing Research* article with the greatest potential to contribute to the practice of marketing research).
- Runner-up for the 2005 *Journal of Consumer Research* Best Article Award.
- Winner in the Marketing Science Institute and Direct Marketing Association competition on "Understanding and Measuring the Effect of Direct Marketing."
- Runner-up for the 1993 *California Management Review* Best Article Award.
- National Science Foundation Grant (for 1996-8).
- Outstanding Reviewer Award, *Journal of Consumer Research*, 2005.
- Honorable Mention for the Sloan Executive Program Teaching Award (Fall 1995).
- Five years in the Berkeley School of Business "6-Point Club" (instructors with teaching ratings of 6 or more on a 7-point scale).

**TEACHING EXPERIENCE**

Stanford University:

      Marketing Management (for MBAs)
      Marketing Management (the Sloan Executive Program)
      Marketing to Businesses (for MBAs)
      Technology Marketing (for MBAs)
      Research Methods for Studying Buyer Behavior (a Ph.D. Course)
      Decision Making (a Ph.D. Course)
      Buyer Behavior (a Ph.D. course)

University Of California, Berkeley:

      Marketing Management (for MBAs - day and evening programs)
      Consumer Behavior and Decision Making (a Ph.D. Course)
      Various Marketing Executive Education Programs.

**BUSINESS EXPERIENCE**

October 1978-August 1983    Motorola, Inc.
Worked in an international subsidiary; responsibilities included marketing research and customer analysis, definition of new products, pricing, analysis of sales force performance, competitive intelligence, and forecasting. Conducted studies of markets for various communications products. Last two years served as Product Marketing Manager for communications products.

**Consulting:**

Consulted for clients from the communications, services, and manufacturing sectors. Expert witness assignments in the areas of trademark infringement, deceptive advertising, market surveys, buyer behavior, marketing management, brand equity, retailing and distribution, and other aspects of marketing.

**PUBLICATIONS**

Chezy Ofir and Itamar Simonson (2006), "The Effect of Stating Expectations on Customer Satisfaction and Shopping Experience," <u>Journal of Marketing Research</u>, forthcoming.

Itamar Simonson, "Decision Making," <u>Encyclopedia of Social Psychology</u>, In press.

Nathan Novemsky, Ravi Dhar, Norbert Schwarz, and Itamar Simonson (2006), "Preference Fluency in Context," <u>Journal of Marketing Research</u>, forthcoming.

Jonah Berger, Michaela Draganska, and Itamar Simonson, "The Influence of Product Variety on Brand Perceptions, Choice, and Experience," <u>Marketing Science</u>, forthcoming.

Raymond Fisman, Sheena Iyengar, Emir Kamenica, and Itamar Simonson (2006), "Gender Differences in Mate Selection: Evidence from a Speed Dating Experiment," <u>Quarterly Journal of Economics</u>, 121 (2), 673-697.

Donnel Briley, Michael Morris, and Itamar Simonson (2005), "Cultural Chameleons: Biculturals, Conformity Motives, and Decision Making," <u>Journal of Consumer Psychology</u>, 15 (4), 351-362.

Itamar Simonson (2005), "In Defense of Consciousness: The Role of Conscious and Unconscious Inputs in Consumer Choice," <u>Journal of Consumer Psychology</u>,15(3), 211-217.

Uptal Dholakia and Itamar Simonson (2005), "The Effect of Explicit Reference Points on Consumer Choice and Online Bidding Behavior," <u>Marketing Science</u>, 24, 206-17.

**PUBLICATIONS  (continued)**

Itamar Simonson (2005), "Determinants of Customers' Responses to Customized Offers:  Conceptual Framework and Research Propositions," <u>Journal of Marketing</u>, 69 (January), 32-45.

Itamar Simonson, Thomas Kramer, and Maia Young (2004), "Effect Propensity," <u>Organizational Behavior and Human Decision Processes</u>, 95 (November), 156-74.

Itamar Simonson and Aimee Drolet (2004), "Anchoring Effects on Consumers' Willingness-to-Pay and Willingness-to-Accept," <u>Journal of Consumer Research</u>, 31 (December), 681-90.

