# EXHIBIT S

Dockets.Justia.com

98

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

AMERICAN BLIND AND WALLPAPER
FACTORY, INC.,

      Plaintiff,

v.

STEVE KATZMAN,

      Defendant.

Case: 2:06-cv-13576
Assigned To: Cohn, Avern
Referral Judge: Pepe, Steven D
Filed: 08-10-2006 At 10:27 AM
cmp AMERICAN BLIND AND WALLPAPER FA
CTORY, INC V. KATZMAN (TAM)

SCOTT A. MACGRIFF (P55864)
DICKINSON WRIGHT PLLC
Attorneys for Plaintiff
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3477
Email: smacgriff@dickinsonwright.com

## AMERICAN BLIND AND WALLPAPER FACTORY'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, American Blind and Wallpaper Factory, Inc. ("American Blind"), by and through its undersigned counsel, upon the accompanying Affidavit of Joel Levine, hereby moves this Court, pursuant to Fed. R. Civ. P. 65, for entry of a temporary restraining order and a preliminary injunction barring defendant, Steve Katzman ("Katzman" or "Defendant"), and any persons acting on Defendant's behalf or at Defendant's request, from using any of American Blind's confidential and proprietary property and information, and requiring Defendant to immediately return to American Blind all such property and information (the "Motion").

In support hereof, American Blind files and incorporates, as if fully restated herein, the attached Brief in Support of its Motion.

DICKINSON WRIGHT PLLC

BY: _____

SCOTT A. MACGRIFF (P55864)
Attorneys for Plaintiff
500 Woodward Avenue
Suite 4000
Detroit, MI 48226
(313) 223-3477
Email: smacgriff@dickinsonwright.com

Date:   August 10, 2006

DETROIT 24336-8 950062v1

2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Exhibits 1, A-O

AMERICAN BLIND AND WALLPAPER
FACTORY, INC.,

      Plaintiff,

v.

STEVE KATZMAN,

      Defendant.

Case: 2:06-cv-13576
Assigned To: Cohn, Avern
Referral Judge: Pepe, Steven D
Filed: 08-10-2006 At 10:27 AM
cmp AMERICAN BLIND AND WALLPAPER FA
CTORY, INC V. KATZMAN (TAM)

SCOTT A. MACGRIFF (P55864)
DICKINSON WRIGHT PLLC
Attorneys for Plaintiff
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3477
Email: smacgriff@dickinsonwright.com

## AMERICAN BLIND AND WALLPAPER FACTORY'S
## BRIEF IN SUPPORT OF MOTION FOR A TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................1

II.   THE PARTIES....................................................................................................2

III.  FACTUAL BACKGROUND ...............................................................................2

IV.   ARGUMENT .......................................................................................................8

      A.    A Temporary Restraining Order Is Warranted .........................................8

      B.    Injunctive Relief Is Warranted.................................................................9

            1.    American Blind will likely succeed on the merits of its claim .............10

                  a)    Violation of the CFAA....................................................10

                  b)    Violation of 18 U.S.C. § 2701 *et seq.* ...........................11

                  c)    Violation of MUTSA .......................................................12

                  d)    Common-law conversion ...............................................15

                  e)    Tortious Interference......................................................15

                  f)    Breach of Contract .........................................................16

            2.    American Blind will be irreparably harmed absent immediate injunctive relief....................................................................................18

            3.    Granting the injunction will not harm anyone .....................................19

            4.    The public interest will be served by issuing the injunction................20

V.    CONCLUSION..................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*ACS Consultant Co., Inc. v. Williams*, No. 06-11301, 2006 WL 897559, *7 (E.D. Mich. Apr. 6, 2006)...................................................................................................... 14, 19

*American Can Co. v. Mansukhani*, 742 F.2d 314, 325 (7th Cir 1984)............................................ 9

*American Parts Co., Inc. v American Arbitration Ass'n*, 154 N.W.2d 5 (Mich. Ct. App. 1967) ........................................................................................................................... 17

*BPS Clinical Laboratories v. Blue Cross and Blue Shield of Michigan*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996)............................................................................................ 16

*CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 813 (Mich. Ct. App. 2002) ........... 13, 14

*Easton Sports, Inc. v. Warrior LaCrosse, Inc.*, No. 05-CV-72031, 2005 WL 2234559 (E.D. Mich. Sept. 14, 2005)......................................................................................... 16

*Fielder v. Greater Media, Inc.*, LC No. 04-436195-CZ, 2006 WL 2060404, *4 (Mich. Ct. App. July 25, 2006)..................................................................................................... 16

*Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (1992)........................................... 15

*In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985)................................................... 9

*In re Eagle-Picher Industries, Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) ......................................... 9

*In re Intuit Privacy Litigation*, 138 F. Supp. 2d 1272, 1276 (C.D. Cal. 2001)............................. 12

*International Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006)..................... 11

*Kimberly & European Diamonds, Inc. v. Burbank*, 684 F.2d 363 (6th Cir. 1982)....................... 15

*Leach v. Ford Motor Co.*, 299 F. Supp. 2d 763 (E.D. Mich. 2004) ............................................. 16

*Merrill Lynch Pierce Fenner & Smith v. Ran*, 67 F. Supp. 2d 764, 778 (E.D. Mich. 1999)........ 19

*PepsiCo., Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).................................................. 14

*Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 113 F.3d 393, 402 (6th Cir. 1997) ....... 10

*Superior Consultant Co. v. Bailey*, No. 00-CV-73439, 2000 WL 1279161, *10 (E.D. Mich. Aug. 22, 2000).................................................................................................... 14

*Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 846 (E.D. Mich. 1994)...................... 9, 18

*Thomas v. Leja*, 468 N.W.2d 58 (Mich. Ct. App. 1991)............................................................... 17

*United Rentals (North America), Inc. v. Keizer*, 355 F.3d 399, 412-13 (6th Cir. 2004) .............. 13

**Statutes**

18 U.S.C. § 1030(a) ........................................................................................................ 10

18 U.S.C. § 1030(e) ........................................................................................................ 11

18 U.S.C. § 2707 ............................................................................................................ 11

M.C.L. § 445.1901 .......................................................................................................... 10

M.C.L. § 445.1902(b) ..................................................................................................... 12

M.C.L. § 445.1902(d) ..................................................................................................... 13

M.C.L. § 445.774a .......................................................................................................... 20

**Other Authorities**

Wright, Miller and Kane, Federal Practice and Procedure, 2nd Ed. 1995, § 2951 p. 253 ................ 8

**Rules**

Fed.R.Civ.P. 65(b) ......................................................................................................... 8

## I.    **INTRODUCTION**

Defendant is the former CEO of American Blind, having resigned voluntarily on May 18, 2006.   In connection with his tenure as American Blind's CEO, Defendant signed an employment agreement which contains provisions forbidding him to use confidential or proprietary information obtained while at American Blind for his own benefit, or for the benefit of anyone other than American Blind (the "Employment Agreement").   (A copy of the Employment Agreement is annexed as Exhibit A to the accompanying Affidavit of Joel Levine, dated August 9, 2006 and filed in conjunction with this Motion.  The Employment Agreement is hereby incorporated by reference.)   The Employment Agreement also contains a provision requiring Defendant to immediately return all American Blind property to American Blind upon his termination.  These provisions explicitly survive the term of the Employment Agreement and Defendant's employment at American Blind.   They also specifically contemplate injunctive relief upon any breach of them by Defendant.

When Defendant resigned, American Blind executives immediately discovered that Defendant had taken with him several confidential items of American Blind's property, violating the Employment Agreement.  Specifically, Defendant took a proprietary spreadsheet containing detailed information about American Blind's competitors (the "Competitive Matrix"), as well as the American Blind employee handbook (the "Employee Handbook").   American Blind has reason to believe that Defendant took with him additional proprietary documents and information which American Blind has yet to identify.

American Blind also discovered that following his resignation, Defendant erased thousands of electronic files contained on several of American Blind's computers to which Defendant had access during his employment.

American Blind also subsequently learned that Defendant has created a new business to compete directly with American Blind, called Nationwide Blind and Wallpaper Factory ("Nationwide"). American Blind has good cause to believe that Defendant currently is wrongfully using the Competitive Matrix and the Employee Handbook, violating ongoing provisions of Defendant's Employment Agreement, in order to help get Nationwide up and running.

By this action American Blind seeks immediate return of all confidential and proprietary documents and information wrongfully taken by Defendant upon his resignation. American Blind also seeks the immediate cessation of any and all use by Defendant, Nationwide, and anyone else acting on Defendant's behalf of American Blind's confidential and proprietary information and documents.

## II.   THE PARTIES

American Blind is a Delaware corporation with its principal place of business at 909 North Sheldon Road, Plymouth, Michigan.

On information and belief, Steve Katzman is a Michigan citizen and resident who resides at 6531 Pembridge Hill, West Bloomfield, Michigan.

## III.   FACTUAL BACKGROUND

American Blind is the largest direct-to-customer retailer of window treatments and wall coverings in the United States. American Blind, through its predecessor companies, has been in the home decorating business for over 50 years.

Defendant was hired as American Blind's CEO in 1998. (Levine Aff. at ¶ 4.[1])

On or about June 5, 2000, as a condition of his continued employment as American

---

[1]   References to the accompany Affidavit of Joel Levine, dated August 9, 2006 and filed in conjunction with this Motion, are to "Levine Aff. at ¶ __".

