# EXHIBIT U

Dockets.Justia.com

```
                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA

GOOGLE, INC., a Delaware corporation,

              Plaintiff,
     vs.                          Case No. C 03-5340-JF

AMERICAN BLIND & WALLPAPER
FACTORY, INC., a Delaware corporation
d/b/a decoratetoday.com, Inc., and
DOES 1 - 100, inclusive,

              Defendants.
_____/

AMERICAN BLIND & WALLPAPER
FACTORY, INC., a Delaware corporation
d/b/a decoratetoday.com, Inc.,

              Counter-Plaintiff,
     vs.

GOOGLE, INC.,

              Counter-Defendant.
_____/
```

**CERTIFIED COPY**

        The video deposition of JEFFREY A. ALDERMAN, taken pursuant to the Rules of the State of California, before Lana Kia Haws, CRR, CM, RPR, CSR-0995, a Notary Public in the County of Oakland, Acting in the County of Wayne, State of Michigan, at the Inn at St. John's, 44045 Five Mile Road, Plymouth, Michigan, on August 4, 2006, commencing at or about the hour of 8:00 a.m.

APPEARANCES:
    Keker & Van Nest, LLP
    BY:  MR. MICHAEL H. PAGE
    710 Sansome Street
    San Francisco, CA  94111-1704
    (415) 391-5400
        Appearing on behalf of the Plaintiff.

    Kelley Drye & Warren, LLP
    BY:  MR. PAUL W. GARRITY
    101 Park Avenue
    New York, New York  10178
    (212) 808-7613
        Appearing on behalf of the Defendants.

**U.S. LEGAL**
*Support*
Certified Shorthand Reporters
180 Montgomery Street, Suite 2180
San Francisco, CA 94104

888-575-3376 • Fax 888-963-3376
www.uslegalsupport.com

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

1   A.   I don't.  Again, how it's printed out, I am
2   concerned with.
3   Q.   That, I can't help with.  That's how we
4   received it.
5   A.   These do look in the ballpark, 54 percent of
6   sales coming from internet campaigns in 2006.
7           MR. PAGE:  Mark as Exhibit 19.
8           (Mark'd for identification
9           was Deposition Exhibit No. 19.)
10  Q.   (BY MR. PAGE)  Exhibit 19 is a two-page string
11  of e-mails, Bates number GGLE00006336 and 7, the last
12  of which in time was from Bill Smith at decoratetoday
13  to Britton Mauchline at Google and several other people
14  at American Blind and Google concerning USA Wallpaper.
15          Have you seen this document before?
16  A.   No, I don't recall seeing this document.  It
17  may have been in the boxes that I went through over
18  the past few days and week.
19  Q.   Did American Blind, in fact, bring
20  USA Wallpaper's ad campaign to Google's attention
21  in January of 2003?
22  A.   That looks like what is being said here in
23  the e-mail.
24  Q.   And did Google inform American Blind that,
25  although they were matching on broad match, that one

1  solution would be to ask USA Wallpaper to put in

2  negatives on American Blind's trademarks?

3      A.  I am just reading the response here from

4  Britton.  She is saying that we can request to place

5  the keyword on an exact, which would eliminate them

6  from your branded search.

7      Q.  And your response to Google was that would be

8  great and how about also making our branded words

9  negative, correct?

10      A.  I don't think the word negative is there.

11          MR. GARRITY:  The top, the last e-mail.

12          MR. PAGE:  It says, also --

13          THE WITNESS:  Oh, I see, okay.

14          MR. GARRITY:  At the top of the page.

15          THE WITNESS:  Sorry.

16          MR. GARRITY:  Okay.

17          MR. PAGE:  We stepped all over her on

18  that one.

19      Q.  (BY MR. PAGE)  So, here is my question.

20          While you were asking Google to help you

21  in getting USA Wallpaper to establish exact matches in

22  negative keywords to protect your trademarks, why didn't

23  you do that for theirs?

24      A.  You know, I don't know the answer to that.  I

25  would assume we would need to ask Bill Smith or Joe

163

**U.S. Legal Support**

1  Charno.
2              If they put us as a negative keyword,
3  then our policy today, as it states, is to, if we have
4  an agreement with a competitor that is brought to our
5  attention, then -- there are alot of sounds here
6  today -- if we, again, have an agreement with a
7  competitor, that we will both put each other's brand
8  keywords into negative campaigns on each other's
9  accounts; and that's what we are doing today.
10             It's an open door policy.  We voluntarily
11 do that to all of our competitors that we come in
12 contact with.
13    Q.  Will you put your competitor's trademarks on
14 negative lists without an agreement with them?
15    A.  Will we put our -- will we put -- would you
16 rephrase that, please?
17    Q.  Let me rephrase it.
18             Do you feel that you have any obligation
19 to put your competitor's trademarks on negative lists
20 in your ad campaigns, independent of having an agreement
21 with them?
22    A.  Again, it's our policy and it seems to work
23 well -- it's an open policy -- that we, as we get
24 approached by a competitor, we will add them as negative
25 keywords to our campaigns.

