1   ROBERT N. PHILLIPS (SBN 120970)
    ETHAN B. ANDELMAN (SBN 209101)
2   HOWREY LLP
    525 Market Street, Suite 3600
3   San Francisco, CA 94105
    T: (415) 848-4900
4   F: (415) 848-4999

5   DAVID A. RAMMELT (Admitted *Pro Hac Vice*)
    SUSAN J. GREENSPON (Admitted *Pro Hac Vice*)
6   KELLEY DRYE & WARREN LLP
    333 West Wacker Drive, Suite 2600
7   Chicago, IL 60606
    T: (312) 857-7070
8   F: (312) 857-7095

9   Counsel for Defendant/Counter-Plaintiff
    American Blind and Wallpaper Factory, Inc.
10

11                  UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13

14  GOOGLE INC., a Delaware corporation,          CASE NO. C 03-5340

15              Plaintiff,                         **AMERICAN BLIND & WALLPAPER
                                                   FACTORY, INC.'S OPPOSITION TO
16          v.                                     GOOGLE'S MOTION FOR SUMMARY
                                                   JUDGMENT**
17  AMERICAN BLIND & WALLPAPER
    FACTORY, INC., a Delaware corporation
18  d/b/a decoratetoday.com, Inc., and DOES
    1-100, INCLUSIVE,                              Date:  February 16, 2007
19                                                 Time:  9:00 a.m.
                Defendant.                         Judge: Hon. Jeremy Fogel
20

21  _____

22  AMERICAN BLIND & WALLPAPER
    FACTORY, INC., a Delaware corporation
23  d/b/a decoratetoday.com, Inc.,                 **REDACTED VERSION**

24              Counter-Plaintiff,

25          v.

26  GOOGLE, INC.,

27              Counter-Defendant.

28  _____

CH01/RAMMD/216530.3

Dockets.Justia.com

# **TABLE OF CONTENTS**

**Page**

I. **INTRODUCTION** ................................................................................................. 1

II. **STATEMENT OF FACTS** .................................................................................. 2

   A. American Blind's Business ................................................................................ 2

      1. The American Blind Marks .......................................................................... 3

         a. AMERICAN BLINDS ......................................................................... 3

         b. AMERICAN BLIND FACTORY .......................................................... 5

         c. DECORATETODAY .......................................................................... 5

         d. AMERICAN BLIND & WALLPAPER ................................................. 5

         e. AMERICAN BLIND & WALLPAPER FACTORY ............................... 6

      2. American Blind's Use of the American Blind Marks ................................... 6

      3. American Blind's Advertising, Promotion  and Use of the American Blind Marks On-Line ............................................................................................... 7

   B. Google's Conduct ............................................................................................. 8

      1. Google's "Old" Trademark Policy Is A Telling Admission ........................ 8

      2. ████████████████████████████████████████ ......... 9

      3. ████████████████████████████████ ................................ 10

      4. ██████████████████████████ ................................. 11

III. **ARGUMENT** ................................................................................................... 12

   A. Summary Judgment Under Rule 56 .................................................................. 12

   B. Google Profits By Selling American Blind's Trademarks To Others, Which Clearly Is A "Use In Commerce" Under The Lanham Act ..................... 13

      1. The Ninth Circuit's Decision in Playboy  Enterprises, Inc. v. Netscape Communications Corp ................................................................................. 13

      2. The Great Body of Keyword Advertising Caselaw Has Ruled That  Google's Conduct Is A "Use in Commerce" Under The Lanham Act ........................ 16

      3. The *1-800 Contacts* Case Did Not Address Keyword Advertising And  The Only Two Cases Google Relies Upon Are Limited to Their Facts ...................... 19

   C. American Blind Has Identified Specific Facts Demonstrating  That it Has a Protectable Interest In the American Blind Marks ............................................. 20

      1. AMERICAN Formative Marks Are Readily Protectable ........................... 21

# TABLE OF CONTENTS

**Page**

2.  The American Blind Marks Have Acquired Secondary Meaning ........................... 21

D.  American Blind Has Raised Substantial Issues of Material Fact That  Google's Use of the American Blind Marks Results in a Likelihood of Confusion .................... 23

1.  The "Initial Interest Confusion" Doctrine Is Not Dead, As Google Suggests .......... 24

2.  Google's Use of the American Blind  Marks Results in a Likelihood of Confusion ........................................................................................................ 25

a.  The American Blind Marks Are Strong .............................................................. 26

b.  The Goods and Services Advertised on the Google Search Results  Page Are Identical to Those Long Offered by American Blind ........................... 27

c.  The Keywords Sold by Google to American Blind's  Competitors Are Identical to the American Blind Marks ................................. 27

d.  The Use of the American Blind Marks As Keywords Results in Actual Confusion ........................................................................................................ 27

e.  American Blind's Products and Services  Are Offered in Identical Marketing Channels ........................................................................................................ 30

f.  Search Engine Users Are Not Sophisticated .......................................................... 30

g.  Google Knowingly and Willfully Trades Upon  The Goodwill of the American Blind Marks ........................................................................................ 30

E.  American Blind Has Raised Substantial Issues of Material  Fact Concerning Google's Dilution of the American Blind Marks ........................................................ 31

F.  Google's "Unclean Hands" Argument is Specious ....................................................... 33

IV.  **CONCLUSION** ........................................................................................................ 34

## TABLE OF AUTHORITIES

**Page**

**CASES**

*1-800 Contacts v. WhenU.com, Inc.*,
    414 F.3d 400 (2d Cir. 2005).................................................................................... 19

*800-JR Cigar, Inc. v. GoTo.com, Inc.*,
    437 F. Supp. 2d 273 (D.N.J. 2006) .......................................................... 17, 19, 20

*Academy of Motion Picture Arts and Sciences v. Creative House Promotions*,
    944 F.2d 1446, 1454 (9th Cir. 1991).......................................................... 23, 29

*Adidas America, Inc. v. Kmart Corp.*,
    2006 WL 2044857 (D. Or. June 15, 2006) ............................................................ 32

*American Scientific Chemical, Inc. v. American Hospital Supply Corp.*,
    690 F.2d 791, 793 (9th Cir. 1982)................................................................ 22, 23

*AMF, Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979)........................................................................ 2

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 247-48 (1986)........................................................................ 12

*Australian Gold, Inc. v. Hatfield*, 4
    36 F.3d 1228 (10th Cir. 2006).............................................................. 16, 17, 20

*Barlow v. Ground*,
    943 F.2d 1132, 1136 (9th Cir. 1991).......................................................... 12

*Bosley Medical Inst., Inc. v. Kremer*,
    403 F.3d 672, 676 (9th Cir. 2005)............................................................ 24

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
    174 F.3d 1036, 1058 (9th Cir. 1999)........................................................ 26, 27, 31

*Burke v. Pitney Bowes, Inc. Long-Term Disability Plan*, No. C 04-4483 MHP,
    2005 WL 1876103 at *4 (N.D. Cal. August 8, 2005) .......................................... 13

*Buying For The Home LLC v. Humble Abode LLC*,
    2006 U.S. Dist. LEXIS 76371 (D.N.J. Oct. 20, 2006)........................................ 18

*Cairns v. Franklin Mint Co.*,
    24 F. Supp. 2d 1013 (C.D. Cal. 1998) ................................................................ 29

*Campana, LLC v. Aetna Ins.*,
    2006 WL 82911 (W.D. Wash. 2006) .................................................................. 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................ 12

*Century 21 Real Estate Corp. v. Sandlin*,
    846 F.2d 1175 (9th Cir. 1988)........................................................................ 26

## <u>TABLE OF AUHORITIES</u>

<u>Page</u>

*Clicks Billiards, Inc. v. Sixshooters Inc.*,
 251 F.3d 1252, 1265 (9th Cir. 2001)........................................................................ 24

*Committee for Idaho's High Desert, Inc. v. Yost*,
 92 F.3d 814, 822 (9th Cir. 1996)............................................................................ 23

*Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.*,
 890 F.2d 165, 173 (9th Cir. 1989)......................................................................... 34

*Downing v. Abercrombie & Fitch*,
 265 F.3d 994 (9th Cir. 2001)................................................................................. 12

*Dreamwerks Production Group v. SKG Studio*,
 142 F.3d 1127 (9th Cir. 1998)............................................................................... 31

*E. & J. Gallo Winery v. Consorzio Del Gallo Nero*,
 782 F. Supp. 457 (N.D. Cal. 1991) ........................................................................ 28

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
 967 F.2d 1280 (9th Cir. 1992)........................................................................... 25, 29

*Eclipse Assoc. Ltd. v. Data General Corp.*,
 894 F.2d 1114 (9th Cir. 1990)............................................................................... 23

*Edina Realty, Inc. v. TheMLSonline.com*,
 2006 WL 737064 (D. Minn. March 20, 2006)................................................... 17, 20

*Eli Lilly & Company v. Natural Answers, Inc.*,
 233 F.3d 456 (7th Cir. 2000)................................................................................. 32

*Empresa Cubana Del Tabaco v. Culbro Corp.*,
 2004 WL 602295 (S.D.N.Y. 2004) ........................................................................ 29

*Flow Control Indust., Inc. v. AMHI, Inc.*,
 278 F. Supp. 2d 1193 (W.D. Wash. 2003) ............................................................. 34

*Ford Motor Co. v. Lloyd Design Corp.*,
 184 F. Supp. 2d 665 (E.D. Mich. 2002)................................................................. 32

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
 826 F.2d 837 (9th Cir.1987).................................................................................. 22

*GoTo.com, Inc. v. Walt Disney Co.*,
 202 F.3d 1199,1208 (9th Cir. 2000)...................................................................... 27

*Government Employees Insurance Co. v. Google, Inc.*,
 2005 WL 832398 at *5 (N.D. Cal. 2005) ............................................................... 16

*Government Employees Insurance Co. v. Google, Inc.*,
 330 F. Supp. 2d 700 (E.D. Va. 2004)........................................................... 16, 20, 29

*Grey v. Campbell Soup Co.*,
 650 F. Supp. 1166, 1173 (C.D. Cal. 1986) ............................................................ 23

## TABLE OF AUHORITIES

Page

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger USA, Inc.*,
80 F.3d 739, 754 (2d Cir. 1996)......................................................................... 31

*International Profit Assoc., Inc. v. Paisola*,
2006 U.S. Dist LEXIS 82971 at *9 (N.D. Ill. November 14, 2006)................... 18

*Interstellar Starship Services, Ltd.  v. Epix, Inc.*,
304 F.3d 936, 942 (9th Cir. 2002)...................................................................... 25

*Interstellar Starship Services, Ltd. v. Epix, Inc.*, 184 F.3d 1107 (9th Cir. 1999) ................ 12, 13

*J.G. Wentworth, S.S.C., Ltd. Partnership v. Settlement Funding LLC*, 2007 WL
30115 at *11 (E.D. Penn. January 4, 2007) ........................................................ 18

*Japan Telecom, Inc. v. Japan Telecom America, Inc.*, 287 F.3d 866, 870 (9th Cir.
2002) ................................................................................................................... 33

*Jockey Int'l, Inc. v. Burkard*, 185 U.S.P.Q. 201 (S.D. Cal. 1975)................................ 28

*Karl Storz Endoscopy-America, Inc. v. Surgical Technologies, Inc.*, 285 F.3d 848,
855 (9th Cir. 2001)............................................................................................. 24

*Kelley Blue Book v. Car Smarts, Inc.*, 802 F. Supp. 278, 291 (C.D. Cal. 1992) ........................ 34

*Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 (9th Cir. 1985)................. 12, 13, 22

*Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120 (C.D. Cal. 1998)................................ 29

*Meeker v. Meeker*, 2004 WL 2457793, No. C 02-0741 JSW (N.D.Cal., July 6,
2004) ................................................................................................................... 23

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 2006 WL 1418616
(S.D.N.Y. May 24, 2006) ................................................................................... 20

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402
(S.D.N.Y. 2006) ................................................................................................. 20

*Morningside Group, Ltd. v. Morningside Capital Group*, LLC, 182 F.3d 133, 139
(2d. Cir. 1999) ................................................................................................... 26

*Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003)................................ 32

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 223-24 (2d Cir. 1999)................................ 32

*New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201-02 (9th Cir. 1979) ................ 23

*New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1202 (9th Cir. 1979)................... 27

*Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004) ........................ 24

*Panavision International L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998) ........................ 5, 24

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 782 F.2d 1508, 1509 (9th Cir.

