# Exhibit J – 1

CH01/PLATC/210357.1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GOOGLE INC., a Delaware )
corporation, )
 )
        Plaintiff, )
 )
vs. ) Case No. C 03-5340-JF (RS)
 )
AMERICAN BLIND & WALLPAPER )
FACTORY, INC., a Delaware )
corporation d/b/a )
decoratetoday.com, Inc.; and )
DOES 1-100, inclusive, )
 )
        Defendants. )
_____)
AMERICAN BLIND & WALLPAPER )
FACTORY, INC., a Delaware )
corporation d/b/a )
decoratetody.com, Inc., )
 )
        Counter-Plaintiff, )
 )
vs. )
 )
GOOGLE, INC., )
 )
        Counter-Defendant. )
 )

DEPOSITION OF RICHARD STEELE, III
MESA, ARIZONA
SEPTEMBER 14, 2006

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
800-288-3376

REPORTED BY: DEBRA M. GALVIN, CR NO. 50375
FILE NO. A006D15

Page 2

```
 1          UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3
 4   GOOGLE INC., a Delaware      )
     corporation,                 )
 5                                )
         Plaintiff,                )
 6                                )
     vs.            ) Case No. C 03-5340-JF (RS)
 7                                )
     AMERICAN BLIND & WALLPAPER   )
 8   FACTORY, INC., a Delaware    )
     corporation d/b/a            )
 9   decoratetoday.com, Inc.; and )
     DOES 1-100, inclusive,       )
10                                )
         Defendant.                )
11   _____)
     AMERICAN BLIND & WALLPAPER   )
12   FACTORY, INC., a Delaware    )
     corporation d/b/a            )
13   decoratetody.com, Inc.,      )
                                  )
14       Counter-Plaintiff,       )
                                  )
15   vs.                          )
                                  )
16   GOOGLE, INC.,                )
                                  )
17       Counter-Defendant.       )
     _____)
18
19
20
21       Deposition of RICHARD STEELE, III, taken on behalf
22   of Defendant/Counter-Plaintiff American Blind & Wallpaper
23   Factory, Inc., at the Holiday Inn, 1600 South Country Club
24   Drive, Mesa, Arizona, commencing at 9:07 a.m., Thursday,
25   September 14, 2006, before Debra M. Galvin, CR No. 50375.
```

Page 3

```
 1             APPEARANCES
 2
 3   FOR THE PLAINTIFF/COUNTER-DEFENDANT GOOGLE, INC.:
 4   KEKER & VAN NEST, LLP
 5   BY: MICHAEL H. PAGE, ESQUIRE
 6   710 Sansome Street
 7   San Francisco, California 94111-1704
 8
 9
10
11   FOR THE DEFENDANT/COUNTER-PLAINTIFF AMERICAN BLIND &
12   WALLPAPER FACTORY, INC.:
13   KELLEY DRYE & WARREN, LLP
14   BY: CAROLINE PLATER, ESQUIRE
15   333 West Wacker Drive, Suite 2600
16   Chicago, Illinois 60606
17
18
19
20   FOR RICHARD STEELE, III, AND SELECTBLINDS:
21   RISTALINC, INTERNET RETAILERS
22   BY: AL SILVERBERG, President/CEO
23   955 East Javelina, Suite B111
24   Mesa, Arizona 85204
25
```

Page 4

```
 1                   INDEX
 2
 3   WITNESS: RICHARD STEELE, III
 4
 5   EXAMINATION                         PAGE
 6      BY MS. PLATER                      7
 7      BY MR. PAGE                       84
 8      BY MS. PLATER                    101
 9
10
11
12   EXHIBITS        DESCRIPTION         PAGE
13   NUMBER
14   1      Subpoena/Amended Notice of Deposition   7
15          and Document Requests
16   2      American Blind Marks                   32
17   3      Negative Keywords, Optimization        32
18          Proposal #6, Campaign #4, Ad Group #1
19          Modifications GGL005975-GGL006028
20   4      Letter from Susan Greenspon to Rick    54
21          Steele ABWF 001491-001493
22   5      E-mail from Rick Steele to Susan       56
23          Greenspon Subject: Keyword list by
24          Google ABWF 005516-005521
25
```

Page 5

```
 1             INDEX CONTINUED
 2
 3   EXHIBITS        DESCRIPTION         PAGE
 4   NUMBER
 5   6      E-mail from Rick Steele to Susan       60
 6          Greenspon Subject: Campaign #4
 7          Negative Keywords ABWF 005522
 8   7      E-mail from Rick Steele to Susan       63
 9          Greenspon Subject: Froogle
10          Information ABWF 005513-005515
11   8      E-mail from Susan Greespon to Rick     67
12          Steele Subject: Settlement
13          ABWF 000672-000673
14   9      E-mail from Rick Steele to Kirstina C  71
15          Subject: Your AdWords optimization
16          is ready GGLE 0019888-0019889
17   10     E-mail from April Dana to Rick Steele  77
18          Subject: Your AdWords optimization
19          is ready GGLE 00017442-00017443
20   11     E-mail from Kerry C to Rick Steele     79
21          Subject: Your AdWords optimization
22          GGLE 0020434-0020439
23   12     E-mail from Susan Greenspon to Rick    87
24          Steele Subject: Keyword list by Google
25          ABWF 000665-000671
```

Page 6

INDEX CONTINUED

| EXHIBITS NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 13 | E-mail from AdWords Support to Rick Steele Subject: Your Google AdWords Approval Status GGL 002602-002603 | 92 |

INFORMATION TO BE SUPPLIED:                    PAGE
  (None)

QUESTION WITNESS INSTRUCTED NOT TO ANSWER:
  (None)

Page 7

1  (Whereupon, Exhibit No. 1 was marked.)
2
3         RICHARD STEELE, III
4     having first been duly sworn, was
5     examined and testified as follows:
6
7            EXAMINATION
8  BY MS. PLATER:
9     Q  Mr. Steele, my name is Carrie Plater. I'm an
10 attorney with Kelley Drye & Warren, and we represent American
11 Blind & Wallpaper Factory in a case entitled Google versus
12 American Blind & Wallpaper Factory.
13        And we've served you with a subpoena in this matter
14 to get your testimony on things that we feel are relevant to
15 the litigation.
16    A  Uh-huh.
17    Q  If you would, just state your name, your full name
18 for the record.
19    A  Richard Henry Steele, III.
20    Q  And, if you could, just spell your last name.
21    A  S-t-e-e-l-e.
22    Q  And it was the III? I'm sorry.
23    A  Correct.
24    Q  And, Mr. Steele, you did receive a subpoena in this
25 matter, and you are appearing here pursuant to that subpoena

Page 8

1  and other correspondence that we've had with you?
2     A  Uh-huh.
3        (Whereupon, the court reporter asks for
4  clarification, and the following was had:)
5     THE WITNESS: Yes.
6     Q  (By Ms. Plater) So this might be an appropriate time
7  to go down some of the ground rules for a deposition.
8        Have you ever had your -- had a deposition taken
9  before --
10    A  No.
11    Q  -- where you've testified?
12    A  No.
13    Q  Basically, what the court reporter had mentioned to
14 you is she needs verbal answers for everything. So no shakes
15 of the head or "uh-huhs" or "huh-huhs," because you can't
16 really decipher on the record whether that's an affirmative
17 or a negative.
18       We both need to keep our voices up with the noise
19 in the room so she can get everything down, and then, as much
20 as possible, try not to speak over each other.
21       Sometimes I'll start asking you a question and
22 you'll know exactly where I'm going or think you know exactly
23 where I'm going, so you want to answer right away.
24       If you can just hold off until I finish the
25 question and then start your answer, that will make for a

Page 9

1  cleaner record.
2        And, basically, if I ask you a question and if you
3  answer it, I'm going to assume that you understood my
4  question.
5     A  Okay.
6     Q  Does that sound fair?
7     A  Yes.
8     Q  Okay. What, if anything, did you do to prepare for
9  today?
10    A  I don't understand.
11    Q  Did you review anything, talk to anyone?
12    A  I reviewed the subpoena.
13    Q  Okay. And when you say "the subpoena," are you
14 referring to the subpoena and the notice of deposition that
15 you received?
16    A  Yes.
17    Q  Okay.
18       MS. PLATER: And we've marked as Exhibit 1 that
19 subpoena and the "Amended Notice of Deposition of Rick Steele
20 and Document Requests."
21       So let the record reflect that this is the
22 subpoena deposition of Richard Henry Steele, III, taken
23 pursuant to subpoena and notice in accordance with the
24 Federal Rules of Civil Procedure, Rules 30 and 45, and it
25 will be taken in accordance with all of the applicable local


## Page 10

1  rules in this matter.
2  Q  (By Ms. Plater) So you've reviewed the subpoena,
3  reviewed the notice. I know you produced one e-mail that you
4  found. Can you tell me what you did to look for the e-mail
5  that you had produced to us?
6  A  An e-mail search in my e-mail files.
7  Q  Okay.
8  A  From Google.
9  Q  So do you have like a subfile broken out in your
10 e-mail for all of your Google correspondence?
11 A  I do.
12 Q  And how far do they date back?
13 A  Two years, plus or minus.
14 Q  And does SelectBlinds have a document retention or
15 e-mail retention policy?
16 A  No.
17 Q  You just sort of clean out your e-mail according to
18 how long you think you need to retain matters?
19 A  Correct.
20 Q  Okay. So any e-mail that you would have had or
21 correspondence from Google or to Google prior to two years
22 ago, you've probably deleted; is that correct?
23 A  Yes.
24 Q  All right. If you can, just give me kind of a
25 quick educational background, nothing too lengthy.

