**Exhibit N – 1**

CH01/PLATC/210357.1

Dockets.Justia.com



# SEARCHING FOR DISCLOSURE

*How Search Engines Alert Consumers to the Presence of Advertising in Search Results*

**Part 1 of 3**

**By Jørgen J. Wouters**
*November 8, 2004*

Consumer Reports WebWatch
101 Truman Avenue
Yonkers, NY 10703-1057
Tel: 914.378.2600
www.ConsumerWebWatch.org

# TABLE OF CONTENTS

## PART 1

Executive Summary ........................................................... 4

About Consumer Reports WebWatch ........................................... 9

A Brief History of Paid Placement & Inclusion ..............................10

Introduction ................................................................. 12
Examining Paid Placement .................................................... 14
Examining Paid Inclusion .................................................... 15
Renewed Debate .............................................................. 16

Study Methodology ........................................................... 17
How These Sites Were Selected ............................................... 17
Designing the Questionnaire ................................................. 18
Testing Procedures........................................................... 19
Evaluating the Results ...................................................... 19

Major Findings .............................................................. 20

Results by Search Engine .................................................... 23
1st Blaze ................................................................. 25
Alta Vista................................................................... 25
AOL Search .................................................................. 28
Ask Jeeves .................................................................. 30

## PART 2

Results by Search Engine (Continued)......................................... 34
CNET's Search.com ........................................................... 34
Google ...................................................................... 37
InfoSpace Web Search ........................................................ 37
Lycos Network Search ........................................................ 39
MSN Search .................................................................. 43
My Search ................................................................... 45

# TABLE OF CONTENTS CONTINUED

## PART 3

Results by Search Engine (Continued) ........................................ 47
My Way Search ............................................................... 47
Netscape Search ............................................................. 47
Overture ...................................................................... 49
Web Search ................................................................... 51
Yahoo! Search ................................................................ 54

Recommendations ............................................................. 57

Consumer Tips ............................................................... 59

Appendices .................................................................... 61
Appendix A: Testing Background ............................................ 61
Appendix B: Tester Profiles ................................................. 62
Appendix C: Disclosure Questionaire ........................................ 63
Appendix D: Search Engines' Disclosure Statements ...................... 66
Appendix E: Search Engine Interrelationships ............................. 73
Appendix F: Guidelines for Search Engines ................................ 75

Reference ..................................................................... 77

Endnotes ...................................................................... 79

# EXECUTIVE SUMMARY

When Consumer Reports WebWatch launched its site in April 2002, it published a comprehensive survey of 1,500 U.S. adult Internet users who had six months experience or more online.[i] The purpose of the survey, which used traditional social science methods, was to find out how much (or how little) experienced Web users trusted the content of sites they visited. One of the survey's most surprising results was that more than 60 percent of its respondents said they were unaware that search engines accept fees to list some sites more prominently than others in search results, a practice commonly known as paid placement.

Intrigued, Consumer Reports WebWatch then commissioned a study using a less common ethnographic research methodology to try to understand why the practice of paid placement was not transparent to consumers.[ii] The study indeed demonstrated among its respondents a lack of awareness of the influence of advertising on search results, but perhaps more significantly, many of them reacted negatively when told details of how search engines integrate advertising into content.

In this report, its second on the credibility of the Web's most significant information guides, WebWatch chose to examine how search engines explain business relationships with advertisers to their users. To create an evaluation tool, WebWatch employed disclosure guidelines issued by the U.S. Federal Trade Commission (FTC) in 2002.

**KEY FINDINGS**

**Consumer Reports WebWatch examined how the top 15 most-trafficked search engines explain their business relationships with advertisers and discovered:**

- Paid inclusion was not satisfactorily disclosed or explained by any of the 15 search engines tested.

- Disclosures by all three meta-search engines (CNET's Search.com, InfoSpace, Web Search) were lacking.

- Eight of the 15 engines labeled paid search listings with disclosure headings that were difficult to spot (e.g., small type, faint color).

The FTC formulated these recommendations for more transparent disclosure among search engines after Commercial Alert, a Portland, Oregon-based consumer-watchdog group, filed a complaint with the commission in 2001, criticizing several major search engines for deceptive advertising practices in their treatment of search results.[iii]

In response, the FTC issued a letter calling on the entire search engine industry to provide "clear and conspicuous disclosure" of paid placement and paid inclusion, the two primary methods of incorporating advertising into search results.[iv] Paid placement programs charge advertisers a fee in exchange for higher rankings within search results. Paid inclusion programs also charge a fee, but only to assure a site's listing within a search engine's full index of possible results—without a guarantee of ranking.

WebWatch's body of research demonstrates consumers' strong interest in knowing whether search engines sell rankings to advertisers, as well as users' considerable frustration in trying to locate and understand these disclosures.

This study, "Searching for Disclosure," evaluated the compliance of 15 major search engines with the FTC's guidelines. WebWatch hopes this report will illuminate the disclosure practices of search engines, as well as help educate consumers about the financial forces at work every time they click a "search" button.

The sites evaluated in the study were: 1st Blaze, Alta Vista, AOL Search, Ask Jeeves, CNET's Search.com, Google, InfoSpace Web Search, Lycos Network Search, MSN Search, My Search, My Way Search, Netscape Search, Overture, Web Search and Yahoo! Search. (See Study Methodology for information on how the sites were chosen.)

Because of the complexity of the subject matter and the well-documented lack of consumer awareness, WebWatch recruited information retrieval experts in library science to test each search engine. (See Study Methodology for information on how the questionnaire was designed, and how and the sites were evaluated.)

Overall, the study revealed most major search engines have made some efforts to satisfy the FTC's recommendations, but compliance varied widely, leaving ample room for improvement throughout the industry. While some sites diligently disclose and explain their business relationships, others appear to obscure the presence of advertising within search results.

> **WEBWATCH'S BODY OF RESEARCH DEMONSTRATES CONSUMERS' STRONG INTEREST IN KNOWING WHETHER SEARCH ENGINES SELL RANKINGS TO ADVERTISERS.**

**FIGURE I**

**DEFINITION OF TERMS**

- **Paid Placement**
  When Web sites pay a fee to be ranked prominently in search results.

