# Exhibit O

CH01/PLATC/210357.1

Dockets.Justia.com

REQUEST FOR ACTION BY THE INTA BOARD OF DIRECTORS

Initial Interest Confusion
September 18, 2006

**ACTION REQUEST:** The Online Use Subcommittee of the Internet Committee requests that the Board of Directors adopt the following resolution on initial interest confusion, recommending that courts consider initial interest confusion using the traditional likelihood of confusion factors.

**PROPOSED RESOLUTION:**

    **WHEREAS**, initial interest confusion is a doctrine which has been developing in U.S. trademark cases since the 1970s, which allows for a finding of liability where a plaintiff can demonstrate that a consumer was confused by a defendant's conduct at the time of interest in a product or service, even if that initial confusion is corrected by the time of purchase;

    **WHEREAS**, the initial interest confusion doctrine has been used more frequently since the development of the Internet, in the context of domain name disputes, metatag use, and keyword advertising, and courts seem to apply different standards to cases of initial interest confusion on the Internet than they do in the bricks and mortar world;

    **WHEREAS**, existing case law has developed in an inconsistent fashion, with no definitive test for initial interest confusion, and no clarity as to the factors a court should consider in deciding initial interest confusion cases; and

    **WHEREAS**, clarity and certainty in the initial interest confusion doctrine would benefit both plaintiffs and defendants in trademark infringement cases by bringing greater predictability to such litigation.

    **BE IT RESOLVED**, that INTA recommends that courts recognize that the initial interest confusion doctrine is not separate from a likelihood of confusion analysis. It is simply a timing question as to when confusion occurs, which recognizes confusion that is dispelled before an actual sale occurs may be actionable. Courts should consider initial interest confusion claims, whether in brick and mortar cases or Internet cases, under traditional likelihood of confusion tests and should consider each element of such tests, as well as related defenses, based on the facts of each case.

**Executive Summary:** The Online Trademark Use Subcommittee recommends that the INTA Board of Directors adopt the preceding resolution concerning initial interest confusion, a trademark cause of action that has developed in the United States and may emerge in other jurisdictions.

Clarity and certainty are missing from the existing case law on initial interest confusion, which allows for liability where a plaintiff can demonstrate that a customer was confused by a defendant's conduct at the time of interest in a product or service, even if that initial confusion is corrected by the time of purchase. Since its creation in the 1970s, the doctrine has been expanding. There is a split in the circuits – and within circuits – regarding what elements must be shown to establish initial interest confusion. Many courts seem to be using the doctrine to find liability for perceived bad acts without engaging in any analysis – they merely conclude there is initial interest confusion and therefore infringement has occurred.

The subcommittee believes that courts should engage in traditional likelihood of confusion analysis in cases of initial interest confusion, rather than creating a new doctrine or treating initial interest confusion as a substitute for actual confusion in the likelihood of confusion analysis. To put it another way, the subcommittee believes that confusion is confusion is confusion, whether it is prior to or at the point of sale, and that the same likelihood of confusion factors should be used in all instances.

In the course of the deliberations in the subcommittee, alternate viewpoints were presented. At first, some members believed that the initial interest confusion doctrine should be eliminated altogether, arguing that since the confusion is alleviated by the time of purchase, there is no harm to be remedied. Others believed that a separate doctrine made sense, and advocated for a bad faith requirement to limit the doctrine to the egregious cases of bait and switch. However, on further consideration, the subcommittee decided that creating a new doctrine was not advisable. The standard likelihood of confusion doctrine would address the wrongs the members were concerned about while limiting the application of remedies when not appropriate, without the difficulty of establishing a new doctrine.

The subcommittee was able to reach consensus that the standard likelihood of confusion analysis is the best way to deal with cases of initial interest confusion. The likelihood of confusion analysis is flexible enough to handle both cases involving actual confusion or likelihood of confusion at the point of sale and those cases involving pre-sale confusion claims. Courts are used to applying a multi-factor test to determine whether there is trademark infringement. While trademark cases are always fact-specific and the factors may be weighed differently from one case to another, the fact that there is a test with several factors which would be applied to initial interest confusion cases brings much-needed structure and clarity to these cases, as opposed to the current chaotic nature of the case law. Therefore, trademark owners and users of third party trademarks can better evaluate their own and competitors' uses of trademarks and can know what factors will be considered by the courts in order to determine trademark infringement.

The report that follows will explain the deliberations of the subcommittee in some detail and address matters that were raised during the course of the analysis.

