# Exhibit R-1

Dockets.Justia.com

1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4  GOOGLE INC., a Delaware    )
   corporation,         )
5              )
      Plaintiff(s),   )
6  vs.         )   Case No.
              )
7  AMERICAN BLIND & WALLPAPER ) C 03-5340-JF (RS)
   FACTORY, INC., a Delaware  )
8  corporation d/b/a     )
   decoratedtoday.com, Inc., and )
9  DOES 1 through 100,    )
   inclusive,       )
10            )
      Defendant(s).   )
11 ——————————————————————————)
              )
12  AMERICAN BLIND & WALLPAPER )
   FACTORY, INC., a Delaware  )
13  corporation d/b/a     )
   decoratedtoday.com, Inc., and )
14  DOES 1 through 100, inclusive )
              )
15     Counter-Plaintiff,  )
   vs.          )
16            )
   GOOGLE INC., a Delaware   )
17  corporation,       )
              )
18     Counter-Defendant.  )
 ——————————————————————————)
19

20    DEPOSITION OF DR. ITAMAR SIMONSON

21       Held at Howrey
     525 Market Street, Suite 3600
22     San Francisco, California
    Friday, December 15, 2006,  9:51 a.m.
23

24

25 REPORTED BY:  James Beasley, CSR No. 12807

Page 2

APPEARANCES

For the Plaintiff and Counter-Defendant:

    KEKER & VAN NEST
    BY:  MICHAEL H. PAGE
    710 Sansome Street
    San Francisco, California 94111
    415.391.5400
    Fax: 415.397.7188
    mhp@kvn.com


For the Defendant and Counter-Plaintiff:

    HOWREY
    BY:  ROBERT N. PHILLIPS
    525 Market Street, Suite 3600
    San Fransisco, California 94105
    415.848.4940
    Fax: 415.848.4999
    phillipsr@howrey.com

Page 3

INDEX OF EXAMINATIONS

EXAMINATIONS                              page
    MR. PHILLIP                           4



            INDEX OF EXHIBITS
NO.        DESCRIPTION                    page
 1  Expert report of Dr. Itamar          13
    Simonson with Exhibits A, B, and C
    attached, 44 pages
 2  Google Inc.'s Responses and          16
    Objections to American Blinds &
    Wallpaper Factory, Inc.'s Subpoena
    Duces Tecum of Dr. Itamar Simonson,
    eight pages
 3  Multiple documents, 62 pages         28
 4  Google Search:  american blinds,     161
    dated 2/4/2004; two pages

 5  Google Search:  american blinds,     161
    dated 1/21/2004; two pages

 6  Google Search:  american blinds,     161
    dated 2/11/2004; two pages

Page 4

1      BE IT REMEMBERED, that on Friday, December
2  15, 2006, commencing at the hour of 9:51 a.m.
3  thereof, at the Law Offices of Howrey, 525 Market
4  Street, Suite 3600, San Francisco, California,
5  before me, James Beasley, a Certified Shorthand
6  Reporter, in and for the County of Sacramento,
7  State of California, there personally appeared
8          DR. ITAMAR SIMONSON,
9  called, as an expert witness, by the Defendant(s),
10  who, being first duly sworn by the Certified
11  Shorthand Reporter was thereupon examined and
12  interrogated as is hereinafter set forth:
13          EXAMINATION
14  BY MR. PHILLIP:
15      Q.  Good morning, Dr. Simonson.  Would you
16  please state your full name for the record.
17      A.  Itamar Simonson.
18      Q.  And do you understand that you're
19  appearing here today as an expert witness?
20      A.  Yes.
21      Q.  And in the case Google versus American
22  Blinds & Wallpaper Factory?
23      A.  Yes.
24      Q.  When were you first retained for this
25  case?

Page 5

1      A.  I think maybe October of 2006.
2      Q.  Okay.
3      A.  I'm not sure if it was earlier than that,
4  maybe September.
5      Q.  Okay.  Who contacted you?
6      A.  Mr. Page.
7      Q.  Okay.  And have you had any dealings with
8  anyone else at Mr. Page's law firm concerning this
9  matter?
10      A.  I think there was -- I spoke at least once
11  on the -- perhaps once on the phone.  His name
12  escapes me.
13      Q.  Do you understand him to be an attorney?
14      A.  Yes.  He's a young attorney.
15      Q.  Someone who worked for Mr. Page?
16      A.  Yes.
17      Q.  Have you had contact with anyone else at
18  the Keker firm concerning this case besides
19  Mr. Page and the attorney that --
20      A.  I don't think so.
21      Q.  Have you had contact with anyone at Google
22  concerning this case?
23      A.  No.
24      Q.  Have you ever had contact with anyone at
25  Google?

DR. ITAMAR SIMONSON

1     A.  Yes.

2     Q.  Okay.  Can you tell me who?

3     A.  Not in litigation context.

4     Q.  Okay.  In what context?

5     A.  Well, just this term as I was teaching

6  marketing to businesses the students had a project

7  whereby they proposed research ideas -- I'm sorry,

8  business ideas for Google targeting small

9  businesses.

10        So they prepared student presentations.

11  People from Google came to class and evaluated

12  those presentations.  The students prepared some

13  written reports.  It was kind of a course project.

14     Q.  Is this an undergraduate course?

15     A.  It's an MBA class.

16     Q.  Okay.  Did any of the presentations relate

17  to Google's keyword advertising program?

18     A.  I don't think so.  And these were new

19  business ideas, targeting small businesses.  I

20  guess that would not necessarily exclude something

21  related to this case, even though blinds typically

22  target consumers.

23        But I can't think of any proposal that had

24  any relevance to search words.

25     Q.  How about --

1     A.  Nothing that I can think of.

2     Q.  How about the manner in which the search

3  results are displayed?

4     A.  Nothing like that.

5     Q.  How about trademark legal issues?

6     A.  None.

7     Q.  And who from Google attended the course

8  presentations?

9     A.  I'm not sure I remember their names.

10     Q.  Do you remember what department they were

11  in?

12     A.  They were from various areas.  One had to

13  be with Adsense.

14     Q.  Say that again.

15     A.  Adsense, A-d-s-e-n-s-e.

16     Q.  Okay.

17     A.  And I think as you might know, nowadays

18  Google is also involved in advertising not through

19  the search engines, but through other means.  One

20  person -- I think just as I recall, moved two weeks

21  earlier from eBay and I don't remember what he was

22  doing.  Yeah, I don't remember their positions.

23  They were three people from Google.

24     Q.  Have you had contact with Google in any

25  other manner besides this coursework?

1        MR. PAGE:  I'll object as vague and

2  ambiguous.

3        THE WITNESS:  No.  I mean, obviously

4  Google is a significant company in Silicon Valley,

5  so I've met and talked with people from Google, but

6  nothing that is relevant.

7  BY MR. PHILLIP:

8     Q.  Have you met or talked to the founders?

9     A.  I did, actually.  I had lunch with them

10  many years ago -- well, I guess they already had,

11  as I recall, the lunch.  The food was quite

12  impressive, even then.  But it was quite a few

13  years back when they were -- way before the IPO.

14        MR. PAGE:  Speaking of trademarks.

15  BY MR. PHILLIP:

16     Q.  So this was a lunch with both founders,

17  Larry Page and the other gentleman?

18     A.  Sergey Brin.  Must have been something

19  around maybe 2000 or so.  Maybe even 1999.  I don't

20  remember.

21     Q.  So lunch with the founders, six, seven

22  years ago.  Have you had any contact with them

23  since then?

24     A.  No.

25     Q.  Do you know anyone in the legal department

1  at Google?

2     A.  Well, I had an involvement in the Geico

3  case.  And in that case I do remember another

4  Michael who was present during trial in Alexandria,

5  Virginia.  So I shook his hand and we might have

6  talked a couple of times while the trial was going

7  on, but that was about it.

8        MR. PAGE:  It's Michael Quan.

9        MR. PHILLIP:  He's an in-house attorney at

10  Google?

11        THE WITNESS:  I believe so.

12  BY MR. PHILLIP:

13     Q.  How about Rose Hagan, have you ever met

14  Rose Hagan?

15     A.  No.

16     Q.  Do you know Mark Lemley?

17     A.  No.

18     Q.  Do you have any financial interest in

19  Google?

20     A.  No, unfortunately, don't even own the

21  stock.

22     Q.  That makes me feel much better that a

23  Stanford professor didn't know to buy Google stock.

24     A.  In fact, I remember -- it's not directly

25  relevant to this, one of the smartest colleagues I

Page 10

1  have, after the IPO when it was around one hundred,
2  he said given the competition, it was Microsoft and
3  Yahoo, I would short that stock.
4      Q.   You were smart not to listen.
5      A.   That's true, I was smart on that.
6      Q.   Other than the Geico case and this case,
7  have you ever been retained as an expert witness in
8  any matter for Google?
9      A.   No.
10     Q.   Obviously you've been deposed many times
11 as an expert witness?
12     A.   Yes.
13     Q.   So I will dispense with the usual
14 pleasantries if that's okay with you.
15     A.   Sure.
16     Q.   But if there is a question that I ask that
17 you don't understand, please tell me and I'll do my
18 best to restate it.
19     A.   Certainly.
20     Q.   Have you worked with the Keker firm before
21 this case?
22     A.   Other than the Geico case you mean?
23     Q.   Yes.
24     A.   I don't think so.
25     Q.   Okay.

