# Exhibit R-2

Dockets.Justia.com

Page 78

1    Q.   Okay.  A survey report is coming, I'm
2  going to send it to you and I want you to take a
3  look at it?
4    A.   Correct.
5    Q.   And I might want you to do your own
6  report?
7    A.   Yes.
8    Q.   Okay.  You understood that?
9    A.   I did.
10    Q.   Okay.  But I'm not -- did Mr. Page also
11  say, but I'm not going to have you do a survey?
12    A.   Yes, as I said, it never came up.
13    Q.   But did he say explicitly in the first
14  call, a survey report is coming, I'm going to send
15  it to you.  I want you to take a look at it and I
16  may have you do your own report, but I'm not going
17  to ask you to do a survey?
18    A.   I don't recall him saying that.
19    Q.   Was that your impression?
20    A.   I don't remember.  Now, are you asking is
21  that not what was said?
22    Q.   Right.
23    A.   But my impression, I would not trust my
24  recollection of unsaid impressions.
25    Q.   Okay.  At any time did he say to you, you

Page 79

1  know, I'm going to have you do a report, but I'm
2  not going to have you do a study?
3    A.   I don't recall that.  I mean, as I said,
4  we didn't talk about doing a survey.
5    Q.   At any time when you were reviewing the
6  report, did you say, hey, Mike, would you like me
7  to do a study for you?
8    A.   I don't think so, no.
9    Q.   Have you thought about doing a study,
10  Mike?
11    A.   Did I think about that?
12    Q.   Did you say to Mike, hey, Mike, have you
13  thought about doing a study?
14    A.   I don't think that I asked that.
15    Q.   Okay.
16    A.   As I said, if the survey did not look like
17  it had major flaws, one thing I would say, probably
18  I'm not the right person to critique it, to
19  evaluate it.
20    Q.   Right.
21    A.   And/or I'd say, well, it looks like it has
22  no major flaws.  Let's do another survey.  Again,
23  it has to be a proper survey that I feel
24  comfortable doing and let's see what happens.
25    Q.   So he sent you Mr. Ossip's survey, then,

Page 80

1  right?
2    A.   Yes.
3    Q.   Do you remember approximately when you
4  received it?
5    A.   I don't.
6    Q.   Was it shortly after signing the
7  confidentiality agreement?
8    A.   I'm not sure.  I thought it was earlier
9  than that.
10    Q.   Okay.  So you think it may have been in
11  October?
12    A.   I don't remember exactly.
13    Q.   Okay.  So you got the survey report and
14  you reviewed it, right?
15    A.   Yes.
16    Q.   Did anybody else review it with you?
17    A.   No.
18    Q.   Did you have anybody help you at all?
19    A.   No.
20    Q.   Okay.  And then what did you do, did you
21  call Mike?
22    A.   I believe I did, yeah.  I said that, you
23  know, it appears to have some major problems.
24    Q.   You looked at it and you said, I think
25  this thing is majorly flawed?

Page 81

1    A.   Yes.
2    Q.   Had Mike told you before you received it
3  that he thought it had flaws in it?
4    A.   No, I don't think -- I don't recall him
5  telling me anything about the survey.  I'm not even
6  sure he read it at that time.
7    Q.   Okay.  So you called him -- was it a
8  telephone conversation after you reviewed the
9  report?
10    A.   I beg your pardon?
11    Q.   Was your next communication with Mike
12  after you reviewed the report -- after you reviewed
13  Ossip's report a telephone conversation?
14    A.   I believe so, yes.
15    Q.   Okay.  So you picked up the phone and you
16  called Mike and you said, I reviewed Al Ossip's
17  report and I think there's problems with it or
18  something to that effect?
19    A.   Correct.
20    Q.   Did you discuss the problems?
21    A.   I don't think there was a very detailed
22  discussion, maybe a couple of minutes.  I don't
23  recall any extensive discussion at that point.
24    Q.   Did you raise the issue of the control?
25    A.   I did.

1    Q.  Right away?

2    A.  Right away.

3    Q.  And did you raise the issue of the

4  universe right away?

5    A.  I don't remember which of these things I

6  did.

7    Q.  Okay.  Which things jumped out at you

8  right away?  Control, anything else?

9    A.  You know, control, obviously.  I think I

10  recall that originally I did not receive all the

11  exhibits.  In other words, all the pages that were

12  shown.  I think I got -- I think I received that

13  later, because his report included -- I forget, one

14  or two examples, but I don't think it included all

15  of them.

16        I might have at that time -- I don't

17  remember if I'd already looked at the verbatim

18  responses and didn't find many references to the

19  search term.  I'm sure that the issue of real world

20  similarity came up.  I don't remember if we talked

21  about the universe.  I remember being a little

22  puzzled by the fact that all the respondents were

23  women.  But again, I don't remember if that was

24  something that we talked about.

25        As I said, it was a very brief

1  conversation.

2    Q.  Okay.  So it sounds like the issue of a

3  lack of control, that jumped out at you right away

4  and you're not exactly sure at what -- how the

5  other issues -- how your other critiques sort of

6  developed over time?

7    A.  Right.

8    Q.  What you saw and when?

9    A.  I beg your pardon.

10    Q.  You're not clear on when you got the full

11  report and when you got the verbatims?

12    A.  No, there were some verbatims in the

13  report, but originally I read the report rather

14  quickly and I read the report, I looked at the

15  questionnaire itself and a few things jumped at me.

16        Later, obviously before starting to put

17  pen to paper or start putting it on the computer, I

18  obviously read it much more carefully.  By then I

19  received the actual questionnaires and so on.

20    Q.  Uh-huh.  Was there some point in time

21  where a decision was made by you and Mike that you

22  would, in fact, prepare an expert report?

23    A.  Yes.

24    Q.  And was that fairly soon after reviewing

25  the Ossip report?

1    A.  Yes.

2    Q.  So in the first conversation?

3    A.  Probably, yes.

4    Q.  Okay.  So you were given the green light

5  to get going on your report?

6    A.  Yes.

7        MR. PHILLIP:  Okay.  Why don't we take a

8  break, if you don't mind.

9        MR. PAGE:  Fine by me.

10        (Lunch recess.)

11  BY MR. PHILLIP:

12    Q.  In connection with your work on this case,

13  did you read any specific cases from the ninth

14  circuit regarding trademark infringement?

15    A.  No.

16    Q.  Are you familiar with the doctrine,

17  initial interest confusion?

18    A.  To some degree.  I mean, just what I

19  vaguely recall from reading from context of some

20  cases in the past.

21    Q.  Okay.  And what's your understanding of

22  initial interest confusion?

23    A.  These are cases where initially someone

24  thinks that two -- that one mark is related to

25  another mark and that leads to, for example,

1  searching for more information or to going to a

2  store, those kinds of things.

3        And even though before purchase is made

4  that confusion is resolved, there is still initial

5  interest confusion.

6    Q.  That's a good enough description.  And you

7  also understand that that is actionable under ninth

8  circuit law?

9        MR. PAGE:  Objection.  Calls for a legal

10  conclusion.

11        THE WITNESS:  Yeah, I'm not sure -- yeah,

12  I -- I believe that there are some cases where that

13  was considered actionable, yes.

14  BY MR. PHILLIP:

15    Q.  Uh-huh.  Have you ever done a study that

16  tested this concept of initial interest confusion?

17    A.  I don't remember.  I might have, but I

18  can't think of any right now.

19    Q.  Okay.  If you do, please let me know.

20    A.  Sure.

21        MR. PHILLIPS:  Did you happen to see his

22  bill during the lunch break?

23        MR. PAGE:  Yes, 59 and a half hours.

24        MR. PHILLIP:  Okay.  Through November 30th

25  or through the current date?

Page 86

1    THE WITNESS:  No, no.  Through November
2  30th.
3  BY MR. PHILLIP:
4    Q.  Okay.  And when did the work -- did you
5  look at the bill during the lunch hour?
6    A.  Not right now.
7    Q.  Do you know when the work commenced?
8    A.  I don't remember.  As I said, I think it
9  started in October, but I'm not sure.
10    Q.  Okay.  So in reviewing things -- let me
11  back up.  Have you ever purchased blinds
12  personally?
13    A.  I might have.  It's been a while, but I
14  remember that we purchased blinds.  Yeah, actually,
15  I have a vivid recollection of something to do --
16  we even did it perhaps last year.
17    Q.  When you say we, are you referring to you
18  and your wife?
19    A.  Yes.
20    Q.  So you accompanied your wife in going out
21  and making some purchases for the home?
22    A.  I don't remember the process, whether it
23  was -- I don't think it was on the Internet.
24    Q.  Okay.  Was -- and did it involve American
25  Blinds?

Page 87

1    A.  Not that I know of.
2    Q.  Before this case, had you heard of
3  American Blinds Wallpaper and More or American
4  Blinds & Wallpaper Factory?
5    A.  No.
6    Q.  Or American Blinds?
7    A.  No.
8    Q.  Okay.  During this case, have you ever
9  reviewed a catalog from American Blinds?
10    A.  No.
11    Q.  Have you ever reviewed any sales
12  information regarding American Blinds?
13    A.  No.
14    Q.  Any advertisements from American Blinds?
15    A.  No.
16    Q.  Have you done any searches of the
17  trademark office to see what registrations they
18  own?
19    A.  No.
20    Q.  Have you done any searches of LexisNexus
21  for any news articles about them?
22    A.  No.
23    Q.  Okay.  And you would agree that all of
24  those kinds of things are relevant to whether a
25  trademark has secondary meaning, correct?

Page 88

1    A.  When you say kinds of things?
2    Q.  All those types of -- all that kind of
3  evidence that I just talked about that's relevant
4  to whether a mark has obtained secondary meaning?
5    MR. PAGE:  I'm going to object as
6  compound.
7    THE WITNESS:  It could contribute to the
8  creation of secondary meaning.  Obviously, as I
9  think I said in my report, it's extremely difficult
10  and getting even more so.
11    But if you have one mark and you keep
12  pushing it and promoting it and consumers buy a
13  product and pay attention and so on, then you may
14  very well be able to create secondary meaning.
15  It's not easy, but it can be done.
16  BY MR. PHILLIP:
17    Q.  Okay.  What did you do in preparation for
18  your deposition today?
19    A.  Just read my report a couple of times.  I
20  reviewed Mr. Ossip's transcript.  I skimmed the
21  transcript of Mr. Layne and Mr. Alderman and I just
22  skimmed the other documents that I had.
23    Q.  Okay.
24    A.  And I met very briefly yesterday with
25  Mr. Page.

