# Exhibit H

CH01/PLATC/210357.1

Dockets.Justia.com



## STRATEGIC ALLIANCE AGREEMENT

THIS STRATEGIC ALLIANCE AGREEMENT (this "Agreement"), dated as of August 27, 2003 (the "Effective Date"), is entered into by and between American Blind & Wallpaper Factory, Inc. a Delaware Corporation ("ABWM"), and Linens N' Things, Inc. a Delaware Corporation ("LNT").

WHEREAS, ABWM is engaged in the business of the sale of window treatments, wall coverings, paint and other home decorating products and related services to its customers through its toll-free telephone numbers, its direct mail catalogs, its web sites as made available via the Internet and through enabled kiosk systems ("Kiosk(s)") and through other distribution channels (collectively, the "ABWM Products");

WHEREAS, LNT is engaged in the business of the sale of home textiles, housewares and decorative accessories to its customers through its retail chain stores, its web sites as made available via the Internet and through other distribution channels (collectively, the "LNT Products"); and

WHEREAS, the parties desire to enter into a strategic business arrangement as set forth in this Agreement to cross-promote their respective products and services through various advertising vehicles.

NOW, THEREFORE, in consideration for the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. <u>Definitions</u>. In addition to capitalized terms defined elsewhere herein, the following terms shall have the following meanings:

   1.1    "ABWM Competitors" means any person or entity whose primary business is the sale of blind and/or wallpaper through any distribution channel including, without limitation, the Internet and direct mail catalogs.

   1.2    "ABWM Marks" means ABWM's trademarks, trade names, service marks, logos and product designations.

   1.3    "ABWM Site" means ABWM's web site currently located at the URL http://www.decoratetoday.com, which address is subject to change at any time.

   1.4    "LNT Competitors" means Bed Bath and Beyond and the T.J. Maxx companies including HomeGoods.

   1.5    "LNT Marks" means the LNT trademarks, trade names, service marks, logos and product designations.

   1.6    "LNT Site" means LNT's web site currently located at the URL http://www.lnt.com, which address is subject to change at any time.

   1.7    "Selected Store(s)" means a LNT store mutually selected by the parties hereto.

CH01/CARTS/156361.2a

2. **ABWM's Marketing Obligations.** ABWM shall perform, at ABWM's sole cost and expense (except as otherwise provided for herein), the following obligations during the Term (as defined below) of this Agreement:

    2.1    ABWM shall place and maintain a persistent hypertext link to the LNT Site on the Partner page of the ABWM Site, subject to LNT's prior approval as to format, position and prominence. LNT shall provide ABWM with the LNT Marks (in digital form) that are to be placed on the LNT Site;

    2.2    ABWM shall create, produce a co-branded catalog to be used in LNT stores and for direct mail and package inserts devoted to ABWM Products (the "Co-Branded Catalog") including the LNT Marks. ABWM shall have editorial control over the appearance, design and content of the Co-Branded Catalog, excluding the LNT Marks, with approval of LNT. ABWM shall update the content in the Co-Branded Catalog as necessary during the Term of this Agreement;

    2.3    ABWM will include LNT blow-in cards in its blind and wallpaper catalogs, LNT offers on its National and Showroom postcards and mention special LNT offers and LNT preferred partner status in its email campaigns over the term of this Agreement. LNT will provide content.

    2.4    ABWM will provide for LNT package inserts to be inserted in ABWM packages to extent ABWM vendors allow such inserts; and

    2.5    ABWM will merchandise and sell LNT product on its website as mutually agreed by the parties; and

    2.6    ABWM shall provide training as necessary to designated LNT employees and stores regarding ABWM Products and/or ABWM's offers included in the LNT marketing campaigns.

