1    KEKER & VAN NEST, LLP
     MICHAEL H. PAGE - #154913
2    MARK A. LEMLEY - #155830
     KLAUS H. HAMM - #224905
3    AJAY S. KRISHNAN - #222476
     710 Sansome Street
4    San Francisco, CA  94111-1704
     Telephone:  (415) 391-5400
5    Facsimile:  (415) 397-7188

6

     Attorneys for Plaintiff and Counter Defendant
7    GOOGLE INC.

8                UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10

11   GOOGLE INC., a Delaware corporation,        Case No. C 03-5340-JF (EAI)

12                              Plaintiff,        **GOOGLE'S REPLY IN SUPPORT OF ITS
                                                  MOTION FOR SUMMARY JUDGMENT**
13          v.
                                                  Date:      February 16, 2007
14   AMERICAN BLIND & WALLPAPER               Time:      9 a.m.
     FACTORY, INC., a Delaware corporation        Courtroom: 3, 5th Floor
15   d/b/a decoratetoday.com, Inc., and DOES 1-   Judge:     Hon. Jeremy Fogel
     100, inclusive,
16
                              Defendants.
17
     AMERICAN BLIND & WALLPAPER
18   FACTORY, INC., a Delaware corporation
     d/b/a decoratetoday.com, Inc.,
19
                         Counter Plaintiff,
20
            v.
21
     GOOGLE INC., AMERICA ONLINE, INC.,
22   NETSCAPE COMMUNICATIONS
     CORPORATION, COMPUSERVE
23   INTERACTIVE SERVICES, INC., ASK
     JEEVES, INC. and EARTHLINK, INC.,
24
                    Counter Defendant/
25             Third-Party Defendants.

26                      **REDACTED VERSION**

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   FACTS ...................................................................................................................2

III.  ARGUMENT ..........................................................................................................5

    A.    Triggering ads with a trademark is not trademark use.............................5

        1.    As this Court has already ruled, *Playboy* did not decide the
             "use in commerce" requirement that is at issue in this case. .....................6

        2.    Google's Keyword Tool does not use the ABWF marks. ..........................9

        3.    Google's policy change does not signal that its new policy is
             illegal...........................................................................................................10

    B.    The mark "American Blinds" is not enforceable against Google..........................10

        1.    "American Blinds" is a descriptive mark, not an inherently
             distinctive one. ............................................................................................11

        2.    ABWF has presented no evidence that "American Blinds"
             acquired secondary meaning before Google's first allegedly
             infringing use. ...........................................................................................12

    C.    ABWF cannot prove a likelihood of confusion for any of the asserted
        marks..........................................................................................................14

        1.    ABWF has no confusion evidence.............................................................15

        2.    ABWF cannot prove initial interest confusion. ........................................22

    D.    ABWF's marks are not famous................................................................23

    E.    The unclean hamds doctrine applies because when it comes to its own
        advertising ABWF does what it claims violates trademarks laws. ........................24

IV.   CONCLUSION.......................................................................................................25

389264.02

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*1-800 Contacts, Inc. v. WhenU.com, Inc.*,
   414 F.3d 400 (2d. Cir. 2005) ...................................................................................8

*AMF, Inc. v. Sleekcraft Boats, Inc.*,
   279 F.3d 1135 (9th Cir. 1979) ............................................................1, 14, 15, 16, 23

*Block v. City of Los Angeles*,
   253 F.3d 410, (9th Cir. 2001) .........................................................13, 18, 19, 25

*Brookfield Commc'ns, Inc. v. West Coast Entertainment Corp.*,
   174 F.3d 1036 (9th Cir. 1999) ...........................................................................14, 17

*Coca-Cola Co. v. Overland, Inc.*,
   692 F.2d 1250 (9th Cir. 1982) ...........................................................................7

*Cohn v. Petsmart, Inc.*,
   281 F.3d 837 (9th Cir. 2002) .............................................................................16

*Commerce National Insurance Services, Inc. v. Commerce National Insurance Agency, Inc.*,
   214 F.3d 432 (3d Cir. 2000)...........................................................................12, 13

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) ......................................................................12, 14, 15,

*Government Employees Ins. Co. v. Google, Inc.*,
   2005 WL 1903128 at *7 (E.D.Va. Aug 8, 2005) ...........................................17

*Karl Storz Endoscopy America, Inc. v. Surgical Techs., Inc.*,
   285 F.3d 848 (9th Cir. 2002) .........................................................................8, 9

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
   150 F.3d 1042 (9th Cir. 1998) ........................................................................11

*Kelley Blue Book v. Car Smarts, Inc.*,
   802 F. Supp. 278 (C.D. Cal. 1992) ................................................................24

*Lamparello v. Falwell*,
   420 F.3d 309 (4th Cir. 2005) ..........................................................................22

*Levi Strauss & Co. v. Blue Bell, Inc.*,
   778 F.2d 1352 (9th Cir. 1985) ....................................................................12, 14

*M2 Software, Inc., v. Madacy Entertainment*,
   421 F.3d 1073 (9th Cir. 2005) ........................................................................15

*Murray v. CNBC*,
   86 F.3d 858 (9th Cir. 1996) ............................................................................15

ii

389264.02

**TABLE OF AUTHORITIES**
(cont'd)

Page(s)

*Nautilus Group, Inc. v. Savvier, Inc.,*
    427 F.Supp.2d 990 (W.D. Wash. 2006)..............................................................16

*Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.,*
    354 F.3d 1020 (9th Cir. 2004) ............................................................6, 7, 8, 9, 16

*Republic Molding Corp. v. B. W. Photo Utilities,*
    319 F.2d 347 (9th Cir. 1963) .........................................................................24

*TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.,*
    244 F.3d 88 (2d Cir. 2001).........................................................................23, 24

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.,*
    419 F.3d 925 (9th Cir. 2005) ...........................................................................11

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

# I.    INTRODUCTION

American Blind & Wallpaper Factory's ("ABWF") Opposition rests on a remarkable series of misstatements of fact and law. Each of these is addressed below. Before wading into that morass, however, it is important to note several crucial ways in which ABWF conflates and confuses several sets of distinct entities and concepts. Each of these deliberate conflations must be corrected, as ABWF's argument relies entirely on them, and fails once they are understood.

**ABWF Conflates Google and its Advertisers.** Throughout its brief, ABWF asks the Court to treat Google interchangeably with ABWF's competitors who advertise on Google. For example, ABWF claims "*Google and its advertisers* offer products and services identical to American Blinds' . . ." and "*Google and its advertisers* use the identical marks on the directly competing products and services."[1] But of course, Google doesn't sell window blinds, Google doesn't compete with ABWF, Google sells advertising space to businesses, not goods to consumers, and Google doesn't sell any products or services under any name other than "Google." ABWF's conflation here has two crucial impacts: first, it allows ABWF to pretend to apply the *Sleekcraft* factors to Google, ticking off each factor (similarity of products, similarity of markets, similarity of brand names) based not on Google but on ABWF's competitors.[2] And second, it allows ABWF to pretend that this is a direct infringement case, seeking to hold Google liable for the acts of its advertisers without bothering to discuss or clear the substantial hurdles of a contributory infringement case.

