# Exhibit 1

Dockets.Justia.com

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GOOGLE, INC., a Delaware corporation,

                Plaintiff,

        vs.                    Case No. C 03-5340-JF

AMERICAN BLIND & WALLPAPER
FACTORY, INC., a Delaware corporation
d/b/a decoratetoday.com, Inc., and
DOES 1 - 100, inclusive,

                Defendants.
_____/

AMERICAN BLIND & WALLPAPER
FACTORY, INC., a Delaware corporation
d/b/a decoratetoday.com, Inc.,

                Counter-Plaintiff,

        vs.

GOOGLE, INC.,

                Counter-Defendant.
_____/

           The video deposition of JEFFREY A. ALDERMAN,
taken pursuant to the Rules of the State of California,
before Lana Kia Haws, CRR, CM, RPR, CSR-0995, a Notary
Public in the County of Oakland, Acting in the County
of Wayne, State of Michigan, at the Inn at St. John's,
44045 Five Mile Road, Plymouth, Michigan, on August 4,
2006, commencing at or about the hour of 8:00 a.m.

APPEARANCES:
     Keker & Van Nest, LLP
     BY:  MR. MICHAEL H. PAGE
     710 Sansome Street
     San Francisco, CA  94111-1704
     (415) 391-5400
          Appearing on behalf of the Plaintiff.

     Kelley Drye & Warren, LLP
     BY:  MR. PAUL W. GARRITY
     101 Park Avenue
     New York, New York  10178
     (212) 808-7613
          Appearing on behalf of the Defendants.

Page 2

1  ALSO PRESENT:  Jody C. Chapa, C.L.V.S.
              Chapa Legal Video
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

EXAMINATION INDEX

Page  Line      Keyword = EXM.

5   10   CROSS-EXM. BY MR. PAGE

Page  Line      Keyword = mark'd

36   17   Deposition Exhibit 1 mark'd
50   14   Deposition Exhibit 2 mark'd
105   15   Deposition Exhibit 3 mark'd
116   8   Deposition Exhibit 4 mark'd
118   18   Deposition Exhibit 5 mark'd
121   17   Deposition Exhibit 6 mark'd
126   8   Deposition Exhibit 7 mark'd
128   14   Deposition Exhibit 8 mark'd
131   11   Deposition Exhibit 9 mark'd
136   23   Deposition Exhibit 10 mark'd
138   23   Deposition Exhibit 11 mark'd
143   8   Deposition Exhibit 12 mark'd
146   9   Deposition Exhibit 13 mark'd
150   25   Deposition Exhibit 14 mark'd
153   19   Deposition Exhibit 15 mark'd
155   10   Deposition Exhibit 16 mark'd
159   13   Deposition Exhibit 17 mark'd
160   15   Deposition Exhibit 18 mark'd
162   8   Deposition Exhibit 19 mark'd
168   5   Deposition Exhibit 20 mark'd
169   22   Deposition Exhibit 21 mark'd
172   5   Deposition Exhibit 22 mark'd
174   8   Deposition Exhibit 23 mark'd
175   24   Deposition Exhibit 24 mark'd
178   11   Deposition Exhibit 25 mark'd
180   19   Deposition Exhibit 26 mark'd
184   3   Deposition Exhibit 27 mark'd

Page 4

1          (The deposition commenced
2  at about 8:00 a.m.)
3
4
5          THE VIDEOGRAPHER:  We are on the record.
6  The time is 8:03:40 a.m.
7          This is the videotaped deposition of
8  Mr. Jeffrey A. Alderman taken in the case of Google,
9  Inc., versus American Blinds and Wallpaper Factory, Inc.
10          Today's deposition is held at the Inn at
11  Saint John's, Plymouth, Michigan.
12          Today's date is August 4, 2006.
13          My name is Jody C. Chapa, C.L.V.S.
14          Today's court reporter is Lana Haws,
15  C.S.R.
16          Please swear the witness.
17          THE REPORTER:  Sir, would you raise your
18  right hand, please?
19          Do you solemnly swear or affirm that the
20  testimony you are about to give will be the truth, the
21  whole truth, and nothing but the truth, so help you God?
22          THE WITNESS:  Yes.
23          THE VIDEOGRAPHER:  Thank you.
24  Counsel, please introduce yourself for the record and
25  begin examination.

Page 5

1          MR. PAGE:  Michael Page of Keker and
2  Van Nest representing Google.
3          MR. GARRITY:  Paul Garrity of Kelley
4  Drye & Warren for American Blind and Wallpaper.
5          THE WITNESS:  Jeff Alderman, American
6  Blinds.
7
8
9          CROSS-EXAMINATION
10  EXM. BY MR. PAGE:
11          Q.  Good morning.  Have you ever had your
12  deposition taken before?
13          A.  Once.
14          Q.  Okay.  And when was that?
15          A.  Several years ago.
16          Q.  Okay.  In what sort of case?
17          A.  Car accident.
18          Q.  So it was not business related?
19          A.  No.
20          Q.  Okay.  I am sure your counsel has gone over
21  the ground rules.  There are a couple of things to keep
22  in mind.
23          One, if at any time my questions seem
24  ambiguous to you or you don't fully understand them,
25  please say so.

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 6

1    I have been known to ask incoherent
2  questions from time to time. Don't guess as to what I
3  mean and answer because someone reading the transcript
4  may have a different guess.
5    A. Okay.
6    Q. Also, as you know, the court reporter will be
7  taking down everything we say.
8    So we have to try to not talk over each
9  other, which is sometimes difficult in conversation.
10 You tend to see where a question is going and start
11 answering it, but she will get mad at us.
12    If you need a break at any time, just let
13 me know. I'll take breaks about once an hour; but if
14 you need one, at any time, just say so.
15    A. Okay.
16    Q. And I will try to get this done and out of
17 here.
18    If you could take a look at -- by your
19 left hand is a document with a sticker that says
20 Layne 1. It should be the top document.
21    If you could take a look at this, and
22 tell me if you have seen it before.
23    A. Yes.
24    Q. Is it your understanding that you have been
25 designated by American Blind to testify concerning a

Page 7

1  number of these topics?
2    A. A number of them, yes.
3    Q. Let's see if I can do this the easy way.
4    Is it your understanding that you have
5  been designated to testify on all these topics, except
6  5 through 7, 9, 10, 19, and 22?
7    A. I believe those are all of them, yes.
8    Q. What did you do, if anything, to prepare for
9  today's deposition?
10    A. Met with Mr. Garrity over this past week. I
11 received a number of boxes with information to go
12 through to educate myself. I went through our corporate
13 files. I went through Mr. Katzman's files.
14    Q. Okay. How many times did you meet with
15 Mr. Garrity?
16    A. I met with Mr. Garrity for the first time in
17 mid July, I believe it was, the 19th; and then I met
18 with him this week Monday, Tuesday, Wednesday, Wednesday
19 and Thursday nights.
20    MR. GARRITY: We have gotten to be good
21 friends.
22    MR. PAGE: You didn't invite me.
23    MR. GARRITY: Next time.
24    Q. (BY MR. PAGE) What's the highest level of
25 education you have received?

Page 8

1    A. Bachelor's of business.
2    Q. And where -- where and when did you receive
3  that?
4    A. Western Michigan University, 1999.
5    Q. Could you summarize for me your employment
6  history starting from graduation in '99?
7    A. Sure. I was working at that time for
8  Cybermind. With Cybermind, I was Director of Internet
9  Marketing.
10    From there, I went to work for Beyond
11 Interactive.
12    From there, I went to work for Glass Tree
13 and from Glass Tree, came to American Blinds.
14    Q. Let's take those one at a time.
15    What is Cybermind?
16    A. Cybermind was a internet company specializing
17 in web development, design, and hosting primarily for
18 small and medium sized businesses.
19    Q. And what was -- and what was your job there?
20    A. My job there was to build the sales team. I,
21 also, at that time worked putting proposals together and
22 a number of things around client relations.
23    Q. And when did you -- and when did you -- I'm
24 sorry.
25    What was the next company before Glass

Page 9

1  Tree?
2    A. Before Glass Tree, Beyond Interactive.
3    Q. When did you go to Beyond Interactive?
4    A. I went to Beyond Interactive around January
5  of 2000.
6    Q. And why did you change jobs?
7    A. Better opportunity.
8    Q. What was your position at Beyond?
9    A. I was -- I believe the title was Dialogue
10 Supervisor, which was inside their E-Mail Marketing
11 Department.
12    Q. Okay. What is a dialogue supervisor?
13    A. I worked with companies such as American
14 Greetings was my biggest account, and I would work
15 with them to create strategies for e-mail marketing.
16    Q. I see. Was Beyond an e-mail marketing company?
17    A. Beyond Interactive was a digital advertising
18 agency. So e-mail was part of what they do.
19    Q. What else did they do beyond e-mail? Sorry.
20    A. They did, when I was there, a lot of on-line
21 marketing, met a lot of clients. They did media buys,
22 optimization, creative were the primary departments
23 that I can recall at this time.
24    Q. Okay, and how long were you with Beyond?
25    A. I was with Beyond for just over a year.

Page 10

1    Q. So what, in 2001, you went to Glass Tree; is
2  that right?
3    A. Yes.
4    Q. What is or was Glass Tree?
5    A. Glass Tree, when I worked there, was a web
6  development, web design, and hosting company.
7    Q. Does it still exist?
8    A. To be honest with you, I don't know.
9    Q. Why did you move to Glass Tree?
10    A. I moved to Glass Tree because it was a better
11  opportunity. I was, you can say, got caught up in the
12  dot com bust at Beyond and was laid off.
13    Q. I see, okay. So, by definition, it was a
14  better opportunity.
15        What was your position at Glass Tree?
16    A. Glass Tree was a similar position to Cybermind.
17  I worked with them to build different materials for
18  sales tools and marketing tools to help the company,
19  brochures, business cards and such, marketing
20  collateral, also, interfaced with clients.
21    Q. And when did you leave Glass Tree?
22    A. I left Glass Tree in September of that year.
23    Q. That year being?
24    A. 2001.
25    Q. 2001, okay. And did you join American Blind at

Page 11

1  that point?
2    A. Yes.
3    Q. Okay. And why did you move from Glass Tree to
4  American Blind?
5    A. I moved to Glass Tree from American Blind
6  because it was a better opportunity.
7    Q. And when you started at American Blind, what
8  was your position?
9    A. My position at that time was E-Commerce
10  Relationship Manager.
11    Q. And what were your responsibilities as
12  E-Commerce Relationship Manager?
13    A. Primarily, responsibilities was to get the
14  e-mail marketing program off the ground and form the
15  E-Commerce Department.
16    Q. Okay. At the time you joined American Blind in
17  2001, was American Blind using paid search advertising?
18    A. Yes.
19    Q. Who -- when you joined in 2001, did you take
20  over primary responsibility for paid search advertising?
21    A. There was an individual there that was running
22  that program already.
23    Q. And who was that?
24    A. Her name was Stephanie. I believe May was her
25  last name.

Page 12

1    Q. When you joined, did she continue to have
2  responsibility for that program?
3    A. She did.
4    Q. And did she report to you?
5    A. Not immediately. She was reporting to another
6  individual.
7    Q. Who did she report to?
8    A. I believe she reported to Sam Stephens.
9    Q. At some point, did that change so that she
10  reported to you?
11    A. Yes.
12    Q. When was that?
13    A. I don't recall the time.
14    Q. Was it shortly after you joined or --
15    A. It was, I would say, a matter of a few months.
16    Q. Okay. When you started at American Blind,
17  what were your responsibilities?
18    A. In primarily e-mail marketing, get an e-mail
19  marketing program off the ground was the primary
20  responsibility that I was brought in to do.
21    Q. At the time you joined, was American Blind
22  doing any e-mail marketing?
23    A. No.
24    Q. Okay, and, I take it, you changed that?
25    A. Yes.

Page 13

1    Q. When did American Blind start doing e-mail
2  marketing?
3    A. It was, I would say, a matter of two months
4  after I joined.
5    Q. And does American Blind continue to do e-mail
6  marketing?
7    A. Yes.
8    Q. Okay. Did your title at American Blind change
9  at any time?
10    A. Yes.
11    Q. Okay. What was the first change after you
12  arrived?
13    A. Well, I was brought in as E-Commerce
14  Relationship Manager. The title then was changed
15  to Marketing Manager.
16    Q. Did your responsibilities change with that
17  title change?
18    A. Responsibilities changed slightly, yes.
19    Q. In what way?
20    A. Took on a number of new programs.
21    Q. And what were those new programs?
22    A. New programs primarily were third-party
23  marketing, alternative media were two of the biggest
24  ones.
25    Q. What is third-party marketing?

Page 14

1    A.  Third-party marketing is what I will refer to
2  as a number of relationships we have with third-party
3  marketing vendors.
4    Q.  Is that sometimes referred to as affiliate
5  programs?
6    A.  You can say affiliate programs is part of that,
7  yes.
8    Q.  Okay.  In addition to affiliate programs, what
9  else is part of that?
10   A.  A number of programs.
11   Q.  Such as?
12   A.  Imagitoss (phonetic).
13   Q.  I'm sorry?
14   A.  Imagitoss.
15   Q.  What is Imagitoss?
16   A.  Imagitoss is a company that manages the
17 official U.S. Postal Service New Mover Program.
18   Q.  Okay.  What is the U.S. Postal Service New
19 Mover Program?
20   A.  Okay.  If you go into a post office anywhere
21 across the country, you can, obviously, go and change
22 your address.  Okay.  You will receive a packet while
23 you are there to change your address.
24       We have our brand there.  So if you
25 wanted to receive our catalog or continue to receive

Page 15

1  our catalog with change your address, you can do it at
2  that time.
3    Q.  Oh, I see.  So this is sort of a direct
4  marketing advertisement that's contained in the
5  change of address packet?
6    A.  I guess you could look at it that way.
7    Q.  Good target for you.
8    A.  Absolutely.
9    Q.  What else -- what other things fall under the
10 rubric of third-party marketing?
11   A.  A number of programs.  Infistar is another
12 program.
13   Q.  Infostar?
14   A.  Infistar.
15   Q.  How is that spelled?
16   A.  I-n-f-i-s-t-a-r.
17   Q.  And what is Infistar?
18   A.  Infistar is a relationship we have.  They are
19 the company that really power our private label credit
20 card program.
21   Q.  So are they -- strike that.
22       Anything else that would fall under the
23 rubric of third-party marketing?
24   A.  A number of programs, yes.
25   Q.  I am gonna keep asking 'til you run out.

