Page 114

1      Q. So the idea is that if you are gonna lose them
2  to your affiliate, it's because they are shopping for
3  something other than your products or not shopping?
4      A. I guess that's -- if we are gonna -- repeat
5  that for me, please.
6      Q. Is the idea of telling your affiliates they
7  can't promote any of your competitors in order to assure
8  that if a customer doesn't get through your affiliate to
9  you, it's not because they are shopping for blinds with
10  somebody else?
11      A. I don't think that's necessarily the case.
12  The intent of taking affiliate just to our website and
13  showing no competition, obviously, is we don't want to,
14  obviously, promote our brand and spend the money we are
15  spending to build our brand and have spent over the
16  years -- you know, we don't want to just have the
17  affiliate capture that traffic and then promote a
18  blinds.com company and loose that customer to a
19  competitor.
20      Q. Okay. In the case of affiliates who direct
21  traffic directly to your website, is your policy
22  as it sets here -- says here, that the affiliates cannot
23  use americanblinds.com, americanwallpaper.com or
24  decorate.com in their display U.R.L.?
25      A. That one point I would tell you again back to

Page 115

1  what we said earlier is it cannot be decorate.com,
2  americanblinds.com, americanwallpaper.com directly in
3  the front part of it.
4          And if we do see that, then we do police
5  that and resolve that.
6          Now, I will tell you that if they want to
7  say, you know, www.affiliatename.com, slash, and then
8  one of these, then that's an okay policy.
9      Q. I see, and this is the policy even if it's an
10  affiliate who actually directs someone directly to your
11  website?
12      A. Correct.
13      Q. They still have to display their own U.R.L.?
14      A. They have to display their own U.R.L. or,
15  again, as you know, after, you know, the affiliate
16  name.com, slash, they can put, you know, one of these
17  marks at the end of that.
18      Q. I see. Are you aware of Google's policy that
19  requires advertisers to display the actual U.R.L. to
20  which the user will be directed in their ad?
21      A. As part of their editorial guidelines?
22      Q. Yeah.
23      A. I have heard of that policy, yes.
24      Q. Doesn't requiring your affiliates to, in fact,
25  direct traffic directly to you not to use these U.R.L.s

Page 116

1  violate that policy?
2      A. I am not familiar with that. I would have to
3  discuss that with outside counsel.
4      Q. You can put that exhibit aside.
5          MR. PAGE: Three.
6          MR. GARRITY: That was 3.
7          MR. PAGE: Mark as Exhibit 4.
8          (Mark'd for identification
9          was Deposition Exhibit No. 4.)
10      Q. (BY MR. PAGE) Exhibit 4 is a multi-page
11  document entitled 2005 S.E.O. Strategy Recommendations,
12  1/13/2005, ABWF046215 through 221?
13          Do you recognize this document?
14      A. Yes, I do.
15      Q. Is this a document you prepared?
16      A. Yes.
17      Q. Take a look at the third to last page, 046219,
18  the one with the Venn diagram, Venn, V-e-n-n.
19          This is a page that's titled Search Term
20  Expansion; and under Generic Terms, it says, browsers
21  search by generic terms; and under Specific Terms, it
22  says, buyers search by specific terms.
23          What do those two comments mean?
24      A. Those two comments really refer to people are
25  at different stages along the buying process.

Page 117

1          Obviously, you have people that are the,
2  you know, I will call the top part of the buying process
3  funnel.
4          Some of those people may use generic,
5  very generic, keywords, to help them kind of get down
6  this buying funnel process.
7          Let me give you an example. A keyword
8  like window treatments, a keyword like blinds, that's
9  one phrase, you know, keyword, generic keyword.
10          Some of those people may know what they
11  want; and some of those people may be at the top part
12  of that shopping process funnel and in research mode to
13  find what they are looking for, so to work their way
14  down the funnel.
15          That is what I refer to as far as under
16  the generic term the browsers and we do it every day.
17  You know, we browse by, highest, you know, generally
18  highest level terms, help me kind of work my way down
19  to specifically, you know, what I am looking for in a
20  lot of cases.
21          Under buyers use, again, specific terms,
22  if somebody is typing in the word American Blinds,
23  American Wallpaper, if somebody is typing in
24  decoratetoday, that's a specific term, that person is
25  in buying mode. They have seen that. They know

Page 118

1  specifically what they want.
2       If somebody types in -- and I will give
3  you another example that's not a branded keyword --
4  Hunter Douglass two-inch wood blinds, that person has
5  done their homework, they have done their research.
6       Q. I see.
7       A. They have a good idea specifically what they
8  are looking for.
9       Q. I see.
10      A. So that's what I mean by those two.
11      Q. I see. So is that sort of the bottom line on
12 this, that the more specific a search term, the higher
13 the conversion rate? Is that it?
14      A. Besides branding, obviously, and, obviously,
15 that varies and it varies across the engine.
16      Q. That makes sense.
17      MR. PAGE: I will mark this as Exhibit 5.
18      (Mark'd for identification
19      was Deposition Exhibit No. 5.)
20      Q. (BY MR. PAGE) Exhibit 5 is a multi-page
21 document, ABWF48841 through 50, which consists of a
22 string of e-mails, the last of which is from -- the
23 last non redacted one is from Joe Charno to a number
24 of people, including yourself.
25      Do you recognize this document?

Page 119

1       A. Yeah, I do recall this document.
2       Q. Is this, in fact, an e-mail -- a string of
3  e-mails that you received?
4       A. It appears so, yes.
5       MR. PAGE: Do you know the basis for the
6  redactions on this?
7       MR. GARRITY: I'm sorry. I don't.
8       Q. (BY MR. PAGE) Do you know what -- do you know
9  what is contained in the various pages that are redacted
10 at the back?
11      A. No, I don't.
12      Q. In this string of e-mails, Mr. Charno says on
13 March 28th, 2003, "We are going to move in a new
14 direction with our U.R.L." This is on the third page.
15 "Our new U.R.L. will be americanblinds.com."
16      By new U.R.L., is he referring to your
17 destination U.R.L.?
18      A. He is referring to -- I am not Joe, so I don't
19 know specifically, I guess, what he was referring to.
20      I would tell you, since this point in
21 time, we have made tremendous progress, especially from
22 a marketing standpoint, to move from decoratetoday.com
23 in marketing to americanblinds.com in this time.
24      This truly was a ripple effect. Around
25 this time is when we started putting americanblinds.com

Page 120

1  on our catalogs, our postcards, all of our print media,
2  our TV commercials, e-mail, search.
3       It was also what we used in things like
4  Linens and Things stores and our program with Linens and
5  Things catalogs.
6       It was truly a ripple effect that took
7  place, again, logo wear, from business cards,
8  stationery, and et cetera.
9       Q. Is it currently the company's plan to phase out
10 the decoratetoday.com U.R.L.?
11      A. The company is in discussions right now of
12 going towards americanblinds.com. There is currently
13 talks about going to americanblinds.com for the
14 destination U.R.L.
15      For consistency, I will tell you that
16 there is also brand equity, however, built in
17 decoratetoday and has been built in decoratetoday
18 since 2000.
19      So, to say abandon it, I wouldn't say
20 necessarily abandon it, because there is brand equity
21 in that; but American Blinds in particular has, in my
22 opinion, and the company opinion here from Joe is
23 there is, again, I would say, more equity in American
24 Blinds than decoratetoday.
25      Q. So is it still an open question as to whether

Page 121

1  American Blind is gonna continue to use the
2  decoratetoday.com U.R.L.?
3       A. I think, again, our management team has
4  discussed that with the new board members. I am sure
5  there is continued discussions around that and what it's
6  gonna take fully to migrate over, again.
7       So I would say, yes, it is in
8  discussions; but, again, it wouldn't be an abandonment
9  case.
10      Q. So, to shorten that, is it still an open
11 question as to whether you are gonna stop using it at
12 some point in time?
13      A. I believe it is an open question. Again, we
14 are making progress but it's an open question at this
15 point.
16      MR. PAGE: I will mark as Exhibit 6.
17      (Mark'd for identification
18      was Deposition Exhibit No. 6.)
19      Q. (BY MR. PAGE) Exhibit 6 is a two-page
20 document, ABWF046258 and 59, which appears to be a
21 printout from a data base or spreadsheet with a caption,
22 Ad Text Report; Date Range May 1, 2004 through May 24,
23 2004; Campaigns, all; AdWords Type, all.
24      Can you tell me what this document is?
25      A. Yeah. It appears to me as a report from

Page 122

1  Google, which is an ad text or ad copy report, which
2  shows the title or headline description, line 1, line
3  2 and the display U.R.L. for each of these campaigns
4  and ad groups.
5      Q. Why does American Blind use different display
6  U.R.L.s in different ads?
7      A. Our customers internalize us and have
8  internalized us over the years as American Blinds,
9  American Wallpaper, decoratetoday, different marks; and
10  so, at this point in time, we used different marks based
11  on the ad group and the keywords associated inside of
12  that ad group.
13     Q. And you continue to do that today, correct?
14     A. We do do that today.
15     Q. If you are trying to, as you put it, make
16  progress, in moving away from the decoratetoday.com
17  brand to the American Blinds or American Wallpaper
18  brand, why do you continue to use decoratetoday.com as
19  a destination U.R.L. in ads?
20     A. That's a good question. In ads -- and this is
21  from '04, obviously. So what we have in place now is
22  different, and we do use decoratetoday today in some
23  ads.
24         We have got, for example, a separate ad
25  group for decoratetoday related brand keywords.