Ran Kivetz and Itamar Simonson (2003) "The Idiosyncratic Fit Heuristic: The Role of Effort Advantage in Consumer Response to Loyalty Programs," <u>Journal of Marketing Research</u>, 40 (November), 454-67.

Ravi Dhar and Itamar Simonson (2003), "The Effect of Forced Choice on Choice," <u>Journal of Marketing Research</u>, 40 (May), 146-60.

Dan Ariely and Itamar Simonson (2003), "Buying, Bidding, Playing, or Competing? Value Assessment and Decision Dynamics in Online Auctions," <u>Journal of Consumer Psychology</u>, 13(1&2), 113–123.

Ran Kivetz and Itamar Simonson (2002), "Self Control for the Righteous: Toward a Theory of Luxury Pre-Commitment," <u>Journal of Consumer Research</u>, 29 (September), 199-217.

Ran Kivetz and Itamar Simonson (2002), "Earning the Right to Indulge:  Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," <u>Journal of Marketing Research</u>, 39 (May), 155-70.

Chezy Ofir and Itamar Simonson (2001), "In Search of Negative Customer Feedback: The Effect of Expecting to Evaluate on Satisfaction Evaluations," <u>Journal of Marketing Research</u>, 38 (May), 170-82.

Itamar Simonson, Ziv Carmon, Ravi Dhar, Aimee Drolet, and Stephen Nowlis (2001), "Consumer Research: In Search of Identity," <u>Annual Review of Psychology</u>, 52, 249-275.

Donnel Briley, Michael Morris, and Itamar Simonson (2000), "Reasons as Carriers of Culture:  Dynamic Vs. Dispositional Models of Cultural Influence on Decision Making," <u>Journal of Consumer Research</u>, 27 (September), 157-178.

Aimee Drolet, Itamar Simonson, and Amos Tversky (2000), "Indifference Curves that Travel with the Choice Set," <u>Marketing Letters</u>, 11(3), 199-209.

Stephen Nowlis and Itamar Simonson (2000), "Sales promotions and the Choice Context as Competing Influences on Consumer Decision Making," <u>Journal of Consumer Psychology</u>, 9(1), 1-17.

**PUBLICATIONS  (continued)**

Ran Kivetz and Itamar Simonson (2000), "The Effect of Incomplete Information on Consumer Choice," Journal of Marketing Research, 37(4), 427-48.

Itamar Simonson and Stephen Nowlis (2000), "The Effect of Explaining and Need for Uniqueness on Consumer Decision Making:  Unconventional Consumer Choices Based on Reasons," Journal of Consumer Research, 27 (June), 49-68.

Itamar Simonson (1999), "The Effect of Product Assortment on Consumer Preferences," Journal of Retailing, 75(3), 347-70.

Ravi Dhar and Itamar Simonson (1999), "Making Complementary Choices in Consumption Episodes:  Highlighting Versus Balancing" Journal of Marketing Research, 36 (February), 29-44.

Houghton, David, ..., and Itamar Simonson (1999), "Correction Processes in Consumer Choice," Marketing Letters, 10(2),107-112.

Ziv Carmon and Itamar Simonson (1998), "Price-Quality Tradeoffs in Choice Versus Matching:  New Insights into the Prominence Effect," Journal of Consumer Psychology, 7(4), 323-343.

Stephen Nowlis and Itamar Simonson (1997), "Attribute–Task Compatibility as a Determinant of Consumer Preference Reversals," Journal of Marketing Research, 34 (May), 205-218.

Joel Huber, ..., and Itamar Simonson (1997), "Thinking About Values in Prospect and Retrospect:  Maximizing Experienced Utility," Marketing Letters, 7, 324-334.

Stephen Nowlis and Itamar Simonson (1996), "The Impact of New Product Features on Brand Choice," Journal of Marketing Research, 33 (February), 36-46.

Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," Journal of Public Policy and Marketing, 13(2), 181-199.

Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," Trademark Reporter, 84 (2), 199-223.

Itamar Simonson, Ziv Carmon, and Suzanne O'Curry (1994), "Experimental Evidence on the Negative Effect of Product Features and Sales Promotions on Brand Choice," Marketing Science, 13 (1), 23-40.