Blind's CEO, Defendant entered into the Employment Agreement with American Blind. (Levine Aff., Ex. A.[2])

On or about September 18, 2003, American Blind and Katzman renewed the Employment Agreement, extending its term through December 31, 2005. (Levine Aff., Ex. B.)

The Employment Agreement contains several provisions forbidding Defendant to, *inter alia*, take with him or use any American Blind proprietary information or documents following termination of his employment at American Blind. (Levine Aff., Ex. A at § 11(a), 11(b).) These provisions explicitly survive the term of the Employment Agreement and remain in effect no matter the circumstances under which Defendant departs American Blind. (*Id.*)

Specifically, subparagraph 11(a) of the Employment Agreement provides, *inter alia*:

> Proprietary Information. Executive [Defendant] shall not during the Employment Term or at any time thereafter (irrespective of the circumstances under which Executive's employment by Corporation [American Blind] terminates), directly or indirectly, use for his own purpose or for the benefit of any person or entity other than Corporation, nor otherwise disclose, any Proprietary Information, . . . to any individual or entity, unless such disclosure has been authorized in writing by the Board or is otherwise required by law . . . .

(*Id.* at § 11(a).)

And subparagraph 11(b) of the Employment Agreement provides, *inter alia*:

> Confidentiality and Surrender of Records. Executive shall not retain, and will deliver promptly to Corporation, any Confidential Records following termination of his employment. "Confidential Records" shall mean all correspondence, memoranda, files, manuals, books, lists, financial, operating or marketing records, magnetic tape or electronic or other media or equipment of any kind which may be in Executive's possession or under his control or accessible to him which may contain any Proprietary Information . . . . All Confidential Records shall be and remain the sole property of Corporation during the Employment Term and

---

[2]    References to Exhibits to the Affidavit of Joel Levine are to "Levine Aff., Ex. __".

thereafter.

(*Id.* at § 11(b).)

Beginning on January 1, 2006, pursuant to mutual agreement by American Blind and Defendant, Defendant continued to serve as American Blind's CEO on a month-to-month basis, receiving the same salary and benefits as set forth in the Employment Agreement. (Levine Aff., Ex. C.)

On February 14, 2006, Defendant executed an Employee Hardware Loan Agreement with American Blind, which obligated Defendant to return, upon his departure from American Blind, the company laptop computer and related accessories that American Blind had furnished for him, among other things (the "Hardware Agreement"). (Levine Aff., Ex. B.)

At approximately 4:30 p.m. on May 18, 2006, Defendant participated in a teleconference in his office along with American Blind's CFO, Gerald Curran. (Levine Aff. at ¶ 11.) At this time, Mr. Curran observed that various property of American Blind, including files, documents, records, electronic data, computer files, and other proprietary information (the "Company Property") was located in Defendant's office and on two desktop computers in Defendant's office. *(Id.)*

Later that evening, at approximately 7:33 p.m. on May 18, 2006, Defendant tendered his resignation to American Blind's board of directors. (Levine Aff., Ex. C.)

The next morning, at about 8:00 a.m. on May 19, 2006, Joel Levine, who replaced Defendant as American Blind's CEO, entered Defendant's office and discovered that the Company Property was missing from Defendant's office. (Levine Aff. at ¶ 13.)

Also on or about May 19, 2006, Greg Ruppert, American Blind's vice president of technical operations, inspected the two desktop computers in Defendant's office at American

4

Blind and discovered that all of the electronic documents and emails had been erased from them. (Levine Aff. at ¶ 14.)

Later that day, on May 19, 2006, American Blind demanded that Katzman return the Company Property by 5:00 p.m. on May 22, 2006. (Levine Aff., Ex. D.) American Blind also disabled Defendant's access to American Blind's Virtual Private Computer Network ("VPN") on May 19, 2006. (Levine Aff. at ¶ 17.)

On May 19, 2006, Mr. Levine discovered that Katzman had been communicating with certain vendors and creditors of American Blind and, on information and belief, falsely indicating or implying to them that American Blind was in financial distress. (*Id.* at ¶ 18.)

Mr. Levine also discovered on that same day that following one such communication with Defendant, First Data, the company who processed American Blind's corporate credit card, placed a "hold" on American Blind's credit in the amount of $750,000.00. (*Id.* at ¶ 19.)

As a result of First Data's "hold", American Blind was forced to secure a loan from another entity in this amount of $750,000.00, at an unfavorable interest rate. (*Id.* at ¶ 20.)

On June 5, 2006, Defendant informed counsel for American Blind that he intended to send American Blind a diskette containing 4,368 company-related emails. Defendant also informed American Blind's counsel that he was sending a copy of the diskette to his own personal attorney, in anticipation of a possible "dispute aris[ing]" involving the "integrity of the information" he was returning. (Levine Aff., Ex. F.) Katzman also stated in his June 5, 2006 email that he was in the process of reviewing "over 15,000" additional electronic files, which he had "archived" on his home computer, so that he could remove any of his "personal" items before sending them back to American Blind. (*Id.*)

On June 12, 2006, Irma Kline, American Blind's vice president of human resources,

resigned. (*Id.* at ¶ 25.)

On June 12, 2006, American Blind received a diskette from Defendant purportedly containing all of Defendant's business-related emails. (Levine Aff. at ¶ 26.)

On June 12, 2006, Defendant informed American Blind's counsel that he was still working to assemble the electronic files demanded by American Blind, and that he intended to return the requested files within a week. (Levine Aff., Ex. G.) Defendant acknowledged in his June 12, 2006 email that he was obligated by paragraph 11(b) of the Employment Agreement to do so, and that he intended to comply with paragraph 11(a)'s nondisclosure requirements. (Levine Aff. at ¶ 27, Ex. G.)

On June 14, 2006, Defendant informed American Blind's counsel that he was returning all company electronic files that were archived on his home computer. (Levine Aff., Ex. H.) Defendant stated that he had already provided his own personal attorney with a copy of the same, again anticipating a "dispute aris[ing] where [sic] the integrity of the information becomes important." (*Id.*) Defendant also stated affirmatively that he would not personally retain a copy of these files, nor would anyone acting on his behalf access those files for any purpose forbidden by the Employment Agreement. (*Id.*)

On June 21, 2006, American Blind's counsel finally received a disk from Defendant purportedly containing the American Blind electronic files which Defendant had archived on his home computer. (Levine Aff. at ¶ 30.)

As of June 21, 2006, Defendant still had not returned his company laptop computer and related accessories. (Levine Aff. at ¶ 31.) American Blind's counsel therefore again communicated American Blind's demand that Defendant immediately return the computer. (Levine Aff., Ex. I.)

Defendant then asked if he could keep the computer and pay American Blind "fair market value" for it. (Levine Aff., Ex. J.) Mr. Levine immediately responded in the negative and again demanded the laptop's return. (Levine Aff., Ex. K.)

Thereafter, Defendant finally returned the laptop. When American Blind personnel inspected the laptop, however, they found that its entire contents had been erased – just as were the desktop computers in Defendant's office. (Levine Aff. at ¶ 36.)

On July 17, 2006, Defendant sent an email message to the American Blind email account of Irma Kline, who was no longer with the company. Defendant's email attached a spreadsheet containing detailed information about American Blind's competitors, which spreadsheet had been developed by and belonged to American Blind (the "Competitive Matrix"), and requested that Kline add additional information to the Competitive Matrix. (Levine Aff. at ¶ 37; Levine Aff., Ex. L.)

On July 21, 2006, Defendant sent another email message to Kline's American Blind email address, this time attaching a red-lined version of American Blind's employee handbook (the "Employee Handbook") which contained numerous and substantial edits to the handbook. (Levine Aff. at ¶ 38; Levine Aff, Ex. M.) Also on July 21, 2006, Defendant again forwarded the Competitive Matrix to Kline's American Blind email address. (Levine Aff. at ¶ 39; Levine Aff., Ex. N.)

Immediately after discovering these email messages from Defendant, American Blind conducted a through search of its computer systems in order to determine the extent of Defendant's attempts to wrongfully access American Blind's proprietary information. (Levine Aff. at ¶ 40.) American Blind determined that since Defendant's resignation, 22 separate attempts had been made to log on to American Blind's VPN from Defendant's Internet Protocol

7

address ("IP Address"), using Kline's, Rupprecht's, and Defendant's passwords. (Levine Aff. at ¶ 40.)

As a direct result of Defendant's repeated attempts to improperly access American Blind proprietary information following his resignation, as well as Defendant's deletion of substantial amounts of data from his company laptop and desktop computers, American Blind has been forced to carry out a number of company-wide security measures, including comprehensively evaluating its network integrity and having employees change their passwords. (Levine Aff at ¶ 43.)

## IV.  ARGUMENT

### A.    A Temporary Restraining Order Is Warranted

Inasmuch as it has become clear that Katzman is using American Blind's confidential and proprietary information in order to start his competing business and there is reason to believe that Katzman is utilizing other yet to be identified confidential and propriety information to the detriment of American Blind, American Blind seeks a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure.

A temporary restraining order is intended to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction and may be issued with or without notice to the adverse party.  Wright, Miller and Kane, Federal Practice and Procedure, 2nd Ed. 1995, § 2951 p. 253 (footnotes omitted).  Furthermore, Rule 65(b) provides that:

> [a] temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be

8

required.