                                                      164

**U.S. Legal Support**

    Q.  And it's also your policy that until -- that if your competitor doesn't approach you and ask, you won't, right?

    A.  We don't aggressively or knowingly bid on competitor's keywords.  We don't buy competitor's keywords and target ads on competitor's keywords.  That's not where we focus our efforts.

    Q.  But you know that you will get traffic on broad match as a result of people searching for your competitor's trademarks, unless you put them in negative lists, right?

    A.  That's correct.

    Q.  And knowing that, you don't put them in, unless your competitors demand that you do, correct?

    A.  If they bring it to our attention, then we will add them as a negative keyword.

    Q.  And if they don't bring it to your attention, you won't, right?

    A.  Again, at this point, it's an open-door policy.  If they come to us, we will do the same.  We don't -- we don't --

    Q:  My question is, if they don't come to you, will you do anything to avoid your broad matches hitting searches for their trademarks?

    A.  We target our ads accordingly with our company

165

name in the brand, in the ad copy. We don't go and add competitive keywords to our account.

Again, willingly, as it comes up, if it is brought to our attention, we will go and add a negative keyword in and it works great today.

Q. My question is, if it is not brought to your attention by your competitors, will you add their trade names as negative keywords?

A. Again, let me tell you, the policy today and how it stands is it's a volunteer policy. It will come if they come to us or we go to them.

Q. I am gonna keep asking this question 'til you answer it. All right?

If they don't come to you and demand that you put in their trademarks as negative keywords, you don't do it, do you?

A. We don't do that today.

Q. And you, nonetheless, send threatening letters to people threatening to sue them when they don't do that for you, correct?

A. We will approach them with, again, Scot Storrie is the process that we use. As we are aware of it, we will send the screen shot to him; and it's brought up to their attention that way.

Q. So your policy is to not proactively put in

166

1  your competitor's trade names as negatives; and yet you
2  threaten to sue your competitors if they have the same
3  policy, correct?
4          MR. GARRITY:  Object to the form.  You
5  can answer.
6          THE WITNESS:  Again, today, I will tell
7  you that we focus our efforts on protecting our brands.
8  We have got a lot of equity in our brands.
9          We do not, at this point in time, today,
10 go and add lists of our competitors into our program.
11         We do not buy their keywords.  I think I
12 just answered your question.
13     Q.  (BY MR. PAGE)  But you threaten to sue them
14 when they don't buy your keywords but hit them because
15 of a broad match, correct?
16     A.  We send them a generic cease and desist letter.
17     Q.  And that cease and desist letter says, do what
18 we want or we will sue you, in effect, correct?
19         MR. GARRITY:  Object to the form.
20         THE WITNESS:  I can't answer that.
21         THE VIDEOGRAPHER:  Why don't we go off
22 the record to see what's going on.  It's really
23 affecting the video and sound.
24         MR. PAGE:  Yes.
25         THE VIDEOGRAPHER:  Thank you.  Off the

                                                    167

**U.S. Legal Support**

1   record, 2:52:42 p.m.
2           (Recess taken.)
3           THE VIDEOGRAPHER: Back on the record,
4   3:02:18 p.m.
5           (Mark'd for identification
6           was Deposition Exhibit No. 20.)
7           MR. PAGE: Mark as Exhibit 20.
8       Q.  (BY MR. PAGE) Exhibit 20 is a multi-page
9   document captioned S.E.O. Overview, Appendix, ABWF045550
10  through 558.
11          Have you seen this document before?
12      A.  Yes. This looks like a document that I have
13  created.
14      Q.  Do you know when you created this document?
15      A.  You know, I don't recall the timing. It looks
16  like it's through June 1st, 2005.
17          That's a forecast. So probably around
18  that time period is what I would say.
19      Q.  I see. So does this reflect data for American
20  Blinds' various adwords, campaigns from the first half
21  of, you are aware of, January through at least May of
22  2005?
23      A.  Yes.
24      Q.  If you could turn to the page numbered 045554,
25  which is captioned Top Drivers/High Cost Terms, there is

168

```
1

2                    CERTIFICATE OF NOTARY

3

4

   STATE OF MICHIGAN    )
5                       ) ss.
   COUNTY OF OAKLAND    )
6

7

8              I, Lana Kia Haws, Certified

9   Shorthand Reporter and Notary Public in and for the

10  above county and state, do hereby certify that the

11  deposition of JEFFREY A. ALDERMAN was taken before me

12  at the time and place hereinbefore set forth; that

13  the witness was by me first duly sworn to testify

14  to the truth, the whole truth and nothing but the

15  truth; that thereupon the foregoing questions were

16  asked and foregoing answers made by the witness

17  which were duly recorded by me stenographically and

18  later reduced to computer transcription; and I certify

19  that this is a true and correct transcript of my

20  stenographic notes so taken.

21

22

23

24

25
                                                        199
```

```
 1
 2
 3
 4           I further certify that I am not Of
 5   Counsel to either party nor interested in the event of
 6   this cause.
 7
 8                    _____
 9                    Lana Kia Haws, CM, RPR, CSR-0995
10                    Notary Public
11                    State of Michigan
12                    County of Oakland
13                    Acting in the County of Wayne
14
15
16   My Commission Expires:
17   September 29, 2011
```