## TABLE OF AUHORITIES

**Page**

1986) .......................................................................................................... 27

*Plasticolor Molded Products v. Ford Motor Co.*, 698 F. Supp. 199, 201 (C.D. Cal.
    1988) ........................................................................................... 12, 29, 31

*Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 2000 WL 1308815
    (C.D. Cal. 2000 ........................................................................................ 14, 15

*Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020 (9th
    Cir. 2004) .................................................................................................... passim

*Re/Max Int'l, Inc v. Help-U-Sell, Inc.*, 20 U.S.P.Q.2d 1945 (C.D. Cal. 1991) .......................... 28

*Rescuecom Corp. v. Computer Troubleshooters USA, Inc.*, 2005 WL 4908692
    (N.D. Ga. September 16, 2005) ........................................................................ 18, 20

*Rescuecom Corp. v. Google, Inc.*, 2006 U.S. Dist. LEXIS 70409 (N.D.N.Y.
    September 28, 2006) ...................................................................................... 20

*Savin Corp. v. Savin Group,* 391 F.3d 439, 452-53 (2d Cir. 2004) ............................................ 32

*Sega Enterprises Ltd. v. Maphian*, 948 F. Supp. 923, 938 (N.D. Cal. 1996)............................... 24

*SMC Promotions, Inc. v. SMC Promotions*, 355 F. Supp.2d 1127 (C.D. Cal. 2005) ................. 25

*STX, Inc. v. Trik Stik, Inc.*, 708 F. Supp. 1551 (N.D. Cal. 1988)................................................. 29

*Surfvivor Media, Inc. v. Survivor Productions, Inc.,* 406 F.3d 625, 634 (9th Cir.
    2005) ...................................................................................................... 31

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31
    (9th Cir. 1987)................................................................................................... 12

*Thane Int'l Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002)........................... 13, 28

*Toho Co., Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788, 790 (9th Cir. 1981) ............................. 13

*U-Haul International, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1252 (D. Ariz.
    1981), *aff'd*, 681 F.2d 1159 (9th Circuit 1982)...................................................... 29

*Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871, 880 (C.D.
    Cal. 1986)......................................................................................................... 25

*Wells Fargo & Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 307 (9th Cir.
    1982) .................................................................................................... 34

*Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) ......................................................... 29

*Whirlpool Props., Inc. v. LG Electronics*, No. 1:03-cv-414, 2006 WL 62846, at *
    3 (W.D. Mich. January 10, 2006) ........................................................................ 29

*White Swan, Ltd. v. Clyde Robin Seed Co, Inc.*, 729 F. Supp. 1257, 1264 (N.D.
    Cal. 1989)......................................................................................................... 21

*Yellow Cab Company of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d

## <u>TABLE OF AUHORITIES</u>

**Page**

925, 930 (9th Cir. 2005)...............................................................................................22

### STATUTES

15 U.S.C. § 1125(c)(2)(A) .......................................................................................... 32

### OTHER AUTHORITIES

5 McCarthy, *McCarthy on Trademarks and Unfair Competition* ¶ 32.178 (4th
ed. 2006)...................................................................................................................... 29

Trademark Manual of Examining Procedure ("TMEP") § 1215.02 (4th ed.) ............................ 4

### RULES

Fed.R.Civ.P. 56(c)................................................................................................. 12, 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT, Case No. C 03-5340-JF (RS)
CH01/RAMMD/216530.3

# I.   <u>INTRODUCTION</u>

American Blind & Wallpaper Factory ("American Blind") and its predecessors have been in the window treatment and wall covering business for over 50 years and have painstakingly built its brand name and reputation, spending over $65 million in the last five years alone on advertising ranging from magazines to the Internet.  Today, it is one of the largest direct-to-consumer provider of these products in the United States.  American Blind's name and trademarks are critical to its success.  The company has spent enormous resources to protect its brand by, among other things, registering its trademarks, registering hundreds of domain names containing variations of its brand and marks, and actively policing the use of its marks.  The U.S. trademark laws were developed precisely to protect this kind of effort and hard work.

Google makes a handsome profit selling American Blind's trademarks (and those of thousands of other companies) to others.  It is undisputed that Google recommends and sells American Blind's trademarks to the highest bidder, usually American Blind's direct competitors, so that their advertisements will appear at the top (and along the sides) of Google's search results as "Sponsored Links" when users input a query with American Blind's marks.  Google purposely does not define "Sponsored Links" or call them what they are – paid advertisements – because doing so would reduce user confusion.  Indeed, independent studies show that Internet users generally don't understand the difference between genuine search results and paid results, and Google's own research shows that (a) there is a "high rate of confusion among participants when confronted with search displays involving advertisements," and (b) "click-throughs" to ads would decrease if the ads were actually called paid advertisements.  Nor does Google use the clear, automated trademark disclaimer system that Google's own trademark policy team *has patented*.  Google does not clearly identify its ads because, for Google, confusion is good.

Google is not really a search company.  It is an advertising agency.  Google likes to say that its advertisements deliver "relevant information" to the consumer.  Of course, during their

depositions in this case, no one at Google – not even founder Larry Page himself – could point to any empirical evidence inside or outside Google to support this claim. Google's advertising formula is simple: the more people that "click-through" to the ads on Google's website, the more money Google makes. To Google, it does not matter if the user knows they are being served an advertisement, stays on the advertiser's website, or actually buys anything from the advertiser. The instant a user clicks on an ad, Google is paid.

Google's motion, which ignores the standard required for summary judgment entirely, should be denied for at least three reasons. First, the practice of auctioning and profiting by the sale of anther company's trademark as a keyword in Internet advertising *is* a "use in commerce" under the Lanham Act in the Ninth Circuit, *e.g., Playboy*, as well as every federal court outside of New York. Second, American Blind's trademarks are protectable. And third, there are genuine issues of material fact regarding the controlling issue of likelihood of confusion under the eight-factor test articulated in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), which test Google disregards completely.

This case will have enormous repercussions on the way that business is conducted over the Internet. As the International Trademark Association explained to the Ninth Circuit in its *amicus curiae* brief in a case involving similar advertising practices over the Internet, *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004): "This appeal will have a significant precedential value in shaping Internet advertising practices. INTA urges this Court to make clear that traditional principles of trademark law … and the types of uses that can trigger infringement claims, apply to cases involving the Internet just as they do in more conventional contexts." To Google, the stakes are equally as high, which explains why it was Google that brought this lawsuit and seeks a broad, sweeping declaration that its advertising practices are legal.

## II.  STATEMENT OF FACTS

### A.  American Blind's Business

American Blind is one of the largest direct-to-consumer retailers of custom order window treatments and wall coverings in the United States. (Declaration of Jeffrey Alderman in

1   Support of American Blind & Wallpaper Factory, Inc.'s Opposition to Google Inc.'s Motion for

2   Summary Judgment ("Alderman Decl.") at ¶¶ 3, 4.)  American Blind promotes, offers for sale

3   and sells its home decorating products across the United States through its website, a network of

4   thousands of on-line marketing affiliates, product catalogues, a shop at home service, a

5   showroom in Michigan, and toll-free telephone numbers.  (*Id.* at ¶ 5.)  Over eight million

6   customers have purchased draperies, window blinds, wallpaper and related products from

7   American Blind.  (*Id.* at ¶ 6.)  American Blind's net sales of its products and services over the

8   past five years well exceeds $500 million.  (*Id.* at ¶ 7.).

9       **1.   The American Blind Marks**

10      Long prior to Google's infringing actions, American Blind adopted and used, and has

11  continued to use, the names and marks AMERICAN BLINDS (and/or AMERICAN BLIND),

12  AMERICAN BLIND FACTORY, DECORATETODAY, AMERICAN BLIND AND

13  WALLPAPER, and AMERICAN BLIND & WALLPAPER FACTORY (hereinafter

14  collectively identified as the "American Blind Marks") in connection with home decorating

15  products and related services offered for sale and sold in interstate commerce.  (*Id.* at ¶ 8.)

16      Plaintiff's company has long been known to customers and prospective customers as,

17  simply, "American" or "American Blinds."  (*Id.* at ¶¶ 9, 11; *see also* ¶ 10, Ex. A.)  With the

18  exception of a brief period in 1999-2000, the corporate and/or trade names used by American

19  Blind for over twenty years have featured the name "American Blind(s)."  (*Id.* at ¶ 12.)  Indeed,

20  of the five American Blind Marks, four feature the name "American Blind(s)."  Likewise,

21  American Blind for many years has advertised and promoted its private label products under the

22  designation "American" or "American Blinds."  (*Id.* at ¶ 13, Ex. B.)  As a result of this

23  advertising, together with the manner in which American Blind's private label blinds have long

24  been sold, American Blind's products and services are commonly known to customers and

25  potential customers under the mark AMERICAN BLIND(S).  (*Id.* at ¶¶ 11, 13.)

26          a.   AMERICAN BLINDS

27      The mark AMERICAN BLINDS is registered in the United States Patent and Trademark

28  Office (the "USPTO") for "mail order catalog services and online ordering services featuring

1   blinds, draperies, wall and window coverings, and home furnishings" under Registration

2   Number 3,149,175.  (Declaration of Paul W. Garrity in Support of Defendant American Blind &

3   Wallpaper Factory, Inc.'s Opposition to Google Inc.'s Motion for Summary Judgment ("Garrity

4   Decl."), Ex. A.)  The AMERICAN BLINDS mark was registered by the USPTO as an

5   inherently distinctive mark, and has been in commercial use since 1986.