## Page 11

1  A  Of my personal?
2  Q  Yes.
3  A  Entrepreneur since 1991. High school graduate,
4  college dropout. School of hard knocks.
5  Q  Where did you go to high school?
6  A  Felicity Franklin.
7  Q  Where is that located?
8  A  Ohio.
9  Q  And how about college?
10 A  University of Dayton, Ohio.
11 Q  And then, if you could, give me your employment
12 history. You don't have to go back -- you know, probably
13 from 1991, forward.
14 A  Telemarketing manager for Fidelity Mortgage. And
15 then in '97, started a mortgage company myself called
16 Affordable Mortgage. That led to my first Internet company,
17 lowestmortgage.com. And ever since, that corporation has
18 held and followed through to the blinds business.
19 Q  How did lowestmortgage.com follow through into the
20 blinds business?
21 A  It's a company we sold in transition; started
22 blinds 2003. So we were an Internet company for all intents
23 and purposes.
24 Q  Uh-huh.
25 A  We just stayed in the Internet business. There was

## Page 12

1  no correlation.
2  Q  Okay. And then when you say the "blinds" company,
3  are you talking about SelectBlinds?
4  A  Correct.
5  Q  All right. And does SelectBlinds go by any other
6  names?
7  A  No.
8  Q  Just SelectBlinds or selectblinds.com?
9  A  Correct.
10 Q  And am I correct that you said 2001 is when
11 SelectBlinds was started up?
12 A  2003.
13 Q  I'm sorry. 2003. What got you interested in doing
14 a blinds business?
15    MR. SILVERBERG: Do you know?
16    THE WITNESS: Yeah. I don't remember, really. I
17 mean, it was just entrepreneurial spirit.
18 Q  (By Ms. Plater) Saw a market --
19 A  Yeah.
20 Q  -- and thought you'd go into it?
21 A  Sure.
22 Q  Okay. And did you, in particular, see that the
23 blinds business was a market you wanted to pursue on the
24 Internet?
25 A  We just had Internet experience, so...

## Page 13

1  Q  Okay. So what was your starting title or position
2  at SelectBlinds, then, in 2003?
3  A  Owner.
4  Q  Owner? How many people did you have working for
5  you then?
6  A  Eight.
7  Q  How about now?
8    THE WITNESS: How many do we have now?
9    MR. SILVERBERG: Sixteen.
10   THE WITNESS: Sixteen.
11 Q  (By Ms. Plater) And SelectBlinds is based in Mesa,
12 Arizona?
13 A  It is.
14 Q  And I guess the mortgage company you had going,
15 were you in Ohio for that one?
16 A  No.
17 Q  You were already in -- been in Arizona?
18 A  Yes.
19 Q  Okay. Can you give me sort of a thumbnail sketch
20 of the business of SelectBlinds -- what you guys do, sell, et
21 cetera?
22 A  Just we sell window fashions over the Internet. I
23 mean, that's a thumbnail.
24 Q  What kind of window fashions, what categories?
25 A  Blinds and shades.

Page 14

1 Q Do you sell drapes?
2 A No.
3 Q And you don't sell anything other than window
4 coverings?
5 A On that Web site, no. We have other businesses,
6 but on the SelectBlinds Web site, that's it.
7 Q Okay. What are the other businesses?
8 A We have a ceiling fan business. That's it.
9 Q Okay. What's the name of the ceiling fan business?
10 A Selectfans.com.
11 Q All right. So as not to be confused.
12    Can you give me a rough estimate of your sales for
13 a year -- or, at least, for 2006 at SelectBlinds?
14 A You know, we like to keep that private. We
15 wouldn't want to disclose any of that.
16 Q Okay. How about volume?
17 A Somebody in our industry could take that and figure
18 that out pretty easily. So we wouldn't want to disclose that
19 either.
20    THE WITNESS: We don't want to disclose that, do
21 we?
22    MR. SILVERBERG: (No verbal response.)
23    THE WITNESS: Yeah. Yeah.
24    MR. PAGE: It's your question.
25    MS. PLATER: Okay. I mean, if you're here

Page 15

1 representing him and you're making that objection, just make
2 it on the record if you would.
3    MR. SILVERBERG: Okay. Well, we object to the --
4 we object to that question, the relevancy of the volume that
5 we're doing.
6 Q (By Ms. Plater) Okay. How does SelectBlinds
7 advertise?
8 A You know, Internet.
9 Q Exclusively?
10 A No. We have other means of advertising.
11 Q Can you tell me what the other means are?
12 A Again, that would be, you know, confidential. It's
13 secret sauce.
14 Q Well, if it's advertising, then it's out in the
15 public. So I would not consider that confidential.
16    THE WITNESS: Can we tell them that?
17    MR. SILVERBERG: Sure.
18    THE WITNESS: Yeah. So we do very small print
19 advertising, you know, from time to time. And...
20    MR. SILVERBERG: But, mainly, Internet.
21    THE WITNESS: Yeah. But, basically, it's primarily
22 Internet advertising.
23 Q (By Ms. Plater) Okay. So if you could split it out,
24 when you say "basically Internet" --
25 A Ninety-nine percent Internet.

Page 16

1 Q Ninety-nine Internet.
2 A Yeah. And 99 in percentage points, yeah.
3 Q Okay. Great. Thank you. So you stated that 99
4 percent of your advertising is done online.
5    Can you tell me where you advertise online?
6 A Yeah. Google, Yahoo, MSN, shopping search sites
7 such as -- well, we can leave it vague, it's generic. And
8 that's -- those are the four places.
9 Q Okay. For each of the four places, can you kind of
10 break down, again, the percentage of advertising you allocate
11 to each one?
12 A Yeah, we don't want to do that because that's --
13 that would get into the proprietary nature of kind of our --
14 how we run -- where we're having our successes and where
15 we're not.
16 Q Okay. Then I guess I will leave that alone, since
17 I'm not interested in that.
18 A Yeah.
19    MR. PAGE: How insulting.
20    MS. PLATER: No. It's called pick your battles.
21 Don't go on a tangent you don't need.
22 Q (By Ms. Plater) Let's see. And from the beginning
23 in 2003, the beginning of SelectBlinds, have you always been
24 advertising with these four, four groups or --
25 A No. We originally started out with just Yahoo. I

Page 17

1 don't think we picked Google up until early 2004.
2    Again, that's a rough estimate.
3 Q Uh-huh.
4 A I'm sure Google could nail that number for you and
5 tell you exactly.
6 Q I would guess so, but I'm not --
7 A We would probably have no --
8 Q -- certain at this point.
9 A Yeah.
10 Q All right. And when you branched out to adding
11 Google, did you see that this increased your profitability or
12 your sales?
13 A Sure. Yes.
14 Q Do you get something from your Google advertisement
15 that you don't get from the other three -- Yahoo, MSN and the
16 shopping search sites?
17    MR. PAGE: I object as to form.
18 Q (By Ms. Plater) You can go ahead.
19 A They offer some features, you know, by advertising
20 on Google, Google analytics. But they're most all the same.
21 Q What kind of Google analytics are you talking
22 about?
23 A Just Web site analytics lets us track visitors.
24 Q Anything else?
25 A No.

Page 18

1  Q  Now based on your recollection, you think you
2  probably started advertising through Google in early 2004?
3  A  Yeah.
4  Q  We'll kind of use that as the time frame for now
5  until we figure out otherwise.
6  A  Okay.
7  Q  During that time, since that time period, have you
8  utilized the AdWords program?
9  A  Yes.
10 Q  And have you used that the entire time you've been
11 advertising with them?
12 A  Yes.
13 Q  And do you work through a representative, or do you
14 sometimes create your campaigns on your own?
15 A  We've never created a campaign on our own that I
16 recall. They've all been recommendations from Google.
17 Q  All right. And have you ever used -- it's gone by
18 two names during the time you may have used it, I think --
19 the Keyword Suggestion Tool or the Keyword Tool?
20      MR. PAGE: Object as to form.
21      THE WITNESS: Yeah. Okay. So let me go back to
22 the last question.
23 Q  (By Ms. Plater) Okay.
24 A  We initially did create our own campaigns, which is
25 generic keywords -- blinds and shades. And that's kind of

Page 19

1  the early dawn of cost-per-click advertising.
2      At that time, we did use the Keyword Suggestion
3  Tools to, you know, give suggestions on keywords.
4      So that would have been, as I recall, the only use
5  of that tool.
6  Q  And do you know how many times you probably used
7  the Keyword Suggestion Tool?
8  A  Just that one time.
9  Q  Just one time. And then you'd probably be -- do
10 you think you turned to using representatives exclusively
11 after that?
12 A  Yes.
13 Q  Okay. Do you recall the one time you did use the
14 Keyword Suggestion Tool what, if any, suggestions that came
15 up when you used it?
16 A  I wouldn't recall that, that's so long ago.
17 Q  Do you recall if it suggested -- I'm going to --
18 actually, at this time, I'm going to show you -- I don't
19 really want to mark this as an exhibit.
20      It's just a list of the American Blind marks, so
21 when I say "American Blind marks," you'll know what we're
22 looking at.
23      MR. PAGE: I'd prefer you mark it --
24      MS. PLATER: Okay.
25      MR. PAGE: -- because, otherwise --