- **Paid Inclusion**
  When Web sites pay a fee to increase the likelihood they will appear somewhere within search results, without a guarantee of a high ranking.

Because of the demonstrable importance consumers place on the integrity and transparency of search results, the industry needs to enhance the effectiveness of disclosures to ensure they are noticed and understood by users. If not, search engines risk losing their credibility with consumers.

## KEY FINDINGS

■ Paid inclusion was not satisfactorily disclosed or explained by any of the search engines tested. The credibility of this practice is of such concern to the industry itself that, after Consumer Reports WebWatch testing had been completed, two of the top five search engines announced plans to terminate paid inclusion programs. <u>MORE ON PAGE 16 >></u>

■ Meta-engines, which present results from several search engines simultaneously, repeatedly failed to adequately disclose the presence of paid placement and paid inclusion within search results. <u>MORE ON PAGE 21 >></u>

■ Disclosures are generally hard to find, accessible by headings and hyperlinks that often blend in with the

---

**FIGURE 2**

### SEARCH ENGINES SELECTED FOR THIS STUDY

**1° BLAZE**
HTTP://WWW.1STBLAZE.COM

**ALTA VISTA**
HTTP://WWW.ALTAVISTA.COM

**AOL SEARCH**
HTTP://SEARCH.AOL.COM/AOLCOM/INDEX.JSP

**ASK JEEVES**
HTTP://WWW.ASK.COM

**CNET'S SEARCH.COM**
HTTP://WWW.SEARCH.COM

**GOOGLE**
HTTP://WWW.GOOGLE.COM

**INFOSPACE WEB SEARCH**
HTTP://WWW.INFOSPACE.COM/HOME/SEARCH

**LYCOS NETWORK SEARCH/DIRECTORIES**
HTTP://WWW.LYCOS.COM

**MSN SEARCH**
HTTP://WWW.SEARCH.MSN.COM

**MY SEARCH**
HTTP://WWW.MYSEARCH.COM/JSP/HOME.JSP

**MY WAY SEARCH**
HTTP://WWW.MYWAY.COM

**NETSCAPE SEARCH**
HTTP://NETSCAPE.COM/SEARCH

**OVERTURE**
HTTP://WWW.CONTENT.OVERTURE.COM

**WEB SEARCH**
HTTP://WWW.WEBSEARCH.COM

**YAHOO! SEARCH**
HTTP://SEARCH.YAHOO.COM

---

**THE CREDIBILITY OF PAID INCLUSION IS OF SUCH CONCERN TO THE INDUSTRY ITSELF THAT, AFTER TESTING, TWO OF THE TOP FIVE SEARCH ENGINES ANNOUNCED PLANS TO TERMINATE THESE PROGRAMS.**

page, making them easy for consumers to overlook.
MORE ON PAGE 21 >>

■ Information disclosed by the sites on business practices with advertisers—and how these practices may affect search results—was often confusing and jargon-laden.
MORE ON PAGE 21 >>

■ Some engines, like Google—one of the few majors not named in the original FTC complaint—took pains to visually segregate paid results from non-paid results.

Consumers may want to avoid others, like 1ˢᵗ Blaze, because of inadequate or absent disclosures that undermine the integrity of search results.
MORE ON PAGE 21 >>

## CREDITS

This project was written and directed by Jørgen J. Wouters, a consultant to Consumer Reports WebWatch who has been writing about the Internet since 1993. In

**FIGURE 3**

## SEARCH ENGINE STATISTICS
NIELSEN//NETRATING'S TOP SEARCH DESTINATIONS FOR DECEMBER 2003*

| BRAND OR CHANNEL | UNIQUE AUDIENCE | ACTIVE REACH (%) | TIME PER PERSON |
|---|---|---|---|
| 1. GOOGLE | 53,058,000 | 37.41 | 0:26:40 |
| 2. MSN SEARCH | 42,297,000 | 29.82 | 0:06:53 |
| 3. YAHOO! SEARCH | 41,250,000 | 29.08 | 0:09:58 |
| 4. AOL SEARCH | 21,953,000 | 15.48 | 0:29:55 |
| 5. ASK JEEVES | 11,481,000 | 8.1 | 0:11:50 |
| 6. OVERTURE | 7,163,000 | 5.05 | 0:04:54 |
| 7. WEB SEARCH | 6,225,000 | 4.39 | 0:03:59 |
| 8. LYCOS NETWORK SEARCH | 5,884,000 | 4.15 | 0:04:44 |
| 9. NETSCAPE SEARCH | 5,563,000 | 3.92 | 0:12:40 |
| 10. MY WAY SEARCH | 5,137,000 | 3.62 | 0:05:27 |
| 11. INFOSPACE WEB SEARCH | 5,031,000 | 3.55 | 0:11:47 |
| 12. ALTA VISTA | 4,041,000 | 2.85 | 0:08:40 |
| 13. MICROSOFT SEARCH * | 3,833,000 | 2.7 | 0:01:57 |
| 14. 1ˢᵗ BLAZE | 3,485,000 | 2.46 | 0:00:47 |
| 15. MY SEARCH | 3,336,000 | 2.35 | 0:06:00 |
| 16. CNET SEARCH | 3,291,000 | 2.32 | 0:01:32 |

Source: Nielsen//NetRatings  Top Search Destinations  Month of December 2003 US, Home and Work

*Note: Number 13, Microsoft Search, was omitted from the list of reviewed sites because it is an internal search engine, and thus unsuitable for this report. WebWatch therefore used Number 16 on the list, CNET Search, in its place.

addition to reporting on the nascent Internet industry for the Washington Post Company's *Washington Technology*, he also edited the *Information & Interactive Services Report*, a weekly newsletter for information industry executives. Wouters also has written for the international consulting firm McKinsey & Company. He participated in testing for this study.

This project was funded by Consumer Reports WebWatch. The research report was edited by Tracy L. Ziemer, WebWatch's researcher and site producer. Neither ConsumerWebWatch.org nor ConsumersUnion.org participate in paid placement or paid inclusion programs with any search engine. ConsumerReports.org does participate in both paid placement and paid inclusion programs.