# Report of the Online Use Subcommittee Concerning the Proposed Resolution on Initial Interest Confusion

## I.    The Definition and Treatment of Initial Interest Confusion

In trademark infringement cases, in order to establish liability, a plaintiff must establish that there is a likelihood of confusion between the junior user's mark and the senior user's mark. This is the case in most countries in the world. Most cases involve confusion at the point of sale. However, in the United States, some courts have considered confusion that occurs at other times. Under the so-called doctrine of "initial interest confusion," liability for trademark infringement may be found where the infringing mark causes initial customer interest in a product or service, even if that initial confusion is corrected by the time of purchase.

U.S. courts are struggling to address the concerns raised by the "shift" of confusion forward on the purchase "timeline." However, clarity, certainty and predictability are missing from the existing case law, and the Online Trademark Use Subcommittee recommends that INTA provide guidance to clarify the significance and impact of this shift on the purchase timeline. The study by the subcommittee revealed numerous conflicting holdings in U.S. cases which cannot be explained by a development of the doctrine over time or a difference of opinion among the U.S. federal circuits. Courts within a single circuit have reached contradictory results. The subcommittee found more than a dozen different holdings on the subject of initial interest confusion. The result of these cases has been to expand the doctrine, such that courts have been increasingly finding liability for initial interest confusion without having a consistent definition of the doctrine or a consistent set of factors that must be established before a finding of initial interest confusion.

At present it appears that initial interest confusion, as grounding a cause of action *per se*, is solely a U.S. doctrine. However, it is apparent that the concepts of pre-transaction confusion and diversion leading to a lost business opportunity are being addressed by courts in other jurisdictions, such as the European Union, Canada and Israel, as relevant factors to be assessed within the framework of existing and well established trademark laws.[1]

---

[1] *See, e.g., Roadtech Computer Systems v. Mandata (Management and Data Services) Ltd*, [2002] E.T.M.R. 970 (Eng. Ch. Div.) (defendant's reproduction of the plaintiff's trademarks in its website metatags was a deliberate attempt to divert web traffic and actionable under the tort of passing off); *Reed Executive plc v. Reed Business Information Ltd.* [2004] R.P.C. 40 (Eng. C.A.) (possibly questioning the existence of initial interest confusion; holding defendant's use of plaintiff's trademarks in metatags and keywords was not actionable under the laws of trademark infringement or passing off); *British Columbia Automobile Assn. v. Office and Professional Employees' International Union, Local 378* (2001), 10 C.P.R. (4th) 423 (BCSC) (examining the U.S. and English cases and holding initial confusion can constitute passing-off); and *Law Society of British Columbia v. Canada Domain Name Exchange Corp.* (2004), 34 C.P.R. (4th) 437 (BCSC), aff'd [2005] B.C.J. No. 2500 (BCCA) (registration of domain names wholly comprised of plaintiff's trademarks and trade names without additional descriptive matter and which resolved to sites featuring adult material and political commentary amounts to passing-off). *See also Claude Ruiz-Picasso v. Office for Harmonisation in the Internal Market, Daimler Chrysler AG*, ECJ 12 January 2005, Case C-361/04 . [2006] ETMR 349 (a court may consider the likelihood of confusion at times other than at the moment of

## II. History of Subcommittee Involvement

The subcommittee began studying the issue of initial interest confusion in 2004 due to the expansion of the doctrine to cases involving domain names, metatags, and other uses on the Internet. The timing of the examination of this issue was accelerated in January 2005, when the subcommittee received a request from the U.S. Amicus Subcommittee seeking clarification on what INTA's position should be with respect to initial interest confusion.

To answer this question, the subcommittee undertook a careful review of the U.S. initial interest confusion cases, both in the brick-and-mortar and Internet contexts. Upon consideration, the subcommittee became concerned that the initial interest confusion doctrine was being expanded with no limits, boundaries, or requirements. There was strong sentiment that the initial interest confusion doctrine should not be a "catchall" to enable a finding of infringement without any analysis of factors.

After spirited discussions that stretched nearly two years and two committee terms, the subcommittee reached consensus that initial interest confusion should not be a separate doctrine or independent tort. Instead, the subcommittee believes that initial interest confusion should be addressed as part of the traditional likelihood of confusion factors to confusion that occurs prior to the point of sale, whether such confusion takes place on the Internet or in the brick and mortar world. To put it another way, the subcommittee believes that "confusion is confusion is confusion," whether it is prior to or at the point of sale, and that the same likelihood of confusion factors should be used in such instances. At the same time, the subcommittee acknowledges that the potential harm caused by initial interest confusion may differ from the harm caused by confusion that occurs at the time of sale. Thus, in the case of initial interest confusion, courts should consider the extent and type of harm that is likely in determining whether any remedy is appropriate and, if so, what specific relief should be awarded.