Page 11

1      A.   Many years ago I had very limited
2  involvement in a case involving Gallo Winery and
3  Trinonleaf (phonetic); that was the label, I think.
4  But I worked more with an attorney by the name of
5  Edwards, whom you don't know, who was a private --
6  I think he had his own private practice and he was
7  at the time located in Palo Alto. I think now he's
8  somewhere else.
9  BY MR. PHILLIP:
10     Q.   Okay. Fred Firth was on the other side,
11 right?
12     A.   I think so, yes.
13     Q.   Okay. So Mr. Page contacted you about
14 this case. Who contacted you to work on the Geico
15 case?
16     A.   Mr. Page.
17     Q.   Okay. And you mentioned that you were
18 present at the trial in that case?
19     A.   Yes.
20     Q.   And you testified?
21     A.   Actually, I did not.
22     Q.   Oh.
23     A.   I did not, because just as I was about to
24 take the witness stand the Court apparently had the
25 right incite, if I may say so, that just based on

Page 12

1  the cross-examination of the survey expert, in her
2  wisdom, she could see that the survey had some very
3  serious issues and I think that led to her ruling
4  and the trial was suspended.
5      Q.   Okay. So you had -- you had prepared a
6  report criticizing that survey in that case,
7  correct?
8      A.   I did.
9      Q.   And that was the survey that was performed
10 by Gary Ford?
11     A.   Correct.
12     Q.   But you didn't -- you didn't actually
13 testify with respect to your opinions in that
14 critique, right?
15     A.   That's correct. Other than in deposition.
16     Q.   Was the report submitted to the judge
17 during any motions?
18     A.   Mr. Page would know more. I would think
19 so, but I don't know.
20         MR. PAGE:  I have no idea. I believe it
21 was marked as an exhibit, but I don't think it was
22 ever entered other than in the form of a cross.
23 BY MR. PHILLIP:
24     Q.   Okay. Did you perform your own study in
25 the Geico case?

Page 13

1      A.   I did not.
2      Q.   Have you ever performed a study for
3  Google?
4      A.   Nope.
5      Q.   Other than the critique of Gary Ford in
6  the Geico case and your critique of Al Ossip in
7  this case, have you worked with Mr. Page in any
8  other matters?
9      A.   No.
10         MR. PHILLIPS:  Let's take care of some
11 housekeeping matters here. Mark that as Exhibit 1.
12         (Exhibit 1 was marked for
13         identification.)
14 BY MR. PHILLIP:
15     Q.   We've marked as Exhibit 1 the expert
16 report of Dr. Itamar Simonson that was produced by
17 Google in this case. And if you would just confirm
18 for me, sir, that this is a complete and accurate
19 copy of your expert report?
20     A.   It is.
21     Q.   And that's your signature on page 28?
22     A.   Yes.
23     Q.   And there are three exhibits attached,
24 Exhibits A, B, and C. Are those all of the
25 exhibits?

1    A.  Yes.

2    Q.  Now, do you understand what a rebuttal

3    expert report is?

4    A.  It's a report that rebuts someone else's

5    opinion or report.

6    Q.  Okay.  And have you done rebuttal expert

7    reports in the past?

8    A.  Yes.

9    Q.  And do you understand that the purpose of

10   a rebuttal report is to address the opinions in

11   someone else's report that's previously been

12   served?

13   A.  Generally, yes.

14   Q.  Is it your practice not to go -- to offer

15   new opinions that are unrelated to the opinions in

16   the -- in the report that you're rebutting?

17   A.  Well, I'm -- in general I'm trying to

18   respond.  In some cases my response would build on

19   my general knowledge of issues.  For example, how

20   consumers make buying decisions.  That might not

21   have been directly addressed by the original

22   report, but they are relevant and therefore they're

23   included in my report.

24   Q.  Have you ever done that and had a court

25   not consider it because it was not considered

1    rebuttal?

2    A.  Not that I'm aware of.

3    Q.  Okay.  Have you ever been told by counsel

4    who's retained you that you need to limit your

5    opinions to matters that directly relate to what's

6    in the report that you're critiquing?

7    A.  I don't have a specific recollection of

8    someone telling me that.  That's my general

9    understanding.

10   Q.  Okay.  Now, does this report that we

11   marked as Exhibit 1 contain all of your opinions

12   with respect to the Al Ossip survey that was

13   commissioned by American Blinds?

14   A.  Yes.

15   Q.  So all of your critiques that you have of

16   Mr. Ossip's survey are set forth in this report?

17   A.  Yes.

18   Q.  And do you currently have any plans to

19   offer any opinions that are not in this report at

20   the trial in this case?

21   A.  Not at this point.  If there is new

22   evidence, then I might.

23   Q.  Okay.  Have you had any discussions with

24   Mr. Page about the possibility of doing any further

25   work?

1    A.  Not at this point.

2    Q.  You don't have any plans to do further

3    work?

4    A.  That's correct.

5    Q.  Okay.  You're aware that a subpoena was

6    served for you to bring documents?

7    A.  Yes.

8    Q.  Okay.  Or to produce documents, I should

9    say.

10   A.  Yes.

11   Q.  Did you get a chance to look over that

12   subpoena?

13   A.  Yes.

14   Q.  Okay.  Have you looked over the response

15   to the subpoena?

16   A.  We talked about that.  I haven't looked at

17   that.

18   Q.  Okay.  Well, I have the response here,

19   which replicates the request in the subpoena and

20   has the official response so we'll use that as the

21   guide.

22   A.  Sure.

23        MR. PHILLIP:  Let's go ahead and mark that

24   as Exhibit 2.

25        (Exhibit 2 was marked for

1        identification.)

2        THE WITNESS:  I remember the name of the

3    person you asked me about that I spoke to,

4    Mr. Hamm.

5    BY MR. PHILLIP:

6    Q.  Klaus Hamm?

7    A.  Yes.

8    Q.  Okay.  Exhibit 2 refreshed your

9    recollection, didn't it?

10   A.  It certainly did.

11   Q.  There's a reason for that rule.

12   A.  Actually, it was Exhibit 1.

13   Q.  Oh, Exhibit 1.  He's on there also.  Okay.

14   So have you brought any documents with you here

15   today?

16   A.  I did not.

17   Q.  So you've already given you file to

18   Mr. Page?

19   A.  No, there was nothing to give.

20   Q.  Okay.  What was in your file?

21   A.  Just the documents that I received, those

22   that are listed in Exhibit C to my report.

23   Q.  Okay.  So that's the -- that's certain

24   documents that have been produced by Mr. Ossip at

25   Bates No. ABWF 055057 through 59238, that's listed

1  in Item 1 on Exhibit C, do you see that?
2      A.  Yes.
3      Q.  And the deposition transcript of Jeffrey
4  Alderman?
5      A.  Correct.
6      Q.  Were you provided with that?
7      A.  Yes.
8      Q.  Did you read it?
9      A.  I did.
10     Q.  The whole thing?
11     A.  I did.  Some sections more carefully than
12 others.
13     Q.  Were there particular sections that
14 Google's counsel pointed you to?
15     A.  Nothing.
16     Q.  How did you know what sections to review?
17     A.  I just read a number of transcripts over
18 the years, so I try to find which topics are of
19 most interest.
20     Q.  And who is Mr. Alderman?
21     A.  Mr. Alderman -- he is a fairly high-level
22 position.  I forget the title.  I mean, he
23 obviously works for ABWF, but I forget his exact
24 title.
25     Q.  Okay.  Do you recall any of his testimony

1  that you thought was pertinent?
2      A.  I refer to some of that in my report, as I
3  recall.  But I believe he talked a great deal about
4  how they bid on keywords and the work with
5  affiliates.  That's what comes to mind right now.
6      Q.  Okay.
7      A.  And he might have been the one or maybe it
8  was Mr. Layne who talked about the name
9  transformations.
10     Q.  Okay.  Anything else that you recall about
11 Mr. Alderman's deposition that you thought was
12 pertinent to your critique?
13     A.  I think it's one of those depositions the
14 issue came up of them bidding on competitors
15 name's, such as USA Wallpaper.  I don't remember.
16 I'm sure there were other things.
17     Q.  Okay.  Now, you also listed the deposition
18 of Michael Layne.  Do you see that?
19     A.  I do.
20     Q.  And is that a deposition that you
21 reviewed?
22     A.  Yes.
23     Q.  And who is Michael Layne?
24     A.  I believe he was in charge of their
25 Internet website.