Page 89

1    Q.  Okay.  Where did you meet?
2    A.  In his office.
3    Q.  And you said it was very briefly; how long
4  was it?
5    A.  I think it was maybe 25 minutes, maybe 30
6  minutes, of which maybe 15 minutes had to do with
7  this case.
8    Q.  Okay.  Let's take a look at your report.
9  You indicate in paragraph 3 that your field of
10  expertise includes trademark infringement.
11    Do you see that?
12    A.  Yes.
13    Q.  And I'm trying to understand what it is
14  that you're saying there, because obviously you're
15  not a lawyer, right?
16    A.  That's very true.
17    Q.  And you've not taught trademark law or
18  trademark infringement classes, right?
19    A.  That's correct.
20    Q.  So is what you're saying here when you're
21  talking about expertise in trademark infringement,
22  you're talking about your work as an expert in
23  trademark infringement cases?
24    A.  No.  I'm talking about, as you know, I
25  published three articles in that area.

23 (Pages 86 to 89)

1    Q.  Okay.

2    A.  Two at the Trademark Reporter and one in

3  the Journal of Public Policy and Marketing.

4    Q.  Okay.

5    A.  So I probably published more about

6  likelihood of confusion surveys -- I don't know,

7  I'm maybe hesitant to say, probably Dr. Jacobe has

8  published more than me in that area, but I guess I

9  could brag and claim I'm the only one who ever

10  received an award for an article published in a

11  journal during a period of three years on that

12  subject.

13    Q.  And that subject is trademark and

14  infringement surveys?

15    A.  I think the title of the article that

16  received the award from the Journal of Public

17  Policy and Marketing is "Trademark Infringement

18  From the Customer Perspective."

19       And then I went on to discuss the meaning

20  of confusion, conditions for confusion and issues

21  of genericness and talked about the two studies

22  that I conducted in which I contrasted different

23  methods for assessing likelihood of confusion and

24  different methods for assessing genericness.

25    Q.  Uh-huh.  Okay.  So is what you're saying

1  that you consider yourself an expert in trademark

2  infringement because of all the work that you've

3  done in doing studies in trademark cases and the

4  writing that you've done about that?

5    A.  Yes.  Of course, having done also some

6  consulting work in the area and having looked at

7  many real-world cases, I've learned from that as

8  well, about situations where confusion, for

9  example, is created or is not created.

10       So it's a combination.  But I would --

11  what you see here in paragraph 3, it's mostly on

12  the basis of my academic writings.

13    Q.  Have you ever been allowed to give an

14  opinion in a case that there was trademark

15  infringement without having done a study?

16    A.  Yes.

17    Q.  You've been allowed to testify that in

18  your opinion there was a likelihood of confusion?

19    A.  Well, there was a case in Southern

20  California -- in downtown L.A. where I testified at

21  trial that there was no reverse confusion without

22  having done any survey just based on general

23  principles of consumer behavior and confusion and

24  explaining why there is no -- there was no

25  confusion.

1    Q.  Uh-huh.

2    A.  Even though there was no surveys in that

3  case.  In fact, the plaintiff conducted something

4  that they referred to as a survey, but it had major

5  problems so it was set aside before trial.  So it

6  didn't -- you know, it wasn't even mentioned during

7  trial.

8    Q.  Other than that one instance, have you, at

9  any other time, given an opinion on infringement

10  likelihood of confusion without having done a

11  survey?

12    A.  You know, I don't remember the details,

13  but in the case of Oracle versus -- I think it is

14  called Light Reading or something like that.  I

15  think it's listed here.

16       Oracle versus Light Reading, number two in

17  Exhibit B.  In that case I prepared a report on

18  behalf of Oracle and did not rely on a survey and

19  even though a significant part of my testimony had

20  to do with branding principles, I believe I also

21  talked about why there was a low likelihood of

22  confusion, obviously without putting a number on

23  that.

24       But saying that there was a low likelihood

25  of confusion and I believe that the other side,

1  indeed, as you suggested, said, well, this is you

2  being a lawyer.  Even though I think I relied on

3  general principles of consumer behavior and

4  marketing as opposed to the law.

5    Q.  Right.

6    A.  And the Court rejected their claim and

7  allowed in my -- and I believe that the decision

8  was in favor of Oracle in that case.

9    Q.  Have you had instances that have gone the

10  other way where you were prevented from giving an

11  opinion on likelihood of confusion without having

12  done a survey?

13    A.  I cannot recall a case like that.  And I

14  should say it's not something that happens often.

15  There might be situations where you have other

16  sources of data, maybe not surveys, that you can

17  rely on.

18    Q.  Okay.  So your testimony is that it

19  doesn't happen often to give an opinion on

20  likelihood of confusion without having done a

21  survey?

22    A.  It doesn't happen often, but it has

23  happened several times during my work as an expert

24  witness and I cannot recall a single case where my

25  opinion or report was rejected for that reason.

1    Q.  Uh-huh.  Okay.  So then in your report on
2  page 5 the section entitled, summary of
3  conclusions -- and these are several short
4  paragraphs that summarize your conclusions in the
5  overall report?
6    A.  Correct.
7    Q.  Why do you put a summary of conclusions up
8  front in your report?
9    A.  Well, I don't always do this.  Sometimes I
10  put it at the end, but just to make it reader
11  friendly.  If someone does not want to bother with
12  all the details, at least they see the summary.
13    Q.  Okay.  And then you have the next section
14  entitled, introduction, on page 8, which in
15  paragraph 19 again states summaries of your
16  critique, right, in very short fashion?
17    A.  Correct.
18    Q.  And then there's a segue there to two
19  basic questions there that need to be addressed in
20  paragraph 20 there.  Do you see that?
21    A.  Yes.
22    Q.  And -- now, these questions that you say
23  need to be addressed weren't addressed specifically
24  in Mr. Ossip's report, were they?
25    A.  That is correct, but I thought that they

1  were relevant to his conclusions.
2    Q.  Okay.  Well, point A is whether a
3  situation whereby consumers go to a store or a
4  website under the belief that the store might offer
5  them a certain product and then find out it does
6  not is uncommon or indicates that consumers were
7  misled, right, that was the first thing you wanted
8  to address?
9    A.  Yes.
10    Q.  Why did you think that general principle
11  was relevant to the Ossip study?
12    A.  Well, because the Ossip survey looked at
13  situations where allegedly consumers are looking
14  for something, let's say that there is this product
15  called American Blinds, they are looking for that,
16  then they click on a particular ad and they do not
17  find the product called American Blinds.
18      So that's a particular situation and the
19  question that I thought was relevant is whether
20  such a situation, in general, is uncommon or is
21  that something that happens often in the real
22  world.
23    Q.  Whether they get to a store and find what
24  they're looking for is not there or whether they
25  were actually misled into going into that store?

1    A.  No, they're not misled.  It just reflects
2  their reality that you may be going to a store
3  under the impression that they might be carrying a
4  particular product and you go there and you find
5  that they don't, it's out of stock, they don't have
6  the particular model, they no longer carry that
7  brand or whatever reason.
8    Q.  Well, if you're talking about a physical
9  store and no one in particular has told them to go
10  to that physical store, that's not analogous to the
11  situation here, is it?
12    A.  No, I think it is.  If you advertise and
13  let's say if you say, I'm carrying all the famous
14  camera brands, right, so you say, okay, I'm looking
15  for the S-70 model of Cannon and you assume that if
16  they're carrying all well known camera brands, they
17  probably will have a mainstream option such as the
18  Cannon S-70.  You go there, they don't.
19      In other cases, I mean, it could be a more
20  direct kind of analogy, if you will, where you
21  advertise specifically that you carry that product
22  and you don't have it, right?  Maybe because you
23  sold out, which is not the case here.
24      So that would be even -- maybe direct
25  analogy is not the right word, but in that case,

1  you said something that you're selling, a
2  particular product, and you don't have it.
3    Q.  But doesn't that -- doesn't that kind of
4  beg the question here?  With all due respect,
5  Dr. Simonson, doesn't this -- isn't this the
6  ultimate issue that you're describing?
7    A.  I'm not sure I'm following.
8    Q.  Well, we say that people are going to
9  these links because they think they're being told
10  to go to these links because they put in a certain
11  search time.  Just like in your example, people
12  would be going to the store, because someone said,
13  if you want to buy a Cannon, go there.
14      And you're saying, no, people just go shop
15  on their own and they're not relying on anybody
16  telling them that they can find what they're
17  looking for here.
18    A.  No, I think --
19    MR. PAGE:  Let me object that it misstates
20  his prior testimony and there's no question
21  pending.
22    THE WITNESS:  There is no question.
23    MR. PAGE:  He didn't ask a question.
24    THE WITNESS:  I thought --
25    MR. PAGE:  It's not a debate.  When he

1  asks a question, you can answer it.
2      THE WITNESS: I may be answering the wrong
3  question or maybe you want to rephrase so we'll
4  make sure that I'm addressing the right question.
5  BY MR. PHILLIP:
6      Q.  Sure.  That's fair enough.  Your 20(A),
7  asking whether the fact that consumers go to a
8  store or website believing that they might find a
9  certain product there and it's not there indicates
10 that they've been misled, that's something that you
11 want to address in your report, right?
12     A.  Right.
13     Q.  Isn't that the ultimate issue here as to
14 what American Blinds is complaining about?
15     A.  I don't think it is.
16     Q.  Why not?
17     A.  I mean, maybe -- obviously I'm not asking
18 you questions here, but you say, isn't that the
19 ultimate issue?  I'm here describing the
20 real-world situations from a consumer researcher's
21 perspective --
22     Q.  Right.
23     A.  -- whereby you were shopping for a
24 product, you're looking at different places, in
25 many cases you don't know that you want one

1  particular model or one particular brand, you're
2  looking for options.
3      Thank God for the Internet.  It makes
4  things a lot easier.  So you go to different
5  places, you're looking for a good price, for a good
6  product, for a good delivery, installation, what
7  have you.  You're just gathering information.
8      And therefore there is no deception
9  involved.  This is just the process of consumers
10 looking for information, evaluating options,
11 crystalizing their own preferences and eventually
12 making a purchase decision.
13     I mean, this is just the reality of how
14 consumers form their preferences.
15 BY MR. PHILLIP:
16     Q.  But that doesn't answer the question of
17 what consumers believe when they put in a search
18 term in Google and what comes back under the
19 sponsored links, does it?
20     A.  Well, I think it does.  I think what it
21 says here is that people do not click on a
22 particular ad or a sponsored link with the idea
23 this link necessarily has a particular brand.
24     Instead they're in the process of
25 gathering information, looking for a good price,