3. **LNT's Marketing Obligations.** LNT shall perform, at LNT's sole cost and expense (except as otherwise provided for herein), the following obligations during the Term of this Agreement:

    3.1    LNT shall place and maintain a hypertext link to the ABWM Site in prominent locations on the LNT Site, including where complementary products are sold. Specifically, enhanced placement will be provided on this page, or an equivalent webpage, for six months of the year. The link shall comprise text and/or graphics as mutually agreed upon by the parties hereto. ABWM shall provide LNT with the ABWM Marks (in digital form) that are to be placed on the LNT Site;

    3.2    LNT shall dedicate the keyword search terms "blinds" and/or "wallpaper" on the LNT Site such that, when input by a user on the LNT Site, it will direct such user to the ABWM Site;

    3.3    At a minimum of nine (9) times per year, on dates determined by the parties hereto, LNT shall include an ABWM offer and advertisement of a size representing at least 1/9 of a page in a location as mutually agreed by the parties hereto, on LNT's national mailers/circulars distributed to LNT's customers promoting ABWM Products and its Free Catalog;

3.4  At a minimum of six (6) times per year, on dates determined by the parties hereto, LNT shall include an offer from ABWM for ABWM Products in LNT's Ink Jet Messages on its direct mail pieces to LNT's customers. The offer shall be comprised of text and/or graphics as mutually agreed upon by the parties hereto;

3.5  LNT shall include an offer from ABWM for ABWM Products in all "New Mover" mailings and a catalog or insert in all Internet packages distributed to LNT customers or prospects. The offer shall comprise text and/or graphics as mutually agreed upon by the parties hereto;

3.6  LNT shall include an offer from ABWM for ABWM Products in LNT's email campaigns directed to a minimum of two million distinct LNT customers per year on dates determined by the parties hereto. The offer shall comprise text and/or graphics as mutually agreed upon by the parties hereto;

3.7  LNT shall distribute the Co-Branded Catalog to all of the LNT stores and will be responsible for all costs regarding same;

3.8  LNT will include an ABWM offer in its Windows/Curtains catalog and ABWM will utilize this catalog to fulfill for ABWM customers requesting same;

3.9  LNT shall create and place the Co-Branded Catalog displays in the Windows and Bedding section of all Selected Stores. The format, position and prominence of such displays shall be as mutually agreed by the parties hereto;

3.10  LNT shall integrate ABWM in LNT's special store of Internet promotional events to the extent possible;

4.  Cooperation. The parties hereby agree to work together on an on-going basis to implement the foregoing marketing plans and to communicate to each other any new marketing campaigns, advertising vehicles or business development opportunities as they arise from time to time.

5.  Non-Standard Marketing Expenses. Notwithstanding the foregoing, to the extent that a party's Marketing obligations as provided herein includes advertising vehicles and/or marketing campaigns that have not been previously used by such party, the other party hereto shall bear all actual, real out-of-pocket costs and expenses for such new campaigns and vehicles to the extent such party benefits from such increased costs.

6.  Kiosk(s).

6.1  Ownership. LNT and ABWM agree and acknowledge that LNT shall own the rights, title, and interest in any Kiosk/Signage and that ABWM owns all the rights, title and interest in the blinds used in the Kiosk

6.2  Configurations and Costs. LNT or its designee shall be responsible for the design, construction, equipment, installation, signage and fixturing of the Kiosk(s) at LNT's sole expense. ABWM will provide all blind product for the Kiosk as required.

6.3  Location:  For each Selected Store, the parties shall mutually agree upon a high-traffic location in the Windows Department where each Kiosk will be placed in reasonably close proximity to the complementary LNT Products.  LNT shall notify ABWM of its intent to

move any Kiosk from such agreed upon location once the Kiosk is installed. LNT hereby agrees to keep said location adequately clear for LNT's customers to view and use the Kiosk(s). Without the prior written consent of ABWM, LNT shall not create or incur any lien or encumbrance with respect to any Kiosk, sublease any Kiosk(s), or move any Kiosk or permit any of the Kiosk(s) to be moved from the applicable Selected Store.