**ABWF Conflates its Various Claimed Trademarks.** ABWF operates under a dizzying hodgepodge of trademarks, and changes its name frequently. When this lawsuit was filed, ABWF had several registered marks, but they did not include "American Blinds." That mark was not registered until less than a year ago, and thus cannot be asserted against Google unless ABWF establishes secondary meaning, which it cannot do. But ABWF's only purported evidence of a likelihood of confusion relates solely to "American Blinds," not its other marks.

---

[1] American Blind & Wallpaper Factory, Inc.'s Opposition to Google's Motion for Summary Judgment ("Opp'n") 27.

[2] In fact, it is wrong about its competitors, who appear to use brand names wholly unlike ABWF's.

389264.02

1   ABWF tries to finesse this problem by simply referring to all of its marks indiscriminately as the

2   "American Blind Marks," obscuring the fact that the mark they claim is infringed is

3   unenforceable, and vice versa.

4       **ABWF Conflates Trademark Use and Likelihood of Confusion:**  As discussed in

5   detail below, trademark use is a separate element of infringement, and it is improper to

6   "bootstrap" use based on evidence of confusion.  ABWF seeks to do precisely that, basing its

7   claims of "use" on its unsupported assertions of what users expect and understand.

8       It is important to keep in mind these three persistent conflations when considering

9   ABWF's arguments, as they form the conceptual backdrop to an equally persistent misstatement

10  of facts.  We now turn to those.

11                        **II.    FACTS**

12      At the summary judgment phase of a case, it is no longer enough for a party to simply

13  make allegations.  Instead, it must point to evidence to show that a fact is or is not in dispute.

14  Because ABWF's brief has so many unsupported allegations about Google that it often reads like

15  a complaint rather than a summary motion brief, it is necessary to show that the undisputed

16  *evidence* again and again demonstrates that ABWF's allegations are not true.  In particular,

17  ABWF pins much of its argument that Google "uses" ABWF's marks on the unsupported

18  contention that by labeling ads as "Sponsored Links" Google tries to hide the fact that they are

19  ads.  Putting aside the problem that this argument conflates use and confusion, it is simply false.

20      ABWF's first misrepresentation in this regard is its repeated refrain that "Google does

21  not define 'Sponsored Links' anywhere on its website."[3]  In fact, Google's website again and

22  again states that Sponsored Links are ads.  For example, in Google's Web Search Help Center,

23  on a page explaining its policies with regard to paid inclusion and advertising, Google explains

24  that "Sponsored links are sites that pay for placement on the same page as Google's search

25  results and on the pages of the other sites that comprise our advertising network. *These*

26  *advertisements* may sometimes appear adjacent to our search results and are always clearly

27  _____

28  [3] Opp'n 11; *see also id.* at 1 ("Google purposefully does not define 'Sponsored Links' or call
    them what they are—paid advertisements—because doing so would reduce user confusion.").

1    labeled as 'Sponsored Links.'"[4]

2         Second, ABWF incorrectly argues, that it is "not necessarily true" that Google's

3    Sponsored Links "are conspicuous and differentiated from its genuine search results" and that

4    "Google does not clearly identify its ads."[5]  ABWF does not provide any citation or evidence to

5    support these false claims.  In fact, the undisputed evidence shows (and as conducting an actual

6    search on Google quickly verifies) that Sponsored Links ads are clearly differentiated from

7    search results.[6]  All Sponsored Links appear in sections of the pages *separate* from the search

8    results and these separate sections are always *labeled* "Sponsored Links."  Sponsored Links

9    appearing on the top of the search results appear in a shaded blue box while the search results do

10   not.  And Sponsored Links appearing to the side of search results are separated from the search

11   results by a vertical blue line.

12        Third, ABWF misrepresents Google's requirement that Google advertisers identify

13   themselves in ads by making the unsupported allegation that Google has no "requirement that

14   advertisers actually identify themselves on their advertisement."[7]  Google, in fact, requires that

15   the advertiser's Sponsored Link "Clearly and accurately describe [its] site."[8]  Every Sponsored

16   Link appearing on Google must display a URL which "must accurately reflect the URL of" the

17   advertiser's website.[9]  Google's requirements for Sponsored Links could hardly be clearer that

18   display URL should identify the site to which the Sponsored Link links:

19            So as not to mislead users, the display URL should give users a clear idea of the
             website or landing page to which they will be taken when they click on an ad.
20            Display URLs must:

21

22   ─────────────────────
     [4]
23   http://www.google.com/support/bin/answer.py?answer=27035&query=sponsored+link&topic=&
     type= (emphasis added).

24   [5] Opp'n 1, 11.

25   [6] *See* Declaration of Klaus H. Hamm In Support of Google's Motion for Summary Judgment
     ("Hamm Decl.") Ex. A.

26   [7] Opp'n 15.

27   [8] https://adwords.google.com/select/guidelines.html.

     [9] *See* Supplemental Declaration of Klaus H. Hamm In Support of Google's Motion for Summary
28   Judgment ("Supp. Hamm Decl.") Ex. A at GOOGLE 002722; *see also*
     https://adwords.google.com/select/guidelines.html.

1    • Indicate who owns the destination URL, but does not need to match the actual
     destination URL of the landing page exactly.

2    ***

3    Here is an example of a correct and an incorrect display URL:

4    
5    Correct:
     Display URL: bigbookstore.com
     Destination URL: bigbookstore.com/new/a-c.htm

6    
7    Incorrect:
     Display URL: bigbookstore.com
     Destination URL: http://www.amazon.com/home.html/104-7002842-259

8    
9    In the first example, clicking on the ad takes users to a page within the
     bigbookstore.com website. Even though the display URL is different from the
     destination URL, it accurately represents where the user will be taken when he or
10   she clicks on the ad.

11   In the second example, the display URL bigbookstore.com does not accurately
     represent the site to which the user will be taken, which is a page within the
12   amazon.com domain. This is improper use of the display URL. An ad with this
     display URL would not be approved.[10]

13   

14   Fourth, ABWF's claim that Google's own research shows that click-throughs would

15   decrease if Google changed the name of "Sponsored Links" to "Paid Advertisements" is

16   unsupported by the evidence that ABWF cites. The cited deposition testimony shows that click-

17   throughs would *increase* if Google changed the name "Sponsored Link" to "ad":

18

19

20

21

22

23

24

25

26

27   [10] http://www.google.com/adwords/learningcenter/text/18928.html.

28   [11] Declaration of Paul J. Garrity In Support of American Blind & Wallpaper Factory, Inc.'s
     Opposition to Google's Motion for Summary Judgment ("Garrity Decl.") Ex. K at 240:15-241:2.