Page 16

1    A.  I will try to recall all of them.
2    Q.  Whatever you can recall?
3    A.  Entertainment Publishing is another program.
4    Q.  Okay.  What's Entertainment publishing?
5    A.  Entertainment Publishing is a coupon book.
6  You know, they publish coupon books all over; and we
7  have a coupon or an offer in that book as well as on
8  their website.
9    Q.  Anything else?
10   A.  Yes, G.M.A.C. Real Estate.
11   Q.  That one, I actually know what it is.  Anything
12 else?
13   A.  Visa.
14   Q.  What's your relationship with Visa?
15   A.  We have had a relationship with them over the
16 years.  Primarily, it is having a link on their website
17 as a featured offer to promote us.  Master card, same
18 type of a deal, Discover Card, Discover Financial,
19 again, on their website.
20       We actually have also had print programs
21 with them, American Express, a number of programs.
22 I am trying to recall them all.
23   Q.  Okay.  You also mentioned -- well, strike that.
24       When did your title change to -- was it
25 Marketing Manager?

Page 17

1    A.  Yes.
2    Q.  When was that?
3    A.  I believe that was in, you know, roughly,
4  May of '05.
5    Q.  Okay.  Is that your current title?
6    A.  No.
7    Q.  What is your current title?
8    A.  Director of Business Development and
9  E-Commerce.
10   Q.  And when did that become your title?
11   A.  I would say around June of this year.
12   Q.  Okay.  Was -- did I miss any changes between
13 Marketing Manager and Director of Business Development
14 and E-Commerce?
15   A.  Not that I can recall.
16   Q.  Did your responsibilities change when you
17 became Director of Business Development and E-Commerce?
18   A.  No, no new responsibilities, just the title
19 change.
20   Q.  Okay.  You mentioned that you had
21 responsibilities -- once you became Marketing Manager,
22 you had responsibilities over alternative media?
23   A.  Correct.
24   Q.  What is alternative media or are, actually?
25   A.  Alternative media, a couple programs that we

Page 18

1  have inside of alternative media are things like
2  national Yellow Pages as well as local Yellow Pages.
3      Q. Anything else fall under the rubric of
4  alternative media?
5      A. Yes. Package insert programs.
6      Q. Anything else?
7      A. Catalog blow-in programs.
8      Q. What is a blow-in program?
9      A. I'm sorry?
10     Q. What is a blow-in program?
11     A. A catalog blow-in program.
12     Q. Yes.
13     A. I will give you an example.
14     Q. Okay.
15     A. This month, we are gonna drop a print insert, I
16 would say, a small print insert, like a four by six, as
17 an example, in different retailers' catalogues, okay;
18 and an example would be Personal Creations.
19         It would be blown in, actually, to the
20 catalogs. So when an individual receives a Personal
21 Creations catalog, they will receive our blow-in and
22 see our products.
23     Q. Is this like a card or a multi-page --
24     A. That one in particular, I believe, is a
25 multi-page fold-out.

Page 19

1      Q. Okay. Prior to coming to American Blind, had
2  you had any experience with paid search advertising?
3      A. Not with paid search, no.
4      Q. Who do you currently report to?
5      A. The name of the individual?
6      Q. Yeah.
7      A. Ron Myers.
8      Q. And who is he?
9      A. Vice-president of Marketing.
10     Q. And how many people report to you?
11     A. I don't have any employees that directly report
12 to me.
13     Q. In the stack next to you, there is a document
14 about six documents down labeled Layne Exhibit 6.
15         If you could pull that out, it's a report
16 from The Kaden Company.
17         There are two of them there.
18         We will start with Exhibit 6.
19         Have you seen this document before?
20     A. Yes.
21     Q. What was your involvement in the survey
22 reported in this document?
23     A. My personal involvement?
24     Q. Yeah.
25     A. I didn't have any involvement in creating this

Page 20

1  survey at all, to be honest with you.
2      Q. Did you have any involvement in asking or
3  commissioning someone else to perform this survey?
4      A. No.
5      Q. Did you receive a copy of this survey at
6  the -- sorry. Strike that.
7          Did you receive a copy of this document
8  at the time it was created or shortly thereafter, in
9  2002?
10     A. I don't recall. I believe I may have.
11     Q. Why did American Blind -- strike that.
12         Was this survey commissioned by American
13 Blind?
14     A. Yes.
15     Q. Who, at American Blind, was responsible for
16 commissioning this survey?
17     A. I would say that was probably Ron Myers.
18     Q. Okay. Why did American Blind commission this
19 survey?
20     A. The best of my recollection is to get a better
21 understanding of the attitudes and perceptions of our
22 customers.
23     Q. Is it your understanding that the -- sort
24 of the top line finding of the survey was that
25 decoratetoday.com was not an appropriate U.R.L. for

Page 21

1  American Blind?
2      A. Define appropriate.
3      Q. Actually, if you could turn to the top of
4  page 5, there is a paragraph that says, "Ostensibly,
5  the purpose of this research is to determine whether
6  decoratetoday.com is an appropriate U.R.L. for ABWF.
7  In this regard, this qualitative research is clear.
8  The U.R.L. is not appropriate."
9          That's the sense in which I am using the
10 word appropriate.
11     A. Okay. I would say that is one of the items
12 that came up during this particular focus group.
13     Q. Did American Blind conduct any surveys or
14 research that came to a contrary conclusion?
15     A. Can you rephrase that question for me, please?
16     Q. Rephrase it. Well, you have one study here
17 that says that decoratetoday.com is not an appropriate
18 U.R.L.
19         Did you have any input from any source
20 to the contrary, i.e., that it was an appropriate
21 U.R.L.?
22     A. Again, I think that did come up. I should say,
23 based on this focus group, some of our customers in this
24 sample did say American Blinds, as I am reading this,
25 was not appropriate; and that the name American would

Page 22

1  be more appropriate.
2      Q.  Given that, why does American Blinds still use
3  decoratetoday.com as its U.R.L.?
4      A.  As its destination U.R.L.?
5      Q.  Yes.
6      A.  I believe that's been a topic of discussion
7  over the years.
8      Q.  Is there a reason why it's only been a topic of
9  discussion?  Why haven't you changed it?
10     A.  We have actually made a lot of progress over
11 the years to change, I will say, the marketing U.R.L.,
12 the display U.R.L., in our marketing pieces.
13         As you can see, americanblinds.com has
14 been in use for marketing materials and programs, you
15 know, really, for a number of years.
16         And so there has been a lot of progress
17 made to, I would say, move in that direction.
18     Q.  Is there some difficulty in changing your
19 destination U.R.L. that precludes you from being able
20 to do so easily?
21     A.  That's really a question for -- Michael Layne
22 would probably be the best one to answer that question,
23 because he is responsible for the website.
24     Q.  Okay, but I am asking you.
25         Do you have an understanding as to why

Page 23

1  American Blind continues to use the decoratetoday
2  U.R.L.?
3      A.  As the destination U.R.L., let's make sure
4  that's clear?
5      Q.  As the destination U.R.L.
6      A.  Again, there has been a lot of progress to
7  move from a marketing standpoint to americanblinds.com.
8  Specifically, you know, decorate.com is still our
9  destination U.R.L.
10         My understanding, after speaking to
11 Michael Layne, is it is a huge project to change
12 the U.R.L., as far as the destination U.R.L., from
13 decoratetoday to something else.
14     Q.  Somehow that's escaping me.
15         Why is it a huge project to change your
16 destination U.R.L.?
17     A.  I'm not a C.T.O., to be honest.
18     Q.  Have you ever asked?
19     A.  I believe we do -- did initially put together a
20 project plan to scope out the project, itself; and it
21 was hundreds, if not thousands, of hours, man hours, to
22 make that change.
23         That's really kind of the big
24 understanding that I have of why it's still the way
25 it is.

Page 24

1      Q.  And, when you say hundreds or thousands of
2  hours to make that change, are you talking technically
3  or in terms of marketing and messaging?
4      A.  Technically, again, I am not a C.T.O., so I
5  can't speak on behalf of our development team and
6  internet content group.
7          That's really for Michael but I would say
8  it's really globally, you know, across the company, we
9  would have to work together to make that change.
10     Q.  I see.  So what I am trying to get at is
11 whether that -- whether that, the hundreds or thousands
12 of hours are what it would take technically simply to
13 change the U.R.L. or whether that also includes anything
14 else you would have to do in terms of changing marketing
15 materials and new stationery and new creatives?
16         Is that everything or is that just a
17 technical problem?
18     A.  From a marketing standpoint, I will tell you
19 that we have used American Blinds as our displayer
20 marketing U.R.L. for the past number of years on our
21 catalogs, as an example, in our TV commercials as an
22 example.  It is on our e-mail program as an example.
23 It's in a number of places from a marketing standpoint.
24     Q.  Then you also use decoratetoday in parallel
25 with it, correct?

Page 25

1      A.  Decoratetoday, can you clarify that question,
2  please?
3      Q.  You also use decoratetoday.com as a name for
4  your company in a lot of your marketing materials?
5      A.  We do.
6      Q.  And you continue to today?
7      A.  We do.  It is actually used in a number of
8  programs today.  I would tell you from paid search
9  perspective, decoratetoday.com is out there.
10         It's in -- on our website.  In the meta
11 data, throughout the website, it is decoratetoday.com
12 and on many different pages of the website.
13         So, yes, to answer your question, it is
14 in use to.
15     Q.  If you could turn to the next exhibit in that
16 stack, which is Exhibit 7, just another report.
17         This one from March, 2003, from The Kaden
18 Company, which is titled A Qualitative Study of American
19 Blinds, Wallpaper and More Catalogs and U.R.L.
20         Do you know why -- well, first, who
21 commissioned this study?
22     A.  American Blinds.
23     Q.  Anyone in particular?
24     A.  I would assume to say that was Ron Myers as
25 well.

Page 26

1    MR. GARRITY: Just, again, I would
2  caution the witness not to assume or guess.
3    MR. PAGE: Okay. He is your 30(b)(6)
4  witness on this study.
5    MR. GARRITY: I understand. I just heard
6  the way he answered. I just wanted to make sure we
7  were clear.
8    Q. (BY MR. PAGE) Do you know why a second study
9  was commissioned?
10   A. Why this particular study was commissioned, is
11 that what you're asking me?
12   Q. Yes, yes.
13   A. Just looking at the title page here, it appears
14 that we were looking for feedback and insight from our
15 customers in their attitudes on our American Blinds,
16 Wallpaper and More catalogs, as well as our U.R.L.
17   Q. If you look at the bottom of page 7, the
18 paragraph there says, "Finally, a word about the U.R.L.
19 address. Decoratetoday.com would seem to be a more
20 appropriate address if the name of the company itself
21 were changed to Decorate Today."
22     In March, 2003, what was the name of the
23 company?
24   A. In March, 2003, the name of the company, are
25 you asking for the name that we went to market with?

Page 27

1    Q. Sure. That's a good place to start.
2    A. I believe in March, 2003, the name of the
3  company at that time was during the transition from
4  American Blind and Wallpaper Factory, as far as going
5  to market with, to American Blinds, Wallpaper, and More.
6    Q. And the name of the company at some point was
7  changed to decoratetoday, correct?
8    A. That's correct.
9    Q. When was that?
10   A. I don't recall the specific time period that it
11 was done.
12   Q. Was it before or after March, 2003?
13   A. It was before March, 2003.
14   Q. Okay. And, in fact, at the time this study
15 was suggesting you change the name of the company to
16 decoratetoday, you had already changed the name of the
17 company to decoratetoday and then back to American
18 Blind, correct, or American Blind and Wallpaper Factory?
19   A. That's what one customer, I believe, here is
20 saying.
21   Q. I see. Is it your understanding that this
22 paragraph at the bottom of page 7 is the comment of a
23 customer?
24   A. My understanding is this is a paragraph from
25 the executive summary from The Kaden Company.

Page 28

1    I am not sure if this was from a customer
2  or how this was particularly used in the context.
3    Q. Does American Blind have any of the
4  underlying data from either of the surveys reflected
5  in Layne Exhibits 6 and 7?
6    A. I believe we did produce some other
7  documentation from The Kaden Group. I believe focus
8  groups, actually the D.V.D.'s of the focus groups, were
9  supplied.
10   Q. The -- I couldn't hear. The what of the focus
11 groups?
12   A. D.V.D.'s.
13   Q. Oh, okay.
14   A. The video recordings of the focus groups.
15   Q. The video recordings, okay, and those are from
16 these surveys?
17   A. I believe we had D.V.D's or tapes from all the
18 surveys.
19   Q. I see. Do you know, were there written
20 responses to questionnaires?
21   A. To the best of my knowledge, from the files
22 that I went through, there were these supplied.
23     We also did have a few written
24 questionnaires from the telephone interview of -- not
25 of these two, but there was a third Kaden study that we

Page 29

1  did do.
2    Q. Okay. We might as well get that out of the way
3  right now.
4      When -- strike that.
5      You said you went back through -- back
6  through the files and produced the D.V.D.'s.
7      When did you first go to look for
8  materials related to studies?
9    A. To these Kaden studies in particular?
10   Q. Yeah.
11   A. At the time I became aware that we needed
12 to produce this type of documentation to Google.
13   Q. And when was that?
14   A. That was a time right after Steve Katzman
15 left the company.
16   Q. So sometime in the last couple of months?
17   A. Correct.
18   Q. Okay. Prior to that, had you been asked by
19 anyone to search for, assemble, or produce any documents
20 in connection with this lawsuit?
21   A. Yes.
22   Q. When was that?
23   A. I don't recall the exact time. I would -- I
24 don't want to assume.
25   Q. Just your best recollection.