Page 123

1          Why do we use that display U.R.L. in
2  those ad groups? So we are more relevant for the
3  searcher if they are typing in decoratetoday as one
4  word, as two words, with a space, dot com, any variation
5  of that. So we have a relevant ad up here.
6      I will also tell you that we have
7  decoratetoday associated with our, I would call it, And
8  More products, meaning products such as art, such as
9  area rugs, curtains, bedding.
10         You know, during the past, we attached
11  decoratetoday to those to show that decoratetoday brand
12  with those And More products.
13     Q. Are you concerned that using multiple different
14  destination U.R.L.s will cause confusion among consumers
15  as to the name of your company?
16     A. Again, today, it's one destination U.R.L.; and
17  that destination U.R.L. today that still resides on the
18  website is decoratetoday.
19     Q. But you display different destination U.R.L.s
20  in different Google ads, right?
21     A. Display. Just so we are clear on terminology
22  here, display U.R.L.s is what we use in the ads.
23  Destination U.R.L. is where they land on the website.
24     Q. Right.
25     A. So, to answer your question --

Page 124

1      Q. Yeah.. Let me reask it.
2      A. Sure.
3      Q. Based on that clarification, I think I used the
4  wrong terms.
5          Don't -- aren't you concerned that using
6  different display U.R.L.s on different ads on, for
7  example, Google will lead to conclusion as to what
8  the name of your company is?
9      A. No.
10     Q. Why not?
11     A. I would tell you that, again, if it's a blind
12  related keyword, window treatment related keyword, we
13  will use American Blinds.
14         If it's a wallpaper related keyword, we
15  will use American Wallpaper.
16         We do not believe there is confusion.
17  Our customers know us, again, as -- and over the past
18  20 years, have known us as American Blinds, American
19  Wallpaper, our customers and the previous buyers -- and
20  we talked about this in the Kaden studies earlier as
21  well -- associate our brand in most cases to what they
22  bought.
23         So, if somebody just bought blinds,
24  what's the name of the company? American Blinds,
25  American Blinds and wallpaper, American Blinds,

Page 125

1  Wallpaper and More.
2          If somebody just bought wallpaper, a lot
3  of those customers refer to us as American Wallpaper,
4  American Wallpaper and Blinds, different derivatives;
5  but the commonality between that is American, associated
6  to the window treatments and wall coverings.
7      Q. And if your goal is to establish that
8  commonality, why would you continue to use decoratetoday
9  as a display U.R.L.?
10     A. Decoratetoday, there is brand equity that has
11  been built up over the last five years, roughly, with
12  decoratetoday. We have decoratetoday on a number of
13  our vendor agreements from several years ago. They are
14  still active agreements.
15         We have got decoratetoday posted
16  throughout the website. It is on the website. We
17  have got decoratetoday as the destination U.R.L.
18  Decoratetoday is in our natural search U.R.L. that
19  people see.
20         So there is brand equity built up over
21  time with that name.
22     Q. But aren't you concerned that that leads people
23  to not know that decoratetoday and American Blind are
24  the same company?
25     A. No, not at all, and I will tell you that, on

Page 126

1  the website today, we have always had American Blinds
2  attached to decoratetoday.  American Blinds brings you
3  decoratetoday.com.
4        We have always -- we have never had a
5  point in time that we haven't attached on the website
6  American Blinds, the company name, to decoratetoday.
7        MR. PAGE:  Mark this as Exhibit 7.
8        (Mark'd for identification
9        was Deposition Exhibit No. 7.)
10     Q.  (BY MR. PAGE)  This is a multi-page document
11  beginning ABWF045830, two, three-page varied spreadsheet
12  that appears to be a spreadsheet printout, caption, Top
13  20 Process.
14        Can you tell me what this document is?
15     A.  This document is a S.E.O. report.
16     Q.  I'm sorry.  A what report?
17     A.  S.E.O., search engine optimization, report
18  that apparently is looking at results from Google.
19  This report is actually from a system that Joe Charno
20  built.
21        It's not from the Coremetrics report that
22  we looked at earlier.  I am not sure how it's bringing
23  back -- it says Top 20 Process.  I'm not real clear
24  here.  Obviously, it's bringing back 30 terms, not 20.
25  So how it's --

Page 127

1     Q.  Well, it's just like all those people who
2  attended one of the 15 top 10 law schools in America.
3        Do you know what the -- is the ranking on
4  here of position based on total clicks?
5     A.  On page 1, that appears to be the case based on
6  these keywords that are here in 1 through 30.
7     Q.  You said this was a system that Joe Charno put
8  together.
9        Do you know, is the data being picked up
10  from Coremetrics?
11     A.  No.
12     Q.  Is this data that's being picked up directly
13  from Google and from internally?
14     A.  This -- the data to create this report, I will
15  tell you, was picked up -- it was a manual process and
16  it was a manual process to pick up the keyword level
17  click cost, click and cost data here from the engines
18  directly; and then we married that up to Vidi Emi, our
19  Vidi Emi web analytics company, which was prior to
20  Coremetrics.
21     Q.  That's V-i-d-i E-m-i?
22     A.  E-m-i.
23     Q.  Okay.  Does this system still exist?
24     A.  This system does.  We don't update the data
25  into this report.  We just rely on core metrics.

Page 128

1     Q.  I see.  So it's still sitting there but it
2  doesn't have current data in it?
3     A.  I believe it still -- yes.  I don't access it,
4  to be honest with you, now.
5        MR. PAGE:  Should we get checked out?
6        MR. GARRITY:  Sure.
7        MR. PAGE:  Okay.
8        THE VIDEOGRAPHER:  Off the record,
9  12:12:56 p.m.
10        (Recess taken.)
11        THE VIDEOGRAPHER:  Back on the record
12  after a lunch break, 1:27:29 p.m.
13        MR. PAGE:  Marked as Exhibit 8.
14        (Mark'd for identification
15        was Deposition Exhibit No. 8.)
16     Q.  (BY MR. PAGE)  Exhibit 8 is a three-page string
17  of e-mails marked GGLE00012372 through 74, the last of
18  which in time is on June 2nd of last year from you to
19  Britton Picciolini.
20        Do you recognize these documents?
21     A.  Yes.
22     Q.  Who is Britton Picciolini?
23     A.  She was one of our Google account reps.
24     Q.  In June of 2005, did you have Google disable
25  all log-ins for the American Blind account, other than

Page 129

1  your own?
2     A.  I believe this is around the time that Joe
3  Charno left.
4     Q.  Okay.  I'm sorry.  I misspoke.  I didn't mean
5  your own.  I meant Steve -- Mr. Katzman's, I believe.
6     A.  Yes.
7     Q.  Is the log-in stevek@americanblinds.com
8  Mr. Katzman's log-in?
9     A.  That was the company log-in.
10     Q.  Prior to this date, what other log-ins did
11  American Blind have with Google?
12     A.  I would have to look in the account.  I believe
13  that was the primary log-in that we used to access our
14  account.
15     Q.  Why is it that you, as you say on the second
16  page at the bottom, needed to do some housekeeping and
17  reset our log-in info to your accounts?
18     A.  Again, I believe that was as a result of Joe
19  Charno leaving.  So it was really just a security
20  protocol that we do.
21     Q.  Was there anyone other than Joe Charno that had
22  access to the prior log-in information that did not have
23  access to the new one?
24     A.  Did not have access to the new one?
25     Q.  Was there anybody eliminated from -- let me

Page 130

1  restate it a little more coherently.
2         Was there anyone other than Mr. Charno
3  who -- whose access to your Google account ended as a
4  result of this change?
5    A. Not to my recollection.
6    Q. Did you have some concern that Mr. Charno would
7  continue to access American Blinds' Google account after
8  he left the company?
9    A. It's just company policy. Whenever somebody
10 leaves, that has access to any reporting system or
11 interface, that we, you know, deactivate their log-in
12 and change passwords.
13   Q. Okay. Since you have been at American Blind,
14 how many people have had access to American Blind's
15 Google account?
16   A. A number of people. I couldn't tell you. I
17 would say, off the top of my head, it's probably
18 roughly in the ballpark of half a dozen.
19   Q. Are all of those people still with the company
20 with the exception of Mr. Charno?
21   A. Obviously, Mr. Katzman is no longer there, as
22 well as Bill Smith.
23   Q. When did Mr. Smith leave?
24   A. I don't recall the timing of when he left.
25   Q. Approximately.

Page 131

1    A. I would say around 2000, end of 2002, if I had
2  to take a guess.
3    Q. All right. At the time he left, did you reset
4  your Google password?
5    A. I believe we did change the password.
6    Q. And have you changed the password again since
7  Mr. Katzman left?
8    A. Yes.
9    Q. Put that aside.
10        MR. PAGE: I mark as Exhibit 9.
11        (Mark'd for identification
12        was Deposition Exhibit No. 9.)
13   Q. (BY MR. PAGE) Exhibit 9 is a multi-page,
14 four-page document beginning at GGLE0018021, a letter
15 to Carrie Chung at Google from Mr. Charno on it appears
16 to be February 8th, 2006 from the footer.
17        Have you seen this document before?
18   A. No, I have not.
19   Q. In this document, Mr. Charno brings to Google's
20 attention a company called BlindsGalore.com and
21 complains that they are operating three websites, all
22 leveraging the same data store, and then identifies the
23 three different U.R.L.s that lead to the same data
24 store.
25        Why did American Blind feel it needed to

Page 132

1  bring that to Google's attention?
2    A. I believe at the time it was, it's my
3  recollection, Google's policy that a company could not
4  have multiple sites listed or, I would say, more than
5  one placement for that advertiser listed on Google.
6    Q. At the time American Blinds sent this letter to
7  Google, it was listing multiple visible U.R.L.s in its
8  own ads on Google, correct?
9    A. You know what, without going back and looking
10 at the ads that were in there, I couldn't recall.
11   Q. Well, we looked earlier at a listing from the
12 spring of 2004, in which you were using multiple visible
13 U.R.L.s, correct?
14   A. Multiple display U.R.L.s.
15   Q. Display, correct.
16   A. Which all link to the same site,
17 decoratetoday.com.
18   Q. Right.
19   A. I believe, in this scenario, these were
20 actually going to the different websites, even
21 though they were owned by the same company.
22   Q. I see. And do you see some sort of substantive
23 difference between those two situations?
24   A. Apparently, that was the case when this letter
25 was written; and, today, if I had to, you know, go back

Page 133

1  and say, you know, can we use multiple display U.R.L.s,
2  again, we have one account, just so we are clear, with
3  Google. We have got one account.
4         Can we use multiple display U.R.L.s for
5  our one account? Yeah, as long as it goes to the one
6  site, one destination U.R.L.s.
7         At this point, they had three destination
8  U.R.L.s, which my understanding here was being operated
9  by the same company.
10   Q. Would -- if each of these three U.R.L.s, in
11 fact, landed at the same destination U.R.L., would you
12 have a problem with that?
13   A. I think what you are asking me is if we had --
14 can you clarify that, please?
15   Q. Suppose that instead of having the three
16 U.R.L.s, BlindsGalore.com, ezblinds.com and
17 austinanddunn.com, going to three different websites
18 with the same content, they had them all go to the same
19 website with the same content, would you have not
20 objected to that?
21   A. So if the three -- if I understand you
22 correctly -- and let me just rephrase that.
23        So, if these websites were display
24 U.R.L.s, in this scenarios, all linked to the same
25 destination U.R.L., would I have a problem with that?

Page 134

1    Q. Right, yeah.
2    A. I would tell you, if they were all bidding on
3  the same keyword like blinds, I would have a problem
4  with that.
5       Today, we have one placement. The
6  company has one Google account. We have got one
7  placement. We have asked Google when we have had --
8  when we have reported scenarios like this to Google --
9  and this so happens to be one, and we asked them if we
10  could have multiple ads for the same keyword. Their
11  answer was no.
12    Q. Okay. And is it your testimony that there is
13  never a circumstance in which an American -- two
14  different American Blind ads appear in response to a
15  single search on Google?
16    A. No, that's not what I said.
17       I said us, as an advertiser, on Google,
18  with our account, the one account that we have, cannot
19  have two ads that we pay for, ourselves, show up under
20  the same search result.
21    Q. I see. So you are drawing a distinction
22  between a situation where one of the ads is from an
23  affiliate?
24    A. Again, we have one account. Affiliates have
25  separate accounts with Google.