Itamar Simonson (1993), "Get Closer to Your Customers by Understanding How They Make Choices," California Management Review, 35 (4), 68-84.

Itamar Simonson, Stephen Nowlis, and Katherine Lemon (1993), "The Effect of Local Consideration Sets on Global Choice Between Lower Price and Higher Quality," Marketing Science, 12 (4), 357-377.

**PUBLICATIONS  (continued)**

Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion
Estimates:  Conceptual Analysis and Empirical Test," Trademark Reporter, 83 (3),
364-393.

Itamar Simonson, Stephen Nowlis, and Yael Simonson (1993), "The Effect of Irrelevant
Preference Arguments on Consumer Choice," Journal of Consumer Psychology, 2
(3), 287-306.

Eldar Shafir, Itamar Simonson, and Amos Tversky (1993), "Reasons-Based Choice,"
Cognition, 49, 11-36.

Amos Tversky and Itamar Simonson (1993), "Context-Dependent Preferences,"
Management Science, 39 (10), 1179-1189.

Itamar Simonson (1992), "Influences of Anticipating Regret and Responsibility on
Purchase Decisions," Journal of Consumer Research, 19 (June), 105-118.

Itamar Simonson and Peter Nye (1992), "The Effect of Accountability on Susceptibility
to Decision Errors", Organizational Behavior and Human Decision Processes, 51 (3),
416-446.

Itamar Simonson and Barry Staw (1992), "De-Escalation Strategies: A Comparison of
Techniques for Reducing Commitment to Losing Courses of Action," Journal of
Applied Psychology, 77 (4), 419-426.

Itamar Simonson and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and
Extremeness Aversion," Journal of Marketing Research, 29 (August), 281-295.

Itamar Simonson and Russell S. Winer (1992), "The Influence of Purchase Quantity
and Display Format on Consumer Preference for Variety", Journal of Consumer
Research, 19 (June), 133-138.

Ravi Dhar and Itamar Simonson (1992), "The Effect of the Focus of Comparison on
Consumer Preferences," Journal of Marketing Research, 29 (November), 430-440.

William T. Ross and Itamar Simonson (1991), "Evaluations of Pairs of Experiences: A
Preference for Happy Endings," Journal of Behavioral Decision Making, 4(4), 273-
282.

## PUBLICATIONS (continued)

Itamar Simonson (1991), "The Effect of Buying Decisions on Consumers' Assessments of Their Tastes", Marketing Letters, 2, 1, 5-14.

Itamar Simonson (1990), "The Effect of Purchase Quantity and Timing on Variety Seeking Behavior," Journal of Marketing Research, 27 (May), 150-162.

Itamar Simonson (1989), "Choice Based on Reasons: The Case of Attraction and Compromise Effects," Journal of Consumer Research, 16 (September), 158-174.

Itamar Simonson, Joel Huber, and John Payne (1988), "The Relationship Between Prior Brand Knowledge and Information Acquisition Order", Journal of Consumer Research, (March), 14,4, 566-78.

## ARTICLES UNDER REVIEW

Aimee Drolet, Dale Griffin, Mary Frances Luce, and Itamar Simonson, "The Influence of Cognitive Load on Consumer Choice Processes."

Raymond Fisman, Sheena Iyengar, Emir Kamenica & Itamar Simonson, "Racial Preferences in Dating: Evidence From Speed-Dating Events."

Song-Oh Yoon and Itamar Simonson, "The Context of Construction As a Determinant of the Stability of Consumer Preferences."

Stephen Nowlis, Ravi Dhar, and Itamar Simonson (2006), "The Effect of Decision Order on Purchase Quantity Decisions."