Although a request for an *ex parte* order requires compliance with these strict requirements, they "need not be burdensome when there is truly a need to proceed *ex parte*. The requirements at issue [under the rule] . . . demand only that the judge issuing the order articulate, and thus carefully consider, both the need for the restraining order and the need for proceeding *ex parte.*" *American Can Co. v. Mansukhani*, 742 F.2d 314, 325 (7th Cir 1984).

Here, the Affidavit of Joel Levine demonstrates the need for the TRO.  Although Katzman promised repeatedly that he would return all Company Property and not disclose confidential and proprietary information, he has been caught with his hand in the proverbial cookie jar.  He is currently using American Blind's confidential and proprietary information to start and operate a competing company.  Having demonstrated his intent to injure American Blind and its business, it is imperative that this Court issue a TRO precluding Katzman from causing even more harm.

**B.    Injunctive Relief Is Warranted**

In considering whether to issue a preliminary injunction, courts weigh four factors: "(1) the likelihood of plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction." *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 846 (E.D. Mich. 1994); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).  These factors are not "prerequisites"; rather, they "simply guide the discretion of the court", who need only balance them. *In re Eagle-Picher Industries, Inc.*, 963 F.2d 855, 859 (6th Cir. 1992).

9

1.     **American Blind will likely succeed on the merits
of its claim**

For purposes of a preliminary injunction, and to demonstrate the likelihood of success on the merits, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 113 F.3d 393, 402 (6th Cir. 1997).

American Blind asserts nine substantive causes of action against Defendant: two for violation of 18 U.S.C. § 1030(a) *et seq.* (the Computer Fraud and Abuse Act, or "CFAA"); one for violation of 18 U.S.C. § 2701 (the "Electronic Communications Privacy Act"); two for violation of M.C.L. § 445.1901 *et seq.* (the Michigan Uniform Trade Secrets Act, or "MUTSA"); one for common-law conversion; one for tortious interference; and two for breach of contract. American Blind has shown that it will prevail on each cause of action.

a)     **Violation of the CFAA**

There are several routes for civil claimants to establishing a violation of the CFAA. Under 18 U.S.C. § 1030(a)(4), a plaintiff must show that the defendant (1) knowingly and with intent to defraud; (2) accessed a protected computer without authorization, or [by exceeding] authorized access; (3) and thereby furthers the intended fraud or obtains something worth more than $5,000.00. 18 U.S.C. § 1030(a)(4). And under subsection 1030(a)(5)(A)(i), a plaintiff must show that the defendant (1) knowingly caused the transmission of a program, information, code, or command; (2) to a protected computer; (3) thereby intentionally causing damage without authorization in an amount exceeding $5,000.00. 18 U.S.C. §§ 1030(a)(5)(A)(i); 1030(a)(5)(B)(i).

American Blind has established its right to recover on both routes under the CFAA. The

American Blind computers Defendant accessed (both Defendant's laptop and the two desktop computers in Defendant's office) were "protected computers" under the CFAA because they were "used in interstate or foreign commerce [and] communication." 18 U.S.C. § 1030(e)(2)(B). Defendant intentionally accessed those computers in order to both (a) knowingly and intentionally defraud American Blind by obtaining proprietary information (*i.e.*, the Competitive Matrix, the Employee Handbook, and likely other records); and to (b) knowingly transmit a program or command sufficient to "erase" the entire contents of those computers. Levine Aff. at ¶¶ 15, 34-40; *see International Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006) (running a program to erase contents of a computer without authorization violates CFAA). The damages incurred by American Blind as a result of Defendant's conduct are already well in excess of $5,000.00 and continue to climb. Levine Aff. at ¶ 43. And the economic value of the Competitive Matrix and the Employee Handbook are themselves substantially more than $5,000.00. Levine Aff. at ¶ 41. In short, what Defendant has done is precisely the kind of conduct proscribed by the CFAA, and preliminary injunctive relief is therefore proper.

**b)    Violation of 18 U.S.C. § 2701 *et seq.***

Section 2707 of the Electronic Communications Privacy Act allows for a private action by an entity aggrieved by a violation of Section 2701. 18 U.S.C. § 2707. Section 2701 is violated when a person (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and there obtains, alters, or prevents authorized access to wire or electronic communication while it is in electronic storage in such system. 18 U.S.C. § 2701.

Here, Katzman accessed his laptop and two desktop computers following his resignation from American Blind and (1) took electronic files and documents for which he no longer had access and (2) destroyed stored communications and electronic files by erasing them from the

11

computers. Moreover, Katzman made repeated attempts to hack into American Blind's VPN from his IP address following his resignation. Although American Blind's VPN log indicates that those attempts failed, if any of those attempts did succeed, such hacking would constitute a direct violation of Section 2701.

As noted by the court in *In re Intuit Privacy Litigation*, 138 F. Supp. 2d 1272, 1276 (C.D. Cal. 2001), "[t]he primary act required for violation of Section 2701 is the act of accessing electronically stored data. For example a hypothetical 'hacker' who accesses data in a computer without the owner's knowledge would be guilty of violating Section 2701 ...." Katzman has exhibited the type of conduct prohibited under this federal statute. Accordingly, American Blinds is likely to succeed on the merits of its claim under the Electronic Communications Privacy Act.

c)    **Violation of MUTSA**

As with the CFAA, there is more than one way for a civil claimant to establish a violation of the MUTSA. Under the "acquisition" prong of that statute, a plaintiff must show that (1) the defendant acquired a trade secret; (2) the trade secret belonged to the plaintiff; and (3) the defendant acquired the trade secret with knowledge or reason to know that the acquisition was by improper means. M.C.L. § 445.1902(b)(i).

Under the "disclosure or use" prong, a plaintiff establishes a right to recover by showing that (1) the defendant disclosed or used a trade secret; (2) the trade secret belonged to the plaintiff; (3) the defendant disclosed or used the trade secret without the plaintiff's consent; and (4) that either (a) the defendant used improper means to acquire the trade secret; or (b) the defendant knew or had reason to know that he or she acquired the trade secret under circumstances giving rise to a duty to maintain its secrecy or limit its use. M.C.L. § 445.1902(b)(ii). Courts can enjoin both actual and threatened misappropriation under the

12

MUTSA, and they can order any affirmative conduct they deem necessary to protect trade secrets. *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 813 (Mich. Ct. App. 2002).

American Blind has shown that it will succeed under both the "acquisition" and "disclosure or use" prongs of the MUTSA. The Competitive Matrix and the Employee Handbooks are certainly "trade secrets" under the MUTSA because they constitute "information, . . . compilation[s], program[s], device[s], method[s], technique[s], or process[es]" that derive independent economic value both by not being generally known or available by proper means by others who might stand to benefit from knowing them, and being subject to reasonable efforts to maintain their secrecy. M.C.L. § 445.1902(d); *see also, e.g., United Rentals (North America), Inc. v. Keizer*, 355 F.3d 399, 412-13 (6th Cir. 2004) (customer list is a trade secret under MUTSA);[3] Levine Aff. at ¶ 39. It is also indisputable that both the Competitive Matrix and the Employee Handbook were created by American Blind personnel for American Blind's exclusive use, and belong to American Blind. *See* Levine Aff. at ¶ 41.

Yet Defendant's July 17-21, 2006 emails reveal that Defendant was using them for his own purposes, without American Blind's consent. Levine Aff. at ¶¶ 37-39. Indeed, barely a month before his July 2006 emails, Defendant affirmatively promised not to keep or use such American Blind property in that manner. Levine Aff. at ¶¶ 28-30. It would therefore defy all logic and reason to conclude that Defendant obtained the Competitive Matrix by anything but improper means, or that he used them with American Blind's consent. Moreover, given

---

[3]    In *United Rentals*, the Sixth Circuit affirmed denial of a preliminary injunction on the plaintiff former employer's MUTSA claim, but only because there was affirmative evidence that the people to whom its former president disclosed the customer list (the former employer in *United Rentals* pursued its MUTSA claim against a competing company, but not the former president) **decided not to use the list**. 355 F.2d at 412-13. Here, by contrast, Defendant's own email messages reveal that he is actively using American Blind's customer list in conjunction with starting his new company. Levine Aff. at ¶¶ 35-37.

13

Defendant's ongoing promises (as evidenced by the July 2006 emails, the Hardware Agreement, and the Employment Agreement), it is beyond dispute that Defendant knew the circumstances under which he obtained the Competitive Matrix and Employee Handbook obligated him to keep them secret and limit their use.[4] Based on the foregoing, American Blind will likely succeed on the merits of its claims under MUTSA. *See, e.g., ACS Consultant Co., Inc. v. Williams*, No. 06-11301, 2006 WL 897559, *7 (E.D. Mich. Apr. 6, 2006) (preliminary injunction granted against former employees who "absconded with client and employee information and would continue to violate the terms of [their] employment agreements, as it appear[ed] they intended to use this information at clients/competitors"); *Superior Consultant Co. v. Bailey*, No. 00-CV-73439, 2000 WL 1279161, *10 (E.D. Mich. Aug. 22, 2000) (preliminary injunction granted against former employee on former employer's breach of employment agreement and MUTSA claims where there was "strong circumstantial evidence" that former employee accessed "confidential information about [former employer] that would be of economic value to third party competitors, . . . [such as] business plans [and] pitched work"); *PepsiCo., Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (affirming issuance of preliminary injunction against former employee on MUTSA claim for threatened misappropriation where employee demonstrated a lack of trustworthiness); *c.f. CMI Int'l, Inc.*, 649 N.W.2d at 813 (inevitable disclosure doctrine applies where ex-employer shows more than just "the existence of generalized trade secrets" and knowledge of those trade secrets on the part of new employer; doctrine not applicable if there is "no evidence of [former employee's] duplicity" or a "specific trade secret [ex-employee was] likely to misappropriate").