6          American Blind identifies itself, together with the products and services which it offers,

7   using the mark AMERICAN BLINDS in multiple different advertising medium, including

8   television and radio commercials, yellow pages listings, magazine advertisements, and postcards

9   mailed to customers and prospective customers.  (Alderman Decl. at ¶ 14.)  American Blind's

10  sales catalogues prominently feature the AMERICAN BLINDS mark (as the display URL for

11  the American Blind's Website) on the cover, and the AMERICAN BLINDS mark is used

12  throughout the pages of each catalogue, appearing on at least every other page.  (*Id.* at ¶ 15, Ex.

13  C.)  American Blind's sales catalogue, identifies American Blind's products only by product

14  type, American Blind's color number, color name and size.  (*Id.* at ¶ 15.)  American Blind's

15  sales agents use sales scripts when answering calls from customers using these catalogues.

16  These sales scripts repeatedly identify American Blind and the products and services offered in

17  the catalogues using the AMERICAN BLINDS mark.  (*Id.* at ¶ 16, Ex. D.)  The AMERICAN

18  BLINDS mark is the display URL for the American Blind's Website.  (*Id.* at ¶ 17.)  The mark

19  appears prominently on each of the "blinds" category pages of the American Blind's Website.

20  (*Id.* at ¶ 17.)

21         Finally, the AMERICAN BLINDS name and mark appears on the actual products

22  ordered from American Blind.  The private label blinds sold by American Blind, together with

23  product samples of such blinds sent to prospective customers, identify and mark American

24  Blind's products with the designation

25                            American
                         Blinds, Wallpaper & More
26
27  together with the AMERICAN BLINDS mark.  (*Id.* at ¶ 21, Ex. E.)[1]  No other name or

28  ───────────────
        [1]  Google claims that Trademark Manual of Examining Procedure ("TMEP") § 1215.02 (4th
    ed.) demonstrates that American Blind's use of AMERICAN BLINDS in the domain name

1    designation appears anywhere on or in connection with the products or the packaging for the

2    products. (*Id.*. at ¶ 22.) Indeed, the sales and shipping invoices accompanying American

3    Blind's product samples and American Blind's private label products identify American Blind's

4    products only by product type, color number, color name and size. (*Id.* at ¶ 22, Ex. F.)

5                    b.    AMERICAN BLIND FACTORY

6        The mark AMERICAN BLIND FACTORY is registered for "window blinds" in the

7    USPTO under Registration Number 1,463,548. (Garrity Decl., Ex. B.) The AMERICAN

8    BLIND FACTORY mark was registered by the USPTO as an inherently distinctive mark, and

9    has been in use in commerce since 1986. The AMERICAN BLIND FACTORY mark has been

10   used on and in connection with window blinds and advertising and promotion for American

11   Blind's products and services. (Alderman Decl. at ¶ 23, 24.)

12                   c.    DECORATETODAY

13       The DECORATETODAY mark has been in use since 2000. (Garrity Decl., Ex. C.)

14   DECORATETODAY is registered for "retail store services and on-line retail mail order services

15   in the field of wall and window coverings and home decorating products" in the USPTO under

16   Registration Number 2,470,542. (*Id.*) The DECORATETODAY mark is used as the destination

17   URL for the American Blind Website and is used on the site. (Alderman Decl. at ¶ 25, *see also*

18   ¶ 26.)

19                   d.    AMERICAN BLIND & WALLPAPER

20       The AMERICAN BLIND & WALLPAPER mark[2] has been in use since 1986.

21   _____

22   www.americanblinds.com does not constitute trademark use. However, TMEP 1215.02 actually
     supports American Blind's position, in that it notes that "[w]hen a trademark . . . is comprised, in

23   whole or in part, of a domain name, neither the beginning of the URL ("www") nor the TLD
     (e.g., ".com") have any source-indicating significance." Here, American Blind's mark is

24   AMERICAN BLINDS, which does not include either the beginning of the URL or the TLD.
     Use of the AMERICAN BLINDS mark on products and catalogues as part of the domain name

25   www.americanblinds.com, which directs users to its online store, is use under the Lanham Act.
     Cf. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998) (finding defendant's

26   registration and use of www.panavision.com domain name actionable as "use" under Lanham
     Act.)

27       [2] It is noted that, subsequent to the commencement of this litigation, American Blind's mark
     AMERICAN BLINDS, WALLPAPER & MORE was registered in the USPTO for "mail order

28   catalog services and online ordering services featuring blinds, draperies, wall and window
     coverings, and home furnishings" under Registration Number 2,923,867. (Garrity Decl., Ex. D.)

1    (Alderman Decl. at ¶ 28.)  The AMERICAN BLIND & WALLPAPER mark is used on order

2    forms for use in purchasing American Blind's products and services.  (*Id.* at ¶ 30.)

3                    e.    AMERICAN BLIND & WALLPAPER FACTORY

4            American Blind owns two registrations for the mark AMERICAN BLIND &

5    WALLPAPER FACTORY in the USPTO, one for the mark with a design for "retail mail order

6    services in the field of wall and window coverings" (Registration No. 2,022,925) and the other

7    for "mail order catalog services and online ordering services featuring blinds, draperies, wall and

8    window coverings, and home furnishings" (Registration Number 2,991,126).  (Garrity Decl., Ex.

9    E.)  The mark has been in commercial use since 1986.  Registration No. 2,022,925 issued from

10   the USPTO as an inherently distinctive mark, and has achieved incontestable status.

11           American Blind makes widespread use of the AMERICAN BLIND & WALLPAPER

12   FACTORY mark.  The mark is used in multiple different advertising medium, including yellow

13   pages listings, magazine advertisements, catalogue display cases, and postcards mailed to

14   customers and prospective customers.  (Alderman Decl. at ¶¶ 31, 32, Ex. G.)  The AMERICAN

15   BLIND & WALLPAPER FACTORY mark appears on company letterhead, order forms,

16   business cards, and apparel.  *Id.*  American Blind's showroom is identified on both exterior and

17   interior signage under the AMERICAN BLIND & WALLPAPER FACTORY mark. (*Id.*)  The

18   AMERICAN BLIND & WALLPAPER FACTORY mark is used throughout the American

19   Blind's Website.  (*Id.* at ¶ 33.)

20           **2.    American Blind's Use of the American Blind Marks**

21           For over 20 years, American Blind has advertised and promoted its products and services

22   sold under the American Blind Marks to customers and potential customers throughout the

23   United States.  American Blind has distributed between ten and twelve million mailings

24   nationwide in each of the past ten years bearing the American Blind Marks.  (*Id.* at ¶ 35.)

25   American Blind maintains a database of over five million e-mail addresses, which it uses for

26   _____

27   The mark has been in commercial use since 2003.  The AMERICAN BLINDS, WALLPAPER
     & MORE mark is in widespread use on American Blind's sales catalogues, the American Blind
     Website, and is the only mark, in addition to AMERICAN BLINDS, appearing on American

28   Blind's products.  (Alderman Decl. at ¶ 27.)

1    extensive e-mail campaigns run multiple times each month.  (*Id.* at ¶ 36.)

2          Since 2001, American Blind has spent in excess of $50 million advertising, marketing

3    and promoting its goods and services under the American Blind Marks in medium other than the

4    Internet ("Off-Line Marketing").  (*Id.* at ¶ 37.)  This amount is in addition to the tens of millions

5    of dollars invested by American Blind in such marketing of the American Blind Marks in the

6    fifteen years the marks were in use before 2001.  (*Id.* at ¶ 38.)  American Blind's Off-Line

7    Marketing efforts using the American Blind Marks include television and radio commercials,

8    direct mail pieces (including catalogues and postcards), newspaper and  magazine advertising,

9    Yellow Pages advertising, trade shows, third party package insert programs, third party

10   catalogue "blow-in" programs, cooperative advertising mailings, and magazine advertising.  (*Id.*

11   at ¶ 39.)  American Blind also promotes the American Blind Marks through its third party

12   partner programs.  (*See Id.* at ¶¶ 40-41, Ex. H.)  Under such programs, American Blind

13   advertises its products and services in print programs through partners such as the U.S. Postal

14   Service, G.M.A.C. Real Estate, and American Express.  (*Id.* at ¶ 40.)

15        **3.    American Blind's Advertising, Promotion**
             **and Use of the American Blind Marks On-Line**

16        A significant and critical amount of American Blind's business is conducted via the

17   Internet.  Over fifty percent of American Blind's sales transactions are consummated through the

18   American Blind Website.  (*Id.* at ¶ 42.)  The American Blind Website receives over thirty

19   thousand visits each day by customers or potential customers. (*Id.*)  American Blind makes over

20   four hundred thousand sales transactions over the American Blind Website each year.  (*Id.*)

21   American Blind has spent over $10 million developing its website, and spends in excess of an

22   additional $1 million each year in maintaining, enhancing and updating the American Blind

23   Website.  (*Id.* at ¶ 43.)

24        American Blind since 2001 has spent over $15 million advertising, marketing and

25   promoting its goods and services under the American Blind Marks exclusively in Internet

26   marketing programs ("Internet Marketing") since 2001.  (*Id.* at ¶ 44.)  American Blind's Internet

27   Marketing programs include affiliate campaigns, participating in on-line shopping networks and

28

1   catalogue aggregation programs, data feed programs, and paid search programs, namely,

2   keyword advertising. (*Id.* at ¶ 45.) Indeed, American Blind has to date paid Google over $5

3   million to advertise products and services under the American Blind Marks. (*Id.* at ¶ 46.)

4          American Blind owns dozens of domain name registrations for iterations of each of the

5   American Blind Marks, and uses each one of the marks in e-mail campaigns and in keyword

6   advertising for its products and services. (*Id.* at ¶ 18, 19; *see also* ¶ 29.) American Blind's on-

7   line affiliates actively use each one of the American Blind Marks on and in connection with

8   thousands of websites and affiliate marketing campaigns advertising and promoting American

9   Blind's products and services. (*Id.* at ¶ 20, 34.) Internet Marketing of the American Blind

10  Marks also includes programs with credit card companies such as Visa, MasterCard, and

11  Discover Card which have featured links to the American Blind Website. (*Id.* at ¶ 47.)

12  American Blind's strategic marketing alliances also have an Internet Marketing component.

13  Target, for example, promotes American Blind as a "Featured Partner" on its website. (*Id.* at ¶

14  48, Ex. I.) Target's on-line customers are directed to a co-branded website on which products

15  and services are advertised and offered for sale under the American Blind Marks. (*Id.*) Target

16  has also sold American Blind products directly through Target's own website. Customers

17  searching the Target website using the American Blind Marks, such as AMERICAN BLINDS,

18  would receive search results identifying various styles and colors of American Blind's products.