Page 20

1      MS. PLATER: Actually --
2      MR. PAGE: -- the person reading the transcript --
3      MS. PLATER: -- what I think I'm going to do --
4      MR. PAGE: -- will have no idea what you're talking
5  about.
6      MS. PLATER: -- I'm going to mark the actual
7  registry that was done. Because I just started to do this as
8  a cheat sheet, so that we wouldn't have to be looking at
9  that.
10     MR. PAGE: I have no objection to using the cheat
11 sheet if it's easier. It's just if you're going to ask him
12 questions that refer to it, somebody reading the transcript
13 won't know --
14     MS. PLATER: All right.
15     MR. PAGE: -- what that means if it's not an
16 exhibit.
17     MS. PLATER: It's easier to read off that, and I'll
18 give you that.
19     THE WITNESS: These are the number of impressions?
20 Q  (By Ms. Plater) No, no, no. Those are the
21 registration --
22 A  Oh. The registration marks.
23 Q  These are trademarks.
24 A  Okay.
25 Q  Because throughout this deposition I'm probably

Page 21

1  going to be referring to the American Blind marks, and I
2  don't want to have to go through all, you know, five listed
3  on there every time. So if you -- you can see it, it's in
4  front of you.
5  A  Sure.
6  Q  And if I say it, you can say, okay, let me see,
7  I'll look, and figure out if it correlates with what I'm
8  asking you.
9  A  Okay.
10     MS. PLATER: So I, actually, only brought two of
11 those, and I'll have you mark his copy of that.
12     THE COURT REPORTER: Okay.
13     MS. PLATER: And that will be Exhibit 2.
14 Q  (By Ms. Plater) Well, with that said, now that I've
15 shown you a list of American Blind marks, do you recall if
16 the one time that you used the Keyword Suggestion Tool
17 whether or not any of the American Blind marks were suggested
18 to you?
19 A  I don't recall.
20     MR. PAGE: Object as to form.
21 Q  (By Ms. Plater) How often, on average, do you
22 communicate with Google or a Google rep with regard to your
23 advertising needs?
24 A  You know, I would say every six months.
25 Q  So you let your campaigns run for six months at a

Page 22

1 time without changing them?
2  A  We get pretty robust --
3     MR. PAGE: Object as to form. Misstates his prior
4 testimony.
5     THE WITNESS: We -- we tweak the campaign from time
6 to time, adding negative keywords and, you know, things that
7 aren't relevant to our industry. But I would say plus or
8 minus every six months.
9  Q  (By Ms. Plater) And then the tweaking you probably
10 do on your own, or do you recall the --
11  A  On our own.
12  Q  You do it on your own?
13  A  Yeah.
14  Q  Okay. Is your communication with Google
15 exclusively through e-mail?
16  A  Primarily.
17  Q  And how else do you communicate?
18  A  Phone.
19  Q  I have a bunch of documents that show a lot of
20 different names for Google representatives that had
21 corresponded with you, and this goes back to January 2004.
22  A  Okay.
23  Q  So I'm going to ask you a couple of their names and
24 maybe see if you could fill in who they are, their last name
25 if I don't have it.

Page 23

1  A  Okay.
2  Q  And --
3     MR. PAGE: I'll object to the form. Of the
4 question. Not to hide anything, my objections as to form are
5 because your questions are almost universally leading, and
6 you're not entitled to lead this witness.
7     MS. PLATER: I know I'm not. And --
8     MR. PAGE: That's the nature of the objection.
9     MS. PLATER: -- I'm doing it kind of to speed
10 through things that are not terribly contentious.
11     MR. PAGE: Nevertheless, I need to object when you
12 lead him.
13     MS. PLATER: Okay.
14  Q  (By Ms. Plater) Let's see. I've got a Kristina C.
15     Do you know who that is from Google?
16  A  Don't know the name.
17  Q  How about April D?
18  A  Don't know that name either.
19  Q  Or Dana K?
20  A  Don't know that name.
21  Q  Let's see. Jill R?
22  A  No.
23  Q  Or Jill Randell?
24  A  Don't remember that name.
25  Q  Is the SelectBlinds name trademarked?

Page 24

1  A  You know, I don't know what trademarks we have on
2 it. I think we at one point in time registered, but I don't
3 know where we stand in that process.
4  Q  Okay. Did you register any other trademarks in
5 conjunction with SelectBlinds?
6  A  I don't believe so.
7  Q  Might you have, though?
8  A  It's possible, yes.
9  Q  What names or phrases would you have possibly
10 registered also?
11     MR. PAGE: Object as to form.
12     THE WITNESS: Yeah. I wouldn't have any
13 recollection of what that would have been.
14  Q  (By Ms. Plater) Who would have a recollection of
15 what might have been registered?
16  A  Rick Steele.
17  Q  Okay. So you just don't have a memory of it --
18  A  Yeah.
19  Q  -- anymore?
20  A  Yeah.
21  Q  So we don't know if SelectBlinds is a trademark,
22 but it is registered, likely, or in the registered process?
23  A  Yeah.
24     MS. PLATER: If I refer to it as their mark, will
25 you object?

Page 25

1     MR. PAGE: As long as the witness understands what
2 you mean --
3     MS. PLATER: Because we --
4     THE WITNESS: Yeah, I understand.
5     MS. PLATER: Okay.
6     (Whereupon, the court reporter asks for
7 clarification, and the following was had:)
8     MR. PAGE: Given that there's only one of them,
9 isn't it easier just to refer to it as SelectBlinds?
10     MS. PLATER: Sure.
11     MR. PAGE: It's not like you need a group name for
12 it.
13     MS. PLATER: No, you're right.
14  Q  (By Ms. Plater) Do you use "select blinds" as
15 keywords in your advertising with Google?
16  A  We do.
17  Q  Do any of your competitors use "select blinds" as
18 keywords in their advertising with Google?
19  A  They've been known to.
20  Q  Do you have any opinion on competitors using
21 "select blinds" as keywords?
22     MR. PAGE: Object that it, obviously, calls for an
23 opinion or a legal conclusion.
24     THE WITNESS: Yeah. I don't have any opinion on
25 it.

Page 26

1  Q  (By Ms. Plater) Do you like it?
2  A  No opinion.
3  Q  So you have no problem with your competitors using
4  "select blinds" as a keyword in their advertising?
5  A  I don't like that it happens.
6  Q  Why don't you like that it happens?
7  A  I guess for obvious reasons.
8  Q  I guess I don't know the obvious reasons.
9  A  It's our -- you know, if it's a trademark, you
10 know, we're using it in commerce, we should be protected by
11 that use.
12 Q  And you put a lot of money into the SelectBlinds'
13 name?
14    MR. PAGE: I'd just object as to form.
15    (Whereupon, the witness and Mr. Silverberg confer,
16 and the following was had:)
17    MR. SILVERBERG: Can we take a short break?
18    MS. PLATER: Sure.
19    (Whereupon, a break was taken, and the following
20 was had:)
21 Q  (By Ms. Plater) Okay. I had a question pending
22 before you left the room with your counselor.
23 A  Yeah.
24 Q  And if the court reporter could read it back to
25 you, give me an answer.

Page 27

1    (Whereupon, the record was read, and the following
2  was had:)
3    THE WITNESS: Clarify that. I mean, I don't know
4  what you mean.
5  Q  (By Ms. Plater) In terms of developing your name in
6  the marketplace, your advertising spending, how much you
7  spend to bid on "select blinds" as a keyword.
8  A  We do spend money on that.
9    MR. PAGE: Object as compound.
10   (Whereupon, the witness and Mr. Silverberg confer,
11 and the following was had:)
12   MR. PAGE: I need to ask that the record reflect
13 that at various times the witness is being coached or spoken
14 to by his associate. I think the record just needs to show
15 that.
16 Q  (By Ms. Plater) And if you just want to take a
17 break, I'd like you to do it after we finish answering the
18 question --
19 A  Okay.
20 Q  -- just so you know.
21   MS. PLATER: Off the record for a second.
22   (Whereupon, there was a discussion off the record,
23 and the following was had:)
24   MS. PLATER: On the record.
25 Q  (By Ms. Plater) Are you aware that in -- in or

Page 28

1  around June 2004, Google changed it's trademark policy with
2  regard to advertising?
3  A  No.
4  Q  Do you know if prior to June 2004, if your
5  competitors were able to bid on the SelectBlinds' name and
6  use it as a keyword?
7  A  Prior to or after?
8  Q  Prior to --
9    MR. PAGE: Object as vague and ambiguous.
10 Q  (By Ms. Plater) Prior to June 2004, do you know if
11 competitors could use it --
12 A  I don't know.
13 Q  -- could use it as a keyword?
14 A  Yeah, I don't know.
15 Q  Don't know. Do you know if they could use it in
16 their ad text?
17 A  I don't know. I don't recall any of that before
18 2004.
19 Q  So after June 2004, do you know if your competitors
20 were able to bid on your company's name, SelectBlinds, as a
21 keyword?
22 A  I do know that, yes. And they are -- were.
23 Q  Do they continue to?
24 A  I'd have to pull up the Internet right now and see.
25   I believe there still are competitors utilizing