# ABOUT CONSUMER REPORTS WEBWATCH

Consumer Reports WebWatch is a project of Consumers Union, the non-profit publisher of *Consumer Reports* magazine and ConsumerReports.org. The project is supported by The Pew Charitable Trusts, which invests in ideas that fuel timely action and results; the John S. and James L. Knight Foundation, which promotes excellence in journalism worldwide and invests in the vitality of 26 U.S. communities; and the Open Society Institute, which encourages debate in areas in which one view of an issue dominates all others. WebWatch's Web site launched April 16, 2002. http://www.consumerwebwatch.org

# A BRIEF HISTORY OF PAID PLACEMENT & INCLUSION

For many consumers, search engines serve literally dozens of important functions, helping to make sense of a cluttered universe of information, promising speed, relevance and convenience. As such, they are looked on as trusted guides.

For the first few years of their existence, search results remained essentially advertising-free. A software program known as a "spider" searched or "crawled" the Web's linked pages and created indexes from which results, based on algorithmic relevance, were then delivered to the user who had entered a search term. The results were typically known as "pure" results—based on relevancy to the user, not marketing or advertising.

Consumer Reports WebWatch learned in its 2003 study, "False Oracles: Consumer Reaction to Learning the Truth About How Search Engines Work," respondents in the study generally believed most, if not all, search results are "pure," or untainted by advertising dollars. The reverse, however, has been true for several years, and "pure" results are now the exception, rather than the rule.

In 1998, Overture became the first major search engine to sell rankings within search results to the highest bidder, ushering in a form of advertising now commonly known as "paid placement." Advertisers didn't need much convincing, since paid placement represented the most targeted form of advertising imaginable, one far less obvious and more effective than banner ads or pop-ups.

In 2000, Inktomi introduced the practice of "paid inclusion," charging Web sites to be spidered more frequently for inclusion within its index—without a guarantee of higher ranking within its search results. These results are typically presented as the so-called "main" results, making it all too easy for consumers to mistake them for "pure" results, when, in fact, they are not.

That same year, Overture and Inktomi ushered in a new era when they began selling their paid placement and paid inclusion results to other search engines. Newcomers like Google quickly followed as well, which led to the establishment of an industry business model, closely followed by a bewildering and ever-changing

array of corporate relationships. (See Appendix E: Search Engine Interrelationships.)

By the end of 2001, the results pages of virtually every major search engine contained either paid placement or paid inclusion listings—and usually both. The dot-com implosion only fueled the trend, as cash-strapped advertisers turned to these more targeted and cost-effective methods, creating one of the fastest-growing advertising mediums in history.

According to the Interactive Advertising Bureau, paid placement listings displaced banner ads in 2003 to become the Internet's single biggest source of ad revenue, helping fuel an almost 21 percent jump in overall sales. Paid placement more than doubled its market share from the previous year to account for 35 percent of the almost $7.3 billion spent on Internet advertising in 2003.[v] Jupiter Research estimates spending on paid placement will increase by a compound annual rate of more than 20 percent over the next five years, hitting $4.3 billion by 2008.[vi]

Spending on paid inclusion sales in comparison, and is only expected to grow from $167 million in 2003 to $293 million by 2006.[vii] But this projection will probably be revised downwards now that two major search engines have terminated their paid inclusion programs.

Paid placement is where the real money lies, as shown by the explosive growth of Google. The world's most popular search engine—one whose brand name has already entered the vernacular as a verb—earns the lion's share of its revenues from selling paid placement listings.

Sales are skyrocketing. According to figures released in preparation for its long-awaited initial public offering (which valued the company at more than $23 billion), Google lost $15 million in 2000 on sales of $19 million.

By 2003, Google earned $106 million on sales of $962 million. Based on its performance during the first quarter of 2004, Google is on track to earn some $250 million in profits on sales of more than $1 billion for the year.

This transformation of search results from impartial and algorithmic to commercial and advertising-driven went largely unnoticed by consumers, since there was little attempt—with Google as a notable exception—to distinguish between paid and non-paid placement listings. Disclosure of paid inclusion was essentially non-existent.

Some industry watchers grew alarmed at the trend. In July 2001, the consumer watchdog group Commercial Alert, based in Portland, Ore., filed a complaint with the U.S. Federal Trade Commission (FTC), charging eight major search engines with deceptive advertising practices.[1] The FTC's response to this complaint cast a spotlight on the problem of inadequate search engine disclosure. That FTC letter forms the basis for this study.

> **BY THE END OF 2001, VIRTUALLY EVERY MAJOR SEARCH ENGINE USED EITHER PAID PLACEMENT OF PAID INCLUSION—AND USUALLY BOTH.**

---

[1] The July 2001 complaint specifically named Alta Vista Co., AOL Time Warner, Inc., Direct Hit Technologies, iWon, Inc., LookSmart Ltd., Microsoft Corp. and Terra Lycos S.A. Available online at: http://www.commercialalert.org/index.php/article_id/index.php/category_id/1/subcategory_id/24/article_id/33

# INTRODUCTION

Research shows a surprisingly large percentage of Web users still fail to comprehend just how extensively advertising dollars influence their search results.

In less than a decade, millions of consumers who grew up relying on encyclopedias, telephones or the Yellow Pages for information now turn instinctively to search engines. In January 2004, Nielsen//NetRatings estimated 151 million active U.S. Internet users spend an average of almost 40 minutes searching. More than 75 percent of Internet users conduct at least one search a month, in ever-increasing volume.[2] In May 2004, Nielsen recorded 1.2 billion searches among American Internet users, a 30-percent jump over the previous year.[3]

As consumers click away on their favorite search engine in search of airfares, life insurance or love, most do so in the belief that they're getting impartial or "pure" results in return. In fact, depending on the search engine, many—if not most—results are influenced to some degree or other by commercial considerations, and the burgeoning search engine advertising market only under-scores the crucial need for more transparent disclosure of these practices.

Of course, a search for "digital cameras" that generates advertising-driven links from Nikon or Canon is certainly no cause for alarm, and may well be what the consumer is looking for. But the issue of paid search can become troubling when consumers looking for factual, unbiased information about health care or investments, for example, are steered toward sites selling particular drugs or financial services—where a bad decision can result in implications for more serious than buying the wrong camera.