Below is a summary of the questions that the subcommittee addressed before arriving at the recommendation contained in the resolution.

## III. Summary of Subcommittee Deliberations

### A. *Should the doctrine of initial interest confusion exist? Does it right a wrong not covered by other existing causes of action, such as likelihood of confusion or dilution?*

The subcommittee concluded that the doctrine of initial interest confusion should exist and in fact, currently does exist under U.S. law and is viable to help trademark owners right wrongs that are not otherwise covered by other causes of action. One example of a "wrong" that the initial interest confusion doctrine helps to "right" includes the typical

---

purchase). In a case of first impression in Israel, the Tel Aviv District Court has recently found inapplicable the doctrine of initial interest confusion. *Matim Li v. Crazy Line et al and Google Israel Ltd.*, D. Ct. Tel Aviv, August 2006

bait-and-switch situation. Imagine a consumer driving on the highway, seeing a billboard that says, "Exit here for Blockbuster Video." When the consumer exits, though, there is no Blockbuster; instead, the consumer sees a competing video store (the store that leased the billboard space, of course). Although the consumer is no longer confused because Video Store X is obviously not Blockbuster, the consumer goes into X nevertheless and makes a purchase. Video Store X is benefiting from the improper use of Blockbuster's trademark. Blockbuster loses a potential sale because the customer, initially confused as to which video store he was exiting for, did not continue one exit down the highway to where Blockbuster actually was located. This is the harm that initial interest confusion seeks to address.

To address this type of bait and switch, U.S. courts began developing the initial interest confusion doctrine in the 1970s.[2] Before then, "traditional" likelihood of confusion cases focused on confusion that occurred at the point of sale or after. The doctrine of initial interest confusion developed to address confusion that occurs prior to the sale and even confusion that might be remedied before a sale occurs. Thus, initial interest confusion was developed to address a difference in timing as to when confusion occurs.[3]

The subcommittee also considered whether initial interest confusion could lead to an expansion of the dilution concept of tarnishment. It decided that initial interest confusion, if properly applied, should not lead to the overexpansion of dilution, because dilution does not require any showing of confusion while initial interest confusion does require such a showing. If the use of a famous mark is unsavory or controversial, that may impact the harm suffered by the plaintiff as a result of the initial interest confusion, but it is not relevant to whether initial interest confusion has indeed occurred. In other words, if there is no likelihood of consumer confusion, then there can be no initial interest confusion, regardless of the potential dilutive nature of the use.

**B.    *Is initial interest confusion being defined differently from standard likelihood of confusion? Should it?***

A review of initial interest confusion cases in the United States reveals that in application the doctrine is hopelessly confused, inconsistent and sometimes incoherent.

Some courts have applied a traditional multi-factor test (*e.g.*, the eight *Polaroid* factors) to determine if a particular online trademark use causes initial interest confusion, equating initial interest confusion with likelihood of confusion in the traditional

---

[2] One of the earliest initial interest confusion cases was *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F.Supp. 707 (S.D.N.Y. 1973), aff'd, 523 F.2d 1331 (2d Cir. 1975) (holding that there was a likelihood of confusion between STEINWEG and STEINWAY for pianos, and noting that the harm to Steinway was that a potential customer, initially thinking there was a connection, would be attracted by the GROTIAN-STEINWEG name to consider that brand of piano, even though later investigation would reveal no connection with the makers of STEINWAY).

[3] Other countries may address bait and switch cases under passing off doctrines; for example, in Canada, bait and switch situations could be covered by the common law tort of passing off or by the statutory codification thereof contained in sections 7(b) through (d) of the Trade-marks Act. Other countries, as in Europe, may address bait and switch situations under laws relating to illegal misleading advertising.

trademark infringement analysis.[4] Other courts have equated initial interest confusion with a particular form of consumer behavior – *e.g.*, clicking on a link to a website that proves to be associated with someone other than the owner of the trademark that caused the consumer to click in the first place – without analyzing if that behavior reflects confusion as to the origin or sponsorship of defendant's goods.[5] And other courts simply have declined to apply what they have characterized as the "relatively new and sporadically applied" doctrine of initial interest confusion.[6] Please see the appendix for a listing and description of the cases reviewed by the subcommittee.