1      Q.  Okay.  And can you recall any specific
2  testimony from that deposition that you relied on
3  in your report or that you found pertinent?
4      A.  I think as I said, I think he mentioned
5  how they changed names and the various web sites
6  that they were using over the years.  So that
7  was -- that was relevant.
8      Q.  Okay.  And when you say changed names,
9  what are you referring to?
10     A.  Well, the different names of the
11 company --
12     Q.  Uh-huh.
13     A.  -- different web sites that they were
14 using.
15     Q.  Uh-huh.
16     A.  I think that's what I was referring to.
17     Q.  Can you recall any of those names or web
18 sites?
19     A.  Well, decoratetoday looms large.  I don't
20 remember.  American Wallpaper.  American Brands.  I
21 don't remember all the names.
22     Q.  Okay.  Was there anything else about
23 Michael Layne's deposition that you thought was
24 important to your report, other than the fact that
25 the -- that American Blinds and Wallpaper Factory

1  has various names?
2      A.  No.  I think that was particularly
3  important.  There might have been others at the
4  time when I was preparing the report.  I can't
5  think of any.
6      Q.  Were you given any exhibits to these
7  deposition transcripts?
8      A.  I don't think so.
9      Q.  Okay.  Then number four is the rough
10 deposition transcript of Mr. Ossip, correct?
11     A.  Right.
12     Q.  And did you review that?
13     A.  Yes.
14     Q.  And then number five is the post-trial
15 order in Geico versus Google.  Do you see that?
16     A.  Yes.
17     Q.  Did you review that?
18     A.  I did.
19     Q.  Was that given to you or was that
20 something you already had?
21     A.  Well, I probably had it.  I didn't look
22 for it.  I probably had it somewhere, so now I have
23 another copy.  And I read it previously, so this
24 time I just skimmed it.
25     Q.  Okay.  And what was -- what was the

1  relevance of the post-trial order in Geico versus
2  Google to your report?
3      A.  Well, you know, for one thing, one of the
4  concerns of the Court in that case was the
5  inadequate control that was used by Dr. Ford and in
6  that light, I find it a little surprising that
7  Mr. Ossip's response to the criticism of the Nike
8  control in the Geico case was to not have control
9  at all.
10     Q.  Okay.  Anything else that you were relying
11 upon in this post-trial order or is that the main
12 point?
13     A.  No, I thought that the control -- or in
14 that case, the various needed controls --
15     Q.  Uh-huh.
16     A.  -- were definitely an important point that
17 had direct relevance to the present survey.
18     Q.  Okay.  And we'll talk about that.  So
19 these are the documents that you reviewed on
20 exhibit that are set forth in Exhibit C, correct?
21     A.  Right, other than web sites.
22     Q.  Okay.
23     A.  Which were not listed.
24     Q.  Okay.  What web sites did you review and
25 rely upon that aren't listed here?

1      A.  Well, I went to the Google website and
2  tried different words.
3      Q.  Uh-huh.
4      A.  I don't think I'll remember all of them,
5  but I tried different words and looked at the
6  resulting or the triggered sponsored links.
7      Q.  Uh-huh.
8      A.  I went to the ABWF website, which is at
9  this point primarily decoratetoday, or at least
10 appears to be.  And I looked at some competitors of
11 ABWF.
12     Q.  Any other sites?
13     A.  I can't think of any.  I probably visited
14 different sites that sell blinds.
15     Q.  Okay.  Did you make printouts of any of
16 those searches?
17     A.  I did not.
18     Q.  Did you capture them as electronic files?
19     A.  I did not.
20     Q.  Were any of these sites that you visited
21 given to you by Mr. Page?
22     A.  No.
23     Q.  You found them all on your own?
24     A.  Yes.
25        MR. PAGE:  Well, Google helped.

1  BY MR. PHILLIP:
2      Q.  Did you review the sites that were
3  included as sponsored links in the AI Ossip study?
4      A.  I might have.
5      Q.  Are you -- you're not sure?
6      A.  I'm not sure.
7      Q.  So you may not have?
8      A.  I probably did.  I'm not sure that I
9  visited every single one of them.
10     Q.  Okay.  Can you recall visiting any one of
11 them?
12     A.  I do recall visited -- visiting some of
13 them.  I don't know if it was just blinds or budget
14 blinds or all of the above.  I just don't remember
15 specifically.
16     Q.  Okay.  Did you rely on anything else
17 besides what's listed in Exhibit C and your various
18 Internet searching in preparing your report?
19     A.  I do recall flipping through my yellow
20 pages.
21     Q.  Okay.  And what are your yellow pages?
22     A.  Just -- I think this particular one was
23 the AT&T one, SBC, whatever it is.
24     Q.  Are you saying you flipped through the
25 phone book?

1      A.  Yes, the yellow pages portion of the phone
2  book, yes.
3      Q.  Right.  Okay.  And what was the purpose of
4  doing that?
5      A.  Just to see how people advertise blinds.
6      Q.  And what did you find?
7      A.  One thing that I recall is that in most
8  cases people were emphasizing the type of blinds
9  that they were offering.
10     Q.  Uh-huh.
11     A.  Whereas my impression was that brand names
12 were not emphasized.
13     Q.  Okay.  So this is based on your scanning
14 of the advertisements in the yellow pages, right?
15     A.  That portion of it, yes.
16     Q.  And was there a specific category called
17 blinds or was it something else like home
18 furnishings or window coverings, do you remember?
19     A.  I don't think it was blinds, but I don't
20 remember where exactly it was.
21     Q.  Okay.  And you didn't keep a copy of this?
22     A.  I did not.  I mean, I do have obviously
23 the directory still.
24     Q.  Okay.  This is a yellow pages book in your
25 office?

Page 26

1    A.  Actually, in my study at home.

2    Q.  Okay.  So it was your impression based on

3  just looking at advertisements in the yellow pages,

4  that advertisers emphasized the type of blinds more

5  so than the actual brand name of the blinds?

6    A.  That was my impression.  It doesn't mean

7  that you don't see brand names at all.  For

8  example, I believe I had encountered the name

9  HunterDouglas before.

10    Q.  Yes.

11    A.  But if you ask me as a marketing

12  researcher or consumer researcher, I look at that,

13  the impression I get is that the type of blinds,

14  miniblinds, appears to be emphasized much more so

15  than brands.

16    Q.  Uh-huh.  Okay.  But each of these

17  advertisements had a company name to call, correct?

18    A.  Usually the seller's name.

19    Q.  Right.  Was American Blinds listed in the

20  yellow pages?

21    A.  I don't recall that name.

22    Q.  Did you look for it?

23    A.  I don't remember specifically looking for

24  it, but given my involvement in this case, I think

25  that's probably a name that would have captured my

Page 27

1  attention.

2    Q.  Okay.  Anything else that you can recall

3  looking at that's -- that you haven't already told

4  me about in preparing your report?

5    A.  I can't think of anything else at this

6  point.

7    Q.  Okay.  Now, you mentioned that there

8  wasn't much in your file or something to that

9  effect.  Do you have a file for this case?

10    A.  The documents that I received.

11    Q.  Okay.

12    A.  Which are listed in Exhibit C.  And I

13  guess it's not listed here, but I did receive

14  copies of all the questionnaires, completed

15  questionnaires.

16    MR. PAGE:  Those are in -- that's in the

17  Bates range in number one.

18    MR. PHILLIP:  Okay.  That's part of

19  Ossip's report, you got the completed

20  questionnaires?

21    THE WITNESS:  Subsequently I received a

22  book with all the questionnaires.

23  BY MR. PHILLIP:

24    Q.  Anything else, did you receive anything

25  else?

Page 28

1    A.  I don't recall anything else.

2    Q.  How did you -- -- strike that.

3    I assume you've had telephone

4  conversations with Mr. Page?

5    A.  Yes.

6    Q.  And you've had some e-mail conversations,

7  e-mail communications?

8    A.  A few.  Yeah, not too many.  I'm not even

9  sure I would quote, unquote dignify them as

10  conversations.  But there might have been a few

11  e-mails.

12    Q.  Okay.  And did you save your e-mails?

13    A.  I do have e-mails.  Yeah, they are

14  available.

15    MR. PAGE:  We've produced them all.

16  BY MR. PHILLIP:

17    Q.  To your knowledge, they've all been

18  produced, Dr. Simonson?

19    A.  You know, I haven't gone over what's been

20  produced, so I couldn't tell you.

21    MR. PHILLIP:  Let's mark this Exhibit 3.

22    (Exhibit 3 was marked for

23    identification.)

24  BY MR. PHILLIP:

25    Q.  Taking a look at Exhibit 3, Dr. Simonson,

Page 29

1  this is a group of documents that appear to all

2  involve you in one way or another.

3    A.  Uh-huh.

4    Q.  So starting with the first document, which

5  is marked GGL 6045, can you identify that for me?

6    A.  That's a protective order.

7    Q.  Okay.  Good.  And that's your signature?

8    A.  It is.

9    Q.  Okay.  Good.  So this was given to you by

10  the Keker firm, it looks like it's dated November

11  14th, 2006.  Do you see that?

12    A.  Right.

13    Q.  Was that -- does that refresh your

14  recollection at all as to when you were first

15  contacted in this case?

16    MR. PAGE:  Objection.  Assumes facts.

17    THE WITNESS:  You know, I still believe

18  that I was first contacted -- or just might have

19  had one brief conversation with Mr. Page before

20  that.