1  looking for a good product and as opposed to
2  clicking on a sponsored link and saying, ah, it
3  necessarily carries brand X, assuming brand X
4  exists.
5      Q.  When you say in 20(A), whether it
6  indicates that consumers were misled, what are you
7  referring to there, misled about what?
8      A.  Well, I think it's pretty clear.  The fact
9  that you often, as a matter of reality, you go to a
10 store looking for a particular product, maybe you
11 have some idea that you want miniblinds, aluminum
12 blinds, wood blinds or whatever, and you go to a
13 store and don't find it.
14     Does that represent someone being misled?
15 The answer is no.
16     Q.  Well, it could.  What if you went to that
17 store because your designer said, if you want this
18 particular brand of blinds, go to this store and
19 you go to that store and it's not there.  Isn't
20 that a form of being misled?
21     A.  Totally not.  I would just say it's a well
22 intentioned designer -- or whoever you said was
23 giving me the advice was misinformed or didn't keep
24 up with the inventory with that store.  I mean, I
25 don't think this has anything to do with being

1  misled.  I presume that the person didn't send me
2  to that store knowing that what he or she was
3  saying was incorrect.
4      Q.  I see.  So they may not have been
5  deceitful, they may just have made a mistake?
6      A.  In that particular example, they may have
7  made a mistake.
8      Q.  Or they might have been deceitful?
9      A.  I'd just assume they made a mistake,
10 especially if they'd like to keep me as a loyal
11 customer.
12     Q.  Okay.  So what else -- what -- I still
13 don't understand what you were saying here when you
14 say, whether that situation indicates that
15 consumers were misled.  Misled about what?  Misled
16 about whether a certain product existed there?
17     A.  No -- yes.  Whether they were misled just
18 because you didn't find it, doesn't mean that you
19 were misled about anything.
20     Q.  Okay.
21     A.  You just did not find it.
22     Q.  Okay.
23     A.  Because not every store carries
24 everything.  It's just a fact of life.
25     Q.  Okay.  So your point here is people shop

1   and sometimes don't find what they're looking for?
2       A.   Yes.
3       Q.   Okay.  And that's just sort of a general
4   observation, I mean, there's no -- that's just your
5   own personal knowledge and opinion based on
6   shopping experience, right?
7       A.   Well, I also know it as a consumer
8   researcher, even though I must admit it is also
9   intuitively appealing.
10      Q.   It's one of those common sense things,
11  sometimes people shop and don't find what they're
12  looking for?
13      A.   Well, and I teach about consumer research
14  and that's related to that.  Yeah, I agree with you
15  it's intuitive and I'm sure you don't need a Ph.D.
16  in anything to know that fact.
17      Q.   One doesn't have to be an expert to know
18  that people sometimes go shopping and don't find
19  what they're looking for, right?
20      A.   I think that's true.
21      Q.   Okay.  How about (B), 20(B), you wanted to
22  address whether consumers are accustomed to the
23  fact that when they search for information about
24  one product or brand, makers of similar products or
25  brands often target them using ads and other

1   promotional means.
2           Why did you feel that question needed to
3   be addressed?
4       A.   It just -- it is directly relevant, I
5   think, because it's the observation that consumers
6   have come to expect that when they were looking for
7   information, for example, by entering certain words
8   in a search engine or by buying from a catalog or
9   by buying anything at the supermarket, for example,
10  that by that they are revealing their preferences.
11          And sellers of the products at issue will
12  try to get their attention and perhaps offer them
13  their own products of that type.  That's just,
14  again, a marketplace reality.
15      Q.   Would you agree with me that that is not a
16  matter of common sense to the layperson, that fact?
17      A.   I don't think it's a question of common
18  sense.  It has to do with consumer learning.
19      Q.   Right.
20      A.   In other words, because consumers have
21  encountered it numerous times in their real lives,
22  they've come to expect that.
23      Q.   What can you -- what kind of empirical
24  data or scientific support do you have for that
25  proposition in 20(B)?

1       A.   Well, I gave one example.  You by orange
2   juice at Safeway and you often would get at the
3   check out -- you'd get immediately a coupon for a
4   competing brands brand of orange juice.
5           I mean, you can look at the store display.
6   Are you looking to find a Sony TV, needless to say,
7   on the same shelf you will see other products.  I
8   mean, that's one reason for putting them -- for
9   organizing them perhaps side by side.
10          If you just bought a house, you would not
11  be surprised to see offers suddenly arriving from
12  finance companies, presumably the real estate
13  company somehow told someone that you are a
14  prospective customer of mortgages and so on.
15          I mean, there are numerous examples and
16  from what we know about consumer learning, they've
17  made that obvious observation.
18      Q.   Consumers have?
19      A.   Yes.
20      Q.   What empirical research or scientific
21  studies are you aware of that support the
22  conclusion that consumers are accustomed to the
23  fact that when they search for information about
24  one product/brands that makers of similar
25  product/brands often target them using ads and

1   other promotional needs?
2       A.   As I said, it's just a basic principal of
3   consumer learning, when something in your life
4   happens over and over again, you learn that that's
5   a realty.
6       Q.   Okay.  But do you know if there are any
7   studies that have actually shown that that is a
8   realty for consumers today?
9       A.   No, I don't think there is -- it is
10  necessary to conducted a survey for something that
11  is, again, quite intuitive and obvious.  Just
12  because something happens over and over again you
13  learn that it happens over and over again.
14      Q.   Well, some people and some people might
15  not learn, so you're making a kind of a sweeping
16  statement here about consumers as a general class
17  being accustomed to this.
18          So I'm wondering what kind of support
19  exists for that out in academia or science beyond
20  this general notion of, you know, people start to
21  become aware after they've experienced it over and
22  over again?
23          MR. PAGE:  Object to the form of the --
24  the form of the speech.  There's no question
25  pending.

1     MR. PHILLIP:  No, there is a question.
2     MR. PAGE:  Okay.
3     MR. PHILLIP:  I can restate it if you'd
4  like.
5     THE WITNESS:  If you're on the Internet
6  and you are constantly bombarded by ads for things
7  that you did not necessarily look for, you just
8  learn that that's their reality and you know
9  that -- you don't need to be an expert on cookies
10  and so on to figure out that if you show that
11  you're interested in something, then you'll start
12  getting related ads targeted at you.
13     Again, it's a matter of -- if you say,
14  does it apply to 100 percent of consumers, maybe
15  not.  Does it apply to consumers who are looking
16  for information about blinds on the Internet, it's
17  extremely likely to apply to the overwhelming
18  majority of them.
19  BY MR. PHILLIP:
20     Q.  Okay.  Well, I understand that's your
21  opinion and I understand that you believe it to be
22  true.  What I'm trying to get at is what kind of
23  empirical data supports that you're aware of,
24  any kind of studies, reports, research, articles?
25     MR. PAGE:  I'll object as asked and

1  answered.
2     MR. PHILLIP:  Okay.  Is the answer none?
3     THE WITNESS:  No, the answer is that it's
4  so obvious, just like, am I aware of studies
5  showing that consumers recognize that advertisers
6  try to sell products to them, I haven't seen any
7  study looking at that.  It's just obvious.
8  BY MR. PHILLIP:
9     Q.  Okay.  Let's go to paragraph 27, then.
10  Are you aware of any studies supporting your
11  conclusion that when using an Internet search
12  engine such as Google, consumers are likely to know
13  that ads and sponsored links that appear on the
14  screen may very well represent products and brands
15  that are different from those entered as the search
16  word?
17     A.  I think I did answer that just saying that
18  there have been many studies in consumer learning
19  that apply to anything that consumers learn from
20  observation, that's one of them.
21     I don't think that there is any study that
22  needed to be conducted specifically for that
23  purpose.  You're looking for general principles
24  that apply also in this case.
25     Q.  So aren't you saying here, Dr. Simonson,

1  that you don't think people using Google are
2  confused by sponsored links?
3     A.  What do you mean by confused by sponsored
4  links, confused about what?
5     Q.  About what the sponsored link represents,
6  what the -- whether it's related to the search
7  terms that they typed in, anything?
8     MR. PAGE:  Object as compound.
9     THE WITNESS:  Related, they might be
10  thinking it's related.  For example, if I'm looking
11  for Sony TV and you show me an ad for a Panasonic
12  TV, then it's related.  Is that -- that's not
13  confusion, though.  I mean, it's just reality that
14  given that I've shown interest in TVs, then other
15  brands of TV are trying to get me to buy their
16  product instead.
17  BY MR. PHILLIP:
18     Q.  Exactly.  So is it your opinion -- are you
19  offering an opinion that when someone enters a
20  trademark as a search term, that they are not
21  confused as to whether the sponsored link is a site
22  that will take them to someplace where they can do
23  business with the company whose trademark they put
24  in the search term?
25     A.  I mean, that's a bit generic.  I mean,

1  obviously there could be truly deceptive sponsored
2  links, for example, if I'm looking for Sony and
3  there is a sponsored link saying, buy directly from
4  Sony and that link is unrelated to Sony, that could
5  very well be deceptive.
6     So I don't think you can offer a
7  generalization, but under normal condition what --
8  I don't know what's normal, but under most
9  conditions I think it is true, at least under the
10  rules that I'm aware of with respect to what Google
11  allows or does not allow.
12     Q.  Right.  So for example, if someone typed
13  in Sony and a sponsored link came back that said
14  great TVs, is it your opinion that consumers know
15  that that link is not related to Sony in any way.
16     A.  I don't know if -- they may click on the
17  link without having any expectation or knowledge
18  whether or not Sony is there.
19     So in other words, if you put -- you enter
20  Sony and you get a sponsored link saying, buy TVs
21  for less, I don't think that consumers would
22  necessarily -- would assume that this particular
23  website sells Sony.
24     It's possible, but they wouldn't know.
25  They would click on that website, they see what it

Page 110

1  offers. If they are -- they would only consider
2  Sony and if that website does not offer Sony, they
3  would just hit the back button and go back to the
4  search results.
5      Q. So do you think it's okay that a
6  competitor can attract traffic that way?
7          MR. PAGE: I'm going to object as vague
8  and ambiguous and calling for a legal conclusion,
9  perhaps.
10         THE WITNESS: I think that consumers, as I
11 said here, consumers would believe that it's quite
12 possible -- in other words, they don't know which
13 brands are offered on a sponsored link that is, for
14 example, that has the heading, buy TVs for less.
15 BY MR. PHILLIP:
16     Q. Uh-huh.
17     A. They're just there. As I said, that
18 information search happens to be real easy to do on
19 the Internet. They would just click. If they were
20 price sensitive and they may find that there is a
21 Sanyo for less, they may change their mind.
22 They're not deceived, they're just searching for
23 options.
24     Q. If they clicked on that site, though,
25 believing that they could find a Sony TV there and

Page 111

1  they get there and they discover they cannot, there
2  is no Sony TV for sell there, is that trademark
3  confusion, in your mind?
4      A. Now you are asking me a legal conclusion.
5  Here, what I said is that consumers have come to
6  expect that when they're looking for a particular
7  product, sellers of that type of product will try
8  to target them, which means that even if they
9  entered a particular trademark, sellers of other
10 trademarks are likely to try to get their business.
11     Q. Okay. What -- so is what your saying
12 that -- are you saying that consumers understand
13 that sponsored listings are paid advertisements?
14         MR. PAGE: I'll object that misstates his
15 prior testimony.
16         MR. PHILLIP: Is that what you're saying?
17         THE WITNESS: I don't think -- did I -- I
18 don't recall saying that.
19 BY MR. PHILLIP:
20     Q. That's my question.
21     A. Whether they know that sponsored links are
22 paid advertising? I'm not sure if they do or do
23 not. I assume over time many of them have learned
24 that fact, whether every single one of them knows
25 that, I'm not sure.