6.4    Test and Rollout Expansion. The parties hereto agree to the following Kiosk milestones: a) Test Expansion: Kiosks installed in 30 Selected Stores in total by December 31, 2003 including installing free-standing fixtures in six stores with end cap fixtures at July 31, 2003 b) Kiosks installed in 125 Selected Stores in total by June 30, 2004 (including the best Window stores as ranked by LNT Window Department sales by store, such store list to be mutually agreed upon by the parties in good faith).    This milestone date will be extended by six months to December 31, 2004 if the 30 Selected Stores with kiosks do not generate annualized Net Sales in excess of $55,000 per store per year by March 31, 2004    c) Kiosks installed in 250 Selected Stores in total by December 31, 2004 (including the best Window stores as ranked by LNT Window Department sales by store, such store list to be mutually agreed upon by the parties in good faith).    This milestone date will be extended by six months to June 30, 2005 under either of the following circumstances    (i) if the 125 Selected Stores with kiosks installed by June 30, 2004 do not generate annualized Net Sales in excess of $55,000 per store per year by September 30, 2004; or (ii) if the 125 Selected Stores installed by December 30, 2003 pursuant to the extension above; do not generate annualized Net Sales in excess of $55,000 by March 31, 2005.

6.5    Loss. LNT shall bear the entire risk of any Kiosk(s) being lost, destroyed, damaged or otherwise rendered permanently unfit or unavailable for use from any cause whatsoever (an "Event of Loss") after arrival at a Selected Store. If an Event of Loss shall occur with respect to any Kiosk, LNT shall promptly and fully notify ABWM thereof.

6.6    Insurance. LNT shall obtain and maintain, at its sole expense, property damage and liability insurance against loss or damage to the Kiosk(s) in the Selected Stores including, without limitation, loss by fire and theft.

6.7    Indemnity. LNT hereby indemnifies and holds harmless ABWM and its successors and assigns from and against any and all claims, demands, actions, suits, proceedings, costs, expenses, damages, liabilities including attorneys' fees arising out of, connected with or resulting from any Kiosk before or after installation in the applicable Selected Store.

7.    License Grants.

7.1    License to ABWM Marks. ABWM hereby grants LNT a nonexclusive, non-transferable, non-sublicensable license to use and display the ABWM Marks on the LNT Site and in the Co-Branded Catalog, pre-approved marketing campaigns, special store events, signage and displays, solely in connection with this Agreement. LNT hereby acknowledges and agrees that: (a) the ABWM Marks are owned solely and exclusively by ABWM; (b) except as set forth herein, LNT has no rights, title or interest in or to the ABWM Marks; and (c) all use of the ABWM Marks by LNT shall inure to the benefit of ABWM. LNT agrees not to apply for registration of the ABWM Marks (or any mark confusingly similar thereto) anywhere in the world. LNT acknowledges and agrees that the presentation and image of the ABWM Marks should be uniform and consistent with respect to all services, activities and products associated with the ABWM Marks. Accordingly, LNT agrees to use the ABWM Marks solely in the manner which ABWM shall specify from time to time in ABWM's sole discretion.

7.2 **License to LNT Marks.** LNT hereby grants ABWM a nonexclusive, non-transferable, non-sublicensable license to use the LNT Marks on the ABWM Site and in the Co-Branded Catalog, pre-approved marketing campaigns and promotions solely in connection with this Agreement. ABWM hereby acknowledges and agrees that: (a) the LNT Marks are owned solely and exclusively by LNT; (b) except as set forth herein, ABWM has no rights, title or interest in or to the LNT Marks; and (c) all use of the LNT Marks by ABWM shall inure to the benefit of LNT. ABWM agrees not to apply for registration of the LNT Marks (or any mark confusingly similar thereto) anywhere in the world. ABWM acknowledges and agrees that the presentation and image of the LNT Marks should be uniform and consistent with respect to all services, activities and products associated with the LNT Marks. Accordingly, ABWM agrees to use the LNT Marks solely in the manner which LNT shall specify from time to time in LNT's sole discretion.

8. **Ownership.**

8.1 **Co-Branded Catalog.** The parties shall jointly own all right, title and interest (including, without limitation, in the world) in all intellectual property rights in the content portrayed in the Co-Branded Catalog; provided, however, that ABWM shall retain all ownership rights to the ABWM Marks and LNT shall retain all ownership rights to the LNT Marks.