4

389264.02

1

2

3

4      Fifth, just as ads shown on televisions are referred to as commercials, it is the accepted

5  industry convention that ads shown next to internet search results are referred to as "Sponsored

6  Links," "Sponsored Results," or some other phrasing that contains the word "Sponsored."  In

7  fact, using such a designation or segregating advertisements from search results is exactly what

8  the Federal Trade Commission's Bureau of Consumer Protection, Division of Advertising

9  Practices told search engine companies to do (and Google does both):

10         Paid placement listings may also be denoted by segregating them from non-paid
           listings. Each separate set of paid placement listings should be clearly labeled as
11         such so they can be easily distinguished from other types. Of the 12 search sites
           owned or operated by the 7 named search engine companies, 11 segregate paid
12         ranking results by placing them above the non-paid results or prominently
           elsewhere. Many of these sites appear to be headed in the right direction, using
13         terms such as "Sponsored Links" or "Sponsored Search Listings" to denote
           payment for rankings.[13]
14

15      This finding is unsurprising given the plain meaning of "Sponsored Links": the word

16  "Sponsored" in the front of the word "Links" indicates that someone is sponsoring, *i.e.*, paying

17  for, the link.  Moreover, after decades of hearing  "And now a word from our sponsors" before

18  viewing television ads, consumers' instinctively recognize that sponsors are advertisers.

19                         **III.    ARGUMENT**

20  **A.    Triggering ads with a trademark is not trademark use.**

21      Whether triggering ads with a keyword that is a trademark constitutes trademark use is an

22  open question in the Ninth Circuit, but the logic of trademark law and the better reasoned cases

23  from outside the Ninth Circuit demonstrate that the answer is no.

24

25

26  _____

27  [12] Garrity Decl. Ex. K (Ex. 21 thereto).
    [13] Supp. Hamm Decl. Ex. B.

28

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1.    **As this Court has already ruled, *Playboy*[14] did not decide the "use in commerce" requirement that is at issue in this case.**

As set forth in Google's opening brief, there are two distinct "use" requirements under the Lanham Act.  One is a jurisdictional requirement, and the other is a requirement that a party use a trademark as a trademark in order for trademark laws to apply.  ABWF' ignores this distinction, citing *Playboy's* treatment of the first "use" requirement as a holding on the second.

The first problem with this argument is that this Court has already rejected it in this case: "The *Playboy* court did not undertake a separate discussion of the element of trademark 'use' and … the court observed that there was '[n]o dispute' as to whether the defendants had 'used the marks in commerce.'"[15]  Moreover, this Court has already ruled that *Playboy's* recitation of "used the marks in commerce" concerned only the jurisdictional requirement of "use '*in commerce*' and not the separate requirement of trademark 'use.'"[16]  Simply ignoring this Court's prior holding, ABWF again argues that *Playboy* held "that the 'use in commerce' requirement for purposes of bringing such a claim under the Lanham Act 'sweeps as broadly as possible.'"[17]  But if one reads the entire quoted sentence, it is clear that *Playboy* was discussing the entirely different, jurisdictional "use in commerce" requirement.  The complete sentence states:  "Federal jurisdiction over trademark cases rests on the Commerce Clause, sweeps as broadly as possible, and clearly encompasses the circumstances of this case."[18]  This Court ruled correctly on this argument the first time around, and ABWF offers no reason to reconsider that ruling.

Moreover, to the extent *Playboy* informs the trademark use question at all, it strongly suggests that there is no use under the current facts.  In *Playboy*, the crucial fact was that the

---

[14] *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020 (9th Cir. 2004).

[15] Order Granting In Part and Denying Part Counter-Defendant's and Third-Party Defendants'' Motions To Dismiss ("Motion to Dismiss Order") at 14 (quoting *Playboy*, 354 F.3d at 1024).

[16] *Id.* (emphasis in original).

[17] Opp'n 14.  ABWF's argument that *Playboy* decided use is flawed for another reason.  ABWF argues that by "Applying the well-established 'initial-interest confusion' doctrine, the court had no difficulty finding that 'defendants clearly used the marks in commerce."  *Id.*  This analysis does not recognize that confusion and use are separate elements and that one cannot be used to find the other, just as a negligence plaintiff cannot establish a duty of care by evidence of causation or harm.

1   banner ads at issue were "confusingly labeled or not labeled at all," since the search engine

2   defendants "do not require that advertisers identify themselves on their banner ads . . . [and] they

3   do not label the advertisements themselves."[19] As a result, the defendant in Playboy impliedly

4   represented to the users that the website they got was the *Playboy* site they asked for. Implied

5   representations based on silence are nothing new, either generally ("raise your hand if you have

6   any objection" leads to an implied statement by those who do not raise their hands) and in

7   trademark law. For example, there is a long line of cases involving unlabelled soft drinks: If I

8   ask my waitress for a Coke, and she silently hands me a glass of Pepsi instead, she has used

9   "Coke" in a trademark sense even though the word never came out of her mouth.[20]

10      As *Playboy* made clear, there is no violation of the trademark laws if ads on search

11  engines are labeled: "if a banner advertisement clearly identified its source . . . no confusion

12  would occur."[21] Judge Berzon's concurrence emphasized this aspect of the court's holding,

13  stating that it is not reasonable to find a trademark violation "when a consumer is never confused

14  as to source or affiliation, but instead knows, or should know, from the outset that a product or

15  web link is not related to that of the trademark holder because the list produced by the search

16  engine so informs him."[22] To continue the Coke analogy, it may be trademark use to pass off

17  unlabelled counterfeits in silent response to a request for a specific brand. It would not be

18  trademark use if, in response to a request for Coke, my waitress either hands me a drink saying

19  "No Coke. Pepsi" or points me to a cooler containing Cokes, Pepsis, and other drinks.[23] There

20  is a fundamental distinction between falsely substituting a counterfeit product and offering

21  consumers both the requested brand and additional alternatives.

---

[18] *Playboy*, 354 F.3d at 1024 n.11.

[19] *Id.* at 1023, 1029.

[20] *See, e.g., Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250 (9th Cir. 1982).

[21] *Playboy*, 354 F.3d at 1025 n.16.

[22] *Id.* at 1034-35.

[23] Nor would confusion change the analysis. Some people might wrongly assume that one needs Coke's permission to offer other brands alongside it, and thus be confused into thinking Coke had "authorized" the restaurant to suggest a competing alternative. Some people also assume that drugstores need Advil's permission to put generics next to it on the shelf, but that can not convert the practice into a Lanham Act violation.

7

1    Thus, under *Playboy*, Google's Sponsored Links do not violate trademark laws, since

2 they are labeled in multiple ways (contrary to ABWF's unsupported assertion that Google does

3 not have "any requirement that advertisers actually identify themselves on their

4 advertisement").[24] First, all Sponsored Links are segregated from Google's search results in

5 sections labeled "Sponsored Links."[25] Second, Google has strict policies requiring Sponsored

6 Links to identify their sources. Not only does Google require Sponsored Links to "[c]learly and

7 accurately describe" the sites to which they link, but every Sponsored Link appearing on Google

8 must display a URL which "must accurately reflect the URL of" the advertiser's website.[26]

9 Google's policy states: "So as not to mislead users, the display URL should give users a clear

10 idea of the website or landing page to which they will be taken when they click on an ad."[27]  And

11 it further requires that the display URL "[i]ndicate who owns the destination URL[.]"[28]  Indeed,

12 ABWF argues that displaying a URL identifies source, pointing to its display of the

13 www.americanblinds.com URL on its catalogs and elsewhere as evidence that it uses "American

14 Blinds" as a trademark.

15    In short, the facts at issue in this case are precisely the facts that *Playboy* ruled would *not*

16 violate trademark laws. While Google emphasizes that *Playboy* did not consider trademark use,

17 to the extent the Court is tempted to conclude that the decision implicitly decided the issue, it can

18 only conclude that the implicit decision is that when advertisements are triggered by a

19 trademarked term but are clearly labeled, then there is no trademark use. And as set forth in our

20 opening brief, trademark use is a separate prerequisite:  absent a finding of use, the Court's

21 analysis does not need to proceed to confusion.[29]

22

23 ────────────────

[24] Opp'n 15.