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 30

1    A. My best recollection, was probably about a
2  year ago, maybe.
3    Q. Okay, and what were you asked to do at that
4  time?
5    A. I was asked to pull together all documentation
6  that I had regarding communications with Google as well
7  as any documentation that I had regarding Google or
8  paid search.
9    Q. And were you given any more specific
10  instructions or just any documentation you had
11  concerning paid search?
12    A. I'm sorry. Can you clarify that, please?
13    Q. I am asking you to. As specifically as you
14  can, can you tell me what you were asked to look for
15  and produce?
16    A. It was all communications that we had with
17  Google --
18    Q. Okay.
19    A. -- as well as documentation regarding Google
20  and paid search programs.
21    Q. You were asked for every document you had that
22  concerned paid search programs?
23    A. I believe, from what I can recall, that was the
24  request.
25    Q. Okay, and in response to that request, what did

Page 31

1  you come up with?
2    A. Over the years, dealing with Google, obviously,
3  a lot of communications with different individuals at
4  Google; and so I did assemble those and printed those
5  out. I also printed out what I could find, all
6  presentations and reports or analysis that we did
7  at that time.
8    Q. Okay, and this was a year ago, roughly?
9    A. Again, roughly, a year ago.
10    Q. Are you involved at all in receiving or
11  responding to customer complaints?
12    A. I do not get involved in customer complaints
13  directly, no.
14    Q. Who does handle customer complaints?
15    A. We would have a whole Customer Service
16  Department.
17    Q. Do you have some sort of formalized system for
18  like tracking and handling complaints?
19    A. We do.
20    Q. How does that system work?
21    A. I am not a real technical guy. It's a system,
22  a legacy system. My understanding is as an e-mail
23  comes in or if a phone call comes in, we do capture
24  information about the customer to help the customer with
25  their activity.

Page 32

1    Q. Okay. And do you have a data base that you
2  maintain of those contacts?
3    A. Of the customer service contacts?
4    Q. Yeah.
5    A. We do.
6    Q. Okay. Do complaints about, for instance, the
7  website go to anyone in particular?
8    A. We have an area on the website, a survey
9  on the website; and this is a survey that customers can
10  engage with us.
11       Those surveys or, I guess, the customer
12  surveys go to an individual, yes.
13    Q. And who is that individual?
14    A. You know what? That individual recently left
15  the company. It's a new person and I don't recall the
16  person's name who took on that responsibility.
17    Q. Who's the person who left who used to have that
18  responsibility?
19    A. From what I can recall, that would have been
20  Amanda Roberts, I believe, was her name.
21    Q. Are you aware of American Blind receiving any
22  customer complaints concerning having been confused in
23  any way by advertising at Google?
24    A. Yes, anecdotally.
25    Q. Okay. Anecdotally, what do you know about

Page 33

1  customer confusion related to Google?
2    A. Steve Katzman, again, who is no longer with the
3  company, did receive some customer complaints, in which
4  he -- again, it was more of just verbal but he did
5  receive customer complaints.
6       I will tell you, however, most of the
7  customer complaints, if there is an issue regarding
8  that, wouldn't even make it to our website.
9       These people would do a search on Google.
10       As an example, they would see our ad on
11  H.G.T.V. They would call, get a catalog, go on their
12  computer, search for American Blinds on their favorite
13  search engine. Maybe it's Google, maybe it's MSN or Ask
14  Jeeves. I don't know.
15       They would then see competitors' ads,
16  went looking for us, intending to look for us to buy
17  from us, click on a competitor's ad.
18       We wouldn't even hear about that.
19    Q. Do you have any actual knowledge that that's
20  ever happened to an individual?
21    A. To an individual?
22    Q. To anyone in the world?
23    A. To anyone in the world? I would ask Google.
24    Q. Independent of asking Google, do you have any
25  information to indicate that this has actually happened

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 34

1   to anyone in the world?
2       A. Has our competitors called me and asked me and
3   told me, hey, we stole this customer from you, the
4   answer is no.
5       Q. Going back to the anecdotal customer complaints
6   that you say Mr. Katzman received, tell me everything
7   you know about them, when, who, what?
8       A. I don't know any customer names. It was really
9   just, you know, in passing. That's about all I know
10  about it. It was -- it left with Steve Katzman. Yeah.
11  I don't know any customer names. I never heard of any
12  customer names that he mentioned. He just said
13  anecdotally that there were confused customers as
14  a result.
15      Q. Did he tell you how he knew that?
16      A. I believe he said, to the best of my
17  recollection, was verbally, from his assistant at
18  that time.
19      Q. Who was his assistant at that time?
20      A. His assistant when he left was Janet Hall.
21      Q. You said at that time. I didn't know -- let me
22  clarify.
23          Did you mean his assistant at the time
24  he left or at the time he learned of this confusion?
25      A. At the time Steve left, his assistant was Janet

Page 35

1   Hall.
2       Q. That's who you were referring to when you said
3   he had heard about it from his assistant?
4       A. Yes, yes. I mean, it was over the years.
5   Steve has had, I believe, a couple different assistants
6   over the years.
7       Q. I see. So the anecdotal evidence that you
8   referred to was, as best you understand, Mr. Katzman
9   hearing from his assistant that some unspecified
10  customers were confused; is that correct?
11      A. As a result of Google selling our ads, yes.
12      Q. I see, and did you have any understanding as to
13  how Mr. Katzman's assistant or assistants came to learn
14  this?
15      A. I don't know that. I wasn't part of those
16  discussions.
17      Q. Do you know if anybody made any record or
18  entered into your complaint data base any information
19  concerning these incidents -- incident or incidents?
20      A. Not to my knowledge.
21      Q. Is there anything more about Mr. Katzman's
22  knowledge of customer confusion that you know that
23  you haven't told me yet?
24      A. No.
25      Q. Putting aside Mr. Katzman, are you -- is

Page 36

1   American Blind aware of any other evidence of actual
2   customer confusion as a result of advertising on
3   Google?
4       A. We have, since Mr. Katzman left, we have,
5   with the new individuals processes in place to alert
6   me directly if they are aware or receive any customer
7   confusion issues as a result of paid advertising from
8   Google.
9       Q. Okay, and have you, in fact, been alerted to
10  any customer confusion issues as a result of paid
11  advertising from Google?
12      A. Not since he left, no.
13      Q. Okay. Were you made aware of any before you
14  left?
15      A. No. Again, just, as I mentioned earlier, just
16  anecdotally from him.
17          (Mark'd for identification
18          was Deposition Exhibit No. 1.)
19      Q. (BY MR. PAGE) This is a big ugly exhibit with
20  hopefully very short questions. I want you to review
21  every page of this document.
22          I have marked as Alderman Exhibit 1 a
23  large and ugly document, Bates ABWF48864 through 48987,
24  which appears to be a text dump from a data base of some
25  sort.

Page 37

1           Can you tell me what this document is?
2       A. It looks like a bunch of gobbley goop. Just
3   looking at the top of the page, it does say Product
4   Surveys.
5       Q. I will represent to you this was produced to us
6   sometime in the last few days, and that is about all I
7   know about it.
8       A. Yeah. This is really -- you know, the product
9   surveys on the website is really handled by Michael
10  Layne.
11      Q. Unfortunately, I received this after his
12  deposition. So I am just trying to find out where it
13  comes from.
14          MR. GARRITY: Absolutely. Do you mind if
15  we just go off the record for just a minute?
16          MR. PAGE: Yeah, sure. You may very well
17  know.
18          THE VIDEOGRAPHER: Off the record,
19  8:54:28 a.m.
20          (Recess taken.)
21          THE VIDEOGRAPHER: Back on the record,
22  9:05:44 a.m.
23      Q. (BY MR. PAGE) Before we broke, we were looking
24  at Alderman Exhibit 1.
25          I think the question is, what is this?

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 38

1      A.  This is, by looking at the top of the page, a
2  product survey, which is on our website.  Our product
3  categories on our website, we have surveys.
4          That's really a way for us to gather
5  customer feedback and suggestions.
6      Q.  I see.  And is this -- it's basically a survey
7  page that's always on your website?
8      A.  I, to be honest with you, don't recall exactly
9  when it went on the website.
10         I will tell you, however, since I have
11 been there, it has been on the website.
12     Q.  Okay.  Is there any -- do you offer any
13 incentive to people to respond to the survey?
14     A.  No.
15     Q.  Do you -- how does a user come to know that the
16 survey exists?
17     A.  Sure.  We have a feedback form or a feedback
18 link on our -- the top -- I believe it's the top right
19 hand of the website once you get into product pages.
20     Q.  I see.  And so is it your experience that the
21 people who were completing this survey tend to be people
22 who have a complaint?
23     A.  Not have a complaint, no.
24     Q.  Is there a separate link on the website for
25 complaints; or if I have a complaint, would my normal

Page 39

1  path be to click on feedback?
2      A.  We are extremely open in how we get feedback
3  from our customers.  We have a Contact Us section of the
4  website; and there is, you know, numerous types of, you
5  know, topics that customers can reply onto.
6      Q.  What, if anything, is done with the data you
7  collect on this -- well, strike that.
8          First, is Exhibit 1 all of the survey
9  information from -- I believe it starts January 1, 2004,
10 and goes up it appears through a couple days ago,
11 July 28th, 2006.
12         The question is, is this all of the
13 information that you have collected on your website
14 survey in that period?
15     A.  Sitting here today, at this table, I can't
16 answer if it's all the information.  Just looking at,
17 again, the dates that you just mentioned, it does look
18 like it covers that time period.
19     Q.  Okay.  Are there -- are there multiple surveys
20 on your website or a single one?
21     A.  No.  There is multiple.
22     Q.  How many different surveys are there on the
23 website?
24     A.  There are, I would say, two primary surveys.
25 One is what we are looking at here today, which is the

Page 40

1  product survey.
2          There are different questions for each
3  product category, and the other type of survey that's
4  on the website is a customer survey.
5      Q.  What is a customer survey?
6      A.  A customer survey is just really a open
7  feedback form for customers to share, again, ideas
8  with us, comments, feedback, and such.
9      Q.  If I go to your -- if I go to the American
10 Blind website, how would I -- how do I get to each of
11 the two surveys?
12     A.  They are both -- well, first let's start with
13 the product survey.
14         The product survey, again, is on our
15 product category pages.  There is a link on those pages,
16 a link to the survey.  I should say a link to an
17 opportunity to fill out the survey.
18         Obviously, from a customer service
19 company, we want to make sure we address true customer
20 service issues first; and so we try to filter those out
21 first.
22         So when they click on the product survey
23 link, they are then taken to a page; and on that page,
24 they could click on different types of Contact Us links;
25 and at the bottom of that page is an opportunity to

Page 41

1  click on the survey and participate in the survey.
2      Q.  I see.  And when you say the survey, that's the
3  product survey?
4      A.  Yes.
5      Q.  Okay.  How about the customer survey?
6      A.  The customer survey is, I believe, on our
7  Contact Us page on the website.
8          Again, that is a link on our top nav of
9  the website, navigation of the website, or the bottom
10 navigation of the website, Contact Us; and then there
11 is a link to the survey at that point.
12     Q.  And what sorts of questions are in the customer
13 survey?
14     A.  Sitting here today, I don't recall the
15 questions.  Primarily, the information here that you
16 would see from customers is an open-ended box in which
17 they can share ideas with us.
18     Q.  What does American Blind do with this
19 information?
20     A.  American Blinds captures this information and
21 it distributes it in spreadsheets on a weekly basis
22 to our management team.
23     Q.  I see.  So everybody in the management team
24 gets a spreadsheet of all of the survey information
25 every week?

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 42

1    A. For that week.
2    Q. I see, and then it's sort of up to the
3  individual as to whether to read it and what to do
4  with it?
5    A. That's correct.
6    Q. Okay. Do you make any use of that information,
7  personally?
8    A. I do. I tell you, a lot of it is, I love you,
9  I hate you. You know, there is -- when I was writing
10  the e-mail marketing program, as an example, we would
11  get, you know, some customers that use the survey or
12  Contact Us forms to say, "Please, take me off of your
13  e-mail mailing list," and I did use the survey at that
14  time.
15       I do read the surveys when I have time at
16  this point; and, again, it's up to the individual
17  members on that list to read the surveys.
18    Q. When you say that management team, who are you
19  referring to?
20    A. On that distribution list, in particular, you
21  know, I would -- on our management team, we have
22  Bruce Burger, Joel Levine, Ron Myers, Bill Tufts,
23  Michael Layne, Martha Ross, Angie Sustarich and, I
24  believe, Greg Ruppert.
25    Q. Okay. You can put that aside.

Page 43

1       If you could pull out the big fat
2  exhibit, Layne number 9, that one.
3    A. Okay.
4    Q. The first question is, have you seen this
5  document before?
6    A. It appears so, yes.
7    Q. What is this document?
8    A. It is a marketing presentation.
9    Q. Did you have a hand in preparing this?
10    A. Yes.
11    Q. What was your role in preparing this?
12    A. It's a pretty thick document.
13       Let me make sure that I understand
14  everything here. Okay.
15    Q. Oh, also, I should point out to you, which we
16  discovered yesterday, this has been colated out of
17  order.
18       MR. PAGE: There is a chunk of -- do you
19  want to take a short break, and we will put this in
20  order?
21       MR. GARRITY: Sure.
22       MR. PAGE: Okay. Let's go off the
23  record.
24       THE VIDEOGRAPHER: Off the record.
25  Certainly. Off the record, 9:16:38 a.m.