Page 135

1    Q. Is it ever the case that more than one ad is
2  triggered from American Blinds' account at the same
3  time?
4    A. Again, as an advertiser, we only have one ad
5  per keyword triggered or -- I'm sorry -- one ad for
6  that search result.
7    Q. What happens if a search matches more than one
8  of your criteria, one of your keywords?
9       For instance, suppose the search was for
10  American Blind and Wallpaper and you have one keyword
11  for American Blind and one keyword for American
12  Wallpaper, both would be triggered by that search,
13  correct?
14    A. Not on Google.
15    Q. Why not?
16    A. They only take one listing per advertiser for
17  that search result.
18    Q. I see. What was Google's response to this
19  letter?
20    A. Again, it's my first time seeing a copy of this
21  letter. I don't recall ever even seeing a response at
22  all regarding this issue around this time period.
23    Q. Okay. Were you aware of this -- were you aware
24  of the issue with BlindsGalore prior to today?
25    A. Yes.

Page 136

1    Q. Do you know whether that issue was resolved in
2  any way?
3    A. I will tell you that BlindsGalore participates
4  very aggressively in the paid search arena.
5       During this time period, they were also
6  aggressively participating in paid search with ezblinds
7  and dunnblinds. I have not seen ezblinds or -- I'm
8  sorry -- dunnandaustin on paid search in a while.
9    Q. So, as far as you know, the problem that you
10  were complaining about in this letter is not current --
11  is not still happening?
12    A. To my knowledge, sitting here today, again, I
13  would see BlindsGalore participate very heavily.
14       I do not see ezblinds and austinanddunn
15  participate in paid search.
16    Q. But you have no knowledge as to why that
17  happened?
18    A. Why what happened?
19    Q. Why now you don't see ezblinds or austinanddunn
20  and you used to?
21    A. No, I don't recall.
22       MR. PAGE: Mark as Exhibit 10.
23       (Mark'd for identification
24       was Deposition Exhibit No. 10.)
25    Q. (BY MR. PAGE) Exhibit 10 is a three-page

Page 137

1  string of e-mails beginning at ABWF001304, which, in
2  turn, also bears some other Bates numbers, the last
3  in time being an e-mail from ByDesign/USA Wallpaper
4  to Susan Greenspon with a cc to
5  lawz414@buckinghamlaw.com, Subject: Re: USA Wallpaper.
6       Have you seen this document before?
7    A. No, I haven't.
8    Q. Are you familiar with any dispute between
9  American Blind and USA Wallpaper concerning paid search?
10    A. USA Wallpaper is a competitor of ours.
11       During the previous week when I was
12  educating myself regarding the lawsuit for this, I
13  recall seeing just the name USA Wallpaper pop up; but I
14  am not familiar with this document.
15    Q. Are you familiar with any dispute between
16  American Blind and USA Wallpaper concerning USA
17  Wallpaper ads showing up on what you considered your
18  brand as keywords?
19    A. There was a point that I do recall hearing
20  about USA Wallpaper, as far as showing up on our brand
21  keywords. I did see them show up on brand keywords.
22  We have, you know, I would say a lot of negative
23  keywords loaded on the search engines.
24       I believe USA Wallpaper is one of those
25  negative keywords in our program, if my memory serves me

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 138

1 correctly.
2    Q. Do you know if USA Wallpaper has put in place
3 negative keywords in their Google campaigns to avoid
4 appearing on your trade names?
5    A. I don't recall. I will tell you that we have
6 literally dozens of settlement agreements in place that
7 we have reached with our other companies; and, in those
8 cases, I would tell you that American Blinds has
9 come to a settlement and, I would say, one, a lot of
10 those settlement agreements that we currently have in
11 place.
12        I am not familiar with the details of
13 them. The details for any litigation that we had was
14 between Steve Katzman and our outside counsel.
15    Q. Do you know whether there was any litigation
16 between American Blind and USA Wallpaper?
17    A. I don't recall.
18    Q. Do you know whether there has ever been any
19 litigation between USA Wallpaper and American Blinds?
20        No. I'm sorry. I just asked that
21 question.
22        MR. PAGE: Mark as Exhibit 11.
23        (Mark'd for identification
24        was Deposition Exhibit No. 11.)
25    Q. (BY MR. PAGE) Exhibit 11 is a five-page

Page 139

1 document beginning at ABWF000227, the first page of
2 which is an e-mail from Mr. Charno to Mr. Katzman
3 reading, "Re: Country Curtains. Steve: Country
4 Curtains is not even a search term for us in Google. We
5 are showing up due to the phrase/broad match on
6 curtains," signed Joe.
7        Are you familiar with a dispute between
8 American Blind and a company called Country Curtains?
9    A. No, I am not.
10    Q. Do you know whether Country Curtains -- whether
11 any litigation ensued between Country Curtains and
12 American Blinds?
13    A. To my recollection, again, I have never seen
14 this; and I am not aware of this.
15    Q. You mentioned a minute ago that American Blind
16 puts in place negative keywords.
17        Is the purpose of those negative keywords
18 to avoid appearing on searches for your competitor's
19 trade names?
20    A. We have some competitors as negative keywords.
21 We use negative keywords also to better target our
22 program and basically filter out, you know, your
23 unqualified traffic. We have involved negative
24 keywords in all the engines over the years.
25    Q. Is it your policy to proactively put in place

Page 140

1 negative keywords for any of your competitors' trade
2 names?
3    A. Again, we have a number of our competitors as
4 negative keywords in our programs.
5    Q. I understand that.
6        My question is whether that is something
7 you do on your own or only when the competitor demands
8 that you do it?
9    A. Negative keywords are added when, as far as
10 negative keywords are added to our program, as it's
11 brought to my attention.
12        If outside counsel tells us, if our CEO
13 tells us, Steve, or Joel, at this point, tells us.
14        Do we target competitors' keywords? No,
15 not at all, we don't target competitors' keywords.
16    Q. Do you consider bidding on the keyword
17 wallpaper to be targeting USA Wallpaper?
18    A. No.
19    Q. Why not?
20    A. If I was bidding on the keyword USA Wallpaper,
21 that would be targeting USA Wallpaper.
22    Q. But if you were just bidding on the term
23 wallpaper, it would not be targeting USA Wallpaper?
24    A. Wallpaper for us is 20 plus percent of our
25 business and has been over the past 20 years.

Page 141

1    Q. Do you know what percentage of USA Wallpaper's
2 business wallpaper is?
3    A. I do not.
4    Q. Is it a fair assumption that they sell
5 wallpaper?
6    A. I would assume so.
7    Q. Do you consider it to be an infringement of
8 their trademark rights if you place an ad for wallpaper
9 with a broad -- if you place an ad keyed on the term
10 wallpaper on Google and, as a result, your ads appear
11 when people search for USA Wallpaper?
12    A. Can you rephrase that question, please?
13    Q. Do you feel that if American Blind keys an
14 ad off the word wallpaper and, as a result, an
15 American Blind ad appears when a user types in the
16 search USA Wallpaper, do you consider that to be an
17 infringement of USA Wallpaper's rights by you?
18    A. I must be missing something there. I am having
19 a tough time with that question.
20    Q. Let me see if I am ask it a different way.
21        MR. GARRITY: Broad search, you mean that
22 kind of a thing?
23        MR. PAGE: Yeah.
24    Q. (BY MR. PAGE) Do you think it is okay to have
25 your ads appear keyed off the word wallpaper in response

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 142

1  by a search from a user by USA Wallpaper?
2      A. A search from a user for USA Wallpaper? If
3  it's a broad match such as wallpaper that we have in the
4  program -- let me just make sure I understand you -- and
5  somebody -- you are saying if somebody types in the
6  search term USA Wallpaper --
7      Q. USA Wallpaper.
8      A. -- and we pop up?
9      Q. Yeah.
10     A. No.
11     Q. You think that's perfectly fair for you to do?
12     A. We are not targeting USA Wallpaper at all.
13 Ideally, they could add us as a negative keyword; or,
14 ideally, Google could not allow is to have them show up
15 on any of our American Wallpaper related or American
16 Blinds related keywords.
17     Q. Have you ever asked USA Wallpaper to use -- to
18 add what you claim to be your trademarks as negatives in
19 their campaigns?
20     A. I have had no communications at all with USA
21 Wallpaper. As former people, Steve Katzman or Joe
22 Charno, have had communications with them. By looking
23 at this e-mail, I would say they have had
24 communications.
25     Q. Okay.

Page 143

1      A. And looking back at this e-mail, I would tell
2  you too it appears that this is in regards to American
3  Blinds and Wallpaper keywords and decoratetoday
4  keywords, not American Wallpaper.
5          MR. PAGE: A little bit of housekeeping
6  here. Sorry.
7          Exhibit 12.
8          (Mark'd for identification
9          was Deposition Exhibit No. 12.)
10     Q. (BY MR. PAGE) Sorry. A multi-page document
11 beginning ABWF008762 is a letter from Stephanie Carter
12 at the august firm of Kelley Drye and Warren to the
13 Commissioner for Trademarks beginning May 2nd, 2005,
14 responding to Office Action Number 1 concerning the
15 American Blind's mark.
16          Have you seen this document before?
17     A. No, I haven't.
18     Q. On the second page of the document, there is a
19 section entitled Likelihood of Confusion, in which your
20 counsel tells the trademark office that, "The registrant
21 of the U.S. Registration number 2,186,728 (the Draperies
22 mark)" -- which is apparently a reference to American
23 Blinds and Draperies and Design -- "and Applicant" --
24 which is American Blind -- "previously entered into that
25 certain Settlement Agreement, dated February 29th, 2000,

Page 144

1  in which the parties resolved any issues of confusion
2  and the registrant consented to the use of the subject
3  mark by Applicant."
4          Are you familiar with a settlement
5  agreement between your company and American Blinds and
6  Draperies and Design?
7      A. If you can just give me a second. I do -- I
8  am familiar. I did run across, I believe, that name in
9  settlement agreements this week.
10          My understanding of the settlement
11 agreements that American Blinds entered into with
12 American Blinds and Draperies was the following:
13          American Blinds and Draperies had to
14 change their name on their website to American Draperies
15 and Blinds.
16          They also had to notify the search
17 engines to no longer use American Blinds and Draperies
18 and that they were using American -- I believe it was
19 americandraperies.com, and they wouldn't participate
20 in the paid search space under American Blinds.
21     Q. I see. Had there been a lawsuit filed
22 between -- sorry. Strike that.
23          Had your company previously filed a
24 lawsuit against -- let's call them American -- if I call
25 them American Draperies, will you understand that's who