**EDITORIAL ACTIVITIES**

Editorial Boards: *Journal of Consumer Research, Journal of Marketing Research, Journal of Consumer Psychology, Journal of Marketing, Journal of Behavioral Decision Making, International Journal of Research in Marketing, Review of Marketing Research, Marketing Letters, Review of Marketing Research.*

Reviewer for *Marketing Science, Journal of Economic Behavior and Organization, Management Science, Journal of Retailing and Consumer Services, Journal of Marketing, Journal of Retailing, Organizational Behavior and Human Decision Processes, Journal of Experimental Psychology, Psychological Review, Psychological Bulletin, Journal of Personality and Social Psychology, Psychological Science, California Management Review, Journal of Economic Psychology, European Journal of Social Psychology,* and *Medical Decision Making.*

**PROFESSIONAL AFFILIATIONS**

> American Marketing Association
> Association for Consumer Research
> Judgment and Decision Making Society
> American Psychological Society

**PERSONAL DATA**

Birth Date:        December 25, 1951
Marital Status:    Married, 2 children

**EXHIBIT B**

EXHIBIT  B

Cases in which Dr. Itamar Simonson Testified as an Expert at Trial (including written
expert reports submitted to the court) or by Deposition in the Past Four Years

1.  M2 Software v. Madacy, Inc.

2.  Oracle v. Light Reading

3.  Alberto-Culver v. Trevive

4.  Carroll Shelby et al. v. Superformance International

5.  R.J. Reynolds Tobacco Company v. Cigarettes Cheaper

6.  Empresa Cubana Del Tabaco v. General Cigar

7.  BattleBots v. Anheuser-Busch

8.  General Motors Corp. v. Avanti Corp.

9.  Kal Kan Foods v. Iams and Procter & Gamble

10.  Coffee Bean & Tea Leaf v. Starbucks

11.  Starbucks v. Sambuck's Coffeehouse

12.  Visa International v. VeriSign; VeriSign v. Visa International

13.  Chase and Bank of America v. REI and US Bank

14.  Trek Bicycle v. Thane International

15.  We've Only Just Begun Wedding, Inc. v. The Little White Wedding Chapel, Inc.

16.  Kubota Corporation v. Daedong – USA

17.  Duncan McIntosh Company v. Newport Dunes Marina et al.

18.  ZonePerfect Nutrition Company v. Hershey Foods and Mr. Barry Sears

19.  Verizon Directories v. Yellow Book

20.  CipherTrust, Inc. v. IronPort Systems, Inc.

21.  GEICO v. Google et al.

22.  Lucent v. Foundry Networks

23.  T. Rowe Price v. Schwab

24. Photographic Illustrators Corp. v. The Gillette Company

25. KCI et al. v. BlueSky et al.

26. BTA Branded v. Syngenta Seeds and Tanimura & Antle

27. Markwins Beauty Products v. Mirage Cosmetics

28. Nissan Motors v. VW and Audi of America

29. Met-Rx Substrate Technology v. Champion Nutrition

30. FTC v. QVC et al.

31. Classic Foods v. Kettle Foods

32. Allergan v. Klein-Becker

33. CollegeNET, Inc. v. XAP Corp.

34. Enterprise Rent-A-Car v. U-Haul International

35. Nautilus v. ICON

36. Newport Pacific v. Moe's Southwestern Grill

**EXHIBIT C**

EXHIBIT C

Documents Reviewed

1. Documents provided by Mr. Ossip, Bates Nos. ABWF055057-59238

2. Deposition Transcript of Jeffrey Alderman

3. Deposition Transcript of Michael Layne

4. Deposition Transcript (rough) of Alvin Ossip

5. Post-trial order, Geico v. Google

1

**PROOF OF SERVICE**

2
3
4

    I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

5

   .On December 5, 2006 I served the following document:

6

**EXPERT REPORT OF DR. ITAMAR SIMONSON**

7
8
9

☑    by **PDF TRANSMISSION AND** by **FEDERAL EXPRESS**, by placing a true and correct copy in a sealed envelope addressed as shown below. I am readily familiar with the practice of Keker & Van Nest, LLP for correspondence for delivery by FedEx Corporation. According to that practice, items are retrieved daily by a FedEx Corporation employee for overnight delivery.

10
11

        Paul Garrity, Esq.
        Kelley Drye & Warren LLP
        101 Park Avenue
        New York, NY 10178

12
13
14

    Executed on December 5, 2006, at San Francisco, California. I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

15
16
17

                        _Noelle Nichols_
                     Noelle Nichols

18
19
20
21
22
23
24
25
26
27
28

1

**Proof Of Service**
**Case No. C 03-5340-JF (RS)**