---

[4]    Defendant's lack of candor and eagerness to use American Blind's property even as he promises not to is troubling, to say the least.

#### d)    Common-law conversion

To succeed on a claim for common-law conversion, a plaintiff must show that the defendant "wrongfully exerted" "any distinct act of domain . . . over [plaintiff's] personal property in denial of or inconsistent with the [defendant's] rights [in that property]." *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (1992).

As explained above, the Competitive Matrix and the Employee Handbook are American Blind's property. Levine Aff. at ¶ 39. Upon his resignation, pursuant to the Employment Agreement, any rights Defendant may have had with respect to them ceased. Following Defendant's resignation, American Blind and American Blind's counsel repeatedly informed Defendant of this fact in numerous emails. *See generally* Levine Aff. Defendant even acknowledged that he had no ongoing rights in any such American Blind property, at least twice. Levine Aff. at ¶¶ 27-29. Yet despite these acknowledgements, it is clear that Defendant has been utilizing the Competitive Matrix and the Employee Handbook, altering them, and – more to the point – adapting them for use in a new company Defendant is starting to compete with American Blind. American Blind will doubtless succeed on the merits of its claim for common-law conversion, and preliminary injunctive relief is proper. *See, e.g., Kimberly & European Diamonds, Inc. v. Burbank*, 684 F.2d 363 (6th Cir. 1982) (preliminary injunction granted on diamond wholesaler's conversion claim against lender[5]).

#### e)    Tortious Interference

The elements of tortious interference with a business expectancy are (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant; (4) inducement or causing

---

[5]    The Sixth Circuit's decision in Kimberly applied Kentucky law, not Michigan law, but the elements of common-law conversion are nearly identical in each state. *See Kimberly*, 684 F.2d at 365-66; *Foremost Ins. Co.*, 486 N.W.2d at 606.

of a breach or termination of the relationship or expectancy by the defendant; and (5) damages resulting to the plaintiff. *BPS Clinical Laboratories v. Blue Cross and Blue Shield of Michigan*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996). A plaintiff can establish a tortious interference by showing that it has been defamed by the defendant. *Fielder v. Greater Media, Inc.*, LC No. 04-436195-CZ, 2006 WL 2060404, *4 (Mich. Ct. App. July 25, 2006).

As American Blind's CEO, Defendant had first-hand knowledge of the business relationships and expectancies of American Blind. Defendant abused this knowledge by communicating to several of American Blind's customers, vendors, and creditors and implying that American Blind was in financial distress. Levine Aff. at ¶ 18. Specifically, Defendant falsely indicated to First Data that American Blind was in financial distress. Id. As a result, First Data withdrew a significant amount of American Blind's credit, forcing American Blind to seek a line of credit elsewhere, at an unfavorable interest rate. Id at ¶¶ 19-20. In short, Defendant intentionally interfered with American Blind's expectancy of its continued credit relationship with First Data. That credit relationship was terminated and American Blind suffered financially as a direct result of Defendant's conduct. Preliminary injunctive relief is proper to prevent any further wrongful interference by Defendant. *Leach v. Ford Motor Co.*, 299 F. Supp. 2d 763 (E.D. Mich. 2004) (preliminary injunction granted against former employer where former executive sued employer for tortious interference); *see also Easton Sports, Inc. v. Warrior LaCrosse, Inc.*, No. 05-CV-72031, 2005 WL 2234559 (E.D. Mich. Sept. 14, 2005) (denying defendant's motion to dismiss tortious interference claim in advance of hearing on plaintiff's motion for temporary restraining order and preliminary injunction).

### f)    Breach of Contract

The elements of breach of contract under Michigan law are (1) the existence of a valid contract between the parties and (2) breach of a contractual term. *American Parts Co., Inc. v*

16

*American Arbitration Ass'n*, 154 N.W.2d 5 (Mich. Ct. App. 1967). A valid contract exists where (a) the parties are competent to contract; (b) the contract covers a proper subject matter; (c) there is legal consideration; (d) there is mutuality of agreement; and (e) there is mutuality of obligation. *Thomas v. Leja*, 468 N.W.2d 58 (Mich. Ct. App. 1991).

There can be no dispute that the Employment Agreement constituted a valid contract between Defendant and American Blind. Both parties were clearly competent to enter into the contract, and the subject matter of the contract (i.e., the terms of employment of a chief executive officer) is proper. Legal consideration passed to each party under the contract: American Blind received the benefits of its CEO's services and promises to engage in, and refrain from, certain conduct in exchange for paying certain stated compensation and benefits. Both parties clearly agreed to the terms of the contract, and each was obligated to perform under it.

Similarly, there can be no dispute that Defendant breached several ongoing terms of the Employment Agreement – specifically, the provisions barring Defendant from taking with him and using confidential American Blind records and information. *See* Levine Aff., Ex. A at ¶¶ 11(a), 11(b). Defendant himself actually acknowledged being subject to those terms, even as he was in the process of violating them. Levine Aff., ¶¶ 27-29. As the accompanying Affidavit of Joel Levine shows, Defendant has taken with him several American Blind proprietary records (the Competitive Matrix, the Employee Handbook, and likely more), and he has also been using them. Defendant's actions plainly violate the terms of the Employment Agreement, and preliminary injunctive relief is proper.

Moreover, the Employment Agreement explicitly contemplates injunctive relief in the event of Defendant's breach of Section 11 of that agreement (and even provides that American Blind need not demonstrate irreparable harm):

17

> [Defendant] agrees that the covenants contained in Section 11 of this Agreement relate to matters which are of a special, unique and extraordinary character and that [American Blind] cannot be reasonably or adequately compensated in damages in an action at law in the event [Defendant] breaches any of these covenants or undertakings. Therefore, [Defendant] agrees that [American Blind] shall be entitled, as a matter of course, without the need to prove irreparable injury, to an injunction, restraining order or other equitable relief from any court of competent jurisdiction, restraining any violation or threatened violation of any such terms by executive.

Levine Aff., Ex. A at § 11(f)(ii). Thus, not only is American Blind entitled to injunctive relief under Michigan Law, but Defendant has already agreed, in writing, to that relief.

### 2. American Blind will be irreparably harmed absent immediate injuntive relief

Defendant currently possesses proprietary records belonging to American Blind that are critical to American Blind's competitive prospects, including, in particular, American Blind's Competitive Matrix. Defendant also currently possesses other American Blind documents, including the Employee Handbook, which was created at considerable expense by and for American Blind's personnel. Despite signing, and acknowledging, contractual provisions specifically barring him from doing so, Defendant is using these records to the detriment of American Blind. Each day that passes with these records in Defendant's possession brings increased dangers that American Blind's business will suffer, and its competitive position compromised. These dangers are also precisely the type of irreparable harm from which courts routinely deliver plaintiffs with preliminary injunctive relief. *See, e.g., Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847-48 (E.D. Mich. 1994) (harm emanating from loss of proprietary information, which effects the loss of fair competition, puts plaintiff at a competitive disadvantage, and is both immeasurable and irreparable).

As set forth above, and as set forth in the accompanying Affidavit of Joel Levine, the

18

vitality of American Blind's business has been jeopardized by Defendant's actions. Defendant has already evidenced a willingness to damage American Blind's goodwill among various customers or creditors by contacting First Data, among others, to falsely indicate that American Blind is suffering financial distress. How many other companies has Defendant contacted to disparage American Blind? Damaging goodwill works irreparable harm, and is precisely the type of conduct warranting preliminary injunctive relief. *See, e.g., Merrill Lynch Pierce Fenner & Smith v. Ran*, 67 F. Supp. 2d 764, 778 (E.D. Mich. 1999) (granting injunctive relief against former employee; noting that goodwill among customers "is an invaluable intangible" and "is not easily quantified. Given the complexities and uncertainties of developing a client base, unless injunctive relief is granted now, the impact of defendants' breaches on [plaintiff] simply cannot be measured."); *ACS Consultant Co., Inc.*, 2006 WL 897559 at *7 ("courts regularly have concluded that there is no adequate remedy at law where trade secrets and confidential information are absconded because the injuries a former employer suffers in connection with the loss of its competitive edge are indefinite and speculative.").