19  (*Id.*)

20  **B.   Google's Conduct**

21         Google operates an Internet search engine. Google, however, alters the search engine

22  experience and profits from it by delivering to the user advertisements called "Sponsored Links"

23  on top of the genuine search results users expect. Most independent studies show that Internet

24  users do not know the difference between paid search results and genuine search results. (*Id.*,

25  Ex. F.) Google's own evidence shows it counts on the ensuing confusion.

26         **1.   Google's "Old" Trademark Policy Is A Telling Admission**

27         Today, Google's policy is that it will not prevent companies from bidding upon

28  trademarks owned by other companies as keywords so long as those trademarks are not also

1    used in the short description (also called "ad text") included with the displayed advertisement.

2    But this is a policy change that occurred after this lawsuit was filed.  Until June 2004, Google's

3    policy was that, upon a complaint from a trademark owner, Google *would* prevent advertisers

4    from bidding upon those trademarks as keywords alone, or as keywords in combination with the

5    ad text.  (*Id.*, Ex. G at pp. 75-79.)  This is persuasive proof that Google knew then, as it knows

6    now, that selling trademarks as keywords is illegal.

7    After this lawsuit was filed but before

8    Google's Initial Public Offering, however, Google abruptly liberalized its trademark policy.

22    **2.**

OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT, Case No. C 03-5340-JF (RS)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**3.**

OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT, Case No. C 03-5340-JF (RS)

CH01/RAMMD/216530.3



1

### 4.   <u>Google Knows Its "Sponsored Links" Are Confusing</u>

Experts in the industry and independent studies show that Internet users are only likely to look at the first few pages of any search results. (*Id.*, Ex. L at pp. 16-20.; Ex. F.) Moreover, most users will click on the first few links that are delivered in response to their search queries. (*Id.*, Ex. M.) This is precisely why Google places advertisements at the very top, and along the side, of its genuine (or organic) search results. Google does not identify these advertisements as such; it does not label them "PAID ADVERTISEMENTS" or anything similar. Instead, Google calls these advertisements "Sponsored Links," which Google's own documents establish is misleading.

First, Google does not define "Sponsored Links" anywhere on its website, which is itself confusing since consumers are never told who or what constitutes sponsorship. As Consumer Reports' research revealed, "Nearly all participants … said the term 'sponsored' was either vague, misleading or confusing". (*Id.*, Ex. N at pp. 23, 30, 37. 57-58.)

OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT, Case No. C 03-5340-JF (RS)
CH01/RAMMD/216530.3

III. **ARGUMENT**

A.  **Summary Judgment Under Rule 56**

A motion for summary judgment should not be granted unless both (i) there is no genuine issue of material fact and (ii) the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Google, as the moving party, bears the burden of demonstrating through pleadings, depositions, answers to interrogatories, admissions, or affidavits that there is no triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is not appropriate if the non-moving party presents evidence from which a reasonable jury could resolve the material issue in his or her favor.  *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991).  With respect to these specific facts offered by the non-moving party, the court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987); *see also Interstellar Starship Services, Ltd. v. Epix, Inc.*, 184 F.3d 1107 (9th Cir. 1999).

The legal test for liability under the Lanham Act for trademark infringement and unfair competition is likelihood of confusion.  *Plasticolor Molded Products v. Ford Motor Co.*, 698 F. Supp. 199, 201 (C.D. Cal. 1988) (Kozinski, Circuit Judge, Sitting by Designation).  Likelihood of confusion is a factual determination.  *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1008 (9th Cir. 2001); *see also Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 (9th Cir. 1985).  Summary judgment may be granted "only if 'no genuine issue' exists regarding likelihood of confusion."  *Thane Int'l Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir.

2002), *quoting* Fed.R.Civ.P. 56(c).  For this reason, the Ninth Circuit has "cautioned that district courts should grant summary judgment motions regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Id.* at 901-902.  Indeed, the Ninth Circuit has admonished, "[b]ecause of the intensely factual nature of trademark disputes, ***summary judgment is generally disfavored in the trademark arena.***"  *Interstellar*, 184 F.3d at 1109 (emphasis added); *Levi Strauss*, 778 F.2d at 1356 n.5; *see also Toho Co., Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788, 790 (9th Cir. 1981) (likelihood of confusion is a question of fact, and can seldom be resolved by summary judgment).

**B.    Google Profits By Selling American Blind's Trademarks To Others, Which Clearly Is A "Use In Commerce" Under The Lanham Act**

Google sells, and its advertising customers hope to purchase, the possibility that they will intercept consumers who, due to American Blind's extensive advertising, name and reputation, are trying to find one of the nation's largest and most respected and trusted direct-to-consumer retailer of window treatments and wall coverings.  In this advertising scheme, Google admits that it sells American Blind's trademarks to advertisers, and it further admits that it profits from the sale of these trademarks.  Yet, without disclosing to this Court the full body of case law in this developing area,[3] Google argues that it is not making "use in commerce" of American Blind's trademarks, as that phrase is interpreted under the Lanham Act.  Although not evident from Google's brief, this position is contrary to Ninth Circuit law and the law in most other courts.

**1.    The Ninth Circuit's Decision in Playboy Enterprises, Inc. v. Netscape Communications Corp**

Google returns to the argument that it is not "using" American Blind's trademarks because it does not "brand" its own products or services with the American Blind Marks.

---

[3]  Google failed to cite to any adverse authority in its brief.  Most of the current cases have refuted the position advanced by Google in this case, but were not cited, addressed or distinguished by Google.  Generally, a party has an ethical duty to make the Court aware of adverse authority.  *See Burke v. Pitney Bowes, Inc. Long-Term Disability Plan*, No. C 04-4483 MHP, 2005 WL 1876103 at *4 (N.D. Cal. August 8, 2005).  This was not done here not even once.

1    However, as the Ninth Circuit recently held in *Playboy Enterprises, Inc. v. Netscape*

2    *Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004), "branding" one's own goods is <u>not</u> a

3    required element of a trademark infringement or dilution claim.  In that case, Playboy alleged

4    that two search engines committed trademark infringement by selling Playboy's trademarks as

5    keywords to advertisers that wanted their ads to appear on the search results page when

6    Playboy's trademarks were used as search terms.  Importantly, none of the ads in question

7    actually displayed Playboy's marks or used them in the ad text; rather, as is the case here,

8    Playboy's marks were the triggering mechanism for the advertisers' unlabeled advertisements.

9    Under the mistaken belief that "Defendants do not use [Playboy's] trademarks *qua* trademarks,"

10   the district court granted the search engines' motion for summary judgment.  2000 WL 1308815

11   (C.D. Cal. 2000).

12       The Ninth Circuit reversed, holding that the search engines had indeed engaged in a

13   "trademark use" of Playboy's marks and that Playboy had established a genuine issue of

14   material fact regarding the infringement and dilution of those marks.  Applying the well-

15   established "initial interest confusion" doctrine, the court had no difficulty finding that

16   "defendants clearly used the marks in commerce," and, further, that the "use in commerce"

17   requirement for purposes of bringing such a claim under the Lanham Act "sweeps as broadly as

18   possible."  354 F.3d at 1024 and n.11.  Considering plaintiff's claims of infringement, the court

19   found:

20           Some consumers, initially seeking PEI's sites, may initially
             believe that unlabeled banner advertisements are links to PEI's
21           sites or to sites affiliated with PEI….  The Internet user will have
             reached the site because of defendants' use of PEI's mark.  Such
22           use is actionable.

23   *Id.* at 1025-26 (emphasis added).  The Ninth Circuit specifically addressed, and rejected, the

24   argument that the Lanham Act did not apply because the search engines did "not label their own

25   goods with [Playboy's] marks."  *Id.* at 1033.

26       The International Trademark Association ("INTA") filed an *amicus curiae* brief urging

27   the precise outcome reached by the Ninth Circuit.  INTA interceded on behalf of its thousands of

28   members because it feared, rightly so, that accepting the search engine's novel and

1  unprecedented argument would re-write decades of trademark jurisprudence:

2          The District Court also reached the erroneous legal conclusion that
3          Excite and Netscape had made a "non-trademark use" as to
           "which the infringement laws simply do not apply." []  Whether
4          the District Court relied on … the fact that the defendants used
           [Playboy's] marks in connection with their advertiser's products
5          and services rather than their own products and services, this was
           error.
6                                          * * * *

7          This appeal will have a significant precedential value in shaping
           Internet advertising practices.  INTA urges this Court to make
8          clear that traditional principles of trademark law, including those
           regarding secondary meaning and the types of uses that can trigger
9          infringement claims, apply to cases involving the Internet just as
           they do in more conventional contexts.

10  2001 WL 34355151 at pp. 3-4 (emphasis added).  (*See also* Garrity Decl., Ex. O ("limiting

11  initial interest confusion cases to uses *by competitors* … would eliminate the review of key

12  factors of the traditional likelihood of confusion analysis." (emphasis added).)

13          Google cannot, and does not, distinguish its conduct from the behavior of the search

14  engines that the Ninth Circuit expressly ruled to be a "use" of the Playboy marks in commerce.

15  The underlying conduct in both cases is analogous, if not practically identical:

16      •   both involve the practice of Internet advertising based upon "keying" search terms, [4]
17          even though the trademarks in question are not displayed to the consumer anywhere
            in the ad text. 354 F.3d at 1022-23.

18      •   the defendants in both cases are the search engines who sold the trademarked terms,
19          not the advertisers who bid upon those terms.

20      •   in both cases the offending advertisements are displayed at the top and along the
            side of the genuine search results page.  *Id.* at 1023.

21      •   in both cases the advertisements are not clearly labeled as "PAID
22          ADVERTISEMENTS".  Likewise, neither Google nor the search engines in *Playboy*
            had any requirement that advertisers actually identify themselves on their
23          advertisement.  *Id.*

24      •   in both cases the search engines actively monitor "click-through" rates and would
            profit from each click-through to an advertisers' website, yet the search engines
25          would do "nothing to prevent click-throughs that result from confusion."  *Id.* at
            1028.

26

27  _____

28      [4]  The Ninth Circuit in *Playboy* described "keying" as advertisements triggered by inputting
        search terms, including trademarks.  354 F.3d at 1022-23.

- in both cases the search engines refused to remove trademarks "from their lists of keywords, even when advertisers request that they do so." *Id.* at 1029.

Indeed, if anything, Google's advertising here is more egregious and goes well beyond the activity of Netscape and Excite condemned by the Ninth Circuit in *Playboy*. First, independent studies show that users do not understand the difference between genuine search results and paid-for placement advertisements. (Garrity Decl., Ex. L.) Second, unlike in *Playboy*, Google does not just passively allow advertisers to bid on marks; it actively encourages and promotes bidding on specific trademarked terms. ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████  Under the Ninth Circuit's controlling ruling in *Playboy*, therefore, Google's motion

must be denied.