Page 29

1  that name today.
2  Q  Do you have to place higher bids on the
3  SelectBlinds' name because of your competitors using it as a
4  keyword?
5  A  I don't know.
6    MR. PAGE: Object as calling for speculation.
7  Q  (By Ms. Plater) Who would know?
8  A  I don't know who would know.
9  Q  No one in your organization would know?
10 A  No.
11 Q  Do you know how much you bid for the SelectBlinds'
12 name, let's say, one year ago today?
13 A  No. I don't know.
14 Q  Do you know how much you have to bid for it today?
15 A  No. Because there's various of ranges that changes
16 based on their algorithm, so I don't know.
17 Q  Do you know the variation? I mean, you don't have
18 to tell me the amount of the bid.
19 A  Yeah.
20 Q  You can tell me the spread?
21 A  I don't know, because I have never -- I've never
22 looked at that.
23 Q  Does anyone at your company look at that?
24 A  I do.
25 Q  But you've never looked at the amount that it costs

8 (Pages 26 to 29)

Page 30

1  to bid on your own tradename?
2     A   For some of the terms, we have broad matches.  So
3  it doesn't tell me what I paid for that name, rather than
4  what I paid for a group of names.  So it's tough for me to
5  tell you what that word -- you know, that one word costs.
6     Q   You did testify that you're aware that some of your
7  competitors have used the SelectBlinds' name as a keyword --
8     A   Right.
9     Q   -- correct?
10    A   Yes.
11    Q   Have you ever filed any kind of complaints with
12 Google regarding that use by competitors?
13    A   Say that again.
14    Q   I'm sorry.  Have you ever filed a trademark --
15    A   Oh.  "Filed."
16    Q   -- filed a trademark, submitted -- whatever you
17 want to call it -- of any kind of complaint procedure with
18 Google in regards to any of your competitors using
19 SelectBlinds as a keyword?
20    A   No.
21    Q   Have you ever filed a lawsuit against any of your
22 competitors for their use of your tradename?
23    A   No.
24    Q   Are you familiar with the company American Blind &
25 Wallpaper Factory?

Page 31

1     A   I am.
2     Q   And how are you familiar with them?
3     A   Word of mouth.
4     Q   When did you first come to know about American
5  Blind & Wallpaper Factory?
6     A   I think the first time I saw them was on TV, on a
7  commercial several years ago, maybe pre-2000.
8     Q   Before you were doing SelectBlinds?
9     A   Yes.  The catalog eight hundred, Steve Katz.
10        MS. PLATER:  Okay.  Off the record.
11        (Whereupon, there was a discussion off the record,
12 and the following was had:)
13        MS. PLATER:  Back on the record.
14    Q   (By Ms. Plater) Would you consider -- I'm going to
15 call American Blind & Wallpaper Factory just American Blind
16 from here on out just to shorten it up.
17    A   Okay.
18    Q   Do you consider American Blind a competitor of
19 SelectBlinds?
20    A   Yes.
21    Q   Is it one of your bigger competitors, smaller
22 competitors -- can you quantify?
23    A   Don't know.
24    Q   Okay.  I'm going to start passing out documents
25 now.  This is the fun part.

Page 32

1     A   Yea.
2        MS. PLATER:  We can mark this as Exhibit 3.
3        (Whereupon, Exhibit Nos. 2 and 3 were marked.)
4     Q   (By Ms. Plater) I'll represent that the documents,
5  the group of documents that I just passed to you are
6  documents that were produced by Google in this litigation,
7  and they are Bates range marked GGL 005975 --
8     A   Uh-huh.
9     Q   -- through 006028.  Have you ever seen these
10 documents before?
11    A   Yeah, I do remember seeing these.
12    Q   Do you know when they're from?
13        MR. PAGE:  Objection.  Compound, perhaps.
14        THE WITNESS:  I don't.  I couldn't put a date on
15 it.
16    Q   (By Ms. Plater) Do you know if they're from 2004?
17    A   I don't.
18    Q   Do you know -- you did say that you've seen them
19 before, correct?
20    A   Yes, I have seen this before.
21    Q   So at some point you received them, correct?
22    A   Yes.
23    Q   Do you know where you got them from?
24    A   Well, this was not produced as a document, rather
25 than a -- an online screen -- applicable link to an online

Page 33

1  screen.
2     Q   Was this online screen from Google?
3        MR. PAGE:  Let me object again as compound.  The
4  objection is you put together a number of different documents
5  that the answer is going to be different as to different
6  documents.
7        MS. PLATER:  Okay.  We'll be going through them
8  page by page, so we'll clarify any problems you have with
9  that.
10    Q   (By Ms. Plater) If you'll look at GGL 005980, that's
11 where I think the online screen that you're referring to
12 begins.
13    A   Say that again.  GGL -- what was the number?
14    Q   Yeah.  5980.
15    A   Yes, I see that.
16    Q   Okay.  All right.  So do you see -- if you go to
17 the top of the page --
18    A   Uh-huh.
19    Q   -- is your name listed up there, or your --
20    A   It is our e-mail address.
21    Q   -- e-mail?
22    A   Uh-huh.
23    Q   Okay.  And do you see the name Ronnie Castro?
24    A   Ronnie Castro.
25    Q   It's up in the --

Page 34

1    A    I do see that, yes.
2    Q    -- corner.
3    A    "AdWords US," yes.
4    Q    Do you know who that is?
5    A    I do not remember that name.
6    Q    Now if you'd keep scrolling down the page --
7    A    Okay.
8    Q    -- to the line that says "Optimization Proposal
9    #6" --
10   A    Uh-huh.
11   Q    -- dash Campaign #4."
12   A    Got it.
13   Q    All right. I'm going to go through and ask you to
14   read some of this document, and I'll probably ask you
15   questions then about the statements made in it.
16   A    Okay.
17   Q    If you go into the boxed portion --
18   A    Got it.
19   Q    -- can you read the first paragraph?
20   A    "We recognized your campaign structure to allow
21   more customized, creative, targeted ads. My proposal
22   involves creating separate Ad Groups for each of your product
23   lines, then reworking your ads to focus specifically on the
24   products in these Ad Groups. Your ads will be more targeted,
25   which will increase the likelihood of a prospect clicking

Page 35

1    through to your site."
2    Q    Do you know who wrote that to you?
3    A    No.
4    Q    Now if you go to the third paragraph down, can you
5    read that?
6    A    "We have separate Ad Groups for high traffic
7    keywords 'blinds' and 'shades.' We suggest 4 customized
8    creatives for such Ad Groups to maximize that keyword's
9    potential."
10   Q    Do you know what the "customized creatives" refers
11   to?
12   A    Yes.
13   Q    What is that?
14   A    Listings, ad listings.
15   Q    Okay. Keep going down the page.
16   A    Okay.
17   Q    And right underneath the "Optimize" and "Decline
18   All" buttons --
19   A    Okay.
20   Q    -- do you see, there's a paragraph? Will you read
21   that paragraph for me, please?
22   A    "If you decide to accept" -- is that --
23   Q    "Google provides optimization" --
24   A    Oh, sorry. "Google provides optimization
25   recommendations for your account as a service and for your

Page 36

1    convenience. Your acceptance of this optimization indicates
2    you have reviewed the optimization fully. Please note that
3    per the Google AdWords terms and conditions, you are solely
4    responsible for the changes which have been made to your
5    account."
6    Q    Okay. So the optimization recommendations that is
7    referenced in that line --
8    A    Uh-huh.
9    Q    -- do you know who provides those to you?
10   A    Our Google rep.
11   Q    Do you know how they come up with their
12   optimization recommendations?
13   A    I do not.
14   Q    Okay. Now we keep going down, and in the next
15   boxed area of the screen --
16   A    Uh-huh.
17   Q    -- it's titled "Proposed Changes." And you keep
18   going on, there's --
19   A    I see it.
20   Q    -- "Ad Groups."
21   A    Got it.
22   Q    And it says: 1 of 27 --
23   A    Uh-huh.
24   Q    -- 1 through 27 of 27 optimized Ad Groups.
25        Can you tell me what the second Ad Group added is?

Page 37

1    A    "American Blinds."
2    Q    And what does it say across from that?
3    A    "Ad Group Created."
4    Q    Do you know what that means?
5    A    That means that that's the proposal, and that the
6    Google rep has created a specific Ad Group for the keyword
7    "American Blinds."
8    Q    Okay. And what's your understanding of the benefit
9    of having an Ad Group that's named American Blinds?
10   A    Well, there's -- the benefit would be to capture
11   buyers in America; and not infringe upon a trademark, but to
12   capture.
13        Now I don't want to make that statement as a
14   blanket statement for the entire Ad Group, because I think
15   when we get into the entire Ad Group, there will be specific
16   keywords that -- you know, my infringement upon a trademark
17   had there not been negatives in the campaign.
18   Q    But, in any event, you had not created this
19   campaign?
20   A    That's correct. That's correct.
21   Q    And you don't know what the Google rep's intentions
22   were in creating the American Blinds campaign, do you?
23   A    Do not.
24   Q    Okay. Let's page to 583 -- no, I'm sorry -- 5983.
25        If you look at the "American Blinds - Suggested Ad

### Page 38

1  Group Addition" -- it's at the top of the page, the "American
2  Blinds" in bold --
3     A   I see that.
4     Q   -- can you read the sentence that's following that?
5     A   "Here's a new Ad Group we feel will help improve
6  your overall advertising performance. If you agree with this
7  suggestion, click 'Approved' below. If you disagree with
8  this suggestion, click 'Decline.'"
9     Q   And this statement states that it's providing you
10 with a suggestion. What's your understanding of what the
11 suggestion is?
12    A   That we could derive clicks if we advertised these
13 words.
14    Q   And the statement also says that here's a new Ad
15 Group we feel will help improve your overall advertising
16 performance.
17    A   Uh-huh.
18    Q   Do you have any understanding of how that would
19 help -- this group would help improve your advertising
20 performance?
21    A   No. I don't think -- I don't know how it would
22 help us improve it.
23    Q   Would it improve your advertising performance if
24 you captured some customers that were looking for American
25 Blind & Wallpaper Factory's Web site?