---

[2] Sullivan, D. " Nielsen NetRatings Search Engine Ratings." Search Engine Watch.com  23 February 2004. Available online at: http://searchenginewatch.com/reports/article.php/2156451

[3] "High Demand for Search Advertising Outpaces Supply, Underscoring Nedd for Innovative by Search Engines." Nielsen//Netratings  July 19, 2004  Available online at: http://www.nielsen-netratings.com/pr/pr_040719.pdf

WebWatch's first commissioned study in 2002, "A Matter of Trust: What Users Want From Web Sites"—a national telephone survey of 1,500 Web-savvy U.S. adults conducted by Princeton Survey Research Associates—showed more than 60 percent of respondents had no idea search engines are paid to list some sites more prominently than others. However, 80 percent of those surveyed believed it was important to disclose such practices. [viii]

Consumer watchdog groups agreed. In July 2001, Commercial Alert wrote to the FTC, charging the failure of search engines to disclose either paid placement or paid inclusion within search results amounted to a deliberate deception,—one that took advantage of consumers' conditioned expectation for advertising-free search results. The crux of the Commercial Alert complaint read as follows:

> Because of the earlier editorial integrity in search engine results, there is an implied representation to search engine users that listings are not skewed by marketing or commercialism. Consumers are accustomed to search engine protocols based on editorial integrity, and have not been told of the departure from these protocols. In effect, this is a high-tech case of "bait and switch." [ix]

The FTC's Bureau of Consumer Protection responded one year later, and agreed many search engines were not clearly and openly explaining to consumers the presence of advertising within search results. Although many search engines were attempting some form of paid-placement disclosure, the FTC said these explanations were not clearly worded, and no search engines were adequately disclosing paid inclusion. [x]

The FTC's reply to Commercial Alert also echoed language in the complaint, noting paid-placement listings represented a departure from standard industry practice—one that had the potential to deceive consumers if not adequately disclosed. The reply also said intermingling search results that paid to be included with those that did not might mislead consumers without a clear explanation.

While the FTC refrained from taking any formal action against the companies listed in the complaint, it did send them a letter outlining recommendations sites needed to implement to avoid possible future action by the commission. [xi] In that letter, the FTC also cited WebWatch research showing four in five Internet users want search engines to disclose their paid search practices. [xii]

**THE FTC'S REPLY SAID INTERMINGLING SEARCH RESULTS THAT PAID TO BE INCLUDED WITH THOSE THAT DID NOT MIGHT MISLEAD CONSUMERS.**

The FTC's recommendations apply to all search engines—regardless of whether they were named in the complaint—as well as any search engine using another site's results. The FTC advised companies to consult the commission publication, "Dot Com Disclosures: Information About Online Advertising," upon which the questionnaire used to test search engines for this study was based. (See Study Methodology for more on how the questionnaire was designed.)

One year after the FTC's letter was sent to search engines, a 2003 WebWatch study, "False Oracles: Consumer Reaction to Learning the Truth About How Search Engines Work," employed an ethnographic approach to examine attitudes of Web-savvy consumers to paid placement programs. Among other things, the study found:

■ Most participants had little understanding of how search engines retrieve Web pages or rank links on a results page.

■ The majority of participants never clicked beyond the first page of search results, so some 40% of the links they selected were in fact paid placement listings, i.e. advertising.

■ All participants said paid placement links were often too hard to recognize or find, and the available disclosure information was clearly written for the advertiser, not the consumer. [xiii]

Consumers aren't alone in their confusion. Even members of the business community appear to have trouble distinguishing between paid and "pure" search results. Research by Internet marketing firm WebAdvantage.net showed slightly less than half of 450 small business owners it surveyed were able to recognize paid-placement listings, a situation the firm attributed to lackluster disclosure efforts. [xiv]

## EXAMINING PAID PLACEMENT

Of the two kinds of search engine advertising addressed by the FTC, paid placement is easily the more obvious—both in terms of its relative visibility and its impact on search results.

In its response to Commercial Alert, the FTC defined "paid placement" as follows:

*Any program in which individual Web sites or URLs can pay for a higher ranking in a search results list, with the result that relevancy measures alone do not dictate their rank.* [xv]

The FTC advises search engines to distinguish paid placement listings from "main" results with disclosures that are easy to spot and understand. Paid placement listings are typically grouped under headings such as "sponsored links" or "sponsored sites," and are usually placed either above, below, or to the right of the main results—

and sometimes all three. Some search engines also highlight these listings by use of graphics such as shaded boxes or borders. Certain search engines, however, mix paid-placement and non-paid placement listings together, and identify them on an individual basis.

Although the FTC did not suggest any further paid placement disclosure beyond a clear and conspicuous heading on the results page, many search engines go above and beyond the commission's recommendations with hyperlinks to separate disclosure pages explaining their paid placement programs. Most of the engines that do this tend to operate paid inclusion programs as well, which require additional disclosures.

Most search engines feature paid placement listings supplied by other engines—most often Google and Yahoo-owned Overture, which dominate the industry. Typically, advertisers bid for placement within search results based upon certain search terms, with the highest rankings going to those willing to pay the highest "cost-per-click," which can range from a few pennies to a few dollars.

Because these links are typically segregated from main listings, and the influence of payment upon rankings is at least somewhat obvious, one might expect little trouble on the part of consumers to identify and understand paid placement listings for what they are: Advertising.

Nevertheless, as noted earlier, WebWatch research indicates many consumers remain unaware about the existence of paid placement listings—underscoring the need for greater transparency among search engines. And advertisers seem to be betting on this ignorance, as the following quote by an online marketer in a trade-press column about search engines results pages (SERP) clearly illustrates:

*Overture listings perform slightly better than Google AdWords listings for our clients. We suspect the reason is the SERP structure. Google's SERPs display clearly labeled ads in text boxes on the right side of the page. Overture ads on Yahoo aren't so obvious. Ads populate prime real estate, in the center of the*

*page two inches from the top. Less-savvy users might not realize the Yahoo! sponsor results are ads.* [xvi]

The last sentence says it all: Unsuspecting or "less-savvy" Web users are more likely to click on links they don't recognize as advertising.