The inconsistent application of the doctrine of initial interest confusion has markedly complicated the analysis of online trademark uses. As the economic importance of online trademark uses continues to increase each year, trademark owners have a compelling interest in the development of a consistent and predictable doctrine of initial interest confusion. The subcommittee believes that it is in the interest of INTA members to articulate a clear statement of the doctrine of initial interest confusion that ties the doctrine to the traditional analysis that courts and trademark users have long applied to evaluate likelihood of confusion.

### C.    *Should any factors of the likelihood of confusion test be weighted more heavily than others in initial interest confusion cases?*

The weighing of factors in initial interest confusion cases should be no different than in a traditional likelihood of confusion analysis, *i.e.*, one that deals with point of sale confusion. In all traditional likelihood of confusion analyses, the weighing of factors is very fact-specific, and different factors may be weighed more heavily in one case versus another. As the Restatement of Unfair Competition states in summarizing U.S. law, "No mechanistic formula or list can set forth in advance the variety of elements that comprise the market context from which likelihood of confusion must be determined."[7] Hereunder the relevance of the different factors traditionally used by U.S. court in a likelihood of confusion analysis for initial interest confusion cases will be discussed.

#### (1) Re: Intent

The subcommittee did consider other possible recommendations, including, for example, whether certain factors, such as intent, should be weighed more heavily in initial interest confusion cases. Initially, in seeking to define the tort of initial interest confusion, the subcommittee debated whether intent was a necessary factor at all. In fact, an earlier draft of the resolution proposed a definition of initial interest confusion which required intent, since: (1) intent would compensate for the absence of real damages in initial interest confusion, due to the typically brief duration of such confusion; and (2) if there is

---

[4] *E.g., Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004), *cert. denied*, 544 U.S. 974 (2005).
[5] *E.g., Australian Gold v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006).
[6] *E.g., Lamparello v. Falwell*, 420 F.3d 309 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 1772, 164 L. Ed. 2d 516 (2006).
[7] Restatement (Third) of Unfair Competition § 21, comment a (1995).

4

no intent to "bait," a party should not be held liable for "bait and switch," even if there is some initial diversion of attention; and (3) the intent requirement would provide a cause of action for trademark owners whose marks are used by others to divert the consumer to venues that are noncompetitive and noncommercial, but potentially offensive nonetheless.

However, the subcommittee decided that intent, while certainly relevant, should not be a necessary element of initial interest confusion[8]. The test of initial interest confusion, the subcommittee concluded, should be no different from the traditional likelihood of confusion analysis. The goal should be to prevent consumer confusion caused by the unauthorized use of another party's mark. In the traditional likelihood of confusion analysis, confusion is no less detrimental because the junior user did not intend to cause it. Likewise, the diversion of the consumer caused by initial interest confusion is no less harmful merely because it was not deliberate.

This is not to say that intent is not a significant element in many, if not most, cases of initial interest confusion. Indeed, intent to deceive is a key element in the classic initial interest confusion scenario involving "bait and switch," and it is powerful evidence in any case that a likelihood of initial interest confusion is present. But the absence of affirmative evidence of intent should not preclude relief for a trademark owner who suffers potential lost sales due to the use, however innocent, of its trademark. If trademark confusion diverts the consumer away from the goods or services of the trademark owner, the diversion caused by confusion which is dispelled prior to the point of sale and diversion caused by confusion that persists up to the point of sale are both susceptible to analysis under the multi-factor test. In each case, the trademark owner has been harmed by the confusion, whether or not it was intentional.

Proper application of the principles of fair use should effectively address concerns that the absence of an intent requirement will lead to an overexpansion of the doctrine and chill free speech and fair competition. For example, a criticism site should not be liable for initial interest confusion merely because it makes nominative fair use of its target's marks in content and metatags, as long as the content of that site (and of the link that appears in response to a search engine query for the target's marks) meets the nominative fair use standards under applicable law.

### *(2) Re: Commercial Use and Use by a Competitor*

The subcommittee also considered whether claims of initial interest confusion should be limited to circumstances in which the mark is used either by a competitor or in connection with the sale and purchase of goods and services (what we will refer to as "commercial use" in this report[9]). The arguments for limiting initial interest confusion to

---

[8] Furthermore, in many jurisdictions including most European jurisdictions, intent is only a relevant factor for the issue of damages and not as to whether an injunction should issue.