21  BY MR. PHILLIP:

22    Q.  Okay.

23    A.  But I just don't remember the exact date.

24    MR. PAGE:  For the record, the reason it

25  was November 14th is that your colleague, for

Page 30

1  reasons that escape us, chose to designate all of
2  Mr. Ossip's survey materials attorneys' eyes only,
3  thereby signing up Dr. Simonson under the
4  protective order.
5      This was immediately after you produced
6  that material.  Rather than argue about the
7  designation, we simply had him sign the protective
8  order.  We're still curious about that one.
9      MR. PHILLIP:  That was cooperative of you.
10     Q.  Well, let me ask you this.  When you had
11 been contacted -- when you were first contacted
12 about this case, were you told or did you know that
13 a study had been done by Mr. Ossip?
14     A.  I have a vague recollection.  Even though
15 it wasn't all that long ago, I don't think that I
16 knew who the expert would be.  But I vaguely recall
17 that Mr. Page indicated that a survey would be
18 forthcoming.
19     Q.  Okay.  So do you believe that he contacted
20 you before -- before he received American Blinds'
21 expert survey report?
22     A.  It is possible that he did.
23     Q.  Okay.  And what did he -- what did he
24 discuss with you at that time?
25     A.  He -- again, I'm constructing it or

Page 31

1  reconstructing it without perfect recollection.
2  But I think he said a survey would be forthcoming
3  and I probably said what I typically say is, of
4  course, if the survey does not have major flaws,
5  then I will tell you that and perhaps you'll find
6  another expert to work on the rebuttal.
7      Q.  Okay.  But he didn't tell you who was
8  doing the survey?
9      A.  You know, I don't remember that he
10 mentioned the name of Ossip.
11     Q.  Okay.  Look at the second document in
12 Exhibit 3, which has Bates GGL 6048 and GGL 6049.
13     Do you see that?
14     A.  Yes.
15     Q.  And what is this?
16     A.  That appears to be the signature page that
17 I faxed --
18     Q.  Okay.
19     A.  -- for my report.
20     Q.  Okay.  Then the next document is GGL 6119
21 through GGL 6146.  And can you identify that for
22 us?
23     A.  That appears to be a rough draft of my
24 report, which I e-mailed to Mr. Page on December
25 3rd.

Page 32

1      Q.  Okay.  Is this the -- is this the very
2  first draft that you sent to Mr. Page?
3      A.  I believe so.  I believe I only -- there
4  was only one draft.  I could be wrong, but I think
5  there was only one draft.
6      Q.  Well, this is dated December 3rd, 2006,
7  correct?
8      A.  Right.
9      Q.  So this is a week and a half ago, right?
10     A.  Yes.
11     Q.  Sitting here today, can you recall sending
12 Mr. Page any other draft besides this draft?
13     A.  No.
14     Q.  And did you ever -- did Mr. Page ever come
15 to your office to review any of your drafts?
16     A.  No.
17     Q.  Okay.  So is this the -- is this the --
18 did you discuss this draft with Mr. Page on the
19 telephone?
20     A.  Very, very superficially and very briefly.
21 I believe he was traveling and I just informed him
22 that I've completed a rough draft.
23     Q.  Okay.  Did you ever send Mr. Page an
24 outline of your report?
25     A.  I did not.

Page 33

1      Q.  Did you ever send him, you know, talking
2  points?
3      A.  Nothing like that.
4      Q.  Okay.  Did he ever send you an outline or
5  talking points?
6      A.  He did not.  No.  That's not the way I
7  work.  I do it all on my own.
8      Q.  Good.  Now, look at the next document, GGL
9  6147.  Can you identify this for me, please?
10     A.  It appears to be an e-mail that he sent
11 regarding a conversation -- a phone conversation
12 that we were going to have and he just checked -- I
13 believe he was out of town, if I recall correctly,
14 and he wanted to know if that time, 3:00 p.m. on
15 Sunday, was working, and I said yes and gave him my
16 home number.
17     Q.  Okay.  And did you have a telephone
18 conversation from your home on that Sunday?
19     A.  Yes.
20     Q.  And what did you and Mr. Page discuss?
21     A.  That was the very brief superficial
22 conversation, probably four or five minutes that we
23 had.
24     Q.  Okay.  And what was the purpose of the
25 conversation?

1    A.   Just to tell him a little bit about my
2    report.
3    Q.   Okay.  Had you -- he didn't have the
4    report yet, though, did he?
5    A.   I don't think so.  No, he did not have the
6    report yet.
7    Q.   So you talked to him on the phone before
8    you sent him the report?
9    A.   That's correct.
10    Q.   Was there anything in particular that you
11    wanted to talk to him about in the report before
12    sending it to him?
13    A.   No, just told him what the report was
14    about.
15    Q.   Uh-huh.
16    A.   Probably -- I mean, I don't have a
17    specific recollection, even though it wasn't all
18    that long ago, but I just told him my main
19    conclusions with respect to the Ossip survey.
20    Q.   Okay.  Did you work on the report any
21    further before sending it to him, based on that
22    telephone call?
23    A.   I don't think making any changes
24    subsequently --
25    Q.   Okay.

1    A.   -- before sending that draft.
2    Q.   Right.  So then turn to the next document,
3    which is 6148 through 6175.  And can you identify
4    that for us, please?
5    A.   That appears to be my report.  I guess it
6    still says draft.  Actually, that was something
7    that he sent to me with his comments on the draft
8    that I had sent him.
9    Q.   Okay.  So these are Mr. Page's recommended
10    changes to your report?
11    A.   Correct.
12    Q.   And did you accept his changes?
13    A.   I -- in some cases he suggested using
14    different words and I accepted in some cases,
15    didn't accept in other cases.
16    Q.   Turn to page 6153 and 6154.  And I'm going
17    to read the sentence that starts with:  To the
18    extent that one relies.
19        Do you see that at the bottom of the page?
20    A.   Which page?  6153?
21    Q.   6153, yes.
22    A.   Yes, I see that.
23    Q.   "To the extent that one relies on this
24    survey, the only conclusion that can be drawn is
25    that the use of trademarks as keywords does not

1    confuse or cause consumers to be misled by
2    sponsored links."
3        Did I read that correctly?
4    A.   Yes.
5    Q.   And Mr. Page had substituted the phrase:
6    "The use of trademarks as keywords does," for the
7    phrase, "entering the search term at issue does."
8        Do you see that?
9    A.   Yes.
10    Q.   Was that a change that you accepted?
11    A.   Yeah.  Actually, that was as I was
12    preparing for the deposition rereading my report, I
13    noticed there was a little typo there on my part.
14    But yes, I think that in -- I did accept most of
15    it.  Maybe not word for word.  I just don't
16    remember.
17    Q.   You had it reading that the only
18    conclusion that could be drawn is that entering the
19    search term at issue does not confuse or cause
20    consumers to be misled by sponsored links, correct?
21    A.   Yes.
22    Q.   And what was the search term at issue in
23    your view?
24    A.   In this case it was american blinds, but I
25    thought that the conclusion could very well be

1    stated more generically, so I thought that was a
2    reasonable way of putting it.
3    Q.   Well, why -- would you agree with me that
4    your language is limited to the effect of entering
5    the search term at issue and Mr. Page's language is
6    the use of any trademark as a keyword.  Do you
7    agree with me that that's the difference there?
8    A.   Yes, that is the difference.
9    Q.   And don't you think that that is a
10    significant difference?
11    A.   I think it is -- I think it is a
12    significant difference.  The point, though, is that
13    there was, in the survey and previously, there was
14    this Geico case, there is nothing there that would
15    apply in this case to say American Blinds and not
16    to American Wallpaper or not to some other
17    trademark combination that I could think of.
18        So in that respect, I thought that one --
19    to the extent that you rely on this particular
20    survey, there was nothing there that would be
21    inconsistent with this more general conclusion.  Of
22    course, as I said, I have some major concerns about
23    the survey.
24    Q.   Right.  But I'm troubled by the fact that
25    you went from drawing a conclusion about entering a

1  particular search term to drawing conclusions about
2  the use of any trademarks as keywords. That seems
3  to be a much bigger bite of the apple, if you will,
4  and what was it that enabled you to make that jump
5  and accept that change from Mr. Page?
6      A.  Because if you look at the explanations
7  that respondents provided when they asked, for
8  example, where would you go and why and then the
9  follow-up question was, do you think that this
10  particular sponsored link or that sponsored link
11  would take you to a particular source, and you look
12  how many referred to entering that search term and
13  the triggered sponsored links as a result of
14  entering the search term.
15      And I think that component is quite
16  generic. In other words, to the extent that you
17  see many people say, well, I entered the search
18  term and therefore I come to the conclusion that
19  every sponsored link on that page must be the
20  company that I asked for.
21      If that's what I found, I think similarly
22  the conclusion would be more generic. It would go
23  beyond american blinds. For example, if someone
24  enters Pepsi-Cola and they said -- and you see
25  sponsored links and you find 20, 50 percent of the

1  people said, well, I entered Pepsi-Cola, so
2  therefore all sponsored links must be from or by
3  Pepsi-Cola, I think that would allow me to derive
4  conclusions that go beyond Pepsi-Cola.
5      Q.  So --
6      A.  And similarly here, the fact that so
7  few -- in fact, if you just look at the first
8  question about, where would you go first, I believe
9  no one referred to the search term. I think that's
10  a generic phenomenon that allows you to derive
11  conclusions that go beyond the particular search
12  term.
13      Q.  So if there was a survey that showed
14  confusion as to the sponsored links after entering
15  a particular trademark, from that, in your opinion,
16  one could reliably conclude that there would be
17  confusion without regard to what the trademark is?
18      A.  Well, that is talking about generic
19  issues. That's all a generic question.
20      Q.  I mean, doesn't it work both ways?
21      MR. PAGE:  Can you let him finish his
22  answer.
23      MR. PHILLIP:  Sure.
24      Q.  Using your logic, doesn't it work both
25  ways?