Page 112

1      Q. Well, why do you say consumers are likely
2  to know that ads and sponsored links that appear on
3  the screen may represent products and brands that
4  are different from those entered as a search word?
5      A. I think I just answered that earlier. As
6  I said, it's a fact of life that consumers have
7  learned that when you're looking for a particular
8  product, you have identified yourself as someone
9  who is in the market for that type of product and
10 sellers of that type of product will try to get
11 your business.
12         In other words, once you identify in one
13 way or another by entering a trademark, by entering
14 the product type, you would expect to see ads that
15 are trying to get your business by various brands.
16     Q. Okay. So I think I understand now. So
17 what you're saying is that consumers have come to
18 learn that when they put in a particular search
19 term, whether it's a trademark or a generic product
20 name, that -- that there will be links returned
21 from a variety of sources trying to get their
22 business?
23     A. There may be, yes. Obviously we know
24 there are some terms that you enter and you get no
25 sponsored links at all.

Page 113

1      Q. Right. But you don't -- you can't point
2  to any particular studies that -- that analyze this
3  issue, in other words, no empirical data on this;
4  is that right?
5      A. I'm not aware. But as I said, I don't
6  think -- it's an interesting question -- but at
7  least it's not a publishable question for the
8  simple reason that it's obvious based on the
9  existing principals.
10     Q. Okay. But in a trademark infringement
11 case where, you know, where incidents of confusion
12 can be as low as 10 percent and be actionable, the
13 actual number of people who do believe certain
14 things or don't believe certain things would be
15 relevant, right?
16         MR. PAGE: I'll object it calls for a
17 legal conclusion.
18         THE WITNESS: Now I think we're confusing
19 two different things. When you say 10 percent
20 could be actionable, you mean these are 10 percent
21 of people who think that brand X originated from
22 the source of brand B or has affiliation or
23 received permission, those kinds of things?
24 BY MR. PHILLIP:
25     Q. Right.

29 (Pages 110 to 113)

1    A.  That's quite different than what we are
2    talking about here.
3    Q.  Okay.  How so?
4    A.  I think what we talked about here is the
5    very generic questions capture inside 20(A) and
6    20(B).
7    Q.  Well, I'm not so sure I agree with that,
8    at least as to 20(B), unless I don't understand
9    your point.  But it seems to me that you're saying
10   in 20(B) and in paragraph 27 that consumers
11   understand that sponsored links represent something
12   different from what they put in as a search term.
13       MR. PAGE:  Objection.  There's no question
14   pending.
15   BY MR. PHILLIP:
16   Q.  Isn't that what your opinion is here?
17   A.  I wouldn't -- I wouldn't phrase it like
18   that.
19   Q.  No?
20   A.  I would phrase it the way I did.
21   Q.  Well, okay.  Go ahead.  I'm not trying
22   to -- I'm just trying to understand and I'm reading
23   what's on the paper here and that's what it reads
24   to me.
25       You used the word different.  You say,

1    very well represent products and brands that are
2    different from those entered as a search word.
3    That's your words, right?
4    A.  Yes.  In other words, all I'm saying and
5    I've said it now a few times, is that consumers
6    have learned that what their -- when they've
7    identified themselves as looking for something, say
8    blinds, then sellers of blinds will try to target
9    them.
10   Q.  And do you believe that consumers
11   understand that sponsored links represent that
12   target effort?
13   A.  As I said, they may very well have
14   recognized that it's not, just as many of their
15   organic results do not represent any particular
16   company.
17       I mean, there are numerous, obviously,
18   organic results --
19   Q.  Right.
20   A.  -- that have nothing to do -- maybe
21   nothing to do is too strong, but are not sites that
22   sell the term that was entered as the search term.
23       So obviously many of the results that are
24   on the web pages that are triggered, whatever is
25   the right word for this, when you enter a search

1    term, are not originating from the company that
2    makes that trademark.
3    Q.  Okay.  I was focusing on your use of the
4    word target.  You're saying people out there
5    targeting the consumer.  And when you refer to
6    being targeted, are you talking about the fact that
7    they've -- they've paid for a sponsored listing?
8    A.  They might have or might not.  I'm not
9    sure that every consumer needs to know the
10   financial arrangements between any sponsored link
11   and Google or the company that bid for that
12   sponsored link just as they probably do not know
13   exactly the financial arrangements, if any, between
14   organic results and Google.
15   Q.  In the last sentence in paragraph 27 you
16   say, this common situation has nothing to do with
17   deception or misleading consumers.  What do you
18   mean by that?  Why did you find it relevant to talk
19   about whether this common situation has anything to
20   do with deception or misleading consumers?
21   A.  Well, my understanding is that the lawsuit
22   in this case has something to do with alleged
23   deception or misleading consumers.
24   Q.  Okay.
25   A.  So in that context, I was saying that the

1    common situation whereby consumers who are looking
2    for information on the Internet and see links,
3    sponsored links and other results, that does not
4    create, generally speaking, deception or anyone
5    being misled.
6    Q.  How do you know that?  How can you say
7    that people -- that in this common situation people
8    are never deceived or misled?
9        MR. PAGE:  Objection.  That misstates his
10   testimony.
11       THE WITNESS:  I never said never.
12   BY MR. PHILLIP:
13   Q.  Okay.
14   A.  As I said, if you said -- if you're
15   looking for Sony and someone puts an ad saying,
16   buy -- we are Sony.  Buy directly from Sony, but
17   actually they have no relationship whatsoever with
18   Sony, that could lead to deception.
19       Or, you know, just to give you another
20   example from this case.  If I'm entering Wallpaper
21   USA -- however it's called, USA Wallpaper and I see
22   an ad for American Wallpaper, I may be deceived in
23   that case.
24       In other words, I entered in quotes on
25   Google, USA Wallpaper, and I see the result

Page 118

1  American Wallpaper, and let's say someone told me,
2  hey, you need to buy wallpaper from USA Wallpaper
3  and I see an ad from American Wallpaper, and I'd
4  say, well, probably that person got a little
5  confused.
6      And that happens to be the first, you
7  know, the first listing just above the organic
8  results, it's conceivable that I would be confused.
9  You would say that American is sometimes used
10  interchangeably.
11     Q.  Are you saying it's not conceivable that
12  someone could be confused by putting in USA
13  Wallpaper and getting a sponsored link that says
14  just wallpaper and clicking on that believing that
15  because they put in USA Wallpaper that they'll be
16  able to buy it at just wallpaper?
17     A.  I say it's very unlikely.
18     Q.  You're just saying that's very unlikely?
19     A.  I say, given this realty, yes, I'm saying
20  that's very unlikely and I have not seen any
21  evidence to the contrary.
22     Q.  Okay.  Nor have you seen any evidence
23  supporting your conclusion that in that situation
24  there wouldn't be confusion; is that right?
25     A.  As I said, based on the basic principles

Page 119

1  that I teach, I would conclude that the likelihood
2  is low.  Have I seen a survey looking at that
3  specific question?  The answer would be no.
4      Q.  Okay.  Do you know -- do you have any
5  information about how many use the Internet in the
6  United States?
7      A.  I think it's changing all the time.  It's
8  probably by now approaching one hundred million.  I
9  don't know.
10     Q.  Do you know how long Google has been
11  returning sponsored listings on it's search engine?
12     A.  I don't know the exact date to which they
13  started.
14     Q.  Do you have an estimation as to the number
15  of years?
16     A.  Several years.  I don't know.  I don't
17  have the exact date.
18     Q.  Okay.  Are you aware of any research that
19  deals with people's understanding as to what a
20  sponsored listing is?
21     A.  I don't think that I've seen -- I don't
22  recall seeing a study on that.
23     Q.  You don't?
24     A.  I do not.  I kind of vaguely recall maybe
25  seeing it somewhere, but I could very well be wrong

Page 120

1  on that.  I definitely do not have any specific
2  recollection.
3      Q.  Do you think the phrase, sponsored
4  listing, is clear?
5      A.  I would think so.  Sponsored means that
6  someone sponsored it; i.e., paid for it, which is
7  what happens with advertising.
8      Q.  Okay.  Do you think it's clear that the
9  person who sponsored it; i.e., paid for it, is
10  someone other than the name of the trademark that
11  gets put in as the search term?
12     A.  I would think it's just as clear as any
13  advertising is clear.  You ask me, well, I see an
14  ad for lighting fixtures.  Do I know exactly who
15  put this ad?  I presume it's the store.  Maybe it's
16  the parent company.  I don't know.
17     I don't see any difference between this
18  and any accepted form of advertising.
19     Q.  Okay.  The next section in your report you
20  criticize Mr. Ossip for not having used a control
21  in his study; is that right?
22     A.  Yeah, you can put it that way.
23     Q.  Okay.  And what generally is a control?
24     A.  A control is designed to estimate the
25  level of noise or error and any systematic biases

Page 121

1  in the survey.
2      Q.  Uh-huh.  Is it always necessary to use a
3  control in a confusion study?
4      A.  Yes.  Whenever you are looking at a cause
5  and effect relationship, you must include a
6  control.
7      Q.  Uh-huh.  Is there ever -- are there ever
8  situations when it's okay not to have a control?
9      A.  I'm not familiar with such situations.
10     Q.  Have you ever done a confusion survey
11  without using a control?
12     A.  I don't think so.  Certainly not on the
13  behalf of a plaintiff --
14     Q.  Right.
15     A.  -- but a --
16     Q.  You might not need one on behalf of a
17  defendant if there was no confusion, right?
18     A.  Exactly.
19     Q.  Okay.
20     A.  But I can't think of any situation where I
21  did not use a control.  It doesn't mean that every
22  time you label something a control, but whenever
23  you have a benchmark that's effectively a control.
24     Q.  Right.  So you've suggested using the term
25  blinds as a control for Mr. Ossip's study, right?