8.2 **New Material.** All marketing and promotional materials developed jointly by the parties shall be co-owned, except for any of the other party's Marks which may be contained therein. Each party reserves the right to revoke such use of its Marks at any time upon reasonable prior written notice to the other party. Neither party hereto may use or disclose any co-owned marketing and promotional materials including, without limitation, the Co-Branded Catalog in any business relationship with a third party without the prior written consent of the other party hereto.

8.3 **Customer Information.**

(a) LNT hereby acknowledges and agrees that any and all customers who purchase ABWM Products pursuant hereto shall be and shall remain, at all times, customers of ABWM. In no event shall LNT have any claim of any ownership or other right, title and interest in and to any information obtained on such customers, regardless of whether such information is learned by LNT, directly or indirectly, from ABWM, via the use by such customer of the LNT Site to access the ABWM Site or from any subsequent communications that LNT may have with ABWM's customers subsequent thereto.

(b) ABWM hereby acknowledges and agrees that any and all customers who purchase LNT Products pursuant hereto shall be and shall remain, at all times, customers of LNT. In no event shall ABWM have any claim of any ownership or other right, title and interest in and to any information obtained on such customers, regardless of whether such information is learned by ABWM, directly or indirectly, from LNT, via the use by such customer of the ABWM Site to access the LNT Site or from any subsequent communications that ABWM may have with LNT's customers subsequent thereto.

(c) To the extent any customer purchases ABWF Products and LNT Products, the parties hereto shall jointly own all right, title and interest in and to the data generated by such customer pursuant to this Agreement. Each party agrees to share its marketing database with the other subject to Privacy Policies. ABWF acknowledges that LNT's current Privacy Policy does not permit sharing data bases.

(d) Each party hereto acknowledges and agrees that it shall have no right to use, disseminate, sell, assign or otherwise transfer the other party's customers' information whatsoever, except in connection with its performance under this Agreement.

8.4 **Existing Rights**. Each party or their respective licensors and third party information and content providers shall retain all rights, title and interest in and to all of the information, content, data, designs, materials and all copyrights, patent rights, trademark rights and other proprietary rights thereto provided by it pursuant to this Agreement. Except as expressly provided herein, no other right or license with respect to any copyrights, patent rights, trademark rights or other proprietary rights is granted under this Agreement. All rights not expressly granted hereunder by a party are expressly reserved to such party and its licensors and information and content providers.

9. **Customer Support**. Each party is solely responsible for the delivery of the correct products to its customers in good condition. In the event any customer reports that they received something different than what was ordered or that the products were damaged or defective, the responsible party hereto will replace the merchandise in accordance with its then-applicable return policy. Each party hereto shall at all times maintain a policy of customer satisfaction and shall address all complaints of and controversies with customers arising hereunder in a timely manner.

10. **Exclusivity**.

10.1 LNT will not endorse, sponsor, partner with, support or otherwise pursue any Partner relationship with any ABWM Competitor. LNT agrees to keep ABWM informed of any direct relationships formed with any ABWM blind or wallpaper vendors.

10.2 ABWM agrees that it will keep LNT informed of potential business relationships between ABWM and any retailer regarding the sale of private label ABWM Products. ABWM agrees to not expand the breadth and depth of its product of its soft window treatments in its LNT catalog.

10.3 ABWM agrees not to produce and distribute a sole purpose Curtains catalog for the sale of any window panels, drapes, tabs, scarves, canopies and other similar products commonly referred to in the industry as "soft" window products. In the event that LNT executes on a direct relationship as indicated in Section 10.1 beyond initial testing, defined as impacting more than 25 stores, LNT agrees to remove this restriction.

11. **Revenue Sharing**.

11.1 Subject to the terms and conditions of this Agreement, ABWM shall pay LNT a revenue share ("**Revenue Share**") of ten percent (10%) of Net Sales as driven by this Agreement (excluding sales of ABWM Products to LNT employees and LNT gift card offers) and tracked to specifically designated LNT catalog codes, discount codes, links to web sites and toll-free numbers (collectively, the "LNT Channels"). For purposes hereof, "Net Sales" means the amounts actually received by ABWM for all ABWM Products sold by ABWM and tracked to the LNT Channels over a ninety (90) day period from the date of the first sale by any ABWM customer commencing on the Effective Date, less discounts, credits, credit card chargebacks and returns associated with this Agreement.