24 [25] Hamm Decl. Ex. A.

25 [26] https://adwords.google.com/select/guidelines.html.

[27] http://www.google.com/adwords/learningcenter/text/18928.html.
26
[28] *Id.*

27 [29] *See 1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400, 412 (2d. Cir. 2005); *see also Karl Storz Endoscopy America, Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 855 (9th Cir. 2002)
28 (trademark use is a determination independent of confusion).

8

389264.02

1

## 2.    Google's Keyword Tool does not use the ABWF marks.

2        ABWF strives mightily to manufacture an issue out of Google's Keyword Tool. This

3   effort fails for several reasons. First, the Keyword Tool does not encourage any advertiser to do

4   anything. The Keyword Tool is an automated tool that presents raw empirical data.[30] For any

5   word one enters, the tool reviews records of billions of searches and other data, and returns a list

6   of *other* words that appear in conjunction with that word. From that list, advertisers can refine

7   their campaigns by switching to more narrowly tailored keywords, adding synonyms, or adding

8   negative keywords to avoid having their ads appear in specific circumstances.[31]

9        For example, entering the word "Apple" generates a list that includes various Apple

10  electronic products (Apple iPod, Apple G4, etc.) as well as "apple cider vinegar" and "Fiona

11  Apple." Armed with that information, a seller of iPod accessories might replace a keyword of

12  "Apple" with "Apple iPod," to avoid paying to advertise to people searching for Apple G4

13  computers. A music retailer might use "Fiona Apple," and a computer seller would use the same

14  "Fiona Apple" phrase as a negative keyword. And everyone except the food merchants will

15  make "apple cider vinegar" a negative keyword.

16        The same raw data is—or is not—a suggestion, depending on the advertiser's own

17  business and goals. For that reason, Google's Keyword Tool warns users that they must make

18  their own decisions, and additionally reminds them that they are uniquely responsible for making

19  sure their advertising campaigns respect applicable law, specifically including trademark law.[32]

20        Second, the Keyword Tool is quintessentially a nominative use.[33] How else could

21  Google inform users of the relative frequencies of use of different words without using those

22  words? When the *San Francisco Chronicle* publishes a list of the top ten grossing films of the

23  year, it must perforce use the names of the films, which are all trademarks. Similarly, when

24  Google lists the words most used in searches, it cannot do so without using the words.

25

26  [30] Declaration of Alana Karen In Support of Google's Motion for Summary Judgment ("Karen Decl.") ¶ 3.

27  [31] *Id.* at ¶ 4.

    [32] *Id.* at ¶ 6, Exs. C-H.

28  [33] *See Playboy*, 354 F.32d at 1029-30.

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1    Finally, and most centrally, ABWF's argument falsely assumes that its trademarks ever

2    appear in the Keyword Tool at all. To the contrary: although there is no legal requirement that it

3    do so, Google further accommodates the interests of trademark holders by *removing* from the

4    Keyword Tool all of the trademarks on its "monitor list."[34] Thus, because ABWF has asked

5    Google to place its registered marks on the list, those marks do not appear in the Keyword Tool.

6    This even extends to the newly minted "American Blinds" mark, as well as the "American

7    Blind" variant. Even though ABWF never bothered to notify Google of the registration that

8    issued last year or to request that it be blocked, Google added the mark to its monitor list when it

9    learned of the registration.[35] Accordingly, none of ABWF's claimed marks appear as results on

10    Google's Keyword Tool.[36]

11    **3.    Google's policy change does not signal that its new policy is illegal.**

12    Finally, ABWF makes the frivolous argument that, because Google once had a policy

13    that *differs* from its current policy, the fact that Google changed its policy is "a telling

14    admission" that its current policy is illegal. The illogic of this argument is patent: it implies that

15    *any* change in a corporate policy makes the new policy illegal. But corporations change policies

16    all the time for a great number of reasons. In Google's case, it changed its policy in order to

17    provide users with more relevant search results, replacing a policy that overprotected the

18    interests of trademark holders with one that reflects a more appropriate (and just as legal)

19    balancing of the interests of consumers and trademark owners. Indeed, it would make just as

20    much sense to assume that any change in policy is an admission that the *prior* policy was illegal.

21    **B.    The mark "American Blinds" is not enforceable against Google.**

22    ABWF's brief conspicuously ignores the undisputed fact that "American Blinds" did not

23    appear on the principal register until September 26, 2006.[37] Nor does ABWF contest the

24    governing legal principle that when the asserted trademark appears on the principal register *after*

25

26    [34] Karen Decl. ¶ 7.

27    [35] *Id.* at ¶ 8.
      [36] *Id.* Exs. C-H.

28    [37] Garrity Decl. Ex. A.

1    the first allegedly infringing use commences, the presumption of validity that typically attaches

2    to registered trademarks does not apply and the party alleging infringement must show that the

3    asserted mark was an enforceable common law mark at the time of the first allegedly infringing

4    use.

5         Tacitly acknowledging that it must prove that "American Blinds" was an enforceable

6    common law mark at the time of the first allegedly infringing use, ABWF argues that "American

7    Blinds" (1) is inherently distinctive, and (2) even if it is not, it has acquired secondary meaning.

8    Both of these arguments fail. First, "American Blinds" is not inherently distinctive, it is

9    descriptive. Second, ABWF has presented no evidence that "American Blinds" acquired

10   secondary meaning at all, much less *before* Google's first allegedly infringing use.

11        **1.    "American Blinds" is a descriptive mark, not an inherently distinctive one.**

12        A mark is inherently distinctive depending on which of the five categories of trademarks

13   it belongs. If it is fanciful, arbitrary, or suggestive, as opposed to generic or descriptive, then it is

14   inherently distinctive.[38] Generic marks "give the general name of the product," descriptive

15   marks "define qualities or characteristics of a product in a straightforward way that requires no

16   exercise of the imagination to be understood," while a suggestive mark is one for which a

17   consumer must use "imagination or any type of multistage reasoning to understand the mark's

18   significance, ... the mark does not describe the product's features, but suggests them."[39]

19        Tellingly, ABWF avoids any analysis about whether "American Blinds" is generic,

20   descriptive or suggestive. Instead, it argues only that because the USPTO registered "American

21   Blinds" without requiring a showing of secondary meaning that the mark must be inherently

22   distinctive. But inherent distinctiveness is not a status that the USPTO can confer upon a mark

23   in the same way that the USPTO can confer incontestability. Instead, as the term suggests, the

24   distinctiveness of the mark must be inherent—in other words a fundamental part of the mark's

25   essence—for it to be inherently distinctive.

26   _____

27   [38] *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 926 (9th Cir. 2005).

28   [39] *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8. (9th Cir. 1998).