Page 44

1       (Recess taken.)
2       THE VIDEOGRAPHER: Back on the record,
3  9:19:19 a.m.
4    Q. (BY MR. PAGE) I think the question is, what
5  role did you have in preparing this document?
6    A. Looking through this document, at a glance,
7  it appears that I put together the majority of this
8  document.
9    Q. What was the purpose of this document?
10  Actually, that's sort of a vague question.
11       Was this used as a presentation at some
12  meeting?
13    A. Again, this is a pretty thick document. So
14  I imagine that different sections of this document
15  was used in a presentation before, yes.
16    Q. When you say the presentation, what
17  presentation are you talking about?
18    A. This doesn't appear to be all part of -- and I
19  may be -- it looks like there is a series of different
20  presentations or documents here.
21    Q. Oh, okay. Were they used at different
22  meetings?
23    A. I believe that's fair to say, yes.
24    Q. Okay. Can you help me separate this out into
25  different documents?

Page 45

1    A. I believe there is different cover pages for
2  each presentation that appears is the case.
3       MR. GARRITY: I am just looking right
4  now, Mike. Maybe if you go to 43007, whether or not
5  that's the start of another -- it looks like that might
6  be a cover page.
7       MR. PAGE: It looks like a bunch of them.
8       MR. GARRITY: It's gonna be in that stack
9  right in front of you.
10       MR. PAGE: Got it.
11       MR. GARRITY: If you look at the page
12  numbers on bottom. You see the things on the bottom?
13       MR. PAGE: Okay.
14    Q. (BY MR. PAGE) So let's take the first about
15  20 pages. There is a cover sheet that says 2Q Marketing
16  Review, Online Landscape; and if you look at what are
17  called Bates numbers, the ABWF numbers, there is another
18  section that starts at 043007 --
19    A. Okay.
20    Q. -- which is captioned April-June Cost
21  Reduction.
22       Taking just that front section, 2Q
23  Marketing Review Online Landscape, was this document
24  prepared by you?
25    A. Yes.

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 46

1    Q. And was this prepared for use in some meeting?
2    A. Yes, it was.
3    Q. What meeting?
4    A. It just says 2Q Marketing Review. So I don't
5 know for sure what year.
6    Q. It might help. The second page is captioned
7 Google Market Snapshot Blinds, Q3 '05; and the third
8 page is Home Furnishings Q4 '05, if that helps you
9 place it.
10    A. Okay, okay. So I would assume that this was
11 used in a marketing meeting.
12    Q. Do you know what marketing -- was this a
13 presentation to the Marketing Department or a
14 presentation to higher executives by the
15 Marketing Department or what?
16    A. I don't recall the exact meeting that this
17 was used in.
18    Q. Okay, okay. If you could flip forward to the
19 next -- what appears to be the next discrete document,
20 which is at 43007, and continues through, it appears,
21 43031, captioned April - June Cost Reduction, Search
22 Engine Marketing Action Items.
23    Did you prepare this document?
24    A. Yes, I did.
25    Q. What?

Page 47

1    A. Yes, I did.
2    Q. And what was the purpose of this document?
3    A. The purpose of this document was to share
4 the -- it appears here, the April to June cost reduction
5 for our search engine marketing programs.
6    Q. I see. So was this a report -- was this --
7 strike that.
8    Was this used in conjunction with a
9 meeting presentation?
10    A. This was probably a presentation.
11    Q. And to whom?
12    A. I don't recall the attendees. I would say
13 that this was a presentation to our marketing program --
14 excuse me -- our marketing team, as well as -- and let
15 me just make sure.
16    What pages are you looking at?
17    Q. I'm looking at starting at 043007, which is the
18 caption page of this April - June Cost Reduction?
19    A. Yes.
20    Q. And then it continues, I would say, to 043031,
21 all of which have the same Tuesday, June 20th, 2006
22 footer in the lower left corner, which, although it has
23 some internal -- additional internal caption pages, I'm
24 assuming are all one document?
25    A. I don't believe that's necessarily the case.

Page 48

1    Q. Okay. About four pages in, there is another
2 caption page that says, Online Marketing Programs
3 Review. It's at 043010.
4    Was that originally a separate document?
5    A. That appears to be the case, yes.
6    Q. It's just coincidence that they were on the
7 same date?
8    A. It was probably because I printed them off at
9 that date.
10    Q. Okay. When you say you printed them off on
11 that date, was that the date you print --
12    THE REPORTER: Off the record.
13    THE VIDEOGRAPHER: Certainly. Off the
14 record, 9:29:12 a.m.
15    (Recess taken.)
16    THE VIDEOGRAPHER: Back on the record,
17 9:35:56 a.m.
18    Q. (BY MR. PAGE) Okay. Before we broke, we were
19 looking at the section of the Layne Exhibit 9 from 43007
20 through 009 captioned April through June Cost Reduction.
21    Is it your understanding that this
22 document was prepared sometime in June of this year?
23    A. That is my understanding.
24    Q. Okay. And was this -- forgive me if I already
25 asked this.

Page 49

1    Was this a presentation made to the
2 marketing group?
3    A. This type of presentation is, you know, a
4 document that I or a report that I -- looks like I
5 produce and these are typically shared with the
6 marketing group and some members of our executive
7 management team.
8    Q. Okay. If you look at the second of those
9 three pages, which is captioned Paid S.E.O., it's 43008.
10    First, what is S.E.O.?
11    A. Search engine optimization.
12    Q. Under Google Facts, it says, "Top 83 driver
13 keywords account for 80 percent of cost and 80 percent
14 of revenue for March 2006."
15    What are driver keywords?
16    A. Top 83 driver keywords refers to our, what I
17 will call, generic keywords, words like blinds,
18 wallpaper, curtains, as an example.
19    Q. I see. As distinct from brand keywords?
20    A. Correct.
21    Q. And you say there is an open paren and FOCUS,
22 all in caps.
23    What does that mean?
24    A. I believe that refers to where we were focusing
25 our resources.

1  Q. Okay. So this is a note that you should focus
2  your resources. Is that what that means?
3  A. I believe this means during that time period,
4  in March, that's where our focus was spent, as well as,
5  obviously, the brand keywords.
6  Q. Okay. And what do you mean by brand keywords?
7  A. Brand keywords are words like American Blinds,
8  American Wallpaper, American Blind and Wallpaper,
9  decoratetoday, American Blind Factory, and such.
10  Q. And, actually, let me get something out of the
11  way here.
12        I only have one copy of this, and all I
13  want to do is find out what it is and authenticate it.
14        (Mark'd for identification
15        was Deposition Exhibit No. 2.)
16  Q. (BY MR. PAGE) I am gonna mark as Alderman 2 a
17  document, ABWF043706 through 043961.
18        It's a Coremetrics S.E.O. R.O.I.
19  Report - Full List, Custom 1/1/2006 through 3/30/2006,
20  and just ask you to tell me what that document is.
21  A. This is a document that is from Coremetrics.
22        It is our -- one of, I would say, the
23  reports we use to help us manage our paid search engine
24  programs.
25        This appears to be -- when it says full

1  list, a list of all the keywords that had activity
2  during that time period.
3  Q. First, who is Coremetrics?
4  A. Coremetrics is our web analytics partner.
5  Q. And they provide you analysis of your web
6  traffic; is that correct?
7  A. That's correct.
8  Q. Do they interface directly with Google to
9  get data and then pass it on to you?
10  A. No.
11  Q. Where does Coremetrics get their data?
12  A. They get their data -- are you talking
13  specifically about this?
14  Q. Yeah. In connection with their work for
15  American Blind?
16  A. Okay. So your question again was?
17  Q. Where do they get their -- where do they get
18  the data that's reflected in that report?
19  A. Sure, okay. Specific data is passed to
20  Coremetrics from us.
21        So, just to help you understand, our
22  operations group pulls data every day from the various
23  paid search engine programs that we participate with,
24  such as Google.
25        So our operations group goes in, pulls

1  data from Google.
2        So, for example, impressions, visits,
3  costs is pulled -- at the keyword level is pulled from
4  Google by us.
5        It is then uploaded to Coremetrics, and
6  Coremetrics has and receives the other information on
7  this report.
8  Q. There is a column in this report that, I
9  believe, is captioned Category --
10  A. Okay.
11  Q. -- which includes such categories as branding
12  and blinds.
13        Do those reflect different ad campaigns
14  at Google?
15  A. I would tell you that the category here in
16  this report are really the different product categories
17  on our website; and, obviously, branding is our brand
18  keywords.
19  Q. So if I wanted to, if going back to Exhibit 9
20  where it says brand keywords account for 3 percent of
21  cost, I could get a list of those brand keywords by
22  looking at this report for all of the keywords listed
23  as branding?
24  A. If this is the entire list, the full list and
25  it's entirety, that would be entitled there, yes.

1  Q. Do you have any reason to think this is not the
2  full list?
3  A. No, I don't.
4  Q. Has the list of words in your branding category
5  stayed relatively constant over time?
6  A. The list, the core list of branding keywords,
7  again, since I have been there over the past
8  approximately five years, the core list of keywords
9  has been constant.
10        We do add some new brand keywords,
11  derivatives, over time; but for the most part, the
12  core list of keywords does stay constant.
13  Q. So, going back to Layne Exhibit 9, where it
14  says brand keywords account for 3 percent of cost and
15  30 percent of revenue for March, 2006, is that fairly
16  typical?
17  A. I would say, you know, at this period of time,
18  it seems fairly typical.
19  Q. Okay. So this isn't wildly out of the average?
20  You are not reporting a bizarre month here?
21  A. No, I don't believe so.
22  Q. And under Action Items on this page, the first
23  one is, turn off all non core product categories.
24        What are non core product categories?
25  A. Non core product categories was defined, I

Page 54

1  believe, was everything besides branding, blinds, and
2  wallpaper.
3      Q. And, did you, in fact, turn off all non core
4  product categories?
5      A. We did. Actually, another one that may have
6  been -- I believe those were all of them; and we did,
7  yes, turn them off for this time period.
8      Q. Okay. Are they still off?
9      A. No.
10     Q. Why did you turn them back on?
11     A. We turned them back on to expand our reach, you
12  could say.
13     Q. I see. Well, let me back up.
14             Why did you turn them off, in the first
15  place?
16     A. Why did we turn them off?
17     Q. Yes.
18     A. It was a direct order from Steve Katzman.
19     Q. I see. Did he give you any reason for that
20  order?
21     A. He did, and it was, they were not, during the
22  time period, the most profitable for us.
23     Q. I see. Were they profitable at all? Let me
24  see if I can ask that a different way.
25     A. Sure.

Page 55

1      Q. Was the reason for turning them off that they
2  simply were not profitable; or was it a matter of
3  budgetary constraints, picking which thing to turn off
4  as less profitable than others?
5      A. I am sure there were a number of factors in his
6  mind; and why, I don't know the exact reason.
7      Q. How long were the non product categories turned
8  off on Google?
9      A. I don't specifically recall. I believe it was
10  probably in the neighborhood of a two to three-month
11  period.
12     Q. So when were they turned back on?
13     A. I don't recall the exact date. I am sure if we
14  go into Google as well as our other search engines, we
15  could look.
16     Q. I see. Was it recently?
17     A. It was, I would say, within the past three
18  months, roughly.
19     Q. We seem to have turning them off as an action
20  item in June of this year.
21             Is that correct, or had they already been
22  turned off in June of 2006?
23     A. Again, I don't remember the exact time period
24  in which we turned them off. I believe from the meeting
25  we had, it was within, you know, that -- I would say

Page 56

1  within that day.
2             I don't recall if it was, you know,
3  immediate or if it was, you know, soon after; but,
4  again, just to go back, I don't remember exactly the
5  time period, you know, when we turned them back on.
6             There is reporting that exists if we
7  wanted to get that information.
8      Q. Did you -- sorry.
9             The next item in Action Items is pull
10  down top cost driver keywords to target position 3
11  through 5.
12             What does that mean?
13     A. That means that we wanted to target a position
14  on the paid search engine program in between a position
15  3 to 5.
16     Q. And had you previously been targeting a higher
17  position?
18     A. For some of those keywords, I would say that's
19  true.
20     Q. Why did you want to target a lower position?
21     A. You know, I would go back to the title of this
22  presentation and it was to cost reduction.
23     Q. I see. So it was just a cost benefit, trade
24  off, bid lower, live with a lower position?
25     A. Cost reduction.

Page 57

1      Q. Did you, in fact, lower your bids on top cost
2  drivers to target a lower position?
3      A. Can you rephrase that?
4      Q. Okay. Did you, in fact, implement this action
5  item?
6      A. Did we turn down our top cost drivers to target
7  a position 3 to 5? Is that what you are asking?
8      Q. Yeah.
9      A. Yeah, we did.
10     Q. Isn't that what I asked the first time?
11             Have you turned them back up, or are you
12  still targeting positions 3 through 5 on those keywords?
13     A. We actually manage the programs on an R.O.I.
14  level for each keyword for each search engine. So some
15  keywords may be higher, some may be lower.
16     Q. I see. And when you say on an R.O.I. level,
17  what do you mean?
18     A. Return on investment level.
19     Q. So how often do you change bids on keywords
20  based on R.O.I.?
21     A. I am in our programs on a daily basis adjusting
22  where necessary, I would say, our brand keywords, as
23  well as our top drivers globally, meaning changing
24  every keyword on the Coremetrics report. We change
25  roughly once a week.