Page 145

1  I am referring to?
2      A. Yes.
3      Q. Had there been a lawsuit filed between American
4  Blind and American Draperies?
5      A. I know there was a settlement reached.
6      Q. My question is whether that settlement
7  was reached before or after a lawsuit was filed?
8          If you don't know, you don't know.
9      A. I don't know the period of time.
10     Q. In that settlement agreement, did American
11 Blind agree to do or not do anything?
12     A. You know, from what I can recall -- I don't
13 recall if there was -- what the details
14 of it were. I have to consult with outside counsel
15 or Steve Katzman, who was part of it at that time.
16     Q. Do you know if in the settlement agreement
17 between American Blind and American Draperies any
18 money changed hands in either direction?
19     A. Not to my knowledge.
20         MR. PAGE: I did make that 12, didn't I?
21         MR. GARRITY: Yes.
22         MR. PAGE: Obviously, for the record, as
23 we have discussed off line, it's our position that
24 that settlement agreement and any other confidential
25 settlement agreement should have been produced to us in

Page 146

1  advance of this deposition; and we would reserve our
2  rights to recall the witness once we have the documents.
3          MR. GARRITY:  Understood.
4          MR. PAGE:  I also understand I am just
5  shooting the messenger.
6          I have no idea why some subset of these
7  don't have staples.
8          MR. PAGE:  Let me mark as Exhibit 13.
9          (Mark'd for identification
10         was Deposition Exhibit No. 13.)
11      Q.  (BY MR. PAGE)  Exhibit 13 is a multi-page set
12  of documents starting at ABWF048405 going through 415.
13         The first page of which consists of a
14  letter from Dawda, D-a-w-d-a, Mann, M-a-n-n, Mulcahy,
15  M-u-l-c-a-h-y, and Sadler, S-a-d-l-e-r, to Jim Buch
16  perhaps, B-u-c-h, who is the CEO of 3 Day Blinds; and
17  this is what's commonly referred to as a cease and
18  desist letter from counsel for American Blind and
19  Wallpaper Factory, Inc., to 3 Day Blinds.
20         Have you seen this document before?  I'm
21  sorry. It's dated June 12th, 2006.
22      A.  I don't recall seeing this document before.
23      Q.  Who are Dawda, Mann, Mulcahy and Sadler?
24      A.  They are our local outside counsel.  We use
25  them to help -- help police our brand in regards to paid

Page 147

1  search programs.
2          I will tell you, if there is an issue
3  that arises -- we police our brands daily.  If there
4  is an issue that arises regarding American Blinds,
5  decoratetoday, any of our marks, we -- our process is to
6  take a screen shot capture.
7          We send that screen shot capture to Scot
8  Storrie, who is a member of this firm.
9          He drafts a cease and desist letter,
10  contacts the individual, and follows up with them
11  accordingly.
12      Q.  Are you familiar with the -- with a dispute
13  between American Blind and 3 Day Blinds concerning a
14  Google search?
15      A.  Again, I have not seen this document before.
16  Obviously, the dispute appears on page 3 with the word
17  American Blinds.
18      Q.  By that you are referring to Exhibit A, which
19  is a Google screen shot?
20      A.  Yes.
21      Q.  Have you seen 3 Day Blind searches before
22  this?
23          I mean, is this an issue you have been
24  aware of before seeing this letter?
25      A.  I have seen 3 Day Blinds pop up on our brand

Page 148

1  keywords on paid search.
2      Q.  Okay.  Can you tell from Exhibit A what the
3  keyword is that 3 Day Blinds bid on?
4      A.  I can't tell based on looking at this.
5      Q.  Do you have any reason to think that they bid
6  on American Blinds rather than simply American or
7  blinds?
8      A.  Again, by looking at a screen shot, I can't
9  say.
10      Q.  If you can't say by looking at a screen shot,
11  how is it you know that 3 Day Blinds has done
12  anything you consider to be infringement of your
13  rights?
14      A.  If I were to do a search and put parentheses
15  around American Blinds and they still showed up, then
16  it would be fairly safe to say that they were bidding
17  on that exact keyword, American Blinds.
18      Q.  I see.  And is it your practice to do that
19  before turning over searches to outside counsel?
20      A.  I do go through that process.  Scot also goes
21  through that process, calls up the company, understands
22  how they are targeting and resolves.
23      Q.  If you could turn to the fourth page of this
24  letter, which is captioned Settlement Agreement, there
25  is a list of terms which this draft agreement would

Page 149

1  prohibit the use of as keywords.
2          Do the settlement agreements that you
3  have reached with competitors typically include this
4  list of terms?
5      A.  For purposes of settlement agreements regarding
6  paid search programs, that's my understanding.
7          Obviously, there has been other
8  settlement agreements taken place for other issues.
9          The new ones that we are catching since I
10  have been working with Scot, really since the May time
11  period, it's a form letter.
12      Q.  So this list is substantially the same in each
13  case?
14      A.  Again, as of May, as of my time working with
15  Scot, this is a form letter.  So, again, I have not seen
16  all of them in detail.
17      Q.  Is it your company's position that anyone
18  keying a search off the term American Wallpaper is
19  infringing your company's rights?
20      A.  American Wallpaper has been a mark and a brand
21  that our customers have come to believe and really take
22  ownership of in their minds over the past 20 years.
23          It's a mark that people in the custom
24  wall coverings business and wallpaper for the past 20
25  years have come to recognize and it's established.

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 150

1    Q.  Is it your -- is it American Blind's position
2   that anyone searching for the words American Wallpaper
3   is looking for your company?
4    A.  I would say, yes.
5    Q.  Have you ever done anything to study whether
6   that's true?
7    A.  We have not done any specific studies for that
8   besides one that I can recall of, which I believe
9   Michael testified to regarding American Wallpaper, which
10  is just a study that he conducted, himself, a number of
11  years ago.
12   Q.  Uh-huh.
13       And that study, in fact, revealed that a
14  third of the people searching for -- a third of the
15  people who came to your website after searching for
16  American Wallpaper weren't looking for your company but

Page 152

1   anyone who did not choose to come to your website
2   after searching for American Wallpaper, correct?
3    A.  Again, I believe they would have to click
4   through one of the keywords to come to our website.
5    Q.  And, over 30 percent of those people were
6   looking for Americana themed wallpaper, correct?
7    A.  Based on this data, that's what I am reading
8   here.
9    Q.  And is it American Blind's position that your
10  competitors are barred from advertising to those 30
11  percent of the people who are searching for Americana
12  themed wallpaper?
13   A.  We do carry, I will tell you, American themed
14  wallpaper and have the largest selection of Americana
15  themed wallpaper of anyone in the industry, as well.
16   Q.  Does that mean that no one else in the world

Page 154

1    And your e-mail says, "Carrie/Jenny, we
2  noticed that wallpaperwholesaler doesn't allow users to
3  click back to Google. This is a violation of Google's
4  policy. Is this correct?"
5    Do you regularly bring to Google's
6  attention violation of their policies by your
7  competitors?
8    A. We do, as we catch them and are aware of
9  them.
10    Q. And is Google typically responsive when you
11  do bring these things -- these issues to their
12  attention?
13    A. Under this particular example, I would tell you
14  that Google was responsive. Google has not always been
15  responsive.
16    I wish we knew all the black box rules at
17  Google but we don't.
18    Q. You and everyone else.
19    A. And, I'll be honest with you, that's why it is
20  very difficult for us to manage the program. It's a
21  black box. There is always a guessing game.
22    You can go through all the reporting you
23  want. You can have whatever formula you want to justify
24  your R.O.I.
25    However, paid search space is a balance

Page 155

1  between the numbers, science, art, and strategy.
2    Q. No voodoo?
3    A. I am sure there is somewhere.
4    MR. GARRITY: Only when you are in New
5  Orleans. Paid search in New Orleans has use of voodoo.
6    MR. PAGE: Do you have pins?
7    THE WITNESS: They have lava lamps. I
8  don't know if that's an indication.
9    MR. PAGE: Mark as Exhibit 16 --
10    (Mark'd for identification
11    was Deposition Exhibit No. 16.)
12    Q. (BY MR. PAGE) -- is a multi-page letter
13  June 21th, 2006 from Mr. Storrie, S-t-o-r-r-i-e, of
14  Dawda, Mann, et cetera, to Neal Kennedy of The Kennedy
15  Law Office in Marble Falls, Texas, ABWF 048505 through
16  512.
17    Have you seen this document before?
18    A. No, I haven't.
19    Q. Okay. This appears to be some correspondence
20  concerning Wallpapers To Go and wallpaperstogo.com
21  and it says that -- it says, "Dear Mr. Kennedy:
22  Pursuant to our previous conversations, American Blind
23  and Wallpaper Factory, Inc., has identified Wallpapers
24  To Go and wallpaperstogo.com as negative keywords;" and
25  then it goes on to say that it appears that Wallpapers

Page 156

1  To Go, Inc., has similarly set American Blinds' marks as
2  negative keywords.
3    Are you familiar with Wallpapers To Go?
4    A. I have seen them, again, in the paid search
5  arena as I manage the programs and police our brands,
6  yes.
7    Q. When were you first aware of Wallpapers To Go?
8    A. I believe they have been around as a company
9  for several years.
10    Q. Okay. When did you -- when did Google first
11  establish negative keywords for Wallpapers To Go and
12  wallpaperstogo.com in its own search bidding?
13    A. When did we put their -- what was your
14  question?
15    MR. GARRITY: I think you misspoke. You
16  said Google as opposed to American Blinds.
17    MR. PAGE: Oh, I'm sorry. Never mind.
18  Let's start again. Thanks.
19    MR. GARRITY: Sure.
20    Q. (BY MR. PAGE) When did American Blind first
21  establish Wallpapers To Go and wallpaperstogo.com as
22  negative keywords in its Google ad campaigns?
23    A. I don't recall the timing.
24    Q. Isn't it the case that you did not establish
25  them as negative keywords until Wallpapers To Go asked