### 3. Granting the injunction will not harm anyone

"Whether injunctive relief would cause substantial harm to others centers on the balance of hardship between the parties." *Superior Consultant Co.*, 2000 WL 1279161 at *12. By this Motion, American Blind does not seek to harm anyone, and nobody will in fact be harmed by granting it. To the contrary, the only effect issuing injunctive relief would have is to prevent Defendant from doing the very wrongful acts he is already contractually barred from doing. *See ACS Consultant Co., Inc.*, 2006 WL 897559 at *8 (granting injunction, noting that "the injunctions sought here do not impose substantial harm on the individual defendants because the injunctions sought merely track the restrictive language of the Employment Agreements."). Yet American Blind "would suffer irreparable harm if [Defendant] disclosed [American Blind]'s

19

trade secrets or confidential information, . . . [or] used that information to unfairly compete against [American Blind]. *Superior Consultant Co.*, 2000 WL 1279161 at *12. Given that Defendant "voluntarily entered into his Employment Agreement and agreed to the limitations that [American Blind] now seeks to enforce," Defendant simply cannot complain about any harm that may, in fact, befall him. *ACS Consultant Co., Inc.*, 2006 WL 897559 at *8.

### 4.    The public interest will be served by issuing the injunction

"Michigan law provides that the public interest is promoted in protecting confidential information and enforcing valid employment agreements." *Id.* at *8, citing M.C.L. § 445.774a. On the other hand, there is no public interest that excuses Defendant's breaches of the Employment Agreement, his intentional and wrongful acquisition, use, and disclosure of American Blind's confidential and proprietary information, or his intentional and fraudulent acts in erasing American Blind computers and attempting to "hack" into the American Blind computer network. American Blind's Motion must therefore be granted.

### V.    CONCLUSION

Defendant has violated various statutes and ongoing provisions of his Employment Agreement since his resignation as American Blind's CEO. He has done so by unlawfully destroying American Blind proprietary property, by taking with him and using for his own purposes trade secret and confidential American Blind files, and by interfering with American Blind's existing relationships with its customers, vendors, and creditors. Every passing day Defendant possesses and uses American Blind's Competitive Matrix and Employee Handbook works continued and increasing harm on American Blind's goodwill with its customers and its business prospects with both existing and potential customers. Unless Defendant is ordered to immediately return all American Blind confidential and proprietary information in his

20

possession, and unless Defendant is ordered to immediately stop using American Blind property he wrongfully took with him when he departed, American Blind will be irreparably harmed. There is no adequate remedy at law that can compensate American Blind for this harm.

WHEREFORE, Plaintiff, American Blind, respectfully requests that this Court enter a temporary restraining order and preliminary injunction that:

(a)    Enjoins Defendant from using any American Blind proprietary documents, files, programs, or other information, including, but not limited to, the Competitive Matrix and the Employee Handbook, for any purpose;

(b)    Requires Defendant to immediately return to American Blind all copies, including original copies, in whatever form, of any American Blind documents, files, programs, or other information in Defendant's possession, whether modified or in original form;

(c)    Requires Defendant to immediately cease communicating with any American Blind customers, creditors, or vendors any false, defamatory, or otherwise negative statements concerning American Blind;

(d)    Requires Defendant to immediately comply fully and completely with Defendant's ongoing obligations under paragraphs 11(a) and 11(b) of the Employment Agreement;

(e)    Requires Defendant to immediately provide a list of every document, file, and program, and all data, which Defendant erased or caused to be erased from the two desktop computers in Defendant's former office at American Blind and the laptop computer which American Blind provided for Defendant's use while employed at American Blind; and

(f)    Awards to American Blind all other, further, and different relief that this Court deems just and proper.

                                            DICKINSON WRIGHT PLLC


                                            BY: _____
                                                SCOTT A. MACGRIFF (P55864)
                                                Attorneys for Plaintiff
                                                500 Woodward Avenue
                                                Suite 4000
                                                Detroit, MI 48226
                                                (313) 223-3477
                                                Email: smacgriff@dickinsonwright.com


Date:    August 10, 2006

DETROIT 24336-8 950002v1



# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

AMERICAN BLIND AND WALLPAPER
FACTORY, INC.,

                                    Case No.

                 Plaintiff,

v.                                  Hon.

STEVE KATZMAN,             JURY TRIAL DEMANDED

                 Defendant.

---

Scott A. MacGriff
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
Tel: (313) 223-3477
Fax: (313) 223-3598
*Attorneys for Plaintiff*

---

## AFFIDAVIT OF JOEL P. LEVINE IN SUPPORT OF AMERICAN BLIND'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

STATE OF MICHIGAN    )
                          ) ss.:
COUNTY OF WAYNE     )

The undersigned, Joel P. Levine, having been duly sworn on oath, does depose and states as follows:

    1.    My name is Joel P. Levine. I currently reside at 660 Hermitage Circle, Palm Beach Gardens, Florida 33410.

    2.    I was born on January 11, 1948.

    3.    I am the Chief Executive Officer of American Blind and Wallpaper Factory, Inc. ("American Blind").

4.    In 1998, Steve Katzman ("Katzman") became American Blind and Wallpaper Factory, Inc.'s Chief Executive Officer.

5.    On June 5, 2000, American Blind and Wallpaper Factory, Inc. ("American Blind") and Katzman entered into an Amended and Restated Employment Agreement, under which Katzman was to serve as CEO for an additional three years (the "Employment Agreement"). (A copy of the Employment Agreement is annexed hereto as Exhibit A and is hereby incorporated by reference.)

6.    Paragraph 11(a) of the Employment Agreement contains a provision forbidding Katzman from using American Blind proprietary information for his own personal benefit or for the benefit of anyone other than American Blind without American Blind's consent following termination of Katzman's employment at American Blind, and forbidding him to do so while employed at American Blind absent his good-faith belief that doing so is necessary or desirable to fulfill his duties as CEO. (*See* Exhibit A at p. 9.)

7.    Paragraph 11(b) of the Employment Agreement contains a provision forbidding Katzman from retaining any confidential American Blind records upon his termination from American Blind, and requiring him to promptly return to American Blind such records upon his termination. (*See* Exhibit A at p. 9.)

8.    On September 18, 2003, American Blind and Katzman renewed the Employment Agreement and extended the term of his tenure as CEO through December 31, 2005.

9.    Beginning on January 1, 2006, pursuant to agreement with American Blind, Katzman continued to serve as American Blind's CEO on a month-to-month basis, receiving the same salary and benefits as set forth in the Employment Agreement.

10.    On February 14, 2006, Katzman executed an Employee Hardware Loan Agreement with American Blind which obligated Katzman to return, upon his departure from American Blind, the company laptop computer and related accessories that American Blind furnished for him for business use and communications, among other things (the "Hardware Agreement"). (A copy of the Hardware Agreement is annexed hereto as Exhibit B and is hereby incorporated by reference.)

11.    I was advised that by American Blind's CFO, Gerald Curran, that at approximately 4:30 p.m., on May 18, 2006, he and Katzman participated in a telephone conference from Katzman's office at American Blind. Gerald Curran further advised me that at that time, various property of American Blind, including files, documents, records, electronic data, computer files, and other proprietary information was located in Katzman's office and on the two desktop computers also in his office (the "Company Property").

12.    Later that evening on May 18, 2006, Katzman voluntarily resigned from American Blind. (A copy of the Katzman's resignation letter is annexed hereto as Exhibit C.)

13.    At approximately 8:00 a.m. on the morning of May 19, 2006, I entered Katzman's former office at American Blind and discovered that the Company Property that was present only the evening before was missing from Katzman's office.

14.    On or about May 19, 2006, Greg Rupprecht, American Blind's Vice President of Technical Operations, inspected the two desktop computers that were in Katzman's office at American Blind and were provided for and used by Katzman for business communication and other purposes.

15.    Mr. Rupprecht advised me that all of the electronic documents and emails had been erased from the desktop computers.

16.    On May 19, 2006, American Blind demanded that Katzman return the Company Property by 5:00 p.m. on May 22, 2006. (A copy of S. Greenspon's May 19, 2006 correspondence is annexed hereto as Exhibit D.)

17.    On May 19, 2006, Katzman's access to the American Blind's Virtual Private Computer Network ("VPN") was discontinued.

18.    On May 19, 2006, I learned that Katzman had been communicating with certain vendors and creditors of American Blind, including, but not limited to, First Data, Woodland Blinds, and Prestige Manufacturing following Katzman's resignation from American Blind. I believe that Katzman falsely indicated or implied to these entities that American Blind was in financial distress.

19.    On May 19, 2006, I was also advised that following Katzman's communication with First Data, an entity that processed American Blind's credit card transactions, that First Data had put a "hold" on $750,000.00 of American Blind's transaction receipts, leaving it with a cash shortfall.

20.    As a result of First Data's "hold", American Blind was forced to increase is borrowings from its lender in this same amount of $750,000.00 and thereupon pay interest in order to borrow its own money.

21.    On May 19, 2006, counsel for American Blind sent Katzman a letter demanding that he cease and desist his communications with the vendors and creditors of American Blind. (A copy of S. Greenspon's May 19, 2006 correspondence is annexed hereto as Exhibit E.)

22.    On June 5, 2006, Katzman informed counsel for American Blind that he was going to send a disk to American Blind containing 4,368 company-related e-mails. (A copy of Katzman's June 5, 2006 e-mail is annexed hereto as Exhibit F.) Katzman also informed American Blind's counsel that he was forwarding to his attorney a copy of the disk for safekeeping, "in the event a dispute arises where [sic] the integrity of the information becomes important." (*See* Exhibit F.)

23.    Katzman further stated in his June 5, 2006 correspondence that he was in the process of reviewing over 15,000 electronic files and documents so that he could remove any "personal" items before sending them to American Blind. (*See* Exhibit F.)