## 2.  The Great Body of Keyword Advertising Caselaw Has Ruled That Google's Conduct Is A "Use in Commerce" Under The Lanham Act

To date, most courts that have considered the issue agree that the sale of trademarks in connection with keyword advertising is a "use in commerce" actionable under the Lanham Act. In addition to the holdings reached in *Government Employees Insurance Co. v. Google, Inc.*, 330 F. Supp. 2d 700 (E.D. Va. 2004), and by this Court, 2005 WL 832398 at *5 (N.D. Cal. 2005), the Tenth Circuit, together with District Courts in Texas, Minnesota, Georgia, New Jersey, Illinois and Pennsylvania have all ruled against the position taken by Google here.

In *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006), the plaintiff complained that a rival tanning salon was using its marks by paying "[search engine Overture.com] for [a premium listing] guaranteeing that one of defendant's Web sites would be among the first three listed if either of plaintiff's trademarks was used in an Internet search query." 436 F.3d at 1233. The Tenth Circuit rejected the notion that this was not a use of a trademark. Applying the initial interest confusion doctrine, the court ruled that the defendants, having purchased a variant of keyword advertising, were liable for trademark infringement:

> Defendants paid Overture.com to list Defendants in a preferred position whenever a computer user searched for Plaintiffs' trademarks. All of

1

2

3

> these actions were attempts to divert traffic to Defendants' Web sites….
> Thus, Defendants used the goodwill associated with Plaintiffs'
> trademarks in such a way that consumers might be lured to the lotions
> from Plaintiffs' competitors.  This is a violation of the Lanham Act.

436 F.3d at 1239.

4

5

6

Keyword advertising was again before a court in *Edina Realty, Inc. v.*

*TheMLSonline.com*, 2006 WL 737064 (D. Minn. March 20, 2006).  The court expressly

7

8

considered the issue of whether a competitor's purchase and use of a trademark as a keyword on

the Google and Yahoo! search engines was an actionable "use in commerce" under the Lanham

9

10

Act.  Like Google here, the defendant claimed it was not engaged in a "use" under the Lanham

Act because there was "no public promotion of the mark during the search transaction."  2006

11

WL 737064 at *3 (citation omitted).  The court flatly rejected this argument:

12

13

> While not a conventional 'use in commerce,' defendant nevertheless uses
> the Edina Realty mark commercially.  Defendant purchases search terms
> that include the Edina Realty mark to generate its sponsored link
> advertisement.  [citing *Brookfield*]  Based on the plain meaning of the
> Lanham Act, the purchase of search terms is a use in commerce.

14

15

16

*Id.* at *3 (emphasis added).  Nor did the court have any difficulty finding a likelihood of

confusion: "it is undisputed that defendant uses a mark identical to plaintiff's by purchasing

Edina Realty as a search term, placing it in the text of its sponsored link, and placing it in hidden

17

text and links."  *Id.* at *5.

18

19

In another case not cited or considered by Google, the District of New Jersey confronted

keyword advertising in *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273 (D.N.J.

20

21

2006).  In *JR Cigar*, plaintiff argued that search engine "GoTo.Com" violated the Lanham Act

by diverting Internet users seeking to find JR Cigar to its rivals, and by profiting from the

22

unauthorized sale of the JR Cigar's trademarks to its competitors.  *Id.* at 280.  Like Google,

23

24

GoTo prompted the purchase of trademarks as search terms through a "Search Term Suggestion

Tool," but argued that it had "not made any trademark use of any JR Cigar search terms" under

25

26

the theory that "it is the advertiser who selects the search term and uses it in conjunction with

the content contained on the advertiser's website."  *Id.* at 282.

27

The court considered and rejected the argument, finding that GoTo's advertising

28

OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT, Case No. C 03-5340-JF (RS)
CH01/RAMMD/216530.3

program was a "use in commerce" under the Lanham Act:

> GoTo makes trademark use of the JR marks in three ways. First, by accepting bids from those competitors of JR desiring to pay for prominence in search results, GoTo trades on the value of the marks. Second, by ranking its paid advertisers before any "natural" listings in a search results list, GoTo has injected itself into the marketplace, acting as a conduit to steer potential customers away from JR to JR's competitors. Finally, through the Search Term Suggestion Tool, GoTo identifies those of JR's marks which are effective search terms and markets them to JR's competitors.

437 F. Supp. 2d at 285. Accordingly, the court concluded that GoTo was "making trademark use of JR Cigar's trademarks." *Id.* (also finding material issues in dispute relating to the issue of likelihood of confusion).

Likewise, the purchase of plaintiff's descriptive trademark as a keyword (but not used in ad text) in connection with Google's Adwords program was at issue in *Buying For The Home LLC v. Humble Abode LLC*, 2006 U.S. Dist. LEXIS 76371 (D.N.J. Oct. 20, 2006). While the court acknowledged that the "[d]efendants' alleged use of [p]laintiff's mark is certainly not a traditional 'use in commerce,'" it nonetheless found that "[p]laintiff has satisfied the 'use' requirement of the Lanham Act." 2006 U.S. Dist. LEXIS 76371 at *26. The court reached this conclusion for two reasons:

> First, the alleged purchase of the keyword was a commercial transaction that occurred "in commerce," trading on the value of Plaintiff's mark. Second, Defendants' alleged use was both "in commerce" and "in connection with any goods or services" in that Plaintiff's mark was allegedly used to trigger commercial advertising which included a link to Defendants' furniture retailing website.

2006 U.S. Dist. LEXIS 76371 at *26-27. *See also J.G. Wentworth, S.S.C., Ltd. Partnership v. Settlement Funding LLC*, 2007 WL 30115 at *11 (E.D. Penn. January 4, 2007) (the purchase of trademarks as keywords – but not used in ad text – in connection with Google's Adwords advertising program was held to be a "use in commerce" under the Lanham Act.); *International Profit Assoc., Inc. v. Paisola*, 2006 U.S. Dist LEXIS 82971 at *9 (N.D. Ill. November 14, 2006) ("defendants are using terms trademarked by IPA as search terms [but not in ad text] in Google's Adwords program in a manner likely to cause confusion."); *Rescuecom Corp. v. Computer Troubleshooters USA, Inc.*, 2005 WL 4908692 (N.D. Ga. September 16, 2005).

These cases are either directly on point or, if distinguishable at all, they are only marginally so.  No doubt, Google has not brought these cases to the Court's attention or attempted to distinguish them for one simple reason: as set forth below, no federal court (outside of New York) has agreed with Google.

### 3.    The *1-800 Contacts* Case Did Not Address Keyword Advertising And The Only Two Cases Google Relies Upon Are Limited to Their Facts

Google's reliance throughout its brief on the Second Circuit's ruling in *1-800 Contacts v. WhenU.com, Inc*., 414 F.3d 400 (2d Cir. 2005) is misplaced.  *1-800 Contacts* involved pop-up ads: an internal unpublished directory of terms used to trigger the delivery of advertising.  The Second Circuit expressly distinguished pop-up advertisements from the keyword advertising scheme before the Court here, finding it significant that "WhenU's activities do not … divert or misdirect [search engine users] away from [plaintiff's] website, or alter in any way the results a [search engine user] will obtain when searching with the [plaintiff's] trademark."  *Id.* at 410.[5]

Further, the Second Circuit specifically distinguished the defendant's internal use to trigger a "pop-up" advertisement from the actions of "several other internet advertising companies," such as Google, that "'sell' keyword trademarks to … customers."  *Id.* at 411.  In addition, the Second Circuit specifically noted that pop-up ads are distinguishable from Google's AdWords scheme because "WhenU does not … permit [advertising clients] to request or purchase specific keywords" *Id.* at 409, and "does not link trademarks to any particular competitor's ads, and a customer cannot pay to have its pop-up ad appear on any specific website or in connection with any particular trademark."  *Id.* at 411.  Finally, the pop-up ads at issue were generated in connection with a software program that the user consented to download.  *Id.* at 404.  Thus, the conduct before this Court is fundamentally different than that presented to the Second Circuit in *1-800 Contacts*.

Google is thus left to attempt to hang its "no use in commerce" argument on two district

---

[5]  The court in *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d at 273, specifically distinguished the practice of giving prominence in search results to the highest bidder from the pop-up advertising cases like *1-800-Contacts*.  "Such use," the court observed, "is qualitatively different from the pop-up advertising context, where the use of trademarks in internal computer coding is neither communicated to the public nor for sale to the highest bidder."  *Id.* at 285.

1    court cases decided in New York after *1-800 Contacts*. In *Merck & Co., Inc. v. Mediplan*

2    *Health Consulting, Inc.*, 425 F. Supp. 2d 402 (S.D.N.Y. 2006) (granting motion to dismiss); and

3    2006 WL 1418616 (S.D.N.Y. May 24, 2006) (denying reconsideration), the court granted

4    defendants' motion to dismiss trademark infringement claims predicated upon keyword

5    advertising. Quoting language from *1-800 Contacts*, the court ruled that the use of the mark

6    ZOCOR to trigger the display of advertising was merely an "internal use" and was "not use of

7    the mark in a trademark sense." 425 F. Supp. 2d at 415. However, the court expressly noted that

8    "it is significant that defendants actually sell Zocor … on their websites." *Id*. at 415-416.

9    "Under these circumstances," the court concluded, "there is nothing improper with defendants'

10   purchase of sponsored links to their websites from searches of the keyword 'Zocor.'" *Id.* at 416.

11          The other case relied upon by Google, *Rescuecom Corp. v. Google, Inc.*, 2006 U.S. Dist.

12   LEXIS 70409 (N.D.N.Y. September 28, 2006), should be disregarded for three reasons. First,

13   its reasoning is flawed and contrary to other courts.[6] Second, the plaintiff in that case did not

14   allege, as American Blind does here, that Google actively suggested that competitor's buy other

15   companies' trademarks through its "Keyword Suggestion Tool." Thus, as alleged here, there *is*

16   a display of American Blind's trademarks. Third, the *Rescuecom Corp.* decision ignores the

17   *Playboy* case and other binding precedent in the Ninth Circuit.

18   **C.  American Blind Has Identified Specific Facts Demonstrating**
     **    That it Has a Protectable Interest In the American Blind Marks**

19

20          The American Blind Marks readily identify and distinguish American Blind's products

21   and services from those of others. The American Blind Marks which are the subject of

22   trademark registrations (AMERICAN BLINDS, AMERICAN BLIND AND WALLPAPER

23   FACTORY, AMERICAN BLIND FACTORY, and DECORATETODAY) are entitled to

24   statutory presumptions of ownership and validity, and, further, American Blind can prove

25   secondary meaning in each one of the American Blind Marks.

26          [6] To reach the result it did, the district court in New York simply disregarded the opposite
     decisions reached by this Court, the Tenth Circuit in *Australian Gold v. Hatfield*, the court
27   (twice) in *Geico v. Google*, the court in *Edina Realty v. MSLOnline*, the court in *800-JR Cigar*,
     and by a district court in Georgia in a case involving the same plaintiff. *Rescuecom Corp. v.*
28   *Computer Troubleshooters USA, Inc.*, 2005 WL 4908692 (N.D. Ga. September 16, 2005).