### Page 39

1     A   No. It would just cost us more money.
2     Q   Would it improve your overall advertising
3  performance if you captured some of those same customers and
4  they purchased from you?
5     A   It wouldn't improve the ad performance, no.
6     Q   What would improve your ad performance?
7     A   Advertising words that are relevant to our company,
8  I think.
9     Q   What are words that are relevant to your company?
10    A   Select Blinds. Generic keywords -- blinds, shades,
11 wood blinds. You know, I think if somebody's looking for
12 American Blind & Wallpaper, I don't want to pay for that
13 customer to come to my site, because they're not looking for
14 SelectBlinds. They're looking for American Blind &
15 Wallpaper.
16    Q   What if they're just looking for wood blinds, and
17 they remember the name American Blind & Wallpaper, but they
18 end up on your site and they purchase from you.
19        Is that a benefit to you?
20    A   I don't -- overall, I don't think it is. Because
21 we have to spend money to get that customer to our site, so I
22 don't believe it is.
23    Q   So, if I'm understanding you, a sale is not -- is
24 not -- it's beneficial to you if it came under any keyword
25 that wasn't either your tradename or a generic name?

### Page 40

1     A   Any sale --
2         MR. PAGE: I'll object as argumentative.
3     Q   (By Ms. Plater) Go ahead.
4     A   Obviously, any sale is important for our company.
5         However, sales at the cost of added expense, that
6  don't fit within our return on our investment, you know, we
7  don't want those sales, bottom line, you know.
8         You know, my true feeling is a customer looking for
9  American Blind & Wallpaper, that's what they're looking for.
10 When they type in "selectblinds," they're looking for
11 SelectBlinds. That's my feeling.
12    Q   Do you sell some of the same products as American
13 Blind & Wallpaper?
14        MR. PAGE: Object as vague and ambiguous.
15    Q   (By Ms. Plater) Do you want me to enumerate some of
16 the products to clarify that?
17        MR. PAGE: The vagueness is -- your question could
18 be do you both sell from the same suppliers as opposed to do
19 you both sell blinds.
20        MS. PLATER: That's what I was going to tell him
21 and clarify it.
22        THE WITNESS: So the question is?
23    Q   (By Ms. Plater) Do you know if American Blind sells
24 blinds?
25    A   I do, yes.

### Page 41

1     Q   Does SelectBlinds sell blinds?
2     A   We do.
3     Q   Do you know if American Blind sells wood blinds?
4     A   They do.
5     Q   Does SelectBlinds sell wood blinds?
6     A   We do.
7     Q   Do you know if American Blind sells shades?
8     A   Yes. They do.
9     Q   Does SelectBlinds sell shades?
10    A   Uh-huh. Yes.
11    Q   So is it fair to say that American Blind and
12 SelectBlinds sell some of the same products?
13        MR. PAGE: Same objection.
14        THE WITNESS: I can't answer that question. I
15 don't know. There's so many brands and labels out there, I
16 don't know that they sell the same product that we sell.
17    Q   (By Ms. Plater) Let's say we take the names and
18 brands out and just say the consumer is looking for wood
19 blinds, white wood blinds.
20    A   I don't have an opinion on what the consumer is
21 looking for, and I don't know --
22    Q   I'm not asking for your opinion, honestly.
23    A   Yeah.
24    Q   I'm asking if you know if you sell the same generic
25 type of product, not -- not the name brand.

Page 42

1  A  Yeah. The answer is I don't know. I know American
2  Blind sells some branded stuff, but I don't know if they --
3  we're selling the same stuff. I don't know.
4  Q  But you did just say you both sell --
5  A  I know that they sell blinds --
6  Q  -- blinds, shades and wood blinds.
7  A  -- because they're American Blind & Wallpaper.
8     (Whereupon, the court reporter reminds the parties
9  to speak one at a time, and the following was had:)
10    THE WITNESS: I don't have a good knowledge of
11 their product mix because they sell a lot of stuff. They
12 sell wallpaper, they sell blinds. In terms of investigating
13 that company, I don't know what their product mix is.
14 Q  (By Ms. Plater) Have you ever visited the American
15 Blind Web site?
16 A  I have, yes.
17 Q  About how many times?
18 A  I don't recall.
19 Q  Ten times?
20 A  I don't know.
21 Q  More? Less?
22 A  I would say it would be more than ten.
23 Q  More than fifty?
24 A  I would say no.
25 Q  Okay. How about 25?

Page 43

1  A  We can put an approximate number on that as 25,
2  sure. Yeah.
3  Q  And is that in the course of since 2003, since
4  you've been in the blinds business?
5  A  Most of it, yes.
6  Q  Okay. All right. If you look through this list
7  under the "American Blinds - Suggested Ad Group Addition" --
8  A  Yes.
9  Q  -- it goes from Page 5983 to 5984.
10 A  Okay.
11 Q  And I'm not going to ask you to count up how many
12 there are, but you can look at my sheet and tell that there
13 are 65 that I've listed out.
14 A  Okay.
15 Q  Did you ask Google to create this Ad Group for you?
16 A  No.
17 Q  Were you surprised that there were 65 iterations on
18 "American Blinds" suggested to you?
19 A  No.
20 Q  Why not?
21 A  It wasn't relevant to me, because we already had
22 negative keywords in our system. So I didn't pay a lot of
23 attention to it.
24 Q  How do you know you already had negative keywords
25 in the system?

Page 44

1  A  We have negative keywords for almost every one of
2  our competitors in our system, so...
3  Q  But you'd previously testified you don't know the
4  date of this --
5  A  Don't know the date, yeah. But, I mean, I remember
6  this happening, and I -- you know, as I look through this
7  right here, I also saw the beginning outline of your
8  document, which was GGL 5980 -- I'm sorry -- before that, GGL
9  5975, which started, you know, the list of our negative
10 campaign words.
11 Q  Right.
12 A  So I made an assumption that this was in
13 conjunction with this AdWord group.
14 Q  No, it's actually not --
15 A  Okay.
16 Q  -- not that I know of. But I was going to ask you
17 about that, because --
18 A  Right.
19 Q  -- we've gotten these documents, and I can't tell
20 exactly what goes with what.
21 A  Yeah.
22 Q  But is "american blind" in this negative keyword
23 list that's --
24 A  The words "wallpaper" are and -- again, I don't
25 know how old this is but -- and you can go through and see a

Page 45

1  lot of manufacturers' words in this negative keyword list
2  that we've put in there.
3  Q  Do you see the word "American" anywhere?
4  A  I don't see the word "American" in there, no.
5  Q  Do you see the word "american blind" anywhere?
6  A  I don't.
7  Q  How about "american blind" and "wallpaper"?
8  A  I see the word "wallpaper" that we utilized to --
9  Q  I'm just asking for the three words together.
10 A  "American blind" and "wallpaper"?
11 Q  Yeah.
12 A  No, I don't see that.
13 Q  Okay. Do you see any iterations of the American
14 Blind marks that I've previously shown to you in this
15 negative keyword list?
16 A  Exact word phrases or a negative match that would
17 negate every one of those?
18 Q  Exact word phrases.
19 A  Exact word, no.
20 Q  But you have no idea when this negative keyword
21 list is from, right?
22 A  I don't. I'd have to look at the dates and see.
23 Q  So it's possible the AdWords campaigns that we're
24 looking through and the negative keyword lists are from
25 completely different times?

Page 46

1  A  Yeah, that is possible.
2  Q  Okay. Going back to the American Blinds Ad Group
3  addition, one of the other statements that --
4  A  Go ahead. I'm sorry.
5  Q  -- that the Google rep had stated in the -- I guess
6  it's the introductory sentence that the Ad Group will help
7  improve your overall advertising performance --
8  A  Uh-huh.
9  Q  -- we addressed that a little bit before, but do
10 you know if this campaign, itself, improved any part of your
11 advertising?
12     MR. PAGE: Let me object to the -- to the speech
13 before the question as assuming facts.
14 Q  (By Ms. Plater) Go ahead.
15 A  I don't know that we even approved this campaign.
16 Q  We can go down --
17 A  Yeah.
18 Q  -- and go through this all. I think you did --
19 A  Okay.
20 Q  -- and I --
21 A  Yeah, I want to make that statement.
22 Q  Don't worry about it. You'll clarify everything as
23 we go along.
24 A  Okay. You know, I think that's a blanket statement
25 that's just put there -- here's a new Ad Group that will help

Page 47

1  you improve your -- I mean, I think tens of thousands of
2  people see that same line, so...
3  Q  Uh-huh. Do you think Google provides you with Ad
4  Groups that are not going to be helpful to your campaign --
5  I'm sorry -- to your advertising?
6  A  I think the case could be made, yes, that they have
7  made recommendations that aren't helpful.
8  Q  But do you think, overall, they're trying to, or
9  their goal is to provide you with helpful --
10 A  Yes.
11 Q  -- campaign suggestions as their introductory
12 statements have said?
13 A  Yes.
14 Q  Okay. Let's keep going. Page 5991 --
15 A  Okay.
16 Q  -- this is the "Cellular Blind - Suggested Ad Group
17 Addition."
18 A  Okay.
19 Q  So is this another new ad campaign that Google had
20 suggested to you at that time?
21 A  It is, yes.
22 Q  And are cellular blinds a type of blind?
23 A  Cellular? Yes, they are.
24 Q  So if you go down to the keyword list, can you read
25 to me the first two keywords?