## EXAMINING PAID INCLUSION

Paid inclusion, on the other hand, represents a far more subtle and pervasive practice. Indeed, with a few notable exceptions (Google, AOL and Netscape), virtually every search engine uses paid inclusion for its main results, which usually outnumber paid placement listings. As such, the main results of most search engines contain a mixture of sites that paid and did not pay to be "crawled."

In its letter to Commercial Alert, the FTC defined "paid inclusion" as follows:

> *Any program in which individual Web sites or URLs are included in a search engine's index, or pool, of sites available for display as search results, when that Web site or URL might not otherwise have been included, or might not have been included at a particular point in time, but for participation in the paid program.* [xvii]

The FTC says search engines must clearly and conspicuously disclose their use of paid inclusion, explain how Web sites are chosen, and allow users to discern what, if any, impact it may have on rankings. This requires a disclosure heading and hyperlink to an easily locatable page or pop-up window disclosing and explaining the paid inclusion program. Paid inclusion results in the main listings are typically grouped under headings such as "Web results," "Web pages" or other generic headings that do not sufficiently manage to indicate paid inclusion.

In fact, the FTC noted in 2002 that none of the sites in question adequately disclosed or explained their paid inclusion programs. Although the situation has certainly

improved, the very nature of paid inclusion makes it more difficult to disclose and explain—let alone describe via a heading. If consumers and business people have difficulty identifying paid placement, one can imagine how few are even aware of the more subtle practice of paid inclusion.

As with paid placement results, most search engines receive their paid inclusion results from other search engines. (See Appendix E: Search Engine Interrelationships.) Web sites typically pay a flat, annual fee per URL for inclusion within a search engine's index, although some sites also charge a "cost-per-click." Even with "per-click" pricing, payment is only supposed to guarantee inclusion in a search engine's index—not a boost in rankings.

But despite disclaimers by every search engine that paid inclusion has absolutely no impact upon rankings, there is no way to confirm these claims, since search engines are not required to distinguish between sites that paid to be crawled and those that did not.

> **IF CONSUMERS AND BUSINESS PEOPLE HAVE DIFFICULTY IDENTIFYING PAID PLACEMENT, ONE CAN IMAGINE HOW FEW ARE EVEN AWARE OF THE MORE SUBTLE PRACTICE OF PAID INCLUSION.**

One of the industry's leading experts, *SearchEngineWatch.com* editor Danny Sullivan, has repeatedly written about the need to better disclose paid inclusion, which he suggests may in fact sometimes affect rankings: "In contrast, paid inclusion interacts directly with editorial results, and we have only the search engines to take at face value when they say it doesn't impact rankings. After seeing ranking boosts explained away for technical reasons, I've become more convinced that paid inclusion content may ultimately have to be labeled or segregated just like paid-placement content." [xviii]

This does not, however, suggest paid inclusion is an inherently harmful or underhanded practice. In fact, properly disclosed, paid inclusion can provide benefits to the consumer, as the FTC itself points out in its letter to Commercial Alert:

> To the extent that paid inclusion does not distort the ranking of a Web site or URL, many of these programs provide benefits to consumers, by incorporating more Web sites—or content—into an individual search engine's database than might otherwise be the case. This can give consumers a greater number of choices in search results lists. [xix]

## RENEWED DEBATE

The debate over paid inclusion was reignited in March 2004, when search engine Ask Jeeves dropped one of its paid inclusion programs. Although company executives said the program was discontinued for inadvertently skewing search results, they also acknowledged concerns over the perception of using a "cost-per-click" model for paid inclusion.

Almost simultaneously, Yahoo announced two new paid inclusion programs for its stable of search engines, both of which feature cost-per-click pricing. Yahoo's announcement fueled a heated debate in the trade press over cost-per-click for paid inclusion and the practice of paid inclusion in general.

In an interview with *DM News* and to the larger trade press, a Google executive reiterated his company's deep-seated aversion to paid inclusion, which he denounced as a violation of consumer trust. "The only way to keep user trust is to keep a church-and-state divide between what is paid and non-paid," said Tim Armstrong, Google's vice president of advertising. [xx]

Intensifying the debate, a December 2003 report by analysts Jupiter Research called for abolishing cost-per-click pricing for paid inclusion programs, which it condemned as completely lacking in credibility. "Paid inclusion programs that currently have a cost-per-click pricing component must eliminate it, as the model has a fundamental and inherent conflict of interest," the report noted. "Under a cost-per-click model, claims that the rankings of paid inclusion customers are unaffected cannot be believed, as the search index has a clear financial incentive to promote rankings." [xxi]

The controversy over paid inclusion continues. In late June 2004, Ask Jeeves announced it would terminate its remaining paid inclusion program, although contractual obligations mean these listings will linger on its site until 2005. One week later, MSN Search followed suit as well, leaving Yahoo as the last paid inclusion hold-out among the top five search engines.

# STUDY METHODOLOGY

Consumer Reports WebWatch evaluated 15 search engines for this study, culling the sites from the list of the top-most trafficked search engines in December 2003, according to Nielsen //NetRatings:

1. 1st Blaze
2. Alta Vista
3. AOL Search
4. Ask Jeeves
5. CNET's Search.com
6. Google
7. InfoSpace Web Search
8. Lycos Network Search/Directories
9. MSN Search
10. My Search
11. My Way Search
12. Netscape Search

13. Overture
14. Web Search
15. Yahoo! Search

(See Figure 2: Search Engine Selected For This Study for a list of the site names and URLs.)

## HOW THESE SITES WERE SELECTED

Commercial Alert's letter of complaint to the FTC specifically named seven companies that owned and operated at least one search engine each.[4] The FTC replied one year later with a letter to companies included in the original complaint, as well as seven others.[5]

But as the FTC made clear in its 2002 letter to

---

[4] The July 2001 complaint specifically named Alta Vista Co., AOL Time Warner, Inc., Direct Hit Technologies, iWon, Inc., LookSmart Ltd., Microsoft Corp. and Terra Lycos S.A. Available online at: http://www.commercialalert.org/index.php/article_id/index.php/category_id/1/subcategory_id/24/article_id/33

[5] According to the FTC, 14 parent companies were sent action letters in June 2002: About, Ask Jeeves, Alta Vista, AOL Time Warner, Teoma (DirectHit), Walt Disney, Google, InfoSpace, iWon, LookSmart, Microsoft, Overture, Terra Lycos and Yahoo. Available online at: http://www.ftc.gov/os/closings/staff/commercialalertattatch.htm

Commercial Alert, its recommendations apply to all search engines, regardless of whether they were named in the original complaint. These guidelines also apply to any third-party Web sites using another site's search results, be they paid placement or paid inclusion.