[9] The subcommittee uses "commercial use" in the common, layperson meaning of the term to refer to the buying and selling of goods and services, rather than the more specialized meaning of "use in commerce"

cases of commercial or competitive use resulted from a concern that the doctrine was being expanded from "bait-and-switch" conduct to cases of gripe sites or fair uses of another party's trademark. The subcommittee decided a commercial use requirement was not a necessary part of the doctrine, because evaluating whether a use is commercial, whether there is competition and whether the use of a mark constitutes a fair use are factors to be considered in the likelihood of confusion analysis. Thus, establishing a requirement that there be a commercial or competitive use would be inconsistent with the application of the traditional multi-factor analysis used in determining the likelihood of confusion.

Therefore, rather than making competition or commercial use a prerequisite, the subcommittee concluded that courts should consider all of the likelihood of confusion factors and weigh them according to the facts of each case. As one court held, "The core element of trademark infringement is whether the similarity of the marks is likely to confuse customers about the source of the products."[10] The degree to which the products and/or services at issue compete with each other is one factor that courts typically consider in a likelihood of confusion analysis.[11] Commercial use is also considered in this analysis when evaluating, for example, the degree of a defendant's good faith or intent to pass-off, the degree and proximity of competition and incidents of actual confusion,[12] but again, it is one factor among several.

Thus, limiting initial interest confusion to uses by competitors and commercial use would eliminate the review of key factors of the traditional likelihood of confusion analysis.[13] Furthermore, the evaluation of the likelihood of confusion factors should not be "'a mechanical process ... 'where the party with the greatest number of factors weighing in its favor wins."[14] Instead, "a court should focus on the ultimate question of whether consumers are likely to be confused.[15]

---

found in the Lanham Act. A mark may be "used in commerce" even if it is not used in connection with the sale or purchase of goods and services.

[10] *Interstellar Starship Services, Limited v. EPIX, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002).

[11] See *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2nd Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed. 2d 25 (1961); *3M v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1308 (8th Cir. 1997).

[12] See e.g. *Faegre & Benson, LLP v. Purdy*, 367 F.Supp.2d 1238, 1247 (D. Minn. 2005) (holding that while defendant may legitimately use plaintiff's trademarks in metatags to refer to plaintiff and describe the content of defendant's website containing criticisms of plaintiff, defendant is not permitted to use plaintiff's marks in defendant's metatags to divert Internet users from plaintiff's website. Defendant's copying of plaintiff's description tags indicated an intent to mislead consumers rather than to categorize defendant's web pages).

[13] See *OBH, Inc.*, 86 F. Supp. 2d at 187 (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995) ("[a]lthough courts need not 'slavishly recite the litany of all [likelihood of confusion] factors in each and every case,' they must 'engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, ... explain why'").

[14] *OBH, Inc.*, 86 F. Supp. 2d at 187 (quoting *Arrow Fastener*, 59 F.3d at 391; *Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 85 (2d Cir. 1988)).

[15] *OBH, Inc.*, 86 F. Supp. 2d at 185-187 (holding that (1) defendant's parody site containing noncommercial speech to be "use in commerce" because defendant used plaintiff's trademark as domain name and defendant's website contained link to another site owned by defendant and operated for commercial purposes; and (2) defendant's use of plaintiff's mark constituted "use in commerce" because it affected plaintiff's ability to offer plaintiff's services in commerce).

In short, courts should not limit initial interest confusion to cases in which there has been use by competitors or commercial use. Rather, courts should take a flexible approach and review the facts of each case to determine whether the alleged infringing use is likely to confuse consumers.

### (3)  Re: Other Likelihood of Confusion Factors

The subcommittee also considered the use of other likelihood of confusion factors, such as strength of the senior mark, the similarity of the junior and senior marks, or the similarity of channels of distribution as possible gatekeepers for a successful initial interest confusion claim. However, these factors were not considered in depth, since the importance of these factors in the traditional likelihood of confusion analysis is very fact-specific, and the subcommittee believed they would be similarly fact-specific in cases of initial interest confusion.

### D.  Is There a Difference in the Initial Interest Confusion Analysis for Internet Cases vs. the Brick and Mortar World?

The subcommittee reached consensus that the better, reasoned view is that the same likelihood of confusion factors applicable in the brick and mortar context should be considered to determine initial interest confusion on the Internet.

The growth of the Internet has led to a myriad of new uses of trademarks on the Internet - in domain names, keyword advertising, pay-per-click advertising, pop-up ads and even metatags not visible to consumers, but readable by search engines. After surveying the major brick and mortar and Internet cases discussing initial interest confusion and articles from legal commentators, the subcommittee concluded that courts should not assume the absence of harm due to the ease of navigating the Internet. Likewise, courts should not assume the existence of harm because of the spontaneity of the Internet.