1      A.  Yeah, I think in many cases it would be.
2  In other words, here the question is generic. To
3  what extent people say, I entered term X, therefore
4  all sponsored links must be by term X, assuming
5  term X is a trademark --
6      Q.  Right.
7      A.  -- that is a generic question. There is
8  really -- I cannot think of a difference between
9  american blinds versus american airlines. I just
10  cannot think -- maybe there are some weird, you
11  know, unexpected differences, but in general, I
12  think this question of the connection of the link
13  between the search term and presumptions about
14  sponsored links, that's a generic question. And --
15  generic phenomena.
16      And to the extent that you find no such
17  link for trademark X, let's assume it is a
18  trademark -- I guess it is a trademark, but let's
19  assume it is a commonly used brand name, then we
20  could generalize it to other brand names.
21      Q.  So if that phenomenon existed with someone
22  who believes a certain name is a trademark, whether
23  it is or not, but if someone believes that it's a
24  trademark, and they're confused, then it shouldn't
25  matter whether that name that they entered is a

1  trademark or not, should it?
2      A.  If they perceive -- if there is evidence,
3  for example, of secondary meaning for that term.
4      In other words, the people, when they see
5  the term American Blinds, they associate it with a
6  single source, even if they don't know the full
7  name, ABWF or whatever it is, but they associate
8  American Blinds with a single source -- so it has
9  secondary meaning and you have a substantial
10  number, I guess.
11      The threshold for secondary meaning is
12  fairly high. Let's say you find 40 percent of the
13  people say American Blinds is one company, they're
14  located wherever they're located, et cetera, or my
15  neighbors have that. I think that's quite possible
16  even if they don't know the legal name of the
17  company.
18      Q.  Right. Or even if they believe that it is
19  an actual company or a brand name, regardless of
20  whether it is, in fact.
21      In other words, regardless of whether
22  there is actually secondary meaning out in the
23  marketplace, but if they believe that it is when
24  they enter that search term, and they're confused
25  about the sponsored links, thinking that it's

Page 42

1  connected in some way, then that would be evidence
2  of confusion, wouldn't it?
3      A.  No.
4          MR. PAGE:  Let me object.  I think it
5  calls for a legal conclusion and is an incomplete
6  hypothetical.
7          THE WITNESS:  I'm a little confused.  So
8  you say there is no secondary meaning, or you say
9  regardless?
10 BY MR. PHILLIP:
11     Q.  Regardless.
12     A.  Regardless of whether there is a secondary
13 meaning, how should I interpret that presumption
14 that they think American Blinds represents many
15 different companies, that there are many different
16 companies that sell American Blinds, what should I
17 assume?
18     Q.  No.  That it is a company or it is a brand
19 of blinds, either one.
20     A.  Okay.  I think there is a difference, A,
21 whether it's a company or a brand.  Let's assume
22 they think it's a brand of window blinds and they
23 associate it with a particular company.  So I'm not
24 an attorney, but it strikes me that probably there
25 is secondary meaning then, in which case, yeah, I

Page 43

1  agree with you that if they believe -- if there is
2  evidence of secondary meaning, and as I said,
3  40 percent of the people believe when they enter
4  the term american blinds that it is a brand of
5  window blinds, that's okay.  They don't need to
6  know the legal name of the corporation.
7      Q.  Okay.
8          MR. PAGE:  When you get to a good spot, I
9  could use a break.
10         MR. PHILLIP:  Okay.  Now is fine.
11         (Recess taken.)
12 BY MR. PHILLIP:
13     Q.  Okay.  Dr. Simonson, this document that we
14 just looked at that had Mr. Page's edits to your
15 report, this is the last document in Exhibit 3 and
16 other than the few nonsubstantive documents that
17 may also exist that Mr. Page referenced during the
18 break, can you recall any other documents from your
19 file?
20     A.  I don't.
21     Q.  Okay.  Now, I noticed that there's no
22 handwritten notes anywhere.
23     A.  That's correct.
24     Q.  Did you prepare handwritten notes?
25     A.  No.

Page 44

1      Q.  So other than working at your computer, do
2  you have any other written records of your work?
3      A.  Nothing.
4      Q.  Okay.  Did you mark up the Ossip report?
5      A.  I did not.
6      Q.  All right.  How much time do you estimate
7  you've spent on your report?
8      A.  I don't remember.
9      Q.  Have you issued a bill?
10     A.  I did.
11     Q.  And do you recall how much the bill was?
12     A.  I don't.
13     Q.  Do you have an estimate?
14     A.  I hate to estimate something that probably
15 exists and I probably will be wrong on that.
16     Q.  Okay.
17         MR. PAGE:  Actually, we just received it.
18 On a break I can probably get that number for you.
19         MR. PHILLIP:  Okay.  Thank you.
20     Q.  Was this bill the final bill that you
21 issued, at least for the report?
22     A.  For the report, yeah, given that I
23 submitted the final version on December 6, it might
24 not be the absolutely -- it was definitely the bulk
25 of it, but maybe there are a few more hours.

Page 45

1      Q.  Okay.  Does the bill indicate the number
2  of hours spent?
3      A.  Yes.
4      Q.  And your hourly rate of $650 per hour?
5      A.  Correct.
6      Q.  Do you have a retainer agreement with the
7  Keker firm or Google?
8      A.  I don't remember if I do.
9      Q.  Okay.  If you look at request number six
10 in Exhibit 2.  And this asks for documents in any
11 governmental investigation or in any
12 administrative, congressional or judicial
13 proceeding involving the use of unit search
14 engines.  Do you see that?
15     A.  I do.
16     Q.  Do you have any documents of that nature?
17     A.  Just the Geico report.
18     Q.  Okay.  Have you done any kind of academic
19 work in the field of Internet search engines?
20     A.  No.
21     Q.  Have you done any academic work in the
22 field of the Internet, generally?
23     A.  Yes.
24     Q.  Can you describe that for me?
25     A.  You mean published work?

12 (Pages 42 to 45)

1    Q.   Yes.

2    A.   I've done some work on online auctions.

3  And in various studies, I tried to study consumer

4  behavior or decision-making in general at a global

5  level, so as not limited to one category or

6  another.  So it may involve searches on the

7  Internet and other types of purchases, say

8  purchases from catalogs.

9    Q.   Right.

10    A.   So I've done a fair amount of work on how

11  people choose among options.  The Internet allows

12  you to arrange a set of options on a web page

13  however you wish to present it, which gives you a

14  lot of degrees of freedom in terms of influencing

15  consumer preferences.

16    Q.   Have you published any articles that have

17  as a section in them consumer purchasing behavior,

18  on the Internet?

19    A.   I don't know if there was a separate

20  section.  I did mention that.  I did mention what I

21  just told you in various articles, I believe.

22    Q.   Okay.

23    A.   Because I've done a lot of work on

24  so-called context effects, that means the effect of

25  the choice set, which options you choose to present

1  to your consumers, how that affects the decisions

2  they make.

3        Those kinds of effects are particularly

4  useful in an Internet context, as I said.  So

5  that's why I mentioned that as an important arena

6  that's obviously becoming more and more important,

7  which means that these kind of effects are much

8  more important.

9    Q.   Uh-huh.  Other than the critique that you

10  did in the Geico case and the critique that you did

11  in this case, have you -- have you done any work in

12  litigation involving purchasing behavior over the

13  Internet?

14    A.   Involving, it's kind of a broad word.  If

15  that's the word, I would definitely say yes.

16    Q.   Okay.  Have you done any studies for

17  purposes of litigation where you used -- where you

18  had respondents use the Internet as part of the

19  study?

20    A.   What I've done more often is just present

21  a hardcopy of a web page.

22    Q.   Okay.  You've used web pages as stimuli in

23  studies?

24    A.   Yes.

25    Q.   Okay.  Can you say approximately how many

1  times you've done that?

2    A.   Probably less than 10, maybe 5.

3    Q.   Okay.  And were these likelihood of

4  confusion studies?

5    A.   I'm not sure if all of them were

6  likelihood of confusion studies, but probably a

7  fair number were or probably most were.

8    Q.   And when you use a website printout as

9  stimuli in a study for litigation purposes, did the

10  question require the consumer to assume that it

11  encountered that page as it was searching on the

12  Internet?

13    A.   Yes.

14    Q.   Did any of the studies also instruct the

15  respondent to assume that they entered a certain

16  search term in order to trigger that stimuli?

17    A.   No.

18    Q.   Okay.  But you've never, in those

19  situations, had a survey where the respondent was

20  actually sitting an a computer and shown the

21  website stimuli?

22    A.   That is probably not the case.  In other

23  words, I think -- I vaguely recall that there were

24  cases where the respondents put -- I mean, there

25  was some sort of CD that included something that

1  looked like -- that was a website but was just

2  captured or stored on a CD so that we have full

3  experimental control.

4    Q.   Uh-huh.  Like what Mr. Ossip did?

5    A.   I think that -- again, I need to think

6  about specific, but I believe that these were

7  actual pages, not manufactured pages.

8    Q.   Okay.  But it was similar to the extent

9  that it was a static page as opposed to one that

10  would, you know, that had active links on it?

11    A.   That is correct.

12    Q.   Okay.  So other than these experiences

13  that you've had where you've used website pages as

14  stimuli in litigation surveys and the research that

15  you've done which can relate to choices consumers

16  have, including on the Internet, can you think of

17  any other work that you've done that would relate

18  to consumer purchase behavior on the Internet?