31 (Pages 118 to 121)

DR. ITAMAR SIMONSON

1    A.   That would be one obvious control.

2    Q.   And would -- would everything else remain

3  the same if using that control?  In other words,

4  would it be, in your view, acceptable to -- to have

5  a control cell with the same questions and stimuli

6  and the only thing that's different is they're told

7  that they put in blinds instead of american blinds?

8    A.   I think that would be a big step forward.

9  The survey may suffer from other flaws.

10   Q.   Right.

11   A.   But because at least some of those flaws

12  would also apply to the control, perhaps not to the

13  same degree, but at least some of them may apply to

14  the same degree.  And therefore by including such a

15  control, you'll be able to find out the level of

16  noise.

17   Q.   By changing the search term from a

18  trademark to a generic term, what are you

19  controlling for?

20   A.   You put the term blinds, for example, you

21  show the same results, the same sponsored links,

22  and you ask people -- you point -- A, you ask, you

23  know, if you wanted to go to find American

24  Blinds -- let's assume that they research a brand.

25       Let's say you want to look for American

1  Blinds, where would you go first?  And let's say

2  that you find that 5 percent point to the sponsored

3  link as opposed to 10 percent who did it when the

4  search term was american blinds.  So that would be

5  10 minus 5 would give you a net of five and then

6  you have to figure out whether five is significant

7  or not, but that's a separate issue.

8       Then, as Mr. Ossip did -- again, using his

9  methodology, you are pointing to, say, just blinds

10  and you say, would you find American Blinds on

11  this -- in this website?  You look at the

12  percentage.  You do the same thing.  So you

13  followed everything the same way.

14       Now, obviously, consumers, until they

15  click on the website, they don't know which brands

16  are offered there, but because you asked them

17  whether they'll find American Blinds, in all

18  likelihood, some people say, maybe many, yes, I'll

19  find American Blinds, why else would you ask me

20  this question?  That is noise.

21       In other words, that has nothing to do

22  with the search term because under your

23  hypothetical, american blinds was not entered, only

24  blinds was entered, which is by all views, a

25  generic term.

1       In other words, the mere fact that you

2  pointed to this link and you said, is there

3  American -- can you buy American Blinds there and

4  someone said yes, well, it tells you there's

5  nothing to do with the search term because american

6  blinds search term was never entered.

7    Q.   Right.

8    A.   It's just because the question was asked

9  and the survey procedure was followed.

10   Q.   But wouldn't there be a problem because if

11  you put in just blinds then the person is looking

12  for information about blinds, not necessarily one

13  brand of blinds?

14       If they were looking for American Blinds,

15  wouldn't they put in american blinds?

16   A.   I'm not sure I understand your question.

17  The survey is designed to find out how many

18  consumers were misled.

19   Q.   I understand that.  But your positing an

20  approach where you say, okay, assume you put in

21  blinds.  Now, where would you go for American

22  Blinds?  Well, if I'm a respondent, I would think,

23  well, that's odd, if I put in -- if I wanted to

24  find American Blinds, I would put in american

25  blinds.  You don't agree with that?

1       MR. PAGE:  I'll object to the -- well.

2       THE WITNESS:  I don't know.  That seems to

3  me an irrelevant point.  The question is, you point

4  to just blinds.com and you say, can you buy

5  American Blinds at this website?  Now, some people

6  might say, I don't know.

7       But if your theory is correct, then

8  significantly fewer people would say yes, right,

9  because they didn't enter -- they were not asked to

10  assume that they entered the term american blinds.

11 BY MR. PHILLIP:

12   Q.   Uh-huh.

13   A.   So therefore that could be a proper

14  control.

15   Q.   Would you be concerned about there would

16  be some confusion -- strike that.

17       Would you be concerned about the

18  potential -- what's the word I'm looking for -- the

19  potential effect on the respondent from telling the

20  respondent that, you know, assume you put in blinds

21  and then showing them search result where the

22  organic search results are mostly talking about one

23  brand of blinds, American Blinds?

24   A.   I would not.

25   Q.   In other words, that wouldn't be the

Page 126

1  search result that the consumer would expect to get
2  if they just put in blinds?
3      A.  I don't know.  I don't think that that
4  would be a concern.  I'm not sure how many
5  consumers have some theories about the algorithm
6  that generates organic results or in the context of
7  the survey that would be a significant factor, but
8  somehow they would analyze and say, well, here is
9  American Blinds.
10         Let's assume that they know to research a
11  brand or think, is there American Blinds, which
12  sounds like a perfectly legitimate organic result.
13  I mean, there are blinds that are made and sold in
14  America.  So there is nothing unusual there.
15      Q.  Okay.  So have you any other suggestions
16  for what a proper control would be?
17      A.  You know, I haven't thought -- that seems
18  so obvious.  I haven't thought about others.
19      Q.  Okay.
20      A.  I mean, you could have asked about a
21  different brand.  That would be another control.
22  Like, would you find -- I don't know, name another
23  brand.
24      Q.  Uh-huh.
25      A.  That could be another control.

Page 127

1      Q.  Okay.
2      A.  This was an especially easy survey for
3  which to find a control.
4      Q.  Would changing the appearance of the way
5  the listings come back be a proper control, in
6  other words, moving the sponsored listings down to
7  the bottom and putting a disclaimer saying that
8  these listings aren't related to the search term?
9      A.  I don't know.  Now you -- that's an
10  open -- there are infinite possibilities about
11  moving it two inches down or an inch and a half up.
12  I don't see any need for that.
13         I mean, the key here is whether the
14  consumers are misled after entering the term
15  american blinds by the sponsored links that appear.
16  So I think that's really the question, not exactly
17  the positioning.
18         I understand the complaint is not saying,
19  how come the sponsored links appear two inches to
20  the right or whatever.  My understanding, that's
21  not the basis for the allegations here.
22      Q.  Well, I think you're mistaken on that.
23  You're aware that the ordering of listings can have
24  an impact on the click-through rate, right?
25      A.  Yes.

Page 128

1      Q.  And that's why right now the sponsored
2  listings are either at the top of the organic
3  listings or directly to the right of the top of the
4  organic listings, correct?
5      A.  Yes.
6      Q.  And so if you assume -- if you just accept
7  my representation that the manner in which the
8  listings are presented in response to a search term
9  in the trademark is part of the problem, would it
10  be an acceptable control to just move the sponsored
11  listings down to the bottom and put a disclaimer
12  up?
13      A.  No.
14      Q.  And why not?
15      A.  No.  I mean, I don't think that's the
16  question.  The question is whether -- I forget how
17  Mr. Ossip defined his mandate, but I believe he
18  said, whether consumers who enter the search term
19  american blinds in the Google search engine are
20  misled by their results by the sponsored links
21  appearing on the web results.
22         That's the question.  So the question is,
23  in other words, you have to enter the terms
24  american blinds and then you are misled by the
25  links.  It doesn't say are misled because the

Page 129

1  links -- the sponsored links appear one inch from
2  the top as opposed to four and a half inches from
3  the top.  I just didn't see that in his objective
4  for the survey.  So therefore that would not be my
5  control.
6      Q.  Okay.  But if it was his control, why
7  wouldn't that have been acceptable, what would your
8  criticism be?
9      A.  Because it would have the same problems
10  that we talked about.
11      Q.  I don't understand.  What would the same
12  problems be?
13      A.  Well, because it still would not show in
14  any way that the beliefs or the answers had
15  anything to do with entering the key words,
16  american blinds.
17      Q.  Well, but you understand that the
18  infringement is not the fact that people type in
19  american blinds, or the alleged infringement is not
20  the fact people type in american blinds, it's what
21  comes back in response to that?
22      A.  Yeah, that's my understanding.
23      Q.  So if you were to compare what's currently
24  coming back versus, you know, rearranging it in
25  some way and you didn't have -- and you didn't have

Page 130

1  confusion in the rearranged way, which is your
2  control cell, why wouldn't that be -- why wouldn't
3  that be an acceptable control?
4      A.  I guess we might be miscommunicating.  The
5  question is whether people who are, by your
6  assumption, looking for the brand called or the
7  company called American Blinds --
8      Q.  Uh-huh.
9      A.  -- are misled by the resulting sponsored
10  links, right?
11      Q.  Right.
12      A.  So it means these people are looking for
13  American Blinds, but if they entered, say, blinds,
14  there is no evidence -- it may be in their head
15  they're looking for American Blinds, they've not
16  shown it in their behavior yet.
17          And therefore, that is the relevant
18  control.  The location has nothing to do with it.
19      Q.  Do you know why Dr. Jacobe didn't use car
20  insurance as a control in his study?
21      A.  I don't remember his controls.
22      Q.  Okay.  Then the next section of your
23  report is -- it starts on page 14 and is related to
24  this issue of whether American Blinds is a brand
25  name and is likely to have secondary meaning,

Page 131

1  correct?
2      A.  Yes.
3      Q.  Okay.  And what is the basis for your
4  statement that American Blinds is not a brand name?
5      A.  I just, at least, haven't seen it used as
6  such.  You would think that, for example, if there
7  is such a brand, it would be displayed among the
8  listed brands on the American Blinds & Wallpaper
9  Factory website.  It's not.
10      Q.  Okay.  So you looked at the website.
11  Anything else?
12      A.  No, I just looked at various web sites
13  that sell blinds.  I looked at yellow pages.  I
14  just did not encounter that brand.
15      Q.  Okay.  Isn't it possible that a company
16  that's called American Blinds Wallpaper and More
17  can be known as American Blinds?
18      A.  It's conceivable.  I do know, though, how
19  challenging it is even for companies that
20  constantly push a particular name to build brand
21  equity and to build recognition and secondary
22  meaning that a company that doesn't bother to do it
23  in a consistent fashion is extremely unlikely to
24  develop such second meaning.
25      Q.  Do you know how long American Blinds has

Page 132

1  been selling blinds at AmericanBlinds.com?
2      A.  When you say AmericanBlinds.com as opposed
3  to decoratetoday.com?
4      Q.  I'm talking about AmericanBlinds.com, yes.
5  Do you know how long that they've been using that
6  website -- that URL, excuse me?
7      A.  I don't remember the exact date.  I
8  probably have seen it someplace.  I know that today
9  if I click on AmericanBlinds.com link, I don't get
10  that website.
11      Q.  Do you know how long they've distributed
12  catalogs with the AmericanBlinds.com URL on the
13  front page of the catalog?
14      A.  I don't know when they started.
15      Q.  Would you agree with me that if a company
16  had used AmericanBlinds.com as its Internet address
17  in all of its advertisements and catalogs and such,
18  that that could give it brand name recognition?
19      A.  I don't know what to make of could.  If
20  that's what they've done, it's unlikely.  It's
21  unlikely for the reason that I indicated.
22  Obviously there are millions and millions of web
23  sites and we're bombarded every day by dot.coms all
24  the time which we don't memorize.
25          Moreover, this category in particular,