11.2 ABWM shall prepare a monthly report of Net Sales statements for the benefit of LNT and mail each such statement to LNT with a postmark no later than the twentieth (20th)



day of each month (or next business day thereafter) (the "Due Date") following the prior month's accounting period, accounting for all sales of ABWM Products tracked to the LNT Channels during the prior month accounting period.

11.3    Notwithstanding anything herein to the contrary, in the event that the Kiosk(s) milestone expansion plan is not met as set forth in Section 6.4 herein, the Revenue Share payable to LNT hereunder shall be reduced to eight percent (8%) of Net Sales as driven by this Agreement (excluding sales of ABWM Products to LNT employees and LNT gift card offers) and tracked to the LNT Channels (except for the Selected Stores that retain a Kiosk presence). In the event that in any month, over twenty percent (20%) of the stores as identified in Section 6.4 do not participate in the Kiosk program and actively promote same (or over 5% of all LNT stores do not promote the ABWM catalog program) as confirmed by SPAR Merchandisers or another firm to be agreed upon between the parties, then the monthly Revenue Share will be reduced by $10,000.    LNT and ABWM agree to mutually develop and agree upon an execution requirements checklist to be utilized by the SPAR Merchandiser for this purpose. ABWM shall keep current and accurate books and records regarding the Revenue Share and payments made by ABWM to LNT pursuant to this Section

11.4    During the Term, but not more than once during any twelve-month period, LNT may request that ABWM render an accounting of the Revenue Share and payments made by ABWM to LNT pursuant to this Section 11.4. In the event such a request is made and at LNT's sole expense, ABWM shall perform and deliver an accounting to LNT no more than thirty (30) days after the date of such request by LNT.

12.    **Press Release**.  Each party shall have the right to issue a press release(s) announcing the partnership between ABWM and LNT upon the execution of this Agreement, and from time to time thereafter during the term of this Agreement; provided, however, the other party shall have the right to review and approve the content of the press release(s) prior to its issuance to the public, such approval to be at each party's discretion.

13.    **Confidentiality; Privacy Policy**.

   13.1    **Confidential Information**.

   (a) Each party that receives any Confidential Information (as defined below) (the "Recipient") from the disclosing party (the "Disclosing Party") agrees that during the term of this Agreement and for three (3) years thereafter it shall hold in strictest confidence, and shall not use or disclose to any third party, any Confidential Information of the Disclosing Party. Nothing in this section shall prohibit or limit the Recipient's use of information if: (i) at the time of disclosure hereunder such information is generally available to the public; (ii) after disclosure hereunder such information becomes generally available to the public, except through breach of this Agreement by the Recipient; (iii) the Recipient can demonstrate such information was in the Recipient's possession prior to the time of disclosure by the Disclosing Party and was not acquired directly or indirectly from the Disclosing Party or its affiliates; (iv) the information becomes available to the Recipient from a third party that is not legally prohibited from disclosing such information and is not breaching an obligation to the Disclosing Party; (v) such information is developed at any time by the Recipient independent of Confidential Information disclosed by the Disclosing Party to the Recipient; or (vi) such information must be disclosed pursuant to applicable federal, state or local law, regulation, court order or other legal process, provided the Recipient has notified the Disclosing Party within a reasonable time prior to such required disclosure and, to the extent

reasonably possible, has given the Disclosing Party an opportunity to contest or seek confidential treatment of such required disclosure.