1    Even the most cursory examination demonstrates that "American Blinds" is not

2  inherently distinctive.  ABWF uses (or at least purports to use) "American Blinds" to identify

3  blinds made and sold in America.  Since the mark defines the product in a straightforward way

4  that requires no imagination or any type of multistage reasoning to understand, the mark is

5  descriptive and not suggestive.[40]

6    **2.    ABWF has presented no evidence that "American Blinds" acquired
        secondary meaning before Google's first allegedly infringing use.**

7

8    Because the "American Blinds" mark is not inherently distinctive, ABWF must show that

9  the mark acquired secondary meaning *before* the first allegedly infringing use by Google

10  began.[41]  ABWF alleged as early as July 23, 2002 that Google infringed the ABWF mark,[42] and

11  it filed its counterclaims containing these allegations on May 24, 2004.  Yet the only evidence it

12  has presented that even arguably supports secondary meaning in the "American Blinds" mark is

13  either undated or from 2006:

14  - ABWF claims that its "sales catalogues prominently feature the AMERICAN
     BLINDS mark,"[43] but its only corroborating evidence is a sales catalog dated
15    "Fall 2006."[44]  Moreover, this catalog is actually branded with "American Blinds,
     Wallpaper & More" and the only thing that resembles "American Blinds" is the
16    website address "www.americanblinds.com."

17  - ABWF also points to sales scripts that contain "American Blinds," but these
     scripts are dated "07.12.06," "12.14.06," "07.13.06," "07.10.06," and
18    "07.11.06."[45]

19  - ABWF submits the label that appears on its private label blinds, but this label is
     undated and while it lists the website "americanblinds.com" the mark "American
20

21  ─────────────────

[40] *See, e.g., Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002) (holding that
22  the mark "Entrepreneur" used to describe a magazine geared toward small business owners is
   descriptive because it "describes both the subject matter and the intended audience of the
23  magazine and programs; an entirely unimaginative, literal-minded person would understand the
   significance of the reference").

24  [41] *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985) (en banc);
   *Commerce Nat'l Ins. Servs., Inc. v. Commerce Nat'l Ins. Agency, Inc.*, 214 F.3d 432, 443 (3d Cir.
25  2000).

26  [42] Supp. Hamm Decl. Ex. C.

27  [43] Opp'n 4.

   [44] Alderman Decl. Ex. C.

28  [45] *Id.* Ex. D.

12

389264.02

1    Blinds" does not appear on it.[46]  Because this label uses the name "American, Blinds, Wallpaper & More," and ABWF began using this name in its advertising beginning in January 6, 2006, it appears that this label is recent too.[47]

2

3    ABWF's other "evidence" that "American Blinds" has secondary meaning is of even less

4    value.  Much of it does not even relate to the "American Blinds" mark; instead it consists of

5    vague assertions that could be referring to any one of six marks.  ABWF states that its "evidence

6    demonstrates that there is a genuine issue of material fact . . . on the issue of secondary meaning

7    in the American Blinds Marks" and goes on to make claim after claim about its use of the

8    "American Blind Marks."  But ABWF defines "American Blinds Marks" to mean six different

9    marks,[48] and claims such as ABWF has marketed products under "the American Blinds Marks

10   nationwide for over 20 years" are not true since ABWF admits that it did not begin using one of

11   the marks until 2000 and its interrogatory responses show that it has repeatedly changed the

12   name of the company.[49]  In short, ABWF's arguments about the "American Blinds Marks" do

13   not provide any specific information about the mark "American Blinds."

14   Jeffrey Alderman's declaration is just as vague.[50]  It does not indicate when ABWF "long

15   ago adopted and used, and has continued to use . . . AMERICAN BLINDS."[51]  Nor does it

16   indicate when it began promoting its private label products under the designation "American

17   Blinds," except by stating that it has done so for "many years."[52]  Moreover, these statements, to

18   the extent they are not self contradicting[53] or expressly contradicted by the evidence,[54] are

19

---

[46] *Id.* Ex. E.

20

[47] Hamm Decl. Ex. H at 3.  ABWF also claims to have used "American Blinds, Wallpaper &

21   More" during "the second half of the 1990s" but it is unlikely that the label is from then because ABWF "does not have access to the majority of the corporate records" from that time period.  *Id.*

22   at 2 n.1.

[48] Opp'n at 3.

23

[49] *Compare* Opp'n at 22 *with* Opp'n at 5; *see also* Hamm Decl. Ex. H.

24   [50] As explained in Google's objections to Mr. Alderman's declaration, much of it is inadmissible.

25   [51] Alderman Decl. ¶ 8.

[52] *Id.* ¶ 13.

26

[53] At one point in his declaration, Mr. Alderman claims that "the AMERICAN BLIND mark is

27   the display URL for the American Blind's [sic] Website," and in another he explains that it is www.decoratetoday.com.  *Compare* ¶ 17 *with* ¶ 25.  The truth is that www.decoratetoday.com is

28   the destination and display URL, such that if one types www.americanblinds.com into his browser he will be redirected to a page whose URL begins with www.decoratetoday.com and

---

13

389264.02

1   uncorroborated, making them of little value and which the Court is "entitled to discredit."[55]

2   Finally, while ABWF admits that "it has failed to conduct a survey on secondary

3   meaning," it incorrectly claims that Google argues this is the sole reason why ABWF cannot

4   prove secondary meaning.[56] Google's point, instead, is simply that ABWF has not proven

5   secondary meaning with circumstantial evidence, as explained above, or with the direct evidence

6   that a survey would provide. In other words, ABWF has *no* evidence of any type that "American

7   Blinds" acquired secondary meaning before Google allegedly began infringing the mark.

8   Because ABWF has no evidence that it has the right assert "American Blinds" against Google,

9   the Court should grant summary judgment on all claims relating to this mark.

10  **C.     ABWF cannot prove a likelihood of confusion for any of the asserted marks.**

11  ABWF makes much of the fact that Google's opening brief does not individually analyze

12  each of the factors enumerated in *AMF, Inc. v. Sleekcraft Boats, Inc.*, 279 F.3d 1135 (9th Cir.

13  1979). But ABWF loses sight of the fact that considering the *Sleekcraft* factors

14  "mechanically... would be entirely misleading, as the determination of one factor is often, in

15  essence, only another way of viewing the same consideration already taken into account in

16  finding the presence or absence of another."[57] Since the situation at issue here is so unique—

17  after all the advertisements clearly display accurate URLs and do not contain ABWF's asserted

18  trademarks—it is even more important to take a thoughtful approach: when considering

19  likelihood of confusion on the internet a court "must be acutely aware of excessive rigidity . . .

20  emerging technologies require a flexible approach."[58] Instead of trying to weigh meaningless

21

22  that displays decoratetoday.com in its text.

[54] For example, ABWF improperly submitted evidence showing that its house blinds are branded
23  "American Blind & Wallpaper Factory," while Mr. Alderman's own Rule 30(b)(6) testimony
    was that they were branded the "American Brand." *See Block v. City of Los Angeles*, 253 F.3d
24  410, 419 (9th Cir. 2001) ("A party cannot create a genuine issue of material fact to survive
    summary judgment by contradicting his earlier version of the facts.").