Page 58

1  Q. So let me see if I understood that.
2   Did you mean that -- did you mean that
3 on key key categories, you will change daily; and on
4 less key categories, you will change once a week?
5  A. Top drivers. Again, there is a lot of, you
6 know, key category, keywords inside of that, like
7 wallpaper, blinds, and such.
8  Q. Yeah, let me rephrase. I misspoke when I said
9 category.
10   Did I understand you to say that for key
11 keywords, you will change the bid on them daily; and on
12 less key ones, you will change it once a week?
13  A. More or less. Again, I would tell you that
14 our top driver keywords and our brand keywords --
15 branded category keywords, we do change as needed on a
16 daily basis and keep a close eye on that.
17  Q. I see.
18  A. Does that answer your question?
19  Q. Yeah. Is this an automated or manual or
20 somewhere in between process, changing the bids?
21  A. It's a manual process.
22  Q. And who performs that process?
23  A. I do.
24  Q. So are you -- so, on a daily basis, you are
25 looking at R.O.I. on your search and deciding whether to

Page 59

1 adjust bids?
2  A. I do look at a number of factors, yes.
3  Q. What factors, other than return on investment,
4 do you look at?
5  A. I look to see, obviously, for brand keywords,
6 target position 1. I also look at the top driver
7 keywords and see who is in, you know, position around
8 us; and if so, we will make necessary changes.
9  Q. The fourth -- actually, the third action item,
10 turn keywords off that have produced a negative R.O.I.
11 of less than 30 percent for year to date.
12   What is a negative R.O.I. of less than 30
13 percent?
14  A. I believe that was relating to keywords that
15 actually had a R.O.I. of negative 30 percent R.O.I. or
16 return on investment, basically, keywords that we were
17 losing money on.
18  Q. Did you mean to say 30 percent not negative 30?
19  A. No. It was really negative 30 percent.
20  Q. I see. So you would keep on keywords that had
21 a negative 20 percent R.O.I.?
22  A. Not necessarily. Obviously, we were on search
23 engine programs on an R.O.I. level. We are in business
24 to make money.
25   Some keywords that may be negative for

Page 60

1 a short time period, we may make changes. So some of
2 those keywords we may bid less to try to improve the
3 performance of those keywords.
4  Q. The next -- the final action item on this page
5 is set minimum bids for 59 keywords that have produced
6 R.O.I. between negative 30 percent to zero R.O.I.
7   What does that mean, set minimum bids?
8  A. Our search engine report in the Coremetrics has
9 what I call a recommended max, maximum, cost per click
10 of what we are willing to pay; and so I believe, in this
11 case, that's what that was referring to, set those bids
12 to that level.
13  Q. I see. So it actually meant set maximum bids?
14  A. I guess, based on our report, it would say
15 that.
16  Q. All right. So Coremetrics suggests bid prices
17 to you as part of their report?
18  A. Coremetrics doesn't necessarily suggest bid
19 prices to us. They don't personally provide any insight
20 or strategic insight to us in that regard.
21   We have built with them this report,
22 Exhibit 2.
23   With them, it was a custom report that
24 we built with them; and there are formulas in there that
25 I will put a recommended maximum bid amount.

Page 61

1  Q. I see. And then you use that as part of the
2 mix in making your decision?
3  A. Yes. It's a guide.
4  Q. Okay. Nice goal.
5   MR. GARRITY: On the following page.
6   MR. PAGE: Just as an aside, that's a
7 great goal, reduce spending 50 percent and don't cut
8 revenue. Strategy two, buy low, sell high.
9  Q. (BY MR. PAGE) Going two pages further along,
10 there is another header at 043010 titled Online
11 Marketing Programs Review, 2006 Trends Year to Date,
12 Coremetrics Data, and that appears to run through
13 043030.
14   Did you prepare this document?
15  A. Yes.
16  Q. What was the purpose of this document, for a
17 meeting or a stand-alone document?
18  A. It was a document that I prepared initially for
19 a meeting as well as to give myself kind of a step back
20 oversight of the program.
21  Q. I see. On the second page, there is an agenda.
22 There are a couple of terms I don't understand.
23   What is a conversion funnel snapshot?
24  A. That's actually a name of one of the reports
25 inside of Coremetrics.

Page 62

1    Q.  And what is a conversion funnel?
2    A.  A conversion funnel -- and it's probably on one
3  of these slides -- is really showing at the highest
4  level people that come to the website and at different
5  stages, where they are at different stages.
6          So, for example, do they add an item
7  to their cart, do they make it to different pages
8  within the check-out process; and, obviously, the
9  most important is, do they result in a purchase.
10   Q.  I actually flipped forward to 43018.
11          Is this the conversion trend funnel
12 report?
13   A.  43018.  Okay.
14   Q.  So does this reflect data on how far various
15 visitors to the website get?
16   A.  Yeah.  Well, this shows you -- this shows you
17 how many uniques we had during that time period, what
18 percent of those are -- let's see here, percent of
19 total unique visitors, what percent of them are new,
20 what percent are previous, and then what percent are
21 unique buyers.
22   Q.  What is the difference between a browser and a
23 shopper?
24   A.  Sure.  A browser is somebody that is just -- my
25 recollection of these definitions of Coremetrics is a

Page 63

1  browser is just looking at product, product detail, or
2  product category pages on the website.
3          A shopper is an individual who actually
4  takes an action of putting the item in their shopping
5  cart.
6    Q.  I see.  So a shopper is someone who starts the
7  shopping cart process.  A buyer is someone who finishes
8  it?
9    A.  Correct.
10   Q.  Got it.  If you could go back to the agenda
11 page, which was 43011, there is an item that says
12 LiveMark Benchmark?
13   A.  Well, LiveMark is a separate report inside of
14 Coremetrics.  I believe that's in here as well.  It's
15 really a benchmark report at the high level.
16          MR. GARRITY:  I think 4030.  Excuse me.
17 43030.
18          MR. PAGE:  Yeah.
19   Q.  (BY MR. PAGE)  If you look at 43030, there is a
20 Q1 LiveMark Benchmark Trends.  It seems to be comparing
21 your site to LiveMark Home.
22          What is LiveMark?
23   A.  LiveMark Home?
24   Q.  Yeah.
25   A.  LiveMark Home is the vertical -- it's a

Page 64

1  vertical inside of Coremetrics.
2    Q.  Oh, okay.  So this is an average of a number of
3  sites?
4    A.  Yes.
5    Q.  I see.  So this is sort of performance against
6  the Dow Jones?
7    A.  It's obviously home, focusing on the home
8  vertical.
9    Q.  I see.  So if I was an insurance company,
10 there would be a LiveMark insurance vertical?
11   A.  I don't know.  I don't know what their
12 verticals are.  We just so happen to be in the
13 Home vertical.
14   Q.  I see.  So the Home there refers to the product
15 category, not a home page?
16   A.  That's correct.
17   Q.  Got it.  Okay.  If you would flip to the page
18 after the Agenda, page 43012, it's captioned 90 Day
19 Unique Visitor Trend.  There are two notes at the bottom
20 of this.
21          The first is, traffic drop off in
22 April was a result of pulling back on S.E.M.
23          What's S.E.M.?
24   A.  Search engine marketing.
25   Q.  And when you say pulling back on S.E.M., does

Page 65

1  that refer to the action items we were just looking at?
2    A.  Yes.
3    Q.  Okay.  The second item there is C.J. brand
4  keyword policy change.
5          Is C.J. Commission Junction?
6    A.  Correct.
7    Q.  Who is Commission Junction?
8    A.  They are an affiliate program, really
9  management company.
10   Q.  Sometimes we ask questions we know the answer
11 to.
12          And do you currently work with Commission
13 Junction?
14   A.  Yes.
15   Q.  And, essentially, Commission Junction directs
16 traffic to your website and charges a commission on it,
17 right?
18   A.  Commission -- we have got affiliates,
19 obviously, inside of Commission Junction; and those
20 affiliates direct traffic to our website.  If somebody
21 from that buys, that affiliate gets commission.
22   Q.  What is the C.J. brand keyword policy change
23 you refer to here?
24   A.  C.J. brand?  In Commission Junction, we were
25 allowing a handful of affiliates, search affiliates, to

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 66

1  bid on our brand keywords.
2       This change is referring to, we changed
3  our policies to no longer allow any affiliates to bid
4  on any brand keywords on any search engines.
5       Q. I see. Let's get to a bunch of questions
6  first.
7       How did you go about deciding -- prior to
8  the policy change, how did you go about deciding which
9  affiliates you would and wouldn't allow to bid on your
10 brand?
11      A. Those affiliates were a handful of affiliates.
12 They were very reputable affiliates, affiliates that we
13 had, had and have good relationships with; and that's
14 really how we decided that. Commission Junction may
15 have also recommended one or two to participate.
16      Q. Why would you allow an affiliate to bid on your
17 brand names?
18      A. Well, because Google was selling our keywords;
19 and we felt that, in order for us to capture or really
20 not lose, limit losing sales from folks that were
21 looking on Google for our brand, any of our brand
22 keywords, we felt since there were competitors popping
23 up, that we would allow some of our affiliates to have
24 an ad on Google, an advertisement.
25      Q. But you were bidding on your own brand keywords

Page 67

1  as well, right?
2       A. Yes.
3       Q. So weren't you simply allowing your affiliates
4  to compete with you?
5       A. That was one school of thought, especially by,
6  I would say, a couple people at the company.
7       The other school of thought was allow
8  the affiliates to, in a sense, flush the competitors
9  into lower positions and potentially off the first page.
10      Q. I see. So the idea was that both the
11 affiliates ad and your ad would run?
12      A. During this period of time that we had allowed
13 them to bid, yes.
14      Q. I see. And did you put any restrictions --
15 during the period when you allowed them to bid on your
16 brand names, did you put any restrictions on how much
17 they could bid?
18      A. The answer to that is, no, we never said, you
19 can only bid X amount.
20      Q. So you would have -- were you -- strike that.
21      Did you care whether your affiliates
22 ended up above or below your own ad?
23      A. Yes.
24      Q. How did you go about preventing the affiliates
25 from ending up above your own ad?

Page 68

1       A. We had guidelines these affiliates had to abide
2  by. Those guidelines, one of those guidelines, to the
3  best of my recollection, was they could not be in a
4  position above us.
5       Q. I see. And how was that policed? Were they
6  simply supposed to lower their bid any time they ended
7  up above you?
8       A. Yes. We do police our brand very vigilantly
9  and aggressively on line.
10      Q. And when an affiliate ad would run on Google,
11 say, let's take an example, on a search for American
12 Blinds, what destination U.R.L. would be reflected in
13 the affiliate's ad?
14      A. Typically, it would be the affiliate's U.R.L.,
15 slash, and then if they wanted to use American Blinds
16 after their U.R.L., the first part of their U.R.L.
17      Q. So your affiliate ads would -- well, can you
18 give me an example of an affiliate who you allowed
19 prior to this change to bid on your brands?
20      A. Pepperjam.
21      Q. So, in the case of a Pepperjam ad, would it
22 say, you know, American Blinds, www.pepperjam.com at
23 the bottom?
24      A. Pepperjam, I believe, just said
25 www.pepperjam.com in the U.R.L., in the display U.R.L.

Page 69

1       Q. Was that true of other affiliates that you
2  allowed to bid on your brand?
3       A. There were some other affiliates who did do
4  that as well.
5       Q. Did you have affiliates who displayed one of
6  your U.R.L.s as the destination U.R.L. in their ads?
7       A. Again, they would -- part of the guidelines
8  were they can either use their own U.R.L. or name,
9  in this case, like a Pepperjam, or it had to be their
10 first -- their U.R.L. at the first part said
11 www.affiliate, as an example, slash, American Blinds.
12      Q. And if I -- to take the Pepperjam example, if
13 I -- if they bid on American Blinds and I ignored your
14 ad and clicked on theirs, would I go to Pepperjam's
15 website?
16      A. Yes.
17      Q. Would Pepperjam then automatically redirect me
18 to your website?
19      A. Pepperjam -- and just to go back, so our ad
20 always would have official -- official, official site.
21      Pepperjam, if you clicked through, you
22 would go to Pepperjam's website.
23      Q. I see, and would you then get presented with a
24 whole range of Pepperjam stuff, including a link to
25 American Blind?

Page 70

1    A.  Stuff?
2    Q.  I don't know what's on Pepperjam's websites.
3    A.  You would be taken to Pepperjam.  That landing
4   page, again, part of our guideline policy was they
5   would -- they could not have any competitors' offers
6   on that page.
7    Q.  I see.
8    A.  And so, in Pepperjam's example, they would
9   have -- again, their landing page would say, you know,
10  our mark; and then it would have content about our
11  company, the value proposition of the company; and
12  then there would be a link to our website from there.
13   Q.  I see.  And was that, in the example of
14  Pepperjam, would you go to a -- would someone clicking
15  on Pepperjam's American Blind ad go to a custom page
16  designed for people who clicked on the American Blind
17  ad, or would they go simply to Pepperjam's home page?
18   A.  No.  It would go to our partner page on
19  Pepperjam's website.
20   Q.  I see.  So there would be a specific American
21  Blind themed page on Pepperjam?
22   A.  I am not certain if they use the American
23  Blinds.  I believe they use the American Blind marks.
24  They may also have used decoratetoday or one of our
25  other brand marks as well.

Page 71

1    Q.  But it was a custom designed landing page --
2    A.  Yes.
3    Q.  -- for American Blind customers or people who
4   clicked on the American Blind ad?
5    A.  Yes.
6         MR. PAGE:  I am told we need to change
7   tapes.  So let's take a short break.
8         THE VIDEOGRAPHER:  Off the record,
9   10:14:07 a.m.
10        (Recess taken.)
11        (Discussion held off the record.)
12        THE VIDEOGRAPHER:  We are back on the
13  record, 10:26:41 a.m.
14   Q.  (BY MR. PAGE)  Before we went off the record,
15  we were discussing the affiliates bidding on your brand.
16        First, when did you change your keyword
17  policy with regard to Commission Junction?
18   A.  During this time period, I believe we stopped
19  allowing our affiliates to bid on the brand keywords
20  around the time period, I believe it was, May, April
21  or May.
22   Q.  And why did you do that?
23   A.  It was really -- why we stopped it was -- or
24  stopped allowing them to bid was really a direction from
25  Steve Katzman.