Page 157

1  you to?
2    A. Again, I don't recall the timing. If they
3  weren't negative keywords in the program, then I suppose
4  we didn't have them in as negative keywords.
5    Q. But you were aware of the existence of
6  Wallpapers To Go for some time, right?
7    You just told me you had --
8    A. Yes.
9    Q. -- known of them for several years.
10    A. Yes.
11    Q. Why is it that you didn't put their trademarks
12  in as negative keywords until they asked you to?
13    A. Why is it?
14    Q. Yeah.
15    A. We -- again, I think this goes back to what we
16  discussed earlier, proactively, you know, we don't go
17  and pull lists of every single competitor and put them
18  in as negative keywords.
19    I will tell you that this word or words,
20  these words, Wallpapers To Go, again, I can't say why we
21  didn't.
22    I will just tell you that we don't have
23  lists of all our competitors and dump them into every
24  search engine for every negative keyword. It would be
25  great if everybody did that and everyone was happy and

Page 158

1  happy.
2      Q. Do you feel that you have any obligation to
3  avoid having your ads show up on broad match on searches
4  for competitor's names before they ask you to?
5      A. You know, we -- again, these competitors -- and
6  a lot of them are small, pure play dot com companies,
7  pop up overnight.
8          It would be impossible for us to know of
9  every company and every competitor. It just starts up a
10 website.
11     Q. But this one you knew of.
12         You have known of this company for a
13 couple years, correct?
14         THE VIDEOGRAPHER: Please repeat your
15 question. It did not come out on the audio of the tape.
16     Q. (BY MR. PAGE) But you knew of Wallpapers To Go
17 for a couple of years without putting them in as a
18 negative keyword, correct?
19     A. Correct. I have heard of the company, that's
20 correct.
21     Q. And you knew that if you didn't put them in
22 as a negative keyword, your ad would appear every time
23 somebody keyed off the word wallpaper, every time
24 somebody on Google typed in Wallpapers To Go, correct?
25         MR. GARRITY: Object to the form of the

Page 159

1  question. You can answer.
2          THE WITNESS: That's correct.
3      Q. (BY MR. PAGE) And you didn't do anything to
4  stop that until they asked you to?
5      A. That's correct.
6          MR. PAGE: Tape change time. Take a
7  short break.
8          THE VIDEOGRAPHER: Off the record,
9  2:25:02 p.m.
10         (Recess taken.)
11         THE VIDEOGRAPHER: Back on the record
12 2:37:14 p.m.
13         (Mark'd for identification
14         was Deposition Exhibit No. 17.)
15     Q. (BY MR. PAGE) Exhibit 17 is a document
16 entitled Permanent Injunction Order, ABWF000170 through
17 73, dated, I think, 16, March, 2001, either 16 or 18, in
18 the matter of Decoratetoday.com, Inc. v. American Blind
19 and Accessory Company, Inc. and Directory One, Inc.
20         Have you seen this document before?
21     A. In preparation for today, went through boxes of
22 documents. It's likely that I took a glance at this but
23 I don't recall seeing this.
24     Q. Are you familiar with a piece of litigation
25 that occurred between Decoratetoday.com, Inc., and

Page 160

1  American Blind and Accessory Company, Inc.?
2      A. I am not familiar with it, no.
3      Q. So do you know -- I take it you -- I might as
4  well ask.
5          Do you know whether there was any sort
6  of settlement agreement or other contract entered into
7  between Decoratetoday.com and American Blind and
8  Accessory Company?
9      A. To my knowledge -- again, I am not familiar
10 with that.
11     Q. So you just don't know?
12     A. No.
13     Q. Now, you are learning how to shorten depos.
14         MR. PAGE: Mark as Exhibit 18.
15         (Mark'd for identification
16         was Deposition Exhibit No. 18.)
17     Q. (BY MR. PAGE) Exhibit 18 is a multi-page
18 document, string of e-mails, ABWF48835 through 39.
19         The last in time, other than whatever has
20 been redacted, being from Scot Powers to yourself,
21 July 21st of this year.
22         Have you seen this document before?
23     A. I recall seeing an e-mail from Scot. How
24 it's printed out, though, it's very difficult to read.
25     Q. Yeah. What is this document?

Page 161

1      A. I believe this document was a high level
2  marketing trend analysis from Scot.
3      Q. I see, and is it your understanding that, for
4  instance, the first two -- strike that.
5          The second and third page represents
6  the percentages attributable to each of the marketing
7  channels listed at the top for each year from 1996
8  through 2006, in terms of where customers were
9  acquired?
10     A. That would be my understanding. I can't
11 testify to these numbers, how it's printed out in
12 this fashion; but I believe that was the content of
13 this e-mail.
14     Q. Okay. So, is it your understanding that, for
15 example, in 1996, 3 percent of customers were acquired
16 by a third party, 5 percent via alternative media, 92
17 percent via magazine?
18         Is that how you would read this?
19     A. Yeah, that's how I would interpret this.
20     Q. And is the second half of this e-mail the
21 percentage attributed to each channel of sales as
22 opposed to customers acquired?
23     A. Yes.
24     Q. Do you have any reason to think there is
25 anything inaccurate about any of these figures?

Page 162

1    A. I don't. Again, how it's printed out, I am
2  concerned with.
3    Q. That, I can't help with. That's how we
4  received it.
5    A. These do look in the ballpark, 54 percent of
6  sales coming from internet campaigns in 2006.
7        MR. PAGE: Mark as Exhibit 19.
8        (Mark'd for identification
9        was Deposition Exhibit No. 19.)
10   Q. (BY MR. PAGE) Exhibit 19 is a two-page string
11 of e-mails, Bates number GGLE00006336 and 7, the last
12 of which in time was from Bill Smith at decoratetoday
13 to Britton Mauchline at Google and several other people
14 at American Blind and Google concerning USA Wallpaper.
15       Have you seen this document before?
16   A. No, I don't recall seeing this document. It
17 may have been in the boxes that I went through over
18 the past few days and week.
19   Q. Did American Blind, in fact, bring
20 USA Wallpaper's ad campaign to Google's attention
21 in January of 2003?
22   A. That looks like what is being said here in
23 the e-mail.
24   Q. And did Google inform American Blind that,
25 although they were matching on broad match, that one

Page 163

1  solution would be to ask USA Wallpaper to put in
2  negatives on American Blind's trademarks?
3    A. I am just reading the response here from
4  Britton. She is saying that we can request to place
5  the keyword on an exact, which would eliminate them
6  from your branded search.
7    Q. And your response to Google was that would be
8  great and how about also making our branded words
9  negative, correct?
10   A. I don't think the word negative is there.
11       MR. GARRITY: The top, the last e-mail.
12       MR. PAGE: It says, also --
13       THE WITNESS: Oh, I see, okay.
14       MR. GARRITY: At the top of the page.
15       THE WITNESS: Sorry.
16       MR. GARRITY: Okay.
17       MR. PAGE: We stepped all over her on
18 that one.
19   Q. (BY MR. PAGE) So, here is my question.
20       While you were asking Google to help you
21 in getting USA Wallpaper to establish exact matches in
22 negative keywords to protect your trademarks, why didn't
23 you do that for theirs?
24   A. You know, I don't know the answer to that. I
25 would assume we would need to ask Bill Smith or Joe

Page 164

1  Charno.
2        If they put us as a negative keyword,
3  then our policy today, as it states, is to, if we have
4  an agreement with a competitor that is brought to our
5  attention, then -- there are alot of sounds here
6  today -- if we, again, have an agreement with a
7  competitor, that we will both put each other's brand
8  keywords into negative campaigns on each other's
9  accounts; and that's what we are doing today.
10       It's an open door policy. We voluntarily
11 do that to all of our competitors that we come in
12 contact with.
13   Q. Will you put your competitor's trademarks on
14 negative lists without an agreement with them?
15   A. Will we put our -- will we put -- would you
16 rephrase that, please?
17   Q. Let me rephrase it.
18       Do you feel that you have any obligation
19 to put your competitor's trademarks on negative lists
20 in your ad campaigns, independent of having an agreement
21 with them?
22   A. Again, it's our policy and it seems to work
23 well -- it's an open policy -- that we, as we get
24 approached by a competitor, we will add them as negative
25 keywords to our campaigns.

Page 165

1    Q. And it's also your policy that until -- that if
2  your competitor doesn't approach you and ask, you won't,
3  right?
4    A. We don't aggressively or knowingly bid on
5  competitor's keywords. We don't buy competitor's
6  keywords and target ads on competitor's keywords.
7  That's not where we focus our efforts.
8    Q. But you know that you will get traffic on
9  broad match as a result of people searching for your
10 competitor's trademarks, unless you put them in negative
11 lists, right?
12   A. That's correct.
13   Q. And knowing that, you don't put them in, unless
14 your competitors demand that you do, correct?
15   A. If they bring it to our attention, then we will
16 add them as a negative keyword.
17   Q. And if they don't bring it to your attention,
18 you won't, right?
19   A. Again, at this point, it's an open-door policy.
20 If they come to us, we will do the same. We don't -- we
21 don't --
22   Q. My question is, if they don't come to you,
23 will you do anything to avoid your broad matches hitting
24 searches for their trademarks?
25   A. We target our ads accordingly with our company

Page 166

1   name in the brand, in the ad copy. We don't go and add
2   competitive keywords to our account.
3         Again, willingly, as it comes up, if it
4   is brought to our attention, we will go and add a
5   negative keyword in and it works great today.
6   Q. My question is, if it is not brought to your
7   attention by your competitors, will you add their trade
8   names as negative keywords?
9   A. Again, let me tell you, the policy today and
10  how it stands is it's a volunteer policy. It will
11  come if they come to us or we go to them.
12  Q. I am gonna keep asking this question 'til you
13  answer it. All right?
14        If they don't come to you and demand that
15  you put in their trademarks as negative keywords, you
16  don't do it, do you?
17  A. We don't do that today.
18  Q. And you, nonetheless, send threatening letters
19  to people threatening to sue them when they don't do
20  that for you, correct?
21  A. We will approach them with, again, Scot Storrie
22  is the process that we use. As we are aware of it, we
23  will send the screen shot to him; and it's brought up to
24  their attention that way.
25  Q. So your policy is to not proactively put in

Page 167

1   your competitor's trade names as negatives; and yet you
2   threaten to sue your competitors if they have the same
3   policy, correct?
4         MR. GARRITY: Object to the form. You
5   can answer.
6         THE WITNESS: Again, today, I will tell
7   you that we focus our efforts on protecting our brands.
8   We have got a lot of equity in our brands.
9         We do not, at this point in time, today,
10  go and add lists of our competitors into our program.
11        We do not buy their keywords. I think I
12  just answered your question.
13  Q. (BY MR. PAGE) But you threaten to sue them
14  when they don't buy your keywords but hit them because
15  of a broad match, correct?
16  A. We send them a generic cease and desist letter.
17  Q. And that cease and desist letter says, do what
18  we want or we will sue you, in effect, correct?
19        MR. GARRITY: Object to the form.
20        THE WITNESS: I can't answer that.
21        THE VIDEOGRAPHER: Why don't we go off
22  the record to see what's going on. It's really
23  affecting the video and sound.
24        MR. PAGE: Yes.
25        THE VIDEOGRAPHER: Thank you. Off the