24.    Katzman also stated in his June 5, 2006 correspondence that as soon as he completed his review of the files and documents, he would forward to American Blind a disk containing all corporate records that he had archived. (*See* Exhibit F.)

25.    On June 12, 2006, Irma Kline, American Blind's Vice President of Human Resources, resigned from American Blind.

26.    On June 12, 2006, American Blind received a disk from Katzman, which purportedly contained all of the company-related emails.

27.    By email dated June 12, 2006, Katzman advised counsel for American Blind that he was still working to assemble the electronic files and documents demanded by American Blind, and that he intended to send the remaining files in his possession that

week. (A copy of Katzman's June 12, 2006 e-mail is annexed hereto as Exhibit G.)

Katzman acknowledged in this e-mail that he was required, pursuant to paragraph 11(b)

of the Employment Agreement, to return to American Blind all documents and records in

his possession containing proprietary information. (*See* Exhibit G.)

28.     Katzman also stated in his June 12, 2006 email that he would maintain the

integrity of the American Blind proprietary information in his possession, and that he

intended to comply with the nondisclosure requirements set forth in paragraph 11(a) of

the Employment Agreement. (*See* Exhibit G.)

29.     By email on June 14, 2006, Katzman advised counsel for American Blind

that he was returning all company emails and documents that were archived on his home

computer. (A copy of Katzman's June 14, 2006 e-mail is annexed hereto as Exhibit H.)

Katzman further stated that he had already provided a copy of all such files to his

attorney for safekeeping, "in the event a dispute arises where the integrity of the

information becomes important." (*See* Exhibit H.) Katzman also stated that he would

not personally retain a copy of these files, nor would he or anyone acting on his behalf

access information contained in those files for any purpose forbidden by the Employment

Agreement. (*Id.*)

30.     On June 21, 2006, counsel for American Blind received a disk from

Katzman purportedly containing American Blind's electronic files and documents.

31.     Also on June 21, 2006, counsel for American Blind demanded that

Katzman return the American Blind company laptop computer and related accessories,

which Katzman was required to do under the Hardware Agreement. American Blind's

counsel demanded the return of the computer by 5:00 p.m. on June 22, 2006. (A copy of S. Greenspon's June 21, 2006 correspondence is annexed hereto as Exhibit I.)

32.    On June 22, 2006, Katzman then inquired whether American Blind would "sell" him the laptop so that he would not have to return it. (A copy of Katzman's June 22, 2006 e-mail is annexed hereto as Exhibit J.)

33.    I immediately rejected Katzman's request and demanded the laptop's return. (A copy of my June 22, 2006 e-mail is annexed hereto as Exhibit K.)

34.    Thereafter, Katzman returned his laptop computer to American Blind.

35.    Following its return, Mr. Rupprecht inspected the laptop.

36.    Following his inspection, Mr. Rupprecht advised me that the entire contents of the laptop – including all electronic data, documents, and files – had been erased from it.

37.    On July 17, 2006, Katzman sent an e-mail message to the American Blind e-mail address of Irma Kline attaching a spreadsheet containing detailed information about American Blind's competitors, which spreadsheet had been developed by and belonged to American Blind (the "Competitive Matrix"), and requesting that Kline add additional information to the Competitive Matrix. (A copy of Katzman's July 17, 2006 e-mail is annexed hereto as Exhibit L.)

38.    On July 21, 2006, Katzman sent another e-mail message to Kline's American Blind email address, attaching a red-lined version of American Blind's employee handbook (the "Employee Handbook") which contains numerous edits to the handbook and details the emergence of Katzman's new company (called "Nationwide

Blinds & Wallpaper Factory"). (A copy of Katzman's July 21, 2006 e-mail and the red-lined handbook attached thereto is annexed hereto as Exhibit M.)

39.    On July 21, 2006, Katzman again forwarded the Competitive Matrix to Kline's American Blind e-mail address. (A copy of Katzman's July 21, 2006 e-mail is annexed hereto as Exhibit N.)

40.    Thereafter, American Blind immediately conducted a thorough search of its computer systems in order to determine the nature and quantity of Katzman's attempts to access American Blind proprietary information following his termination. American Blind discovered that 22 separate attempts had been made since Katzman's resignation to log on to American Blind's VPN from Katzman's IP address using Katzman's, Kline's, and Rupprecht's ID's and passwords. (A copy of the relevant portion of American Blind's VPN log from this time period, which reflects these log-on attempts, is annexed hereto as Exhibit O.)

41.    The Competitive Matrix and Employee Handbook contain confidential and proprietary American Blind information. Both are American Blind property created by and for American Blind employees, and both are the subject of numerous measures to keep their contents confidential. The Competitive Matrix is extremely valuable to American Blind's operations because it provides a comprehensive and succinct analysis of American Blind's competitors' businesses, enabling American Blind to develop and implement competitive processes designed to maximize its own business. The Employee Handbook is similarly valuable because it is the key mechanism through which American Blind secures its employees' loyalty and effective work performance. Moreover, all employees are required to sign a statement agreeing to return the employee handbook to

the company upon termination of employment. Both the Competitive Matrix and the
Employee Handbook would be immensely valuable to any person or entity who wishes to
compete with American Blind, and they are not available through any legitimate channels
to any such person or entity

42.     It is my belief that Katzman acquired the Competitive Matrix and the
Employee Handbook from the company laptop computer and desktop computers he used
while employed at American Blind. It is also my belief that, prior and subsequent to his
resignation, Katzman has been using the Competitive Matrix and the Employee
Handbook in order to help him create a new business to compete with American Blind,
called "Nationwide Blinds and Wallpaper Factory". Katzman's efforts to found
Nationwide are detailed in the first page of the red-lined Employee Handbook, which
Katzman has adapted for use in his new company. It is also my belief that Katzman may
possess additional American Blind proprietary records and may be using them to help
create his competing business. Each day that Katzman possesses and uses American
Blind confidential and proprietary information brings increasing danger that American
Blind will lose market share and the goodwill of its customers.

43.     After discovering Katzman's repeated attempts to log on to American
Blind's VPN, American Blind personnel spent considerable hours evaluating its network
and having each and every American Blind employee go through the process of changing
their passwords. These procedures have distracted American Blind's business and
sapped the productivity of key employees. American Blind estimates that Katzman's
conduct has already cost the company more than $5,000.00 in lost time and other
resources.

_____
Joel P. Levine

**SWORN** to before me
this **9**th day of August 2006.

_____
Notary Public

CHRYSOULA C. NTALI
Notary Public, Wayne County, MI
My Commission Expires June 8, 2007



## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This Amended and Restated Employment Agreement made this _5th_ day of _June_, 2000, between DECORATETODAY.COM, INC. a Delaware corporation, with its principal office at 909 N. Sheldon Road, Plymouth, Michigan, (the "Corporation"), and STEVEN B. KATZMAN, residing at 10755 Oxbow Lake Shore Drive, White Lake, MI 48386, (the "Executive").

### WITNESSETH

WHEREAS, Executive is currently the chief executive officer ("CEO") of the Corporation pursuant to the terms of that certain Employment Agreement dated August 14, 1998, by and between the Executive and the Corporation (the "Original Employment Agreement");

WHEREAS, the Corporation desires to secure the continued services of Executive, and Executive desires to continue to furnish services to the Corporation, on the terms and conditions hereinafter set forth; and

WHEREAS, concurrently with the execution of this Agreement, the Corporation is entering into that certain Stock Purchase Agreement with Primus Capital Fund IV Limited Partnership, Primus Executive Fund Limited Partnership and certain other co-Investors, for the purchase of Class A shares of the Corporation (the "Investment"); and

WHEREAS, it is a term and condition of the Investment that the Executive enter into this Amended and Restated Employment Agreement upon the terms and conditions herein contained.

NOW, THEREFORE, in consideration of the premises and the mutual agreements hereinafter contained, the parties hereto hereby agree as follows:

1.    **Employment**. The Corporation shall employ Executive, and Executive shall serve the Corporation upon the terms and conditions hereinafter set forth.

2.    **Term**. Subject to the terms and conditions hereinafter set forth, the term of Executive's employment hereunder shall commence on the date hereof, (the "Effective Date"), and shall continue until the third anniversary of the Effective Date, unless earlier terminated pursuant to Sections 8, 9 or 10 herein (the "Initial Employment Term"). Unless earlier terminated pursuant to Sections 8, 9 or 10 the Initial Employment Term (and each one-year extension thereof pursuant to this sentence (each, an "Extended Employment Term")) may be extended upon the same terms and conditions as set forth herein for additional one year terms by mutual agreement of the Executive and the Corporation, no later than the ninety (90) days prior to the expiration of the Initial Employment Term (or Extended Employment Term, as applicable). The Initial Employment Term and all

**Page 1**

K:\ETA\SJG\dtd\agmt\emplagmkatzman-2000-6.wpd

Extended Employment Terms (if any) are hereinafter collectively referred to as the "Employment Term".

3.    **Duties and Extent of Service.** During the Employment Term, Executive shall serve as CEO of the Corporation, and shall devote substantially all of his business time, energy and skill to such employment. The Executive shall be vested with the duties and authority that are customarily delegated to a chief executive officer of a corporation of similar size but which are in no event materially less than the responsibilities, duties and authority that Executive has as of the Effective Date. The Executive shall report only to, and be subject to the direction, of the Board of Directors of the Corporation (the "Board"). The Executive shall also perform such other specific duties and services of a senior executive nature commensurate with his position as the Board shall request, including, without limitation, serving as a senior officer and/or director of any of the Corporation's subsidiaries.