1. **AMERICAN Formative Marks Are Readily Protectable**

Google in its brief falsely argues that "AMERICAN" formative marks are inherently weak, second class citizens. This is belied by the existence of some of the most famous marks presently in use in the United States, including AMERICAN BROADCASTING COMPANY, AMERICAN EXPRESS, AMERICAN STANDARD, AMERICAN AIRLINES, and AMERICAN IDOL. Google further suggests that marks comprised of AMERICAN plus a descriptive term are generally not viewed as inherently distinctive by the USPTO, and require a showing of inherent distinctiveness. This is not true. The Patent and Trademark Office has registered each of American Blind's marks AMERICAN BLINDS, AMERICAN BLIND AND WALLPAPER FACTORY, AMERICAN BLIND FACTORY, and DECORATETODAY without requiring a showing that the marks had acquired secondary meaning. Such registrations "certainly [are] an indication of 'inherent distinctiveness'" of American Blind's marks. *White Swan, Ltd. v. Clyde Robin Seed Co, Inc.*, 729 F. Supp. 1257, 1264 (N.D. Cal. 1989). Furthermore, the USPTO has registered a wide range of such marks on the Principal Register without requiring the applicant to make any showing of acquired distinctiveness under Section 2(f) of the Lanham Act. In addition to American Blind's registrations, these marks include:

- AMERICAN STOCK EXCHANGE (Reg. No. 876,068); ) for, *inter alia*, "securities exchange services – namely, providing a market for securities, providing information about securities and corporations issuing securities, compiling and disseminating price level and volume indices" owned by American Stock Exchange LLC;

- AMERICAN GREETINGS (Reg. No. 878,262) ) for "greeting cards" owned by American Greetings Corporation;

- AMERICAN FOOTBALL CONFERENCE (Reg. No. 1,092,963) ) for "associated services, namely, promoting the interests of member football clubs, scheduling games, and promoting interest in football" owned by the National Football League.

These registrations clearly demonstrate that marks comprised of the term AMERICAN plus a descriptive or generic word are not automatically viewed as descriptive, and may be registered and protected without a need for showing of acquired distinctiveness.

2. **The American Blind Marks Have Acquired Secondary Meaning**

The Ninth Circuit, ruling that the unregistered mark AMERICAN SCIENTIFIC had

1    acquired secondary meaning as used in connection with chemicals and chemical handling

2    accessories, noted that '[s]econdary meaning has been defined as association, nothing more.'"

3    *American Scientific Chemical, Inc. v. American Hospital Supply Corp.*, 690 F.2d 791, 793 (9th

4    Cir. 1982), *quoting Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir.

5    1970). "[T]he question of secondary meaning is one of fact." *Levi Strauss & Co. v. Blue Bell,*

6    *Inc.*, 778 F.2d 1352, 1355 (9th Cir.1985) (*en banc*). Notwithstanding the USPTO recognizing

7    the inherent distinctiveness of the American Blind Marks, Google argues that American Blind's

8    names and marks are descriptive. Assuming, *arguendo*, that the marks herein are properly

9    classified as descriptive, "[t]o determine whether a descriptive mark has secondary meaning, a

10   finder of fact considers: '(1) whether actual purchasers of the product bearing the claimed

11   trademark associate the trademark with the producer, (2) the degree and manner of advertising

12   under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4)

13   whether use of the claimed trademark has been exclusive.'" *Yellow Cab Company of*

14   *Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 930 (9th Cir. 2005), *quoting Levi*

15   *Strauss*, 778 F.2d at 1358 (internal quotation omitted).

16       American Blind's evidence demonstrates that there is a genuine issue of material fact for

17   trial on the issue of secondary meaning in the American Blind Marks. American Blind has

18   exclusively advertised and promoted its products and services under the American Blind Marks

19   nationwide for over 20 years. American Blind has expended tens of millions of dollars

20   advertising under the American Blind Marks with resultant sales success in the hundreds of

21   millions of dollars. The use of the American Blind Marks has ranged from all forms of

22   advertising to the products themselves. Such efforts undoubtedly result in an association

23   between the American Blind Marks and plaintiff in the minds of purchasers.

24       Indeed, the fact that Google is affirmatively suggesting to its advertising customers that

25   they use keywords comprised in whole or in part of the American Blind Marks itself is evidence

26   of secondary meaning. As recognized by the Ninth Circuit, "deliberate copying may suffice to

27   support an inference of secondary meaning." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826

28   F.2d 837, 844 (9th Cir.1987); *cf. Meeker v. Meeker*, 2004 WL 2457793, No. C 02-0741 JSW

(N.D.Cal., July 6, 2004).  Google and its advertising customers deliberately copy the American Blind Marks and use them as keywords in Google's AdWords program.  These actions, in themselves, evidence the strength, value, goodwill and secondary meaning in American Blind Marks, resulting entirely from American Blind's efforts herein.

In a last ditch effort to assail American Blind's evidence of secondary meaning in the American Blind Marks, Google suggests that American Blind cannot prove secondary meaning in the marks because it has failed to conduct a market survey on secondary meaning.  This is false.  Although it is true that expert market surveys *can* be used to evidence secondary meaning, the Ninth Circuit has made it abundantly clear that surveys are not the only means to demonstrate the acquisition of secondary meaning.  *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir. 1996) ("survey evidence is only one of the most persuasive ways to prove secondary meaning, and not a requirement for such proof."); *see also American Scientific*, 690 F.2d at 793 ("consumer testimony is not required to prove secondary meaning.").

**D.   American Blind Has Raised Substantial Issues of Material Fact That <u>Google's Use of the American Blind Marks Results in a Likelihood of Confusion</u>**

The core element of trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the marks is likely to confuse customers about the source of the products. *Academy of Motion Picture Arts and Sciences v. Creative House Promotions*, 944 F.2d 1446, 1454 (9th Cir. 1991); *Eclipse Assoc. Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990).  A *prima facie* case for trademark infringement under the Lanham Act is established by a showing that (1) the mark is owned by or associated with a particular plaintiff, and (2) the defendant's use of the mark is likely to cause confusion or mistake among the public as to the origin of the goods or services.  *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201-02 (9th Cir. 1979).  The "appropriate inquiry is whether the average purchaser would be likely to believe that the infringer's product has 'some connection' with the trademark owner."  *Grey v. Campbell Soup Co.*, 650 F. Supp. 1166, 1173 (C.D. Cal. 1986), *citing Steinway & Sons v.*

1   *Robert Demars & Friends*, 210 USPQ 954, 964 (C.D.Cal.1981)[7].  Likelihood of confusion is

2   established "when consumers viewing the mark would probably assume that the product or

3   service it represents is associated with the source of a different product or service identified by a

4   similar mark."  *Clicks Billiards, Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1265 (9th Cir. 2001).[8]

5          Actionable use of a mark in commerce under the Lanham Act does not, as argued again

6   by Google, require use of the mark "to identify the source of goods or services."  (Google Brief,

7   p. 8.)  Rather, in the Ninth Circuit, "use in commerce" under the Lanham Act "contemplate[s]

8   trading upon the goodwill of or association with the trademark holder."  *Karl Storz Endoscopy-*

9   *America, Inc. v. Surgical Technologies, Inc.*, 285 F.3d 848, 855 (9th Cir. 2001).  Google's

10   activity here falls squarely within the Ninth Circuit's definition of "use in commerce" in

11   *Panavision International L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998).  As American Blind is

12   left to hopelessly continue to pay Google to secure the first listing on the Google search results

13   page, Google, as did Toeppen, "'act[s] as a 'spoiler,' preventing [American Blind] and others

14   from doing business on the Internet under their trademarked names unless they pay [Google's]

15   fee." *Id.* at 1325, *quoting Panavision International L.P. v. Toeppen*, 938 F. Supp. 616, 621 (C.D.

16   Cal. 1996); *cf. Karl Storz*, 285 F.3d at 856 ("where the substance of [defendant's actions] was

17   the construction of a new product associated with the [plaintiff's] trademark, there was a use in

18   commerce.").

19       **1.**   **The "Initial Interest Confusion" Doctrine Is Not Dead, As Google Suggests**

20          To be sure, Google does not like the initial interest confusion doctrine.  Its paid expert,

21   Itamar Simonson, dismisses it out of hand.  But it *is* the law in the Ninth Circuit.  *See Nissan*

22   *Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004); *Playboy Enterprises, Inc.*

23   *v. Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004); *Campana, LLC v. Aetna*

24

25          [7]  *Cf. Sega Enterprises Ltd. v. Maphian*, 948 F. Supp. 923, 938 (N.D. Cal. 1996) (use in

26   commerce established by defendant's use of mark as a file descriptor for an electronic bulletin
board).

27          [8]  *Cf. Bosley Medical Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) ("trademark
infringement law protects only unauthorized uses of a trademark in connection with a

28   commercial transaction in which the trademark is being used to confuse potential
consumers."[citation omitted]).

1    *Ins.*, 2006 WL 82911 (W.D. Wash. 2006); *SMC Promotions, Inc. v. SMC Promotions*, 355 F.

2    Supp.2d 1127 (C.D. Cal. 2005).  The doctrine has special importance in the Internet context

3    because independent research shows that 54% of users only look at the first page of results; and

4    42% only look at the first two listings.  (Garrity Decl., Ex. P.)  Thus, Internet users are impatient

5    and will abandon their searches quickly.

6          **2.   Google's Use of the American Blind**
             **Marks Results in a Likelihood of Confusion**

7          The offering for sale and sale of the American Blind Marks to deliver paid advertising

8    appearing on a Google "search results" page results in a likelihood of confusion.  Though found

9    nowhere in Google's brief, the Ninth Circuit in *Sleekcraft* enumerated a multi-factor test to

10   guide courts in assessing the question or likelihood of confusion.  Those factors include: (1)

11   strength of the allegedly infringed mark; (2) proximity or relatedness of the goods; (3) similarity

12   of the sight, sound, and meaning of the marks; (4) evidence of actual confusion; (5) degree to

13   which the marketing channels converge; (6) type of the goods and degree of care consumers are

14   likely to exercise in purchasing them; (7) intent of the defendant in selecting the allegedly

15   infringing mark; and (8) likelihood that the parties will expand their product lines.  599 F.2d at

16   348-54.  The presence or absence of a particular factor does not necessarily drive the

17   determination of a likelihood of confusion.  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d

18   1280, 1290 (9th Cir. 1992).  In the context of the Internet, however, the Ninth Circuit has stated

19   that "the three most important Sleekcraft factors in evaluating the likelihood of confusion are (1)

20   the similarity of the marks, (2) the relatedness of the goods and services, and (3) the parties

21   simultaneous use of the Web as a marketing channel.  When this 'controlling troika' or Internet

22   trinity suggests confusion is likely, the other facts must weigh strongly against a likelihood of

23   confusion to avoid the finding of infringement."  *Interstellar Starship Services, Ltd.  v. Epix,*

24   *Inc.*, 304 F.3d 936, 942 (9th Cir. 2002); *see also Walt Disney Productions v. Filmation*

25   *Associates*, 628 F. Supp. 871, 880 (C.D. Cal. 1986) (denying summary judgment because

26   "evidence of some of the factors – including relatedness of the goods, marketing channels used,

27   and the similarity of the marks – is sufficient to show that a consumer … could be confused by

28

1    [defendant's] advertisements.").