Page 48

1  A  "American blind cellular, american blinds
2  cellular."
3  Q  Do you know why the phrase "american blind" or
4  "american blinds" was combined with "cellular" in this ad
5  campaign?
6  A  I don't know their reasons behind it, no.
7  Q  Why do you think?
8  A  I don't want to really state my opinion on it.
9  Q  That's what I'm here for.
10    MR. PAGE: No, it's not what you're here for.
11    THE WITNESS: Yeah, I don't --
12    MR. PAGE: I object that it calls for an opinion.
13       If he has knowledge to testify to it, he can
14 testify to it. But you can't turn him into an expert.
15 Q  (By Ms. Plater) Do you think the phrases "american
16 blind" or "american blinds" in conjunction with the term
17 "cellular" could capture some traffic that was intended to go
18 to the American Blind Web site?
19    MR. PAGE: Objection. Calls for speculation.
20 Q  (By Ms. Plater) You can answer.
21 A  Yes, I think it could.
22 Q  Page 6018 and 6019. And then on 6018, it is
23 entitled "Ad Group #1 - Suggested Ad Group Modifications."
24    And is Ad Group #1, just as it's being referred to,
25 SelectBlinds' existing advertising group that had been

Page 49

1  created by -- I don't know who it had been created by --
2  prior to this optimization campaign that was sent to you?
3     MR. PAGE: I'm sorry. Could you read that back to
4  me?
5     MS. PLATER: I can restate it. It got kind of
6  jumbled.
7     MR. PAGE: Okay.
8     MS. PLATER: Don't bother. Even I got tripped up.
9  Q  (By Ms. Plater) Is Ad Group #1 -- was that an
10 existing Ad Group that SelectBlinds had before this -- I
11 guess I will call it this group of campaign suggestions were
12 sent to you?
13 A  Yes, it is.
14 Q  Okay. And now looking again at the keyword list,
15 can you tell me what the Xs next to the keywords mean?
16 A  I have no idea.
17 Q  If you -- if you look above --
18 A  Oh.
19 Q  -- X equals --
20 A  Okay.
21 Q  -- X equals removal.
22 A  Oh. I'm sorry. Yeah, removal. Yes.
23 Q  So is that the negative --
24 A  Yes.
25 Q  -- negative that you'd put on the American Blind's

Page 50

1  mark that you were referring to?
2  A  No. "American blind wallpaper" is a broad match,
3  meaning that's not a negative. That X would be us requesting
4  to remove that keyword from the campaigns.
5  Q  This X, do you know if it reflects your ad
6  preferences before this -- this optimization campaign was
7  sent to you or after?
8  A  I believe this was before.
9  Q  Okay. Then if you go to the next page, 6019, seven
10 lines down --
11 A  Uh-huh.
12 Q  -- if you can just look, I think there are seven
13 listed keywords in a row that I'm interested in.
14 A  "American blind," "american blinds," "american
15 blinds & wallpaper," "american blinds and wallpaper."
16 Q  "American blinds wallpaper"?
17 A  "American blinds wallpaper," "american wallpaper &
18 blinds," "american wallpaper and blinds." I think that's the
19 same one.
20 Q  And these are all broad --
21 A  Broad matched.
22 Q  And they do not have "remove" on them; is that
23 correct?
24 A  That is correct, yes.
25 Q  And what's the significance of that?

Page 51

1  A  Use in the campaign; basically, meaning that they,
2  you know, could be used to generate traffic.
3  Q  Can you tell me what the line next to the -- next
4  to "Broad" means -- "default CPC," "default URL"?
5  A  "Default CPC" means it's our generic cost per click
6  that we pay over the entire campaign.
7     "Default URL" is the default URL we list in our
8  campaign for the traffic to be driven to at that time.
9  Q  Do you know if Ad Group #1 that we're looking at
10 right now, that you said was in existence prior to the
11 suggestions, was that created by you or was that created by
12 Google?
13 A  Well, I was going to ask you earlier. You know, we
14 haven't talked about dates for any of these, and these are,
15 you know, separate Ad Groups. And do you have dates for
16 these?
17 Q  I don't have dates for these. I've been trying
18 to --
19 A  Can any dates be produced for these? Because
20 that's pretty important significance on, you know --
21 Q  Right. I think maybe when we go through some of
22 the other documents I have, you might be able to clarify it.
23    MR. PAGE: Counsel, you produced to us an e-mail
24 and we produced to you an e-mail that was sent to
25 Mr. Steele --

Page 52

1     MS. PLATER: Yeah.
2     MR. PAGE: -- that this was, effectively, an
3  attachment to. The e-mail says we have done this --
4     MS. PLATER: Right.
5     MR. PAGE: -- click here to go look at it.
6     MS. PLATER: And I think it doesn't exactly tie it
7  up, because if -- you'll see that the lists aren't exact
8  matches. So that's why I'm a little confused on dates as
9  well.
10 Q  (By Ms. Plater) But I think we can -- we can
11 generally narrow it down if I show you a couple more
12 documents.
13 A  Okay. So to answer your question, these do look
14 like keywords that were generated through, you know, a
15 Keyword Suggestion Tool. That's what they look like.
16    Does that answer your question?
17 Q  Yes.
18 A  Okay.
19 Q  If I told you that we think that this is from the
20 time frame of around February 2004, would that sound correct
21 to you?
22 A  I don't know.
23    MR. PAGE: Well, show him the document.
24    MS. PLATER: I'm getting to it. I'm getting to it.
25    I think there's a little confusion, that's why

Page 53

1  I want to get his knowledge on it.
2     THE WITNESS: Okay. So I would say that sounds
3  right. If we're talking about broad dates, that sounds
4  right.
5  Q  (By Ms. Plater) Okay. Have you ever been contacted
6  by anyone from American Blind regarding SelectBlinds' use of
7  American Blind's marks in SelectBlinds' advertising with
8  Google?
9  A  We both had conversations, yes, back and forth
10 about the use of those.
11 Q  And who did you speak with?
12 A  You know, I think we spoke with counsel for
13 American Blind & Wallpaper Factory, but I'm not sure who it
14 was.
15 Q  Was it Susan Greenspon?
16 A  I don't remember.
17 Q  Was it a woman?
18 A  Yeah. I don't recall who it was. It's been
19 awhile.
20 Q  All right.
21 A  Yeah, I think we negatived out whatever we could.
22    And then there was another one lingering out there,
23 and we had a casual conversation about us getting rid of each
24 other's words.
25 Q  I got you. Here's a letter, and it'll probably

Page 54

1  refresh your memory seeing that --
2  A  Yeah, I do --
3  Q  -- at least, hopefully.
4       MS. PLATER: This is going to be marked as
5  Exhibit -- I believe we're on 4 now?
6       THE COURT REPORTER: Yes.
7       (Whereupon, Exhibit No. 4 was marked.)
8       MS. PLATER: This is a document that was produced
9  in this litigation, Bates labeled ABWF 001491 through 001493.
10 Q  (By Ms. Plater) Mr. Steele, have you had a chance to
11 look at that document?
12 A  Yeah. Yeah, I remember this document.
13 Q  Do you recall receiving this from American Blind?
14 A  I do.
15 Q  And do you recall speaking to Susan Greenspon with
16 regard to this correspondence?
17 A  I don't recall speaking -- you know, who I spoke
18 to, but I know that it was handled.
19 Q  You spoke to an attorney --
20 A  Yes.
21 Q  -- as far as you know?
22 A  Uh-huh.
23 Q  Okay.
24 A  Yes.
25 Q  Can you describe the events that led up to your

Page 55

1  receipt of this letter?
2  A  I think there was use of these words in our AdWords
3  program.
4  Q  Have you had a chance to actually read through the
5  letter again?
6  A  Yes.
7  Q  Okay. To your knowledge, are the factual
8  statements in the letter accurate?
9  A  In terms of the words, I don't know. The keywords
10 that are used, I don't know. I can't tell you what we had in
11 our campaign at that time, what we had negative campaigned
12 out.
13      MR. PAGE: Objection. Compound.
14      THE WITNESS: It's tough recalling, you know, all
15 of those words.
16 Q  (By Ms. Plater) I'm going to show you --
17 A  I don't know that the -- you know, the infringement
18 upon ABW's trademarks was accurate.
19 Q  I'm not asking a legal question --
20 A  Okay. All right. You're just talking about --
21 Q  -- just the factual statements of like we found
22 this at this time, these keywords came up --
23 A  We received this, right.
24 Q  Exactly.
25 A  Okay.

Page 56

1  Q  And I assume that the factual statements are
2  correct?
3       MR. PAGE: Same objection, compound. And,
4  depending on the statement, calls for speculation.
5  Q  (By Ms. Plater) To the best of your knowledge.
6       MR. SILVERBERG: You can answer.
7       THE WITNESS: Yes.
8  Q  (By Ms. Plater) Okay. I'm going to show you what
9  we're going to mark as Exhibit 5.
10      (Whereupon, Exhibit No. 5 was marked.)
11 Q  (By Ms. Plater) So I'm handing you what is another
12 document that was produced in this litigation by American
13 Blind, and it's marked ABWF 005516 --
14 A  Sure.
15 Q  -- through 005521. If you want to, take a second
16 to look through this before I ask you any questions on it.
17 A  Okay.
18 Q  There's not really much to look at.
19 A  Okay. I remember this document.
20 Q  Okay. And do you see it's dated February 12, 2004,
21 at 11:49. We've got a lot of -- I'm noting the dates and
22 times right now, just because there's a lot of e-mails on
23 this same date.
24 A  Okay.
25 Q  And so we can go in chronological order, then.