Two years is an eternity in the Internet business, one in which the competitive landscape remains in constant flux. Some of the companies named in the Commercial Alert complaint have since been absorbed by competitors, while other once-dominant search engines have since been reduced to bit players, particularly as Google's popularity grew.

Faced with such a fluid market, Consumer Reports WebWatch decided to let the market decide and surveyed the most-trafficked search engines, regardless of whether they were named in the original complaint—and regardless of whether one or more sites were owned by the same parent company. As it turned out, nearly all engines appearing on the FTC's list—with the exception of Go.com, About and iWon, which is now owned by Ask Jeeves—were evaluated in this study.

Nielsen//NetRatings provided WebWatch with its list of the 15 top-trafficked search destinations by U.S. users at home and work as of December 2003. No.13 on that list, "Microsoft Search," was in fact an internal search engine—designed to search Microsoft's own site—and thus was unsuitable for evaluation. That site was removed from the list and No. 16, "CNET Search," was added to maintain the number of sites evaluated at 15. (See Figure 3: Search Engine Statistics for the Nielsen//NetRatings list.)

## DESIGNING THE QUESTIONNAIRE

In order to evaluate compliance among major search engines with the FTC's recommendations, Consumer Reports WebWatch created a questionnaire designed to measure clear and conspicuous disclosure of paid placement and paid inclusion programs.

In its letter of recommendation to the search engine industry, the FTC encouraged companies to review and implement the guidelines laid out in the commission publication, "Dot Com Disclosures: Information About Online Advertising." [xxii] Although this publication acknowledges the need for flexibility among the methods search engines use to disclose their advertising practices, it does provide a detailed list of criteria the FTC deems necessary to protect consumers from deceptive advertising practices. WebWatch relied exclusively on this publication and the FTC's letters to inform its questionnaire, which it believes provides an objective tool as close as possible to the spirit, letter and intent of the FTC recommendations. (See Appendix C: Disclosure Questionnaire.)

These guidelines outlined in the FTC publication revolve around a few basic concepts necessary for clear and conspicuous disclosure, and include "placement," "proximity" and "prominence," as well as the need of the disclosure language to be simple, straightforward and understandable. These concepts apply to headings, hyperlinks and the actual disclosures themselves. (See Appendix D: Search Engines' Disclosure Statements for an annotated results page.)

While the FTC does not call for the use of hyperlinks to disclosure pages for paid placement programs, most major search engines do, in fact, disclose their paid placement programs in this manner, as they do for paid inclusion programs.

Because most search engines tested exceed the FTC recommendations regarding the disclosure of paid placement by providing an explanation page and not just a heading, questions regarding hyperlinks and disclosure pages were included in the "paid placement" section of the questionnaire as well. Although some testers found fault with search engines that disclose paid placement with only a heading, it must be stressed these sites are technically in compliance with FTC guidelines. However, the obviousness and effectiveness of these headings to users, in terms of visibility and clarity, is open to scrutiny.

## TESTING PROCEDURES

Previous Consumer Reports WebWatch research demonstrates a lack of awareness among consumers regarding the impact of advertising dollars on search engine rank. Consumers—indeed, even savvy information retrieval experts, as this report will show—have even greater difficulty identifying and understanding paid inclusion.

WebWatch's desire to evaluate search engine compliance with FTC guidelines for both paid placement and paid inclusion resulted in the decision to use information retrieval experts with a thorough understanding of the issues. Four information specialists in library science were recruited to participate in the study and asked to test 15 search engines each, for which they were each paid $500. (See Appendix B: Testing Profiles.)

Because of this study's focus on disclosures rather than results, queries were not chosen in any scientific manner. Search terms were instead chosen for timeliness, perceived popularity and for a balance between commercial and informational topics. (See Figure 20 in Appendix A: Testing Background for query terms.)

A search engine's disclosure of paid placement or paid inclusion doesn't vary from query to query, although non-commercial searches may sometimes fail to generate paid placement listings. As such, each tester was assigned two queries per search engine from a rotating list.

The actual testing took place between April 28 and May 4, 2004, during which time testers were free to evaluate the 15 search engines in any order—or at any time—they chose. The testers were not required to click beyond the first page of results. They completed one questionnaire per search engine, submitting a total of 15 questionnaires each. Besides noting specifics such as whether a given search engine followed a given guideline, the testers were also asked to record any comments and observations, which were noted where appropriate throughout the engine-by-engine findings.

Several search engines sometimes practiced "content promotion," a confusing gray area used to highlight a site's related internal content, other worthwhile links, sponsored results or a combination of all three. Content promotion results (which often include links and images) are typically inserted at the top of the page, above paid placement listings, but are sometimes found above, or within, the main listings.

Since the FTC did not address content promotion, it was not specifically addressed in this study, except when identified by testers or the author for one or other reason.

## EVALUATING THE RESULTS

This study, it must be stressed, focused on the manner in which search engines disclose their results rather than the actual nature of those results. This study did not attempt to compare search results on an engine-by-engine basis, or to determine whether the search results returned were relevant to a given query.

The purpose of these evaluations were not to assign grades, rankings or even a pass/fail to individual search engines based on their perceived compliance with FTC recommendations. The focus was on singling out practices, rather than engines. That said, the study did note instances in which certain search engines appeared to be meeting—or falling short—of the FTC guidelines.

Consumer Reports WebWatch hopes, with this study, to alert the industry to any current practices that may result in long-term credibility problems, as well as to call attention to potential inadequacies in the FTC recommendations and alert consumers to the presence of advertising within search results.

The search engine industry is nothing if not dynamic, with business models and relationships subject to frequent and abrupt change. Some of the engines reviewed may have altered or discontinued some paid placement and paid inclusion programs in place during testing. Further, their disclosure of paid placement and/or paid inclusion programs may also have changed—for better or worse—between the time testing was conducted and the report was published.