The court in *Brookfield Communications, Inc. v. W. Coast Entertainment Corp*[16] analogized using another's trademark in one's metatags to posting a billboard on the brick and mortar highway with a competitor's mark. The court recognized that entering a website from a search engine takes little effort – merely one click. The converse is also true – diversion can similarly be corrected by clicking on the "back" button. The subcommittee believes that while correcting diversion on the Internet is less intrusive and arguably requires less effort than returning to the highway and traveling an additional exit, this fact should not necessarily mitigate the fact that a customer's attention was diverted and was potentially confused by the actions of the competitor.

In attempting to answer whether there is a difference between initial interest confusion on the Internet vs. the brick and mortar world, the subcommittee also discussed whether the sophistication of the Internet user is a factor, *i.e.*, is initial interest confusion less likely in Internet cases, because "Internet surfers are inured to the false starts and excursions

---

[16] 174 F.3d 1036 (9th Cir. 1999)

7

awaiting them in this evolving medium?"[17] Here again, the subcommittee recommends that there not be a different standard for the Internet vs. the brick and mortar world. The subcommittee did analyze cases that go in either direction, namely finding greater sophistication among Internet users[18] vs. decisions that have found that sophistication of Internet users is not a factor.[19] The subcommittee agrees with the court in *Edina Realty, Inc. v. TheMLSonline.com*, which said "The court must avoid excessive rigidity when applying the law in the Internet context because emerging technologies require a flexible approach."[20] As a result, the subcommittee concluded that the doctrine of initial interest confusion is best left to the case-by-case examination of the facts and circumstances of each case. In short, the likelihood of confusion factors that are grounded in consumer protection rationale and serve to protect the source-identifying function of trademarks should continue without change in the context of trademarked goods and services marketed and sold on the Internet.

### E.   What Should the Remedy Be in Initial Interest Confusion Cases?

As in traditional trademark infringement cases in the U.S., even if confusion is found, whether any remedy is appropriate, and if so, what relief should be awarded, will be up to judicial discretion and based on the facts of each case. The subcommittee believes harm to a trademark can exist in cases of initial interest confusion, and that both injunction and damages may be appropriate depending on the facts. In some cases, monetary damages may be appropriate, such as where lost sales are likely or have been shown; in other cases, injunctive relief alone may be adequate. There can also be cases, particularly on the Internet, in which a consumer is initially confused but the confusion is so quickly dispelled with no loss of sales, opportunity, goodwill, or reputation, and with no damage to the mark's inherent value that imposition of a remedy would not be appropriate[21]

In sum, even if initial interest confusion is found, courts should consider the totality of the evidence and facts in deciding whether any relief should be awarded and, if so, in fashioning the remedy that is appropriate.

### F.   Should the Recommendation be solely for U.S. cases, or should it be an international recommendation?

Although the current case law on initial interest confusion is U.S.-focused, the subcommittee believes that the resolution could be applied in other jurisdictions to the extent similar issues emerge. As the English, Canadian, and Israeli cases described above show, courts in other jurisdictions do consider the concept of pre-transaction confusion under established laws of trademark infringement or passing off. In the E.U. there have

---

[17] *Chatham v Bodum*, 157 F. Supp. 2d 549, Civ. Act. No. 00-1793 (E.D.Pa. August 7, 2001).
[18] *Id.*
[19] *See, e.g., PACCAR, Inc., Plaintiff, v. TELESCAN TECHNOLOGIES, L.L.C*, 115 F.Supp. 2d 772 (ED Mich. 2000.
[20] 2006 WL 737064 (D. Minn. March 20, 2006).
[21] *See, e.g., SMJ Group, Inc. v 417 Lafayette Restaurant LLC*, 06 Civ. 1774, slip op. (S.D.N.Y. July 6, 2006) (finding initial interest confusion but denying motion for preliminary injunction because plaintiff failed to show any irreparable injury).

been cases such as the *Picasso* case where the relevance of the perception of consumers in other instances than the moment of purchase in establishing likelihood of confusion has been accepted.[22] To the extent that countries' trademark laws have a likelihood of confusion analysis, the subcommittee believes that the factors of that analysis should be applied whether the confusion is pre-sale or at the point of sale. The subcommittee does not encourage the creation of a new doctrine to deal with cases of initial interest confusion.