19    A.   Well, I -- nowadays, when I work with my

20  doctoral students, more often than not they use the

21  Internet to run the study.  In other words, when we

22  ask people to make choices, let's say I'm showing

23  them an array of posters or an array of chocolates

24  and I've asked them to rank order them or to rate

25  them or whether they would rather get $3 or one of

Page 50

1  those posters, we use the Internet for that
2  purpose.
3       And I run these kinds of studies very
4  often, or more precisely, my doctoral students do.
5    Q.  Right.  Have you ever done any research --
6  any empirical research on people's experiences with
7  search engines, such as Google?
8    A.  No.
9    Q.  And have you ever reviewed other
10  research -- have you ever reviewed or commented on
11  other person's research in that field?
12    A.  No, I can't think of anything.
13    Q.  Okay.  So you haven't done peer review,
14  for example, in that field?
15    A.  Not that I recall.
16    Q.  Okay.  And you haven't had any doctoral
17  students that have done research on people's
18  experiences with Internet search engines?
19    A.  No.  And I should say, I don't know if
20  it's still the case, but at some point if you
21  looked on my web page --
22    Q.  Uh-huh.
23    A.  -- my Stanford web page and it states
24  there your research interest, I probably was one of
25  the only people around the world who said consumer

Page 51

1  behavior on the Internet was one of the things I
2  put there.
3       So it's definitely an area that I'm
4  interested in, so you would think that if there has
5  been a lot of academic research in that area, I
6  probably would have reviewed it by now, especially
7  given that I have the good fortune or misfortune of
8  being asked to review many articles for referee
9  journals.
10    Q.  So the fact that you can't recall having
11  done any of those reviews, are you saying that that
12  means there is just not much academic research out
13  there in this area?
14    A.  You know, on the issue of information
15  search on the Internet, there has been a lot -- I
16  should say a great deal of research.  The use of
17  search engines, I can't think of any.  It doesn't
18  mean that there hasn't been any, but I just cannot
19  think of any.
20    Q.  Has Mr. Page ever indicated to you that
21  Google retained someone else to do a study in this
22  case?
23    A.  No.
24    Q.  Has he ever inferred that to you?
25    A.  No.

Page 52

1    Q.  He's never inferred that Google piloted a
2  study but opted not to run it in full?
3    A.  No.
4       MR. PAGE:  Object as vague and ambiguous.
5  I think you mean imply.
6       MR. PHILLIP:  Okay.
7       THE WITNESS:  No.
8  BY MR. PHILLIP:
9    Q.  And you're not aware of any such study
10  being do?
11    A.  That's correct.
12    Q.  Okay.  Have you ever asked Mr. Page why
13  Google did not do its own study in this case?
14    A.  No.
15    Q.  You've not discussed that at all?
16    A.  No, we did not.  I could speculate.  As I
17  said, we haven't talked about it.  If there was a
18  valued survey submitted showing that there is
19  confusion that is at issue here, then perhaps a
20  survey would have been conducted.  However, given
21  that -- I think the survey, as I detail in my
22  report, had major flaws, there was no need to do
23  it.
24    Q.  Well, in your experience, haven't you been
25  involved in cases where -- where defendants have

Page 53

1  come forth with surveys showing no likelihood of
2  confusion?
3    A.  Yes.
4    Q.  Have you --
5    A.  It happens.  Again, I'm not an attorney.
6  My understanding is that the plaintiff needs to --
7  I guess as you guys call it, have the burden of
8  proof.  And I think if there was a legitimate
9  survey here, I think perhaps Google would have
10  considered running a survey.  As far as I can tell,
11  there wasn't such a survey here, so there was no
12  need for the defendant to.
13    Q.  So is that your speculation, in other
14  words, you think that Google made a strategic
15  choice not to do a survey and wait and see what
16  American Blinds came forth with?
17    A.  That's beyond speculation.  I have no idea
18  on that.
19    Q.  Have you ever reviewed the survey report
20  that Dr. Jacobe prepared in the Geico case?
21    A.  I might have skimmed it.  I never
22  evaluated it very carefully.
23    Q.  I --
24    A.  And I have only a vague recollection of
25  what he did.

Page 54

1    Q.  I noticed it wasn't in your Exhibit C. Was
2  it something that you looked at in the context of
3  preparing this report?
4    A.  No.
5    Q.  When was the last time you looked at it?
6    A.  It's possible -- it's likely that in the
7  context of the Geico case --
8    Q.  Uh-huh.
9    A.  -- I took a look at that at some point.
10    Q.  Do you know Dr. Jacobe?
11    A.  I do.
12    Q.  And you've had communication with him
13  before?
14    A.  Yes.
15    Q.  Did you ever discuss his report in the
16  Geico case with him?
17    A.  You know, I don't think that I did.
18    Q.  Okay.  You don't recall ever asking him
19  why he used a certain control or why he did
20  something a certain way?
21    A.  Nope.
22    Q.  Okay.  Did you assist him at all in
23  designing his survey?
24    A.  Nope.
25    Q.  Did he consult you at all when he was

Page 55

1  designing his survey?
2    A.  He did not.
3    Q.  Other than Dr. Jacobe's report in the
4  Geico case, Dr. Gary Ford's report in the Geico
5  case and Al Ossip's report in this case, have you
6  seen any other studies addressing the issue of
7  consumer perception when using search engines?
8    A.  I can't think of any.
9    Q.  Now, I know as a full time professor, you
10  are often very busy and sometimes don't have time
11  to do surveys, correct?
12    A.  That's correct.
13    Q.  And would you say that when you get
14  involved in litigation, that more often than not
15  you do critiques than actually run studies?
16    A.  I don't think that's true.
17    Q.  Okay.
18    A.  I'd say probably on half the cases I do
19  surveys and in some cases I do both.  In some cases
20  I run more than one survey.  Other cases I may just
21  do an evaluation of the other side's report or
22  reports.
23    Q.  Okay.  So in some cases where you've
24  critiqued someone else's survey you've also run
25  your own study to demonstrate that the -- that the

Page 56

1  things that you were critiquing had an impact on
2  the results?
3    A.  Not necessarily, just I may -- might have
4  done my own survey.  In some cases both surveys are
5  done simultaneously as opposed to sequentially.
6    Q.  Uh-huh.
7    A.  So just to give you an example, in a case
8  involving Starbucks and another chain, something to
9  do with Tea Leaf.  I forget their name.  I think
10  they have a store here on Market Street, Coffee
11  Bean and Tea Leaf or something like that where
12  there was an issue of the term ice blended, whether
13  it was generic or the fact that Starbucks was using
14  the term ice blended created confusion with that
15  other chain.
16    So I was doing surveys and then they were
17  doing a survey.  And then reports were exchanged
18  and then I evaluated the other side's survey.
19    Q.  Okay.  So that's a situation where the two
20  parties produced their surveys simultaneously and
21  then each party then followed up with a critique of
22  the other party's surveys?
23    A.  Correct.
24    Q.  Okay.  Have you ever had a situation where
25  you -- where one party produced a survey and then

Page 57

1  you, on behalf of another party, reviewed it,
2  critiqued it, and then ran your own survey?
3    A.  I'm sure it happened.
4    Q.  Okay.  Have you had situations where
5  you've run a survey and someone else has critiqued
6  it?
7    A.  Oh, yes.  Definitely.
8    Q.  Have you had --
9    A.  You mean critiqued and ran a subsequent
10  survey or just critiqued it?
11    Q.  Either.
12    A.  Yeah, I'm sure that happened.
13    Q.  Both?
14    A.  When you say ran a survey, specifically to
15  rebut my survey or -- in other words, to correct a
16  flaw in my survey or just a survey to assess, say,
17  confusion or genericness or secondary meaning,
18  whatever it is?
19    Q.  No.  In other words, that you've run a
20  survey and someone else critiqued it and ran their
21  own survey to back up their critique?
22    A.  I don't have a specific recollection.  I
23  mean, it might have happened.
24    Q.  Okay.  All right.  How long have you been
25  doing studies in trademark cases?

15 (Pages 54 to 57)

Page 58

1    A.  In litigation, you mean?

2    Q.  Yes.  Just approximately how many years?

3    A.  Maybe a dozen years, maybe 13 years.

4    Q.  Okay.  And approximately how many studies

5  do you think you've done in litigation?

6    A.  A hundred.  I don't know.  I'm just

7  guessing.

8    Q.  And you've done likelihood of confusion

9  studies, correct?

10    A.  Yes.

11    Q.  And you've done secondary meaning studies?

12    A.  Yes.

13    Q.  And you've done genericness studies?

14    A.  I did.  And dilution.

15    Q.  Dilution studies?

16    A.  And just general marketing kinds of

17  issues.

18    Q.  Right.  Have you ever been asked to

19  critique a report and reviewed the report and saw

20  absolutely nothing in it that you could critique?

21    A.  Many times.

22    Q.  And in those cases you turned down the

23  assignment?

24    A.  Yeah, I told the attorney after looking at

25  the report, I see no major problems with this

Page 59

1  survey.

2    Q.  Okay.  Have you ever critiqued a survey

3  from Dr. Jacobe?