Page 133

1  it's not like you're buying blinds every day.
2  You're probably doing it once every three years,
3  five years.  So you're not paying attention to
4  blinds all the time.  You're only doing it when
5  you're about to buy the product.
6          So it's unlikely the fact that they've
7  been using it for years, it's extremely unlikely
8  that it would affect any single consumer at the
9  time when they are actually looking for blinds.
10      Q.  Okay.  Did you consider doing a secondary
11  meaning study?
12      A.  No.
13      Q.  You've done them in the past, though?
14      A.  I have.
15      Q.  And Mr. Ossip didn't do a secondary
16  meaning study, did he?
17      A.  He did not.
18      Q.  But he did include awareness of American
19  Blinds as a company or a brand in the screening
20  questionnaire, didn't he?
21      A.  Without controls, he did.
22      Q.  And then in the -- in the test
23  questionnaire he, again, repeated American Blinds
24  as a company and a brand name, didn't he?
25      A.  Yeah, he referred to it -- I don't recall

1  it exactly, but I think he said, oh, earlier you
2  told me you're familiar with this. So now assume
3  that you're looking for that. It's very ambiguous
4  whether he was referring to a company or to a brand
5  of blinds.
6      Q.  So getting back to something that we
7  talked about earlier in this deposition, if at that
8  point in the survey the consumer believes that
9  there is a company called American Blinds or a
10  brand called American Blinds, whether they're
11  guessing or not, and they enter it in Google
12  believing that it's a trademark, then if they are
13  confused as to what the sponsored links represent,
14  it shouldn't matter whether it's actually a
15  trademark or not?
16      A.  We don't know if --
17      MR. PAGE:  Objection. There's no question
18  pending.
19  BY MR. PHILLIP:
20      Q.  Do you agree with that?
21      A.  No.
22      Q.  Why not?
23      A.  I disagree with it. We don't know if they
24  believe that there is such a brand at that point
25  and what it meant, whether it's a company, whether

1  it's a brand, whether it's blinds made in America.
2  We don't really know any of that.
3      In fact, if you look at the open-ended
4  answers, you would expect if they believe they
5  research a brand, they would say -- they would make
6  references to that brand. I didn't see many
7  references to that or references to the search term
8  that was entered. Oh, there were a few that did in
9  the later questions.
10  BY MR. PHILLIP:
11      Q.  But didn't you agree with me this morning
12  that you could extrapolate from any one survey that
13  shows either confusion or no confusion in this
14  situation, using the Google search engine, that you
15  could extrapolate from that that applies to any
16  marks?
17      MR. PAGE:  Object. That misstates his
18  testimony.
19  BY MR. PHILLIP:
20      Q.  Wasn't that your testimony this morning,
21  that logically, that that would follow, which is
22  why you accepted Mr. Page's revision to your
23  report?
24      A.  No, I don't think that's what I said.
25      Q.  No?

1      A.  No.
2      Q.  Okay. Well, how did I misstate you just
3  then?
4      A.  Could you repeat the question again.
5      Q.  Didn't you agree with me this morning that
6  you could extrapolate from one survey that shows
7  either confusion or no confusion in this situation
8  using the Google search engine, that you could
9  extrapolate from that as it applies to any marks?
10      A.  I thought that what we talked about this
11  morning focused on a very specific issue.
12      In other words, if I recall correctly,
13  what we talked about this morning had to do with
14  the connection between the search term and products
15  that are sold by advertisers on the results web
16  page. I recall -- maybe I'm forgetting what we
17  talked about. I think that's what I talked about.
18  I believe that's what we discussed.
19      Q.  I'm referring to how you accepted
20  Mr. Page's revision to your report from specific
21  search term, search term at issue to any trademark
22  put in as a keyword. That's what I'm referring to.
23      A.  And I believe I said -- again, we could --
24  we have it on the record. I think I remember the
25  context of what we talked about, and what I said is

1  that based on the survey results, we can conclude
2  more generally that the mere fact that a certain
3  search term was entered does not lead consumers to
4  believe that every ad that appears on the results
5  page is by the company named in the search term.
6      I believe that's what we talked about.
7      Q.  Okay. I had a different understanding,
8  but that's okay. We'll just move on and let the
9  record speak for itself on that.
10      Okay. Then the next section you take
11  Ossip to task for not approximating marketplace
12  conditions, right?
13      A.  Yes.
14      Q.  Did you understand what Ossip was -- why
15  Ossip used the stimuli that he used?
16      A.  I heard what he said --
17      Q.  What was that?
18      A.  -- during his deposition testimony and I
19  guess also he mentioned it in his report.
20      Q.  And what was that?
21      A.  That he was interested in a world that
22  would have existed had ABWF not needed to
23  defensively place sponsored links that are
24  triggered when the search terms are american
25  blinds.

Page 138

1    Q.   Okay.  And his stimuli were consistent
2   with that, correct?
3    A.   Well, they were -- his stimuli deviated
4   from marketplace conditions in other ways.  In
5   other words, he manufactured a web page that would
6   never exist even if we were to put aside the
7   omission of ABWF links.
8    Q.   And how so?
9    A.   Well, for example, as I recall correctly,
10  in phase one he had just one sponsored link.
11  That's about half his survey respondents.  They saw
12  only one link.  I've tried entering american blinds
13  and blinds and so on, I've never encountered a case
14  where there is just one sponsored link.
15   Q.   Okay.  Have you ever -- have you been told
16  by Google that that will never occur?
17   A.   I didn't talk to Google about that.  It's
18  just as a matter of fact does not appear to be the
19  case.
20   Q.   Okay.  But you don't know one way or the
21  other whether that could, in fact, happen?
22   A.   I think that's obviously extremely
23  unlikely because the term blinds is a fairly common
24  term.  There are many marketers competing for the
25  business of people who are looking for information

Page 139

1   about blinds.  So it's extremely unlikely there
2   will be just one sponsored link.  Is it impossible,
3   I guess anything is possible.
4       If blinds go out of fashion and there is a
5   new technology, maybe.
6    Q.   So how many sponsored links do you believe
7   would appear even assuming no defensive bidding by
8   American Blinds?
9    A.   I don't remember exactly.  Six -- I don't
10  know, I'm just throwing a number.  I don't remember
11  exactly.  There were several.
12   Q.   Okay.  How else are you saying that it
13  didn't approximate real life conditions even
14  assuming no defensive bidding by American Blinds?
15   A.   Well, I think the fact there was just one
16  link and then the four other links -- sponsored
17  links that were in the so-called phase two, were
18  also -- again, there is no such situation in the
19  real world where you have these four.
20       And again, there is no link that would
21  take you to ABWF website.
22   Q.   In the sponsored links?
23   A.   Correct.  In other words, what he did --
24  he led you.  After he asked you where would you go
25  first, most of his so-called confusion was

Page 140

1   generated by those four sponsored links which
2   people did not select originally.
3       So he took them to say, in phase two, to
4   four links and said, would you find here American
5   Blinds, would you find here American Blinds,
6   et cetera.  And I was surprised that he didn't find
7   higher numbers of people saying at least one of
8   them would allow you to buy American Blinds.
9       MR. PAGE:  Rob, when you get to a good
10  spot, I could use a break.
11      MR. PHILLIP:  Now is fine.
12      (Recess taken.)
13  BY MR. PHILLIP:
14   Q.   So Dr. Simonson, did you save any of your
15  searches or screen shots when you were trying to
16  figure out what a representative search result
17  would look like?
18   A.   No.
19   Q.   Are you aware that you can -- currently,
20  even with bidding, put in American Blinds in the
21  search term and not have it come back as the first
22  sponsored listing?
23   A.   I haven't --
24      MR. PAGE:  Let me object that it assumes
25  facts.

Page 141

1       THE WITNESS:  I haven't checked that.
2   BY MR. PHILLIP:
3    Q.   Okay.  Do you know whether if you put in
4   american blinds currently that it can come back not
5   in the sponsored listings at all?
6       MR. PAGE:  Same objection.
7       THE WITNESS:  I presume there is a bidding
8   system, so if you don't bid high enough, I think
9   order could come in different forms.
10  BY MR. PHILLIP:
11   Q.   Okay.  So there may be -- there may be
12  situations where using a stimuli that doesn't have
13  American Blinds in the sponsored listings actually
14  does replicate market conditions, correct?
15   A.   You mean that it does not appear at all?
16   Q.   Yes.
17   A.   At least I haven't encountered such a
18  case.
19   Q.   But it could occur?
20   A.   In theory, I presume it could occur.  It
21  clearly is not a typical marketplace condition, at
22  least as far as I can tell.
23   Q.   Okay.  Turn to the next section in your
24  report that starts on paragraph 48 where you were
25  critiquing the universe.

1    So this is the women only issue, correct?
2    A.   That's one of them.
3    Q.   Okay.  Well, first of all, have you ever
4  done a study where you only included women?
5    A.   I can't remember one, but it's not
6  inconceivable.  It's not inconceivable that I did
7  that, obviously after research showing that
8  100 percent of the relevant consumers are of one
9  gender.
10    Q.   Would it have to be 100 percent to justify
11  doing it this way?
12    A.   Fairly close, yes.  For example, I just --
13  I can't name it.  I just recently did a survey
14  involving a certain cosmetic product, and in that
15  case, you would think is overwhelmingly women;
16  turns out not exactly.  So I had 80 percent of the
17  respondents women and 20 percent men.
18    Q.   Uh-huh.
19    A.   And obviously you need to base it on the
20  best evidence available.
21    Q.   Right.  And if the best evidence available
22  to Mr. Ossip was that the relevant consumer was
23  overwhelmingly women in the case, what harm did he
24  do to the survey by not including any men, assuming
25  that there are some men out there who have

1  purchased blinds?
2    A.   Well, it just misrepresented the relevant
3  universe which is an important principal of surveys
4  conducted in the context of litigation.
5    Q.   But does it necessarily make the results
6  so unreliable as to be fatal?
7    A.   No, I would not say that.
8    Q.   Okay.  And if you have a real low
9  percentage of men as customers, would you agree
10  that it can be very difficult and time consuming
11  and expensive to try and find and screen them for
12  the survey?
13    A.   Not at all.  If you tell me it's one in
14  500, yes.  In this case, I'll probably be -- I
15  mean, I haven't looked at the data and it appears
16  that Mr. Ossip didn't either.
17    But I would be more inclined to divide the
18  respondent sample 50/50 between men and women as
19  opposed to doing 100 percent women and 0 percent
20  men because we're dealing with information research
21  on the Internet that we know and Mr. Ossip knew
22  from the documents given to him that men are more
23  likely to use search engines.
24    Q.   How did Mr. Ossip know that?
25    A.   That was just among one of the documents

1  that were produced as having been available to him
2  and that was based on a study, I believe, conducted
3  by Pew Research or something like that.
4    Q.   Okay.  Was that a study that you had seen
5  before?
6    A.   No.  But I've seen it in the context of
7  this case.
8    Q.   Right.
9    A.   Furthermore, blinds, that strikes me as a
10  family decision.  I would assume that men have a
11  significant role in installing them, so I just
12  don't see any reason why anything close to
13  100 percent women would be representative of the
14  relevant universe.
15    Q.   Uh-huh.  Okay.  If you go to the next
16  section in your report about the survey questions
17  being biased and leading.  What were biased about
18  the questions?
19    A.   There were -- if you have the
20  questionnaire here, I can be very specific.  But
21  they were biased in the sense that they suggested
22  that one or more of the sponsored links offered
23  American Blinds products.
24    Q.   How are they any more bias than, you know,
25  the ever-ready questions?