(b)  For purposes hereof "Confidential Information" shall include all information, data and material of any kind, nature or description (whether represented in a tangible or an intangible form) relating in any way to the Disclosing Party, or its business (or business prospects), which is, directly or indirectly: disclosed orally, in writing, electronically or by any other means to Recipient. Without limiting the generality of the foregoing, "Confidential Information" shall include: names, business patterns and practices of any customers, marketing methods, concepts, ideas or strategies and related data, prices at which it sells or has sold goods or services, customer lists, supplier lists, product cost information, employee information, materials, records, documents, equipment, notebooks, rolodex cards, memoranda, reports, files (electronic or otherwise), computer programs and disks, books, correspondence, creations, developments, formulae, patterns, programs, methods, techniques, processes, studies, analyses, schedules, specifications, plans, technical data, compilations, devices, inventions, engineering and laboratory notebooks, material lists, drawings, prototypes and models and other information relating to the manner of operation of the Disclosing Party or its business. Information disclosed by the Disclosing Party shall be deemed to include any Confidential Information disclosed by the Disclosing Party's affiliates, directors, officers, employees, attorneys, accountants, advisers, consultants or other agents. Information disclosed to Recipient shall be deemed to include any Information disclosed to Recipient's affiliates, shareholders, directors, officers, employees, attorneys, accountants, advisers, consultants or other agents. This Agreement shall apply to all disclosures of Confidential Information, whether made before or after the execution of this Agreement.

13.2  <u>Use of Confidential Information</u>. Both parties agree that, during the term of this Agreement and thereafter, Confidential Information shall be used by each party solely in the performance of its obligations pursuant to this Agreement. Each party shall receive Confidential Information in confidence and not disclose, give, sell, or otherwise transfer or make available, directly or indirectly, any Confidential Information to any third party, except as may be necessary to perform its obligations pursuant to this Agreement, and except as may be agreed upon in writing by the other party. Each party shall ensure that its employees and agents are made aware of the confidential status of the Confidential Information, and that its employees and agents comply with all relevant provisions of this Section 13.2.

13.3  <u>Return or Destruction of Confidential Information; Disclosure</u>. Upon request or upon the termination of this Agreement, each party shall return to the other party all of the other party's Confidential Information in its possession or control or, if requested by the other party, a party hereto shall destroy the other party's Confidential Information and such destruction shall be certified in writing to such other party. Neither party shall disclose, furnish, or use in any way whatsoever, and shall take measures to prevent its agents, employees and subcontractors from so using, any Confidential Information to which it becomes privy, except as may be necessary for that party to perform its obligations pursuant to this Agreement or for which the prior written consent of the other party has been obtained. Each party shall be permitted to make such disclosures to the public or to governmental agencies as its counsel shall deem necessary to maintain compliance with and to prevent violation of applicable federal or state securities laws.

13.4  <u>Injunctive Relief</u>. Recipient acknowledges and agrees that (i) the restrictions and obligations placed on it in this Agreement are necessary to protect the Disclosing Party's investment and interests in its Information and business, (ii) the Disclosing Party would not have disclosed Information to Recipient without the protections contained in this Agreement and (iii) a

breach of the terms of this Agreement by Recipient will cause irreparable harm to the Disclosing Party and will likely result in unascertainable damages for the Disclosing Party. Recipient further agrees that the Disclosing Party shall be entitled as a matter of right to equitable relief, including an injunction from a court of competent jurisdiction restraining any actual or threatened breach of this Agreement. Recipient further agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. The rights to injunctive relief shall be in addition to, and not in lieu of, all other rights and remedies of the Disclosing Party under this Agreement, by statute, at law, in equity or otherwise (such as requiring an accounting and repayment of all profits, compensation, remuneration or other benefits realized in violation of this Agreement).

   13.5   **Privacy Policy**. With respect to information about or gathered from any ABWM or LNT customers pursuant to this Agreement, each party agrees to adhere at all times to their respective privacy policy as posted on the ABWM Site or LNT Site as the case may be (and as revised from time to time). Each party also agrees to adhere at all times with any law, regulation or rules, including foreign laws, regulations or rules, applicable to the use, gathering, storage and transmission of such information.

14. **Representations and Warranties**.

   14.1   **By LNT**.

      (a) LNT represents and warrants that: (i) it has all right and authority to enter into this Agreement and to grant ABWM the rights granted herein; (ii) it is permitted by applicable law and regulations to enter into this Agreement; and (iii) it owns (or has been duly licensed) all of the rights in and to the LNT Marks.