25  [55] *Levi Strauss & Co.*, 778 F.2d at 1358 (affirming judgment against plaintiff asserting mark
    because district court was entitled to discredit "uncorroborated testimony" regarding first use).
26  [56] Opp'n at 23.

27  [57] *Entrepreneur Media*, 279 F.3d at 1141; *see also Brookfield Commc'ns, Inc. v. West Coast
    Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).
28  [58] *Brookfield*, 174 F.3d at 1054; *see also Playboy* ("In the Internet context, courts must be

14

389264.02

1    factors, it is critical to focus on "the analysis as a whole," which is "the likelihood of consumer

2    confusion as to the origin of the product or service bearing the allegedly infringing mark."[59]

3        Moreover, ABWF bears the burden of proving a likelihood of confusion. To meet this

4    burden it must "show sufficient evidence to permit a rational trier of fact to find that confusion is

5    'probable,' not merely 'possible.'"[60] And it must shows that the alleged "use of a mark must be

6    likely to confuse an *appreciable* number of people as to the source of the product."[61]

7        **1.    ABWF has no confusion evidence.**

8        Given the circumstances of this case, the question of whether there is any actual

9    confusion emerges as the most important factor in determining whether a reasonable consumer is

10   likely to be confused. If no one is confused that a Google page with lots of search results

11   displays an advertisement that promotes a product relevant to the search term then it would be

12   nonsensical to conclude that there is a likelihood of confusion simply because of the presence of

13   one or more of the other *Sleekcraft* factors. More importantly, ABWF's purported application of

14   the various *Sleekcraft* factors mistakenly analyzes the claimed similarity *not* of Google and its

15   products but of nonparty competitors' products. It may be that some of ABWF's competitors

16   sell similar goods in similar markets through similar channels with similar names, but ABWF

17   has made no effort to establish this, and it is evident from their competitors' advertisements that

18   they operate under very different names. As for Google, none of the *Sleekcraft* factors apply:

19   Google sells advertising space to primarily corporate customers under the brand names

20   "Google," "AdWords," and the like. ABWF sells window treatments to individuals under an

21   array of brand names wholly unlike Google's.[62]

22

---

23   flexible in applying the factors, as some may not apply.")

24   [59] *Entrepreneur Media*, 279 F.3d at 1141 (emphasis in original).

     [60] *M2 Software, Inc., v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005) (quoting *Murray v.*
25   *CNBC*, 86 F.3d 858, 861 (9th Cir. 1996)).

26   [61] *Entrepreneur Media,* 279 F.3d at 1151.

     [62] Indeed, the presence of other *Sleekcraft* factors might even suggest that there is *not* a
27   likelihood of confusion in this case. For example, ABWF emphasizes the similarity of the marks
     factor, arguing that because Sponsored Links are triggered with their marks that factor weighs in
28   its favor. But Google is a search engine that displays search results relevant to the user queries,
     so users actually *expect* to see results from multiple sources that are relevant to the search term

15

389264.02

1        Taking into account the unique issues of internet advertising, application of the

2   *Sleekcraft* factors makes little sense here, particularly when they are applied to ABWF's

3   competitors rather than to Google. It is not surprising that when *Playboy* considered likelihood

4   of confusion in a similar context it opined that "actual confusion is at the heart of the likelihood

5   of confusion analysis" while recognizing that "no confusion would occur" if an advertisement

6   appearing on a search engine results pages "clearly identified its source."[63]

7                    **a.    ABWF has no evidence of actual confusion.**

8        When an alleged infringement has been taking place for years and there is no evidence of

9   confusion, this absence "can be a powerful indication that there is no likelihood of confusion

10  between the two marks."[64] Even though ABWF alleges that Google has infringed its trademarks

11  for more than four years, ABWF has no evidence that a consumer has ever viewed a

12  competitor's ad triggered by one of its alleged trademarks thinking that the ad emanated from

13  ABWF. Nor does it have evidence that a consumer has ever clicked on one of these ads thinking

14  that the ad emanated from ABWF or that a consumer has ever purchased a product from one its

15  competitors believing that she was making a purchase from ABWF. Indeed, when Google asked

16  ABWF in an interrogatory to state all facts supporting its contention that ABWF's customers are

17  confused about the origin and sponsorship of Google's Sponsored Links, ABWF stated, with no

18  detail, only that its call center occasionally receives calls from people who thought they placed

19  an order with ABWF but had actually placed it with a competitor.[65] When pressed, however,

20  ABWF could present no evidence of such calls. Without such evidence, it is impossible to know

21  if those purported instances had anything to do with Google, or with internet advertising at all.

22  _____

23  entered. And without a doubt, consumers consider competing products relevant. Indeed, they
    may have even been seeking such results when they entered an ABWF trademark as a search
    term. The important issue then is not whether the search terms is the same as ABWF's mark or

24  if both ABWF and its competitors market their goods on the internet; it is whether users
    recognize the ads for what they are or are confused by them.

25  [63] *Playboy*, 354 F.3d at 1025 n.16, 1027.

26  [64] *Nautilus Group, Inc. v. Savvier, Inc.*, 427 F.Supp.2d 990, 997 (W.D.Wash. 2006); *see also
    Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842-43 (9th Cir. 2002) (when complained of practice has

27  been ongoing "some evidence of actual confusion should have become available if [the alleged
    infringer's] coexisting use had created a genuine likelihood of confusion").

28  [65] Supp. Hamm Decl. Ex. D - F.

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

389264.02

1  This lack of confusion strongly suggests there is no likelihood of confusion because it is a "rare

2  case in which a likelihood of future confusion is possible even where it is conceded that two

3  marks have been used simultaneously for years with no resulting confusion."[66]

4  **b.    ABWF's confusion survey is of no probative value.**

5         Nor does ABWF have any survey evidence suggesting that consumers are confused about

6  the sponsorship of ads triggered by ABWF's alleged trademarks. And while ABWF claims that

7  the mere presence of a survey is enough to preclude summary judgment, this claim ignores the

8  fact that in another case revolving around virtually identical facts, Google was granted judgment

9  as a matter of law precisely because the plaintiff's flawed survey left it with no confusion

10 evidence: "plaintiff has failed to establish a likelihood of confusion stemming from Google's use

11 of [plaintiff's] trademark as a keyword and has not produced sufficient evidence to proceed on

12 the question of whether the Sponsored Links that do not reference [plaintiff's] marks in their

13 headings or text create a sufficient likelihood of confusion to violate . . . the Lanham Act."[67]

14       Tellingly, ABWF makes virtually no effort to respond to the myriad reasons why the

15 Ossip report is of no probative value. As set forth in Google's opening brief, this is not the

16 typical case where a trademark defendant quibbles with the wording of a survey: such quibbles,

17 ABWF correctly notes, usually go to weight, not admissibility. Instead, this is a case where the

18 many errors in the survey are so sweeping that the Court must conclude that no trier of fact could

19 conclude from it that there is a likelihood of confusion. Rather than make any substantive

20 response to those critiques, however, ABWF goes off on two tangents: it first questions the

21 competence of *Google's* expert, Dr. Itamar Simonson, to raise those critiques. And it then

22 argues that Google cannot question the validity of ABWF's survey without submitting one of its

23 own. Neither argument can salvage ABWF's survey.