Page 72

1    Q.  Did he express any reason for that direction?
2    A.  He really said, from what I can recall, was we
3   are already going to -- I take that back -- why pay for
4   that sale, why pay the commission to the affiliate for
5   that particular sale.  They are gonna see, you know, our
6   ad.  We are paying for it on TV, driving them to the
7   website, and other mediums that way.
8    Q.  Did you agree with that analysis.
9    A.  It was one school of thought.
10   Q.  The question is, did you attend that school?
11   A.  In my opinion, if I had my druthers, you know,
12  Google would not sell advertising for our brand keywords
13  and we wouldn't have an issue.
14   Q.  And I wanted a pony for Christmas; but given
15  Google's current policy, did you agree that you should
16  stop letting your affiliates bid on your brands?
17   A.  Again, we stopped it really because we felt
18  that we were paying -- we were gonna get those sales.
19        Why we put them back on was to test the
20  impact of allowing them to go back on a Google
21  advertisement again.  We will certainly keep a close
22  eye on the performance and the analysis.
23   Q.  Which leads me to the next question that I
24  didn't ask earlier, which is, have you, again, reversed
25  that policy and now allow affiliates to bid on your

Page 73

1   brands?
2    A.  Yes.  We have over 4,000 affiliates in our
3   C.J. program.  Only about a half dozen or so of our
4   affiliates are allowed to bid on our brand keywords.
5    Q.  So, when did you turn them back on?
6    A.  We turned them back on, I believe it was,
7   around June of this year --
8    Q.  I see.
9    A.  -- around that time period.
10   Q.  So they were only barred from bidding on your
11  brands for how long?
12   A.  I believe it was around six weeks, roughly.
13   Q.  I see.  What was the effect of that?  How did
14  it work out?
15   A.  How did it work out?  Steve Katzman was no
16  longer with the company.  New management.  Part of that
17  wanted to see reports and was open to some obviously
18  new ideas.
19        And one of the recommendations that I
20  made to them was to revisit this, at which time we did.
21   Q.  Is it your view that you're better off letting
22  your affiliates bid on your brands?
23   A.  Again, we made that change to allow a handful
24  of them to bid back on our brands; and we will keep a
25  close eye on it.

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 74

1    Q. I am asking for your view. Which school were
2 you in and are you in?
3    A. Yeah. You know, at this point in time, I am
4 in favor of allowing our affiliates to bid on our brand
5 keywords as part of the strategy to flush competitors
6 off for the brand keywords.
7    Q. Have you done any analysis of the results
8 within/without this rule?
9    A. We did and that was actually used. I did take
10 a look at that analysis. That analysis was used to make
11 the decision, really, to allow affiliates to bid back on
12 our brand keywords.
13    Q. How did you go about making that analysis?
14 Tell me about what you found.
15    A. Sure. The analysis was actually, in part,
16 supplied by our Commission Junction reps, who, again, we
17 have two reps there who help manage the program; and so
18 they put together some analysis. We also looked in
19 Coremetrics to see the impact.
20    Q. And what did you find when you went to see what
21 the impact was?
22    A. The impact was when they were not allowed to
23 bid on our brand keywords, we were losing money.
24    Q. And how did you determine you were losing
25 money?

Page 75

1         Was this a matter of total visits or
2 total sales or R.O.I. on particular words or what did
3 you look at?
4    A. Sure. I believe it was actually primarily
5 sales or revenue and visit activity.
6         Number one, it was definitely, you know,
7 the revenue, how much money we were making from it, how
8 much money did we lose when that was in play.
9    Q. I see, and were you looking at revenue tracked
10 to particular keywords or just revenue from affiliates
11 or what?
12    A. Sure. The primary analysis was looking at the
13 revenue for the entire Commission Junction program,
14 before and after.
15    Q. And the result -- I assume the result of not
16 allowing them to bid on your brands was that your
17 Commission Junction revenue went down?
18    A. It did.
19    Q. Did you have -- do you have any way of
20 determining whether -- strike that.
21         Do you have any way of determining where
22 those customers are going now that -- strike that,
23 because I'm in the wrong tense.
24         During the period in which affiliates
25 were not allowed to bid on your brands, do you have any

Page 76

1 way of knowing where customers who previously have
2 clicked on the affiliate's ads ended up?
3         Who's getting them?
4    A. I would say our competitors, because we did not
5 see, you know, any spike in brand keyword traffic during
6 that time period that they were not allowed to bid.
7    Q. Did you look at traffic from your organic
8 listing?
9    A. We did look at that as well.
10    Q. And how much traffic do you get from organic --
11 your organic listing on Google?
12    A. Natural, organic search?
13    Q. Right.
14    A. Natural, organic search today is not a big part
15 of our business. I will tell you that our site is big
16 and complex, and we do have a project in place to help
17 us increase our natural search results.
18    Q. Your natural search result for searches on your
19 claimed brand names is typically top of list on Google,
20 isn't it?
21    A. It really depends on what brand name keywords
22 you are talking about. If it's a word like American
23 Blinds, American Wallpaper, American Blind and
24 Wallpaper, decoratetoday, you know, typically, we are
25 higher, high in the rankings.

Page 77

1         Obviously, you can't control how a
2 consumer types in the keyword or if they have a fat
3 finger and, you know, type two keys instead of one.
4         So, in a lot of those cases, we may not
5 be high on the list.
6    Q. Are you aware of any instances in which for a
7 search for American Blind and Wallpaper Factory
8 correctly typed, you have not been the number one
9 result in Google's natural listings?
10    A. I would tell you, sitting here today, I don't
11 have the answer. I would say, you know, looking at
12 Coremetrics, because Coremetrics is again what we use --
13 we started using Coremetrics in December of last year,
14 and there are natural search reports in Coremetrics that
15 we can take a look at. It does not have ranking reports
16 inside of Coremetrics, unfortunately.
17    Q. Okay. So Coremetrics does provide you with
18 reports on natural search results?
19    A. Yes.
20    Q. What are contained in those results?
21    A. It contains what keyword or what phrase they
22 searched on, what engine they searched on, and general
23 traffic information, number of visits or sessions,
24 revenues, orders.
25    Q. How do they get that information?

Page 78

1    A. How does Coremetrics get that information?
2    Q. Yeah.
3    A. I believe from the U.R.L.s itself, and that's
4 how they identify if it was Google versus Yahoo versus
5 MSN.
6    Q. Oh, let me see if I understand that.
7        They are looking at data from visitors to
8 your website?
9    A. Yes.
10    Q. I see, and that includes where they were last
11 at?
12    A. We have the website tagged for Coremetrics,
13 again.
14    Q. Uh-huh.
15    A. So the information is passed to Coremetrics,
16 and that's how they do pick it up.
17    Q. Okay. Does that -- how does -- how does
18 Coremetrics know whether a given visitor came from
19 Google to you via a natural result versus an ad?
20    A. Versus an ad words ad?
21    Q. Yeah.
22    A. Okay. All of our paid search programs, those
23 ad words, in this case, have a special parameter on the
24 U.R.L. string.
25        It starts with M.M.C. equals and that's a

Page 79

1 parameter. We have got a number of parameters in the
2 U.R.L. string which identifies where they come from.
3        If a U.R.L. does not have the M.M.C.
4 parameter and it comes from Google, then that's natural.
5    Q. Then it's natural?
6    A. Yes.
7    Q. What -- how -- strike that.
8        How many visits from Google natural
9 results do you receive in any given period of time,
10 whatever you know, weekly, monthly, daily?
11    A. From Google, itself, I can't recall specific
12 numbers.
13        Sitting here, I will tell you, though,
14 it's probably in some of these reports.
15        Here on number 019, the Channel Summary
16 report, it says --
17    Q. I see.
18    A. -- natural search activity.
19        So from 1/1/06 to 6/11/06, from natural
20 search, we received visitors; and this is some daily.
21 So 143,925 from natural search.
22    Q. Okay, and is this Google or is this all search?
23    A. That's all search. On that little kind of
24 eyeglass icon, you would be able to click and drill
25 down.

Page 80

1    Q. I see. So you ended up with, from natural
2 search activity, for this six-month period, you had
3 $725,000 in sales. Am I reading that correctly?
4    A. Yes.
5    Q. Okay, and that's --
6    A. And that's just shopping cart sales, obviously.
7    Q. So it doesn't take into account people who go
8 to the website and then get on the phone?
9    A. Correct.
10    Q. Okay. What is referring sites activity? Is
11 that affiliate linking?
12    A. Referring sites is anything that would not be
13 considered a M.M.C. or a marketing programs report, or
14 natural search by default would fall into referring
15 sites activity.
16    Q. What's included within M.M.C. vendors?
17    A. That includes all of our paid search engine
18 programs. It includes C.J. activity. It includes
19 strategic alliances, such as what we have with Target,
20 Linens and Things, Entertainment Publishing, again,
21 the credit card company that I mentioned previously
22 as well, basically, any marketing program that we want
23 to track.
24    Q. I see. So anything you have got an M.M.C. code
25 on, basically?

Page 81

1    A. Correct.
2    Q. So referring sites would be just sort of
3 somebody who put up a link to you or out of a directory
4 or something where it's not something you bought?
5    A. That's right, yeah, just kind of a default
6 catch bucket.
7    Q. Great. And direct load activity, is that
8 people who simply typed in your -- one of your U.R.L.s
9 in a search engine -- I mean in a browser?
10    A. That is, yes. So if somebody goes in
11 and opens up a browser bar and types in
12 www.decoratetoday.com or one of our U.R.L.s, that would
13 show as a direct load.
14    Q. Or has is book marked or something like that?
15    A. Correct.
16    Q. If you could turn to 043020, is a 90 Day
17 Natural S.E.O. Trend.
18    A. Uh-huh.
19    Q. First, it's difficult to tell from this copy.
20 Do you know which of these lines is Google?
21    A. The top line.
22    Q. And the visitors numbers on the left side, are
23 those per day?
24    A. I believe those are per day, yes.
25    Q. Okay, and the units are single, in other words,

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 82

1   the 450 line would be 450 visitors a day; is that
2   correct?
3       A. Yes.
4       Q. At the bottom of this, it says, 90 percent of
5   sales from natural search are a result of brand keyword
6   searches.
7           How do you know that?
8       A. We can see inside of Coremetrics, you know,
9   what the keyword is that people typed in to come to
10  that result.
11      Q. So, if I come to -- if I search for American
12  Blind on Google, click on your natural result, Google
13  will pass to you not only -- will pass to you the search
14  term that I used to get to that page?
15      A. Yes, based on the U.R.L. string, yes.
16      Q. I see. So the U.R.L. string that gets passed
17  to you when I click on a natural result includes my
18  search term?
19      A. I believe it does. That's how that's
20  calculated.
21      Q. Okay. Can you jump forward to starting at
22  page 043032 is captioned E Commerce Review, April 30th,
23  2004.
24          Can you tell me where that document ends?
25      A. This is the document. We are looking at

Page 83

1   actually 2004. If you flip to the next page where it
2   says Google visits, average cost per click --
3           MR. GARRITY: I think what Mike is asking
4   you --
5           MR. PAGE: That's the beginning of the
6   document. I am trying to find the end of it.
7           THE WITNESS: Oh, okay.
8           MR. GARRITY: So it seems to be a series
9   of tables or slides, and I think the question is just
10  where that goes to.
11          I do note that at 43044, there seems to
12  be another title kind of a page.
13          MR. PAGE: Okay. That's what I am
14  looking for.
15          THE WITNESS: Yes, that's correct.
16      Q. (BY MR. PAGE) Is this a document you prepared?
17      A. Yeah, it looks like a document that I prepared
18  or had input into.
19      Q. Do you have any reason to think any of the data
20  reflected in this document is incorrect?
21      A. No.
22      Q. On a number of the charts in this report, there
23  is a bar labeled C.T.O. What is C.T.O.?
24      A. Click to conversion rate.
25      Q. So is the O order, click to order?

Page 84

1       A. Yeah. Basically, people that came to the
2   website and bought.
3       Q. I see. Okay. If you could move forward to the
4   next document, which is 043044, E-Commerce Review, July
5   and August.
6       A. Okay.
7       Q. Can you tell me where that document ends?
8       A. It appears 093 is the last page.
9       Q. Okay. All right. And is this a document you
10  prepared?
11      A. This is a document that I had input into. I
12  believe Scot Powers put this together.
13      Q. Okay. Do you have any reason to think that any
14  of the data in this report is inaccurate?
15      A. No, no reason to believe that it's inaccurate.
16      Q. And is it your understanding that the July and
17  August referred to on the caption page is 2004?
18      A. Yes.
19      Q. If you could flip forward to the next document,
20  which starts at 043094 --
21      A. Okay.
22      Q. -- if you could tell me where that document
23  ends. My guess is 107.
24      A. Yes.
25      Q. Is this a document you prepared?

Page 85

1       A. Are you referring -- you are referring to this
2   one here?
3       Q. Yes, S.E.O. Impact Analysis starting at 043094.
4       A. I believe Scot Powers put this together.
5       Q. Was there a time in which American Blind
6   reduced the bids on all of its search programs -- all
7   or some of its search programs to a maximum of ten cents
8   per click?
9       A. Not all keywords in the program. I believe
10  the majority of keywords were dropped to a minimum --
11  I should say a maximum bid of ten cents.
12      Q. Okay, and why did you do that?
13      A. I believe we did that because that was
14  direction from Steve Katzman and our C.F.O. as well.
15  I believe it was a cost reduction exercise.
16      Q. Was it originally designed to be an experiment,
17  or was it just a new policy?
18      A. I believe it was just an experiment, actually.
19  We also tried to determine if we cranked all of our
20  bids down what the true impact of that would be to the
21  company.
22      Q. Okay, and what did you find? What was the
23  impact on the company?
24      A. The impact to the company was paid search
25  programs are very important to the business.