Page 168

1   record, 2:52:42 p.m.
2               (Recess taken.)
3         THE VIDEOGRAPHER: Back on the record,
4   3:02:18 p.m.
5         (Mark'd for identification
6         was Deposition Exhibit No. 20.)
7         MR. PAGE: Mark as Exhibit 20.
8   Q. (BY MR. PAGE) Exhibit 20 is a multi-page
9   document captioned S.E.O. Overview, Appendix, ABWF045550
10  through 558.
11        Have you seen this document before?
12  A. Yes. This looks like a document that I have
13  created.
14  Q. Do you know when you created this document?
15  A. You know, I don't recall the timing. It looks
16  like it's through June 1st, 2005.
17        That's a forecast. So probably around
18  that time period is what I would say.
19  Q. I see. So does this reflect data for American
20  Blinds' various adwords, campaigns from the first half
21  of, you are aware of, January through at least May of
22  2005?
23  A. Yes.
24  Q. If you could turn to the page numbered 045554,
25  which is captioned Top Drivers/High Cost Terms, there is

Page 169

1   a column -- the first column is Searchterm. The second
2   is Category. The third is something called S.T. Group.
3         What is S.T. Group?
4   A. I believe that recalls to -- sorry. I believe
5   this S.T. group refers to a flag that we had that said
6   either a top keyword is a quote, unquote, generic top
7   driver or by default not.
8   Q. I see. So this was just a code so that you
9   could, for example, like affect all of your top drivers
10  as a unit or sort?
11  A. Yeah, more for reporting purposes. This is an
12  old -- one of the old Joe Charno reports that we did
13  use.
14  Q. Do you have any reason to think that the --
15  strike that.
16        As far as you know, is the data set forth
17  in this exhibit accurate?
18  A. It appears accurate.
19  Q. I have no further -- no.
20        MR. GARRITY: Too good.
21        MR. PAGE: Mark as Exhibit 21.
22        (Mark'd for identification
23        was Deposition Exhibit No. 21.)
24  Q. (BY MR. PAGE) Exhibit 21 is a four-page string
25  of e-mails, the last in time being from you to Britton

Page 170

1  Mauchline, M-a-u-c-h-l-i-n-e, at Google, October 28th,
2  2004.
3       Do you recognize this document?
4  A.  It appears to be one of my correspondences with
5  Google.
6  Q.  If you could turn to the third page, there is
7  an e-mail from you from October 26th to Oscar Castro and
8  John Ludgey.  Subject:  Google ABWM Brand Keywords; and
9  it says, "Can you please create tracking U.R.L.s for
10 these Google AdWords keywords."
11      What's a tracking U.R.L.?
12 A.  Tracking U.R.L. is -- just to put this in the
13 context with Vidi Emi again, this is when they were
14 predating Coremetrics as our web analytic partner.
15      A tracking U.R.L. is a -- we are direct
16 marketers, so we measure everything as best as we can.
17      So tracking U.R.L. is simply a method in
18 which we track activity for that particular event, in
19 this case, keyword.
20 Q.  I see.  So is this -- we, I think earlier
21 today, we were talking about your ability to tell what
22 keyword a Google user had searched for when they arrived
23 at your website.
24      Is this the mechanism by which you do
25 that?

Page 171

1  A.  For paid search.
2  Q.  For paid search, ah.  Strike that.
3       This morning we discussed the fact
4  that Google passes through to you on natural search
5  information concerning what the search term was.
6       Is this the analogue for paid search?
7  A.  The tracking U.R.L.s back in this time,
8  October 26th of '04, this looks like how our trucking
9  U.R.L.s were constructed.
10 Q.  I see, and I take it there is something in the
11 code after the question mark on each of these U.R.L.s
12 that corresponds to the keyword that triggered the ad?
13 A.  Yes.
14 Q.  Is it just some sort of numerical list?
15 A.  It's a -- it's a parameter, you know, made up
16 of code numbers and letters, X.G.O.A. at the end of that
17 where you say a.d.c. equals X.G.O.A. represents Google.
18 Q.  And I take it there is some portion of the
19 earlier string that represents a particular search term?
20 A.  Yes.  The zjxj equals -- those parameters are
21 the corresponding keywords.
22 Q.  So, since these are actually all different
23 pages with different U.R.L.s, whoever lands on this
24 page, you can tell they got there by that particular
25 keyword on that particular search engine, correct?

Page 172

1  A.  Yes.  They are not different pages but just,
2  again, there is a parameter in the U.R.L. that's
3  different.
4       MR. PAGE:  Okay.  Exhibit 22.
5       (Mark'd for identification
6       was Deposition Exhibit No. 22.)
7  Q.  (BY MR. PAGE)  Exhibit 22 is a two-page
8  document, ABWF008488, entitled S.E.O. R.O.I. Report,
9  Full List, March, 2006.
10      Can you tell me what this document is?
11 A.  It is a report from Coremetrics.  It's an
12 S.E.O. R.O.I. Report for Google is the vendor.
13      The category for most of these says
14 branding, and these are some of our branding search
15 terms.
16 Q.  Is this some of your branding search terms or
17 all of them?
18 A.  This looks like some of them.
19 Q.  Can you think of any branding search terms that
20 are missing from this list?
21 A.  American Blind without the S.
22 Q.  It's the fifth one down, isn't it?
23 A.  Oh, I'm sorry.  You are correct.  We have got,
24 you know, I would say, you know, around 40 or so
25 branding keywords in our program.

Page 173

1  Q.  So is it true that you don't know one way or
2  the other whether this is a complete list of your
3  branding keywords?
4  A.  I would say that's true, because if this report
5  was run from this time period and a word did not pick up
6  activity, then it wouldn't show up on this list; but we
7  still might have it in the program.
8  Q.  I see.  So when you get reports from
9  Coremetrics, do they omit keywords for which there are
10 no clicks?
11 A.  Not necessarily.  It depends on the time period
12 you are running the report, because we could run this
13 report from , you know, 3/1 to 3/20.
14      There could be a keyword, however, that
15 didn't receive a click during the month of March, as an
16 example, that landed on the file in February purchased
17 during this time period, and that would show up but it
18 wouldn't have a click.  It would have a sale but not a
19 click.
20 Q.  Ah, I see.
21 A.  Because that was cookied.
22 Q.  Ah, I see.  So you could have user X visits the
23 website -- follows an ad through to the website in
24 February, comes back in March and buys blinds.
25      So you would end up with zero clicks but

1  sales?
2      A. Correct.
3      Q. Which is where some of the division by zero
4  errors would come from?
5      A. That's probably an example, yes.
6      Q. Okay, got it.
7          MR. PAGE: Let me mark as Exhibit 23.
8          (Mark'd for identification
9          was Deposition Exhibit No. 23.)
10     Q. (BY MR. PAGE) Exhibit 23 is another
11  Coremetrics report, three pages, ABWF008806 through 8.
12         On the second page, it's captioned S.E.O.
13  R.O.I. Report - Keyword Detail; and then it's dated May,
14  2006, 5/1/2006 through 5/10/2006.
15         What is this document?
16     A. This appears to be a report that Steve Katzman
17  ran and had e-mailed to his Yahoo account.
18     Q. Is this a report that's automatically generated
19  at some particular frequency or only upon request?
20     A. This particular one, I am not sure, to be
21  honest with you. You can set reports to get e-mailed
22  to you at any frequency.
23     Q. I see. So, on the Coremetrics system, am I
24  correct in assuming that you can have like an automated
25  weekly report that just comes out; or you can have some

1  sort of standard report form that you can trigger when
2  you want to --
3      A. Yes.
4      Q. -- or you can simply go in and construct a
5  search at any time for specific information?
6      A. For ad hoc reports, yes.
7      Q. And do you do all three of those things?
8      A. We do have some reports set up for different
9  things, you know. It's really, you know, Coremetrics is
10  our partner to keep the finger on the pulse, if you
11  will, for the on-line business.
12     Q. So it's really just depending on what your
13  needs are, you either automate a report or you just do
14  it ad hoc?
15     A. Correct.
16     Q. How big a company is Coremetrics? Do they
17  provide services to a lot of people?
18     A. They are, I would say, the leader in the web
19  analytic space.
20         If you go to their website, I am sure
21  they have got a partial client list you can take a
22  look at.
23     Q. Quite a business.
24         (Mark'd for identification
25         was Deposition Exhibit No. 24)

1      Q. (BY MR. PAGE) Let me show you. Exhibit 24
2  is another Coremetrics report sent from Coremetrics
3  to Mr. Katzman on May 11th, 2006, ABWF009026 through
4  30.
5          Can you tell me what this report is?
6      A. It looks like another report that Mr. Katzman
7  had set up to e-mail him. It looks like e-mail him
8  or actually just send it to his Yahoo e-mail.
9      Q. I see. And is this report details on R.O.I.
10  and other figures for all of your branding keywords
11  for the period 5-1-2006 through 5-10-2006?
12     A. It appears to be the case, looking at this
13  document.
14     Q. If you could look at -- the last two pages list
15  average cost per click and average position for the
16  various keywords for this period.
17         Again, you have to keep flipping back and
18  forth, because it's a spreadsheet; but do those cost per
19  click for these branding keywords appear typical to you,
20  or is there anything that looks out of the ordinary?
21     A. No. I would say it looks pretty typical.
22     Q. There is nothing in there that goes, god,
23  that's not normal? It's not a trick question. I don't
24  see anything I think is, if that helps.
25     A. No. It's -- you know, when it's paired off

1  like this, no, it does not look abnormal.
2          I would say -- you know, let me see what
3  this sale, J 12, average position, 7.64.
4      Q. Yeah. I believe -- check me if I'm wrong but I
5  believe that's your grand total of all campaigns as
6  opposed to branding?
7          I think 13 is the average for all
8  branding.
9      A. Okay.
10     Q. Does that match your understanding?
11     A. Yeah. That seems, I would say, a little high,
12  though, for average position for the overall campaign
13  during the time period.
14     Q. High meaning, typically, your placement is
15  better than that?
16     A. Average position overall. Again, we have over
17  7,000 keywords in the program. An average position
18  changes, you know, by keyword obviously but, overall, I
19  would say we -- I would say we are closer to an average
20  position overall of around position 5.
21     Q. So, by higher, you mean higher numerically than
22  average?
23     A. Yes.
24     Q. Not higher on the page?
25     A. Higher numerically. So 7.64 is, obviously,

Page 178

1 higher than average 5.
2    Q. And is 1.34 pretty average for the position on
3 the branding keywords?
4    A. That does seem a little bit low; but, again,
5 that position, average position, changes accordingly
6 to the keyword.
7        I don't think this report also shows
8 content match keywords or activity. That's separate.
9    MR. PAGE: I'll tell you something later.
10 Let me mark as Exhibit 25.
11        (Mark'd for identification
12        was Deposition Exhibit No. 25.)
13    Q. (BY MR. PAGE) Exhibit 25 is another
14 Coremetrics report, also from Thursday, May 11th, to
15 Mr. Katzman.
16        It's ABWF009128 through 134 and the
17 subject, Same Day Sales 2, number 2, Trending, Google
18 and MSN.
19        Have you seen this document before?
20    A. No, I haven't.
21    Q. Have you seen reports of this format?
22    A. Sure.
23    Q. What does the graph on this second page
24 represent?
25    A. A lot of lines.