4.    **Base Salary.** Effective as of the commencement of the Corporation's current fiscal year and during the Employment Term, the Corporation shall pay Executive a base salary ("Base Salary") at a rate of Three Hundred Eighty-Five Thousand United States Dollars (U.S. $385,000) per annum, payable in equal bi-weekly installments. Commencing as of January 1, 2001 and at the beginning of each calendar year thereafter during the Employment Term, the Base Salary shall automatically increase by Five Percent (5%) of the Base Salary then in effect. The parties hereto hereby agree that the Executive's Base Salary shall be reviewed and may be modified by the Corporation's Compensation Committee, on not less than an annual basis commencing as of January 1, 2001; provided, however that in no event shall the Executive's Base Salary be reduced from the Executive's Base Salary as of the Effective Date and in no event shall the Executive's Base Salary be increased by any less than Five Percent (5%) per annum of the Base Salary then in effect.

5.    **Incentive Compensation.** In addition to the Base Salary payable to Executive as set forth in Section 4 hereinabove, Executive shall also be entitled to incentive compensation as follows:

(a)    **Amount.** Executive shall be eligible to receive an annual bonus based upon the attainment of certain performance goals and objectives mutually agreed upon by the Corporation's Compensation Committee and Executive and in accordance with the Corporation's Business Plan, as may be approved annually by the Board of Directors of the Corporation. The bonus amount to be paid to the Executive, including any bonus to be paid to Executive for fiscal year 2000, will be determined annually by the Corporation's Compensation Committee. Specifically, such bonus will be paid to the Executive based initially on the Corporation's ability to meet fiscal year "Net Revenue" and "EBITDA Financial Performance Projections" ("Bonus Targets") as set forth in the Corporation's Business Plan from year to year. Notwithstanding the foregoing, the Executive will receive a bonus of not less than 30% of the Executive's then current Base Salary in any fiscal year during which both

K:\ETA\SJG\ltd\agmt\emplagmk\rtzman-2000-6.wpd

the Bonus Targets are met or exceeded. The Compensation Committee shall have the authority to pay the Executive a bonus in excess of 30% of the Executive's then current Base Salary in any fiscal year in which both the Bonus Targets are met or exceeded.

For purposes of determining the Executive's bonus compensation for the Corporation's fiscal year 2000, 5/12ths of such bonus shall be based upon 100% of the Executive's current Base Salary and 7/12ths of such bonus shall be based upon 30% of the Executive's current Base Salary. In addition, the parties hereto further agree that for fiscal year 2000, the Net Revenue and EBITDA Performance Projections shall be $137 million and an EBITDA loss no greater than $5 million, respectively, subject, however, to review and adjustments by the Corporation's Compensation Committee.

(b)   Certain Definitions. (i)  EBITDA Financial Performance Projections shall mean the EBITDA (consolidated earnings before interest, taxes, depreciation and amortization of the Corporation, as determined pursuant to generally accepted accounting principals in effect from time to time)  target for such fiscal year contained in the performance projections prepared and presented by the Executive and subsequently reviewed and approved by the Board; (ii)  Net Revenue shall mean the annual net sales of the Corporation as determined pursuant to generally accepted accounting principals in effect from time to time.

6.   Option Agreements. Concurrently with the execution of this Employment Agreement, the Executive and the Corporation shall each execute the Amended and Restated Option Agreement attached hereto and made a part hereto as Exhibit "A" and the new Option Agreement attached hereto and made a part hereof as Exhibit "B" (collectively, the "Option Agreements").

7.   Executive Benefits.

(a)   During the Employment Term, Executive shall receive all benefits which Executive has been receiving prior to the Effective Date from the Corporation, and all coverage and/or benefits under any and all medical insurance, life insurance and pension plans and other employee benefit plans of the Corporation generally made available to senior executives of the Corporation from time to time. Notwithstanding the foregoing, Executive shall be provided, at a minimum, and at no cost to Executive (other than taxes), life insurance of a value not less than four (4) times the Executive's then current Base Salary and long term disability insurance in an amount of not less than the lesser of the current level of disability insurance provided by the Corporation to the Executive as of the Effective Date or Sixty-five Percent (65%) of Executive's then current Base Salary (with an exclusion period of not more than six (6) months and based on an "executive's occupation" provision); provided, however, that the Executive shall be entitled to increase the amount of such disability insurance up to Sixty Five Percent (65%) of his then current Base

Page 3

Salary, at any time during the Term of this Agreement, so long as the premiums to be paid by the Corporation for such insurance are not disproportionately higher than the premiums that the Corporation is or would be paying for the Executive's disability insurance coverage as of the Effective Date. The Executive hereby represents that he has no reason to believe that he is not insurable at rates prevailing as of the Effective Date for healthy men of Executive's age.

(b)    The Executive shall be entitled to four (4) weeks paid vacation (taken consecutively or in segments), in accordance with the standard vacation policy of the Corporation for senior executives, in each calendar year during the Employment Term. Such vacations shall be taken at times consistent with the effective discharge of Executive's duties. In no event shall Executive be entitled to accrue any unused vacation from one year to the next.

(c)    During the Employment Term, Executive shall be accorded office facilities and secretarial assistance commensurate with his position as CEO of the Corporation and adequate for the performance of his duties hereunder.

8.    <u>Termination - Death or Disability</u>.

(a)    <u>Death</u>.  In the event of the termination of Executive's employment because of the death of Executive during the Employment Term, the Corporation shall pay to any one or more beneficiaries designated by Executive pursuant to notice to the Corporation, or, failing such designation, to Executive's estate: (i) accrued but unpaid Base Salary and vacation owing to the Executive; (ii) a bonus for the year in which such termination occurs, based upon the prior year's bonus received by the Executive <u>times</u> a fraction, the numerator of which is the number of days in such year prior to and including the effective date of such termination, and the denominator of which is three hundred sixty-five (365) (the "Pro Rata Bonus"), (such Pro Rata Bonus to be paid no later than the fifteenth (15th) day of the month immediately following the month of such termination).  Notwithstanding the foregoing, in the event that the Executive's employment is terminated as a result of the Executive's death prior to December 31, 2000, then the Executive's Pro Rata Bonus shall be deemed to be 30% of the Executive's Base Salary as of the Effective Date of this Agreement times the above-stated fraction ("Year 2000 Pro Rata Bonus"). In addition, while Executive's dependents remain eligible for COBRA continuation health coverage, the Corporation shall provide them with medical and other health benefits by paying the COBRA premiums therefor.

(b)    <u>Disability</u>.  In the event that Executive shall become Disabled (as hereinafter defined), the Corporation shall have the right to terminate Executive's employment hereunder by giving him written notice of such termination while he is still Disabled. Upon receipt of such notice, Executive's employment hereunder shall terminate. In the event of such termination, the Corporation shall pay to Executive: (i) the accrued but unpaid Base Salary and vacation owing to Executive; <u>plus</u> (ii) an

amount equal to the Base Salary that would have been paid to Executive for an additional period of one year, commencing as of the effective date of such termination, if Executive had not become Disabled and had instead continued to serve through such date, to be paid in equal bi-weekly installments; plus (iii) Executive's Pro Rata Bonus, or Year 2000 Pro Rata Bonus, as the case may be, if any, (such Pro Rata Bonus to be paid no later than the fifteenth (15th) day of the month immediately following the month of such termination).  In addition, while Executive or his dependents remain eligible for COBRA continuation health coverage, the Corporation shall pay the premiums therefore. For purposes hereof, "Disabled" shall mean, with respect to Executive, having been physically or mentally disabled, whether totally or partially, so that Executive has been substantially unable to perform his material responsibilities and duties hereunder for a consecutive period of more than six (6) months.

9.    **Termination for Cause by Corporation or Without Good Reason or Non-Renewal by Executive**.

(a)    *Termination for Cause*.  Executive's employment hereunder may be terminated by the Corporation for Cause (as hereinafter defined) upon compliance with the provisions of Section 9(b).  In the event that Executive's employment hereunder shall be terminated by the Corporation for Cause, the Corporation shall promptly pay to Executive: (i) accrued but unpaid Base Salary and vacation owing through the date of termination; and thereafter the Corporation shall have no further obligations under this Agreement except pursuant to Section 13 herein.  Upon termination of Executive's employment hereunder for Cause, Executive shall nonetheless remain bound by the obligations provided for in Section 11 as and to the extent set forth therein.  For purposes hereof, "Cause" shall mean: (i) the Executive's conviction of, or plea of *nolo contendere* to, a felony, (other than traffic violations in which there were no material aggravating factors or vicarious liability as a result of Executive's position if Executive did not have material knowledge of the matter or if he had such knowledge, he acted upon and in accordance with, advice of counsel); (ii) perpetration by Executive of wilful misconduct or gross negligence having a material adverse impact on the business, operations, property, condition (financial or otherwise) or prospects of the Corporation; (iii) the commission of any crime, as may be determined by a criminal or civil court of competent jurisdiction, involving moral turpitude or the commission of any act or omission involving dishonesty, disloyalty or fraud; (iv) reporting to work under the influence of alcohol or illegal drugs, the use of illegal drugs (whether or not at the workplace) or other willful or repeated conduct causing the Company or its affiliates or subsidiaries substantial public disgrace or disrepute or economic harm; (v) a material breach by Executive of his obligations pursuant to this Agreement; or (vi) Executive's failure to attempt to follow the reasonable direction from the Board, to the extent that such direction is within Executive's control; provided, however, that in the event the Board determines that Cause has arisen under Section 9(a)(vi) herein above, the Board shall be required to first give Executive written notice of

such action, specifying the particulars of the action or inaction of Executive, and Executive shall thereafter be provided with not less than seven (7) days to cure same (if such breach is reasonably capable of being cured).