2          Incredibly, Google fails to even identify the *Sleekcraft* factors in its brief.  It incorrectly

3    argues that "the *only* evidence of confusion that [American Blind] can offer" is the survey

4    American Blind conducted in this case, and that the alleged flaws in the survey "mandates

5    summary judgment in Google's favor."  (Google Brief, p. 23).  This unsupported statement is

6    factually and legally wrong.  American Blind here identifies specific facts demonstrating that

7    there is, at the very least, a dispute as to material facts based on the elements of the *Sleekcraft*

8    factors.  Furthermore, Google's argument that American Blind *must* proffer evidence of actual

9    confusion is, simply, incorrect.  *Eclipse*, 894 F.2d at 1118 ("'The failure to prove instances of

10    actual confusion is not dispositive' of an infringement claim." (*quoting Sleekcraft*, 599 F.2d at

11    353). )

12                      a.   <u>The American Blind Marks Are Strong</u>

13          "The stronger a mark – meaning the more likely it is to be remembered and associated in

14    the public mind with the mark's owner – the greater the protection it is accorded by the

15    trademark laws."  *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174

16    F.3d 1036, 1058 (9th Cir. 1999).  "Marks may be strengthened by extensive advertising, length

17    of time in business, public recognition, and uniqueness."  *Century 21 Real Estate Corp. v.*

18    *Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988).  American Blind's longstanding, continuous and

19    extensive use and advertising of the American Blind Marks warrant a finding of strength.

20    Further, the "successful policing of a mark adds to its strength to the extent that it prevents

21    weakening of the mark's distinctiveness in the relevant market."  *Morningside Group, Ltd. v.*

22    *Morningside Capital Group*, LLC, 182 F.3d 133, 139 (2d. Cir. 1999).  American Blind's

23    policing efforts – commencing at least sixteen infringement actions to protect the American

24    Blind Marks – undoubtedly demonstrate strength here.  (Declaration of Susan Greenspon

25    "Greenspon Decl." at ¶¶ 4-7.)

26          Nevertheless, even if this Court were to accept Google's unsubstantiated arguments that

27    the American Blind Marks are not strong, "even an extremely weak mark may be infringed if the

28    infringing product and the marks themselves are similar."  *See New West Corp. v. NYM Co. of*

1    *Cal., Inc.*, 595 F.2d 1194, 1202 (9th Cir. 1979). In the Ninth Circuit, "in situations" such as this

2    case "in which the appearance of conflicting marks and the services are almost identical, the

3    strength of the mark is of diminished importance in the likelihood of confusion analysis."

4    *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199,1208 (9th Cir. 2000) (internal citations

5    omitted). Google and its advertisers offer products and services identical to American Blind's

6    and use the American Blind Marks to do so: this makes confusion likely.

7              b.    The Goods and Services Advertised on the Google Search Results
                     Page Are Identical to Those Long Offered by American Blind

8

9         "When the goods produced by the alleged infringer compete for sales with those of the

10   trademark owner, infringement usually will be found if the marks are sufficiently similar that

11   confusion can be expected." *Sleekcraft*, 599 F.2d at 348; *see also Brookfield*, 174 F.3d at 1056

12   (where the marks are identical, "if they were used with identical products or services likelihood

13   of confusion would follow as a matter of course."). Again, Google and its advertisers use the

14   identical marks (the American Blind Marks) on the directly competing products and services.

15             c.    The Keywords Sold by Google to American Blind's
                     Competitors Are Identical to the American Blind Marks

16        The marks used by Google and its advertisers are indistinguishable from the American

17   Blind Marks. The keywords sold by Google are either identical to the American Blind Marks or

18   are abbreviations, misspellings or iterations of the American Blind Marks. Given the great

19   similarity between the marks here at issue, the greater the likelihood of confusion resulting from

20   Google's advertising scheme. *GoTo*, 202 F.3d at 1205-06.

21             d.    The Use of the American Blind Marks
                     As Keywords Results in Actual Confusion

22

23        Notwithstanding the fact that evidence of actual consumer confusion "is merely one

24   factor to be considered ... and it is not determinative" if it is not shown (*Park 'N Fly, Inc. v.*

25   *Dollar Park and Fly, Inc.*, 782 F.2d 1508, 1509 (9th Cir. 1986)), in addition to Google's own

26   evidence showing confusion, American Blind presents actual confusion evidence here.

27             (1)   The Ossip Study Is Evidence of Actual Confusion

28        American Blind's survey expert Alvin Ossip designed and supervised a study to

OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT, Case No. C 03-5340-JF (RS)
CH01/RAMMD/216530.3

1    determine whether Internet users seeking to order products on-line from American Blind are

2    likely to be confused by Sponsored Links presented by Google, as a result of Google's Key

3    Word Advertising Program.  Mr. Ossip found that in excess of 29% of respondents falsely

4    believed, after being shown a Google search results page for the entry "AMERICAN BLINDS,"

5    that "Sponsored Links" appearing on that page were affiliated with American Blind.  This is far

6    in excess of the levels of confusion found to be actionable in other Lanham Act litigation.  *See,*

7    *e.g., Jockey Int'l, Inc. v. Burkard*, 185 U.S.P.Q. 201 (S.D. Cal. 1975) (11.4 % confusion

8    actionable); *Re/Max Int'l, Inc v. Help-U-Sell, Inc*., 20 U.S.P.Q.2d 1945 (C.D. Cal. 1991)

9    (finding 28% confusion "significant" and noting that "much lower rates have been found to be

10   'strong evidence' of likelihood of confusion).

11          In the Ninth Circuit, survey evidence showing a likelihood of confusion, even if

12   criticized by the opposing party, will ***alone*** create a triable issue of fact precluding summary

13   judgment against the trademark holder.  *Playboy,* 354 F.3d at 1027 ("Because actual confusion

14   is at the heart of the likelihood of confusion analysis, Dr. Ford's [criticized, but uncontradicted]

15   report alone probably precludes summary judgment."); *Thane Int'l Inc.,* 305 F.3d at 903 ("But

16   drawing all justifiable inferences from the survey in Trek's favor as we must on summary

17   judgment, we must conclude that the survey provides evidence from which a reasonable jury

18   *could* conclude that more than one quarter of those who encounter both Trek and OrbiTrek ads

19   will be confused about the origin of the OrbiTrek exercise machine."); *E. & J. Gallo Winery v.*

20   *Consorzio Del Gallo Nero*, 782 F. Supp. 457, 466 (N.D. Cal. 1991) ("drawing all inferences in

21   the non-movant's favor, the Court finds nonetheless that there is *some* evidence of a likelihood

22   of confusion under both surveys, even if the Jacoby Survey results in only a 'trivial' showing.").

23                    (2)   Google's Unsupported Attacks on the Ossip
                           Study Go to Weight, Not Its Admissibility

24          Google argues that the Ossip Study "is of zero probative value."  (Google Brief, p. 18).

25   Relying upon the "Expert Report of Dr. Itamar Simonson" (the "Simonson Report"), Google,

26   citing no caselaw whatsoever, posits that the Ossip Study should be disregarded entirely by this

27   Court.  Although the flaws in Simonson's Report are addressed in detail in American Blind's

28

1    Evidentiary Objections and Daubert Motion filed herewith, Google's argument fails for three

2    reasons.  First, methodological deficiencies in a survey generally relate to the weight to be given

3    the survey's conclusions rather than to its admissibility.  *See Wendt v. Host Int'l, Inc.*, 125 F.3d

4    806, 814 (9th Cir. 1997).  Further, as stated in a leading treatise on trademark law, "it is

5    notoriously easy for one survey expert to appear to tear apart the methodology of a survey

6    conducted by someone else."  5 McCarthy, *McCarthy on Trademarks and Unfair Competition* ¶

7    32.178 (4th ed. 2006).

8         Second, although it is the plaintiff, Google has conducted no survey of its own in this

9    litigation (notwithstanding the fact that it did so in the *GEICO* litigation), and Simonson himself

10   has no empirical data upon which to base his criticisms.  "A plaintiff's failure to conduct a

11   consumer survey, assuming it has the financial resources to do so, may lead to an inference that

12   the results of the survey would be unfavorable."  *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d

13   1013, 1041 (C.D. Cal. 1998).  Thus, the failure of a critic such as Simonson to support his

14   criticisms with a survey of his own is a ground for giving such criticism no weight.  *See e.g. U-*

15   *Haul International, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1252 (D. Ariz. 1981), *aff'd*, 681

16   F.2d 1159 (9th Circuit 1982); *see also Whirlpool Props., Inc. v. LG Electronics*, No. 1:03-cv-

17   414, 2006 WL 62846, at * 3 (W.D. Mich. January 10, 2006).

18        Third, without citation to any authority, Google argues that "without a control" the Ossip

19   Study "cannot be relied upon" and is "of precisely zero probative value."  This too is false.

20   Courts in the Ninth Circuit regularly accept and rely upon survey evidence in Lanham Act cases

21   that do not incorporate a control cell.  *See e.g. Academy of Motion Picture Arts and Sciences v.*

22   *Creative House Promotions, Inc.*, 944 F.2d 1446 (9th Cir. 1991), *STX, Inc. v. Trik Stik, Inc.*, 708

23   F. Supp. 1551 (N.D. Cal. 1988), *Plasticolor*, 698 F. Supp. at 202; *Gallo Cattle Co.*, 967 F.2d at

24   1292; *cf. Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120 (C.D. Cal. 1998).  Ultimately,

25   the identical criticism – that a survey must have a control cell to be admissible – was similarly

26   lodged unsuccessfully by Dr. Simonson against a report authored by Mr. Ossip in *Empresa*

27   *Cubana Del Tabaco v. Culbro Corp.*, 2004 WL 602295 (S.D.N.Y. 2004).

28



**e.    American Blind's Products and Services
Are Offered in Identical Marketing Channels**

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. The marketing channels here are, in fact, identical: together with its competitors buying the American Blind Marks as keywords from Google, American Blind advertises and markets its products and services through Internet search engines.

**f.    Search Engine Users Are Not Sophisticated**

Independent research establishes that the majority of search engine users are not aware that there are two different kinds of search results. A 2002 study by Consumer Reports WebWatch of 1,500 U.S. adult Internet users showed that more than 60% of respondents were unaware that search engines accept fees to list some sites more prominently than others. (Garrity Decl., Ex. N.) A 2005 study by the Pew Internet & American Life Project found that 62% of Internet searchers are not aware of the distinction between paid and unpaid results. Further, only 18% of searchers said they could always identify which results are sponsored. (Garrity Decl., Ex. L.; *see also Id.*, Ex. Q at p. 8.) Not only does this evidence demonstrate that search engine users are not sophisticated and not likely to exercise any degree of care in connection with the advertising which Google delivers using keywords, the standard "includes the ignorant and credulous." *Sleekcraft*, 599 F.2d at 353. This factor strongly supports a finding of likelihood of confusion.