Page 57

1  A  Uh-huh.
2  Q  So do you know why you sent this e-mail to Ms.
3  Greenspon?
4  A  I think it was just in response to the cease and
5  desist on the keywords, and that we had, you know, gone in --
6  you know, shortly thereafter, the keywords were created and
7  used the negative keyword "american."
8       So it negated all of the keywords out, you know,
9  from our campaign in respect to American Blind & Wallpaper's
10 trademarks. I think that was the response.
11 Q  Okay. And in your message to Susan, it says: Here
12 is the campaign Google created. I will also forward their
13 email mentioning this campaign.
14      And is the list that is inserted below is what
15 you're referring to as the campaign Google created?
16 A  Campaign recommendations, I believe. I think
17 probably "campaign" was wrong, because at that time we didn't
18 have a rep. And I think -- well, maybe we did.
19      But I believe it was with the Keyword Suggestion
20 Tool was how we created the campaign.
21 Q  If you -- now I'm going to have you look at what
22 was -- this is Exhibit 3. You can compare the two.
23 A  Okay.
24 Q  It's the -- we'll go back to the American Blind
25 optimization campaign --

15 (Pages 54 to 57)

Page 58

1  A  Okay.
2  Q  -- which is on Page 5983.
3  A  Okay.
4  Q  If you compare the lists --
5  A  That looks right.
6  Q  -- does this look to be the same list that was sent
7  to you and suggested to you by Google?
8  A  You know, actually, yes. So this would have been a
9  rep suggestion, yes.
10 Q  Okay.
11    MR. PAGE: Belatedly object as vague and ambiguous.
12    I assume you were asking him to compare the
13 first part of this list to those pages.
14    MS. PLATER: Oh, yes. I'm sorry. The first part
15 up, through "american blind wallpaper," right prior to "1 a
16 blinds."
17    THE WITNESS: It seems to match up.
18 Q  (By Ms. Plater) Okay. Have you ever heard of this
19 list, the American Blind list -- let's say the sixty-odd
20 iterations of "american blind" with other words as keywords
21 referred to as the American Blind optimization campaign?
22 A  No.
23 Q  Now this list appears to be a comprehensive list.
24 I'm back on Exhibit 5. I'm sorry. It's a very long list.
25 It's about five and a half pages long.

Page 59

1     And do you know where you got this list from -- I
2  mean physically, to drop it into an e-mail?
3     MR. PAGE: I'm going to object to the preface to
4  the question.
5  Q  (By Ms. Plater) Go ahead.
6  A  I think it was just copied from our existing
7  campaigns, and -- both active and deactive. We can see our
8  paused and deactive campaigns, as well as active.
9  Q  Uh-huh.
10 A  So it's not necessarily from active, running
11 campaigns --
12 Q  Uh-huh.
13 A  -- but from campaigns that were listed as -- you
14 know, a Google rep had created.
15 Q  Right. Do you have any idea which Google rep might
16 have created this list for you?
17 A  No, I don't.
18 Q  In comparing this list to the list of American
19 Blind marks that I gave you, do you see some American Blind
20 marks on both lists?
21    MR. PAGE: Object. The document speaks for itself.
22    THE WITNESS: I see, yes.
23    MS. PLATER: I can still ask my question.
24    MR. PAGE: Sure. But I don't see where it gets
25 you. They either are or aren't.

Page 60

1     (Whereupon, Exhibit No. 6 was marked.)
2  Q  (By Ms. Plater) This is Exhibit 6. I'm showing you
3  what is another document produced by American Blind in this
4  litigation, Bates labeled ABWF 005522.
5     Have you seen this before, Mr. Steele?
6  A  I don't recall this e-mail. It's, you know, a few
7  years' old.
8  Q  I'm sorry. I didn't hear --
9  A  I don't recall that e-mail, no.
10 Q  And then if you see the date and time, it's
11 Thursday, February 12, 2004, at 12:28. And the prior e-mail
12 you had sent to Susan Greenspon was, I think -- what was the
13 time of that? So it was before this timewise?
14 A  The e-mail I sent was before this.
15 Q  Yeah. The --
16 A  Okay.
17 Q  Exhibit 5 was at 11:49, so -- and this is just a
18 little background --
19 A  Okay.
20 Q  -- to tie things up. So in Exhibit 6, your
21 statement to Ms. Greenspon is: Here's some correspondence.
22 It references the optimization Google performed.
23    And my question is, is this -- is this statement
24 you made referring to the prior statement you made: I will
25 also forward their email mentioning this campaign?

Page 61

1  A  I don't know how I could have been referring to
2  this e-mail.
3     MR. PAGE: Let me object. This calls for
4  speculation. He's testified he doesn't recall this at all.
5     THE WITNESS: Yeah, I don't recall the e-mail. But
6  going purely on dates, I don't know how it could, because it
7  came after I told her this.
8  Q  (By Ms. Plater) Maybe I'm not being clear.
9     In your first e-mail to Susan Greenspon of that
10 day --
11 A  Yes.
12 Q  -- which you say was in response to the cease and
13 desist letter, correct?
14 A  Uh-huh.
15 Q  In that first e-mail you say: I will also forward
16 their email mentioning this campaign.
17 A  Okay.
18 Q  All right? So I'm trying to figure out if
19 subsequent e-mails you sent to her, if you were doing that,
20 if you were forwarding e-mails mentioning this campaign?
21 A  I don't recall. Yeah, I don't recall what I did
22 send her after that.
23 Q  Would you agree that this was -- this e-mail was
24 sent after your original e-mail?
25 A  I don't know.

Page 62

1  Q    The date --
2  A    Oh. Okay. So it is to --
3  Q    Yeah.
4  A    -- Susan --
5  Q    And it's --
6  A    -- yes.
7  Q    -- 12:28.
8  A    It's from me, yes.
9  Q    Okay. And then my question was trying to tie up
10 whether this correspondence you forward -- you say it
11 references the optimization Google performed -- is connected
12 with your prior statement you made at 11:49 in your e-mail to
13 Susan Greenspon?
14      MR. PAGE: Same objections.
15      THE WITNESS: Yeah. Again, I don't recall this
16 document, so it's tough to tell -- you know, say what it was
17 in respect to.
18 Q    (By Ms. Plater) Okay. So, then, just look down
19 below. What is the -- what's the e-mail below that you're
20 forwarding to Susan Greenspon?
21      MR. PAGE: Objection. Vague and ambiguous.
22      THE WITNESS: That I asked for some negative
23 keywords; she failed to send those. And then that she was
24 loading those in the system.
25 Q    (By Ms. Plater) And since you don't have any

Page 63

1  recollection of this e-mail, I'm assuming you don't know what
2  negative keywords she's referring to.
3       MR. PAGE: Object. There's no question.
4  Q    (By Ms. Plater) Do you know what negative --
5  A    No, I do not know what negative keywords she was
6  referring to.
7  Q    Okay. All right. And then if you look at the
8  subject line, it states, "Campaign #4 Negative Keywords."
9       If you go back to Exhibit 3, we are looking at Page
10 5980, and the title of that is "Optimization Proposal #6 -
11 Campaign #4." It's an e-mail sent to you by Kristina C.,
12 with the subject line "Campaign #4," referring to the
13 campaign that starts on GGL 005980?
14      MR. PAGE: Same objections.
15      THE WITNESS: Yeah. I don't know.
16 Q    (By Ms. Plater) Could it be?
17 A    It's possible, but I do not know.
18 Q    Do you have any idea how your campaigns are
19 numbered?
20 A    No.
21 Q    Okay.
22      (Whereupon, Exhibit No. 7 was marked.)
23 Q    (By Ms. Plater) Moving on, I'm handing you an
24 exhibit that is another e-mail, and this is marked as Exhibit
25 No. 7. If you want to take a look at this, you can have a

Page 64

1  chance to read it.
2  A    Okay.
3  Q    Can you tell me the date and time of the first
4  e-mail in the string?
5  A    The first e-mail in the string --
6  Q    I'm sorry. The last.
7  A    The last e-mail? Okay. The last e-mail was
8  February 12th. Again, correspondence to Susan --
9  Q    Yeah.
10 A    -- at 12:56.
11 Q    Okay. So this e-mail followed the e-mail that
12 we've marked as Exhibit 6?
13 A    Uh-huh.
14 Q    And can you just read to me your statement to --
15 within the e-mail?
16 A    Yeah. "Susan, I have deleted this campaign
17 altogether. Google should refresh soon. Let me know if you
18 need me in on a call with Google to help you guys out.
19 Thanks, Rick."
20 Q    And if you'll take a look at the e-mail that is
21 forwarded, that follows what you just read to me --
22 A    Take a look at it?
23 Q    Yeah.
24 A    Okay.
25 Q    Who is -- do you recall speaking with or

Page 65

1  corresponding with Jill R. from Google?
2  A    You know, I remember Jill. I remember the name,
3  yes.
4  Q    Is she a Google rep that you worked with?
5  A    She was at that time.
6  Q    Did she create ad campaigns for you?
7  A    I don't know who created the campaigns. I know she
8  was our rep.
9  Q    Okay. Do you have any idea if there are different
10 personnel at Google that create campaigns, other than the
11 reps?
12 A    I don't know. I don't have any idea.
13 Q    Have you ever heard of an optimizer?
14 A    No.
15 Q    Does your Google rep pass on ad campaigns that have
16 been created for you?
17 A    Yes.
18 Q    And then if you look at the body of the e-mail from
19 Jill R. to you --
20 A    Okay.
21 Q    -- this is dated January 19, 2004 -- in it, she
22 says: I have submitted your blinds campaign to be optimized
23 and will let you know once it is completed.
24      Do you know what she means by having your campaign
25 optimized?