# MAJOR FINDINGS

Although most major search engines are making some effort to comply with the FTC's recommendations to clearly reveal the presence of advertising within search results, compliance varied widely, our study revealed. All sites tested could improve the visibility and/or clarity of their disclosures. Most troubling, some search engines seem to be doing as little as possible to explain their relationship with advertisers—and as much as possible to obfuscate both their use and disclosure of paid placement and paid inclusion.

Of the 15 search engines tested, only one—1st Blaze—was found to disregard disclosures and each of the FTC's guidelines. Although the site appears to engage in at least some paid placement—the results it provides under the heading "Featured Sites" were identical for every tester, regardless of the search term—the site makes no attempt to disclose this fact with obvious headings, hyperlinks or disclosure pages. Whether 1st Blaze uses paid inclusion remains uncertain, since testers found no information or explanation on the site about how search results are generated.

Disclosures on other sites could improve as well. Despite the expertise of the testers, nearly all of them experienced some difficulties with certain search engines, whether identifying headings or hyperlinks; differentiating between content promotion, paid placement and paid

**IF EXPERTS IN INFORMATION RETRIEVAL HAVE PROBLEMS FINDING AND UNDERSTANDING DISCLOSURE INFORMATION, WHAT DOES THIS MEAN FOR THE AVERAGE CONSUMER?**

inclusion; or making sense of disclosure statements. These problems tended to occur with greater frequency when evaluating paid inclusion. If experts in information retrieval, on the lookout for disclosures, have problems finding and understanding this information, what does this mean for the average consumer?

## AMONG THE MAJOR FINDINGS

■ **Majority of Disclosure Headings Were Difficult to Spot**
Eight of the 15 search engines tested labeled their paid search listings with headings that were both smaller and duller in color than the search results themselves. The use of inconspicuous fonts and colors increases the likelihood consumers may not notice disclosures and fail to grasp the true nature of their results.

■ **Most Hyperlinks to Disclosures Were Imperceptible**
With only three exceptions (Yahoo, AOL, Lycos), all search engines tested used tiny and faint fonts, such as light gray, for hyperlinks to disclosure pages. Some of these hyperlinks blended in so well with the page that some testers missed them completely. Engines' pervasive use of eye-straining hyperlinks, which almost seemde-signed to be overlooked, greatly reduces the chances consumers will ever see their disclosures.

> EVERY TESTER FOUND FAULT WITH THE LACK OF DISCLOSURE PROVIDED BY THE THREE META-SEARCH ENGINES TESTED.

■ **Many Disclosures Were Incomprehensible**
Disclosure statements should be both simple and straight-forward. But testers found many of them—for both paid placement and paid inclusion—were anything but, and almost seemed written to discourage reading. Many disclosures also seemed geared more toward advertisers than consumers and were peppered with jargon and trademarked names for various programs—particularly for paid inclusion—leaving some testers baffled and uncertain about what they had read.

■ **Meta-Search Engines Were Mega-Offenders**
Every tester found fault with the disclosure, or lack there-of, provided by the three meta-search engines tested: CNET's Search.com, InfoSpace and Web Search. Meta-search engines present results from several other engines simultaneously. But they also tend to strip away all exist-ing disclosures search engines have provided for their sites and often do a poor job providing any of their own. Although CNET and InfoSpace disclosed paid place-ment, none of the three meta-engines tested adequately disclosed paid inclusion—despite relying on results that may have contained paid inclusion. In fact, CNET and InfoSpace omitted any mention of paid inclusion any-where on their respective sites, while Web Search men-tioned the practice might occur without indicating where or when. Several months after testing concluded, Web Search began identifying paid placement listings on a link-by-link basis.

■ **Most Search Engines Exceeded Paid Placement Guidelines**
Although the FTC only requires a visible and clearly worded heading to indicate paid placement results, most major search engines tested went a step further by providing a hyperlink to a separate disclosure page. Those sites that did not, however, were criticized by testers for not voluntarily offering additional information for consumers. Google, which supplies many sites with paid results, was singled out for failing to provide an explanation of its paid placement programs beyond a heading on its own site. Most of the sites Google supplies with paid placement listings provide fuller and easier-to-locate disclosures than Google does itself, testers noted.

### ■ Some Disclosures Were Buried Too Deep

Search engines should make full disclosures available in a prominent position after the first click, according to the FTC. Many of the engines tested took users directly to the appropriate disclosure whether it stood alone (Ask Jeeves) or shared the page with other disclosures (AOL). But some search engines forced users to scroll or click again—or both—in order to locate disclosures (MSN, My Way Search), making them unnecessarily difficult and frustrating for testers to find.

### ■ Several Engines Divorced Hyperlinks from Headings

Hyperlinks should be placed near headings so consumers can easily find the heading, says the FTC. Whenever certain search engines separated hyperlinks from headings, testers complained of the difficulty in finding them—and sometimes failed to spot them at all. Some engines placed hyperlinks across the page from the heading (Ask Jeeves), at the top of the page (InfoSpace), or buried them at the bottom of the page (Web Search, My Search), undermining the disclosure.

### ■ Paid Inclusion Headings Confusing

Almost all of the search engines tested labeled their paid placement listings with headings that most testers believed clearly conveyed the use of advertiser-driven results ("Sponsored Links," "Sponsored Results," etc.). However, none of the search engines tested used headings ("Web Results," "Web Pages," etc.) that any tester said clearly indicated paid inclusion. These shortcomings may soon become moot, due to the growing controversy over the credibility of paid inclusion. Some two months after the conclusion of testing, both Ask Jeeves and MSN Search announced plans to phase out their programs, leaving Yahoo as the last major paid inclusion player.

### ■ Lack of Clarity Can Lead to False Assumptions About Paid Inclusion

At the time of testing, all but a few of the sites tested—Google and the sites it supplies with main listings, namely, AOL and Netscape—used paid inclusion. Because the use of paid inclusion was almost universal, and certain sites used it without openly stating so, Google, AOL and Netscape inadvertently misled some testers by not explicitly stating their main results were advertising-free. The lack of any such statement by these sites led several testers to express uncertainty over their use of paid inclusion; or to erroneously conclude they used paid inclusion without bothering to disclose it—as certain other sites did.