## IV.  Conclusion

The Online Trademark Use Subcommittee recommends that courts engage in traditional likelihood of confusion analysis in cases of initial interest confusion. This approach solves the problem of courts failing to engage in any analysis of factors in initial interest confusion cases or engaging in conflicting analyses from circuit to circuit. Some courts have seemed to use initial interest confusion as a way to punish a perceived bad actor without engaging in any evaluation of factors. The approach that is recommended will require courts to consider each of the likelihood of confusion factors before reaching a conclusion of trademark infringement.

The subcommittee is grateful for the opportunity to present its recommendation.

---

[22] *Claude Ruiz-Picasso v. Office for Harmonisation in the Internal Market, Daimler Chrysler AG*, ECJ 12 January 2005, Case C-361/04 . [2006] ETMR 349.

## Appendix

The current state of the doctrine of initial interest confusion – and the difficulty faced by trademark owners attempting to evaluate their own or a competitor's online trademark use – is illustrated by the following inconsistent holdings concerning initial interest confusion on the Internet:

- Mere diversion or distraction alone creates actionable initial interest confusion.[i]
- Initial interest confusion precedes diversion and is not actionable unless the defendant capitalizes on the confusion.[ii]
- In order to be actionable, there must be confusion as the point of sale.[iii]
- Confusion at an initial stage is sufficient to find a Lanham Act violation, even if there is no point-of-sale or post-sale confusion, and even if the products are unavailable for sale in the U.S.[iv]
- Actionable initial interest confusion requires a finding of bad faith.[v]
- Actionable initial interest confusion requires a finding of an intent to trick an Internet user into visiting a site.[vi]
- Actionable initial interest confusion requires a finding of an intent to profit from distraction or diversion of interest or a commercial motivation.[vii]
- Actionable initial interest confusion requires a finding of intentional deception.[viii]
- The sites at issue must be competitive,[ix] or in a closely related business.[x]
- Initial interest confusion can be found where the sites are not competitive.[xi]
- Initial interest confusion can be found where the defendant's website was a parody or criticism site.[xii]
- A disclaimer or proper labeling on a website or advertisement can overcome initial interest confusion.[xiii]
- Disclaimers are not effective and cannot overcome initial interest confusion.[xiv]
- The court can assume initial interest confusion where a domain name is identical to a trademark, regardless of content.[xv]
- The court can assume initial interest confusion where a domain name contains a trademark plus words that are not unmistakably critical.[xvi]
- Use of a competitor's trademark in metatags creates initial interest confusion.[xvii]
- Use of a competitor's trademark in metatags does not create actionable confusion.[xviii]

---

[i] *Australian Gold v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006); *McSpadden v. Caron*, 2004 WL 2108394 (W.D.N.Y. Sept. 20, 2004); *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 2003 U.S. Dist. LEXIS 22932 (S.D.N.Y. Dec. 22, 2003), rev'd, 414 F.3d 400 (2d Cir. 2005), cert. denied, 126 S.Ct. 749 (2005); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176 (W.D.N.Y. 2000).

[ii] *Nissan Motor Co. v. Nissan Computer Corp.*, 89 F. Supp. 2d 1154 (C.D. Cal. 2000), aff'd, 246 F.3d 675 (9th Cir. 2000); 204 F.R.D. 460 (C.D. Cal. 2001) (defendant's motion for leave to add counterclaims denied); 2002 U.S. Dist. LEXIS 6365 (C.D. Cal. Jan. 8, 2002) (plaintiff's motion for partial summary

judgment granted); 2002 U.S. Dist. LEXIS 6488 (C.D. Cal. Jan. 7, 2002) (defendant's motion for partial summary judgment granted); 231 F. Supp. 2d 977 (C.D. Cal. 2002) (plaintiff's motion for permanent injunction granted), *aff'd in part, rev'd in part,* 378 F.3d 1002 (9th Cir. 2004), *cert. denied,* 544 U.S. 974 (2005).

[iii] *Benchmark v. Benchmark Builders, Inc,* 2000 WL 1886570 (D. Me. Dec. 29, 2000).

[iv] *Empresa Cubana Del Tabaco v. Culbro Corp.,* 2004 U.S. Dist. LEXIS 4935, 70 U.S.P.Q.2D 1650 (S.D.N.Y. Mar. 26, 2004), *aff'd in part, rev'd in part,* 399 F.3d 462 (2nd Cir. 2005).