4    A.  Quite a few times.

5    Q.  Have you ever critiqued a survey from

6  Henry Offsburg?

7    A.  Yes.

8    Q.  Have you ever critiqued a survey from

9  Deborah Jay?

10    A.  No.

11    Q.  Have you ever been asked to critique a

12  survey from Deborah Jay and declined?

13    A.  Yes.

14    Q.  Is that because you felt the survey was

15  not flawed or was there some other reason?

16    A.  Well, at that time, it was just because I

17  looked at the survey and I thought it was a good

18  survey.

19    Q.  Okay.

20    A.  I also -- at this point I also know her

21  personally and I would rather not critique friends.

22    Q.  Okay.  Fair enough.  Do you have any other

23  people that you would put in that category?

24    A.  Yes.

25    Q.  And who is that?

Page 60

1    A.  Jerry Ford.

2    Q.  How about Phil Johnson, have you critiqued

3  Phil Johnson?

4    A.  Quite a few times.

5    Q.  And Gary Ford you've critiqued?

6    A.  Yes.

7    Q.  How about Sandra Cohgen, have you

8  critiqued her?

9    A.  Quite a few times.

10    Q.  And Al Ossip?

11    A.  In the Cohiba case.  I think that was the

12  only other case.

13    Q.  Okay.  Would you say that it's fairly

14  typical in litigation -- more often than not it's

15  typical for these -- you know, these people, these

16  experts that are in this field to critique one

17  another?

18    A.  Yes.

19    Q.  If we look at Exhibit 1, which is your

20  report, and if you turn to Exhibit B, which is a

21  list of cases that you've testified in or given a

22  deposition in the past four years.  Did you prepare

23  this list?

24    A.  Yes.

25    Q.  And I assume you update it as need be?

Page 61

1    A.  I tried.  I don't always have the exact

2  dates, but it's approximately in the past four

3  years.

4    Q.  Okay.  Can you tell me which of these

5  matters was a -- can you tell me in which of these

6  matters you offered an opinion which was a critique

7  only, as best as you can recall?

8    A.  Number four.  Number five.  In number six

9  there was a confusion survey, but I'd say that was

10  less than half the opinion.  I mean, I think there

11  were many other issues there, such as whether the

12  name -- the Cuban Cohiba was famous on a certain

13  date in 1992, which had to do with various other

14  issues that had nothing to do with Mr. Ossip's

15  survey.

16    Q.  So are you saying you did a survey in

17  number six?

18    A.  No, I did not.

19    Q.  You did a critique?

20    A.  No.  As I said, my report, which was quite

21  long in that case, focused -- I don't recall

22  exactly.  Most of it has to do with the question of

23  whether the Cuban Cohiba was famous as of November

24  or something like that of '92, which was the date

25  on which General Cigar reregistered the mark Cohiba

16 (Pages 58 to 61)

Page 62

1  in the U.S.
2       And there were many, many surveys that was
3  done at the time such as by Cigar Aficionado and
4  various other sources which were used to infer the
5  level of fame at that time.  Now, in addition,
6  Mr. Ossip conducted a survey, I forget, around 2002
7  or something like that.
8       Did I say number eight?
9     Q.   No, you did not.  That's a critique only,
10  right?
11    A.   Right.
12    Q.   Okay.
13    A.   Number 15.  I think number 16.  And I
14  think number 17.  Number 19.  Number 21.  Might
15  have been in 23.  25, I think.  And number 27.
16  Number 30.  Number 33, there were various issues.
17  One of them was an evaluation of a survey, but
18  there were many other issues.  That's it.
19    Q.   Okay.
20    A.   Now, there might have been other cases
21  where I also evaluated the other side's surveys,
22  but that was not the primary --
23    Q.   Right, in addition to doing your own
24  survey?
25    A.   In most cases.

Page 63

1     Q.   Are there any other cases here that you
2  haven't mentioned where you offered an opinion on
3  something but didn't actually do a survey?
4     A.   Yes.
5     Q.   And which are those?
6     A.   Number one.  Number two.  I think number
7  seven.  It's been a while.  Number nine.  I think
8  13.  Number 20.  24.  26.  That's it.
9     Q.   Okay.  So am I correct, then, in saying
10  the remaining matters were all matters in which you
11  conducted a study?
12    A.   One or more, yes.
13    Q.   Okay.  In number three, what kind of study
14  was that?
15    A.   Just a forward confusion survey.
16    Q.   Okay.  In number 10, what kind of study
17  was that?
18    A.   There were a few surveys there.  There
19  were one or two genericness surveys, maybe just
20  one.  I'm not sure.  And there was forward
21  confusion and reverse confusion.
22    Q.   Okay.  And you worked -- you did studies
23  on all those issues?
24    A.   Yes.
25    Q.   Okay.  How about number 11?

Page 64

1     A.   That was a dilution survey.
2     Q.   Okay.  And number 12.
3     A.   Confusion.
4     Q.   The presence or absence of?
5     A.   It was a survey to assess the likelihood
6  of confusion.
7     Q.   Were you representing -- were you retained
8  by the trademark holder or the alleged infringer?
9     A.   By Visa International.  I guess the
10  alleged infringer.
11    Q.   Okay.  How about in number three, were you
12  retained by the trademark holder or the alleged
13  infringer?
14    A.   Alleged infringer.
15    Q.   Okay.  And then number 14?
16    A.   I think it was a confusion survey.
17    Q.   By which side?
18    A.   Thane International.
19    Q.   Who was the alleged infringer, correct?
20    A.   Correct.
21    Q.   And number 18?
22    A.   Number 18, that was on behalf of
23  ZonePerfect Nutrition.
24    Q.   What kind of study?
25    A.   It was forward confusion.

Page 65

1     Q.   By the trademark holder?
2     A.   Yes.
3     Q.   Okay.  And number 22?
4     A.   Well, that was a patent case.
5     Q.   Okay.  And number 28?
6     A.   28, I think I did a fame survey.  Did I do
7  anything else?  I don't remember.  It was
8  definitely a fame survey on behalf of Nissan.  It
9  had to do with the fame of the models with the
10  letter Q.
11    Q.   Okay.  Number 29?
12    A.   That was a confusion case on behalf of the
13  trademark holder.
14    Q.   All right.  Number 31?
15    A.   That was -- my part had to do with
16  genericness and I conducted a survey on behalf of
17  Classic Foods, which despite appearing first, was
18  actually the alleged infringer.
19    Q.   Okay.  And 32?
20    A.   That's -- that's ongoing.  That's a
21  confusion study which I conducted on behalf of
22  Allergan.
23    Q.   Okay.  34?
24    A.   I conducted there at least two surveys.  I
25  believe both a confusion survey and a dilution

17 (Pages 62 to 65)

Page 66

1    survey and that was on behalf of U-Haul.
2        Q.   Alleged infringer?
3        A.   Yes.
4        Q.   Thirty-five?
5        A.   Confusion on behalf of ICON.
6        Q.   Alleged infringer?
7        A.   Yes.
8        Q.   And last but not least, 36?
9        A.   That was another case where I did both
10   confusion and dilution on behalf of the plaintiff,
11   Newport Pacific.
12       Q.   Okay.  In any of these cases where you
13   performed a survey, have any of them been excluded
14   at trial by the judge?
15       A.   No.
16       Q.   Have any of them been the subject of
17   published opinions critiquing the survey?
18           MR. PAGE:  I'll object as vague and
19   ambiguous.
20           THE WITNESS:  I'm not aware of any case
21   that critiqued.
22   BY MR. PHILLIP:
23       Q.   And just to be clear, criticized the work?
24       A.   No, I understand.  I'm not aware, you
25   know.  Yeah, I'm not aware of any critique of any

Page 67

1    of these surveys.
2        Q.   Okay.  Are you aware of any cases,
3    published decisions that discussed your surveys?
4        A.   That were done in the context of
5    litigation?
6        Q.   Yes.  Any court opinions where the judge
7    wrote, you know, Mr. Simonson's survey says or
8    Mr. Simonson testified -- commented upon it in some
9    way?
10       A.   Yeah, there were some cases.  There was an
11   old case involving Simon Property Group versus
12   mySimon where I believe the Court referred
13   extensively to my opinion.  And I'm sure there were
14   other cases.  Once the case is done I just don't
15   read it as closely.
16           The control that I used in that case was
17   Simonson.com.  I saved that exhibit.
18       Q.   Okay.  So how about in the other
19   direction, have you -- have any surveys that you
20   have critiqued been excluded at trial?
21       A.   I believe so, but you know, this issue of
22   exclusion, I guess there is a difference obviously
23   between exclusion and harshly criticized?
24       Q.   Exactly.
25       A.   And I'm not -- I'm not sure exactly which

Page 68

1    category.  So let's say if I criticize a survey and
2    then there was summary judgment --
3        Q.   Right.
4        A.   -- consistent with my critique, now, I'm
5    not sure if the summary judgment was based
6    completely on my critique or on the flaws of that
7    survey or not.
8        Q.   Right.
9        A.   So it's hard for me to answer that.
10       Q.   Okay.  How about any decisions that you
11   can recall where the Court actually cited your
12   critique in support of its criticisms of someone
13   else's work?
14       A.   Again, it could -- I assume it happened,
15   but I just don't keep track of that.
16       Q.   Okay.  So do you consider yourself fairly
17   well known within the legal world as someone that
18   companies can go to if they need a confusion study
19   done in a case?
20       A.   I haven't done that survey yet.  I could
21   tell you that I get about a call a day and I keep
22   turning people down or referring them to others, so
23   I guess that provides some evidence.  But I haven't
24   checked for secondary meaning.  Actually, secondary
25   meaning I would fail because there is another