1    A.   Well, ever-ready questions are open-ended.
2    In other words, you don't say, who puts
3  out the Sanyo camera?  You don't ask that.  And you
4  don't ask, does Sanyo camera put out Sony cameras,
5  which would be equivalent to what Mr. Ossip did.
6    You show them a product and you say, which
7  company puts it out?  And then you ask, is it
8  affiliated with another company?  And if they say
9  yes, say, which other company?  These are
10  open-ended questions.  Whereas Mr. Ossip pointed to
11  one link after asking, where would you go first?
12    Q.   So that first question was okay, that
13  wasn't biased?
14    A.   That question was not biased, putting
15  aside the presentation of, for example, one link,
16  one sponsored link and the fact that the question
17  is highly ambiguous, but it was not biased.
18    Q.   Okay.  And that's the question four, four
19  (A)?
20    A.   Could be.
21    Q.   Yeah.  Okay.  So you're saying that it was
22  the follow-up questions where he had the cursor
23  move to a specific link and they were asked what
24  they think they would get by clicking on that link?
25    A.   No, they didn't ask that question.  They

Page 146

1    asked, could you -- to paraphrase, could you buy
2    American Blinds on that website?
3        Q.  Right.
4        A.  That's what I mean.  That's a
5    suggestive -- leading, biased -- whatever you want
6    to call it, question.  And then he repeated that,
7    let's say in phase two, for four different links.
8        Q.  Okay.  In his question five he said,
9    without actually doing so, if you were to click on
10   the particular listing I have moved the cursor on,
11   do you think it would or would not take you
12   directly -- or link you to a website where you
13   could order American Blinds online or don't you
14   know.
15       So they had an option to say that it would
16   or would not and they had an option to say they
17   didn't know.  Does that help to make it nonbias and
18   nonleading?
19       A.  No, it's still bias and leading because
20   you selected a particular thing.  In other words,
21   think on the psychology of the respondent here.
22       You first asked where would you go first.
23   All those 10 percent or so who gave the right
24   answer, they selected the link as he designated
25   representing confusion.

Page 147

1        Now, the remaining people are now asked,
2    now, let me take you to this one, can you get
3    American Blinds there or not?  If you're a
4    respondent saying to yourself, well, you know,
5    obviously I got it wrong and now they're trying to
6    help me out.  Let's say you still say, well, I
7    don't know.
8        So then they give you another chance.
9    They take you to the next one and say, well, how
10   about this one?  You've got here a tough respondent
11   who is not giving up.  And they're continuing,
12   third time and fourth time, saying, now, is this
13   it?
14       At some point -- I guess in this case not
15   most people, but some people are going to say,
16   yeah, how many chances would I get here, they're
17   trying to tell me something about the fact that I
18   can't buy there.
19       Q.  Well, in looking at the verbatim
20   responses, was there anybody who said no, no, no,
21   all right, yes already?
22       A.  No, respondents tend not to say those
23   kinds of things.
24       Q.  Did you see anyone who said no, no, no,
25   and then yes at the fourth one?

Page 148

1        A.  No.  Even from the first one that they
2    were asked was biased and leading because, as I
3    said, the first question was, where would you go
4    first?  You said something like you pointed to some
5    organic result.
6        Okay.  Now, you're thinking to yourself --
7    okay, now they take you by the hand, effectively,
8    and they say now, could you get it here?  Wouldn't
9    a reasonable respondent say, well, they're trying
10   to tell me something here?
11       Q.  Okay.  So how else were the questions
12   biased or leading?
13       A.  I think that's the --
14       Q.  That's it?
15       A.  I think that's the main way.  These are
16   pretty much all of the questions that he had there.
17       Q.  Right.  You stated that -- at the last
18   section of your report about what can we learn, you
19   end up concluding that a negligible percentage,
20   less than 3 percent, made any reference to the
21   search term when explaining why they said yes when
22   asked whether they could order American Blinds from
23   the links shown to them.  Do you recall that?
24       A.  I do.
25       Q.  Okay.  Do you have a tally of which

Page 149

1    responses constitute that 3 percent?
2        A.  You know, I just went through his report
3    and he has certain pages where he listed all the
4    open-ended answers that he counted as reflecting
5    confusion and I just counted on those pages how
6    many referred to the search term.
7        Q.  Okay.  But you haven't -- I mean, you
8    could have indicated by respondent number or
9    response which ones you were including and which
10   ones you weren't including, right?
11       A.  I could have, but numbers were so small
12   that I saw no reason to do that.  If it was
13   borderline, maybe I would have thought to do it,
14   but I thought the evidence and the conclusion was
15   so clear that there was no sense of doing that.
16       Q.  Except there's no way for us to tell
17   whether it's 3 percent or 6 percent or 9 percent
18   based on what you've done here.  That's not a
19   question.
20       MR. PAGE:  What he said.
21       MR. PHILLIP:  I beat you finally.
22       Q.  Have you ever, in preparing a report,
23   reviewed the verbatims and made your calculations
24   of confusion answers based on your own personal
25   review of the verbatims?

38 (Pages 146 to 149)

Page 150

1   A.  As I said, I looked at the answers that he
2   considered as reflecting confusion and just counted
3   how many people.
4   Q.  Right.  In your own experience, though, in
5   doing other studies, have you created reports based
6   on those studies where you tallied up what you
7   considered the confusion responses to be by
8   reviewing the verbatims?
9   A.  By reviewing the verbatims, I don't have a
10  recollection of that.  I did reanalyze the other
11  side's survey results.  I don't remember if that
12  was necessarily based on verbatims.
13  Q.  I'm talking about in cases where you've
14  done your own surveys and issued your own reports,
15  have you --
16  A.  I'm sorry.  So you're asking about my own
17  reports?
18  Q.  Yes.
19  A.  Whether I classified it based on -- in a
20  few cases?
21  Q.  And is that -- I mean, was there anything
22  improper in doing it that way in the few cases that
23  you did it that way?
24  A.  When I did it, it was proper.
25  Q.  Oh, okay.  Have the rules changed?

Page 151

1   A.  What do you mean?
2   Q.  I take from your answer that you're
3   implying that somehow when Mr. Ossip did it, it was
4   improper?
5   A.  I see.  Are you asking whether I coded the
6   responses myself?
7   Q.  Yes.
8   A.  I'm sorry.  I completely misunderstood
9   you.  I thought that you were asking whether I
10  looked at it.  No, I don't do that.
11  Q.  Okay.
12  A.  I asked -- in fact, Larry Herman, who is
13  now with Target Research Grouch, but I've worked
14  with him over the years when he was in various
15  companies.
16      He works with another firm that does the
17  coding of open-ended answers.  They don't know
18  anything about who sponsors the survey, what a
19  survey is about.  They just take the open-ended
20  answers and code them.
21  Q.  Right.
22  A.  And I asked them to prepare a very
23  detailed list of code so they don't need to use any
24  judgment.  Unless someone used virtually the same
25  words, they would put it in separate categories.

Page 152

1   And then they prepare tables to see what
2   percentages -- what are the frequencies of each
3   specific word or phrase.
4       And then we report it and then the results
5   are tabulated and then I use it in my report.  No,
6   I do not in the context of litigation or in other
7   context.  In fact, if I were to submit an article
8   to a journal, a referee journal with me, the
9   researcher, who knows the hypothesis doing the
10  coding, the reviewers would reject that paper.
11      Because whether I intend to be so or not,
12  you cannot be objective about your own hypothesis.
13  Now, there are some cases where it's just a matter
14  of counting words.  Like, how many words the
15  respondents used.  Something like that, that's
16  different, that's something you could do.  Whenever
17  there is any subjective judgment involved, you need
18  to use so-called blind judges.
19  Q.  What's the lowest percentage of confusion
20  results that you have reported as indicating a
21  likelihood of confusion in a case?
22  A.  I don't remember.
23  Q.  You don't?
24      MR. PAGE:  Let me also object as calling
25  for a legal conclusion.

Page 153

1   BY MR. PHILLIP:
2   Q.  Well, don't you typically, in your
3   reports, say, this study shows that there's a
4   likelihood of confusion?
5   A.  I would say, I mean, if it's borderline, I
6   would say it appears to be above noise level.  I'm
7   on record of saying -- and this is really a legal
8   question.
9   Q.  Yes.
10  A.  So what I have said many times, is when
11  it's 15 percent or over, courts have typically
12  regarded that as significant.
13  Q.  Uh-huh.
14  A.  If it's between, you know, 10 or so, you
15  know, I think there were a couple of cases where
16  even less than 10 was regarded as sufficient, up to
17  15, you know, it depends, I think, on the survey.
18      If you have a strong survey that does not
19  have major flaws, has proper control, et cetera,
20  then it could be significant.  If it's, say, below
21  5 percent -- and again, this is a legal issue -- if
22  it's below 5 percent, I'm not aware of any case
23  where that was regarded as significant.
24  Q.  Okay.  What's the lowest where you have
25  said this is in the ballpark, 10?