      (b) LNT represents and warrants that the performance of its obligations pursuant to this Agreement is and will be in compliance with all applicable laws, rules and regulations as well as all contractual obligations of LNT.

   14.2   **By ABWM**.

      (a) ABWM represents and warrants that: (i) it has all right and authority to enter into this Agreement and to grant LNT the rights granted herein; (ii) it is permitted by applicable law and regulations to enter into this Agreement; and (iii) it owns (or has been duly licensed) all of the rights in and to the ABWM Marks.

      (b) ABWM represents and warrants that the performance of its obligations pursuant to this Agreement is and will be in compliance with all applicable laws, rules and regulations as well as all contractual obligations of ABWM.

   14.3 **Limitation of Warranty**. EXCEPT AS EXPRESSLY STATED HEREIN, THE PARTIES MAKE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

15.  **Limitation of Liability**. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, ARISING OUT OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO LOST PROFITS OR BUSINESS INTERRUPTION, REGARDLESS OF THE FORM OF ACTION AND, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Case 5:03-cv-05340-JF    Document 266-9    Filed 01/26/2007    Page 11 of 14



16. <u>Term and Termination</u>.

    16.1    <u>Term</u>. This Agreement shall commence on the Effective Date and terminate two (2) years thereafter unless sooner terminated as provided herein or upon ninety (90) days written notice, and can be renewed for additional one (1) year periods by written agreement of the parties confirming all or amending this Agreement within ninety (90) days of the expiration of the initial or any applicable expansion term. (collectively, the "Term").

    16.2    <u>Termination for Cause</u>. This Agreement may be terminated by either party hereto for "Cause" immediately by written notice upon the occurrence of any of the following events: (a) if the other ceases to do business, or otherwise terminates its business operations; (b) if the other shall fail to promptly secure or renew any license, registration, permit, authorization or approval for the conduct of its business in the manner contemplated by this Agreement or if any such license, registration, permit, authorization or approval is revoked or suspended and not reinstated within thirty days; (c) if the other breaches any material provision of this Agreement and fails to fully cure such breach within thirty (30) days of written notice describing the breach; and (d) if the other becomes insolvent, or seeks protection under any bankruptcy, receivership, trust deed, creditor's arrangement composition or comparable proceeding, or if any such proceeding is instituted against the other and not dismissed within ninety (90) days thereafter.

    16.3    <u>Effect of Termination</u>. Upon termination of this Agreement for any reason, each party agrees to immediately disassemble and terminate all hyperlinks between its web site and the other party's web site and each party further agrees to remove from its web site all references to the other party's name and all Marks and content belonging to the other party. Upon termination, each party hereto shall destroy or return to the other party any of the other party's Confidential Information and any materials embodying or containing the other party's Marks or content, including all copies of the foregoing and any such destruction shall be certified in writing to such other party. In addition, ABWM shall have a reasonable period of time to remove all of the Kiosk(s) from the Selected Stores, but in no event later than fifteen (15) business days following termination of this Agreement.

17. <u>Indemnification</u>.

    17.1    Each party hereto hereby agrees to indemnify, defend and hold the other party hereto (and its subsidiaries and respective officers, directors and employees) harmless from and against any and all losses, claims, damages, suits, proceedings, liabilities, costs and expenses (including attorneys' fees) resulting from or arising out of: (a) infringement of any third party proprietary right; (b) any third party claim that arises from the gross negligence or willful misconduct of LNT or ABWM, as the case may be; (c) any misrepresentation or breach of representation or warranty of LNT or ABWM, as the case may be, contained herein; or (d) any third party claim of LNT Product or ABWM Product, as the case may be, defects in material and workmanship from normal use

    17.2    The foregoing indemnification by each party hereto shall be subject to the following: (a) the indemnified party promptly notifies the other party in writing of the claim; provided that the failure to so notify the indemnifying party shall not relieve the indemnifying party of any liability it may have to the indemnified party hereunder except to the extent the indemnifying party has been materially prejudiced thereby; (b) the indemnifying party has sole control of the defense and all related settlement negotiations with respect to the claim, provided, however, that the indemnified party has the right, but not the obligation, to participate at its expense in the defense of any such claim or action through counsel of its own choosing; and (c)

CH01/CARTS/156361.2a        10



the indemnified party cooperates fully to the extent necessary, and executes all documents necessary for the defense of such claim.

18. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of Delaware without regard to its conflicts or choice of laws provisions. In any action to enforce, or arising out of, this Agreement, LNT and ABWM each consent to the jurisdiction of and venue in each of the state and federal courts located in the State of Delaware for the adjudication of all matters relating hereto or arising hereunder.

19. <u>Remedies Cumulative</u>. All rights and remedies granted in this Agreement or available under applicable law shall be deemed concurrent and cumulative and not alternative or exclusive remedies, to the full extent permitted by law and this Agreement, and any party may proceed with any number of remedies at the same time or in any order.

20. <u>Assignment</u>. Neither party shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party.

21. <u>Notices</u>. Any notices or other communications required or permitted under this Agreement shall be made in writing and shall be deemed given (i) upon receipt, if delivered by hand, (ii) one day after being sent, if sent by courier (e.g., overnight delivery) or (iii) three days after being sent, if sent by certified mail, return receipt requested, first class postage and registration fees prepaid and correctly addressed to the party to receive such notice at its address as set forth below or to such other address as any of the parties hereto may designate by notice to the others (such notice of change in address to be effective only upon actual receipt thereof). The parties shall acknowledge in writing any notice given by hand delivery.

|  |  |
|---|---|
| If to ABWM: | American Blinds Wallpaper & More, Inc.<br>909 N. Sheldon,<br>Plymouth, MI 48170<br>Attention: Robert Flynn, CFO |
| With a copy to: | Kelley Drye & Warren LLP<br>333 W. Wacker, Suite 2600<br>Chicago, IL 60606<br>Attention: Susan J. Greenspon, Esq. |
| If to LNT: | LNT    6 Brighton Road<br>Clifton, NJ 07012<br>Attention: Brian Tilzer<br>Vice-President Strategy and Planning |
| With a copy to: | LNT<br>6 Brighton Road<br>Clifton, NJ 07012<br>Attention:    Vice-President Legal Services/General Attorney |

22. <u>Relationship of the Parties</u>. Nothing herein shall be construed to create a relationship of employer and employee, joint venture, partnership or association between ABWM and LNT. Except as expressly provided herein, neither party shall have the right to bind or obligate the other party in any manner without the prior written consent of the other party.

23. **Force Majeure.** Each party shall have no obligation to perform under this Agreement to the extent and for the period of time that that party is prevented from doing so by reason of any cause beyond its reasonable control, including without limitation the inability to use or the failure of the Internet or any third party telecommunications carrier or other services.

24. **Survival.** The provisions of Sections 11.4, 13, 15, 16.3 and 17 shall survive the termination of this Agreement.

25. **Severability.** If any provision of this Agreement is held invalid or unenforceable for any reason, the invalidity shall not affect the validity of the remaining provisions of this Agreement, and the parties shall substitute for the invalid provisions a valid provision which most closely approximates the intent and economic effect of the invalid provision.

26. **Entire Agreement; Waiver; Counterparts.** This Agreement sets forth all of the promises, agreements, conditions and understandings between the parties respecting the subject matter hereof and supersedes all negotiations, conversations, discussions, correspondence, memorandums and agreements between the parties concerning the subject matter hereof. Headings shall not be used in interpreting this Agreement. This Agreement may not be modified except by a writing signed by authorized representatives of both parties to this Agreement. No waiver of any term or provision of this Agreement or right hereunder shall be valid unless the waiver is in writing and signed by the waiving party. No waiver or failure to enforce any provision or right hereunder shall be deemed to be a waiver of the same or any other provision or right in any other instance, nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

*[Signature Page Follows.]*

IN WITNESS WHEREOF, the parties have executed this Strategic Alliance Agreement to be effective as of the date first written above.

AMERICAN BLIND & WALLPAPER FACTORY, INC.

LINENS N' THINGS, INC.

By:_____

Print Name: Robert C. Flynn

Title:_____

By:_____

Print Name:_____

Title:_____