24       As to the first point, Dr. Simonson is one of the most respected experts on survey

---

[66] *Brookfield*, 174 F.3d at 1050 ("We cannot think of more persuasive evidence that there is no *likelihood* of confusion between these two marks than the fact that they have been simultaneously used for five years without causing any consumers to be confused as to who makes what.").

[67] *Government Employees Ins. Co. v. Google, Inc.*, 2005 WL 1903128 at *7 (E.D.Va. Aug. 8, 2005).

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

389264.02

1   methodology in the nation, and is certainly competent to testify as to the egregious flaws in

2   ABWF's survey. We address ABWF's objections to Dr. Simonson's report separately.[68] But on

3   the only criticism ABWF addresses in its opposition—the lack of any control—the Court need

4   not look only to Dr. Simonson. ABWF's *own expert*, Mr. Ossip, candidly admits that the lack of

5   a control in this case leaves him unable to express *any* expert opinion on the relevant question in

6   this case: whether the use of trademarks *as keywords* causes confusion. Because he failed to test

7   the levels of confusion when the search term is generic (such as "blinds"), he has no basis to

8   opine whether using an alleged trademark ("American Blinds") adds to that nonexistent baseline:

9

10          Q.   Do you have any scientific basis for the opinion that the confusion would
            have been less using the search term blinds?

11          A.   I didn't do it, so I can't say I have evidence in that regard.[69]

12      As explained in our opening brief, ABWF's expert controlled for and tested the wrong

13   hypothesis—whether levels of confusion change depending on the number of advertisements—

14   rather than the correct hypothesis: whether use of trademarks as keywords causes confusion.

15   Google does not need the Court to discard Mr. Ossip's opinion (although for many other reasons

16   it can and should). Instead, Google is asking the Court to recognize—as Mr. Ossip himself

17   does—that Mr. Ossip has not submitted a relevant opinion in the first place.

18      As for the other fatal flaws identified by Google, ABWF's response in each instance is…

19   silence. ABWF simply ignores each of the following issues raised by Google:

20

21   • Mr. Ossip mistakenly believed that a product named "American Blinds" exits,
       only included in his survey respondents who shared that mistaken belief, and then
       asked them where they could buy that nonexistent product.[70]

22

---

[68] ABWF has both objected to Dr. Simonson's report as evidence in support of this motion and
filed a *Daubert* motion, set for argument March 12, 2007. We address the objections that relate
to this motion in our response filed herewith. Other issues raised by the *Daubert* motion, which
relate to portions of Dr. Simonson's report that are not relied on in Google's summary judgment
motion, will be addressed in opposition to that motion.

[69] Hamm Decl. Ex. G at 24:4-8.

[70] Although it ignores this issue in it brief, ABWF submits evidence concerning the brand name
that appears on its house brand blinds. Curiously, that evidence *both* directly contradicts the
sworn deposition testimony of the same witness, Mr. Alderman, and *nonetheless* confirms
Google's point. While Mr. Alderman previously testified that those products are labeled
"American Brand," he now reverses himself and swears that they instead bear labels reading

18

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1    • Mr. Ossip failed to conduct any survey concerning any of ABWF's registered
2       trademarks, instead using only "American Blinds"—a mark that was not
        registered until long after this suit began.

3    • Mr. Ossip, purports to test whether users who were trying to find ABWF's
4       website would be diverted to other sites. But when, notwithstanding the other
        problems in his methodology, only 10-13% of his respondents failed to find
5       ABWF on the first try, Mr. Ossip then asked additional questions of the
        respondents who had already gotten the right answer, and then counted many of
6       them as confused, nearly tripling his confusion figures.

7    • Mr. Ossip altered the real-world Google search pages by removing ABWF's own
        advertisements, violating the basic rule that surveys should mirror as much as
8       possible the real world, and removing a "correct" choice the user would see in an
        actual search.

9    • Mr. Ossip "coded" his own verbatim results, rather than having a "blind" panel do
10      it. As a result, he counts responses such as "Because on the computer you can get
        anything quick and fast" as indicating confusion caused by the search term.[71]

11   In each instance, ABWF offers no defense to its survey. Instead, it takes the remarkable

12   position that its survey is immune to criticism because Dr. Simonson has not conducted his own

13   survey. In order to make this argument, ABWF engages in a transparent bit of semantic

14   gamesmanship. ABWF relies on a number of cases that hold that a "plaintiff's" failure to

15   conduct a survey leads to an adverse inference that there is no confusion.[72] ABWF then argues

16   that "although it is the plaintiff, Google has conducted no survey . . . ."[73]

17   The foolishness of this argument is self evident: in a typical trademark case, it is the

18   trademark holder that is the "plaintiff" and is claiming confusion. More importantly, it is the

19   "plaintiff" who has the burden of proof, and thus the failure to submit evidence to meet that

20
_____

21   "American Blinds, Wallpaper & More." *Compare* Supp. Hamm Decl. Ex. G at 189:20-190:21
     *with* Alderman Decl. ¶ 21. Notwithstanding the fact that it a party cannot create a disputed issue
22   of fact by submitting a declaration that contradicts its earlier deposition testimony, *see*
     *Block*, 253 F.3d at 419, in neither version of the tale are there any products branded "American
23   Blinds." But given the confusion that ABWF's constantly revolving brand names appear to
     cause even among its own senior executives, it is little wonder that both its expert and the public
     are similarly baffled.

24   [71] Note that this was doubly damaging: not only did someone who knew the desired result do the
25   subjective analysis, but that person—Mr. Ossip—thought he was testing whether the number of
     ads caused confusion, rather than whether the search term did, and thus was making decisions
26   based on whether each answer was relevant to the wrong hypothesis. For example, "Because it's
     the top ad" would certainly be counted as relevant to whether allowing more than one ad makes a
27   difference, but not to whether the search term does.

     [72] Opp'n at 29.
28   [73] *Id.*

_____

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

389264.02

1   burden is often fatal.  Here, however, this case started as a declaratory judgment action, followed

2   by counterclaims by ABWF, and thus Google appears on the caption as the "plaintiff."  But

3   ABWF is the trademark holder, the party alleging infringement, and the party with the burden of

4   proof on, *inter alia*, confusion.  In order to survive summary judgment, it is ABWF that must

5   adduce evidence of confusion.  Google, on the other hand, does not have the burden of proof:  its

6   burden, on summary judgment, is met by showing the absence of evidence on ABWF's part, not

7   by affirmatively proving the negative.  Google has no obligation to conduct its own survey,

8   particularly where—as here—its opponent's survey proves nothing to begin with.[74]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

---

23   [74] ABWF's position appears to be that one can never challenge the work of an expert without
duplicating that work.  But if that were the case, why would there ever be such a thing, with a
24   separate submission deadline, as "rebuttal reports"?  Presumably, had Dr. Simonson's report
included a survey, ABWF would be seeking to strike it as an improper rebuttal, saying that
25   because it contained its own evidence it should have been submitted as an opening report.