Page 86

1    Q.  And for how long did you keep the maximum bid
2  of 10 cents in place?
3    A.  I believe the time period in which we did
4  that, if I recall properly, was -- here we go.  It
5  appears to be November 11th.
6        And I believe we operated that policy
7  until around mid February of that following year.
8    Q.  I see.  And, if you look at page 043104, which
9  is captioned Google --
10   A.  Okay.
11   Q.  -- is this a summary of results of 30 -- 30
12 days of each policy?
13   A.  Yes, it appears to be a before and after of
14 that, yes.
15   Q.  I see, and was the basic top line result that,
16 although your return on investment got much better, your
17 overall revenue went down?
18   A.  We did lose some revenue because of that; and,
19 obviously, when you take costs, major costs, out of any
20 program, your R.O.I. is gonna get drastically better.
21   Q.  Okay.  Do you -- you said that the following
22 February, you stopped this, I guess, in hindsight
23 experiment; is that correct?
24   A.  Yes.  I believe that's when we basically
25 went back and weaned back our programs.

Page 87

1    Q.  Do you currently have any maximum on bid
2  prices?
3    A.  Yes.
4    Q.  What is that maximum?
5    A.  The maximum that we have or that we use is
6  five dollars a click.
7    Q.  Why five dollars?
8    A.  On some search engines, you can't prevent any
9  competitors from basically driving up your bids to a
10 unprofitable level; and that's what we use, is the
11 five dollars.
12   Q.  I see.  So -- and then, of course, you set the
13 individual bids on the metrics we talked about earlier?
14   A.  Right, to the keyword level based on R.O.I.
15 of that keyword across the engine, across the period of
16 time that we are looking at.
17   Q.  What do you -- never mind.  Hopefully, we can
18 get through this.
19        If you would move forward to the next
20 document in this stack, which starts at 043107, 2005
21 Paid Search Programs, 6/16/2005.
22        Where does this document end?
23   A.  It appears to be 117.
24   Q.  117 is the beginning of the next document,
25 correct?

Page 88

1    A.  Oh, I'm sorry.
2    Q.  Correct?
3    A.  Yes.
4    Q.  Is this a document you prepared?
5    A.  Yes.
6    Q.  And was this as part of a presentation?
7    A.  I believe it was part of a presentation.
8    Q.  And by whom and to whom?
9    A.  I put this presentation together, and I would
10 imagine that it was to the marketing group as well as
11 members of the management team and finance.
12   Q.  Okay.  If you could look at the page 043109,
13 which says 2005 Overview --
14   A.  Okay.
15   Q.  -- the third bullet point says, manage Google
16 and Overture C.P.C. Programs to zero percent R.O.I.
17 level excluding branding.
18        First, what does it mean to say manage
19 C.P.C. programs to zero percent R.O.I. level?
20   A.  That means that the objective strategy of the
21 company, which is a collective across management team,
22 finance, and marketing, was to run these programs at a
23 zero percent R.O.I. level and for generic terms, meaning
24 don't include branding in them.
25   Q.  Okay, and you say run it to zero percent.  I

Page 89

1  assume you mean zero or better?
2    A.  Absolutely.  We need to make money.
3    Q.  Why do you exclude branding from that?
4    A.  Branding -- again, branding is, you know, we
5  look at as, again, people are finding us either through
6  for the first time seeing us on paid search.  Sometimes
7  they are seeing us on H.G.T.V. or any number of TV
8  stations we are advertising on or in any of the
9  magazines that we are advertising in.
10        So those people are coming to us, opening
11 up a browser, coming to us and in some cases through
12 Google or through a search engine.
13        Our branding keywords are, again, those
14 American Blinds, American Wallpaper keywords; and that's
15 why we tend to look at them a little bit differently.
16   Q.  Does that mean that you were willing to have a
17 negative R.O.I. on someone who searched for one of your
18 brands rather than have them go elsewhere?
19   A.  Our R.O.I. keywords are the most profitable,
20 best R.O.I. keywords.  We are talking, you know, for
21 the category itself, you know, a thousand plus percent
22 R.O.I.
23   Q.  So your return on investment on your branded
24 keywords is your best return of any keywords anyway,
25 right?

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 90

1    A. No question.
2    Q. So, is there any purpose of saying, excluding
3 branding here?
4    A. Again, the strategy behind that was to let's
5 focus in generic categories.
6    Q. I see. So that wasn't because you were going
7 to allow branding to go negative, but rather because
8 branding was nowhere near zero, and you didn't need to
9 focus on it; is that correct?
10    A. Again, I would tell you, branding is the best
11 performing category. You know, the other categories,
12 we want to get the most for our money on. We want to
13 be able to get as many customers as we possibly can
14 based on what we are willing to spend.
15    Q. Where do you typically bid on your brands on
16 Google, what kind of bid prices?
17    A. Some keywords, you know, the max bid in the
18 program are ten cents; and some, you know, are up to
19 five dollars.
20    Q. For, for instance, American Blind and Wallpaper
21 Factory, the bid price on that is typically very low,
22 isn't it?
23    A. It's probably not near the five dollar mark
24 for that particular term.
25    Q. In fact, your claimed brands, the keywords in

Page 91

1 your branding category tend to be the cheapest keywords
2 you are bidding on?
3    A. Some are, you know, less inexpensive than
4 others.
5    Q. Let's go finally to what I hope is the last
6 document in this pile, 043117. It's a four-page
7 document captioned, 8 Million, I believe, January Sales
8 Goal, Search Engine and Affiliate Action Items.
9            What is this document?
10    A. It's a presentation that I put together for our
11 marketing group as well as Steve Katzman, Ron Myers,
12 just as a high level snapshot showing what we are doing
13 on the search engine affiliate space.
14    Q. Again, when was this presentation?
15    A. I don't recall when the presentation was. I
16 believe it was sometime near, you know, middle of the
17 month.
18    Q. Middle of which month?
19    A. Of January.
20    Q. I see. Is that January of this year?
21    A. Yes.
22    Q. So what does the 8 million January Sales Goal
23 refer to?
24    A. That was a goal that was shared and passed down
25 from Steve Katzman.

Page 92

1    Q. Is that -- does that reflect a goal for company
2 wide sales for that month?
3    A. I believe that 8 million was the company's
4 goal, yes.
5    Q. I see, and this was just your report on what
6 you were doing in the search engine world to --
7    A. From the search engine affiliate world, what we
8 could do to get in line and attack that goal.
9    Q. Okay. We can finally put that one aside. I
10 know you are gonna miss it.
11            Let me ask you to dig further down in
12 that pile to a document that's labeled Curran Exhibit 1.
13 It's a two-page document that looks like that.
14    A. Okay.
15    Q. Have you seen this document before?
16    A. No, I have not.
17    Q. Do you have any understanding of what period of
18 time this document refers to?
19    A. No, I do not.
20    Q. Do you know what this document was prepared
21 in connection with, the period of time in 2004 when
22 you reduced your bids to 10 cents?
23    A. I don't.
24    Q. Okay. That makes that one easy. If you could
25 look at Exhibit Curran 3, which is two more documents

Page 93

1 down; and tell me if you have seen this document before.
2    A. Yes.
3    Q. And what is this document?
4    A. This is a document that is, I would say,
5 similar to the S.E.O. R.O.I. Coremetrics report that we
6 reviewed earlier.
7            It appears to be an S.E.O. analysis for
8 Google, just showing our category trends.
9    Q. And this is for the year 2005 followed by month
10 by month; is that correct?
11    A. Yes.
12    Q. How is the revenue -- strike that.
13            The column labeled revenue, what does
14 that reflect? Is that gross revenue?
15    A. Gross shopping cart revenue.
16    Q. So it's whatever got charged to somebody's
17 credit card somewhere?
18    A. I would say, again, it's gross, gross revenue.
19 So, yes, if a cart went through, then that would reflect
20 that, yes.
21    Q. I see. And C.T.O., is that basically just the
22 ratio of visits to -- that's backwards -- orders to
23 visits?
24    A. Yes.
25    Q. And I take it the data here is data for paid

Page 94

1  search only?
2      A. For Google, yes, during this time period.
3      Q. It doesn't include natural results?
4      A. No.
5      Q. Okay. This is the result of printing a
6  spreadsheet. So the second half of the first page
7  is about five pages in at 8035.
8          The first column of the second half of
9  this exhibit is ADJNS$. What is that?
10     A. That really stands for adjusted net sales.
11     Q. Okay. How is that calculated?
12     A. It's a formula that we use; and I believe it
13 takes into account revenue with off-line sales factors,
14 a number of other things, return factors as well.
15     Q. I see. So it's an attempt to get to a more
16 complete number of what sales flowed from that visit?
17     A. It's to get closer to a global number, yes.
18     Q. And you have some factor, based on history, of
19 what percentage go off to the telephone and things like
20 that?
21     A. Yes.
22     Q. Then, I take it EBITDA is just an estimate of
23 your net earnings off those sales?
24     A. That's correct.
25     Q. And EBITDA percentage, what is that a

Page 95

1  percentage of?
2      A. I believe that's EBITDA divided by adjusted net
3  sales. It's a formula as well.
4      Q. I see. So, essentially, it's a measure of
5  margin?
6      A. Yes.
7      Q. And R.O.I., I take it, is -- well, let me ask.
8          How is the R.O.I. percentage calculated?
9      A. It's a formula. It takes into account EBITDA,
10 I believe, divided by cost.
11     Q. I see. So it is --
12     A. It is a return on investment for that category.
13     Q. And if the -- on page 008035, the fourth line
14 down, the 1,161 percent return, that's for branding
15 keywords, correct?
16     A. Correct.
17     Q. That compares with an overall average of 77
18 percent?
19     A. Yes.
20     Q. And that 77 percent includes the branding
21 return on investment, correct?
22     A. Yes.
23     Q. It would have to. There is no other number.
24 And the average, A.V.G.C.P.C., is that the average cost
25 per click for each category?

Page 96

1      A. Correct.
2      Q. Is blinds always that much more expensive than
3  every other category?
4      A. Yes, it is.
5      Q. Is it just more competitors in blinds than in
6  wallpaper?
7      A. That's a fair statement. It's definitely more
8  competitive and keywords are getting more expensive.
9      Q. And is that true on other search engines as
10 well?
11         In other words, is blinds more expensive
12 on Yahoo than wallpaper?
13     A. As far as the average cost per click?
14     Q. Yes.
15     A. Yes.
16     Q. And then the last column is R-E-C-M-A-X-C-P-C.
17         What does that stand for?
18     A. It stands for recommended maximum cost per
19 click.
20     Q. I see. Is that the recommended number that's
21 generated by Coremetrics?
22     A. In the Coremetrics report, right, it's a
23 formula.
24     Q. I see. Okay. So, for the fourth one down, the
25 Coremetrics formula recommends a maximum cost per click

Page 97

1  of 2.92 for branding?
2      A. Yes.
3      Q. I take it that's some sort of formula that is
4  designed to tell you you would still be making money
5  if you bid $2.92 cents?
6      A. I believe the formula is actually based on
7  break even for that particular, in this case, category
8  or keyword.
9      Q. I see. Do you know if anything goes into
10 that calculation, other than the data reflected on
11 this spreadsheet, in other words, the EBITDA estimates
12 of telephone sales, things like that?
13         Is there any other inputs into that
14 calculation?
15     A. For recommended max --
16     Q. Yeah.
17     A. -- or recommended max C.P.C.? Again, it's a
18 formula. If I had it in front of me, it's, you know, I
19 would be able to tell you but it's everything here.
20     Q. I think I can do that. Okay.
21         Let's go a little further down on this
22 stack to Exhibit 6.
23     A. Are we done with this one?
24     Q. Yeah. You can set that aside.
25     A. Exhibit 6?

1      MR. GARRITY: Yep.
2      Q. (BY MR. PAGE) And if you can tell me what
3  Exhibit 6 is, if you know?
4          Exhibit 6, this is the order they came
5  in. I have no idea whether this is 1, 2, 5 or
6  20 different -- well, fewer than 20.
7          I make no representation as to whether
8  these are actually a single document. I don't know.
9  They appear to be bits and pieces of different things,
10  but the questions I have are on the second and third
11  page.
12      A. Okay.
13      Q. I just want to walk through some of these
14  formulas and make sure I understand them.
15          On the third page -- oh, I'm sorry.
16          Do you recognize this document or any
17  pieces of it?
18      A. Pieces of it, I do.
19      Q. Which pieces?
20      A. Page two, page three, page four, near the back
21  where it says Search Term Expansions, so 590, and the
22  following page as well.
23      Q. Okay. Going back to the handwritten page of
24  formulas, is this your handwriting?
25      A. No.

1      Q. Do you know whose it is?
2      A. Joe Charno's.
3      Q. Who is Joe Charno?
4      A. He is our former Vice-President of Advertising
5  and E-Commerce.
6      Q. And when did Mr. Charno leave the company?
7      A. I believe Joe left -- I don't recall the exact
8  time period. I believe Joe left in '05.
9      Q. Why did he leave?
10      A. From what I was told, it was a better
11  opportunity and to pursue other interests.
12      Q. Were you aware of whether he was fired or
13  quit?
14      A. I did talk to him once after that point in
15  time; and he just said the same thing, he just pursued
16  other interests.
17      Q. Do you know if that's true?
18      A. I will tell you, I don't believe he was fired.
19      Q. Okay, all right. On this page, the adjusted
20  net sales formula, which is the second formula, has
21  something that says off-line sales factor --
22      A. Uh-huh.
23      Q. -- of 1.5. Is that the factor that takes into
24  account visits where the customer then places -- gets on
25  the phone and does a phone order rather than goes

1  through the shopping cart?
2      A. You got it.
3      Q. Okay, and is that just based on historical
4  data?
5      A. Historical data from our finance group, yes.
6      Q. And I assume ret factor is a return factor?
7      A. Correct.
8      Q. Okay. And what is G.P. dollar?
9      A. Gross profit dollars.
10      Q. I see. And is that just based on a historical
11  factor of your profit margin?
12      A. Based on the product category.
13      Q. I see. So it differs for different product
14  categories?
15      A. Yes.
16      Q. What is a secondary marketing factor?
17      A. Secondary marketing factor is a factor that
18  our finance group uses saying that we are also going --
19  once we land them on the file, customers in the file, we
20  are going to market to them as well with e-mail
21  campaigns, catalogs, postcards and so on.
22      Q. I see.
23          So this is an extra 2 percent that you
24  expect to get from having that customer contact down
25  the road; is that right?