Page 179

1    Q. And what do those lines tell a user or a
2 reader?
3    A. That this is a very difficult report to read,
4 don't look at it. I can't read this graph, especially
5 in black and white.
6    Q. Infinite information and no information tend to
7 be synonymous.
8    A. It looks to me what this table below is,
9 though, is the search engine and then the category.
10    Q. For each day between February 10th and
11 May 10th?
12    A. That's what it looks like to be, yes.
13    Q. I see, and the dollar amounts reflected, are
14 those sales attributable to each category for each day
15 as opposed to ad spend?
16    A. Yes. Actually, on the left side of this chart,
17 there is something I can read. It says sales, same
18 session on the left.
19    Q. I see. So this is tracking daily sales coming
20 from people who click through on ads on Yahoo and Google
21 in each of these categories that day but not tracking
22 subsequent revisit sales; is that correct?
23    A. Actually, it's only same session sales. So,
24 let's give you a quick example.
25        If I clicked right now, I closed my

Page 180

1 browser and I come back 10 minutes from now, that would
2 show up as one.
3    Q. I see. So, in other words, if you bought
4 something in the session 10 minutes from now, it would
5 not reflect -- it would not be counted, if that session
6 ten minutes from now wasn't as a result of coming
7 through an ad?
8    A. I believe that's the case in this report.
9    Q. So, basically, it's a report that doesn't have
10 to go track cookies and figure out subsequent history?
11    A. How the same session works is just again the
12 same session. It doesn't pick up concurrent activity.
13    Q. Okay. Is there -- do you have any reason to
14 think any of the data in this report is inaccurate?
15    A. No reason to believe that it's inaccurate
16 looking at it at a glance. Just so you are clear, too,
17 this does not include any off-line sales. It's just
18 same session cart sales, shopping cart.
19        (Mark'd for identification
20        was Deposition Exhibit No. 26.)
21    Q. (BY MR. PAGE) I show you Exhibit 26, which is,
22 much to your surprise, a Coremetrics report from
23 Thursday, May 11th.
24    MR. GARRITY: A busy day in the
25 Coremetrics household.

Page 181

1    MR. PAGE: Yeah.
2    Q. (BY MR. PAGE) ABWF009135 through 141.
3 Subject: M.T.D. Keyword Conversion Rate Same Session
4 Google and Yahoo.
5        Can you tell me what this report
6 reflects, other than a messy graph?
7    A. It looks similar to the previous report,
8 meaning it looks like it's showing search engine, then
9 the category or the keyword category; and it's showing
10 the conversion rate only again on the same session,
11 conversion rate.
12    Q. And that's essentially C.T.O.? Is that the
13 correct term for it?
14    A. Based in the S.E.O. report, that would be
15 defined at C.T.O.
16    Q. So it's the percentage of visits that turn into
17 sales?
18    A. It's the percentage of visits that convert into
19 an order. It's not sales dollars.
20    Q. Right.
21    A. Okay.
22    Q. So it's the percentage of the people who
23 actually complete an order in that session?
24    A. Correct.
25    Q. And, again, this does not include telephone

Page 182

1 follow on or later sessions?
2     A. Correct.
3     Q. And is it typical that your branding campaigns
4 have much better conversion rates than your other
5 campaigns?
6     A. Absolutely, without a question.
7     Q. And that's true on both Google and Yahoo?
8     A. And MSN. It's not here, actually. Yes.
9     Q. Okay. All right. Have you ever done a
10 comparison of branding campaign results between Yahoo
11 and Google?
12     A. To my knowledge, not a specific comparison. We
13 may have over the years. I don't recall.
14     Q. So do you know whether your R.O.I. is better
15 on branding campaigns on Google or Yahoo?
16     A. Off the top of my head, I couldn't tell you
17 that.
18          Obviously, the data exists. I would
19 tell you that the best converting search engine for us
20 is MSN.
21     Q. Is that uniform over different campaigns?
22     A. Overall, at the program level.
23     Q. So MSN converts better on both branding and
24 non branding campaigns?
25     A. Yeah, at the program level. I haven't looked

Page 183

1 at it per se at the branding versus branding across
2 engine level.
3     Q. Do you have an understanding as to why MSN
4 converts better than Google or Yahoo?
5     A. It's really a different user group, different
6 audience that uses MSN versus Google versus Yahoo.
7     Q. Is there something about the MSN user group
8 that leads it to be -- to have a better conversion
9 rate?
10     A. I am not MSN. I really can't answer that.
11     Q. I am just wondering if you had any idea about
12 it. It seems like an interesting phenomenon.
13     A. Again, it's a different user group.
14          A.O.L. is a different user group
15 altogether as well. It's an older generation, you know,
16 people that need a little more hand-holding potentially.
17          MR. PAGE: The residents of the land of
18 the flashing 12, yeah. You want a portrait of the
19 A.O.L. user, my mom.
20          MR. GARRITY: I was just going to say, my
21 oxygenarian parents, who forget their log-in I.D. every
22 week.
23          MR. PAGE: And probably not because they
24 change it.
25          MR. GARRITY: No. The old gray cells

Page 184

1 just aren't what they used to be.
2          MR. PAGE: Mark as Exhibit 27.
3          (Mark'd for identification
4          was Deposition Exhibit No. 27.)
5     Q. (BY MR. PAGE) Exhibit 27 is a multi-page
6 document, ABWF49243 through 285, which is a Complaint
7 in the matter of American Blind and Wallpaper Factory,
8 Inc., versus Blindsforless.com, L.L.C., doing business
9 as WindowtreatmentsUSA.com.
10          Are you familiar with
11 WindowtreatmentsUSA.com?
12     A. That may have been one in, again, the boxes
13 that I went through; but, no, I am not familiar with
14 that one in particular.
15     Q. This was -- I think it was very recent.
16          This complaint is dated less than a month
17 ago, July 10th, 2006.
18          Does that refresh your recollection at
19 all as to whether you know anything about this
20 lawsuit?
21     A. No. Again, I am involved in -- as an
22 individual marketing. Legal affairs are run through
23 our CEO and our outside counsel.
24     Q. I was just wondering if this happened to be --
25 whether this was a -- were you involved at all in

Page 185

1 locating the allegedly infringing website?
2     A. I may have sent this screen shot and done the
3 screen shot capture.
4     Q. Do you know one way or the other?
5     A. I may have.
6     Q. Okay. Have you ever had any communication
7 with anyone at either blindsforless.com or
8 windowtreatmentsUSA.com?
9     A. No, I have not.
10     Q. Okay. Other than the surveys that we discussed
11 earlier today, are you aware of any market research,
12 consumer surveys, or consumer studies that American
13 Blind has conducted related to any of its trademarks?
14     A. The three Kaden studies that we talked about
15 earlier today, the Michael Layne, the American Wallpaper
16 study, those are all that I am aware of.
17     Q. When you say the Michael Layne, you're
18 referring to the survey on the website that would
19 concern what people were looking for when they search
20 for American Wallpaper?
21     A. Yes.
22     Q. That's what you meant by the Michael Layne
23 one?
24     A. Yes.
25     Q. Other than those, are you aware of any surveys

82fe5069-57cc-4387-80e6-78261c1e0b7f

1  that American Blind has conducted concerning anything to
2  do with its trademarks?
3      A. No.
4      Q. Other than -- we discussed various affiliates
5  that you have through Commission Junction.
6          Do you have any affiliates, other than
7  Commission Junction affiliates?
8      A. Define affiliates.
9      Q. Okay. Anyone who receives a commission as a
10 result of directing traffic to your website?
11     A. Yes.
12     Q. Other than Commission Junction, what affiliates
13 do you have?
14     A. Target, Linens and Things. The third one would
15 be Entertainment -- Entertainment Publishing.
16     Q. What is Linens and Things?
17     A. Linens and Things is a retailer. We have a
18 kiosk presence in over 500 stores across the country.
19 We have kiosk displays in their stores, which may be a
20 wooden kiosk display that has different styles or types
21 of blinds so customers can go and feel what they are
22 looking for.
23         We have got -- we have catalog bins and
24 fliers as well inside of Linens and Things stores, over
25 500 stores across the country, with, as you walk into

1  the store, it's in primarily the window area of the
2  store as well as the bedding area of the store.
3  That's a value add for their guests.
4          It's displayed in the store as well as on
5  the co-brand catalogs that we have them -- that Linens
6  and Things partners with American Blinds, Wallpaper and
7  More.
8      Q. And these kiosks, do they include some sort of
9  computer for which people can place orders?
10     A. No. They are not electronic kiosks.
11     Q. They are just display?
12     A. They are display kiosks and catalog bins that
13 drive people to go on line as well as to call an 800
14 number. We also do on-line marketing with them as
15 an exchange.
16         So on Linens and Things website, which is
17 owned through dot com, as an example, you will see us in
18 multiple places on their website; and they are also on
19 our website.
20         We've also done a number of other
21 programs with them, such as package insert programs.
22         So we have an insert piece, a paper
23 insert piece, which has sometimes over the years been
24 a co-branded catalog.
25         It sometime has been an insert piece with

1  them that, as an example, talks about the relationship;
2  and it positions us as their featured partner.
3          So if an order transacts on Linens and
4  Things website, our insert piece is actually placed
5  inside of their packages with the packing slip.
6      Q. I see.
7      A. We have done credit card programming inserts
8  with them as well, new mover program inserts, store
9  announcements that we have actually gone out to their
10 stores and met with key store managers in the morning
11 and did a kind of rah-rah, fire-up session of, this is
12 who we are; and this is the value ad to your guests.
13         So it's a good relationship.
14     Q. Other than your Commission Junction affiliates,
15 Target, Linens and Things, and Entertainment, do you
16 have other affiliates?
17     A. Again, affiliates being --
18     Q. People who you pay one way or another to direct
19 traffic to your website.
20     A. At this point in time, again, Target is the
21 other one. I don't know if I mentioned them. We are
22 on target.com's site.
23         So if you are searching for window
24 treatments or window coverings on Target, you are gonna
25 see our banner, our featured partner page in their

1  website. We also have custom blinds. We power all
2  their custom blinds on their website.
3      Q. Other than -- any other affiliates you can
4  think of?
5      A. Not as I sit here today.
6          MR. PAGE: Tape changing time
7          THE VIDEOGRAPHER: Off the record,
8  3:43:42 p.m.
9          (Recess taken.)
10         THE VIDEOGRAPHER: Back on the record,
11 3:52:14 p.m.
12     Q. (BY MR. PAGE) Other than affiliates,
13 does American Blind license its trademarks to
14 anyone?
15     A. Yes, our marketing partners. I alluded to
16 some of them earlier, such as G.M.A.C. Real Estate, the
17 credit card issuers, Visa, Discover, Master Card,
18 Infibank, which is Infistar, yeah, a number of our
19 marketing partners, absolutely.
20     Q. You have a custom blind line that you refer to
21 as American Brand, correct?
22     A. Correct.
23     Q. If I buy -- if I buy a blind from that line --
24     A. Uh-huh.
25     Q. -- what name is on the box?