(b)    Procedure. Termination for Cause shall be effected only by action of a majority of members of the Board then in office (excluding Executive and his designee) at a meeting duly called and held .

(c)    Termination Without Good Reason or Non-Renewal by Executive. Executive may terminate his employment hereunder without Good Reason (as hereinafter defined) by providing written notice to the Corporation to such effect (such termination to be effective on the date specified in such notice, which date shall not be more than sixty (60) nor less than thirty (30) days after the date of such notice). If Executive terminates his employment without Good Reason or elects to not renew his employment hereunder upon the expiration of the Initial Employment Term or any Extended Employment Term, then the Corporation shall promptly pay to Executive all accrued but unpaid Base Salary and vacation owing through the date of termination, and thereafter the Corporation shall have no further obligations under this Agreement except pursuant to Section 13 herein. Upon such termination by Executive, Executive shall nonetheless remain bound by the obligations provided for in Section 11, as and to the extent set forth therein.

10.    Termination for Good Reason by Executive or Without Cause or Non-Renewal by Corporation.

(a)    Termination for Good Reason. Executive's employment hereunder may be terminated by Executive for Good Reason by providing written notice to the Corporation to such effect (such termination to be effective on the date specified in such notice, which date shall not be more than sixty (60) nor less than thirty (30) days after date of such notice); provided, however, that the Corporation shall have a period of seven (7) days to cure the actions or inactions constituting Good Reason hereunder (if the same are reasonably capable of being cured).

(b)    Termination for No Reason. The Corporation shall have the right to terminate the Executive at any time, for any reason or no reason; provided, however, that any termination of the Executive by the Corporation, except for Cause as defined herein, shall be deemed a termination by the Corporation without Cause.

(c)    Payment. If at any time: (i) Executive terminates his employment for Good Reason; or (ii) the Corporation terminates Executive's employment without Cause, or the Corporation elects to not renew Executive's Employment for any Extended Term; then the Corporation shall pay to Executive, payable to the Executive in the same increments as if the Executive were still employed by the Corporation, following the date of termination, an amount (the "Base Severance Amount") equal to the greater of: (aa) the Executive's Base Salary then in effect

**Page 6**

through the end of the then current Employment Term (without giving effect to Executive's termination); or (bb) the sum of the Executive's then current Base Salary for a period of one year plus the Executive's Pro Rata Bonus (or Year 2000 Pro Rata Bonus, as the case may be) plus an amount equal to the Bonus paid to the Executive in the year prior to such termination. In addition, the Corporation shall pay to Executive: (cc) accrued but unpaid Base Salary and vacation which shall be paid through the date of such termination; plus (dd) the Corporation shall provide to Executive and his dependents, until the earlier of the date upon (which Executive obtains new employment or the first anniversary of the date of termination of Executive's employment with the Corporation, all medical, life, dental and other insurance coverage provided to Executive pursuant to Section 7, as of the date of such termination (the "Residual Insurance Amount"). Notwithstanding the foregoing, nothing herein contained shall be construed to limit Executive's COBRA rights thereafter.

(d)    Change of Control.    Notwithstanding anything set forth in Section 10(c), if the Corporation terminates Executive without Cause or elects not to renew Executive's Employment Agreement for any Extended Term, or if the Executive terminates his employment for Good Reason, each upon the occurrence of a change of control then the Corporation shall pay (or provide, as the case may be), to Executive, the same Severance Payment due to Executive as set forth in Section 10(c) hereinabove.

In addition, in the event that the Executive terminates his Employment for Good Reason, or is terminated by the Corporation without Cause or the Corporation declares its decision not to renew the Executive's Employment Agreement upon such Change of Control and in the event that upon or as a result of such Change of Control, the Corporation's Class A Shareholders receive cash or unrestricted stock at or above the levels set forth below, the Executive shall also receive an additional bonus, payable in a lump sum not less than 10 days after the effective date of such Change of Control, in an amount equal to One Million, Two Hundred Thousand and no/100 Dollars ($1,200,000.00) the ("Change of Control Bonus"). In order for the Executive to receive the Change of Control Bonus, the Corporation must receive cash or unrestricted stock at or above the following levels (after giving effect to the Change of Control Bonus).

(i)    May 31, 2000 - May 30, 2001, the price per share is equal to a 3x return to the Class A Shareholders;

(ii)    May 31, 2001 - May 30, 2002, the price per Share is equal to a 4x return to the Class A Shareholders.

(iii)    May 31, 2002 - May 30, 2005, the price per Share is equal to a 5x return to the Class A Shareholders.

(e)    Certain Definitions.

(i)    "Change of Control" shall mean (aa) the acquisition by any person or entity, directly or indirectly, of more than Fifty Percent (50%) of the common stock of the Corporation or otherwise more than Fifty Percent (50%) of the voting control of the Corporation; (bb) the sale of all or substantially all of the assets of the Corporation to such person or entity; or (cc) the merger or consolidation of the Corporation with or into such person or entity.

(ii)    "Good Reason" shall mean any of the following events after the Corporation's receipt from Executive of written notice thereof and the Corporation's failure to cure same within seven (7) days after its receipt of such notice:

(aa)    Executive shall be removed from the position of CEO at any time during the Employment Term (other than for Cause or due to death or Disability);

(bb)    Executive shall fail to be vested with the powers and authority of CEO of the Corporation as described in Section 3, or the title, powers and authority of such position or his responsibilities with respect thereto shall be diminished in any material respect;

(cc)    the Corporation shall have assigned to Executive, without his express written consent, any duties, functions, authority or responsibilities that are materially inconsistent with Executive's positions described in Section 3;

(dd)    Executive's principal place of employment is changed to a location outside of the Detroit, Michigan metropolitan area;

(ee)    the Corporation shall reduce Executive's then-current Base Salary or the benefits available to Executive as of the Effective Date pursuant to Sections 4 and 7; or

(ff)    the Executive is not offered employment by any acquirer of the Corporation upon similar economic and equity terms as the Executive has immediately prior to a Change of Control.

(f)    Survival. Without limiting other sections herein intended by their terms to survive Executive's termination of employment, upon any termination of Executive's employment pursuant to this Section 10, Executive shall nonetheless

remain bound by the obligations provided for in Section 11, as and to the extent set forth therein.

11.   Non-disclosure of Proprietary Information; Confidentiality and Surrender of Records; Inventions and Patents; Non-Compete.

(a)   Proprietary Information.  Executive shall not during the Employment Term or at any time thereafter (irrespective of the circumstances under which Executive's employment by Corporation terminates), directly or indirectly, use for his own purpose or for the benefit of any person or entity other than Corporation, nor otherwise disclose, any Proprietary Information, (as hereinafter defined), to any individual or entity, unless such disclosure has been authorized in writing by the Board or is otherwise required by law, or while employed by the Corporation, Executive, in good faith, believes that such disclosure is necessary or desirable in the fulfillment of his duties. "Proprietary Information" shall include, but is not limited to,: (a) the name or address of any customer, vendor or affiliate of Corporation or any information concerning the transactions or relations of any customer, vendor or affiliate of Corporation with Corporation; (b) any information concerning any product, technology or procedure being developed, tested or employed by Corporation but not generally known to its customers, vendors or competitors; (c) any information relating to Corporation's computer software, computer systems, pricing or marketing methods, sales margins, cost of goods, cost of material, capital structure, operating results, borrowing arrangements or business plans; (d) any confidential information belonging to customers, vendors or affiliates of Corporation which Corporation has agreed, in writing, to hold in confidence and has so notified Executive in writing; (e) any inventions, innovations or improvements covered by Section 11(c); (f) any other information which is confidential or proprietary; and (g) all written, graphic and other material relating to any of the foregoing. However, Proprietary Information shall not include any information that is or becomes generally known to the industries in which the Corporation competes through sources other than improper disclosure by Executive. It shall also not include Executive's knowhow and general knowledge about the sale through "800 numbers" or over the Internet of any wallpaper, blinds or other window treatments and wall coverings, or any other business in which the Corporation is actively engaged in at the time of termination of Executive's employment with the Corporation.

(b)   Confidentiality and Surrender of Records.  Executive shall not retain, and will deliver promptly to Corporation, any Confidential Records following termination of his employment.    "Confidential Records" shall mean all correspondence, memoranda, files, manuals, books, lists, financial, operating or marketing records, magnetic tape or electronic or other media or equipment of any kind which may be in Executive's possession or under his control or accessible to him which contain any Proprietary Information, but not Executive's rolodex or similar phone directories. All Confidential Records shall be and remain the sole property of Corporation during the Employment Term and thereafter.

Page 9