**g.    Google Knowingly and Willfully Trades Upon
The Goodwill of the American Blind Marks**

The last *Sleekcraft* factor to be considered here is Google's intent in its use of the

1   American Blind Marks in its advertising program. "Knowing use by an infringer of a trademark

2   identical to that of the trademark owner is strong evidence of intentional infringement and

3   likelihood of confusion." *Plasticolor*, 698 F. Supp. at 201. As the Ninth Circuit has held,

4   "'where the alleged infringer adopted his mark with knowledge, actual or constructive, that it

5   was another's trademark,' resolution of this factor" in the likelihood of confusion analysis favors

6   plaintiffs. *Surfvivor Media, Inc. v. Survivor Productions, Inc.,* 406 F.3d 625, 634 (9th Cir. 2005)

7   (quoting *Brookfield*, 174 F.3d at 1059); *see also Sleekcraft*, 599 F.2d at 354.

8          Here, Google unquestionably had actual and constructive knowledge of American

9   Blind's adoption and use of the American Blind Marks, not only through their use and

10  registration on the Principal Register at the USPTO, but also through multiple communications

11  received from American Blind informing Google of American Blind's marks.

12         Moreover, Google neither sought nor obtained an opinion of counsel that their trademark

13  policy for triggering keyword advertising was acceptable. *See Int'l Star Class Yacht Racing*

14  *Ass'n v. Tommy Hilfiger USA, Inc.*, 80 F.3d 739, 754 (2d Cir. 1996) (failure to conduct

15  trademark search or follow advice of counsel "reminds us of two of the famous trio of monkeys

16  who, by covering their eyes and ears, neither saw nor heard any evil. Such willful ignorance

17  should not provide a means by which Hilfiger can evade its obligations under trademark law.");

18  *see also Dreamwerks Production Group v. SKG Studio*, 142 F.3d 1127, 1132 (9th Cir. 1998)

19  ("any [] new company [] must ensure that its proposed mark will not infringe on the rights of

20  existing trademark holders.").

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  This, in combination with Google's adoption of marks identical to the ABWF marks for keyword

24  sales, must lead to the conclusion that this *Sleekcraft* favor weighs in favor of a likelihood of

25  confusion existing as a result of Google's conduct.

26  **E.    American Blind Has Raised Substantial Issues of Material**
        **Fact Concerning Google's Dilution of the American Blind Marks**

27         American Blind seeks relief for Google's conduct, which has led to the dilution of its

28

1   trademarks.  Google argues that American Blind's dilution claims are barred for a ***single*** reason:

2   because American Blind allegedly has failed, "[mainly] by failing to produce a survey" (Google

3   Brief, pp. 26, 28), to adduce evidence that the American Blind Marks are famous.[9]  Under

4   Section 43(c) of the Lanham Act, as amended in October 2006, "a mark is famous if it is widely

5   recognized by the consuming public of the United States as a designation of source of the goods

6   or services of the mark's owner."  In *Adidas America, Inc. v. Kmart Corp.*, 2006 WL 2044857

7   (D. Or. June 15, 2006), defendants asserted that plaintiff Adidas had submitted no evidence of

8   the fame of the Adidas marks at the time defendants began their use in the 1970s.  The court

9   noted that "[A]didas has submitted evidence that it has constantly used its Three-Stripe mark in

10  connection with footwear since 1952," and based on this evidence, concluded that defendants'

11  motion for summary judgment on plaintiff's dilution claim should be denied.  The same is true

12  here.  Google attempts to say that simply because American Blind has not performed a survey

13  specifically directed toward ascertaining whether the mark is famous, it has presented no

14  evidence of the fame of the mark.  Again, this is wrong on the law.  *See Nabisco, Inc. v. PF*

15  *Brands, Inc.*, 191 F.3d 208, 223-24 (2d Cir. 1999) (dilution surveys "are expensive, time-

16  consuming and not immune to manipulation…[P]laintiffs are ordinarily free to make their case

17  through circumstantial evidence that will justify an ultimate inference of injury."); *see also Eli*

18  *Lilly & Company v. Natural Answers, Inc.*, 233 F.3d 456, 468 (7th Cir. 2000) ("we doubt that

19  dilution of the distinctiveness of a mark is something that can be measured on an empirical basis

20  by even the most carefully constructed survey.").

21      Google fails to acknowledge that 15 U.S.C. § 1125(c)(2)(A) provides a non-exclusive list

22  of four factors to be considering in determining whether a mark is "famous."  These factors are:

23  _____

24      [9]  Google also claims that American Blinds' damages claim for dilution is barred because of
    a failure to show "actual dilution" under *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433
25  (2003).  This is wrong on the law.  *Moseley* held that "actual dilution" could be proven by
    circumstantial evidence where, as here, the defendant used an identical mark to that of the
26  plaintiff.  537 U.S. 434 ("Direct evidence of dilution . . . will not be necessary if actual dilution
    can reliably be proved through circumstantial evidence – the obvious case is one where the
27  junior and senior marks are identical.").  *See, e.g., Savin Corp. v. Savin Group,* 391 F.3d 439,
    452-53 (2d Cir. 2004).  "The closer the junior user comes to the senior's area of commerce, the
28  more likely it is that dilution will result from the use of a similar mark."  *Ford Motor Co. v.*
    *Lloyd Design Corp.*, 184 F. Supp. 2d 665, 680 (E.D. Mich. 2002).

1    (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the

2    amount, volume, and geographic extent of sales of goods or services offered under the mark; (3)

3    actual recognition of the mark; and (4) registration of the mark is registered on the principal

4    register.  American Blind here presents evidence that each of these factors weigh in favor of a

5    finding that the American Blind Marks are famous.  The balance of the American Blind Marks

6    have been in exclusive use nationwide in connection with American Blind's products and

7    services for over twenty (20) years.  American Blind has sold hundreds of millions of dollars

8    worth of products and services under its marks throughout the country.  The American Blind

9    Marks are well recognized – evidenced by their value when sold by Google as keywords to

10   American Blind's competitors.  And finally, as discussed above, American Blind is the owner of

11   all right, title and interest in and to federal registrations for the marks AMERICAN BLINDS;

12   AMERICAN BLIND FACTORY; DECORATETODAY; AMERICAN BLINDS,

13   WALLPAPER, & MORE; and AMERICAN BLIND AND WALLPAPER FACTORY.

14         When all the factors set forth in the statute are properly weighed, American Blind has

15   presented evidence sufficient to raise a factual question about whether or not its marks are

16   properly viewed as "famous" under the FTDA and California state law.  Accordingly, Google's

17   motion for summary judgment must be denied.

18   **F.   Google's "Unclean Hands" Argument is Specious**

19         Google, in a transparent attempt to draw attention from its infringing conduct, also

20   asserts that American Blind's claims are barred by its unclean hands, because American Blind's

21   own keyword advertising appears when a Google user searches for the query "USA Wallpaper."

22   While a plaintiff's unclean hands may be a defense to a Lanham Act trademark infringement or

23   dilution suit, "[t]o make out an unclean hands defense, a trademark defendant must demonstrate

24   that the plaintiff's conduct is inequitable and the conduct relates to the subject matter of its

25   claims.  To show that a trademark plaintiff's conduct is inequitable, defendant must show that

26   plaintiff used the trademark to deceive consumers."  *Japan Telecom, Inc. v. Japan Telecom*

27   *America, Inc.*, 287 F.3d 866, 870 (9th Cir. 2002).  "Bad intent is the essence of the defense" of

28   unclean hands.  *Wells Fargo & Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 307 (9th Cir.

1    1982). The doctrine of unclean hands "bars relief . . . to a plaintiff who has dirtied his hands in

2    acquiring the right presently asserted." *Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.*, 890

3    F.2d 165, 173 (9th Cir. 1989). Crucially, the alleged unclean hands must relate to the

4    *acquisition* of the right being asserted, and not be independent of the obtaining of those rights.

5    American Blinds' alleged unclean hands have no relation to how it obtained rights in the

6    American Blind Marks, and, therefore, cannot serve as a bar to American Blinds' claims that

7    Google's advertising scheme infringes those marks. *See Flow Control Indust., Inc. v. AMHI,*

8    *Inc.*, 278 F. Supp. 2d 1193 (W.D. Wash. 2003) (defendants' allegations that plaintiff had

9    infringed AMHI's AMFLOW mark did not bar Flow Control's ability to recover for

10   infringement by the defendant of Flow Control's SKOFLO mark.); *Kelley Blue Book v. Car*

11   *Smarts, Inc.*, 802 F. Supp. 278, 291 (C.D. Cal. 1992) ("What is material is not that the plaintiff's

12   hands are dirty, but that he dirties them in acquiring the right he now asserts.").

13          Furthermore, American Blind's alleged conduct does not rise to the level of unclean

14   hands. Indeed, American Blind does exactly what it asks Google to do here. Upon receiving

15   notification from a competitor or through American Blind's own policing that one of its

16   keyword-triggered advertisements appears when another party's trademark is input into the

17   Google search engine, American Blind promptly requests that such search term be denoted as a

18   "negative keyword" under Google's AdWords program. See Decl. of Susan Greenspon in

19   Support of Opposition to Google's Motion for Sanctions (Dkt. No. 258), ¶ 27. For instance,

20   American Blind has specifically designated as negative keywords a number of its competitors'

21   marks, including "Blinds To Go," "Just Blinds," "Star Blinds," and "Select Blinds." (*Id.*) Thus,

22   American Blind does exactly what it is asking Google to do. Upon request, American Blind

23   designates its competitor's marks as negative keywords in "broad match" keyword advertising

24   for terms such as "blind" and "wallpaper." That is precisely the injunctive relief American

25   Blind seeks from Google.

26                              **IV. <u>CONCLUSION</u>**

27          American Blind has raised triable issues of fact relating to its ownership of the American

28

1    Blind Marks, Google's use of the American Blind's Marks in commerce as required under the

2    Lanham Act, and the likelihood of confusion resulting from such use of the American Blind

3    Marks.  Given that the controlling issue of likelihood of confusion is so inherently factual, this

4    Court should deny Google's motion for summary judgment.

5    Dated: January 26, 2007                    HOWREY LLP

6                                               By:  /s/ Robert N. Phillips
7                                                    ROBERT N. PHILLIPS

8                                               David A. Rammelt
                                                Susan J. Greenspon
9                                               KELLEY DRYE & WARREN LLP
                                                333 West Wacker Drive, Suite 2600
10                                              Chicago, Illinois 60606

11                                              Attorneys for Defendant/Counter-Plaintiff
                                                American Blind and Wallpaper Factory, Inc.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28