Page 66

1  A  I do.
2  Q  What does that mean?
3  A  The addition of keywords that are relevant.
4  Q  Suggested by Google?
5  A  Their suggestions, their opinions.
6  Q  And when you forwarded this e-mail to Susan to say
7  you've deleted this campaign altogether, and we don't have
8  anything but --
9  A  Yeah.
10  Q  -- this statement, you're just saying --
11  A  I'm assuming it's referring to the campaign that we
12  were talking about, which is the American Blind's campaign.
13  Q  Okay. Now do you know if you talked to Jill on the
14  phone, or did you just e-mail with her?
15  A  I believe I talked to her before.
16  Q  Because in the second page of the e-mail, there's a
17  couple of e-mails within this exhibit from Jill R.
18  A  Okay. I'm sure I talked to her on the phone.
19  Q  And she mentions she'd like to -- you can give her
20  a call to discuss ways to improve your account and meet your
21  advertising goals. Had you ever done that, called up Jill to
22  do that?
23  A  Again, I don't recall if I did or what we talked
24  about if -- I'm sure we talked on the phone.
25  Q  Do you recall at any time talking with Jill that

Page 67

1  she suggested you add any of the American Blind marks as
2  keywords --
3  A  I don't recall that.
4  Q  -- to improve your advertising?
5  A  Yeah, I don't recall any of that.
6  MS. PLATER: Okay. We'll mark this as an exhibit.
7  I think we're on -- is it 8?
8  THE COURT REPORTER: Yes.
9  (Whereupon, Exhibit No. 8 was marked.)
10  Q  (By Ms. Plater) Okay. I'm showing you an e-mail
11  string, which is following the February 12th e-mail
12  correspondence you had with Susan Greenspon. And the Re:
13  line of these e-mail strings is "Settlement."
14  Do you recall seeing these e-mails before?
15  A  I don't remember the e-mails, but -- I mean, it
16  looks like I wrote one of them.
17  MR. SILVERBERG: Is there another question?
18  MS. PLATER: I was just waiting for him to finish
19  reading.
20  THE WITNESS: Okay. I'm done.
21  Q  (By Ms. Plater) So go down to Ms. Greenspon's e-mail
22  to you on the first page, dated February 17, 2004, 1:52.
23  A  Uh-huh.
24  Q  She states: I realize that you believe that Google
25  is at fault for your infringement of the American Blind marks

Page 68

1  by promoting and selling to your company the American Blinds
2  optimization campaign, which your company did get the
3  benefit -- I'm sorry -- get a benefit from this use, as well
4  as Google.
5  Now is her statement regarding your belief correct?
6  Is that something that you had expressed to her?
7  A  I don't remember. No, I don't remember.
8  Q  Looking at it today, do you agree with that
9  statement?
10  MR. PAGE: Object.
11  THE WITNESS: I don't know, because I don't
12  remember.
13  MR. PAGE: Let me object. It calls for a legal
14  conclusion.
15  THE WITNESS: Yeah.
16  Q  (By Ms. Plater) You can answer.
17  A  Yeah, I don't remember. I mean, I still wouldn't
18  know.
19  Q  If Google had suggested the American Blind marks
20  and the American Blind optimization campaign and you were
21  contacted by American Blind for infringement, would you say
22  that Google caused you to be contacted by American Blind?
23  MR. PAGE: Objection. It's a hypothetical. Calls
24  for a legal conclusion, I think.
25  MS. PLATER: It's, actually, cause and effect.

Page 69

1  Q  (By Ms. Plater) How did you get contacted by
2  American Blind?
3  MR. PAGE: Then it calls for speculation.
4  Q  (By Ms. Plater) Whose behavior caused you to get
5  contacted by American Blind on this issue of infringement?
6  MR. SILVERBERG: It's a very good objection. I
7  don't know how you can speculate on Google's -- or American
8  Blind's motivation.
9  MS. PLATER: No speaking objections, please. Just
10  the objection, and the basis.
11  MR. SILVERBERG: I agree. That objection calls for
12  total speculation.
13  Q  (By Ms. Plater) If you know.
14  A  I don't know.
15  Q  If Google had not suggested the American Blind
16  optimization campaign to you, would you have included those
17  words as keywords in your advertising?
18  A  Typically, I would say no. I don't know why I
19  would have.
20  Q  In your response to that e-mail, the e-mail that
21  you have drafted above --
22  A  Okay.
23  Q  -- on the second paragraph you state: You should
24  go after Best Blinds, AZ Blinds, Blinds.com, Star Decorating,
25  EdirectBlinds.com and so on. I hope this was all a

Page 70

1  misunderstanding.
2       Can you explain that statement to me?
3    A   It sounds like those were the companies still
4  listed. You know, when I did a search on Google for
5  "american blinds" or any derivative of those words, with the
6  keyword "american," that those companies were still showing
7  up. And we had complied with the request to remove the
8  campaign. When I logged in, the campaign was removed.
9       And that looks like -- the reference in my e-mail
10 was that, you know, maybe Susan's computer hadn't refreshed
11 or something had happened, but, you know, they weren't
12 appearing on our screen.
13   Q   Okay. I'm almost done.
14   A   Really?
15   Q   Just with my part. But I'm covering most of the
16 documents at length, so you probably won't have a lengthy --
17   A   Cool.
18       (Whereupon, Exhibit No. 9 was marked.)
19   Q   (By Ms. Plater) This is Exhibit 9. So I'm handing
20 you an exhibit that was produced by American Blind in this
21 litigation. It's ABWF 000665 through 000671.
22       MS. PLATER: Oh. I think I just handed out the
23 wrong exhibit, you guys. I'm sorry. I'm going to have to
24 re-mark --
25       THE WITNESS: I'm sorry. What?

Page 71

1    Q   (By Ms. Plater) I've handed out the wrong exhibit.
2  Hold on to that. We'll get back to it.
3    A   Okay.
4       (Whereupon, Exhibit No. 9 was re-marked.)
5       MR. PAGE: Oh. So you're just out of order?
6       MS. PLATER: Yes. I'll use it later.
7    Q   (By Ms. Plater) Okay. I'm showing you now -- this
8  is an exhibit of documents produced by Google in this
9  litigation, and the Bates range is GGLE 0019888 -- I'm
10 sorry -- 19889 through 19889.
11   A   Uh-huh.
12   Q   Have you ever seen this e-mail string before?
13   A   I don't remember it.
14   Q   Do you see anything in there -- have you had a
15 chance to read it? I'm sorry.
16   A   No, I just read it. Yeah, absolutely. Yeah.
17   Q   Okay. Well, let's look at the last e-mail in the
18 string, the first one on top.
19   A   Okay.
20   Q   It states that it's from you, and the following
21 recipients are Kristina C. -- these are all recipients at
22 Google, let's just say, and I'm going to ask you if you know
23 who these people are.
24       Kristina C. -- do you know who that is?
25       MR. PAGE: Object. Asked and answered.

Page 72

1       THE WITNESS: I don't.
2    Q   (By Ms. Plater) Do you know who Kristina Cuterra
3  (phonetic) is?
4    A   I do not know.
5    Q   Have you ever heard of that name before?
6    A   No.
7    Q   And then you have "sergei@google." Do you know who
8  that --
9    A   I remember the name, but I don't remember his last
10 name.
11   Q   Is this -- was this meant to be sent to Sergey
12 Brin?
13   A   I have no idea.
14   Q   Have you ever heard of Sergey Brin?
15   A   Yeah. He's one of the founders of Google. Good
16 friends.
17       MR. PAGE: He told me to say "Hi."
18       MS. PLATER: You didn't disclose this.
19       MR. PAGE: Let the record show we're all laughing.
20   Q   (By Ms. Plater) All right. Do you know any other
21 Sergey at Google?
22   A   No. But, you know, I -- maybe that's how I know
23 the name. That's probably...
24   Q   Okay. Then there's a Larry at Google?
25   A   I don't know who that is.

Page 73

1    Q   Was that meant to be Larry Page?
2    A   It might be.
3    Q   And then --
4       MR. PAGE: He didn't say "Hi."
5       THE WITNESS: No, he didn't.
6    Q   (By Ms. Plater) And then there's Dana K. at Google.
7       And I think, unless you've miraculously remembered
8  who she is, you'd previously testified you didn't know who
9  Dana is.
10   A   Yeah. I don't remember the name.
11   Q   All right. If you could, please, read the second
12 paragraph of your e-mail.
13   A   Second paragraph: On a more serious note, the
14 legal department from American Blinds and Wallpaper Factory
15 called me regarding the campaign Google created for me a few
16 weeks back. I have deleted this campaign, however there is
17 something more we need to talk about with Google's legal
18 department. I want to make sure my company keeps itself out
19 of trouble. My corporate attorney has advised me to delete
20 the campaign, however we have copied the screen shots and
21 source for future should we both need it. I'm a huge Google
22 fan and it has dramatically increased our business. Let me
23 know whet I can do to help us both out.
24   Q   Let's just call that a "what" --
25   A   "What."