### ■ Content Promotion Creates Confusion

Some of the search engines tested (AOL, MSN, Netscape, Lycos and Yahoo) sometimes use "content promotion," placing internal and/or sponsored content either above their main results or under separate headings. Regardless of where they were placed, or how they were disclosed, these content promotion listings confused testers. Testers sometimes mistook them for paid placement and/or paid inclusion. Some content promotion disclosures only muddied the waters by mentioning the use of "sponsored" content. Some two months after testing, MSN Search, which made frequent use of content promotion under a "Featured Sites" heading, dropped the practice.

### ■ Cross-Ownership is Not Always Acknowledged

Some testers were misled by the failure of certain search engines to acknowledge their business relationships with other sites mentioned in disclosures. Yahoo, for instance, acknowledges its ownership of Overture in its disclosure, but does not mention its ownership of Alta Vista in the latter's disclosure. In its disclosure pages, Ask Jeeves does not readily acknowledge its ownership of Teoma. This led one tester to wonder whether Ask Jeeves intended to obfuscate that fact.

# RESULTS BY SEARCH ENGINE

Below are detailed engine-by-engine assessments distilled from questionnaires completed by each tester. In addition to noting specifics—such whether or how a certain search engine satisfied a given FTC disclosure recommendation—the results also make liberal use of observations by the testers.

It should be noted that one of the testers repeatedly questioned whether the use of the word "Sponsored" in headings (e.g., "Sponsored Links") adequately conveyed advertising-driven results. This observation supports a key finding of an earlier WebWatch report, "False Oracles: Consumer Reaction to Learning the Truth About How Search Engines Work." Nearly all participants in that study, who were informed about the influence of advertising on search results and asked to identify indicators of paid placement, said the term "sponsored" was either vague, misleading or confusing. Furthermore, participants likened the term to something positive or virtuous, such as giving money to charity, and not to advertising.

Every search engine tested for this study featured paid placement, and all but a handful used paid inclusion. Both practices were examined separately.

Using Yahoo as an example, the terminology for the purposes of this study is as follows (See Figure 4: Disclosure Elements):

**Heading:** The label used to indicate a group of paid placement or paid inclusion listings. Using Yahoo as an example, "Sponsor Results" and "Top 20 Web Results" represent paid placement and paid inclusion headings, respectively.

**Hyperlink:** The link that takes users to a disclosure page. Hyperlinks should appear next to the heading. In the example below, hyperlinks are represented by the "What's This?" links.

**Disclosure Page:** A separate Web page or pop-up window that explains paid placement and paid inclusion.

Because most sites use identical fonts and colors for both their paid placement and paid inclusion headings (as well as duplicate wording of hyperlinks), fuller descriptions were given for the former than the latter to avoid needless repetition. Exceptions were noted. Finally, many of the comments make reference to language used in disclosure pages, some of which are partially quoted below. The complete disclosure statements offered by each search engine are available in Appendix D.



FIGURE 4: DISCLOSURE ELEMENTS

HEADINGS                                              HYPERLINKS

## 1ˢᵀ BLAZE

http://www.1stblaze.com
Dates tested: April 28, 29 & May 4
See Figure 5

### Paid Placement

1ˢᵗ Blaze appeared to use 'paid placement for at least some results, but did not explain how search results are generated, either on the results page or anywhere else on the site, a practice that was criticized by every tester.

Visually, 1ˢᵗ Blaze returned results in three batches. The first group appeared after the statement: "Your search for "X" returned the following results." The second group appeared after the heading "Featured Sites," while the third group appeared under the statement: "Results from around the world related to X." While the first and third groups returned results related to the search terms, the "Featured Sites" group did not. None of the headings offered hyperlinks to disclosure pages.

Strangely, the "Featured Sites" results remained identical —and irrelevant—for each and every query. Whether searching for information on breast cancer, the Atkins Diet or digital cameras, 1ˢᵗ Blaze returned the same "Featured Sites" results: Links to a contest, an offer of easy credit, a dating service, and a solicitation to earn a college degree. The results led some testers to suspect paid placement, although the listings' irrelevancy caused confusion. "I can't tell if 'Featured Sites' are paid placement ads or not," said one tester. "They're ads, but they're totally unrelated to the search."

Several testers said it was impossible to tell whether the site used paid placement, although most suspected it did. Every tester found fault with the site's lack of transparency. "This search engine does not have any disclosure information whatsoever," and "very secretive search engine" said one. "There is really no indication as to the basis on which a search result is generated," remarked another.

### Paid Inclusion

1ˢᵗ Blaze offered no obvious headings, hyperlinks or disclosure pages. Testers were highly critical of the site as a result.

"1ˢᵗ Blaze does not provide enough information on its site to make any determinations regarding its paid placement and/or paid inclusion programs," said one, echoing comments of the entire group.

An attempt to reach 1ˢᵗ Blaze on September 16, 2004 by e-mail—the only means of contact available anywhere on the site—bounced, returning the message, "I'm sorry to have to inform you that the message returned below could not be delivered to one or more destinations."

## ALTA VISTA

http://www.altavista.com
Dates tested: April 28, 29 & May 4
See Figure 6

### Paid Placement

Alta Vista's paid placement listings appeared in groups at the top and bottom of the results page and were distinguished from other results by a heading and hyperlink to a disclosure page. Results were provided by Overture, a subsidiary of Yahoo, which also owns Alta Vista— although this fact was not mentioned in the site's disclosure pages.

Most testers believed the "Sponsored Matches" heading clearly conveyed the engine's use of paid placement, and all praised the easy-to-spot red font. Although most said the "About" hyperlink label indicated the availability of a disclosure statement, the hyperlink's faint, gray font blended in with the page, making it hard to spot.

"Light gray on white background, poor contrast—[it's] not clear that this is an active link since it reminds one of normal Windows menu items that are 'grayed out,' i.e inaccessible," complained one tester.

Clicking on the "About" hyperlink opened a separate page containing all disclosures. This page, several testers noted, was incorrectly labeled "Alta Vista—Types of Audio Results" at the top of the browser window. The paid placement disclosure, which was explained under the heading "Sponsored Matches," required users to



FIGURE 5: 1" BLAZE