[v] *Interstellar Starship Servs., Ltd. v. EPIX, Inc.,* 983 F. Supp. 1331 (D. Or. 1997), *rev'd,* 184 F.3d 1107 (9th Cir. 1999), 125 F. Supp. 2d 1269 (D. Or. 2001) (motion to compel production), *aff'd,* 304 F.3d 936 (9th Cir. 2002).

[vi] *Bihari v. Gross,* 119 F. Supp. 2d 309 (S.D.N.Y. 2000).

[vii] *Northland Ins. Cos. v. Blaylock,* 115 F. Supp. 2d 1108 (D. Minn. 2000); *Nissan Motor Co. v. Nissan Computer Corp.,* 89 F. Supp. 2d 1154 (C.D. Cal. 2000), *aff'd,* 246 F.3d 675 (9th Cir. 2000); *Nissan Motor Co. v. Nissan Computer Corp.,* 378 F.3d 1002 (9th Cir. 2004), *cert. denied,* 544 U.S. 974 (2005).

[viii] *Savin Corp. v. Savin Group,* 2003 U.S. Dist. LEXIS 19220 (S.D.N.Y. Oct. 24, 2003), *aff'd in part and vacated in part,* 391 F.3d 439 (2nd Cir. 2004), *cert. denied,* 126 S. Ct. 116, 163 L. Ed. 2d 64 (2005).

[ix] *Bihari v. Gross,* 119 F. Supp. 2d 309 (S.D.N.Y. 2000).

[x] *Bigstar Entm't, Inc. v. Next Big Star, Inc.,* 105 F. Supp. 2d 185 (S.D.N.Y. 2000); *Chatam Int'l, Inc. v. Bodum, Inc.,* 157 F. Supp. 2d 549 (E.D. Pa. 2001) (summary judgment), aff'd 40 Fed Appx. 685 (3d Cir. 2002); *Interstellar Starship Servs., Ltd. v. EPIX, Inc.,* 983 F. Supp. 1331 (D. Or. 1997), *rev'd,* 184 F.3d 1107 (9th Cir. 1999), 125 F. Supp. 2d 1269 (D. Or. 2001) (motion to compel production), *aff'd,* 304 F.3d 936 (9th Cir. 2002).

[xi] *Pennsylvania Business Bank v. Biz Bank Corp.,* 330 F. Supp. 2d 511 (E.D. Pa. 2004); *Bear Stearns Companies, Inc. v. Lavalle,* 2002 WL 31757771 (N.D. Tex. Dec. 3, 2002).

[xii] *OBH, Inc. v. Spotlight Magazine, Inc.,* 86 F. Supp. 2d 176 (W.D.N.Y. 2000).

[xiii] *Promatek Indus. v. Equitrac Corp.,* 300 F.3d 808 (7th Cir. 2002); *Playboy Enters., Inc. v. Netscape Communications, Inc.,* 55 F. Supp. 2d 1070 (C.D. Cal. 1999) (plaintiff's motion for preliminary injunction), *aff'd,* 202 F.3d 278 (9th Cir. 1999), 2000 U.S. Dist. LEXIS 13418 (C.D. Cal. Sept. 14, 2000) (defendants' motions for summary judgment), *reversed,* 354 F.3d 1020 (9th Cir. 2004).

[xiv] *N.Y. State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs.,* 79 F. Supp. 2d 331 (S.D.N.Y. 1999); *Paccar, Inc. v. Telescan Techs., L.L.C,* 115 F. Supp. 2d 772 (E.D. Mich. 2000), *aff'd in part and vacated in part,* 319 F.3d 243 (6th Cir. 2003); *Caterpillar Inc. v. Telescan Techs.,* 2002 U.S. Dist. LEXIS 3477 (C.D. Ill. Feb. 13, 2002); *1-800 Contacts, Inc. v. WhenU.com, Inc.,* 2003 U.S. Dist. LEXIS 22932 (S.D.N.Y. Dec. 22, 2003), *rev'd,* 414 F.3d 400 (2d Cir. 2005), *cert. denied,* 126 S.Ct. 749 (2005).

[xv] *Pennsylvania Business Bank v. Biz Bank Corp.,* 330 F. Supp. 2d 511 (E.D. Pa. 2004).

[xvi] *Bear Stearns Companies, Inc. v. Lavalle,* 2002 WL 31757771 (N.D. Tex Dec. 3, 2002).

[xvii] *Australian Gold v. Hatfield,* 436 F.3d 1228 (10th Cir. 2006).

[xviii] *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.,* 2006 WL 800756 (S.D.N.Y. March 30, 2006).