Page 69

1    expert by the name of Dr. Simonson, which
2    unfortunately, his name is Alexander Simonson and
3    he has been harshly criticized.  What are the odds
4    that you'll have two likelihood of confusion
5    experts with the same last name.
6    BY MR. PHILLIP:
7        Q.   Certainly you've been known to Mr. Page at
8    least since the Geico case, right?
9        A.   Correct.
10       Q.   So for example, if he wanted to contact
11   you to do a study in this case, he certainly knew
12   where you were and how to get ahold of you?
13       A.   That's correct.
14       Q.   If he had contacted you to ask you to do a
15   study on behalf of Google in this case, would you
16   have considered doing it?
17       A.   Well, I did all my teaching for the year
18   during those 10 weeks of the fall.  So I was fairly
19   busy and I had a couple of other surveys going on.
20       Q.   Uh-huh.
21       A.   So I'm not sure that I would or I would
22   tell him, call Deborah or call Jerry.
23       Q.   Right.  Time permitting, is there
24   anything -- would there be any reason why you would
25   consider not doing a survey in this case on behalf

18 (Pages 66 to 69)

Page 70

1  of Google?
2      A.  No.
3      Q.  Okay.  Are there any particular, you know,
4  challenges that you would think could not be
5  overcome in doing a survey for Google?
6      A.  No.  I think if there was a perceived need
7  to do so, it could have been done.
8      Q.  Okay.  Have you given -- have you ever
9  given thought as to how it could have been done?
10     A.  No.  Survey design is something I take
11  seriously and I'm sure if I -- had I accepted that
12  assignment, I would have spent some time and come
13  up with what I consider to be an appropriate
14  design.
15     Q.  Okay.  And based on what you know so far,
16  having reviewed a lot of people's work in this
17  area, you feel like you could have come up with an
18  acceptable design to show no likelihood of
19  confusion?
20     A.  I think a survey, a proper survey could
21  have been designed.  I mean, that's my assumption.
22  Again, without having thought about it carefully.
23  Obviously I thought about it carefully in the
24  context of evaluating what Mr. Ossip did.
25     Q.  If Mr. Ossip were to follow your critique

Page 71

1  and run a survey that addresses each of the issues
2  that you've taken issue with, would that, in your
3  opinion, be a proper survey?
4          MR. PAGE:  Object as an incomplete
5  hypothetical and circular.
6          THE WITNESS:  Yeah, I think it meets a
7  survey that followed everything, all the concerns
8  that I raised, I think that -- again, you know,
9  it's hard to speak in the abstract.  But generally
10  speaking, if he addressed all my concerns, then I
11  would have no concerns left.
12  BY MR. PHILLIP:
13     Q.  So is all of your time spent between your
14  teaching duties at Stanford and then litigation
15  consulting?
16     A.  Well, I spend a great deal of time with my
17  doctoral students on their research and other
18  academic research.
19     Q.  Uh-huh.  But I get -- I mean, this is
20  probably obvious, but your time is spent in either
21  academia or doing expert work?
22     A.  On rare occasions I spend some time with
23  my family.
24     Q.  I understand that.  Can you give me a, you
25  know, rough estimate in terms of percentage of how

Page 72

1  much your income comes from expert work?
2      A.  I don't know.  I'd have to guess.  Half.
3  I'm not sure.  Perhaps a little more than half.
4      Q.  Okay.  You're familiar with the treatises
5  by professor McCarthy, right?
6      A.  Yes.
7      Q.  And it's one of the most widely used
8  treatises in the area of trademark litigation?
9      A.  That's my impression.
10     Q.  He's the man, as they say, right?
11     A.  I think so, yes.
12     Q.  Okay.  And do you have a copy of his
13  treatises in your office?
14     A.  I do, dated, I think '02, but yes.
15     Q.  And you'll rely on it from time to time?
16     A.  Yes.
17     Q.  Are you aware that he states in his
18  treatises, that, and I'm quoting, it is notoriously
19  easy for one survey expert to appear to tear apart
20  the methodology of the survey conducted by somebody
21  else?
22     A.  I think I recall him saying that.
23     Q.  Okay.  And do you agree with that?
24     A.  I think so.  I think there is no perfect
25  survey.  Having said that, it doesn't mean that

Page 73

1  anything goes.  In other words, one needs to make a
2  distinction between minor flaws and major flaws.
3      Q.  Right.
4      A.  If we are in a situation where the flaws
5  on their own can account for whatever the result
6  you get, then the survey didn't teach you anything.
7  So I think that's the important distinction.
8      Q.  Okay.  Which is ultimately the Court's --
9      A.  I beg your pardon?
10     Q.  Which is ultimately the Court's function,
11  correct?
12         MR. PAGE:  I object.  Calls for a legal
13  conclusion.
14         THE WITNESS:  I'm sure that's the case.
15  BY MR. PHILLIP:
16     Q.  Have you ever testified that the best way
17  to determine whether an alleged design flaw that
18  you spotted in critiquing a survey had any impact
19  on the outcome of the survey was to conduct another
20  survey?
21     A.  That strikes me as something that if I
22  said it ever, it would have been overly sweeping
23  and generic because there are some flaws that are
24  flagged on their face, so obviously, for example,
25  you don't have a control.  I don't think that you

19 (Pages 70 to 73)

Page 74

```
1   need to conduct a survey to establish the fact,
2   which I think, for example, in this case, Mr. Ossip
3   readily admits that he did not have a control.
4        You don't need a survey to prove that.  He
5   admits it.
6        Q.   That's right.  But to determine
7   empirically whether the lack of control had any
8   impact on the outcome of the survey, wouldn't you
9   need to conduct another survey with a control to
10  show if it had any impact?
11       A.   I don't think it would be necessary.
12  Because when you submit a survey and there's some
13  rules and there is nothing more, I'd say basic,
14  than you know, needing to include a control.  In
15  this case it was easy to find the control.
16       Just put the name blinds.  I presume that
17  plaintiff in this case is not objecting to Google
18  selling the keyword blinds and allowing anyone who
19  wants to bid on that word to do so.  So he could
20  have just used that as a control.
21       Q.   But without doing that, we don't know
22  whether it would change the outcome?
23       A.   Well, but we do know that we cannot rely
24  on this survey without a control.  That's what we
25  know for sure.
```

Page 75

```
1        Q.   Okay.  And I'll accept that, but my
2   question is, without actually running another
3   survey with control, you can't say with any
4   certainty whether the results would be different?
5        A.   Well, I'd be shocked if they were not
6   different.  Maybe you say, well, instead of the
7   noise that you would have obtained in the survey
8   would not be 15 percent, it would be 10 percent.  I
9   can't tell you that --
10       Q.   Uh-huh.
11       A.   -- without running the survey.  I can tell
12  you that in all likelihood, it will be
13  significantly lower than it is and furthermore,
14  just as in academia, in any setting, without a
15  control, you just cannot rely on that survey.
16       Q.   Uh-huh.  When you do surveys, who do you
17  use to collect -- to actually go out and perform
18  the research and collect the data?
19       A.   Well, my -- the firm that supervises
20  implementation is the same one that Mr. Ossip used,
21  Target Research Group.  Actually, most of the
22  interviews are done by the people who operate those
23  shopping mall research locations.
24       Q.   Who Target contracts with?
25       A.   Exactly.
```

Page 76

```
1        Q.   So you've been satisfied with Target?
2        A.   Very much so.
3        Q.   And you don't have any criticisms of the
4   work they did for Mr. Ossip, setting aside the
5   design of the survey?
6        A.   That's correct.  I mean, it sounded like
7   there were some particular issues, but that can
8   happen, where apparently some mall locations were
9   not performing properly and there were some errors
10  made.
11       Q.   Right.
12       A.   It doesn't happen all that often, but it
13  has happened.
14       Q.   And Mr. Ossip acknowledged that in his
15  report and said he was not relying on that data,
16  right?
17       A.   That's correct.
18       Q.   And that's the right thing to do in that
19  situation?
20       A.   Yes.
21       Q.   And just to tie up a loose end from
22  earlier, is it right that you've never spoken with
23  anyone at Google in connection with this
24  assignment?
25       A.   That's correct.
```

Page 77

```
1        Q.   Do you use Google regularly as your search
2   engine of choice?
3        A.   Probably more often than any other search
4   engine.
5        Q.   Does it come up automatically when you
6   open up your browser?
7        A.   I have several notebooks.  I think in all
8   but one it is.
9        Q.   Okay.  Are you familiar with their ad
10  words program?
11       A.   Somewhat.
12       Q.   Have you heard of the term, negative
13  keyword?
14       A.   Yes.
15       Q.   And what's your understanding of a
16  negative keyword?
17       A.   I understand that's keywords for which you
18  want your ad not to appear.
19       Q.   So when you were retained by Mr. Page,
20  what exactly did he ask you to do?
21       A.   He just said that a survey report was
22  forthcoming.
23       Q.   I'm going to send you a survey report and
24  I'd like you to critique it?
25       A.   No, I want you to take a look at it.
```

20 (Pages 74 to 77)