1    A.  You know, I can think -- there is a case
2  that's going on now where there are two parts of
3  the survey where one part -- with different
4  stimuli, one part showed, I think, something like
5  close to 9 percent and the other one showed close
6  to 17 percent or 16 percent.
7        So if you combined the two, you get to
8  about whatever it is, 12, 13, and I regarded that
9  as significant, especially considering that I think
10  that I've used a very conservative methodology.
11    Q.  Okay.  So that's the lowest you can
12  remember, 12 to 13?
13    A.  I cannot remember -- I cannot remember
14  another case that was lower, but as I said, I'm
15  aware there were cases where 8 percent was regarded
16  as significant.
17    Q.  Do you have any opinion about whether a
18  Google user is more or less likely to be misled or
19  confused if the trademark is used in the ad text of
20  a sponsored link versus only as a keyword?
21    A.  Versus only?
22    Q.  As a keyword?
23    A.  Could you repeat that question?
24    Q.  Sure.  Do you have an opinion about
25  whether a Google user is more or less likely to be

1  misled or confused if the trademark is used -- if
2  it appears in the ad text of a sponsored link as
3  opposed to only as the keyword?
4    A.  I have no evidence of confusion, period.
5  So I really can't answer that.
6    Q.  Okay.  Do you have -- do you agree that
7  Google knows that users tend to click on the first
8  four or five or six or seven links displayed in
9  response to an inquiry?
10        MR. PAGE:  I'll object that it calls for
11  speculation.
12        THE WITNESS:  I have no idea.
13  BY MR. PHILLIP:
14    Q.  Okay.  Are you aware of a patent
15  application that Google has filed for a method of
16  reducing confusion from the manner in which search
17  results are returned?
18    A.  Nope.
19        MR. PAGE:  Object as it assumes facts.
20  BY MR. PHILLIP:
21    Q.  Do you know how much time and money
22  American Blinds has spent developing its brand?
23    A.  Which brand?
24    Q.  American Blinds?
25    A.  Nope.

1    Q.  Any other brand?
2    A.  No.  I mean, as I said, I read those
3  deposition transcripts, but I don't know.
4    Q.  Okay.  Is it your opinion that Google
5  users want to see ads in response to their
6  inquiries?
7    A.  I haven't tested it.  If you ask me
8  generically speaking, I think there are many
9  situations where consumers who are in the market
10  for a product are looking for more sources of
11  information and the Internet offers those sources
12  of information.
13        For example, in the area of blinds, you
14  click on some of those web sites, they offer you a
15  wide range of brands and product types and price
16  ranges.  As a consumer, I think that it could be
17  quite useful.
18    Q.  Do you have any empirical support for that
19  statement?
20    A.  What statement?
21    Q.  What you just said.
22    A.  That consumers prefer more information to
23  less, yes.
24    Q.  But I'm talking about consumers using
25  Google?

1    A.  Again, coming back to what we discussed
2  earlier --
3    Q.  Right.
4    A.  -- information search is one of the most
5  basic components of consumer education and purchase
6  process and consumers want more information about
7  more options.
8        In fact, sometimes they get more
9  information than they need or can handle, but
10  they -- other things equalled, they like more
11  information, more options, cheaper prices,
12  et cetera, and they use the Internet to obtain such
13  information.
14        Probably if you think about what's the
15  most important contribution of the Internet, it's
16  probably exactly that.
17    Q.  Are you aware of any empirical support for
18  the proposition that ads enhance the Google user
19  experience as Google claims in this case?
20    A.  I didn't get it.
21    Q.  Are you aware of any empirical support for
22  the proposition that advertisements enhance the
23  Google user experience as Google claims in the
24  case?
25    A.  As I said, in general, I thought we just

40 (Pages 154 to 157)

Page 158

1  discussed it.  In general ads that provide more
2  information about more options about better prices
3  and so on are certainly benefitting consumers.
4    Q.  Okay.  I understand that's your opinion,
5  but I'm getting at whether this issue of whether
6  there's empirical support for that?
7    A.  Yes.  If you open any basic consumer
8  behavior or marketing management textbook, you'll
9  find a fairly lengthy section talking about
10  consumer's need for information before they make
11  purchase and the Internet provides that
12  information.
13      There have been numerous, numerous studies
14  that have documented consumer's search for
15  information.  And also search for information on
16  the Internet.
17    Q.  And as to the latter category, can you
18  identify any of those studies?
19    A.  I don't remember specifics off the top of
20  my head, but there have been many studies regarding
21  the effect of the manner in which people search for
22  information on the Internet.
23    Q.  How come you didn't site to any of those
24  in your report?
25    A.  I didn't see the need to do that.

Page 159

1    Q.  Other than the Pew report that you saw
2  from Mr. Ossip's files, are you aware of any other
3  reports that provide empirical support for the
4  notion that if men had been used in Mr. Ossip's
5  study that this would have effected or reduced the
6  confusion rate?
7    A.  No.  As I said, we don't know what the
8  results would have been, but we do know that there
9  is the basic principal of surveys conducted in the
10  context of litigation that the sample universe
11  should be representative of the relevant
12  population.
13      The results could be different, but we
14  will not know.
15    Q.  Okay.  I asked you earlier this morning
16  about whether you had any financial interest in
17  Google directly, but I didn't ask you if you're
18  aware of any indirect financial interest such as
19  through Stanford's investments, pension plans,
20  401Ks, anything of that sort?
21    A.  Not that I'm aware.  I know that Stanford
22  benefitted, I think, handsomely from owning Google
23  stocks, I think because the founders of Google did
24  some of the work while they were Stanford students.
25      So I think that Stanford made some money

Page 160

1  on those stocks.  I'm not aware that the business
2  school has any connection with Google and
3  unfortunately I wasn't wise enough to invest in
4  that stock when it was possible.
5      MR. PHILLIP:  Okay.  Let's just take a
6  short break.  I think I'm almost done.
7      (Recess taken.)
8  BY MR. PHILLIP:
9    Q.  Just a couple of things here.  You
10  mentioned your article, that you -- one of the
11  articles that you published in the Trademark
12  Reporter titled, "The Effect of Survey Method on
13  Likelihood of Confusion Estimates."
14    A.  Right.
15    Q.  And one of the things you stated in the
16  article is that, quote:
17      "It is important to remember that
18          measuring confusion is a very
19          difficult task and any specific
20          estimation procedure is likely to
21          have some flaws and is at best an
22          approximation."
23    A.  Right.
24    Q.  That's your position?
25    A.  It is.

Page 161

1    Q.  Okay.  The other thing is, in paragraph 13
2  of your report you -- on this issue of
3  approximating marketplace conditions you said that
4  Mr. Ossip chose to omit all sponsored links related
5  to ABWF even though such links always appear on the
6  resulting web page when the search term american
7  blinds is entered in the Google search engine.
8      Do you see that?
9    A.  Yes.
10    Q.  I'm going to admit some examples for you
11  to see showing that's not true.  Let's go ahead and
12  mark this next in order.
13      (Exhibit 4 was marked for
14      identification.)
15      MR. PHILLIP:  Let's mark this Exhibit 5.
16      (Exhibit 5 was marked for
17      identification.)
18      MR. PHILLIP:  And Exhibit 6.
19      (Exhibit 6 was marked for
20      identification.)
21      MR. PAGE:  Rob, are you making the
22  representation that in each of these three exhibits
23  your clients don't have any sponsored links?  That
24  seems to be what was implied by your question.
25      MR. PHILLIP:  I'm asking the witness to

41 (Pages 158 to 161)

Page 162

1  confirm that American Blinds does not appear as --
2  ABWF does not appear as a sponsored link.
3      MR. PAGE:  Then I'll object that it
4  misstates the document.  You've got ads on two of
5  these three.
6      MR. PHILLIP:  As sponsored links?
7      MR. PAGE:  Yeah.
8      MR. PHILLIP:  Which ones are you pointing
9  to?
10     MR. PAGE:  On Exhibit 5, all blinds up to
11 85 percent off, americanblindfactory.com.
12     On Exhibit 6, all blinds up to 85 percent
13 off, americanblindfactory.com.
14     I realize you're confused by the many
15 brand names your client has.  Sorry, I couldn't
16 resist that.
17     MR. PHILLIP:  Your comments are noted,
18 Michael.
19     Q.  But on Exhibit 4, Exhibit 4 is a search
20 for american blinds and there is no -- there is no
21 American Blinds link in the sponsored links,
22 correct?
23     A.  It appears in that one case from 2004 it
24 does not appear.  Obviously it's listed first on
25 the organic results.

Page 163

1      Q.  Right.  And in Exhibits 5 and 6, it
2  appears -- americanblindfactory appears in the
3  sponsored links on the right-hand side, but not at
4  the top, not the top two positions, correct?
5      A.  You mean -- not in the sponsored links
6  above the organic results, is that your question?
7      Q.  That's right.
8      A.  That's correct.
9      MR. PHILLIP:  Okay.  Thank you,
10 Dr. Simonson.  I don't have any further questions.
11     THE WITNESS:  Thank you.
12         (The deposition proceedings were
13          concluded at 3:23 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 164

1
2
3
4
5
6          CERTIFICATE OF WITNESS
7
8
9
10     I have read the foregoing deposition
11 transcript and by signing hereafter, approve same.
12
13 Dated_____.
14
15
16
_____
17     (Signature of Deponent)
18
19
20
21
22
23
24
25

Page 165

1      DEPOSITION OFFICER'S CERTIFICATE
2  STATE OF CALIFORNIA   }
3                        } ss.
   COUNTY OF SACRAMENTO  }
4
5      I, James Beasley, hereby certify:
6      I am a duly qualified Certified Shorthand
7  Reporter in the State of California, holder of
8  Certificate Number CSR 12807 issued by the Court
9  Reporters Board of California and which is in full
10 force and effect.  (Fed. R. Civ. P. 28(a)).
11     I am authorized to administer oaths or
12 affirmations pursuant to California Code of Civil
13 Procedure, Section 2093(b) and prior to being
14 examined, the witness was first duly sworn by me.
15 (Fed. R. Civ.  P. 28(a), 30(f)(1)).
16     I am not a relative or employee or
17 attorney or counsel of any of the parties, nor am I
18 a relative or employee of such attorney or counsel,
19 nor am I financially interested in this action.
20 (Fed. R. Civ. P. 28).
21     I am the deposition officer that
22 stenographically recorded the testimony in the
23 foregoing deposition and the foregoing transcript
24 is a true record
25              / / /

42 (Pages 162 to 165)

Page 166

1   of the testimony given by the witness.  (Fed. R.

2   Civ. P. 30 (f)(1)).

3           Before completion of the deposition,

4   review of the transcript [  ] was [  ] was not

5   requested.  If requested, any changes made by the

6   deponent (and provided to the reporter) during the

7   period allowed, are appended hereto.  (Fed. R. Civ.

8   P. 30(e)).

9

10  Dated: _____, 2006

11

12           _____

13           JAMES BEASLEY, CSR No. 12807

14

15

16

17

18

19

20

21

22

23

24

25

DR. ITAMAR SIMONSON