26

27

28

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

389264.02

1
2
3
4
5
6

**2.    ABWF cannot prove initial interest confusion.**

7        Instead of addressing Google's argument that ABWF cannot prove initial interest

8   confusion, ABWF ignores it.  ABWF relies on the initial interest confusion theory because it

9   does not contend—much less provide evidence—that anyone has ever bought a competitor's

10  product believing that it was purchasing from ABWF.  The initial interest confusion doctrine

11  rests on the notion that a company can still profit from trademark confusion even if this later

12  confusion is dispelled because the consumer may not want to incur the switching costs of

13  purchasing from the trademark owner.  But because switching costs are negligible on the

14  internet—it takes only a click to change course—one of the doctrine's requirements is that a

15  finding of initial confusion cannot be based on the content of a link to a website alone.  Instead,

16  the website to which the link connects must be examined.[82]  ABWF has failed to undertake that

17  analysis or to provide any evidence about the websites to which the Sponsored Links connect.

18        ABWF's non-responsive rebuttal to this shortcoming consists only of the statement that

19  "Google does not like the initial interest confusion doctrine" and a citation to cases

20  demonstrating its existence.[83]  But Google does not argue that the doctrine does not exist.

21  Instead Google merely points out that, like all legal doctrines, the initial interest confusion

22  doctrine has certain requirements that must be met in order to apply.  ABWF's disregard for its

23  own theory renders its *Sleekcraft* analysis virtually irrelevant since it focuses only on the

24  Sponsored Links and not the websites to which they link.  As a result, ABWF cannot show that

25

---

26  [80] Opp'n 10.

    [81] Opp'n 30.

27  [82] *See Lamparello v. Falwell*, 420 F.3d 309, 316 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 1772 (2006).

28  [83] Opp'n 24.

1  Google's supposed use of its marks is likely to cause confusion.

2  **D.    ABWF's marks are not famous.**

3      ABWF's evidence of fame is of no value for the same reason that its evidence of

4  secondary meaning was of no value: ABWF treats each of its six independent marks (and one

5  mark not even at issue in this case) as if they are one mega-mark. But the fame inquiry is not

6  performed on a collection of marks. It is performed on individual marks. Practically all of

7  ABWF's evidence of fame is collective, such as the value of commerce done under the marks

8  collectively, and their alleged collective value as keywords. This evidence is worthless, because

9  a jury could not glean from it any information about any individual mark. Then ABWF attempts

10  to argue that the marks have been in collective use nationwide for twenty years. Perhaps. But as

11  ABWF's own interrogatory response admits, no individual mark has been used continuously as

12  the name of the business for more than five years.[84] Indeed, the only individualized evidence of

13  fame that ABWF can proffer is that ABWF has federal registrations for each of the marks. So

14  what? That just means that ABWF has registered trademarks, not that it has famous marks.

15      Even if the Court were willing to consider ABWF's collectivized evidence, ABWF has

16  still failed to make the one point that it needed to make: that its marks are widely recognized. As

17  case law makes clear, a trademark holder cannot just throw a bunch of numbers at a court to

18  create the suggestion of fame. The numbers must be meaningful. *This is precisely why a fame*

19  *survey is so valuable.* Take the example of *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*,

20  244 F.3d 88 (2d Cir. 2001). The Second Circuit rejected the evidence—which is very similar to

21  the evidence ABWF provided here—as too "sketchy" to permit a finding of fame:

22      According to TCPIP's affidavit, in 1999 it operated 228 retail stores in 27 states
        under the mark "The Children's Place," and achieved sales in 1998 of $280
23      million…. Over the past decade, the affidavit asserts, TCPIP spent "tens of
        millions of dollars" advertising its mark, but does not tell how many millions,
24      when expended, or how effectively. Nor did TCPIP submit consumer surveys,
        press accounts, or other evidence of fame….While it asserts that the plaintiff (and
25      its predecessors) have used the mark continuously and exclusively for thirty years,
        [the affidavit] gives no further information…that would enable a court to
26      determine the extent or dimension of public recognition of the mark and whether

27

28  ---
    [84] Hamm Decl. Ex. H.

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

389264.02

1    it has fame sufficient to meet the requirement of the Act.[85]

2    Because ABWF's evidence about sales and marketing do not help the Court to determine how

3    widely recognized any one of its marks is, summary judgment should be granted on the dilution

4    claim.

5    **E.    The unclean hamds doctrine applies because when it comes to its own advertising ABWF does what it claims violates trademarks laws.**

6

     ABWF offers two responses to Google's unclean hands argument.  Neither holds water.

7    First, ABWF cites a 1992 District Court case for the proposition that unclean hands

8    applies only to cases where the trademark was *acquired* by improper means:  "*Kelley Blue Book*

9    *v. Car-Smarts, Inc.*, 802 F. Supp. 278, 291 (C.D. Cal. 1992) ('What is material is not that the

10   plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts.')."[86]

11   Unfortunately, ABWF neglects to identify the original source of that quote, or to include the rest

12   of it.  It originates from a Ninth Circuit case, and was quoted in its entirety in our opening brief:

13   "What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring

14   the right he now asserts, *or that the manner of the dirtying renders inequitable the assertion of*

15   *such rights against the defendant*."[87]  It is the *second* prong of this test that is relevant:  ABWF's

16   treatment of identically situated competitors renders the relief they seek here inequitable:

17   ABWF cannot urge this Court to find illegal and enjoin the same conduct it engages in itself.[88]

18

19   Nor can ABWF absolve itself by way of its second argument:  that it stops violating the

20   rights of others if they demand it.  First, let's be clear:  *Google* does not believe there is anything

21   wrong with *either* ABWF or its competitors keying ads off each others' marks.  It is simply

22   healthy competition, with each seeking to inform the others' customers and potential customers

23   of its own products.  It is *ABWF* that claims that allowing competitors' ads to appear when a user

24   searches for "American Blinds" violates the Lanham Act.  And yet ABWF continues, *to this day*,

25   _____

     [85] *TCPIP Holding*, 244 F.3d at 99-100.

26   [86] Opp'n 34.

27   [87] *Republic Molding Corp. v. B. W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963) (emphasis added).

28   [88] It does not matter if one calls this "unclean hands" or "equitable estoppel."

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

389264.02

1   to place ads that appear when users search for "USA Wallpaper," for example.[89]

2        ABWF's claim that it enters "negative keywords" when a competitor demands it makes

3   no difference. ABWF's own claims against its competitors do not depend on those competitors

4   receiving and refusing a demand to stop; it is ABWF's position that Google and its advertisers

5   are liable regardless whether ABWF has policed its mark itself.

6

7

8

9

10

11

12

13

14

15                  **IV.    CONCLUSION**

16        For the foregoing reasons, this Court should enter summary judgment in favor of Google.

17   Dated: February 2, 2007              KEKER & VAN NEST, LLP

18

19

20                          By:  /s/ Michael H. Page
                                 MICHAEL H. PAGE
21                               Attorneys for Plaintiff and Counter Defendant
                                 GOOGLE INC.

22

23   _____

24   [89] Hamm Decl. Ex. W.

     [90] Hamm Decl. Ex. L at 163:19-165:12. Submitting this contracting declaration is improper. *See*
25   *Block*, 253 F.3d at 419 ("A party cannot create a genuine issue of material fact to survive
     summary judgment by contradicting his earlier version of the facts.").

26

27

28

GOOGLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. C 03-5340-JF (RS)

389264.02