1      A. I don't believe -- not get but spend.
2      Q. Ah. I see. I see.
3          Since you are already capturing the sales
4  that flow from them, you're building in the cost of
5  follow-up mailings?
6      A. Exactly.
7      Q. Got it. Okay. The next line, Inc Spending
8  Factor, I think that is what that says.
9          What is that?
10      A. Incremental spending factor, I believe that
11  takes into account things like admin, any other, you
12  know, expenses to manage the program.
13      Q. I see. It's sort of designed to capture
14  overhead that increases with the increase of visitors
15  as opposed to being fixed?
16      A. Yeah, for the paid search program, itself.
17  We are trying to look at this and manage the paid
18  search business, you know, fully baked, you know, how
19  much money are we truly spending, how much money are
20  we truly making.
21      Q. Okay, and cost, I take it, is simply what you
22  pay Google?
23      A. It's cost from the search engines, again, that
24  we pull on a daily basis.
25      Q. Okay. And, so, to get back around to my old

Page 102

1  question, the recommended max cost per click is simply
2  straight break even, right?
3      A. Yeah. What's in the system, what it's gonna
4  net out to is break even level.
5      Q. So the earning plus the cost -- earning plus
6  cost -- yeah, okay.
7          MR. GARRITY: Yeah.
8          MR. PAGE: We don't really need him, do
9  we?
10         MR. GARRITY: No. Jeff, you have a soda.
11 Mike and I will --
12         MR. PAGE: Yeah. So often, almost
13 literally true of a 30(b)(6) deposition.
14     Q. (BY MR. PAGE) Let me -- if you could flip to
15 the next document, Curran 7; and if you could tell me
16 what this document is?
17     A. Well, it appears to be an analysis showing each
18 search engine program, Google, Yahoo, MSN, C.J., data
19 feeds as well and just showing it looks like just year
20 over year how much we have spent in '03, '02, '03, '04
21 and an estimate for '05.
22     Q. I see, and breaking out total spend versus
23 branded keyword spend kind of?
24     A. Yes.
25     Q. All right. And, if you go on to Exhibit 8 --

Page 103

1  sorry -- Curran 8, which is a multi-page document that
2  has a caption on the first page that reads Incremental
3  Advertise -- looking like it's gonna end in ing.
4      A. Okay.
5      Q. Can you tell me what this document is?
6          MR. GARRITY: I am just looking through
7  this as well, Mike.
8              It looks like the way that it breaks,
9  it's done year over -- it's a little bit -- you know,
10 unfortunately, the way that it had to get broken in
11 half, it looks like 3018 through 3023 would be the total
12 2005 Incremental Advertising but just gets broken in
13 half.
14         MR. PAGE: Yeah, and then it goes back in
15 time.
16         MR. GARRITY: And then it goes back and
17 it starts the next one. So, for example, 3021 seems to
18 be the right half of the document that starts on 3018.
19         MR. PAGE: Yeah.
20         MR. GARRITY: Just for clarity, Jeff, I
21 think it does that, you know, over and over again by
22 year.
23         THE WITNESS: Oh, I see. Okay.
24     Q. (BY MR. PAGE) It's the usual pain of printing
25 a spreadsheet.

Page 104

1          So, is what he just said right?
2      A. That appears to be correct, yes.
3      Q. First, did you have any involvement in
4  preparing this document?
5      A. No, I did not.
6      Q. Do you know who did prepare this document?
7      A. This type of a document is prepared from our
8  finance group, and I believe the individual would be
9  Jeff Rouleau.
10     Q. Is this a true and accurate summary of American
11 Blind's advertising spending from 2001 through 2005?
12     A. It appears to be. It's difficult to read how
13 it's printed, but it appears to be. If I am just
14 looking at the totals, it appears to be accurate.
15     Q. Do you have any reason to think that there
16 is anything missing from this that was spent on
17 advertising in any of these years?
18     A. It's in the ball park. We typically spend
19 around ten million dollars a year on advertising.
20     Q. An irrelevant question, but I have got to ask.
21         What's the difference between back of
22 book and front of book in magazines?
23     A. In magazine ads --
24     Q. Yes.
25     A. -- sure. Back of book ads are typically the

Page 105

1  last group of pages that have, you know, a kind of a
2  business card size ad where the front of the book
3  would be more of a full page or half page ad.
4      Q. So the back of book is sort of like the
5  classified stuff at the back of the magazine?
6      A. Classified or advertisers' section, index.
7          MR. PAGE: Time flies. We need to change
8  tape again.
9          THE VIDEOGRAPHER: Off the record,
10 11:23:47 a.m.
11         (Recess taken.)
12         THE VIDEOGRAPHER: Back on the record,
13 11:32:38 a.m.
14         MR. PAGE: I will mark as Exhibit 3.
15         (Mark'd for identification
16         was Deposition Exhibit No. 3.)
17     Q. (BY MR. PAGE) Exhibit 3 is a four-page
18 document consisting of a string of e-mails, the last
19 one being from yourself to Joel Levine and Ron Myers
20 on July 6th, 2006. Subject, analysis of C.J. brand
21 keyword policy change.
22         Do you recognize this document?
23     A. Yes.
24     Q. Did you, in fact, write this?
25     A. Yes.

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 106

1    Q. Is this the analysis you referred to earlier
2  that Commission Junction had done on the impact of
3  changing your bidding rules on branded keywords?
4    A. Yes.
5    Q. And what was the conclusion from that
6  analysis?
7    A. The conclusion was, based on my notes here,
8  that we saw 55 percent drop in sales from our affiliate
9  program during that time period.
10   Q. And it was your conclusion that most of that
11 drop was likely a result of the policy change?
12   A. Yes.
13   Q. In the second paragraph of your conclusions,
14 you say, "Since 4/7/06, we have not experienced an
15 increase in sales from our branded keyword category on
16 Google, Yahoo or M.S.N. Does this mean our competition
17 is picking up these sales from infringing our these
18 marks? My assumption is yes, but this will be hard to
19 prove."
20       Why -- first of all, it was 4-7-06, the
21 date on which you stopped letting affiliates bid on your
22 branded keywords?
23   A. Yes.
24   Q. Did you do any analysis of whether there was
25 an increase or decrease in visits to your website via

Page 107

1  natural results on branded searches?
2    A. We did.
3    Q. And what was your result?
4    A. We did not see any increase.
5    Q. How much income -- how much -- strike that.
6        The comparison you did on sales was
7  quarter to quarter, correct, in terms of C.J. sales?
8    A. Yes. That was the time period in the analysis,
9  was quarter to quarter.
10   Q. And was Q -- are you running calendar quarters
11 here? Is Q1 January 1 through the end of March?
12   A. Yes.
13   Q. And Q2 is first of April through the end of
14 June?
15   A. Correct.
16   Q. And for that period, the policy you were
17 testing in Q2 was only in effect for six weeks, correct?
18   A. It was about six weeks.
19   Q. Did you compare those six weeks to other weeks
20 in Q2?
21   A. We did. In Coremetrics, we looked back
22 previously really on -- it was a daily level, a daily
23 trend level.
24   Q. And what was the comparison of daily trends for
25 the six-week period in which C.J. affiliates were not

Page 108

1  allowed to bid on branded --
2    A. We saw a, again, significant drop off in sales
3  was the biggest key factor that we discovered; and we
4  were looking to see that difference in sales, was that
5  picked up by any other of our programs.
6    Q. Okay. Did you compare that to the level of
7  spend by the Commission Junction affiliates?
8    A. With Commission Junction, really, sales is, you
9  know, a direct result of spend, meaning our affiliates
10 get paid a percentage of sale, of sales that they
11 generate for us. So we did look at that as well.
12   Q. Maybe I asked that badly.
13       What I am trying to get at is whether
14 when you put this policy in effect, did your Commission
15 Junction affiliates immediately start spending more on
16 other keywords; or did you simply have less Commission
17 Junction paid search activity for some period of time?
18   A. When we kicked the affiliates off of the brand
19 keywords, some of -- I would tell you that most of our
20 affiliates, paid search affiliates, at that time, saw
21 a significant reduction in sales and traffic that they
22 were driving to us.
23       Some of our affiliates have other
24 keywords in their programs as well that they target
25 for us.

Page 109

1    Q. Right.
2    A. More niche keywords they target for us, paid
3  and natural.
4    Q. So my question is -- well, different question.
5        Do you know whether in response to being
6  kicked off your branded keywords, your C.J. affiliates
7  increased their spend on non-branded keywords?
8    A. That, I don't know. I would tell you that our
9  affiliates are really an outstretched sales arm for us,
10 for the organization; and affiliates are in business,
11 also, to make money; and so affiliates can spend on
12 paid search how much they can to make a profit still.
13       So they are not gonna go in the red and
14 bid three, four dollars a click on a word like blinds.
15 It just doesn't make sense.
16   Q. How are your commission rates set to C.J.
17 affiliates? Is it strictly a flat percentage of
18 sales?
19   A. Yes.
20   Q. Is it the same for each affiliate?
21   A. We have got a standard affiliate rate, which is
22 five and a half percent. We do have a couple affiliates
23 that we -- that are a little bit higher than that that
24 we use an incentive to get in our program and then
25 monitor them over a given period of time; and if they do

82fe5069-57cc-4387-80e6-78261c1e0b7f

1  well, obviously, or give us increased placement,
2  permanent placement on their website, like with a
3  company like My Points, as an example, you know, then
4  we will increase their commission during a little time
5  period.
6      Q. If the drop in sales from quarter 1 to quarter
7  2 was 55 percent and the period in quarter 2 in which
8  the policy change was six weeks, wouldn't you have had
9  to had negative sales for that six-week period in order
10 to get the 55 percent drop for the entire quarter?
11     A. I am not sure I understand your question
12 there.
13     Q. Let me put it another way.
14         How can an effect that was only in place
15 for six weeks out of a quarter be responsible for a
16 55 percent drop in sales for the entire quarter? It's
17 physically impossible.
18     A. Again, when we determined the before and after
19 impact, we were looking at trending activity. These are
20 the quarter over quarter numbers.
21         Just based on looking at this e-mail,
22 there was a 55 percent drop in sales a quarter after
23 quarter. It may have not been a --
24     Q. But if you took the sales from quarter 1 and
25 you removed -- if you set six weeks of that quarter to

1  zero, it would be less than a 55 percent reduction for
2  the quarter, wouldn't it?
3      A. Yeah, I suppose so.
4      Q. So there has to be some cause other than the
5  change in policy for this 55 percent drop, correct?
6      A. Well, no. We looked at all of our paid search
7  affiliates individually as well and looked at their
8  trends year to date, and we did see a drop-off in all
9  of those paid search affiliates the moment we changed
10 the policy and said you can no longer bid on our brand
11 keywords.
12     Q. Do you have that data?
13     A. I don't know if it's here in front of us; but,
14 obviously, we could pull that together. I am sure that
15 was -- I'm surprised it was not sent.
16         MR. GARRITY: Certainly, yeah, if it
17 wasn't previously sent, of course, we would be happy
18 to send it.
19     Q. (BY MR. PAGE) Okay. All right. In -- I am
20 sure we have the data somewhere, but, roughly, what was
21 the sales -- strike that.
22         The figures here for Q1 and Q2, the
23 868,000 and the 562,000, those are gross sales, right?
24     A. Correct.
25     Q. So your commission would have been -- you would

1  have paid a commission of five-and-a-half percent,
2  roughly, on that number?
3      A. Right. Plus, obviously, the Commission
4  Junction management fee on top of that.
5      Q. For the same quarter, either one of them, do
6  you know, roughly, what your own sales were through
7  paid search?
8      A. I am sure we have that information. If not
9  here, it's easily accessible.
10     Q. Roughly, for the year, what are your quarterly
11 sales through paid search total?
12     A. I don't want to guess.
13     Q. Okay. I'm sure I can find it.
14     A. Yeah.
15     Q. After reporting your conclusion, you have a
16 section called Solution and you have various
17 recommendations here?
18     A. Yes.
19     Q. Are all of the -- strike that.
20         Were all of the things you recommended in
21 the Solutions section, in fact, implemented?
22     A. To the best of my knowledge, these were all
23 implemented.
24     Q. Okay, and are they all -- are all of these
25 things that you suggest current policy?

1      A. This is the current policy. Obviously, we do
2  police it with our affiliates. If there is an issue, I
3  will pick up the phone or e-mail the affiliate and it's
4  resolved immediately.
5          If it's not resolved, if they don't take
6  care of it, then they are removed from the program.
7      Q. Okay. I mean, none of these solutions were
8  vetoed by the company?
9      A. No.
10     Q. So affiliates -- do all of your Commission
11 Junction affiliates direct traffic to their own websites
12 from their ads, as opposed to your website?
13     A. Some of our paid search affiliates direct
14 traffic right to us. For the most part, affiliates
15 direct it to their website, in which they have, in most
16 cases, have a preferred partner page built on their
17 website, which says something to the nature of, you
18 know, welcome to American Blinds, a paragraph about the
19 company, links to individual services.
20     Q. And, of course, if they can make more keeping
21 that customer on their website than sending them to you,
22 they would prefer to keep them there, right?
23     A. That's why one of our guidelines with the paid
24 search affiliates is that they can not promote any
25 competition on that landing page.