Page 190

1    A. What name is on the box?
2    Q. Yeah. I mean, how is it branded when it comes
3 in the mail?
4    A. It definitely says -- the blinds is American
5 Blinds. I believe there is a sticker, even on the
6 bottom of the blind, to help you, and further assist
7 you, if you have got any questions; and you know for
8 sure it's American Blinds.
9    Q. Okay. So it doesn't say American Brand?
10 That's just what you call it?
11    A. Well, see, American Brand -- American Brand is
12 a significant part of our business; and there is brand
13 equity in American Brand blinds, no question about it.
14       American Brand blinds, for example,
15 accounts for, roughly, 41 percent of our total business
16 and 60 percent of all of our blind sales.
17       There is significant equity built in
18 American Brand. It's in our catalogs. It's on our
19 website. We have jump pages for it, e-mail campaigns.
20 Affiliates promote American Brand in some cases to pick
21 up the data fee.
22    Q. What I am trying to get at is whether, in fact,
23 as a customer, I see the word American Brand or whether
24 I see the words American Blind when I purchase an
25 American Brand blind?

Page 191

1       In other words, is American Brand the
2 name you put on the box; or is that something you refer
3 to it as internally when you are referring to blinds
4 that are trade marked American Blind?
5    A. I think our customers definitely when they
6 buy American Brand, they will call it American Brand
7 blinds. In their mind's eye, it's painted American
8 Brand blinds. I don't know what else to tell you.
9    Q. Yeah, I'm confused now. Let's go back. I go
10 on your website. I buy an American Brand blind.
11    A. Okay.
12    Q. It comes in a box, right?
13    A. Correct.
14    Q. What does the box say?
15    A. The boxes --
16    Q. Does it say American Blind and Wallpaper
17 Factory, does it say American Blind, or does it say
18 American Brand blinds?
19    A. You know, I don't know the answer to that, to
20 be honest with you. It's a private label and we have
21 different vendors for our own private label.
22       On the packing slip inside the box, it
23 will say American Brand. So, for example, American
24 Brand two-inch mini. So, yes, there is --
25    Q. I see. As a part description?

Page 192

1    A. As a part description, product I.D., whatever
2 you want to call it.
3    Q. Will there be a logo on the packing slip?
4    A. There should be a logo on the packing slip,
5 yes.
6    Q. Do you know what it is?
7    A. It's, I believe, American Blinds. That's my
8 understanding as we sit here today.
9    Q. Okay, okay. Your -- I think we covered this
10 this morning. Your current policy with affiliates is
11 that for a select set of affiliates, they are permitted
12 to key advertisements on Google off of your trademarks,
13 correct?
14    A. They are allowed -- a select group of our
15 affiliates, search affiliates, are allowed on Google
16 only to flush out competitors to bid on our select
17 group of brand keywords.
18    Q. Okay, and you do not permit them to do that on
19 other search engines?
20    A. Correct.
21    Q. Are they permitted to use the -- use your
22 branding keyword terms in the text of their
23 advertisements?
24    A. Are they permitted to use our branding keyword
25 terms in the text?

Page 193

1    Q. Yeah.
2    A. Yes.
3    Q. Is that true of any affiliate?
4    A. Affiliates are allowed to use the name, our
5 marks; and that's the license agreement with them.
6    Q. Other than your search affiliates, is anyone
7 else permitted by American Blind to use your branding
8 terms in the text of advertisements on Google?
9    A. No, no one is permitted outside of that core
10 group of affiliates to do that.
11    Q. And when you say core group of affiliates, are
12 you referring to that select group, they can use it as a
13 keyword, or the larger group of affiliates that can use
14 your brands in the text of their ads?
15    A. Again, the five or six that are allowed to bid
16 on our brand keywords, that's who I am referring to when
17 I said core.
18    Q. Right, but the larger universe of affiliates is
19 permitted to use your trademark terms in the text of
20 ads, correct?
21    A. Paid?
22    Q. Yes.
23    A. Yes, they are.
24    Q. If you could take a look at Curran Exhibit 4,
25 which is somewhere in one of the many piles, it's a

Page 194

1 single page.
2     A. Okay.
3     Q. Have you seen Curran Exhibit 4 before?
4     A. Yes, I did see it during this week.
5     Q. And does the top section of Curran 4 accurately
6 report the total number of visitors to American Blind's
7 website for each of the month's listed?
8     A. It's total sessions. So you would probably say
9 that's closer to total visits than visitors.
10     Q. I see. So, in other words, if an individual
11 visited twice in June, it would count two here, rather
12 than one because it was a unique visitor?
13     A. I would have to go back to the individual who
14 constructed this report to see if that's an accurate
15 statement.
16     Q. You don't know one way or the other?
17     A. Off the top of my head, I don't.
18     Q. Jeff, do you know if you guys have produced
19 anything other than this for total visits?
20     THE WITNESS: Jeff or Paul?
21     MR. PAGE: Paul.
22     MR. GARRITY: Oh, I'm sorry. The reason
23 why I didn't look up -- no problem.
24     MR. PAGE: Bad time.
25     MR. GARRITY: I believe that this is it,

Page 195

1 but, I mean, I can certainly -- I can go back and
2 confirm that, though. That's my belief.
3     In what I have gone through, which is a
4 lot in the last few, two weeks or three weeks or so, I
5 have not seen anything beyond this.
6     MR. PAGE: Neither have I.
7     THE WITNESS: We get roughly 30 to 35,000
8 unique visits a day to the website. So these numbers do
9 look like a fair representation.
10     Q. (BY MR. PAGE) And do you know, on the second
11 section on this spreadsheet, are the shopping cart
12 sales, are these dollars or number of sales?
13     A. They appear to be sales.
14     Q. Sales?
15     A. Sales dollars.
16     Q. Sales dollars. In other words, so, for
17 instance, the three million and change in the last
18 month on here for 2006 would be three million dollars,
19 not three million individual sales?
20     A. Correct. Again, that's just shopping cart
21 sales.
22     Q. All right. And is the next -- and the next
23 section at the bottom is -- represents -- strike that.
24     Does the bottom section represent
25 shopping cart sales plus related sales?

Page 196

1     A. That's my understanding of this document, yes.
2     Q. And the related sales are sales through
3 the 800 number that's posted on the website; is that
4 correct?
5     A. It's probably an 800 number, 800 numbers that
6 we have set up for internet programs.
7     Q. To the best of your knowledge, are these true
8 and correct figures?
9     A. Yes.
10     MR. PAGE: Let's take a short break.
11     THE VIDEOGRAPHER: Certainly. Off the
12 record, 4:05:22 p.m.
13     (Recess taken.)
14     THE VIDEOGRAPHER: Back on the record,
15 4:12:40 p.m.
16     MR. PAGE: With the caveat that we
17 reserve the right to recall this witness in the event
18 additional documents relevant to his testimony are
19 produced, I have no further questions.
20     MR. GARRITY: I will just reserve --
21 certainly reserve our right to object on whether or
22 not this witness needs to be recalled with respect
23 to any additional documents that might be produced.
24     With that being said, thanks very much,
25 Mike, and thanks to the witness.

Page 197

1     THE VIDEOGRAPHER: That concludes the --
2     MR. PAGE: I'm sorry.
3     THE VIDEOGRAPHER: Oh, I'm sorry. Go
4 ahead.
5     MR. PAGE: A couple of housekeeping
6 items. You were going to check whether you have any
7 additional documents related to surveys that hadn't
8 been produced.
9     MR. GARRITY: The review of the drop-off
10 by affiliates?
11     MR. PAGE: Right. That's right.
12     MR. GARRITY: Yeah. Absolutely.
13     MR. PAGE: And, also, there was one
14 document, whose exhibit number I don't have in front
15 of me, that had a number of redacted pages; and you
16 were going to find out what the basis was for that
17 redaction since we haven't gotten any log on it.
18     MR. GARRITY: I'm sorry. I didn't
19 realize -- I am glad you reminded me on that.
20     Yes, we will be happy to get back to you
21 on that.
22     MR PAGE: Great. All right. Great.
23     THE VIDEOGRAPHER: That's it? That
24 concludes today's deposition of Mr. Jeffrey A. Alderman.
25 Off the record, 4:14:10 p.m.

82fe5069-57cc-4387-80e6-78261c1e0b7f

Page 198

```
 1          (The deposition concluded
 2          at or about 4:15 p.m.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 200

```
 1
 2
 3          I further certify that I am not Of
 4  Counsel to either party nor interested in the event of
 5  this cause.
 6
 7          _____
 8          Lana Kia Haws, CM, RPR, CSR-0995
 9          Notary Public
10          State of Michigan
11          County of Oakland
12          Acting in the County of Wayne
13
14
    My Commission Expires:
15
    September 29, 2011
16
17
18
19
20
21
22
23
24
25
```

Page 199

```
 1
 2          CERTIFICATE OF NOTARY
 3
 4
    STATE OF MICHIGAN   )
 5                      ) ss.
 6  COUNTY OF OAKLAND   )
 7
 8          I, Lana Kia Haws, Certified
 9  Shorthand Reporter and Notary Public in and for the
10  above county and state, do hereby certify that the
11  deposition of JEFFREY A. ALDERMAN was taken before me
12  at the time and place hereinbefore set forth; that
13  the witness was by me first duly sworn to testify
14  to the truth, the whole truth and nothing but the
15  truth; that thereupon the foregoing questions were
16  asked and foregoing answers made by the witness
17  which were duly recorded by me stenographically and
18  later reduced to computer transcription; and I certify
19  that this is a true and correct transcript of my
20  stenographic notes so taken.
21
22
23
24
25
```

82fe5069-57cc-4387-80e6-78261c1e0b7f